**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| VERVICIA HENDERSON, on behalf of herself and as personal representative of CRAIG HENDERSON; DEBORAH REESE, on behalf of herself and as personal representative of MARIE OUTING; RICHARD EIDEMILLER, on behalf of himself and acting as personal representative of CHRISTINE EIDEMILLER; PATRICIA RAMSEY; BRENDA JACKSON, on behalf of herself and as personal representative of CLIFFORD REYNOLDS JR.; EMILIO SAN MARTIN; ERIC RUTLEDGE; WENDY STONE; TOM STONE; KEVIN KIELY; KRISTEN SHEEN; BRENDAN HAVENS; JEFF KOZAK; BRIAN SLUSARZ; KRISTI HUJIK; HELEN TOSTI; JOHN TOSTI; ERIC SAPERSTEIN; ANA SAPERSTEIN;  ARI SAPERSTEIN; JORDAN SCHURSKY; AUBREY CARP; HARRISON CARP-SCHURSKY; LAURA JUDA; MARK JUDA; ANDREW EBERT; BRENDA WHITE; DONALD GOERTZ; JENNIFER JOHNSON; DREW JOHNSON; BENJAMIN JOHNSON; PATRICIA ANDERSON; ARTHUR ANDERSON; DAVID BERRY; ADAM BRACKETT; ELIZABETH BRACKETT; MEREDITH BRUNELLE; JUSTIN BRUNELLE; DONNA DE MILT; VICTOR GOLDSCHMIDT; ELAINE GOLDSCHMIDT; LOGAN GOODSON; MICHAEL L. IACOVINO; DAWN IACOVINO; MICHAEL D. IACOVINO; MORGAN INNES; ANDREW INNES; BRIAN KEMP; KELLY KEMP; NAOYUKI KOMATSU; NAHO KOMATSU; RYO KOMATSU; MICHAEL MCGARRY; ANN MCGARRY; JEFFREY MUDDELL; STEPHANIE MUDDELL; RENEE ROSS; | Case No.:  6:21-cv-01363-RBD-DCI<br><br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

WILLIAM SIEGRIST; AMANDA
SIEGRIST; AUSTIN SIEGRIST; CRISTINA
TURK; JACK TURK; and THEODORE
TURK;

                Plaintiffs,

v.

LOCKHEED MARTIN CORPORATION; and
UNIVERSAL CITY PROPERTY
MANAGEMENT COMPANY III, LLC;

                Defendants.

Plaintiffs Vevicia Henderson, on behalf of herself and as personal representative of Craig Henderson, Deborah Reese, on behalf of herself and as personal representative of Marie Outing, Richard Eidemillier, on behalf of himself and as personal representative of Christine Eidemiller, Patricia Ramsey, Brenda Jackson, on behalf of herself and as personal representative of Clifford Reynolds Jr., Emilio San Martin, Eric Rutledge, Wendy Stone, Tom Stone, Kevin Kiely, Kristen Sheen, Brendan Havens, Jeff Kozak, Brian Slusarz, Kristi Hujik, Helen Tosti, John Tosti, Eric Saperstein, Ana Saperstein, Ari Saperstein, Jordan Schursky, Aubrey Carp,  Harrison Carp-Schursky, Laura Juda, Mark Juda, Andrew Ebert, Brenda White, Donald Goertz, Jennifer Johnson, Drew Johnson, Benjamin Johnson, Patricia Anderson, Arthur Anderson, David Berry, Adam Brackett, Elizabeth Brackett, Meredith Brunelle, Justin Brunelle, Donna De Milt, Victor Goldschmidt, Elaine Goldschmidt, Logan Goodson, Michael L. Iacovino, Dawn Iacovino, Michael D. Iacovino, Morgan Innes, Andrew Innes,  Brian Kemp, Kelly Kemp, Naoyuki Komatsu, Naho Komatsu, Ryo Komatsu, Michael McGarry, Ann McGarry, Jeffrey Muddell, Stephanie

Muddell, Renee Ross,  William Siegrist, Amanda Siegrist, Austin Siegrist, Christina Turk, Jack Turk, and Theodore Turk, ("Plaintiffs") sue Defendants Lockheed Martin Corporation and Universal City Property Management Company III, LLC ("Defendants") and, based on personal knowledge and on investigation of counsel and review of public documents and information, allege as follows:

## **INTRODUCTION**

1.      Plaintiffs bring this action against Lockheed Martin Corporation ("Lockheed Martin"), the owner and operator of weapons manufacturing facilities at 5600 Sand Lake Road, Orlando, FL 32819 ("Orlando Facility"), for damages resulting from Lockheed Martin's dangerous and reckless mismanagement of extremely hazardous toxins, including but not limited to, heavy metals, persistent environmental pollutants, and Volatile Organic Compounds ("VOC").

2.      Lockheed Martin's dangerous failures at the Orlando Facility occurred over decades. The Orlando Facility manufactures weaponry and associated components and began operations in 1957. The operations at the Orlando Facility utilize chemicals that are among the most toxic to human health on earth, and require the utmost care and handling.

3.      Instead of carefully managing these toxins from the moment they arrived at the facility, and ensuring they were properly used, stored, and disposed of, Lockheed Martin stored toxins in leaking storage tanks, collected and transported waste materials in leaking underground piping systems, and dumped thousands of tons of highly toxic waste sludges into trenches dug throughout the Orlando Facility.

4.      Lockheed Martin's stunning indifference to environmental protection and human health resulted in staggering levels of contamination at the Orlando Facility. For instance, the EPA has set a regulatory limit of 5 parts per billion, and a goal of 0 parts per billion ("ppb"), for contaminants such as methylene chloride and trichloroethylene. Trichloroethylene has been detected in concentrations as high as 386,000 ppb in groundwater under the Orlando Facility. Methylene Chloride has been detected in concentrations as high as 213,600 ppb in groundwater under the Orlando Facility.

5.      Trichloroethylene and methylene chloride, like many of the contaminants Lockheed Martin dumped into the soil and groundwater at the Orlando Facility, are artificial chemicals that do not occur naturally. They are known as Volatile Organic Compounds because they are unstable and vaporize into the air from contaminated soil and groundwater. Once these chemicals are airborne, they can be inhaled and cause profoundly harmful effects to the human body.

6.      The contaminants Lockheed Martin dumped into soil, air and groundwater at the Orlando Facility damage virtually every human bodily system. These contaminants have intense effects on the central nervous system, cause blood disorders, are toxic to the liver, kidneys, skin, heart, and the immune system. These contaminants damage the respiratory system, skeletal system, reproductive system, and endocrine system, and cause birth defects and developmental disorders.

7.      Many of the contaminants Lockheed Martin dumped into soil, air and groundwater at the Orlando Facility are powerful carcinogens and cause a wide array of different cancers.

8.      The contaminants Lockheed Martin dumped into soil, air and groundwater at the Orlando Facility are harmful to humans through any route of exposure. They will damage human health if they are inhaled, swallowed, or touch the skin.

9.      The severe and widespread contamination at the Orlando Facility poses extreme risks to those who live and work nearby. Residents and workers in the area, including Plaintiffs, have been exposed to this contamination by activities that cause contaminated soils to become airborne and move offsite. Due to the volatile nature of the contaminants originating from the Orlando Facility, residents and workers nearby, including Plaintiffs, have also been exposed to contaminants that have off-gassed from the soil and groundwater.

10.     After creating an environmental nightmare at the Orlando Facility, Lockheed Martin's subsequent efforts to treat contaminated soil and groundwater at the Orlando Facility have perversely increased the risks of exposure and harm to those working and living nearby.

11.     Lockheed Martin installed numerous packed tower air strippers and air sparge systems designed to separate contaminants from millions of gallons of groundwater. Likewise, several soil vapor extraction systems were installed to remove contaminants from millions of tons of soil.

12.     These air strippers, air sparge systems, and soil vapor extraction systems do not destroy the contaminants, they merely induce a phase change which causes the pollutants to become gaseous. To protect residents and workers nearby from exposure, the

air strippers and soil vapor extraction systems would have to collect the gaseous toxins in sealed collection systems.

13.     Astonishingly, Lockheed Martin failed to contain the gaseous toxins extracted from the soil and groundwater treatment systems, but instead expelled concentrated amounts of these harmful chemicals directly into the air that Plaintiffs breathed.

14.     In doing so, Lockheed Martin addressed a situation which was already hazardous to Plaintiffs, and other people working and living nearby, by recklessly increasing their risks and the amounts of exposure to the contamination at the Orlando Facility.

15.     Throughout all relevant times, Lockheed Martin also continued to engage in manufacturing operations at the Orlando Facility that caused numerous additional tons of hazardous air pollutants and VOCs to enter the air every year and be inhaled by Plaintiffs.

16.     Over the years, Lockheed Martin sold certain parcels of the Orlando Facility, and near to the Orlando Facility, for redevelopment, further increasing the number of individuals who would be exposed to Lockheed Martin's contamination. After selling these parcels, Lockheed Martin remained responsible for and continued to engage in activities that caused its contamination in soil and groundwater to become airborne and inhaled by Plaintiffs.

17.     NBCUniversal Media LLC acquired certain contaminated parcels at the Orlando Facility previously owned by Lockheed Martin through its wholly owned subsidiary Universal City Property Management Company III. After acquiring these parcels at the Orlando Facility, these Universal entities engaged in a joint venture with Lockheed

6

Martin to continue the same and similar contamination activities, including air stripping, air sparging, and vapor extraction activities, on these parcels. These joint activities by the Universal entities and Lockheed Martin increased Plaintiffs' exposures to Lockheed Martin's toxic wastes.

18.     Plaintiffs come now seeking damages relating to the lifechanging and debilitating diseases they have suffered as a result of their exposure to contaminants released from Lockheed Martin's Orlando Facility.

## PARTIES

19.     Plaintiff Vervicia Henderson is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

20.     Additionally, Plaintiff Vervicia Henderson is the surviving spouse and personal representative of the estate of Craig Henderson, who was exposed to, and consumed, harmful levels of Lockheed Martin's contamination and suffered the injuries alleged herein.

21.     Potential beneficiaries of a recovery for wrongful death of Craig Henderson, and their relationship to the deceased, are identified as follows:

> a.  The Estate of Craig Henderson c/o Vervicia Henderson, as Personal Representative of the Estate of Craig Henderson;
>
> b.  Vervicia Henderson, wife and survivor of Craig Henderson pursuant to the Florida Wrongful Death Act.

22.     Plaintiff Deborah Reese is a citizen of Georgia and lives in DeKalb County, Georgia. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

23.     Additionally, Plaintiff Deborah Reese is the surviving daughter and personal representative of the estate of Marie Outing, who was exposed to, and consumed, harmful levels of Lockheed Martin's contamination and suffered the injuries alleged herein.

24.     Potential beneficiaries of a recovery for wrongful death of Marie Outing, and their relationship to the deceased, are identified as follows:

   a. The Estate of Marie Outing c/o Deborah Reese, as Personal Representative of the Estate of Marie Outing;

   b. Deborah Reese, daughter and survivor of Marie Outing pursuant to the Florida Wrongful Death Act;

   c. Michael Outing, David Outing, Darryl Outing, and Johnny Outing Jr., sons and survivors of Marie Outing pursuant to the Florida Wrongful Death Act.

25.     Plaintiff Richard Eidemiller is a citizen of Florida and lives in Brevard County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

26.     Additionally, Plaintiff Richard Eidemiller is the surviving spouse and personal representative of the estate of Christine Eidemiller, who was exposed to, and

consumed, harmful levels of Lockheed Martin's contamination and suffered the injuries alleged herein.

27.     Potential beneficiaries of a recovery for wrongful death of Christine Eidemiller, and their relationship to the deceased, are identified as follows:

    a.  The Estate of Christine Eidemiller c/o Richard Eidemiller, as Personal Representative of the Estate of Christine Eidemiller;

    b.  Richard Eidemiller, husband and survivor of Christine Eidemiller pursuant to the Florida Wrongful Death Act;

    c.  Gail Orth and Charles Orth, parents and survivors of Christine Eidemiller pursuant to the Florida Wrongful Death Act;

    d.  Jayda Eidemiller, daughter and survivor of Christine Eidemiller pursuant to the Florida Wrongful Death Act.

28.     Plaintiff Patricia Ramsey is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

29.     Plaintiff Brenda Jackson is a citizen of Maryland and lives in St. Mary's County, Maryland. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

30.     Additionally, Plaintiff Brenda Jackson is the surviving daughter and personal representative of the estate of Clifford Reynolds Jr., who was exposed to, and consumed, harmful levels of Lockheed Martin's contamination and suffered the injuries alleged herein.

31.     Potential beneficiaries of a recovery for wrongful death of Clifford Reynolds Jr,, and their relationship to the deceased, are identified as follows:

      a.  The Estate of Clifford Reynolds Jr. c/o Brenda Jackson, as Personal Representative of the Estate of Clifford Reynolds Jr.;

      b.  Brenda Jackson, daughter and survivor of Clifford Reynolds Jr. pursuant to the Florida Wrongful Death Act;

      c.  Rosie Wingater, surviving spouse and survivor of Clifford Reynolds Jr. pursuant to the Florida Wrongful Death Act.

32.     Plaintiff Emilio San Martin is a citizen of Texas and lives in Travis County, Texas. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

33.     Plaintiff Eric Rutledge is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

34.     Plaintiff Wendy Stone is a citizen of Florida and lives in Lake County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been

exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

35.     Plaintiff Tom Stone is a citizen of Florida and lives in Lake County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

36.     Plaintiff Kevin Kiely is a citizen of Pennsylvania and lives in Allegheny County, Pennsylvania. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

37.     Plaintiff Kristen Sheen is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

38.     Plaintiff Brendan Havens is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

39.     Plaintiff Jeff Kozak is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

40.     Plaintiff Brian Slusarz is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

41.     Plaintiff Kristi Hujik is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

42.     Plaintiff Helen Tosti is a citizen of Oklahoma and lives in Carter County, Oklahoma. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

43.     Plaintiff John Tosti is a citizen of Oklahoma and lives in Carter County, Oklahoma. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

44.     Plaintiff Eric Saperstein is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of himself and his minor child Ari Saperstein.

45.     Plaintiff Ana Saperstein is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been

exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor child Ari Saperstein.

46.    Plaintiff Ari Saperstein is a minor child and citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

47.    Plaintiff Jordan Schursky is a citizen of New York and lives in Richmond County, New York. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of himself and his minor child Harrison Carp-Schursky.

48.    Plaintiff Aubrey Carp is a citizen of New York and lives in Richmond County, New York. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor child Harrison Carp-Schursky.

49.    Plaintiff Harrison Carp-Schursky is a minor child and citizen of New York and lives in Richmond County, New York. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed

Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

50.     Plaintiff Laura Juda is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

51.     Plaintiff Mark Juda is a citizen of Florida and lives in Orange County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

52.     Plaintiff Andrew Ebert is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

53.     Plaintiff Brenda White is a citizen of Florida and lives in Orange County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

54.     Plaintiff Donald Goertz is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

55.     Plaintiff Drew Johnson is a citizen of Florida and lives in Lake County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been

exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of himself and his minor child Benjamin Johnson.

56.     Plaintiff Jennifer Johnson is a citizen of Florida and lives in Lake County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor child Benjamin Johnson.

57.     Plaintiff Benjamin Johnson is a minor child and citizen of Florida and lives in Lake County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

58.     Plaintiff Patricia Anderson is a citizen of Wisconsin and lives in Brown County, Wisconsin. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

59.     Plaintiff Arthur Anderson is a citizen of Wisconsin and lives in Lake County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

60.     Plaintiff David Berry is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been

exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

61.    Plaintiff Adam Brackett is a citizen of Florida and lives in St. Johns County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

62.    Plaintiff Elizabeth Brackett is a citizen of Florida and lives in St. Johns County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

63.    Plaintiff Meredith Brunelle is a citizen of New York and lives in New York County New York. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

64.    Plaintiff Justin Brunelle is a citizen of New York and lives in New York County, New York. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

65.    Plaintiff Donna De Milt is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

66.    Plaintiff Victor Goldschmidt is a citizen of Florida and lives in Seminole County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has

been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

67.     Plaintiff Elaine Goldschmidt is a citizen of Florida and lives in Seminole County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

68.     Plaintiff Logan Goodson is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

69.     Plaintiff Michael L. Iacovino is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of himself and his minor child Michael D. Iacovino.

70.     Plaintiff Dawn Iacovino is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor child Michael D. Iacovino.

71.     Plaintiff Michael D. Iacovino is a minor child and citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's

contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

72.    Plaintiff Morgan Innes is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

73.    Plaintiff Andrew Innes is a citizen of Florida and lives in Orange County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

74.    Plaintiff Brian Kemp is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

75.    Plaintiff Kelly Kemp is a citizen of Florida and lives in Orange County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

76.    Plaintiff Naoyuki Komatsu is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

77.    Plaintiff Naho Komatsu is a citizen of Florida and lives in Orange County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the

injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor child Ryo Komatsu.

78.     Plaintiff Ryo Komatsu is a minor child and citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

79.     Plaintiff Michael McGarry is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

80.     Plaintiff Ann McGarry is a citizen of Florida and lives in Orange County, Florida. Defendants' operations at the Orlando Facility have caused Plaintiff to suffer the injuries alleged herein.

81.     Plaintiff Jeffrey Muddell is a citizen of Florida and lives in Lee County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

82.     Plaintiff Stephanie Muddell is a citizen of Florida and lives in Lee County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has suffered the injuries alleged herein.

83.     Plaintiff Renee Ross is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

84.     Plaintiff William Siegrist is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of himself and his minor child Austin Siegrist.

85.     Plaintiff Amanda Siegrist is a citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor child Austin Siegrist.

86.     Plaintiff Austin Siegrist is a minor child and citizen of Florida and lives in Orange County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

87.     Plaintiff Cristina Turk is a citizen of Florida and lives in Broward County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This

exposure and consumption has caused Plaintiff to suffer the injuries alleged herein. Plaintiff brings claims on behalf of herself and her minor children Jack Turk and Theodore Turk.

88.     Plaintiff Jack Turk is a minor child and citizen of Florida and lives in Broward County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

89.     Plaintiff Theodore Turk is a minor child and citizen of Florida and lives in Broward County, Florida. Because of Defendants' operations at the Orlando Facility, Plaintiff has been exposed to, and consumed, harmful levels of Lockheed Martin's contamination. This exposure and consumption has caused Plaintiff to suffer the injuries alleged herein.

90.     Defendant Lockheed Martin Corporation is a Delaware corporation with its headquarters and principal place of business at 6801 Rockledge Drive, Bethesda, Maryland 60093. At all relevant times, Lockheed Martin and its predecessors in interest in law and fact owned and operated the Orlando Facility.

91.     Defendant Universal City Property Management Company III, LLC ("UCPM") is a Delaware limited liability company with its headquarters and principal place of business at 45 Ansley Drive, Newnan, Georgia 30263. UCPM acquired portions of the Orlando Facility in December 1998 as a wholly owned subsidiary, alter-ego, and joint venture partner of NBCUniversal Media LLC.

21

## JURISDICTION AND VENUE

92.     Plaintiffs filed this action in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, and assert causes of action arising solely under State law. Plaintiffs have common citizenship with defendants in this action and deny the existence of federal jurisdiction over their claims.

93.     Defendant Lockheed Martin removed this action to the United States District Court for the Middle District of Florida, alleging federal jurisdiction under 28 U.S.C. § 1442(a)(1).

94.     Plaintiffs have contested the validity of Defendant Lockheed Martin's claimed basis for federal jurisdiction, and have filed a motion to remand this action back to Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida.

95.     This is an action to recover damages in excess of $15,000, exclusive of fees, costs, and interest.

96.     The Circuit Court of the Ninth Judicial Circuit in and for Orange County is authorized to exercise personal jurisdiction over each Defendant pursuant to the Florida Long-Arm Statute, Fla. Stat. §§ 48.193(1)(a)(1), (1)(a)(2), and (1)(a)(6), because the causes of action stated herein arise out of each Defendant:

> a.     Operating, conducting, engaging in, or carrying on a business or business venture in Florida or having an office or agency in Florida; and
>
> b.     Committing tortious acts within Florida.

97.     The Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida is authorized to exercise personal jurisdiction over each Defendant pursuant to the

Florida Long-Arm Statute, Fla. Stat. § 48.193(2), because each Defendant is engaged in substantial and not isolated activity within Florida.

98.     The Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida is authorized to exercise personal jurisdiction over each Defendant because each Defendant enjoys such numerous, continuous, significant, and systematic contacts with Florida that each Defendant may fairly be regarded as at home in Florida.

99.     Venue is proper in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida pursuant to Fla. Stat. § 47.051 because:

a.     Defendants Lockheed Martin and UCPM are foreign corporations;

b.     Defendants Lockheed Martin and UCPM have agents or representatives within that venue; and

c.     All causes of action against all Defendants accrued and arose in that venue.

100.     Plaintiffs' claims in this action are brought solely under state law. Plaintiffs do not herein bring, assert, or allege, either expressly or impliedly, any causes of action arising under any federal law, statute, regulation or provision. Thus, there is no federal jurisdiction in this action on the basis of a federal question under 28 U.S.C. § 1331.

101.     Furthermore, Defendants and Plaintiffs share common citizenship. Therefore, there is no federal jurisdiction in this action on the basis of diversity under 28 U.S.C. § 1332.

## STATEMENT OF FACTS

**A.    THE ORLANDO FACILITY**

102.    The Orlando Facility was built and began operations in 1957. The facility was initially owned and operated by the Martin Company, which became Martin Marietta in 1961. In March 1995, Martin Marietta and Lockheed Corp. merged to become Lockheed Martin.

103.    The facility occupies a site approximately 2.5 miles by 1.8 miles between Sand Lake Road to the north, Bee Line Expressway to the south, and Universal Boulevard (formerly known as Republic Drive) to the west. It is approximately a half mile from Sea World and a mile from Universal Studios (see Figure A).



(Figure A—The Orlando Facility)

104.    Throughout the course of its operations, the Orlando Facility has been used to manufacture heavy weaponry and artillery, including nuclear capable Pershing ballistic missiles, nuclear capable Sprint antiballistic missiles, Walleye and Bullpup guided missiles, Lacrosse and Patriot surface to air missiles, and Hellfire air to surface missiles. The facility also produced communications and microelectronics systems, processed and reproduced photographic imagery, and engaged in plating and micro-plating activities. Lockheed Martin serviced and modified helicopters and armored vehicles at the facility and operated a two-mile long laser target range. Other areas of focus at the Orlando Facility include electro-optics, smart munitions, anti-armor, and air defense technologies.

105.    Since beginning operations at the Orlando Facility, Lockheed Martin has been storing, utilizing and disposing of toxic chemicals for process operations. These operations have continued to this day, and result in the generation and emission of numerous tons of hazardous air pollutants and VOCs each year.

## B.    LOCKHEED MARTIN'S TOXIC MISMANAGEMENT

106.    The operations at the Orlando Facility generated dangerous wastes including metal cuttings and scraps, oils and greases, electroplating solutions and sludge, metallic hydroxide sludge, acid and alkali solutions, cyanide, chromate rinse waste, spent acid solutions, waste-cutting oils, and various solvents used to degrease machinery and weaponry. Additionally, the Orlando Facility stored large volumes of chemicals to be used in the facility's operations.

25

107.   The chemicals stored and used at the Orlando Facility, and the wastes generated by the facility's operations, are extremely dangerous to human health. The utmost care and attention is required to ensure that these materials are properly stored, transported, collected, and disposed.

108.   Because of the danger inherent to the toxins used at the Orlando Facility, the risks posed to human health can never be eliminated. However, the risks of exposure can be greatly exacerbated if these toxins are mismanaged, as they were by Lockheed Martin.

109.   Lockheed Martin's storage, transportation, collection, and disposal practices at the Orlando Facility were outrageously and recklessly indifferent to human health.

110.   The Main Plant area, at the northern portion of the Orlando Facility, has been involved in electroplating and waste treatment operations since becoming operational in 1958. The electroplating operations involved heat treatment, vapor degreasing, electro/electroless plating of chromium, copper and nickel into various components, and the chemical conversion coating of aluminum. Wastewater treatment operations consisted predominantly of the treatment of electroplating rinse water.

111.   Since 1958, electroplating operations have included an initial degreasing step which utilized a solvent bath of either trichloroethylene ("TCE") or tetrachloroethylene ("PCE") and 1,1,1-trichloroethane ("Methyl Chloroform"). Cyanide was then used in plating bath operations. Acid and alkaline rinse water wastes from the plating operations were neutralized with concentrated sodium hydroxide or sulfuric acid. Hexavalent chromium was a byproduct of these operations as well. The sludges remaining from these

operations were pumped to a sludge storage tank. Cyanide wastes were transferred to cyanide captive pits and batch tanks.

112.    The initial system design at the Orlando Facility collected plating operation wastes in concrete troughs that transferred the wastes to captive pits. These troughs leaked into underlying soils for many years, perhaps as early as the late 1950's. Further, lines carrying solvents to collection and treatment systems leaked, causing further contamination.

113.    The contamination underneath and surrounding the Main Plant is extensive, both in soil and groundwater. Multiple additional sites of soil and groundwater contamination exist at the facility within close proximity to the Main Plant.

114.    Beginning in 1959, Lockheed Martin received and stored hazardous materials and toxic chemicals at the northwest boundary of the Orlando Facility, adjacent to Sand Lake Road. The hazardous materials and toxic chemicals stored in this area were repeatedly mismanaged by Lockheed Martin, causing the soil and groundwater in this area to become contaminated. Processes undertaken in this area further contributed to the contamination. Lockheed Martin discharged wastes from oil filled transformers, and drained industrial wastewaters and process discharges directly to soil in this area.

115.    Between 1958 and 1964, Lockheed Martin operated an incinerator in an area used for assembling and testing nuclear capable Pershing Ballistic Missiles. This area was also used to dump equipment, printed circuit boards, scrap metal, and toxic contaminants from 1958 to 1998.

116.   From 1958 to 1967, Lockheed Martin dumped 5,180 tons of metallic hydroxide sludge and other hazardous wastes in an unlined 3.5 acre landfill in the central area of the facility.

117.   In the late 1960's and early 1970's, Lockheed Martin dug shallow unlined trenches across 8 acres of land on the west-central portion of the Orlando Facility, and filled the trenches with 1,700 cubic feet of toxic sludge and 3,700 tons of other hazardous wastes.

118.   In the early 1970's, Lockheed Martin dug shallow unlined trenches across 3.5 acres on the western boundary of the Orlando Facility and filled the trenches with 1,200 cubic feet of toxic sludge. Lockheed Martin then constructed a canal, called the New-Over Canal, that received wastes from these trenches and carried them off in surface waters.

119.   From 1973 to 1983, Lockheed Martin dumped 7,800 tons of hazardous wastes in an 11-acre landfill on the Southeast portion of the Orlando Facility. Three sludge ponds adjacent to the landfill were filled to capacity with sludges, including metal hydroxide sludge generated from spent plating solutions and cyanide bearing wastes. A large "sludge cake" was also disposed at this site.

120.   In 1981 and 1982, Lockheed Martin dug shallow unlined ditches across 5 acres on the south-central portion of the Orlando Facility, and filled them with 1,900 tons of hazardous wastes.

121.   For many years prior to 1985, Lockheed Martin collected, stored, and transported toxic wastes from the Orlando Facility's Microelectronics Center in an inaccessible and complicated maze of underground piping and solvent holding tanks.

28

Lockheed Martin operated this collection system for many years despite the piping being in a state of disrepair and leaking highly toxic wastes into soil and groundwater.

122.    These activities, along with others undertaken by Lockheed Martin at the Orlando Facility, have resulted in extensive contamination of soil and groundwater throughout the site. There are, and have been, numerous plumes of highly contaminated groundwater underneath the Orlando Facility. Additionally, large areas of highly toxic soil exist, and have existed, throughout the Orlando Facility.

123.    Additionally, Lockheed Martin's ongoing operations from 1958 to the present have utilized large volumes of VOCs, hazardous air pollutants, and other toxic substances. These operations have resulted in the emission of numerous tons of harmful chemicals each year, and Plaintiffs to be exposed to and inhale these harmful chemicals.

## C.    CONTAMINATION LOCKHEED MARTIN DUMPED INTO THE SOIL, GROUNDWATER, AND AIR AT THE ORLANDO FACILITY

124.    Trichloroethylene ("TCE") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 28,000 ppb, TCE has a sweet odor similar to ether or chloroform.[1] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of TCE are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of TCE detected at the Orlando Facility can

---

[1] EPA Fact Sheet—TCE, January 2017. https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/trichloroethylene.pdf

cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, kidneys, immune system, endocrine system, reproductive system, neurological defects, developmental defects, and the injuries suffered by Plaintiffs herein.[2] TCE is a potent human carcinogen. It is classified by the International Agency for Research on Cancer ("IARC") as "carcinogenic to humans" and classified as a "known human carcinogen" by the U.S. Department of Health and Human Services ("HHS"). The U.S. Environmental Protection Agency ("EPA") has characterized TCE as "likely to be carcinogenic to humans by all routes of exposure".[3] TCE can cause numerous types of cancer, including but not limited to, kidney cancer, liver cancer, malignant lymphoma, non-Hodgkin's lymphoma, leukemia, testicular cancer, lung tumors, and the injuries suffered by Plaintiffs herein.[4]

125.    Tetrachloroethylene ("PCE") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 1,000 ppb, TCE has a sharp, sweet odor.[5] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of PCE are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of PCE detected at the Orlando Facility can cause

---

[2] ATSDR Toxicological Profile for TCE, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp19.pdf
[3] ATSDR Toxicological Profile for TCE, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp19.pdf
[4] ATSDR Toxicological Profile for TCE, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp19.pdf
[5] EPA Fact Sheet—PCE, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/tetrachloroethylene.pdf

extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, kidneys, reproductive system, unborn children, brain chemistry, developmental defects and the injuries suffered by Plaintiffs herein.[6] PCE is a potent human carcinogen. It is classified by the IARC as "probably carcinogenic to humans", and EPA has characterized PCE as "likely to be carcinogenic to humans by all routes of exposure".[7] PCE can cause numerous types of cancer, including but not limited to, bladder cancer, multiple myeloma, non-Hodgkin's lymphoma, liver cancer, kidney cancer, cancers of the blood system, and the injuries suffered by Plaintiffs herein.[8]

126.    1,1,1-Trichloroethane ("Methyl Chloroform"), is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 120,000 ppb, Methyl Chloroform has a sharp, sweet odor similar to chloroform.[9] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Methyl Chloroform are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Methyl Chloroform detected at the Orlando Facility can cause harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These

---

[6] ATSDR Toxicological Profile for PCE, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp18.pdf
[7] ATSDR Toxicological Profile for PCE, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp18.pdf
[8] ATSDR Toxicological Profile for PCE, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp18.pdf
[9] EPA Fact Sheet— Methyl Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/methyl-chloroform.pdf

harmful effects include, but are not limited to, damage to the nervous system, liver, kidneys, reproductive system, unborn children, and the injuries suffered by Plaintiffs herein.[10]

127. Vinyl Chloride is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 3,000,000 ppb, Vinyl Chloride has a mild, sweet odor.[11] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Vinyl Chloride are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Vinyl Chloride detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, cardiovascular system, lungs, liver, kidneys, reproductive system, unborn children, nerve damage, and the injuries suffered by Plaintiffs herein.[12] Vinyl Chloride is a potent human carcinogen. It is classified by the IARC as "carcinogenic to humans", and EPA has characterized PCE as "a human carcinogen".[13] Vinyl Chloride can cause numerous types of cancer, including but not limited to, liver cancer, brain cancer, breast cancer, hematopoietic cancers, and the injuries suffered by Plaintiffs herein.[14]

---

[10] ATSDR Toxicological Profile for Methyl Chloroform, July 2006. https://www.atsdr.cdc.gov/toxprofiles/tp70.pdf
[11] ATSDR Toxicological Profile for Vinyl Chloride, July 2006. https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf
[12] ATSDR Toxicological Profile for Vinyl Chloride, July 2006. https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf
[13] ATSDR Toxicological Profile for Vinyl Chloride, July 2006. https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf
[14] ATSDR Toxicological Profile for Vinyl Chloride, July 2006. https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf

128.    Methylene Chloride is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 200,000 ppb, Methylene Chloride has a mild, sweet odor.[15] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Methylene Chloride are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Methylene Chloride detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, ocular system, unborn children, nervous system, cardiovascular system, lungs, and the injuries suffered by Plaintiffs herein.[16] Methylene Chloride is a potent carcinogen. EPA has characterized Methylene Chloride as "a probable cancer causing agent in humans".[17] Methylene Chloride can cause numerous types of cancer, including but not limited to, lung cancer, liver cancer, breast cancer, mouth cancer, and the injuries suffered by Plaintiffs herein.[18]

129.    Toluene is a VOC that is found naturally in crude oil. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 2,140 ppb,

---

[15] ATSDR Toxicological Profile for Methylene Chloride, September 2000.
https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf
[16] ATSDR Toxicological Profile for Methylene Chloride, September 2000.
https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf
[17] ATSDR Toxicological Profile for Methylene Chloride, September 2000.
https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf
[18] ATSDR Toxicological Profile for Methylene Chloride, September 2000.
https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf

Toluene has a sweet, pungent odor.[19] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Toluene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Toluene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, brain, immune system, kidney, liver, lungs, reproductive system, unborn children, developmental defects, and the injuries suffered by Plaintiffs herein.[20]

130.    Benzene is a VOC that is found naturally in crude oil. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 60,000 ppb, Benzene has a sweet odor.[21] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Benzene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Benzene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the blood, bone marrow, immune system, reproductive system, unborn children and the injuries suffered by

---

[19] ATSDR Toxicological Profile for Toluene, June 2017. https://www.atsdr.cdc.gov/toxprofiles/tp56.pdf
[20] ATSDR Toxicological Profile for Toluene, June 2017. https://www.atsdr.cdc.gov/toxprofiles/tp56.pdf
[21] ATSDR Toxicological Profile for Benzene, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf

Plaintiffs herein.[22] Benzene is a potent human carcinogen. It is classified by the HHS as a "known carcinogen"; IARC and EPA have both determined that benzene is "carcinogenic to humans", and EPA has characterized Benzene as "a human carcinogen".[23] Benzene can cause numerous types of cancer, including but not limited to, leukemia, and the injuries suffered by Plaintiffs herein.[24]

131.    Chlorobenzene is an artificial VOC that does not occur in nature. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Chlorobenzene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Chlorobenzene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the blood, bone marrow, liver, kidneys, immune system, nervous system, and the injuries suffered by Plaintiffs herein.[25]

132.    Ethylbenzene is a VOC that is found naturally in coal tar. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 2,300 ppb, Ethylbenzene has a sweet, gas-like odor.[26] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to

---

[22] ATSDR Toxicological Profile for Benzene, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[23] ATSDR Toxicological Profile for Benzene, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[24] ATSDR Toxicological Profile for Benzene, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[25] ATSDR Toxicological Profile for Chlorobenzene, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp131.pdf
[26] ATSDR Toxicological Profile for Ethylbenzene, November 2010. https://www.atsdr.cdc.gov/toxprofiles/tp110.pdf

Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Ethylbenzene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Ethylbenzene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the inner ear and hearing, kidney, respiratory system, nervous system, eyes, blood, and the injuries suffered by Plaintiffs herein.[27]

133.   1,2-dichlorobenzene ("1,2-DCB") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 50,000 ppb, 1,2-DCB has a pleasant, aromatic odor.[28] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,2-DCB are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,2-DCB detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, liver, blood, kidneys, thyroid, pituitary gland, nervous system, and the injuries suffered by Plaintiffs herein.[29]

---

[27] ATSDR Toxicological Profile for Ethylbenzene, November 2010. https://www.atsdr.cdc.gov/toxprofiles/tp110.pdf; EPA Fact Sheet—Ethylbenzene, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylbenzene.pdf
[28] ATSDR Toxicological Profile for DCBs, August 2006. https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf
[29] ATSDR Toxicological Profile for DCBs, August 2006. https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf

134.   1,3-dichlorobenzene ("1,3-DCB") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 50,000 ppb, 1,3-DCB has a pleasant, aromatic odor.[30] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,3-DCB are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,3-DCB detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, liver, blood, kidneys, thyroid, pituitary gland, nervous system, and the injuries suffered by Plaintiffs herein.[31]

135.   Carbon Disulfide is a VOC that is used to produce rubber chemicals and pesticides. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Carbon Disulfide are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Carbon Disulfide detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the respiratory system, brain, nervous

---

[30] ATSDR Toxicological Profile for DCBs, August 2006. https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf
[31] ATSDR Toxicological Profile for DCBs, August 2006. https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf

system, blood, liver, kidneys, eyes, cardiovascular system, reproductive system, unborn children, developmental problems and the injuries suffered by Plaintiffs herein.[32]

136.    Carbon Tetrachloride is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 10,000 ppb, Carbon Tetrachloride has a sweet odor.[33] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Carbon Tetrachloride are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Carbon Tetrachloride detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, nervous system, respiratory system, unborn children, reproductive system and the injuries suffered by Plaintiffs herein.[34] Carbon tetrachloride is a potent human carcinogen. EPA has characterized Carbon Tetrachloride as "a probable human carcinogen".[35] Carbon Tetrachloride can cause numerous types of cancer, including, liver cancer and the injuries suffered by Plaintiffs herein.[36]

---

[32] EPA Fact Sheet—Carbon Disulfide, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/carbon-disulfide.pdf

[33] EPA Fact Sheet—Carbon Tetrachloride, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf

[34] EPA Fact Sheet—Carbon Tetrachloride, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf

[35] EPA Fact Sheet—Carbon Tetrachloride, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf

[36] EPA Fact Sheet—Carbon Tetrachloride, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf

137.    1,1-Dichloroethane ("1,1-DCA") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 120,000 ppb, 1,1-DCA has a mild, sweet odor similar to ether.[37] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,1-DCA are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,1-DCA detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, cardiovascular system, kidneys, unborn children, and the injuries suffered by Plaintiffs herein.[38] 1,1-DCA can cause cancer, and is classified by EPA as "a possible human carcinogen".[39] 1,1-DCA can cause numerous types of cancer, including but not limited to, cancer of the blood vessel walls, breast cancer, liver cancer, endometrial cancer, and the injuries suffered by Plaintiffs herein.[40]

138.    1,2-Dichloroethane ("1,2-DCA") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 6,000 ppb, 1,2-DCA has a mild, sweet odor similar to chloroform.[41]

---

[37] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf
[38] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf
[39] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf
[40] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf
[41] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf

Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,2-DCA are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,2-DCA detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, cardiovascular system, respiratory system, liver, kidneys, immune system, and the injuries suffered by Plaintiffs herein.[42] 1,2-DCA is a potent human carcinogen, and has been classified by EPA as "a probable human carcinogen".[43] 1,2-DCA can cause numerous types of cancer, including but not limited to, colon cancer, rectal cancer, stomach cancer, blood vessel wall cancer, breast cancer, lung cancer, endometrial cancer, liver cancer, and the injuries suffered by Plaintiffs herein.[44]

139.    1,1-Dichloroethene ("1,1-DCE") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 190,000 ppb, 1,1-DCE has a mild, sweet odor similar to chloroform.[45] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,1-DCE are, and have been, present

---

[42] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf
[43] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf
[44] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf
[45] EPA Fact Sheet—1,1-DCE, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/vinylidene-chloride.pdf

in the soil and groundwater at the Orlando Facility. The concentrations of 1,1-DCE detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, kidneys, lungs, and the injuries suffered by Plaintiffs herein.[46] 1,1-DCE can cause numerous types of cancer, including but not limited to, kidney cancer, breast cancer, and the injuries suffered by Plaintiffs herein.[47]

140.   1,2-Dichloroethene ("1,2-DCE") is an artificial VOC that does not occur in nature. It is colorless and odorless.[48] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,2-DCE are, and have been, present in the soil and groundwater at the Orlando Facility. 1,2-DCE has also been found at the Orlando Facility in as Cis-1,2-DCE and Trans-1,2-DCE forms. The concentrations of 1,2-DCE detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, circulatory system, and the injuries suffered by Plaintiffs herein.[49]

141.   1,1,2-Trichloroethane ("1,1,2-TCA") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous

---

[46] EPA Fact Sheet—1,2-DCE, Date Unknown. https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf
[47] EPA Fact Sheet—1,2-DCE, Date Unknown. https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf
[48] EPA Fact Sheet—1,2-DCE, Date Unknown. https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf
[49] EPA Fact Sheet—1,2-DCE, Date Unknown. https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf

concentrations. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,1,2-TCA are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,1,2-TCA detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, respiratory system, liver, kidneys, immune system, and the injuries suffered by Plaintiffs herein.[50] 1,1,2-TCA causes cancer, and has been classified by EPA as "possibly carcinogenic to humans".[51] 1,1,2-TCA can cause numerous types of cancer, including but not limited to, liver cancer, adrenal cancer, and the injuries suffered by Plaintiffs herein.[52]

142.    Chloroform is a VOC that readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of chloroform are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of chloroform detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, blood, kidney, nervous system, reproductive system, unborn children, developmental defects, and the injuries

[50] ATSDR Toxicological Profile for 1,1,2-TCA, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp148.pdf
[51] ATSDR Toxicological Profile for 1,1,2-TCA, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp148.pdf
[52] ATSDR Toxicological Profile for 1,1,2-TCA, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp148.pdf

suffered by Plaintiffs herein.[53] Chloroform is a potent carcinogen, and has been classified by EPA as "likely to be carcinogenic to humans by all routes of exposure".[54] Chloroform can cause numerous types of cancer, including but not limited to, intestinal cancer, rectal cancer, bladder cancer, kidney cancer, liver cancer and the injuries suffered by Plaintiffs herein.[55]

143.    1,2-Dichloropropane is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 250 ppb, 1,2-Dichloropropane has a chloroform-like odor.[56] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,2-Dichloropropane are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,2-Dichloropropane detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, blood, liver, reproductive system, and the injuries suffered by Plaintiffs herein.[57] 1,2-Dichloropropane is a potent carcinogen

---

[53] EPA Fact Sheet—Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/chloroform.pdf
[54] EPA Fact Sheet—Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/chloroform.pdf
[55] EPA Fact Sheet—Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/chloroform.pdf
[56] EPA Fact Sheet—1,2-Dichloropropane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf
[57] EPA Fact Sheet—1,2-Dichloropropane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf

and has been classified by EPA as a "probable human carcinogen".[58] 1,2-Dichloropropane can cause numerous types of cancer, including but not limited to, breast cancer, liver cancer and the injuries suffered by Plaintiffs herein.[59]

144.    Dichlorobromomethane is a VOC that is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Dichlorobromomethane are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Dichlorobromomethane detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, immune system, unborn children, developmental defects, and the injuries suffered by Plaintiffs herein.[60] Dichlorobromomethane is a potent human carcinogen. EPA characterizes Dichlorobromomethane as "a probable human carcinogen".[61] Dichlorobromomethane can cause numerous types of cancer, including but not limited to, rectal cancer, kidney cancer, intestinal cancer, liver cancer, and the injuries suffered by Plaintiffs herein.[62]

[58] EPA Fact Sheet—1,2-Dichloropropane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf
[59] EPA Fact Sheet—1,2-Dichloropropane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf
[60] ATSDR Toxicological Profile for Dichlorobromomethane, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp129.pdf
[61] ATSDR Toxicological Profile for Dichlorobromomethane, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp129.pdf
[62] ATSDR Toxicological Profile for Dichlorobromomethane, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp129.pdf

145.    Bis(2-ethylhexyl)phthalate ("DEHP") is an artificial VOC that does not occur in nature, and is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of DEHP are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of DEHP detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, respiratory system, reproductive system, immune system,  unborn children, developmental defects, and the injuries suffered by Plaintiffs herein.[63] DEHP causes cancer, and has been classified by EPA as a "probable human carcinogen".[64] DEHP can cause numerous types of cancer, including but not limited to, liver cancer, pancreatic cancer, testicular cancer and the injuries suffered by Plaintiffs herein.[65]

146.    Xylene is a VOC that is colorless and odorless unless present in extremely high and dangerous concentrations. Above 1,100 ppb, Xylene has a sweet odor.[66] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and

---

[63] EPA Fact Sheet—DEHP, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/bis-2-ethylhexyl-phthalate.pdf; ATSDR Toxicological Profile for DEHP, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp9.pdf

[64] EPA Fact Sheet—DEHP, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/bis-2-ethylhexyl-phthalate.pdf

[65] EPA Fact Sheet—DEHP, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/bis-2-ethylhexyl-phthalate.pdf; ATSDR Toxicological Profile for DEHP, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp9.pdf

[66] EPA Fact Sheet—Xylene, January 2017. https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/xylenes.pdf

egregious conduct, dangerous levels of Xylene are, and have been, present in the soil and groundwater at the Orlando Facility. Xylene has also been found at the Orlando Facility in as m-Xylene, p-Xylene, and o-Xylene. The concentrations of Xylene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the respiratory system, gastrointestinal system, nervous system, cardiovascular system, kidneys, unborn children, developmental defects and the injuries suffered by Plaintiffs herein.[67]

147.   Methylnaphthalene is a VOC that is found naturally in crude oil. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Methylnaphthalene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Methylnaphthalene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the blood, gastrointestinal system, respiratory system, and the injuries suffered by Plaintiffs herein.[68] Methylnaphthalene can cause cancer and is classified by EPA as "a possible human carcinogen".[69] Methylnaphthalene can cause

---

[67] EPA Fact Sheet—Xylene, January 2017. https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/xylenes.pdf
[68] ATSDR Toxicological Profile for Methylnaphthalene, August 2005. https://www.atsdr.cdc.gov/toxprofiles/tp67.pdf
[69] ATSDR Toxicological Profile for Methylnaphthalene, August 2005. https://www.atsdr.cdc.gov/toxprofiles/tp67.pdf

numerous types of cancer, including but not limited to, lung cancer, throat cancer, colorectal cancer, and the injuries suffered by Plaintiffs herein.[70]

148.    Benzo(a)pyrene is a VOC that is found naturally in crude oil. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of Benzo(a)pyrene are, and have been, present in the soil and groundwater at the Orlando Facility. Two related compounds with similar effects, Benzo(a)anthracene and Benzo(b)fluoranthene, have also been detected at the Orlando Facility at dangerously high concentrations. The concentrations of Benzo(a)pyrene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, reproductive system, immune system, unborn children, developmental defects, and the injuries suffered by Plaintiffs herein.[71] Benzo(a)pyrene is a potent human carcinogen, and is classified by IARC as "a known human carcinogen".[72]  Benzo(a)pyrene can cause numerous types of cancer, including but not limited to, gastrointestinal cancer, liver cancer, kidney cancer, throat cancer, lung cancer, and the injuries suffered by Plaintiffs herein.[73]

---

[70] ATSDR Toxicological Profile for Methylnaphthalene, August 2005.
https://www.atsdr.cdc.gov/toxprofiles/tp67.pdf
[71] EPA Toxicological Review of Benzo(a)pyrene, January 2017.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0136tr.pdf
[72] EPA Toxicological Review of Benzo(a)pyrene, January 2017.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0136tr.pdf
[73] EPA Toxicological Review of Benzo(a)pyrene, January 2017.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0136tr.pdf

149.     Polychlorinated biphenyls ("PCBs") are artificial VOCs that do not occur in nature. They are colorless and odorless. Because they are volatile, PCBs readily converts to a gas and travels through air with wind. PCBs also move through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of PCBs are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of PCBs detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the respiratory system, gastrointestinal system, liver, kidney, blood, nervous system, endocrine system, and the injuries suffered by Plaintiffs herein.[74] PCBs are potent human carcinogens, and both EPA and IARC have determined that PCBs are "probable human carcinogens".[75] PCBs can cause numerous types of cancer, including but not limited to, liver cancer, intestinal cancer, skin cancer, gallbladder cancer, non-Hodgkin's lymphoma, testicular cancer, prostate cancer, pancreatic cancer, lung cancer, ovarian cancer, uterine cancer, throat cancer, pancreatic cancer, uterine cancer, and the injuries suffered by Plaintiffs herein.[76]

150.     Dichlorodiphenyltrichloroethane ("DDT") is an artificial VOC that does not occur in nature. It is colorless and odorless. Because it is volatile, it readily converts to a

---

[74] ATSDR Toxicological Profile for PCBs, November 2000. https://www.atsdr.cdc.gov/toxprofiles/tp17.pdf; Addendum to ATSDR Toxicological Profile for PCBs, April 2011. https://www.atsdr.cdc.gov/toxprofiles/pcbs_addendum.pdf
[75] ATSDR Toxicological Profile for PCBs, November 2000. https://www.atsdr.cdc.gov/toxprofiles/tp17.pdf; Addendum to ATSDR Toxicological Profile for PCBs, April 2011. https://www.atsdr.cdc.gov/toxprofiles/pcbs_addendum.pdf
[76] ATSDR Toxicological Profile for PCBs, November 2000. https://www.atsdr.cdc.gov/toxprofiles/tp17.pdf; Addendum to ATSDR Toxicological Profile for PCBs, April 2011. https://www.atsdr.cdc.gov/toxprofiles/pcbs_addendum.pdf

gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of DDT are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of DDT detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to unborn children, birth and developmental defects, type 2 diabetes mellitus, liver, nervous system, and the injuries suffered by Plaintiffs herein.[77] DDT is a potent carcinogen, and has been classified by IARC and EPA as a "probable human carcinogen".[78] DDT can cause numerous types of cancer, including but not limited to, liver cancer, lung cancer, and the injuries suffered by Plaintiffs herein.[79]

151.    1,4-Dioxane is an artificial VOC that does not occur in nature. It is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of 1,4-Dioxane are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,4-Dioxane detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, respiratory system,

---

[77] ATSDR Toxicological Profile for DDT, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp35.pdf
[78] ATSDR Toxicological Profile for DDT, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp35.pdf
[79] ATSDR Toxicological Profile for DDT, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp35.pdf

brain, and the injuries suffered by Plaintiffs herein.[80] 1,4-Dioxane causes cancer and has

been classified by IARC and EPA as a "probable human carcinogen".[81] 1,4-Dioxane can

cause numerous types of cancer, including but not limited to, liver cancer, nasal cancer,

gallbladder cancer, and the injuries suffered by Plaintiffs herein.[82]

152.    Dioxins are persistent environmental pollutants used in pesticides such as

Agent Orange.  Because dioxins are persistent, they remain in the environment for long

periods of time and bioaccumulate in human bodies.[83] Due to Lockheed Martin's

unreasonable, reckless, and egregious conduct, dangerous levels of dioxins are, and have

been, present in the soil and groundwater at the Orlando Facility. The concentrations of

dioxins detected at the Orlando Facility can cause extremely harmful effects whether

exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects

include, but are not limited to, damage and toxicity to the epidermis, blood, liver, metabolic

system, immune system, reproductive system, unborn children, thyroid, developmental

defects, and the injuries suffered by Plaintiffs herein.[84] Dioxins cause cancer, and have been

classified by IARC and EPA as "probable human carcinogens".[85] Dioxins can cause

numerous types of cancer, including but not limited to, liver cancer, thyroid cancer, skin

cancer, and the injuries suffered by Plaintiffs herein.[86]

---

[80] EPA Fact Sheet—1,4-Dioxane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/1-4-dioxane.pdf
[81] EPA Fact Sheet—1,4-Dioxane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/1-4-dioxane.pdf
[82] EPA Fact Sheet—1,4-Dioxane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/1-4-dioxane.pdf
[83] ATSDR Toxicological Profile for Dioxins, December 1998. https://www.atsdr.cdc.gov/toxprofiles/tp104.pdf
[84] ATSDR Toxicological Profile for Dioxins, December 1998. https://www.atsdr.cdc.gov/toxprofiles/tp104.pdf
[85] ATSDR Toxicological Profile for Dioxins, December 1998. https://www.atsdr.cdc.gov/toxprofiles/tp104.pdf
[86] ATSDR Toxicological Profile for PFAS, December 2018. https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

153.    Perfluoroalkyls ("PFAS") are persistent environmental pollutants used in plating and electronics manufacturing. Because PFAS are persistent, they remain in the environment for long periods of time and bioaccumulate in human bodies.[87] Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of PFAS are, and have been, present in the soil and groundwater at the Orlando Facility. PFAS have also been detected at unsafe levels at the Orlando Facility as perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"). The concentrations of PFAS detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the liver, immune system, metabolic system, thyroid, respiratory system, reproductive system, unborn children, developmental defects, and the injuries suffered by Plaintiffs herein.[88] PFAS can cause cancer, and have been classified by IARC and EPA as "possible human carcinogens".[89] PFAS can cause numerous types of cancer, including but not limited to, testicular cancer, kidney cancer, liver cancer, pancreatic cancer, and the injuries suffered by Plaintiffs herein.[90]

154.    Cadmium is a heavy metal used in electroplating. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of cadmium are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of cadmium detected at the Orlando Facility can cause extremely harmful effects whether

---

[87] ATSDR Toxicological Profile for PFAS, December 2018. https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[88] ATSDR Toxicological Profile for PFAS, December 2018. https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[89] ATSDR Toxicological Profile for PFAS, December 2018. https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[90] ATSDR Toxicological Profile for PFAS, December 2018. https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, respiratory system, kidneys, gastrointestinal system, musculoskeletal system, liver, nervous system, reproductive system, blood, immune system, and the injuries suffered by Plaintiffs herein.[91] Cadmium is a potent human carcinogen. It has been classified by HHS as a "known human carcinogen" and by IARC as "carcinogenic to humans".[92] Cadmium can cause numerous types of cancer, including but not limited to, lung cancer, prostate cancer and the injuries suffered by Plaintiffs herein.[93]

155.   Chromium is a heavy metal used in plating operations. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of chromium are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of chromium detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, respiratory system, stomach, gastrointestinal system, blood, reproductive system, immune system, reproductive system, epidermis, eyes, and the injuries suffered by Plaintiffs herein.[94] Chromium is a potent human carcinogen. It has been classified by EPA as a "known human carcinogen" and by IARC as "carcinogenic to humans".[95] Chromium can cause numerous

---

[91] ATSDR Toxicological Profile for Cadmium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf
[92] ATSDR Toxicological Profile for Cadmium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf
[93] ATSDR Toxicological Profile for Cadmium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf
[94] ATSDR Toxicological Profile for Chromium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp7.pdf
[95] ATSDR Toxicological Profile for Chromium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp7.pdf

types of cancer, including but not limited to, gastrointestinal cancer, mouth cancer, lung cancer and the injuries suffered by Plaintiffs herein.[96]

156.    Lead is a heavy metal used in the manufacture of munitions. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of lead are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of lead detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, kidneys, cardiovascular system, blood, immune system, reproductive system, unborn children, developmental defects, respiratory system, endocrine system, liver, musculoskeletal system, gastrointestinal system, and the injuries suffered by Plaintiffs herein.[97] The toxic effects of lead have been observed in every organ system studied.[98] Lead is a potent human carcinogen. It has been classified by EPA as a "probable human carcinogen" and by IARC as "probably carcinogenic to humans".[99] Lead can cause numerous types of cancer, including but not limited to, lung cancer, respiratory tract cancer, stomach cancer, gastrointestinal cancer, throat cancer, glioma, and the injuries suffered by Plaintiffs herein.[100]

157.    Arsenic is a heavy metal used in rat poison, ammunition and semiconductors. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels

---

[96] ATSDR Toxicological Profile for Chromium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp7.pdf
[97] ATSDR Toxicological Profile for Lead, August 2020. https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf
[98] ATSDR Toxicological Profile for Lead, August 2020. https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf
[99] ATSDR Toxicological Profile for Lead, August 2020. https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf
[100] ATSDR Toxicological Profile for Lead, August 2020. https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf

of arsenic are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of arsenic detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the epidermis, gastrointestinal system, blood, cardiovascular system, nervous system, respiratory system, unborn children, kidneys, bladder, and the injuries suffered by Plaintiffs herein.[101] Arsenic is a potent human carcinogen. It has been classified by EPA as a "known human carcinogen" and by IARC as "carcinogenic to humans".[102] Arsenic can cause numerous types of cancer, including but not limited to, skin cancer, liver cancer, bladder cancer, lung cancer, and the injuries suffered by Plaintiffs herein.[103]

158.    In addition to these specifically named contaminants, Lockheed Martin has caused the release of numerous additional hazardous air pollutants, as will be proven at trial.

## D.    LOCKHEED MARTIN EXPOSES THE COMMUNITY TO TOXIC WASTE

159.    Lockheed Martin was well aware of the risks to human health posed by the toxic materials it used and handled at the Orlando Facility, including those described herein. Lockheed Martin knew, or should have known, that mismanaging and mishandling these harmful chemicals could pose egregious risks of exposure, and result in debilitating, life-changing, and fatal illnesses and diseases.

---

[101] ATSDR Toxicological Profile for Arsenic, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf
[102] ATSDR Toxicological Profile for Arsenic, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf
[103] ATSDR Toxicological Profile for Arsenic, August 2007. https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf

160.     Instead of taking proper, or in some cases, any, precautions to protect against potential exposures, Lockheed Martin created a toxic stew of contamination at the Orlando Facility. This contamination is the result of years of callous and reckless indifference to the health and safety of the environment, and individuals living and working nearby and around the Orlando Facility.

161.     These failures are Lockheed Martin's original sin, from which further harm to Plaintiffs flowed.

162.     Lockheed Martin clearly knew, or at the very least should have known, that burying toxic wastes in trenches, transporting toxic wastes in leaking and inaccessible piping, dumping toxic sludge in ponds, and engaging in the other reckless conduct described herein, would cause profound and widespread soil and groundwater contamination throughout the Orlando Facility.

163.     Lockheed Martin also knew, or should have known, that the contamination resulting from these activities, and present at the Orlando Facility, would pose significant health risks to people living and working nearby, including Plaintiffs.

164.     Lockheed Martin knew, or should have known, that thousands of people lived and worked near the Orlando Facility, and that it was completely inappropriate to use and handle such hazardous contaminants at this location.

165.     Lockheed Martin knew, or should have known, that Plaintiffs, and others working and living nearby, would be exposed to Lockheed Martin's contamination through inhaling, ingesting, and coming into dermal contact with contaminated soils that are

regularly disrupted by the operations at the Orlando Facility, and thereafter become airborne and travel offsite.

166.    Lockheed Martin also knew, or should have known, that Plaintiffs, and others working and living nearby, would be exposed to Lockheed Martin's contamination through inhaling VOCs that off-gassed from the soil and groundwater.

167.    Lockheed Martin knew, or should have known, that Plaintiffs would be exposed to Lockheed Martin's contamination by coming into contact with contaminants carried offsite through groundwater migration.

168.    Lockheed Martin also knew, or should have known, that Plaintiffs would be exposed to contamination by Lockheed Martin's continuing operation of the Orlando facility, and the resulting generation and emission of toxic wastes. Lockheed knew, or should have known, that emitting numerous tons of hazardous air pollutants each year would cause Plaintiffs to inhale such contaminants.

169.    Lockheed Martin knew, or should have known that, because of the dangerous constituents it dumped into the soil, air and groundwater, the toxic nature of emissions from ongoing operations, and the high levels of contamination resulting from Lockheed Martin's recklessness, such offsite exposures could, and would, cause severe and debilitating illnesses and diseases to individuals living and working near and around the Orlando Facility.

170.    Nevertheless, Lockheed Martin continued to expose nearby residents and workers, including Plaintiffs, to toxic contaminants from the Orlando Facility.

171.    In fact, Lockheed Martin's efforts to treat the soil and groundwater at the Orlando Facility increased the risks of exposure to toxic contaminants to Plaintiffs and others living and working nearby.

172.    Lockheed Martin utilized contaminated groundwater for spray irrigation, causing underground contaminants to make contact with air, vaporize, be carried offsite with winds, and inhaled by Plaintiffs and others in the vicinity of the Orlando Facility.

173.    Lockheed Martin installed numerous Air Stripping Towers, Soil Vapor Extraction Systems, and Air Sparging Systems at the Orlando Facility. These technologies remove harmful contaminants from soil and groundwater by inducing a phase change that causes VOCs to become gaseous. These systems then separate the gaseous VOCs from the soil or groundwater that they are treating.

174.    However, these treatment systems do not destroy the harmful contaminants, they simply separate contaminants from the treated soil or groundwater. To prevent exposing nearby residents and workers to the harmful toxic gases remaining after the soil or groundwater is treated, it is necessary to collect, contain, and seal the remaining toxic gases in airtight containers.

175.    Lockheed Martin failed to contain the toxic gases remaining after the soil and groundwater was treated with Air Stripping Towers, Soil Vapor Extraction Systems, and Air Sparging Systems at the Orlando Facility. Instead, Lockheed Martin recklessly expelled these toxic gases directly into the air breathed by Plaintiffs and others in the vicinity of the Orlando Facility.

176.    By venting these toxic gases directly into the air, at low heights, Lockheed Martin unearthed high levels of toxic contamination that was present below the ground surface, concentrated the contamination into potent and dangerous gases, and injected the contamination directly into the air supply for the community near and around the Orlando Facility.

177.    Additionally, Lockheed Martin's ongoing operations caused numerous additional tons of hazardous air pollutants to be released into the air breathed by Plaintiffs and others in the vicinity of the Orlando Facility.

178.    Over the years, Lockheed Martin sold certain parcels of the Orlando Facility, and near to the Orlando Facility, for redevelopment, further increasing the number of individuals who would be exposed to Lockheed Martin's contamination. After selling these parcels, Lockheed Martin remained responsible for and continued to engage in activities that caused its contamination in soil and groundwater to become airborne, and inhaled by Plaintiffs and others living and working near the Orlando Facility.

179.    In December 1998, Lockheed Martin sold southern areas of the Orlando Facility to Universal Studios, Inc. and its wholly owned subsidiary and joint venture partner UCPM. Universal Studios, Inc. subsequently became known as, and continued operations as NBCUniversal via a later merger. The areas acquired by NBCUniversal & UCPM included several contaminated landfills described above (see Figure B).



Figure B—The Universal Parcel

180.    As a condition of the sale, Lockheed Martin agreed to remain responsible for addressing the contamination from Lockheed Martin's prior activities in the Universal parcel, to pay for contamination activities on the Universal parcel, and to assist with the execution of all such activities.

181.    In return, NBCUniversal and UCPM agreed to continue contamination activities made necessary by Lockheed Martin's original sin. If Lockheed Martin had not dumped thousands of tons of extremely toxic pollutants into the soil and groundwater to begin with, such contamination activities would not have been undertaken.

182.    Lockheed Martin, NBCUniversal, and UCPM had a community of interest in the contamination activities undertaken on the Universal parcel, and shared in the potential liabilities arising therefrom. They each retained authority to control the contamination activities undertaken thereon and were responsible for sharing in its costs. They would each share in profits achieved if contamination activities could be continued for little cost, remove the contamination from the parcels owned by each defendant, or cease before the contamination was completely removed. The extraction of contaminants from soil and groundwater constituted profits, since the extraction of contaminants would eliminate or mitigate liabilities that Lockheed Martin and the Universal entities shared in. As a result, the contamination activities on the Universal parcel were a joint venture between Lockheed Martin, NBCUniversal, and UCPM.

183.    After acquiring the southern parcel in Dec. 1998, NBCUniversal, UCPM and Lockheed Martin continued the contamination activities begun by Lockheed Martin, including the use of Air Strippers, Air Sparging, and Soil Vapor Extraction Systems, that caused pollutants to become airborne and inhaled, ingested, and dermally contacted by Plaintiffs. Over the years additional similar systems were added to the Universal parcel by NBCUniversal, UCPM and Lockheed Martin.

184.    In 2000-2001, Lockheed Martin, NBCUniversal and UCPM built the UCPM Treatment System. This system included several air strippers and an 80 acre sprayfield. Like the other contamination activities undertaken at the Orlando Facility, the UCPM Treatment system did not utilize appropriate control equipment, but instead dumped lethal contaminants directly into the air after they were extracted from soil and groundwater.

185.    The UCPM Treatment System was used by Lockheed Martin, NBCUniversal, and UCPM to treat contamination located on both the Lockheed Martin and Universal owned parcels of the Orlando Facility. Lockheed Martin, NBCUniversal and UCPM retained joint right of control over the UCPM Treatment System, financial responsibility for the UCPM Treatment System, and joint interests in its functioning and ownership and as result operated UCPM Treatment System as a joint venture.

186.    Plaintiffs, and others in the community, did inhale, ingest and come into dermal contact with contaminated soils originating from the Orlando Facility, airborne contaminants resulting from the volatization of contaminated soil and groundwater originating from the Orlando Facility, contaminants carried offsite through groundwater migration, and contaminants generated and released by the continued operation of the Orlando Facility, and as a result suffered injuries, as described herein.

187.    Lockheed Martin's continuing operation of the Orlando Facility, and the resultant continued release of toxic contaminants, has caused additional exposures to Plaintiffs, and has caused or contributed to the injuries suffered by Plaintiffs.

188.    Plaintiffs' exposures to VOCs, and those of others in the community, were increased, and exacerbated by Lockheed Martin's decision to extract harmful chemicals from soil and groundwater at the Orlando Facility, concentrate the contaminants in gaseous form, and vent the contaminants directly into the air that Plaintiffs breathed. Plaintiffs, and others in the community, did inhale concentrated VOCs emitted from the Air Stripping Towers, Soil Vapor Extraction Systems, and Air Sparging Systems at the Orlando Facility, and as a result suffered injuries, as described herein.

### E.     PLAINTIFFS WERE EXPOSED TO LOCKHEED MARTIN'S TOXIC WASTES, AND SUFFERED EGREGIOUS BODILY HARM

189.   Plaintiffs, and others in the community, did inhale, ingest and come into dermal contact with contaminated soils, groundwater, and airborne toxic wastes originating from the Orlando Facility.

190.   Plaintiffs' exposures to VOCs, and those of others in the community, were increased, and exacerbated by Lockheed Martin's decision to extract harmful chemicals from soil and groundwater at the Orlando Facility, concentrate the contaminants in gaseous form, and vent the contaminants directly into the air that Plaintiffs breathed. Plaintiffs, and others in the community, did inhale concentrated VOCs emitted from the Air Stripping Towers, Soil Vapor Extraction Systems, and Air Sparging Systems at the Orlando Facility.

191.   At all relevant times, Lockheed Martin's ongoing operations at the Orlando Facility resulted in the generation of additional toxic wastes. Plaintiffs, and others in the community, did inhale, ingest, and come into dermal contact with toxic wastes generated by Lockheed Martin's ongoing operations at the Orlando Facility.

192.   As a result of these exposures to Lockheed Martin's toxic wastes, Plaintiffs suffered injuries, as described herein.

193.   Vervicia Henderson lived within the vicinity of the Orlando Facility, in Tangelo Park, from 1995 until 2020. As a result of her exposure to Lockheed Martin's toxic wastes, Vervicia Henderson has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes. Vervicia Henderson has also

lost the companionship, comfort, guidance, kindly offices and advices of her husband Craig Henderson as a result of his injuries.

194.    Craig Henderson lived within the vicinity of the Orlando Facility, in Tangelo Park, from 1995 until 2020. Craig Henderson also worked within the vicinity of the Orlando Facility, at 9400 Universal Boulevard, from 2003 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes, Craig Henderson was diagnosed with hepatocellular carcinoma. He suffered extensive bodily injury, pain and suffering, sorrow and mental anguish, and received extensive treatments for his conditions. Both his and his family member's lives were changed forever by defendants' wrongful conduct. Craig Henderson passed away in 2020.

195.    As personal representative of the estate of Craig Henderson, Vervicia Henderson seeks all damages available under Florida's Wrongful Death Act, and/or all damages available through Survival actions under Fl. St. 46.021.

196.    Deborah Reese lived within the vicinity of the Orlando Facility, in Tangelo Park, from 1970 until 1992. As a result of her exposure to Lockheed Martin's toxic wastes, Deborah Reese has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes. Deborah Reese has also lost the companionship, comfort, guidance, kindly offices and advices of her mother Marie Outing as a result of her injuries.

197.    Marie Outing lived within the vicinity of the Orlando Facility, in Tangelo Park, from 1963 until 2019. As a result of her exposure to Lockheed Martin's toxic wastes, Marie Outing was diagnosed with Breast Cancer and a Pituitary Gland Tumor in 2012. She

suffered extensive bodily injury, pain and suffering, sorrow and mental anguish, and received extensive treatments for her conditions. Both her and her family member's lives were changed forever by defendants' wrongful conduct.

198.    As a further result of her exposure to Lockheed Martin's toxic wastes, Marie Outing was diagnosed with, and passed away from ovarian cancer in 2020.

199.    As personal representative of the estate of Marie Outing, Deborah Reese seeks all damages available under Florida's Wrongful Death Act, and/or all damages available through Survival actions under Fl. St. 46.021.

200.    Christine Eidemiller worked within the vicinity of the Orlando Facility, at Universal Studios, from 2006 until 2018. As a result of her exposure to Lockheed Martin's toxic wastes, Christine Eidemiller was diagnosed with breast cancer, lymph node cancer, and brain lesion in 2018. She suffered extensive bodily injury, pain and suffering, sorrow and mental anguish, and received extensive treatments for her conditions. Both her and her family member's lives were changed forever by defendants' wrongful conduct. As a further result of her exposure to Lockheed Martin's toxic wastes, Christine Eidemiller passed away in 2019.

201.    Richard Eidemiller's wife worked within the vicinity of the Orlando Facility from 2006 until 2018. As a result of his wife's exposure to Lockheed Martin's toxic wastes, and her resulting injuries, Richard Eidemiller has lost the companionship, comfort, guidance, kindly offices and advices of his wife Christine Eidemiller.

202.    As personal representative of the estate of Christine Eidemiller, Richard Eidemiller seeks all damages available under Florida's Wrongful Death Act, and/or all damages available through Survival actions under Fl. St. 46.021.

203.    Patricia Ramsey worked within the vicinity of the Orlando Facility, at 7675 Municipal Drive, from 2000 until 2013. As a result of her exposure to Lockheed Martin's toxic wastes Patricia Ramsey was diagnosed with anal cancer in 2017. She suffered extensive bodily injury, pain and suffering, sorrow and mental anguish, and received extensive treatments for her conditions. Both her and her family member's lives were changed forever by defendants' wrongful conduct.

204.    Brenda Jackson lived within the vicinity of the Orlando Facility, in Tangelo Park, from 1970 until 1973. As a result of her exposure to Lockheed Martin's toxic wastes, Brenda Jackson has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes. Brenda Jackson has also lost the companionship, comfort, guidance, kindly offices and advices of her father Clifford Reynolds Jr. as a result of his injuries.

205.    Clifford Reynolds Jr. lived within the vicinity of the Orlando Facility, in Tangelo Park, from 1970 until 1973. As a result of his exposure to Lockheed Martin's toxic wastes, Clifford Reynolds Jr. was diagnosed with, and passed away from lung cancer in 2019. He suffered extensive bodily injury, pain and suffering, sorrow and mental anguish, and received extensive treatments for her conditions. Both he and his family member's lives were changed forever by defendants' wrongful conduct.

206.    As personal representative of the estate of Clifford Reynolds Jr., Brenda Jackson seeks all damages available under Florida's Wrongful Death Act, and/or all damages available through Survival actions under Fl. St. 46.021.

207.    Emilio San Martin worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1994 until 2014. Mr. San Martin also lived within the vicinity of the Orlando Facility during this time period. As a result of his exposure to Lockheed Martin's toxic wastes, Emilio San Martin was diagnosed with brain lesions, multiple sclerosis, and hypoactive thyroid in 2016. He has received extensive treatments for his conditions, and his life has been changed forever.

208.    Eric Rutledge worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2001 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes, Eric Rutledge was diagnosed with multiple sclerosis in 2014. He has received extensive treatments for his conditions, and his life has been changed forever.

209.    Wendy Stone worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1998 until 2018. As a result of her exposure to Lockheed Martin's toxic wastes, Wendy Stone was diagnosed with breast cancer in 2008 and ovarian and uterine cysts in 2016. She has received extensive treatments for her conditions, and her life has been changed forever.

210.    Tom Stone's wife Wendy Stone worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1998 and 2018. He suffers the loss of consortium of his wife as a result of her exposure to Lockheed Martin's toxic wastes, and her resulting injuries.

211.    Kevin Kiely worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1994 until 1999. As a result of his exposure to Lockheed Martin's toxic wastes, Kevin Kiely was diagnosed with testicular cancer in 2010. He has received extensive treatments for his conditions, and his life has been changed forever.

212.    Kristen Sheen worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1994 until 2020. As a result of her exposure to Lockheed Martin's toxic wastes Kristen Sheen was diagnosed with breast cancer in 2008. She has received extensive treatments for her conditions, and her life has been changed forever.

213.    Brendan Havens worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2002 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes Brendan Havens was diagnosed with thyroid cancer in 2005. He has received extensive treatments for his conditions, and his life has been changed forever.

214.    Jeff Kozak worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1995 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes Jeff Kozak was diagnosed with numerous blood clots in 2016. He has also suffered multiple kidney stones and degenerative neurological effects. He has received extensive treatments for his conditions, and his life has been changed forever.

215.    Brian Slusarz worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2009 until 2017. As a result of his exposure to Lockheed Martin's toxic wastes Brian Slusarz was diagnosed with multiple sclerosis in 2013. He has received extensive treatments for his conditions, and his life has been changed forever.

216.     Kristi Hujik worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2003 until 2020. As a result of her exposure to Lockheed Martin's toxic wastes Kristi Hujik was diagnosed with multiple sclerosis in 2017. She has received extensive treatments for her conditions, and her life has been changed forever.

217.     Helen Tosti worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2001 until 2003. As a result of her exposure to Lockheed Martin's toxic wastes Helen Tosti was diagnosed with cervical dystonia in 2010 and papillary renal cell carcinoma in 2019. She has received extensive treatments for her conditions, and her life has been changed forever.

218.     John Tosti's wife Helen Tosti worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2001 and 2003. He suffers the loss of consortium of his wife as a result of her exposure to Lockheed Martin's toxic wastes, and her resulting injuries.

219.     Eric Saperstein worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1994 until 2008. Mr. Saperstein also lived within the vicinity of the Orlando Facility between 2002-2012. As a result of his exposure to Lockheed Martin's toxic wastes Eric Saperstein was diagnosed with multiple sclerosis in 2020. Mr. Saperstein has also been diagnosed with 20 brain lesions, as well as thoracic and cervical lesions. He has received extensive treatments for his conditions, and his life has been changed forever. Eric Saperstein also suffers the loss of consortium of his son Ari Saperstein as a result of his exposure to Lockheed Martin's toxic wastes, and their resulting injuries.

220.    Ana Saperstein lived within the vicinity of the Orlando Facility from 2010 until 2012. As a result of her and her husband's exposure to Lockheed Martin's toxic wastes Ana Saperstein gave premature birth to a son born with deformities and chromosomal mutation. She has received extensive treatments for these conditions, and her life has been changed forever. She also suffers the loss of consortium of her husband Eric Saperstein and her son Ari Saperstein as a result of their exposure to Lockheed Martin's toxic wastes, and their resulting injuries. Further, Ana Saperstein has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

221.    Ari Saperstein's parents Eric Saperstein and Ana Saperstein lived and worked within the vicinity of the Orlando Facility during the period in which Ari Saperstein was conceived and in utero of his mother Ana Saperstein. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Ari Saperstein was born prematurely, with deformed hands, fingers, and toes, and ectodermal dysplasia. Ari Saperstein was born without tear ducts, and has lived in constant discomfort to breathe.  He has received extensive treatments for these conditions, and his life has been changed forever.

222.    Jordan Schursky worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2016 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes, Jordan Schursky's son Harrison Carp-Schursky was born with bilateral club foot. He has received extensive treatments for these conditions, and his life has been changed forever.  Jordan Schursky also suffers the loss of consortium of his son Harrison Carp-Schursky as a result of his exposure to Lockheed Martin's toxic wastes, and their resulting

injuries. Further, Jordan Schursky has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

223.    Aubrey Carp's husband Jordan Schursky worked within the vicinity of the Orlando Facility from 2016 until 2020. As a result of her and her husband's exposure to Lockheed Martin's toxic wastes Aubrey Carp gave birth to a son born with deformities, including bilateral club foot. She has received extensive treatments for these conditions, and her life has been changed forever. She also suffers the loss of consortium of her son Harrison Carp-Schursky as a result of their exposure to Lockheed Martin's toxic wastes, and their resulting injuries. Further, Aubrey Carp has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

224.    Harrison Carp-Schursky's father Jordan Schursky worked within the vicinity of the Orlando Facility during the period in which Harrison Carp-Schursky was conceived and in utero of his mother Aubrey Carp. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Harrison Carp-Schursky was born in 2019 with bilateral club foot, and remains unable to walk or move his feet properly. He has received extensive treatments for these conditions, and his life has been changed forever.

225.    Laura Juda worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1998 until 2018. She also lived within vicinity of the Orlando Facility. As a result of her exposure to Lockheed Martin's toxic wastes Laura Juda was diagnosed with numerous brain lesions, related hearing loss, and other degenerative neurological conditions in 2015. She has received extensive treatments for her conditions, and her life has been changed forever.

226.    Mark Juda's wife Laura Juda worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1998 and 2018. He suffers the loss of consortium of his wife as a result of her exposure to Lockheed Martin's toxic wastes, and her resulting injuries.

227.    Andrew Ebert worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1996 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes Andrew Ebert was diagnosed with kidney & bile duct cancer in 2020. He has received extensive treatments for his conditions, and his life has been changed forever.

228.    Brenda White's husband Andrew Ebert worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1996 until 2020. She suffers the loss of consortium of her husband as a result of his exposure to Lockheed Martin's toxic wastes, and his resulting injuries.

229.    Donald Goertz worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2013 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes Andrew Ebert was diagnosed with testicular cancer in 2016. He has received extensive treatments for his conditions, and his life has been changed forever.

230.    Jennifer Johnson worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2011 until 2020. As a result of his and her and her husband Drew Johnson's exposures to Lockheed Martin's toxic wastes, Jennifer Johnson's son Benjamin Johnson was born with heart defects and Klinefelter's syndrome. Jennifer Johnson's son has received extensive treatments for these conditions, and their life has been changed forever. Jennifer Johnson also suffers the loss of consortium of her son Benjamin Johnson

71

as a result of her exposure to Lockheed Martin's toxic wastes, and his resulting injuries. Further, Jennifer Johnson has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

231.    Drew Johnson worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2011 until 2020. As a result of his and his wife Jennifer Johnson's exposures to Lockheed Martin's toxic wastes, Drew Johnson's son Benjamin Johnson was born with heart defects and Klinefelter's syndrome. Drew Johnson's son has received extensive treatments for these conditions, and their life has been changed forever.  Drew Johnson also suffers the loss of consortium of his son Benjamin Johnson as a result of his exposure to Lockheed Martin's toxic wastes, and his resulting injuries. Further, Drew Johnson has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

232.    Benjamin Johnson's father Drew Johnson and mother Jennifer Johnson worked within the vicinity of the Orlando Facility during the period in which Benjamin Johnson was conceived and in utero of his mother Jennifer Johnson. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Benjamin Johnson was born in 2020 with heart defects and Klinefelter's syndrome. He has received extensive treatments for these conditions, and his life has been changed forever.

233.    Patricia Anderson worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2000 until 2020. As a result of her exposure to Lockheed Martin's toxic wastes Patricia Anderson was diagnosed with complex ovarian cysts in 2003 and breast

cancer in 2011. She has received extensive treatments for her conditions, and her life has been changed forever.

234.    Arthur Anderson's wife Patricia Anderson worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2000 and 2020. He suffers the loss of consortium of his wife as a result of her exposure to Lockheed Martin's toxic wastes, and her resulting injuries.

235.    David Berry worked within the vicinity of the Orlando Facility, at Millenium Technologies, from 2013 until 2020. As a result of his exposure to Lockheed Martin's toxic wastes David Berry was diagnosed with testicular cancer in 2016. He has received extensive treatments for his conditions, and his life has been changed forever.

236.    Adam Brackett worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2000 until 2006. As a result of his exposure to Lockheed Martin's toxic wastes Adam Brackett was diagnosed with testicular cancer in 2005. He has received extensive treatments for his conditions, and his life has been changed forever.

237.    Elizabeth Brackett's husband Adam Brackett worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2000 and 2006. She suffers the loss of consortium of her husband as a result of her exposure to Lockheed Martin's toxic wastes, and his resulting injuries.

238.    Meredith Brunelle worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1994 until 1996. As a result of her exposure to Lockheed Martin's toxic wastes Meredith Brunelle was diagnosed with pancreatic cancer in 2020. She has received extensive treatments for her conditions and her life has been changed forever.

239.     Donna De Milt worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2008 until 2019. As a result of her exposure to Lockheed Martin's toxic wastes Donna De Milt was diagnosed with multiple sclerosis in 2015. She has received extensive treatments for her conditions, and her life has been changed forever.

240.     Victor Goldschmidt worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2006 until 2010. As a result of his exposure to Lockheed Martin's toxic wastes Victor Goldschmidt was diagnosed with thyroid cancer in 2017. He has received extensive treatments for his conditions, and his life has been changed forever.

241.     Elaine Goldschmidt's husband Goldschmidt worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2006 until 2010. She suffers the loss of consortium of her husband as a result of his exposure to Lockheed Martin's toxic wastes, and his resulting injuries.

242.     Logan Goodson worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2013 until 2021. As a result of his exposure to Lockheed Martin's toxic wastes Logan Goodson was diagnosed with anaplastic large cell lymphoma in 2020. He has received extensive treatments for his conditions, and his life has been changed forever.

243.     Michael L. Iacovino worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1994 until 2021. As a result of his exposure to Lockheed Martin's toxic wastes, Michael L. Iacovino's son Michael D. Iacovino was born with severe heart defects and only one kidney. He has received extensive treatments for these conditions, and his life has been changed forever. Michael L. Iacovino also suffers the loss of consortium of his son Michael D. Iacovino and wife Dawn Iacovino as a result of his exposure to Lockheed

Martin's toxic wastes, and their resulting injuries. Further, Michael L. Iacovino has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

244.    Dawn Iacovino's husband Michael L. Iacovino worked within the vicinity of the Orlando Facility from 1994 until 2021. As a result of her and her husband's exposure to Lockheed Martin's toxic wastes Dawn Iacovino' son Michael D. Iacovino was born with deformities, including severe heart defects and only one kidney. Additionally, she conceived another child who had severe deformities and who did not survive the pregnancy. She has received extensive treatments for these conditions, and her life has been changed forever. She also suffers the loss of consortium of her son Michael D. Iacovino as a result of their exposure to Lockheed Martin's toxic wastes, and their resulting injuries.

245.    Michael D. Iacovino's father Michael L. Iacovino worked within the vicinity of the Orlando Facility during the period in which Michael D. Iacovino was conceived and in utero of his mother Dawn Iacovino. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Michael D. Iacovino was born in 2011 with severe heart defects and only one kidney. He has received extensive treatments for these conditions, and his life has been changed forever.

246.    Morgan Innes worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2013 until 2019. As a result of her exposure to Lockheed Martin's toxic wastes Morgan Innes was diagnosed with hodgkin's disease and nodular sclerosis of intrathoracic lymph nodes in 2020. She has received extensive treatments for her conditions, and her life has been changed forever.

247.   Andrew Innes' wife Morgan Innes worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2013 and 2019. He suffers the loss of consortium of his wife as a result of her exposure to Lockheed Martin's toxic wastes, and her resulting injuries.

248.   Brian Kemp worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2006 until 2016. As a result of his exposure to Lockheed Martin's toxic wastes Brian Kemp was diagnosed with hairy cell leukeia in 2020. He has received extensive treatments for his conditions, and his life has been changed forever.

249.   Kelly Kemp's husband Brian Kemp worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2006 and 2016. She suffers the loss of consortium of her husband as a result of her exposure to Lockheed Martin's toxic wastes, and his resulting injuries.

250.   Naoyuki Komatsu worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2002 until 2021. As a result of his exposure to Lockheed Martin's toxic wastes Naoyuki Komatsu was diagnosed with leukemia in 2015. He has received extensive treatments for his conditions, and his life has been changed forever. Naoyuki Komatsu also suffers the loss of consortium of his son Ryo Komatsu as a result of his exposure to Lockheed Martin's toxic wastes, and their resulting injuries.

251.   Naho Komatsu's husband Naoyuki Komatsu worked within the vicinity of the Orlando Facility from 2002 until 2021. As a result of her and her husband's exposure to Lockheed Martin's toxic wastes Naho Komatsu gave birth to a son born with deformities, including digeorge syndrome. She has received extensive treatments for these conditions,

and her life has been changed forever. She also suffers the loss of consortium of her husband Naoyuki Komatsu and son Ryo Komatsu as a result of their exposures to Lockheed Martin's toxic wastes, and their resulting injuries.

252.    Ryo Komatsu's father Naoyuki Komatsu worked within the vicinity of the Orlando Facility during the period in which Ryo Komatsu was conceived and in utero of his mother Naho Komatsu. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Ryo Komatsu was born in 2006 with severe birth and developmental defects, including digeorge syndrome. He has received extensive treatments for these conditions, and his life has been changed forever.

253.    Michael McGarry worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1995 until 2009. As a result of his exposure to Lockheed Martin's toxic wastes Michael McGarry was diagnosed with Parkinson's disease in 2017. He has received extensive treatments for his conditions, and his life has been changed forever.

254.    Ann McGarry's husband Michael McGarry worked within the vicinity of the Orlando Facility, at the Golf Channel, from 1995 and 2009. She suffers the loss of consortium of her husband as a result of her exposure to Lockheed Martin's toxic wastes, and his resulting injuries.

255.    Jeffrey Muddell worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2000 until 2007. As a result of his exposure to Lockheed Martin's toxic wastes Jeffrey Muddell was diagnosed with testicular cancer in 2015. He has received extensive treatments for his conditions, and his life has been changed forever.

256.    Stephanie Muddell's husband Jeffrey Muddell worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2000 and 2007. She suffers the loss of consortium of her husband as a result of her exposure to Lockheed Martin's toxic wastes, and his resulting injuries.

257.    Renee Ross worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2018 until 2021. As a result of her exposure to Lockheed Martin's toxic wastes Renee Ross was diagnosed with breast cancer in 2019. She has received extensive treatments for her conditions, and her life has been changed forever.

258.

259.    William Siegrist worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2013 until 2021. As a result of his exposure to Lockheed Martin's toxic wastes, William Siegrist's son Austin Siegrist was born with juvenile idiopathic arthritis, autism, severe developmental delays and is immunocompromised. He has received extensive treatments for these conditions, and his life has been changed forever.  William Siegrist also suffers the loss of consortium of his son Austin Siegrist as a result of his exposure to Lockheed Martin's toxic wastes, and their resulting injuries. Further, William Siegrist has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

260.    Amanda Siegrist's husband William Siegrist worked within the vicinity of the Orlando Facility from 2013 until 2021. As a result of her and her husband's exposure to Lockheed Martin's toxic wastes Amanda Siegrist gave birth to a son born with juvenile idiopathic arthritis, autism, severe developmental delays and immunocompromised state.

She has received extensive treatments for these conditions, and her life has been changed forever. She also suffers the loss of consortium of her son Austin Siegrist as a result of their exposure to Lockheed Martin's toxic wastes, and their resulting injuries.

261.    Austin Siegrist's father William Siegrist worked within the vicinity of the Orlando Facility during the period in which Austin Siegrist was conceived and in utero of his mother Amanda Siegrist. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Austin Siegrist was born in 2016 with juvenile idiopathic arthritis, autism, severe developmental delays, and is immunocompromised. He has received extensive treatments for these conditions, and his life has been changed forever.

262.    Cristina Turk worked within the vicinity of the Orlando Facility, at the Golf Channel, from 2008 until 2020. As a result of her exposure to Lockheed Martin's toxic wastes Cristina Turk gave birth to one son born with a cleft lip and palate, and another son with autism spectrum disorder and severe developmental defects. She has received extensive treatments for these conditions, and her life has been changed forever. She also suffers the loss of consortium of her sons Jack Turk and Theodore Turk as a result of their exposure to Lockheed Martin's toxic wastes, and their resulting injuries. Further, Cristina Turk has been injured by the present need to incur the costs of diagnostic testing of illnesses, diseases or disease processes.

263.    Jack Turk's mother Cristina Turk worked within the vicinity of the Orlando Facility during the period in which Jack Turk was conceived and in utero of his mother Cristina Turk. As a result of his and his parent's exposure to Lockheed Martin's toxic

wastes, Jack Turk was born in 2018 with cleft lip and palate. He has received extensive treatments for these conditions, and his life has been changed forever.

264.  Theodore Turk's mother Cristina Turk worked within the vicinity of the Orlando Facility during the period in which Theodore Turk was conceived and in utero of his mother Cristina Turk. As a result of his and his parent's exposure to Lockheed Martin's toxic wastes, Theodore Turk was born in 2016 with autism spectrum disease and severe developmental defects. He has received extensive treatments for these conditions, and his life has been changed forever.

265.  As a direct and proximate result of their exposure to the proven hazardous contaminants originating from the Orlando Facility, at greater than normal background levels, caused by Lockheed Martin's negligence, Plaintiffs also presently suffer, and will continue to suffer, a present increased risk of contracting additional illnesses and diseases as described herein, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of these illnesses, diseases and disease processes. Monitoring regimes exist that make the early detection of these illnesses, diseases and disease processes possible, and differ from what would normally be recommended in the absence of exposure to Lockheed Martin's toxic wastes.

## COUNT I—STRICT LIABILITY; ULTRAHAZARDOUS ACTIVITY
### *(On behalf of all Plaintiffs, against Lockheed Martin)*

266.  Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265 as if fully set forth herein.

267.    Defendant Lockheed Martin's handling, storage, use, and disposal of the highly toxic contaminants described herein constituted ultrahazardous activities.

268.    Handling, storing, utilizing, disposing and emitting the highly toxic contaminants described herein is abnormally dangerous and cannot be made safe by the exercise of the utmost care. The operations at the Orlando Facility resulted in emissions of toxic substances into nearby homes and businesses, which posed a high degree of risk to Plaintiffs.

269.    There is a reasonable likelihood that the handling, storing, utilizing, disposing, and emitting the toxic substances described herein will result in life-threatening cancer and other devastating illnesses, diseases and disease processes. These risks cannot be eliminated as long as these toxic contaminants are handled, stored, utilized, disposed of, or emitted near populated areas.

270.    Manufacturing ballistic missiles, lethal weaponry, war equipment, and component parts is not a manner of common usage but is an extraordinarily rare and unusual enterprise. Likewise, it was completely inappropriate for Defendant Lockheed Martin to carry out these activities and use, handle, store, dispose of and emit toxic contaminants near populated areas.

271.    The emissions of the toxic substances described herein near homes and businesses is likely to result in great harm to persons and property.

272.    Defendant Lockheed Martin's handling, storing, utilizing, disposing and emitting of the toxic contaminants described herein created a high degree of risk of harm to

those who live in the surrounding area and substantially increased their risk of developing cancer and other devastating illnesses, diseases and disease processes.

273.    The activities conducted by Defendant Lockheed Martin are not a manner of common usage, are exceedingly dangerous and offer little or no value to the surrounding community.

274.    Because these activities are ultrahazardous, Defendant Lockheed Martin is strictly liable for any injuries proximately resulting therefrom.

275.    As a direct and proximate result of Defendant Lockheed Martin's ultrahazardous activities and the exposure to toxic contaminants resulting therefrom, Plaintiffs were exposed to Defendant's toxic wastes, and suffered injuries, as described herein.

276.    Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

277.    Defendant Lockheed Martin knew or ought to have known that its conduct would naturally and probably result in injury to others, including Plaintiffs and others in the vicinity of the Orlando Facility. Defendant Lockheed Martin carried on and continued such conduct in reckless disregard of the consequences. Punitive damages are thus warranted.

278.    By reason of the foregoing, Defendant Lockheed Martin is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

## COUNT II—STRICT LIABILITY; Fla. Stat. §376.313
### *(On behalf of all Plaintiffs, against Lockheed Martin)*

279.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265 as if fully set forth herein.

280.    Defendant Lockheed Martin owned and operated the Orlando Facility, and caused discharges of the contaminants described herein, and polluting conditions which are prohibited by Fla. Stat. §§376.30, 376.302 *et seq.*

281.    Defendant Lockheed Martin discharged hazardous substances, petroleum, petroleum products, and solvents, as described herein, in violation of Fla. Stat. §§376.30, 376.302 *et seq.*

282.    Defendant Lockheed Martin's discharges of contaminants, hazardous substances, solvents, petroleum, petroleum products, and creation of polluting conditions, in violation of Fla. Stat. §376.30 *et seq.*, caused Plaintiffs to be exposed to Defendant's toxic wastes, and suffer injuries, as described herein

283.    By reason of the foregoing, Defendant is strictly liable to Plaintiffs for compensatory damages resulting therefrom, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

284.    Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

## COUNT III—PUBLIC NUISANCE
### *(On behalf of all Plaintiffs, against Lockheed Martin)*

285.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265 as if fully set forth herein.

286.    Plaintiffs have a common right to breathe clean air and enjoy a clean environment without dangerous levels of harmful toxic wastes.

287.    Defendant Lockheed Martin's unreasonable and reckless use, storage, transport, handling, disposal and emission of toxic wastes at its Orlando Facility substantially and unreasonably infringes upon and transgresses this public right.

288.    By unreasonably and recklessly using, storing, transporting, handling, disposing, and emitting toxic wastes at its Orlando Facility, Defendant Lockheed Martin is maintaining a place that tends to annoy the community or injure the health of the surrounding community.

289.    By unreasonably and recklessly using, storing, transporting, handling, disposing, and emitting toxic wastes at its Orlando Facility, Defendant Lockheed Martin is maintaining a place where the laws of the State of Florida are violated.

290.    At all times relevant hereto, Defendant Lockheed Martin knew these toxic wastes to be hazardous and harmful to human beings.

291.    Defendant Lockheed Martin knew or should have known that the levels of toxic wastes it emitted at its Orlando Facility would have a deleterious effect upon the health, safety, and well-being of people living and working in nearby areas.

292.    Defendant Lockheed Martin's operation of its Orlando Facility caused those who live and work in the surrounding area to inhale, ingest, and come into dermal contact with high levels of harmful toxic wastes on a routine and constant basis, causing a substantially elevated risk of cancer and other debilitating diseases.

293.    As a proximate result of Defendant Lockheed Martin's operations at its Orlando Facility, Plaintiffs' and the general public's common right to breathe clean air and enjoy a clean environment without dangerous levels of harmful toxic wastes was eliminated and/or severely diminished.

294.    As a proximate result of Defendant Lockheed Martin's operation of its Orlando Facility, dangerous levels of harmful toxic wastes continuously invaded and contaminated the areas surrounding Plaintiffs' workplace and residences, thereby exposing them harmful toxic wastes.

295.    As a direct and proximate result of Defendant Lockheed Martin's creation of a public nuisance and the exposure to harmful toxic wastes resulting therefrom, Plaintiffs suffered injuries, as described herein.

296.    Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

297.    Defendant Lockheed Martin's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiffs, and punitive damages are thus warranted.

298.    By reason of the foregoing, Defendant Lockheed Martin is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

## COUNT IV—PRIVATE NUISANCE
### *(On behalf of all Plaintiffs, against Lockheed Martin)*

299.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265 as if fully set forth herein.

85

300.   At all times relevant hereto, Defendant Lockheed Martin knew its toxic wastes to be hazardous and harmful to human beings.

301.   Defendant Lockheed Martin's unreasonable and reckless storage, use, transport, handling, disposal and emission of toxic wastes from its Orlando Facility constituted an unreasonable invasion of Plaintiffs' interests and rights of reasonable use and enjoyment of property and their rights to enjoyment of life free from consuming toxic wastes.

302.   Defendant Lockheed Martin's unreasonable and reckless storage, use, disposal and emission of toxic wastes from its Orlando Facility constituted negligent or reckless conduct.

303.   Defendant Lockheed Martin's unreasonable and reckless storage, use, disposal and emission of toxic wastes from its Orlando Facility was an ultrahazardous or abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

304.   Defendant Lockheed Martin's operation of its Orlando Facility caused those who live and work in the surrounding area to breathe, ingest, and come into dermal contact with high levels of toxic contaminants on a routine and constant basis, causing a substantially elevated risk of cancer and other debilitating disease.

305.   As a proximate result of the Defendant Lockheed Martin's operation of its Orlando Facility, Plaintiffs' common rights to enjoy a clean environment, without dangerous levels of toxic wastes, were infringed and/or severely diminished.

306.    As a proximate result of Defendant Lockheed Martin's operation of its Orlando Facility, toxic contaminants continuously invaded and contaminated the areas surrounding Plaintiffs' places of employment and residences, thereby exposing them to toxic wastes.

307.    As a direct and proximate result of Defendant Lockheed Martin's creation of a private nuisance and the exposure to toxic wastes resulting therefrom, Plaintiffs suffered injuries, as described herein.

308.    Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

309.    Defendant Lockheed Martin's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiffs, and punitive damages are thus warranted.

310.    By reason of the foregoing, Defendant Lockheed Martin is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

## COUNT V—NEGLIGENCE
### *(On behalf of all Plaintiffs, against Lockheed Martin)*

311.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265 as if fully set forth herein.

312.    Defendant Lockheed Martin owed Plaintiffs a duty to operate its Orlando Facility in a manner which would not cause Plaintiffs injury or harm. Plaintiffs were foreseeable victims located within the scope of the risk created by the Defendant Lockheed Martin's unreasonable and reckless conduct.

313. Defendant Lockheed Martin negligently breached its duty of care by mismanaging toxic contaminants in a way that would cause severe and widespread contamination at its Orlando Facility, emitting dangerous levels of toxic wastes from its Orlando Facility, failing to take steps to minimize or eliminate the release of toxic wastes from its Orlando Facility, failing to utilize alternative processes that would not result in widespread contamination of the release of toxic wastes, failing to use proper materials in constructing the facility, failing to institute proper procedures and training, releasing toxic wastes into a heavily populated community, and further increasing the number of people exposed to its contamination by selling parcels of the Orlando Facility for redevelopment.

314. Defendant Lockheed Martin owed Plaintiffs a duty of reasonable care commensurate with the risk of operating the Orlando Facility.

315. Defendant Lockheed Martin negligently breached its duty by, among other things:

    a. Filling crude unlined trenches and ponds with toxic wastes;

    b. Transporting toxic wastes through defective lines, piping systems, and broken concrete troughs;

    c. Draining toxic wastes directly onto soil;

    d. Emitting dangerous amounts of toxic wastes into the air;

    e. Failing to employ safe methods to adequately control, reduce, or eliminate toxic waste emissions from its Orlando Facility;

    f. Failing to use alternative practices and procedures which would not result in the emission of toxic wastes into neighboring communities;

g.  Emitting dangerous amounts of toxic wastes into a populated area;

h.  Failing to warn neighboring residents and workers that they were being exposed to toxic wastes and of the consequent risks of disease the residents and workers acquired because of that exposure;

i.  Failing to take steps to minimize or eliminate the release of toxic wastes, by failing to utilize alternative procedures that would not result in the release of toxic wastes;

j.  Failing to install closed loop treatment technologies which would contain toxic wastes in sealed containers;

k.  Failing to use proper materials in constructing and maintaining the Orlando Facility; and

l.  Failing to institute proper procedures and training to prevent releases of toxic wastes.

316.   As a direct and proximate result of Defendant Lockheed Martin's negligence, Defendant Lockheed Martin emitted toxic substances near homes and businesses, posing a high degree of risk to the surrounding community, including Plaintiffs.

317.   As a direct and proximate result of Defendant Lockheed Martin's negligence, Plaintiffs were exposed to, and inhaled, ingested, and dermally contacted Defendant Lockheed Martin's toxic wastes. As a result of their exposure to, inhalation of, ingestion of, and dermal contact with Lockheed Martin's toxic wastes, Plaintiffs suffered injuries, as described herein.

318.   Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

319.   At all times relevant, Defendant Lockheed Martin owed Plaintiffs a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, property, and well-being of Plaintiffs.

320.   Upon information and belief, Defendant Lockheed Martin was, at all times relevant, aware that the toxic wastes it was storing, handling disposing and emitting at its Orlando Facility were highly carcinogenic, capable of causing debilitating diseases, and/or otherwise extremely harmful to humans.

321.   Upon information and belief, Defendant Lockheed Martin was, at all times relevant, aware of the considerable health risks associated with the mismanagement and emissions of its toxic wastes at the Orlando Facility, including the risk of causing various forms of cancer and other debilitating diseases in the surrounding population.

322.   Upon information and belief, Defendant Lockheed Martin was, at all times relevant, aware that their handling, storage, use, disposal, and treatment of toxic wastes at the Orlando Facility actually resulted in the unreasonably dangerous emissions of toxic wastes into the surrounding communities, homes and businesses, which posed a high degree of risk to Plaintiffs.

323.   Defendant Lockheed Martin's failures in these and other respects, in the face of actual knowledge regarding the risks of unreasonable levels of toxic contamination, constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs.

324.    Defendant Lockheed Martin's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiffs, and punitive damages are thus warranted.

325.    By reason of the foregoing, Defendant is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

### COUNT VI—NEGLIGENCE

*(On behalf of Plaintiffs Vervicia Henderson, Deborah Reese, Richard Eidemiller, Patricia Ramsey, Emilio San Martin, Tom Stone, Kevin Kiely, Brendan Havens, Helen Tosti, John Tosti, Eric Saperstein, Ana Saperstein, Ari Saperstein, Aubrey Carp, Harrison Carp-Schursky, Mark Juda, Brenda White, Jeff Kozak, Arthur Anderson, David Berry, Adam Brackett, Elizabeth Brackett, Meredith Brunelle, Justin Brunelle, Victor Goldschmidt, Elaine Goldschmidt, Logan Goodson, Michael L. Iacovino, Dawn Iacovino, Michael D. Iacovino, Morgan Innes, Andrew Innes, Kelly Kemp, Naho Komatsu, Ryo Komatsu, Michael McGarry, Ann McGarry, Jeffrey Muddell, Stephanie Muddell, William Siegrist, Amanda Siegrist, Austin Siegrist, Cristina Turk, Jack Turk, and Theodore Turk against Defendant UCPM)*

326.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265 as if fully set forth herein.

327.    UCPM owed Plaintiffs a duty to operate its parcel at the Orlando Facility in a manner which would not cause Plaintiffs injury or harm. Plaintiffs were foreseeable victims located within the scope of the risk created by the UCPM's unreasonable and reckless conduct.

328.    UCPM negligently breached its duty of care by emitting dangerous levels of Lockheed Martin's toxic wastes from their parcel at the Orlando Facility, failing to take steps to minimize or eliminate the release of Lockheed Martin's toxic wastes from their

parcel at the Orlando Facility, failing to utilize alternative processes that would not result in the release of Lockheed Martin's toxic wastes, failing to use proper materials in constructing their contamination equipment, failing to institute proper policies, procedures and training, releasing Lockheed Martin's toxic wastes into a heavily populated community, and entering into a joint venture with Lockheed Martin to operate contamination equipment and continue contamination activities.

329.    UCPM owed Plaintiffs a duty of reasonable care commensurate with the risk of operating its parcel at the Orlando Facility.

330.    UCPM negligently breached their duty by, among other things:

   a. Emitting dangerous amounts of Lockheed Martin's toxic wastes into the air;

   b. Failing to employ safe methods to adequately control, reduce, or eliminate toxic waste emissions from their parcel at the Orlando Facility;

   c. Failing to use alternative practices and procedures which would not result in the emission of Lockheed Martin's toxic wastes into neighboring communities;

   d. Emitting dangerous amounts of Lockheed Martin's toxic wastes into a populated area;

   e. Failing to warn neighboring residents and workers that they were being exposed to Lockheed Martin's toxic wastes and of the

Case 6:21-cv-01363-RBD-DCI   Document 74   Filed 11/09/21   Page 93 of 155 PageID 910

consequent risks of disease the residents and workers acquired because of that exposure;

    f.   Failing to take steps to minimize or eliminate the release of Lockheed Martin's toxic wastes, by failing to utilize alternative procedures that would not result in the release of Lockheed Martin's toxic wastes;

    g.   Failing to install closed loop treatment technologies which would contain Lockheed Martin's toxic wastes in sealed containers;

    h.   Failing to use proper materials in constructing and maintaining their contamination equipment at the Orlando Facility; and

    i.   Entering into a joint venture with Lockheed Martin to operate contamination equipment and continue contamination activities.

331.   As a direct and proximate result of UCPM's negligence, and their resulting exposure to Defendant Lockheed Martin's toxic wastes, Plaintiffs suffered injuries, as described herein.

332.   However, none of UCPM's acts would have occurred or caused harm to Plaintiffs if not for Lockheed Martin's original sin: dumping thousands of tons of highly toxic wastes into the soil and groundwater at the Orlando Facility to begin with.

333.   All of the UCPM's negligent acts were undertaken in a joint venture with Lockheed Martin.

334.   Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

335.   UCPM's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiffs, and punitive damages are thus warranted.

93

336.    By reason of the foregoing, UCPM is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

### COUNT VII—MEDICAL MONITORING
*(On behalf of Plaintiffs Vervicia Henderson, Deborah Reese, Ana Saperstein, Aubrey Carp, Michael L. Iacovino, William Siegrist, and Cristina Turk against all Defendants)*

337.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265, and 311 through 336, as if fully set forth herein.

338.    Plaintiffs have been significantly exposed to levels of toxic contaminants that are far higher than normal background levels. These toxic wastes include dangerous carcinogens that have been proven to cause cancer in humans, and substances which cause numerous other debilitating illnesses.

339.    Plaintiffs came into direct contact with, and consumed, these toxic contaminants due to Defendants' negligence.

340.    As a proximate result of their exposure to these toxic contaminants, Plaintiffs have a significantly increased risk of contracting several different types of cancer and other debilitating diseases. These increased risks make periodic diagnostic medical examinations reasonably necessary.

341.    Monitoring procedures exist that makes early detection of these cancers and debilitating diseases possible. These monitoring procedures are different than those normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiffs' exposures to toxic wastes from the Orlando Facility.

342.   Plaintiffs did inhale, ingest and come into dermal contact with contaminated soils, groundwater, and air borne toxic wastes originating from Lockheed Martin's Orlando Facility.

343.   Plaintiffs' exposures to VOCs were increased and exacerbated by Lockheed Martin's ongoing operation of the Orlando Facility, and resulting releases of toxic wastes, and by Lockheed Martin's decision to extract harmful chemicals from soil and groundwater at the Orlando Facility, concentrate the contaminants in gaseous form, and vent the contaminants directly into the air that Plaintiffs breathed. Plaintiffs did inhale, ingest, and come into dermal contact with toxic wastes released by Lockheed Martin's continued operation of the Orlando Facility, and with concentrated VOCs emitted from the Air Stripping Towers, Soil Vapor Extraction Systems, Air Sparging Systems and other contamination systems at the Orlando Facility.

344.   As a result of these exposures to Lockheed Martin's toxic wastes, Plaintiffs and have been injured by their present need to incur the costs of diagnostic testing for the early detection of illnesses, diseases or disease process.

345.   Plaintiffs' claims for medical monitoring are based solely on their exposure to toxic wastes originating from Lockheed Martin's Orlando Facility. Therefore, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' claims in this case.

346.   Plaintiffs have suffered injury proximately caused by Defendants' tortious conduct. Plaintiffs have a legally protected interest in not being exposed to toxic chemicals, such as Lockheed Martin's contamination, and at levels that can result in an increased risk

of illness, disease, or disease process. Plaintiffs also have a legally protected interest in avoiding the present and future medical need for expensive diagnostic testing. The exposure to Lockheed Martin's contamination and resulting increased risk of illness, disease or disease process associated with Lockheed Martin's contamination, and the present and future need to incur the cost of medically necessary diagnostic testing for the early detection of disease as a result of Lockheed Martin's contamination, constitutes an invasion of the legally protected interests of Plaintiffs and injury to Plaintiffs. Plaintiffs would not have the present and future need to incur the cost of the diagnostic testing to determine the presence of illness, disease, or disease process related to these exposures but for the tortious conduct of Defendants.

347.   Monitoring procedures exist that make the early detection of cancers and illnesses associated with exposure to Lockheed Martin's contamination possible. These monitoring procedures can lead to the early detection of these disease processes, the progression of biomarker abnormalities indicative of these illnesses, and other early warning signs of illness, disease process and disease associated with exposure to Lockheed Martin's contamination.

348.   Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including lymphomas, such as Hodgkin's Lymphoma and Non-Hodgkin's Lymphoma, possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, erythrocyte sedimentation rate, flow cytometry, fluorescence in situ hybridization panel, cytogenetic analysis, hematopathology

consultation and clonality studies.[104] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[105] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of lymphoma due to their exposure to Lockheed Martin's contaminants.[106]

349.    Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including multiple myeloma possible.   These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, bone x-rays, cytogenetic analysis, fluorescence in situ hybridization panel, fat pad aspirate, serum and urine protein electrophoresis and immunofixation.[107] These procedures are not components of standard

---

[104] Moffitt Cancer Center, https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/screening/; https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/; Willamette Valley Cancer Institute, https://www.oregoncancer.com/lymphoma/hodgkins-lymphoma/diagnosis/; https://www.oregoncancer.com/lymphoma/non-hodgkins-lymphoma/diagnosis
[105] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[106] Moffitt Cancer Center, https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/screening/; https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/; Willamette Valley Cancer Institute, https://www.oregoncancer.com/lymphoma/hodgkins-lymphoma/diagnosis/; https://www.oregoncancer.com/lymphoma/non-hodgkins-lymphoma/diagnosis
[107] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

preventative healthcare, and are not recommended for the general population.[108] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of multiple myeloma due to their exposure to Lockheed Martin's contaminants.[109]

350.   Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including leukemias possible.  These monitoring procedures include screening and diagnostic tools such as peripheral blood smear, immunophenotyping, reverse transcription-polymerase chain reaction tests, cytogenetic analysis, fluorescence in situ hybridization panel, genomic testing, flow cytometry, computerized tomography scans, magnetic resonance imaging, and ultrasound.[110] These procedures are not components of standard preventative healthcare, and are not

---

[108] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[109] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

[110] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/acute-myeloid-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/acute-lymphoblastic-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/chronic-lymphocytic-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/chronic-myeloid-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/hairy-cell-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/myelodysplastic-syndrome/screening-and-diagnosis

recommended for the general population.[111] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of leukemias due to their exposure to Lockheed Martin's contaminants.[112]

351.   Monitoring procedures exist that make the early detection of kidney cancers possible.   These monitoring procedures include screening and diagnostic tools such as intravenous pyelogram, computerized tomography scans, magnetic resonance imaging, and ultrasound.[113] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[114] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of kidney cancer due to their exposure to Lockheed Martin's contaminants.[115]

---

[111] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[112] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

[113] Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

[114] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

[115] Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

352.    Monitoring procedures exist that also make the early detection of other kidney damage, including Chronic Kidney Disease, possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of albumin to creatinine ratio and glomerular filtration rate.[116] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[117] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of kidney damage due to their exposure to Lockheed Martin's contaminants.[118]

353.    Monitoring procedures exist that make the early detection of liver cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound and computerized tomography scans, and the evaluation of tumor markers and biomarkers such as alpha-fetoprotein.[119] These procedures are not components of standard

---

[116] National Kidney Foundation, https://www.kidney.org/atoz/content/know-your-kidney-numbers-two-simple-tests#:~:text=ACR%20is%20a%20urine%20test,will%20be%20tested%20for%20albumin.; NIH National Institute of Diabetes and Digestive and Kidney Diseases, https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/tests-diagnosis

[117] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[118] National Kidney Foundation, https://www.kidney.org/atoz/content/know-your-kidney-numbers-two-simple-tests#:~:text=ACR%20is%20a%20urine%20test,will%20be%20tested%20for%20albumin.; NIH National Institute of Diabetes and Digestive and Kidney Diseases, https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/tests-diagnosis

[119] NIH National Cancer Institute, https://www.cancer.gov/types/liver/patient/liver-screening-pdq; MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/liver-cancer-screening.html

preventative healthcare, and are not recommended for the general population.[120] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of liver cancer due to their exposure to Lockheed Martin's contaminants.[121]

354.    Monitoring procedures exist that also make the early detection of other liver damage possible, including liver disease, liver failure, liver enlargement, and liver necrosis possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of serum bilirubin, serum albumin, serum alkaline phosphatase, serum aminotranferases, prothrombin time, alanine transaminase, aspartate transaminase, gamma-glutamyl transpeptidase, lactic dehydrogenase, 5'-nucleotidase, alpha-fetoprotein, and mitochondrial antibodies.[122] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[123] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably

---

[120] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[121] NIH National Cancer Institute, https://www.cancer.gov/types/liver/patient/liver-screening-pdq; MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/liver-cancer-screening.html

[122] Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/liver-kidneys-and-urinary-system/chronic-liver-disease/diagnosis/liver-function-tests.html

[123] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

medically necessary for individuals such as plaintiffs, who have increased risks of liver damage due to their exposure to Lockheed Martin's contaminants.[124]

355.    Monitoring procedures exist that make the early detection of biliary cancers, including gallbladder cancer possible.  These monitoring procedures include screening and diagnostic tools such as liver function tests, imaging tests such as ultrasound, computerized tomography scans, magnetic resonance imaging, percutaneous trashepatic cholangiography, positron emission tomography, and the evaluation of tumor markers and biomarkers such as carcinoembryonic antigen and cancer antigen 19-9.[125] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[126] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of gallbladder cancer due to their exposure to Lockheed Martin's contaminants.[127]

---

[124] Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/liver-kidneys-and-urinary-system/chronic-liver-disease/diagnosis/liver-function-tests.html; American Liver Foundation, https://liverfoundation.org/for-patients/about-the-liver/the-progression-of-liver-disease/
[125] Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/bile-duct-cancer/bile-duct-cancer-diagnosis/bile-duct-cancer-diagnostic-tools; Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/gallbladder-cancer/diagnosis
[126] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[127] Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/bile-duct-cancer/bile-duct-cancer-diagnosis/bile-duct-cancer-diagnostic-tools; Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/gallbladder-cancer/diagnosis; NIH National Cancer Institute, https://www.cancer.gov/types/gallbladder/patient/gallbladder-treatment-pdq

356.    Monitoring procedures exist that make the early detection of bladder cancers possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as bladder tumor associated antigen, mucin, carcinoembryonic antigen, nuclear matrix protein 22, tests such as UroVysion which evaluate chromosomal changes in bladder cells, cystoscopy, and imaging tests such as urography, ultrasound, computerized tomography scans, and magnetic resonance imaging.[128] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[129] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of bladder cancer due to their exposure to Lockheed Martin's contaminants.[130]

357.    Monitoring procedures exist that make the early detection of reproductive system damage, including testicular cancer, possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as alpha-fetoprotein, beta-human chorionic gonadotropin, and imaging tests such as

---

[128] American Cancer Society, https://www.cancer.org/cancer/bladder-cancer/detection-diagnosis-staging/detection.html#references; Columbia University, https://www.columbiaurology.org/adult-urology/urologic-oncology/bladder-cancer/bladder-cancer-screening-and-diagnosis
[129] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[130] Fradet, Yves. Can. Urol. Assoc J. 2009 Dec; 3(6 Suppl 4). Screening for bladder cancer: the best opportunity to reduce mortality

ultrasound.[131] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[132] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of testicular cancer due to their exposure to Lockheed Martin's contaminants.[133]

358.    Monitoring procedures exist that make the early detection of prostate cancer possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as prostate specific antigen, kallikrein-related peptidase 2, prostate cancer antigen 3, the TMPRSS2-ERG gene fusion, [-2]proPSA, and imaging tests such as ultrasound.[134] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[135] However, because these procedures can lead to earlier treatment and improved outcomes, they are

---

[131] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/testicular-cancer/screening-and-diagnosis
[132] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[133] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/testicular-cancer/screening-and-diagnosis; UK NHS, https://www.nhs.uk/conditions/testicular-cancer/diagnosis/
[134] American Cancer Society, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html; https://www.cancer.org/cancer/prostate-cancer/about/new-research.html
[135] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

reasonably medically necessary for individuals such as plaintiffs, who have increased risks of prostate cancer due to their exposure to Lockheed Martin's contaminants.[136]

359.   Monitoring procedures exist that make the early detection of glioma and other brain and spinal cord cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound, computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, and the evaluation of tumor markers and biomarkers such as C228T and C250T.[137] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[138] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of glioma, brain and spine cancers due to their exposure to Lockheed Martin's contaminants.[139]

360.   Monitoring procedures exist that also make the early detection of other neurological damage, including nerve and brain damage, Multiple Sclerosis, and

---

[136] American Cancer Society, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html; https://www.cancer.org/cancer/prostate-cancer/about/new-research.html
[137] Massachusetts General Hospital, https://news.harvard.edu/gazette/story/2020/10/breakthrough-blood-test-developed-for-brain-tumors/; Weill Cornell Brain and Spine Center, https://weillcornellbrainandspine.org/early-detection-can-be-key-surviving-brain-tumor
[138] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[139] Massachusetts General Hospital, https://news.harvard.edu/gazette/story/2020/10/breakthrough-blood-test-developed-for-brain-tumors/; Weill Cornell Brain and Spine Center, https://weillcornellbrainandspine.org/early-detection-can-be-key-surviving-brain-tumor

Parkinson's Disease, possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, positron emission tomography, single photon emission computed tomography, angiography, cerebrospinal fluid analysis, electroencephalography, electromyography, electronystagmography, evoked potentials, myelography, polysomnogram, thermography, ultrasound imaging, and x-rays.[140] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[141] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[142]

361.    Monitoring procedures exist that also make the early detection of autoimmunity and autoimmune disorders possible. These monitoring procedures include screening and diagnostic tools such as antinuclear antibody immunofluorescence assay, evaluation of autoimmunity biomarkers such as anti-dsDNA, anti-RNP, anti-Smith, anti-Sjogren's SSA and SSB, anti-scleroderma, anti-Jo-1, anti-CCP, anti-cardiolipin, and anti-

---

[140] NIH National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Neurological-Diagnostic-Tests-and-Procedures-Fact; World Health Organization, https://www.who.int/mental_health/neurology/neurological_disorders_report_web.pdf

[141] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[142] NIH National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Neurological-Diagnostic-Tests-and-Procedures-Fact; World Health Organization, https://www.who.int/mental_health/neurology/neurological_disorders_report_web.pdf

chromatin.[143] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[144] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[145]

362.   Monitoring procedures exist that also make the early detection of cardiovascular disorders possible. These monitoring procedures include screening and diagnostic tools such as computed tomography, carotid artery ultrasound, abdominal aorta ultrasound, electrocardiography, echocardiography, stress tests, holter monitoring, magnetic resonance imaging, evaluation of autoimmunity biomarkers such as carotid intima-media thickness, coronary artery calcium, c-reactive protein, lipoprotein(a), and homocysteine.[146] These procedures are not components of standard preventative healthcare,

---

[143] Michigan Medical, https://www.uofmhealth.org/health-library/abq5017; Doghramji, Paul. Screening and Laboratory Diagnosis of Autoimmune Diseases using Antibody Immunofluorescence Assay and Specific Autoantibody Testing, https://www.aafp.org/dam/AAFP/documents/about_us/sponsored_resources/Quest_%20ANA-IFA_Monograph.pdf

[144] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[145] Michigan Medical, https://www.uofmhealth.org/health-library/abq5017; Doghramji, Paul. Screening and Laboratory Diagnosis of Autoimmune Diseases using Antibody Immunofluorescence Assay and Specific Autoantibody Testing, https://www.aafp.org/dam/AAFP/documents/about_us/sponsored_resources/Quest_%20ANA-IFA_Monograph.pdf; Harvard Health Blog, https://www.health.harvard.edu/blog/autoimmune-lung-disease-early-recognition-and-treatment-helps-2020062420339

[146] Wallace, Margaret et al. Screening Strategies for Cardiovascular Disease in Asymptomatic Adults. Prim. Care. 2014 Jun; 41(2): 371-397; Bhatnagar, Aruni. Studying Mechanistic Links Between Pollution and Heart Disease. Circulation Research. 2006; 99:692-705; Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-disease/diagnosis-treatment/drc-20353124

and are not recommended for the general population.[147] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[148]

363.    Monitoring procedures exist that also make the early detection of musculoskeletal damage possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, arthrography, radionuclide scanning, dual-energy x-ray absorptiometry, ultrasound and x-rays.[149] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[150] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary

---

[147] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[148] Wallace, Margaret et al. Screening Strategies for Cardiovascular Disease in Asymptomatic Adults. Prim. Care. 2014 Jun; 41(2): 371-397; Bhatnagar, Aruni. Studying Mechanistic Links Between Pollution and Heart Disease. Circulation Research. 2006; 99:692-705; Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-disease/diagnosis-treatment/drc-20353124

[149] University of Colorado, https://www.colorado.edu/venturepartners/2020/04/15/advanced-early-detection-musculoskeletal-disease; Merck Manual, https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/diagnosis-of-musculoskeletal-disorders/tests-for-musculoskeletal-disorders

[150] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[151]

364.   Monitoring procedures exist that make the early detection of mouth and oral cancers possible.  These monitoring procedures include screening and diagnostic tools such as tests utilizing toluidine blue or fluorescent light, exfoliative cytology, brush biopsy and fiber optic nasopharyngolaryngoscope exam.[152] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[153] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of mouth and oral cancers due to their exposure to Lockheed Martin's contaminants.[154]

365.   Monitoring procedures exist that make the early detection of throat cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound, computerized tomography scans, computed axial tomography scans, magnetic

---

[151] University of Colorado, https://www.colorado.edu/venturepartners/2020/04/15/advanced-early-detection-musculoskeletal-disease; Merck Manual, https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/diagnosis-of-musculoskeletal-disorders/tests-for-musculoskeletal-disorders; Stover, Bert: https://digital.lib.washington.edu/researchworks/handle/1773/5407
[152] American Cancer Society, https://www.cancer.org/cancer/oral-cavity-and-oropharyngeal-cancer/detection-diagnosis-staging/detection.html; Oral Cancer Foundation, https://oralcancerfoundation.org/discovery-diagnosis/cancer-screening-protocols/
[153] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[154] American Cancer Society, https://www.cancer.org/cancer/oral-cavity-and-oropharyngeal-cancer/detection-diagnosis-staging/detection.html; Oral Cancer Foundation, https://oralcancerfoundation.org/discovery-diagnosis/cancer-screening-protocols/

resonance imaging, positron emission tomography scans, tests utilizing swallowed barium, laryngeal videostoboscopy, fiberoptic endoscopic examination of swallowing, and the evaluation of tumor markers and biomarkers such as hypermethylated genes.[155] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[156] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of throat cancers due to their exposure to Lockheed Martin's contaminants.[157]

366.   Monitoring procedures exist that make the early detection of reproductive system damage, including endometrial and uterine cancers, possible.  These monitoring procedures include screening and diagnostic tools such as   imaging tests such as transvaginal ultrasound, endometrial biopsy, dilation and curettage, and the evaluation of tumor markers and biomarkers such as cancer antigen 125.[158] These procedures are not

---

[155] MD Anderson Cancer Center, https://www.mdanderson.org/cancer-types/throat-cancer/throat-cancer-diagnosis.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/SwishandSpit_Test_Accurate_for_Cancer

[156] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[157] MD Anderson Cancer Center, https://www.mdanderson.org/cancer-types/throat-cancer/throat-cancer-diagnosis.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/SwishandSpit_Test_Accurate_for_Cancer

[158] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/endometrial-cancer-screening.html; Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/uterine-cancer-and-endometrial-cancer/uterine-cancer-and-endometrial-cancer-screening-and-diagnosis

components of standard preventative healthcare, and are not recommended for the general population.[159] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of endometrial and uterine cancers due to their exposure to Lockheed Martin's contaminants.[160]

367.    Monitoring procedures exist that make the early detection of reproductive system damage, including ovarian cancers, possible.  These monitoring procedures include screening and diagnostic tools such as imaging tests such as transvaginal sonography, and the evaluation of tumor markers and biomarkers such as cancer antigen 125.[161] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[162] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for

---

[159] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[160] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/endometrial-cancer-screening.html; Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/uterine-cancer-and-endometrial-cancer/uterine-cancer-and-endometrial-cancer-screening-and-diagnosis
[161] National Ovarian Cancer Coalition, https://www.ovarian.org/about-ovarian-cancer/how-am-i-diagnosed
[162] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

individuals such as plaintiffs, who have increased risks of ovarian cancers due to their exposure to Lockheed Martin's contaminants.[163]

368.   Monitoring procedures exist that make the early detection of intestinal cancers possible.  These monitoring procedures include screening and diagnostic tools such as upper gastrointestinal series, enterocylsis, barium enema with X-rays, computerized tomography scans, and endoscopic procedures.[164] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[165] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of intestinal cancers due to their exposure to Lockheed Martin's contaminants.[166]

369.   Monitoring procedures exist that make the early detection of stomach and gastrointestinal cancers possible.  These monitoring procedures include screening and diagnostic tools such as upper endoscopy, imaging tests such as upper gastrointestinal series, computerized tomography scans, postiron emission tomography scan, magnetic

---

[163] National Ovarian Cancer Coalition, https://www.ovarian.org/about-ovarian-cancer/how-am-i-diagnosed
[164] Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/intestinal-cancer/about; OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/small-intestine-cancer/screening-and-diagnosis
[165] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[166] Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/intestinal-cancer/about; OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/small-intestine-cancer/screening-and-diagnosis

resonance imaging, and endoscopic ultrasound.[167] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[168] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of stomach and gastrointestinal cancers due to their exposure to Lockheed Martin's contaminants.[169]

370.    Monitoring procedures exist that also make the early detection of other gastrointestinal disorders possible.  These monitoring procedures include screening and diagnostic tools such as upper GI series, gastroscopy, endoscopic retrograde cholangiopancreatography, endoscopic ultrasound, pH monitoring, manometry, barium enema, sigmoidoscopy, endoscopy, fecal calprotectin, fecal occult blood test, fecal immunochemical test, stool acidity test, stool culture, lactose tolerance test, hydrogen breath test, magnetic resonance imaging, barium beefsteak meal, colorectal transit study, computerized tomography, defecography, lower GI series, oropharyngeal motility,

---

[167] American Cancer Society, https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/how-diagnosed.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stomach-gastric-cancer/how-endoscopy-detects-stomach-cancer
[168] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[169] American Cancer Society, https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/how-diagnosed.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stomach-gastric-cancer/how-endoscopy-detects-stomach-cancer

radioscopic gastric-emptying scan, sigmoidoscopy.[170] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[171] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of kidney damage due to their exposure to Lockheed Martin's contaminants.[172]

371.    Monitoring procedures exist that make the early detection of adrenal cancers possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, positron emission tomography scans, magnetic resonance imaging, ultrasound, x-ray, laparoscopy.[173] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[174] However, because these procedures can lead to earlier treatment and improved outcomes,

[170] GI Society, https://badgut.org/information-centre/diagnostic-tests-and-procedures/; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/digestive-diagnostic-procedures
[171] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[172] GI Society, https://badgut.org/information-centre/diagnostic-tests-and-procedures/; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/digestive-diagnostic-procedures; Massachusetts General Hospital, https://advances.massgeneral.org/digestive-health/video.aspx?id=1128
[173] Moffitt Cancer Center, https://moffitt.org/cancers/adrenal-cancer/diagnosis/screening/; Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/adrenal-cancer/diagnosis-and-detection
[174] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of adrenal cancers due to their exposure to Lockheed Martin's contaminants.[175]

372.   Monitoring procedures exist that make the early detection of pancreatic cancers possible.  These monitoring procedures include screening and diagnostic tools such as endoscopic ultrasound, magnetic resonance imaging, computerized tomography scans, magnetic resonance cholangiopancreatography, endoscopic retrograde cholangiopancreatography, and the evaluation of tumor markers and biomarkers such as cancer antigen 19-9.[176] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[177] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of pancreatic cancers due to their exposure to Lockheed Martin's contaminants.[178]

373.   Monitoring procedures exist that make the early detection of thyroid cancers possible. These monitoring procedures include screening and diagnostic tools such as

---

[175] Moffitt Cancer Center, https://moffitt.org/cancers/adrenal-cancer/diagnosis/screening/; Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/adrenal-cancer/diagnosis-and-detection; National Cancer Institute, https://www.cancer.gov/types/adrenocortical/patient/adrenocortical-treatment-pdq

[176] Johns Hopkins Medicine, https://pathology.jhu.edu/pancreas/participating-research/caps; Moffitt Cancer Center, https://moffitt.org/cancers/pancreatic-cancer/screening/

[177] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[178] Johns Hopkins Medicine, https://pathology.jhu.edu/pancreas/participating-research/caps; Moffitt Cancer Center, https://moffitt.org/cancers/pancreatic-cancer/screening/

imaging tests such as ultrasound, radioiodine scan, magnetic resonance imaging, computerized tomography scans, and positron emission tomography scans.[179] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[180] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of thyroid cancers due to their exposure to Lockheed Martin's contaminants.[181]

374.   Monitoring procedures exist that also make the early detection of other endocrine damage, including adrenal, pancreatic, pituitary and thyroid disorders, possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, positron emission tomography, single photon emission computed tomography, angiography, molecular pathology, cytogenics, ultrastructural analysis, cerebrospinal fluid analysis, electroencephalography, electromyography, electronystagmography, evoked potentials, myelography, polysomnogram, thermography, ultrasound imaging, rapid dynamic gadolinium-enhanced pituitary imaging, x-rays, evaluation of glucose suppression, growth hormone stimulation,

---

[179] American Cancer Society, https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/how-diagnosed.html

[180] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[181] American Cancer Society, https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/how-diagnosed.html

and dexamethasone suppression.[182] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[183] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of endocrine damage due to their exposure to Lockheed Martin's contaminants.[184]

375.    Monitoring procedures exist that make the early detection of nasal and paranasal cancers possible.  These monitoring procedures include screening and diagnostic tools such as magnetic resonance imaging, computerized tomography scans, and positron emission tomography scans.[185] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[186] However, because these procedures can lead to earlier treatment and improved outcomes, they are

---

[182] Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/endocrinology-diabetes-and-metabolism/endocrinology-services/diagnosis-and-treatment-of-endocrine-disorders; OHSU, https://www.ohsu.edu/brain-institute/pituitary-disorders-diagnosis-and-treatment

[183] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[184] Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/endocrinology-diabetes-and-metabolism/endocrinology-services/diagnosis-and-treatment-of-endocrine-disorders; Sanford Health, https://www.sanfordhealth.org/medical-services/endocrinology; OHSU, https://www.ohsu.edu/brain-institute/pituitary-disorders-diagnosis-and-treatment

[185] Cedars Sinai Cancer Center, https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/nasal-cavity-and-sinus-cancer.html; Baptist Cancer Center, https://www.baptistcancercenter.com/cancers-we-treat/nasal-cavity-paranasal-sinuses

[186] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

reasonably medically necessary for individuals such as plaintiffs, who have increased risks of nasal and paranasal cancers due to their exposure to Lockheed Martin's contaminants.[187]

376.   Monitoring procedures exist that make the early detection of skin cancers possible.   These monitoring procedures include screening and diagnostic tools such as complete skin exams and regular dermatologic surveillance.[188] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[189] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of skin cancers due to their exposure to Lockheed Martin's contaminants.[190]

377.   Monitoring procedures exist that make the early detection of lung and respiratory tract damage, including lung and respiratory cancers, possible.   These monitoring procedures include screening and diagnostic tools such as computerized tomography scans.[191] These procedures are not components of standard preventative

---

[187] Cedars Sinai Cancer Center, https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/nasal-cavity-and-sinus-cancer.html; Baptist Cancer Center, https://www.baptistcancercenter.com/cancers-we-treat/nasal-cavity-paranasal-sinuses
[188] Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/skin/screening-guidelines-skin
[189] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[190] Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/skin/screening-guidelines-skin
[191] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/lung-cancer-screening.html

healthcare, and are not recommended for the general population.[192] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of lung and respiratory tract cancers due to their exposure to Lockheed Martin's contaminants.[193]

378.   Monitoring procedures exist that make the early detection of rectal and colorectal cancers possible.  These monitoring procedures include screening and diagnostic tools such as highly sensitive fecal immunochemical tests, highly sensitive guaiac-based fecal occult blood tests, multi-targeted stool DNA tests, and imaging tests such as colonoscopy, computerized tomography colonography, and flexible sigmoidoscopy.[194] These procedures may be components of standard preventative healthcare, and recommended for the general population.[195] However, because plaintiffs have increased risks of rectal and colorectal cancers as a result of their exposure to Lockheed Martin's contaminants, it is reasonably medically necessary for them to receive these tests and

---

[192] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[193] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/lung-cancer-screening.html
[194] American Cancer Society, https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.html
[195] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

examinations earlier, and more frequently, than what is recommended for the general public.[196]

379.    Monitoring procedures exist that make the early detection of breast cancers possible.  These monitoring procedures include screening and diagnostic tools such clinical breast exams and mammography.[197] These procedures may be components of standard preventative healthcare, and recommended for the general population.[198] However, because plaintiffs have increased risks of breast cancers as a result of their exposure to Lockheed Martin's contaminants, it is reasonably medically necessary for them to receive these tests and examinations earlier, and more frequently, than what is recommended for the general public.[199] Due to their increased risks of breast cancer resulting from their exposures to Lockheed Martin's contaminants, it is also reasonably medically necessary for plaintiffs to receive supplemental monitoring procedures that are not recommended for the general population, such as tomosynthesis magnetic resonance imaging.[200]

---

[196] American Cancer Society, https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.html
[197] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf
[198] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[199] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf
[200] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf

380.    These monitoring procedures are different than for the unexposed populations.  The monitoring procedures will benefit Plaintiffs since they will allow for the early detection of latent disease associated with exposure to Lockheed Martin's contamination.  Plaintiffs have the present need of diagnostic testing to diagnose properly the warning signs of the illness, disease, or and disease process resulting from exposure to Lockheed Martin's contamination.  Finding cancer and other deadly diseases early, when it has not spread or worsened, allows for more treatment options.  If left to when the disease becomes obvious, Plaintiffs will lose valuable treatment time.  These monitoring procedures are different from what would normally be recommended in the absence of exposure to Lockheed Martin's contamination.  The monitoring procedures are reasonably medically necessary as a direct and proximate result of Defendants' conduct due to the exposure of Plaintiffs to Lockheed Martin's contamination.

381.    Medical monitoring is recognized as a beneficial service provided to individuals in communities where there is believed to be an increased risk of disease from exposure to hazardous substances released into the environment.[201]  The purpose of a medical monitoring program is case-finding in order to refer individuals for further evaluation and, as appropriate, treatment.[202]  Moreover, medical monitoring is widely accepted as a response to toxic exposure.[203]

---

[201] ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, 60 FR 38841. July 28, 1995.
[202] Id.
[203] See C8 Medical Monitoring Program, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf; Department of Environmental Health, Fernald Medical Monitoring Program, UNIVERSITY OF CINCINNATI

382.    As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

383.    Defendants are jointly liable for damages sought by Plaintiffs.

### COUNT VIII—MEDICAL MONITORING
*(On behalf of Plaintiffs Brenda Jackson, Jordan Schursky, Jennifer Johnson, and Drew Johnson against Defendant Lockheed Martin)*

384.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265, and 311 through 325, as if fully set forth herein.

385.    Plaintiffs have been significantly exposed to levels of toxic contaminants that are far higher than normal background levels. These toxic wastes include dangerous carcinogens that have been proven to cause cancer in humans, and substances which cause numerous other debilitating illnesses.

386.    Plaintiffs came into direct contact with, and consumed, these toxic contaminants due to Defendant's negligence.

387.    As a proximate result of their exposure to these toxic contaminants, Plaintiffs have a significantly increased risk of contracting several different types of cancer and other debilitating diseases. These increased risks make periodic diagnostic medical examinations reasonably necessary.

---

COLLEGE OF MEDICINE, https://med.uc.edu/eh/research/projects/fcc/fmmp-history, Environmental Health & Safety, Pesticide Users Medical Monitoring Program, UNIVERSITY OF FLORIDA, http://www.ehs.ufl.edu/programs/ih/pesticide/; World Trade Center Health Program, About the Program, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/wtc/about.html.

122

388.    Monitoring procedures exist that makes early detection of these cancers and debilitating diseases possible. These monitoring procedures are different than those normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiffs' exposures to toxic wastes from the Orlando Facility.

389.    Plaintiffs did inhale, ingest and come into dermal contact with contaminated soils, groundwater, and air borne toxic wastes originating from Lockheed Martin's Orlando Facility.

390.    Plaintiffs' exposures to VOCs were increased and exacerbated by Lockheed Martin's ongoing operation of the Orlando Facility, and resulting releases of toxic wastes, and by Lockheed Martin's decision to extract harmful chemicals from soil and groundwater at the Orlando Facility, concentrate the contaminants in gaseous form, and vent the contaminants directly into the air that Plaintiffs breathed. Plaintiffs did inhale, ingest, and come into dermal contact with toxic wastes released by Lockheed Martin's continued operation of the Orlando Facility, and with concentrated VOCs emitted from the Air Stripping Towers, Soil Vapor Extraction Systems, Air Sparging Systems and other contamination systems at the Orlando Facility.

391.    As a result of these exposures to Lockheed Martin's toxic wastes, Plaintiffs have been injured by their present need to incur the costs of diagnostic testing for the early detection of illnesses, diseases or disease process.

392.    Plaintiffs' claims for medical monitoring are based solely on their exposure to toxic wastes originating from Lockheed Martin's Orlando Facility. Therefore, any alleged

alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' claims in this case.

393.    Plaintiffs have suffered injury proximately caused by Defendants' tortious conduct.  Plaintiffs have a legally protected interest in not being exposed to toxic chemicals, such as Lockheed Martin's contamination, and at levels that can result in an increased risk of illness, disease, or disease process.  Plaintiffs also have a legally protected interest in avoiding the present and future medical need for expensive diagnostic testing.  The exposure to Lockheed Martin's contamination and resulting increased risk of illness, disease or disease process associated with Lockheed Martin's contamination, and the present and future need to incur the cost of medically necessary diagnostic testing for the early detection of disease as a result of Lockheed Martin's contamination, constitutes an invasion of the legally protected interests of Plaintiffs and injury to Plaintiffs.  Plaintiffs would not have the present and future need to incur the cost of the diagnostic testing to determine the presence of illness, disease, or disease process related to these exposures but for the tortious conduct of Defendants.

394.    Monitoring procedures exist that make the early detection of cancers and illnesses associated with exposure to Lockheed Martin's contamination possible. These monitoring procedures can lead to the early detection of these disease processes, the progression of biomarker abnormalities indicative of these illnesses, and other early warning signs of illness, disease process and disease associated with exposure to Lockheed Martin's contamination.

395.     Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including lymphomas, such as Hodgkin's Lymphoma and Non-Hodgkin's Lymphoma, possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, erythrocyte sedimentation rate, flow cytometry, fluorescence in situ hybridization panel, cytogenetic analysis, hematopathology consultation and clonality studies.[204] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[205] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of lymphoma due to their exposure to Lockheed Martin's contaminants.[206]

396.     Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including multiple myeloma possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans,

---

[204] Moffitt Cancer Center, https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/screening/; https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/; Willamette Valley Cancer Institute, https://www.oregoncancer.com/lymphoma/hodgkins-lymphoma/diagnosis/; https://www.oregoncancer.com/lymphoma/non-hodgkins-lymphoma/diagnosis
[205] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[206] Moffitt Cancer Center, https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/screening/; https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/; Willamette Valley Cancer Institute, https://www.oregoncancer.com/lymphoma/hodgkins-lymphoma/diagnosis/; https://www.oregoncancer.com/lymphoma/non-hodgkins-lymphoma/diagnosis

magnetic resonance imaging, positron emission tomography scans, bone x-rays, cytogenetic analysis, fluorescence in situ hybridization panel, fat pad aspirate, serum and urine protein electrophoresis and immunofixation.[207] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[208] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of multiple myeloma due to their exposure to Lockheed Martin's contaminants.[209]

397.    Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including leukemias possible.  These monitoring procedures include screening and diagnostic tools such as peripheral blood smear, immunophenotyping, reverse transcription-polymerase chain reaction tests, cytogenetic analysis, fluorescence in situ hybridization panel, genomic testing, flow cytometry, computerized tomography scans, magnetic resonance imaging, and ultrasound.[210] These

---

[207] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

[208] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[209] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

[210] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/acute-myeloid-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/acute-lymphoblastic-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-

procedures are not components of standard preventative healthcare, and are not recommended for the general population.[211] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of leukemias due to their exposure to Lockheed Martin's contaminants.[212]

398.   Monitoring procedures exist that make the early detection of kidney cancers possible.  These monitoring procedures include screening and diagnostic tools such as intravenous pyelogram, computerized tomography scans, magnetic resonance imaging, and ultrasound.[213] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[214] However, because these procedures

caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/chronic-lymphocytic-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/chronic-myeloid-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/hairy-cell-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/myelodysplastic-syndrome/screening-and-diagnosis
[211] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[212] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html
[213] Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/
[214] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of kidney cancer due to their exposure to Lockheed Martin's contaminants.[215]

399.    Monitoring procedures exist that also make the early detection of other kidney damage, including Chronic Kidney Disease, possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of albumin to creatinine ratio and glomerular filtration rate.[216] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[217] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of kidney damage due to their exposure to Lockheed Martin's contaminants.[218]

---

[215] Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/
[216] National Kidney Foundation, https://www.kidney.org/atoz/content/know-your-kidney-numbers-two-simple-tests#:~:text=ACR%20is%20a%20urine%20test,will%20be%20tested%20for%20albumin.; NIH National Institute of Diabetes and Digestive and Kidney Diseases, https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/tests-diagnosis
[217] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[218] National Kidney Foundation, https://www.kidney.org/atoz/content/know-your-kidney-numbers-two-simple-tests#:~:text=ACR%20is%20a%20urine%20test,will%20be%20tested%20for%20albumin.; NIH National Institute of Diabetes and Digestive and Kidney Diseases, https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/tests-diagnosis

400.    Monitoring procedures exist that make the early detection of liver cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound and computerized tomography scans, and the evaluation of tumor markers and biomarkers such as alpha-fetoprotein.[219] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[220] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of liver cancer due to their exposure to Lockheed Martin's contaminants.[221]

401.    Monitoring procedures exist that also make the early detection of other liver damage possible, including liver disease, liver failure, liver enlargement, and liver necrosis possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of serum bilirubin, serum albumin, serum alkaline phosphatase, serum aminotranferases, prothrombin time, alanine transaminase, aspartate transaminase, gamma-glutamyl transpeptidase, lactic dehydrogenase, 5'-nucleotidase, alpha-fetoprotein, and mitochondrial antibodies.[222] These procedures are not components of standard preventative

---

[219] NIH National Cancer Institute, https://www.cancer.gov/types/liver/patient/liver-screening-pdq; MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/liver-cancer-screening.html
[220] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[221] NIH National Cancer Institute, https://www.cancer.gov/types/liver/patient/liver-screening-pdq; MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/liver-cancer-screening.html
[222] Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/liver-kidneys-and-urinary-system/chronic-liver-disease/diagnosis/liver-function-tests.html

healthcare, and are not recommended for the general population.[223] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of liver damage due to their exposure to Lockheed Martin's contaminants.[224]

402.   Monitoring procedures exist that make the early detection of biliary cancers, including gallbladder cancer possible.  These monitoring procedures include screening and diagnostic tools such as liver function tests, imaging tests such as ultrasound, computerized tomography scans, magnetic resonance imaging, percutaneous trashepatic cholangiography, positron emission tomography, and the evaluation of tumor markers and biomarkers such as carcinoembryonic antigen and cancer antigen 19-9.[225] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[226] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as

---

[223] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[224] Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/liver-kidneys-and-urinary-system/chronic-liver-disease/diagnosis/liver-function-tests.html; American Liver Foundation, https://liverfoundation.org/for-patients/about-the-liver/the-progression-of-liver-disease/

[225] Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/bile-duct-cancer/bile-duct-cancer-diagnosis/bile-duct-cancer-diagnostic-tools; Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/gallbladder-cancer/diagnosis

[226] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

plaintiffs, who have increased risks of gallbladder cancer due to their exposure to Lockheed Martin's contaminants.[227]

403.    Monitoring procedures exist that make the early detection of bladder cancers possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as bladder tumor associated antigen, mucin, carcinoembryonic antigen, nuclear matrix protein 22, tests such as UroVysion which evaluate chromosomal changes in bladder cells, cystoscopy, and imaging tests such as urography, ultrasound, computerized tomography scans, and magnetic resonance imaging.[228] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[229] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of bladder cancer due to their exposure to Lockheed Martin's contaminants.[230]

---

[227] Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/bile-duct-cancer/bile-duct-cancer-diagnosis/bile-duct-cancer-diagnostic-tools; Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/gallbladder-cancer/diagnosis; NIH National Cancer Institute, https://www.cancer.gov/types/gallbladder/patient/gallbladder-treatment-pdq
[228] American Cancer Society, https://www.cancer.org/cancer/bladder-cancer/detection-diagnosis-staging/detection.html#references; Columbia University, https://www.columbiaurology.org/adult-urology/urologic-oncology/bladder-cancer/bladder-cancer-screening-and-diagnosis
[229] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[230] Fradet, Yves. Can. Urol. Assoc J. 2009 Dec; 3(6 Suppl 4). Screening for bladder cancer: the best opportunity to reduce mortality

404.    Monitoring procedures exist that make the early detection of reproductive system damage, including testicular cancer, possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as alpha-fetoprotein, beta-human chorionic gonadotropin, and imaging tests such as ultrasound.[231] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[232] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of testicular cancer due to their exposure to Lockheed Martin's contaminants.[233]

405.    Monitoring procedures exist that make the early detection of prostate cancer possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as prostate specific antigen, kallikrein-related peptidase 2, prostate cancer antigen 3, the TMPRSS2-ERG gene fusion, [-2]proPSA, and imaging tests such as ultrasound.[234] These procedures are not components of standard

---

[231] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/testicular-cancer/screening-and-diagnosis
[232] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[233] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/testicular-cancer/screening-and-diagnosis; UK NHS, https://www.nhs.uk/conditions/testicular-cancer/diagnosis/
[234] American Cancer Society, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html; https://www.cancer.org/cancer/prostate-cancer/about/new-research.html

preventative healthcare, and are not recommended for the general population.[235] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of prostate cancer due to their exposure to Lockheed Martin's contaminants.[236]

406.    Monitoring procedures exist that make the early detection of glioma and other brain and spinal cord cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound, computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, and the evaluation of tumor markers and biomarkers such as C228T and C250T.[237] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[238] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks

---

[235] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[236] American Cancer Society, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html; https://www.cancer.org/cancer/prostate-cancer/about/new-research.html

[237] Massachusetts General Hospital, https://news.harvard.edu/gazette/story/2020/10/breakthrough-blood-test-developed-for-brain-tumors/; Weill Cornell Brain and Spine Center, https://weillcornellbrainandspine.org/early-detection-can-be-key-surviving-brain-tumor

[238] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

of glioma, brain and spine cancers due to their exposure to Lockheed Martin's contaminants.[239]

407.   Monitoring procedures exist that also make the early detection of other neurological damage, including nerve and brain damage, Multiple Sclerosis, and Parkinson's Disease, possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, positron emission tomography, single photon emission computed tomography, angiography, cerebrospinal fluid analysis, electroencephalography, electromyography, electronystagmography, evoked potentials, myelography, polysomnogram, thermography, ultrasound imaging, and x-rays.[240] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[241] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[242]

---

[239] Massachusetts General Hospital,
https://news.harvard.edu/gazette/story/2020/10/breakthrough-blood-test-developed-for-brain-tumors/; Weill Cornell Brain and Spine Center, https://weillcornellbrainandspine.org/early-detection-can-be-key-surviving-brain-tumor
[240] NIH National Institute of Neurological Disorders and Stroke,
https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Neurological-Diagnostic-Tests-and-Procedures-Fact; World Health Organization,
https://www.who.int/mental_health/neurology/neurological_disorders_report_web.pdf
[241] U.S. Preventative Services Task Force, Recommendations:
https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;
American Academy of Family Physicians; Preventative Healthcare Schedule:
https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[242] NIH National Institute of Neurological Disorders and Stroke,
https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Neurological-

408.   Monitoring procedures exist that also make the early detection of autoimmunity and autoimmune disorders possible. These monitoring procedures include screening and diagnostic tools such as antinuclear antibody immunofluorescence assay, evaluation of autoimmunity biomarkers such as anti-dsDNA, anti-RNP, anti-Smith, anti-Sjogren's SSA and SSB, anti-scleroderma, anti-Jo-1, anti-CCP, anti-cardiolipin, and anti-chromatin.[243] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[244] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[245]

409.   Monitoring procedures exist that also make the early detection of cardiovascular disorders possible. These monitoring procedures include screening and diagnostic tools such as computed tomography, carotid artery ultrasound, abdominal aorta

---

Diagnostic-Tests-and-Procedures-Fact; World Health Organization, https://www.who.int/mental_health/neurology/neurological_disorders_report_web.pdf

[243] Michigan Medical, https://www.uofmhealth.org/health-library/abq5017; Doghramji, Paul. Screening and Laboratory Diagnosis of Autoimmune Diseases using Antibody Immunofluorescence Assay and Specific Autoantibody Testing, https://www.aafp.org/dam/AAFP/documents/about_us/sponsored_resources/Quest_%20ANA-IFA_Monograph.pdf

[244] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[245] Michigan Medical, https://www.uofmhealth.org/health-library/abq5017; Doghramji, Paul. Screening and Laboratory Diagnosis of Autoimmune Diseases using Antibody Immunofluorescence Assay and Specific Autoantibody Testing, https://www.aafp.org/dam/AAFP/documents/about_us/sponsored_resources/Quest_%20ANA-IFA_Monograph.pdf; Harvard Health Blog, https://www.health.harvard.edu/blog/autoimmune-lung-disease-early-recognition-and-treatment-helps-2020062420339

ultrasound, electrocardiography, echocardiography, stress tests, holter monitoring, magnetic resonance imaging, evaluation of autoimmunity biomarkers such as carotid intima-media thickness, coronary artery calcium, c-reactive protein, lipoprotein(a), and homocysteine.[246] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[247] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[248]

410.    Monitoring procedures exist that also make the early detection of musculoskeletal damage possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, arthrography, radionuclide scanning, dual-energy x-ray absorptiometry, ultrasound and x-rays.[249] These procedures are not components of standard preventative healthcare, and are

---

[246] Wallace, Margaret et al. Screening Strategies for Cardiovascular Disease in Asymptomatic Adults. Prim. Care. 2014 Jun; 41(2): 371-397; Bhatnagar, Aruni. Studying Mechanistic Links Between Pollution and Heart Disease. Circulation Research. 2006; 99:692-705; Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-disease/diagnosis-treatment/drc-20353124

[247] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[248] Wallace, Margaret et al. Screening Strategies for Cardiovascular Disease in Asymptomatic Adults. Prim. Care. 2014 Jun; 41(2): 371-397; Bhatnagar, Aruni. Studying Mechanistic Links Between Pollution and Heart Disease. Circulation Research. 2006; 99:692-705; Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-disease/diagnosis-treatment/drc-20353124

[249] University of Colorado, https://www.colorado.edu/venturepartners/2020/04/15/advanced-early-detection-musculoskeletal-disease; Merck Manual, https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/diagnosis-of-musculoskeletal-disorders/tests-for-musculoskeletal-disorders

not recommended for the general population.[250] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[251]

411.    Monitoring procedures exist that make the early detection of mouth and oral cancers possible.  These monitoring procedures include screening and diagnostic tools such as tests utilizing toluidine blue or fluorescent light, exfoliative cytology, brush biopsy and fiber optic nasopharyngolaryngoscope exam.[252] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[253] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have

---

[250] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[251] University of Colorado, https://www.colorado.edu/venturepartners/2020/04/15/advanced-early-detection-musculoskeletal-disease; Merck Manual, https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/diagnosis-of-musculoskeletal-disorders/tests-for-musculoskeletal-disorders; Stover, Bert: https://digital.lib.washington.edu/researchworks/handle/1773/5407
[252] American Cancer Society, https://www.cancer.org/cancer/oral-cavity-and-oropharyngeal-cancer/detection-diagnosis-staging/detection.html; Oral Cancer Foundation, https://oralcancerfoundation.org/discovery-diagnosis-cancer-screening-protocols/
[253] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

increased risks of mouth and oral cancers due to their exposure to Lockheed Martin's contaminants.[254]

412.   Monitoring procedures exist that make the early detection of throat cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound, computerized tomography scans, computed axial tomography scans, magnetic resonance imaging, positron emission tomography scans, tests utilizing swallowed barium, laryngeal videostoboscopy, fiberoptic endoscopic examination of swallowing, and the evaluation of tumor markers and biomarkers such as hypermethylated genes.[255] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[256] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of throat cancers due to their exposure to Lockheed Martin's contaminants.[257]

---

[254] American Cancer Society, https://www.cancer.org/cancer/oral-cavity-and-oropharyngeal-cancer/detection-diagnosis-staging/detection.html; Oral Cancer Foundation, https://oralcancerfoundation.org/discovery-diagnosis/cancer-screening-protocols/

[255] MD Anderson Cancer Center, https://www.mdanderson.org/cancer-types/throat-cancer/throat-cancer-diagnosis.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/SwishandSpit_Test_Accurate_for_Cancer

[256] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[257] MD Anderson Cancer Center, https://www.mdanderson.org/cancer-types/throat-cancer/throat-cancer-diagnosis.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/SwishandSpit_Test_Accurate_for_Cancer

413.   Monitoring procedures exist that make the early detection of reproductive system damage, including endometrial and uterine cancers, possible.  These monitoring procedures include screening and diagnostic tools such as   imaging tests such as transvaginal ultrasound, endometrial biopsy, dilation and curettage, and the evaluation of tumor markers and biomarkers such as cancer antigen 125.[258] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[259] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of endometrial and uterine cancers due to their exposure to Lockheed Martin's contaminants.[260]

414.   Monitoring procedures exist that make the early detection of reproductive system damage, including ovarian cancers, possible.  These monitoring procedures include screening and diagnostic tools such as imaging tests such as transvaginal sonography, and the evaluation of tumor markers and biomarkers such as cancer antigen 125.[261] These

---

[258] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/endometrial-cancer-screening.html; Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/uterine-cancer-and-endometrial-cancer/uterine-cancer-and-endometrial-cancer-screening-and-diagnosis
[259] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[260] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/endometrial-cancer-screening.html; Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/uterine-cancer-and-endometrial-cancer/uterine-cancer-and-endometrial-cancer-screening-and-diagnosis
[261] National Ovarian Cancer Coalition, https://www.ovarian.org/about-ovarian-cancer/how-am-i-diagnosed

procedures are not components of standard preventative healthcare, and are not recommended for the general population.[262] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of ovarian cancers due to their exposure to Lockheed Martin's contaminants.[263]

415.    Monitoring procedures exist that make the early detection of intestinal cancers possible.  These monitoring procedures include screening and diagnostic tools such as upper gastrointestinal series, enterocylsis, barium enema with X-rays, computerized tomography scans, and endoscopic procedures.[264] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[265] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of intestinal cancers due to their exposure to Lockheed Martin's contaminants.[266]

---

[262] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[263] National Ovarian Cancer Coalition, https://www.ovarian.org/about-ovarian-cancer/how-am-i-diagnosed

[264] Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/intestinal-cancer/about; OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/small-intestine-cancer/screening-and-diagnosis

[265] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[266] Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/intestinal-cancer/about; OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-

416.    Monitoring procedures exist that make the early detection of stomach and gastrointestinal cancers possible.  These monitoring procedures include screening and diagnostic tools such as upper endoscopy, imaging tests such as upper gastrointestinal series, computerized tomography scans, postiron emission tomography scan, magnetic resonance imaging, and endoscopic ultrasound.[267] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[268] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of stomach and gastrointestinal cancers due to their exposure to Lockheed Martin's contaminants.[269]

417.    Monitoring procedures exist that also make the early detection of other gastrointestinal disorders possible.  These monitoring procedures include screening and diagnostic tools such as upper GI series, gastroscopy, endoscopic retrograde

---

about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/small-intestine-cancer/screening-and-diagnosis
[267] American Cancer Society, https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/how-diagnosed.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stomach-gastric-cancer/how-endoscopy-detects-stomach-cancer
[268] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[269] American Cancer Society, https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/how-diagnosed.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stomach-gastric-cancer/how-endoscopy-detects-stomach-cancer

cholangiopancreatography, endoscopic ultrasound, pH monitoring, manometry, barium enema, sigmoidoscopy, endoscopy, fecal calprotectin, fecal occult blood test, fecal immunochemical test, stool acidity test, stool culture, lactose tolerance test, hydrogen breath test, magnetic resonance imaging, barium beefsteak meal, colorectal transit study, computerized tomography, defecography, lower GI series, oropharyngeal motility, radioscopic gastric-emptying scan, sigmoidoscopy.[270] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[271] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of kidney damage due to their exposure to Lockheed Martin's contaminants.[272]

418.   Monitoring procedures exist that make the early detection of adrenal cancers possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, positron emission tomography scans, magnetic resonance

---

[270] GI Society, https://badgut.org/information-centre/diagnostic-tests-and-procedures/; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/digestive-diagnostic-procedures
[271] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[272] GI Society, https://badgut.org/information-centre/diagnostic-tests-and-procedures/; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/digestive-diagnostic-procedures; Massachusetts General Hospital, https://advances.massgeneral.org/digestive-health/video.aspx?id=1128

imaging, ultrasound, x-ray, laparoscopy.[273] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[274] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of adrenal cancers due to their exposure to Lockheed Martin's contaminants.[275]

419.   Monitoring procedures exist that make the early detection of pancreatic cancers possible.  These monitoring procedures include screening and diagnostic tools such as endoscopic ultrasound, magnetic resonance imaging, computerized tomography scans, magnetic resonance cholangiopancreatography, endoscopic retrograde cholangiopancreatography, and the evaluation of tumor markers and biomarkers such as cancer antigen 19-9.[276] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[277] However, because these

---

[273] Moffitt Cancer Center, https://moffitt.org/cancers/adrenal-cancer/diagnosis/screening/; Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/adrenal-cancer/diagnosis-and-detection
[274] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[275] Moffitt Cancer Center, https://moffitt.org/cancers/adrenal-cancer/diagnosis/screening/; Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/adrenal-cancer/diagnosis-and-detection; National Cancer Institute, https://www.cancer.gov/types/adrenocortical/patient/adrenocortical-treatment-pdq
[276] Johns Hopkins Medicine, https://pathology.jhu.edu/pancreas/participating-research/caps; Moffitt Cancer Center, https://moffitt.org/cancers/pancreatic-cancer/screening/
[277] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of pancreatic cancers due to their exposure to Lockheed Martin's contaminants.[278]

420.   Monitoring procedures exist that make the early detection of thyroid cancers possible. These monitoring procedures include screening and diagnostic tools such as imaging tests such as ultrasound, radioiodine scan, magnetic resonance imaging, computerized tomography scans, and positron emission tomography scans.[279] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[280] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of thyroid cancers due to their exposure to Lockheed Martin's contaminants.[281]

421.   Monitoring procedures exist that also make the early detection of other endocrine damage, including adrenal, pancreatic, pituitary and thyroid disorders, possible. These monitoring procedures include screening and diagnostic tools such as computerized

---

[278] Johns Hopkins Medicine, https://pathology.jhu.edu/pancreas/participating-research/caps; Moffitt Cancer Center, https://moffitt.org/cancers/pancreatic-cancer/screening/
[279] American Cancer Society, https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/how-diagnosed.html
[280] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[281] American Cancer Society, https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/how-diagnosed.html

tomography, magnetic resource imaging, positron emission tomography, single photon emission computed tomography, angiography, molecular pathology, cytogenics, ultrastructural analysis, cerebrospinal fluid analysis, electroencephalography, electromyography, electronystagmography, evoked potentials, myelography, polysomnogram, thermography, ultrasound imaging, rapid dynamic gadolinium-enhanced pituitary imaging, x-rays, evaluation of glucose suppression, growth hormone stimulation, and dexamethasone suppression.[282] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[283] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of endocrine damage due to their exposure to Lockheed Martin's contaminants.[284]

422.   Monitoring procedures exist that make the early detection of nasal and paranasal cancers possible.  These monitoring procedures include screening and diagnostic tools such as magnetic resonance imaging, computerized tomography scans, and positron

---

[282] Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/endocrinology-diabetes-and-metabolism/endocrinology-services/diagnosis-and-treatment-of-endocrine-disorders; OHSU, https://www.ohsu.edu/brain-institute/pituitary-disorders-diagnosis-and-treatment

[283] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[284] Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/endocrinology-diabetes-and-metabolism/endocrinology-services/diagnosis-and-treatment-of-endocrine-disorders; Sanford Health, https://www.sanfordhealth.org/medical-services/endocrinology; OHSU, https://www.ohsu.edu/brain-institute/pituitary-disorders-diagnosis-and-treatment

emission tomography scans.[285] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[286] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of nasal and paranasal cancers due to their exposure to Lockheed Martin's contaminants.[287]

423.   Monitoring procedures exist that make the early detection of skin cancers possible.  These monitoring procedures include screening and diagnostic tools such as complete skin exams and regular dermatologic surveillance.[288] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[289] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as

---

[285] Cedars Sinai Cancer Center, https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/nasal-cavity-and-sinus-cancer.html; Baptist Cancer Center, https://www.baptistcancercenter.com/cancers-we-treat/nasal-cavity-paranasal-sinuses

[286] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[287] Cedars Sinai Cancer Center, https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/nasal-cavity-and-sinus-cancer.html; Baptist Cancer Center, https://www.baptistcancercenter.com/cancers-we-treat/nasal-cavity-paranasal-sinuses

[288] Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/skin/screening-guidelines-skin

[289] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

plaintiffs, who have increased risks of skin cancers due to their exposure to Lockheed Martin's contaminants.[290]

424.    Monitoring procedures exist that make the early detection of lung and respiratory tract damage, including lung and respiratory cancers, possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans.[291] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[292] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs, who have increased risks of lung and respiratory tract cancers due to their exposure to Lockheed Martin's contaminants.[293]

425.    Monitoring procedures exist that make the early detection of rectal and colorectal cancers possible.  These monitoring procedures include screening and diagnostic tools such as highly sensitive fecal immunochemical tests, highly sensitive guaiac-based fecal occult blood tests, multi-targeted stool DNA tests, and imaging tests such as colonoscopy, computerized tomography colonography, and flexible sigmoidoscopy.[294]

---

[290] Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/skin/screening-guidelines-skin
[291] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/lung-cancer-screening.html
[292] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[293] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/lung-cancer-screening.html
[294] American Cancer Society, https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.html

These procedures may be components of standard preventative healthcare, and recommended for the general population.[295] However, because plaintiffs have increased risks of rectal and colorectal cancers as a result of their exposure to Lockheed Martin's contaminants, it is reasonably medically necessary for them to receive these tests and examinations earlier, and more frequently, than what is recommended for the general public.[296]

426.    Monitoring procedures exist that make the early detection of breast cancers possible.  These monitoring procedures include screening and diagnostic tools such clinical breast exams and mammography.[297] These procedures may be components of standard preventative healthcare, and recommended for the general population.[298] However, because plaintiffs have increased risks of breast cancers as a result of their exposure to Lockheed Martin's contaminants, it is reasonably medically necessary for them to receive these tests and examinations earlier, and more frequently, than what is recommended for the general

---

[295] U.S. Preventative Services Task Force, Recommendations:
https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;
American Academy of Family Physicians; Preventative Healthcare Schedule:
https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[296] American Cancer Society, https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.html
[297] MD Anderson Cancer Center,
https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf
[298] U.S. Preventative Services Task Force, Recommendations:
https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;
American Academy of Family Physicians; Preventative Healthcare Schedule:
https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

public.[299] Due to their increased risks of breast cancer resulting from their exposures to Lockheed Martin's contaminants, it is also reasonably medically necessary for plaintiffs to receive supplemental monitoring procedures that are not recommended for the general population, such as tomosynthesis magnetic resonance imaging.[300]

427.   These monitoring procedures are different than for the unexposed populations.  The monitoring procedures will benefit Plaintiffs since they will allow for the early detection of latent disease associated with exposure to Lockheed Martin's contamination.  Plaintiffs have the present need of diagnostic testing to diagnose properly the warning signs of the illness, disease, or and disease process resulting from exposure to Lockheed Martin's contamination.  Finding cancer and other deadly diseases early, when it has not spread or worsened, allows for more treatment options.  If left to when the disease becomes obvious, Plaintiffs will lose valuable treatment time.  These monitoring procedures are different from what would normally be recommended in the absence of exposure to Lockheed Martin's contamination.  The monitoring procedures are reasonably medically necessary as a direct and proximate result of Defendants' conduct due to the exposure of Plaintiffs to Lockheed Martin's contamination.

428.   Medical monitoring is recognized as a beneficial service provided to individuals in communities where there is believed to be an increased risk of disease from

---

[299] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf
[300] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf

exposure to hazardous substances released into the environment.[301] The purpose of a

medical monitoring program is case-finding in order to refer individuals for further

evaluation and, as appropriate, treatment.[302] Moreover, medical monitoring is widely

accepted as a response to toxic exposure.[303]

429.    As a result, Plaintiffs should be awarded the quantifiable costs of such a

monitoring regime.

430.    Defendant Lockheed Martin is jointly liable for damages sought by Plaintiffs.

## COUNT IX—LOSS OF CONSORTIUM

*(On behalf of Plaintiffs Vervicia Henderson, Deborah Reese, Richard Eidemiller, Brenda*
*Jackson, Tom Stone, John Tosti, Eric Saperstein, Ana Saperstein, Jordan Schursky,*
*Aubrey Carp, Mark Juda, Brenda White, Jennifer Johnson, Drew Johnson, Arthur*
*Anderson, Elizabeth Brackett, Justin Brunelle, Elaine Goldschmidt, Michael L. Iacovino,*
*Dawn Iacovino, Andrew Innes, Kelly Kemp, Naoyuki Komatsu, Naho Komatsu, Ann*
*McGarry, Stephanie Muddell, William Siegrist, Amanda Siegrist, and Cristina Turk*
*against Defendant Lockheed Martin)*

431.    Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in paragraphs 1 through 325 as if fully set forth herein.

432.    As a result of the tortious, negligent, and reckless behavior by Defendant

Lockheed Martin, described herein, Plaintiffs' close familial relations have suffered

---

[301] ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring
Program Under CERCLA, 60 FR 38841. July 28, 1995.
[302] Id.
[303] See C8 Medical Monitoring Program, http://www.c-
8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf; Department of
Environmental Health, Fernald Medical Monitoring Program, UNIVERSITY OF CINCINNATI
COLLEGE OF MEDICINE, https://med.uc.edu/eh/research/projects/fcc/fmmp-history,
Environmental Health & Safety, Pesticide Users Medical Monitoring Program, UNIVERSITY
OF FLORIDA, http://www.ehs.ufl.edu/programs/ih/pesticide/; World Trade Center Health
Program, About the Program, CENTERS FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/wtc/about.html.

devastating injuries and disease. This has caused Plaintiffs mental anguish and a loss of companionship, solace, comfort, fellowship, society and assistance in their close familial relationships.

433.    Defendant Lockheed Martin's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiffs, and punitive damages are thus warranted.

434.    By reason of the foregoing, Defendant is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

## COUNT X—LOSS OF CONSORTIUM
*(On behalf of Plaintiffs Vervicia Henderson, Deborah Reese and Richard Eidemiller, Tom Stone, John Tosti, Eric Saperstein, Ana Saperstein, Aubrey Carp, Mark Juda, Brenda White, Arthur Anderson, Elizabeth Brackett, Justin Brunelle, Elaine Goldschmidt, Michael L. Iacovino, Dawn Iacovino, Andrew Innes, Kelly Kemp, Naho Komatsu, Ann McGarry, Stephanie Muddell, William Siegrist, Amanda Siegrist, and Cristina Turk against Defendant UCPM)*

435.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 265, and 326 through 336 as if fully set forth herein.

436.    As a result of the tortious, negligent, and reckless behavior by UCPM, described herein, Plaintiffs' close familial relations have suffered devastating injuries and disease. This has caused Plaintiffs mental anguish and a loss of companionship, solace, comfort, fellowship, society and assistance in their close familial relationships.

437.    UCPM's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiffs, and punitive damages are thus warranted.

151

438.   By reason of the foregoing, Defendant is liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, and all such other relief as the Court deems proper.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

1.   For an award of damages, including nominal and compensatory damages, including past and future pain and suffering, past and future treatment costs, and other amounts as allowed by law and in an amount to be determined;

2.   For an award to fund a medical monitoring program in an amount determined just and reasonable; or, in the alternative, for the Court to supervise and administer a medical monitoring program and trust fund;

3.   For an award of punitive damages as allowed by law and in an amount to be determined;

4.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

5.   For prejudgment interest on all amounts awarded; and

6.   Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a jury trial as to all issues so triable.

Date: November 9, 2021


*/s/ Frank Petosa*

Frank M. Petosa
FL Bar No. 972754
fpetosa@ForThePeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION**
**GROUP**
8151 Peters Road
4th Floor
Plantation, FL 33324
P:  (954) 327-5366
F:  (954) 327-3018


T. Michael Morgan
FL Bar No. 62229
mmorgan@ForThePeople.com
**MORGAN & MORGAN, P.A.**
20 N Orange Ave., Suite 1600
Orlando, FL 32801
P: (407) 418-2031
F: (407) 245-3384
Rene F. Rocha*
rrocha@ForThePeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION**
**GROUP**
400 Poydras St., Suite 1515
New Orleans, LA 70130
P:  (954) 318-0268
F:  (954) 327-3018


Michael F. Ram*
mram@forthepeople.com
Marie N. Appel*
mappel@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION**
**GROUP**
711 Van Ness Avenue, Suite 500

153

San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6923

Pamela C. Papasov
FL Bar No. 1004434
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin St., Suite 700
Tampa, FL 33602
ppapasov@ForThePeople.com
P: (813) 424-5628
F: (813) 424-5673

*Pro Hac Vice*

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on November 9, 2021 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/Frank M. Petosa*

Frank M. Petosa, FL Bar No. 972754