## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

VERVICIA HENDERSON et al.,

      Plaintiffs,

v.

LOCKHEED MARTIN
CORPORATION and UNIVERSAL
CITY PROPERTY MANAGEMENT
COMPANY III, LLC,

      Defendants.

Case No. 6:21-cv-01363-RBD-DCI

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## AS TO GENERAL CAUSATION
## AND SUPPORTING LEGAL MEMORANDUM

Plaintiffs, pursuant to Fed. R. Civ. P. 56, move for partial summary judgment in their favor on the issue of general causation. In support of this motion, Plaintiffs, pursuant to Local Rule 3.01(a), submit the following legal memorandum.

## INTRODUCTION

This is an environmental contamination case involving the release of highly toxic chemicals from the Lockheed Martin weapons manufacturing facility in Orlando. This motion addresses the issue of general causation, that is, the question of whether the alleged toxic chemicals are capable of causing the Plaintiffs' injuries. Plaintiffs present two bases for granting partial summary judgment as to general causation: (1) the chemicals at issue in this case are in "category one" under *McClain*

1

*v. Metabolife Intern., Inc.,* 401 F.3d 1233, 1239 (11th Cir. 2005), meaning that general causation is satisfied and only specific causation remains for trial; and (2) Defendants fail to offer adequate expert opinions on general causation to rebut Plaintiffs' experts' opinions, leaving the latter uncontradicted. Instead of rebutting Plaintiffs' experts, Defendants' evidence reveals that the focus of causation in this case is on plaintiff-specific exposure questions and, as *McClain* teaches, there is rarely a reason to expend judicial resources on general causation in this type of case. 401 F.3d at 1239, 1239 fn.5.

## LEGAL STANDARD

A party may move for partial summary judgment by identifying the part of the claim on which summary judgment is sought and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to issues for which the movant would bear the burden of proof at trial, the 'movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party[.]'" *Ayers v. State Farm Mut. Automobile Ins. Co.*, 316 F. Supp. 3d 1324, 1327 (M.D. Fla. 2018) (quoting *Landolfi v. City of Melbourne, Fla.,* 515 F. App'x 832, 834 (11th Cir. 2013)). Although "[t]he Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant," *id.* at 1328 (citing *Battle v. Bd. of Regents,* 468 F.3d 755, 759 (11th Cir. 2006)), "[a] court need not permit a case to go to a jury … when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Id.*

2

(quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

A partial summary judgment order serves the purpose of narrowing and focusing the issues for trial and speeding up the litigation. *See Kearney v. Auto-Owners Ins. Co.*, 2009 WL 3398377, at *1 (M.D. Fla. Oct. 19, 2009) ("A court may enter a partial summary judgment order … to narrow the issues for trial."); *Comprehensive Care Corp. v. Katzman*, 2010 WL 3190136, at *4 (M.D. Fla. July 30, 2010) ("eliminating those issues where no genuine issue of material fact exists will focus the trial"); Advisory Committee Notes to Rule 56 (explaining that partial summary judgment "is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case" and "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact").

## FACTS RELATING TO GENERAL CAUSATION

### A.    Background

In the Fourth Amended Complaint, Plaintiffs allege that Defendants contaminated the air, soil and groundwater with numerous toxic chemicals at and around the Lockheed Martin weapons manufacturing facility in Orlando.[1] As a result

---

[1] *See* Plaintiffs' Fourth Amended Complaint (Doc. 89) ¶¶ 127-161 (identifying the following chemicals: trichloroethylene (TCE); tetrachloroethylene (PCE); 1,1,1-trichloroethane (methyl chloroform); vinyl chloride, methylene chloride; toluene; benzene; chlorobenzene; ethylbenzene; 1,2-dichlorobenzene (1,2-DCB); 1,3-dichlorobenzene (1,3-DCB); carbon disulfide; carbon tetrachloride; 1,1-dichloroethane (1,1-DCA); 1,2-dichloroethane (1,2-DCA); 1,1-dichloroethene (1,1-DCE); 1,2-dichloroethene (1,2-DCE); 1,1,2-trichloroethane (1,1,2-TCA); chloroform; 1,2-dichloropropane; dichlorobromomethane; bis(2-ethylhexyl)phthalate (DHEP); xylene; methylnaphthalene; benzo(a)pyrene; polychlorinated biphenyls (PCBs); Dichlorodiphenyltrichloroethane (DDT); 1,4-dioxane; dioxins; perfluoroalkyls (PFAS); cadmium; chromium; lead; arsenic; and additional toxins and

of the contamination, Plaintiffs allege that they inhaled, ingested and came into dermal contact with toxic chemicals, and that those chemicals have caused cancers, birth defects, and neurological and immunological injuries.[2] In support of general causation in this case – showing that the toxic chemicals are capable of causing the Plaintiffs' injuries – Plaintiffs have disclosed several experts, including: Dipak Panigrahy, MD (opining on cancer), Daniel Kantor, MD (opining on neurological and immunological injuries), Donald Mattison, MD (opining on birth defects).

### B.   Dr. Panigrahy (cancer)

Dr. Panigrahy is an Assistant Professor of Pathology at Harvard's Beth Israel Deaconess Medical Center where he oversees a laboratory (the "Dipak Panigrahy Lab"[3]) to study the initiation and promotion of cancer.[4] His research efforts "are focused on identifying the causes of cancer and preventing and finding a cure for cancer."[5]

Dr. Panigrahy provides the opinion that seven of the chemicals Plaintiffs were exposed to are capable of causing cancer: trichloroethylene (TCE), formaldehyde, arsenic, hexavalent chromium, tetrachloroethylene (PCE), 1,1,1-trichloroethane, and styrene.[6] "The peer reviewed animal and human cancer studies … demonstrate that

---

pollutants as will be proven at trial).
[2] *See* Plaintiffs' Fourth Amended Complaint ¶ 192-268.
[3] *See* https://www.bidmc.org/research/research-by-department/pathology/laboratories/dipak-panigrahy-lab
[4] Panigrahy Rpt. (ex. 1) at 2.
[5] Panigrahy Rpt. (ex. 1) at 2.
[6] Panigrahy Rpt. (ex. 1) at 10.

these 7 human carcinogens cause several types of human cancers, including kidney cancer, breast cancer, blood cancers (e.g., lymphoma, non-Hodgkin's lymphoma (NHL), and leukemia), pancreatic cancer, thyroid cancer, liver & bile duct cancers, lung cancer, testicular cancer, anal cancer, and brain cancer (e.g., glioblastoma)."[7] Each is genotoxic[8] and there is no safe level of exposure.[9] Further, mixtures of chemicals "are categorized according to either the carcinogenicity of the mixture or the classification of the carcinogenic substances included" and "in this case with 7 carcinogens, there will likely be an increased cancer risk with the solvent mixtures."[10] Dr. Panigrahy's opinions are made "with a reasonable degree of scientific and medical certainty."[11] As discussed in more detail below, Dr. Panigrahy's opinions on the toxicity and cancer-causing potential of these chemicals is widely accepted by research organizations, regulatory agencies and courts.

Trichloroethylene (TCE): The International Agency for Research on Cancer (IARC) classifies TCE as a "known carcinogen" and "carcinogenic to humans."[12] The U.S. Environmental Protection Agency (EPA) concludes that TCE is "highly likely"

---

[7] Panigrahy Rpt. (ex. 1) at 357-358, 362-363, 363 (kidney cancer), 373 (breast cancer), 380 (blood cancers), 392 (thyroid cancer), 400 (pancreatic cancer), 408 (liver and bile duct cancers), 420 (lung cancer), 432 (testicular cancer), 439 (anal cancer), 445 (brain cancer).
[8] Panigrahy Rpt. (ex. 1) at 10-12.
[9] Panigrahy Rpt. (ex. 1) at 23 ("there is no dose without a potential cancer-causing effect"); Panigrahy Rebuttal Rpt. (ex. 2) at 20 ("Regulatory agencies such as the FDA, European Medical Association (EMA- 32 European countries), Health Canada, and Australia state that genotoxic carcinogens are not safe, and that exposure should be limited to the greatest extent possible.").
[10] Panigrahy Rpt. (ex. 1) at 57-59.
[11] Panigrahy Rpt. (ex. 1) at 17.
[12] Panigrahy Rpt. (ex. 1) at 65.

to produce cancer and that "TCE is carcinogenic to humans by all routes."[13] The U.S. National Toxicology Program (NTP) classifies TCE as "reasonably likely to be a human carcinogen."[14] "The scientific evidence on TCE exposure and resultant cancers are considered unequivocally sufficient and persuasive evidence to classify TCE as a human carcinogen."[15] *See also Schmucker v. Johnson Controls, Inc.,* 9 F.4th 560, 561 (7th Cir. 2021) ("trichloroethylene or TCE, is a carcinogen"); *Crofton Ventures Ltd. Partn. v. G & H Partn.*, 258 F.3d 292, 294 (4th Cir. 2001) ("trichloroethylene ("TCE") [is] a common solvent known to be carcinogenic and constituting a hazardous substance under federal and state environmental laws").

Formaldehyde: IARC classifies formaldehyde as "carcinogenic to humans."[16] The National Toxicology Program states that "Formaldehyde is *known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans and supporting data on mechanisms of carcinogenesis."[17] *See also Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1053 (N.D. Cal. 2018) ("Formaldehyde has been classified as a known carcinogen").

Arsenic: IARC classifies arsenic as "carcinogenic to humans."[18] The NTP states that "Arsenic and inorganic arsenic compounds are *known to be a human carcinogen*

---

[13] Panigrahy Rpt. (ex. 1) at 67-68.
[14] Panigrahy Rpt. (ex. 1) at 68.
[15] Panigrahy Rpt. (ex. 1) at 59.
[16] Panigrahy Rpt. (ex. 1) at 106.
[17] Report on Carcinogens, Fifteenth Edition, available at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf
[18] Panigrahy Rpt. (ex. 1) at 147.

based on sufficient evidence of carcinogenicity in humans."[19] "Since the late 17th century, it has been known that arsenic can induce cancer in humans, and many scientific publications have documented the various mechanisms on how arsenic induces cancer."[20] *See also Villanueva v. Biter*, 12016 WL 8730882, at *2 (E.D. Cal. 2016) (taking judicial notice that "[a]rsenic is a known human carcinogen"); *Phelps Dodge Corp. v. Occupational Safety and Health Rev. Commn.*, 725 F.2d 1237, 1240 (9th Cir. 1984) (finding that the Occupational Safety and Health Review Commission "reviewed the medical evidence of carcinogenicity and other adverse health effects of inorganic arsenic in the preamble to the standard, and noted that there is no known safe level of exposure").

Hexavalent Chromium (Chromium (VI)): IARC classifies compounds containing Chromium (VI) as Group 1 human carcinogens (carcinogenic to humans).[21] "The capability of chromium to cause cancers has been known for more than a century, and numerous epidemiological studies have been performed to determine its carcinogenicity."[22] *See also Pub. Citizen Health Research Group v. Chao*, 314 F.3d 143, 146 (3d Cir. 2002) ("Since 1980, the Department of Health and Human Service's National Toxicology Program has designated various hexavalent chromium compounds as human carcinogens. The Environmental Protection Agency has been

---

[19] Report on Carcinogens, Fifteenth Edition, available at
https://ntp.niehs.nih.gov/ntp/roc/content/profiles/arsenic.pdf
[20] Panigrahy Rpt. (ex. ) at 138.
[21] Panigrahy Rpt. (ex. 1) at 189.
[22] Panigrahy Rpt. (ex. 1) at 189.

in accord since 1984, and it confirmed its carcinogenic classification of the compound in a review of the toxicological data in 1998. … Disturbingly, the primary evidence of hexavalent chromium's carcinogenicity come not from animal studies, but from epidemiological studies of workers exposed to it; in short … 'the principal evidence is actual human body counts.'").

Tetrachloroethylene (PCE): IARC classifies PCE as a "probable human carcinogen."[23] The EPA classifies PCE as "likely to be carcinogenic to humans by all routes of exposure."[24] The NTP states that "Tetrachloroethylene is *reasonably anticipated to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in experimental animals."[25]

1,1,1-Trichloroethane: IARC classifies 1,1,1-trichloroethane as "probably carcinogenic to humans."[26]

Styrene: IARC classifies styrene as "probably carcinogenic to humans."[27] The NTP states that styrene is "*reasonably anticipated to be a human carcinogen*."[28] In *Styrene Info. and Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71 (D.D.C. 2013), the court rejected a trade association's challenge to the NTP's finding that styrene is a carcinogen. *See* 944 F. Supp. 2d at 88-89 ("In short, the Report provides a rational

---

[23] Panigrahy Rpt. (ex. 1) at 225.
[24] Panigrahy Rpt. (ex. 1) at 238.
[25] Report on Carcinogens, Fifteenth Edition, available at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/tetrachloroethylene.pdf
[26] Panigrahy Rpt. (ex. 1) at 284.
[27] Panigrahy Rpt. (ex. 1) at 298.
[28] Panigrahy Rpt. (ex. 1) at 299; *see also* Report on Carcinogens, Fifteenth Edition, available at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/styrene.pdf

explanation for the Secretary's decision to list styrene as a reasonably anticipated human carcinogen, and this explanation is adequately supported by the administrative record.").

### C.    Dr. Kantor (neurological and immunological injuries)

Dr. Kantor is a board-certified neurologist.[29] He specializes in neuro-immune diseases including multiple sclerosis, and he serves as President Emeritus of the Florida Society of Neurology, and as Vice President for Clinical Research & Development at a neurological research institute focusing on Parkinson's disease.[30] Dr. Kantor opines that the solvents PCE, TCE, toluene, xylenes, and styrene, individually or in mixtures, are capable of causing the Plaintiffs' alleged neurological and immunological injuries, including multiple sclerosis, Parkinson's disease, neurodegeneration (including impaired vision, balance, memory, hearing, reaction time, and motor skills, and lesions in and damage to the central nervous system), and neuroinflammation and inflammation (including juvenile idiopathic arthritis).[31]

Dr. Kantor's opinions are consistent with and based, in part, on "a comprehensive appraisal of toxicological reviews by agencies (such as the Agency for Toxic Substances and Disease Registry [ATSDR] and Environmental Protection Agency [EPA])[.]"[32] His opinion on multiple sclerosis is consistent with that of an

---

[29] Kantor Rpt. (ex. 4) at 2.
[30] Kantor Rpt. (ex. 4) at 2.
[31] Kantor Rpt. (ex. 4) at 8 (PCE summary), 15 (TCE summary), 19 (toluene summary), 21 (xylenes summary), 23 (styrene summary), 29-32 (summary of health endpoints).
[32] Kantor Rpt. (ex. 4) at 3. Dr. Kantor cites to ATSDR and EPA sources throughout his report.

expert panel from the National Institute of Environmental Health Sciences (NIEHS).[33] Dr. Kantor's opinions are made "to a reasonable degree of medical and scientific certainty" under a "more likely than not" causation standard.[34]

### D.    Dr. Mattison (birth defects)

Dr. Mattison is a Distinguished Professor at the Arnold School of Public Health at the University of South Carolina.[35] He trained in obstetrics and gynecology at the Sloane Hospital for Women, and in developmental and reproductive pharmacology and toxicology at the National Institute of Child Health.[36] He previously worked as Medical Officer and Chief at the National Institutes of Health Section on Reproductive Toxicology and as Director of Human Risk Assessment at the U.S. Food and Drug Administration's National Center for Toxicological Research.[37] Dr. Mattison opines that exposure to PCE, TCE, toluene, xylenes, formaldehyde, and styrene, as individual chemicals and in chemical mixtures, is capable of causing congenital heart defects, limb and organ malformations, orofacial clefts, chromosomal disorders, and autism and developmental delays.[38]

Dr. Mattison cites to the Agency for Toxic Substances and Disease Registry (ATSDR) [39] and the EPA[40] throughout his report to support his opinions. Dr.

---

[33] Kantor Rpt. (ex. 4) at 29.
[34] Kantor Rpt. (ex. 4) at 29.
[35] Mattison Rpt. (ex. 3) at 2.
[36] Mattison Rpt. (ex. 3) at 2.
[37] Mattison Rpt. (ex. 3) at 2.
[38] Mattison Rpt. (ex. 3) at 20-24.
[39] Mattison Rpt. (ex. 3) at 7, 8, 13, 19, 20.
[40] Mattison Rpt. (ex. 3) at 6, 7, 9, 13, 14, 15.

Mattison's opinions are made "to a reasonable degree of medical and toxicological certainty" under a "more likely than not" causation standard.[41]

## ARGUMENT

### A.  For purposes of general causation the Eleventh Circuit categorizes chemicals depending on their toxicity.

General causation asks whether "exposure to the alleged toxic substance can cause a particular disease." *Guinn v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1239, 1242 (M.D. Fla. 2009), *aff'd*, 602 F.3d 1245 (11th Cir. 2010). To answer this question, the Eleventh Circuit divides toxic tort cases into two categories: "first, those cases in which the medical community generally recognizes the toxicity of the drug or chemical at issue, and second, those cases in which the medical community does not generally recognize the agent as both toxic and causing the injury plaintiff alleges. *McClain v. Metabolife Intern., Inc.,* 401 F.3d 1233, 1239 (11th Cir. 2005). "The battleground in this first category of cases focuses on plaintiff-specific questions: was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?" *Id*. "This two-part designation for toxic tort cases is devised to further the interests of judicial economy. There is rarely a reason for a court to consider opinions that medical doctors routinely and widely recognize as true[.]" *Id.* at 1239, fn. 5.

When a case falls into *McClain* category one, general causation is satisfied and only specific causation is at issue. *See Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 691 (N.D.

---

[41] Mattison Rpt. (ex. 3) at 20.

Ga. 2006) ("In the first type of toxic tort case [under *McClain*] … general causation is already established, leaving only specific causation at issue for trial."); *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *8 (N.D. Fla. Nov. 4, 2020), *aff'd sub nom. In re Deepwater Horizon BELO Cases*, 2022 WL 104243 (11th Cir. Jan. 11, 2022) ("In the 'first category,' [as defined in *McClain*] … only specific causation is at issue."); *In re Abilify (Aripiprazole) Products Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 fn.16 (N.D. Fla. 2018) ("where the medical community recognizes and agrees that a particular substance is toxic … general causation is accepted"); *Waite v. AII Acq. Corp.*, 194 F. Supp. 3d 1298, 1312 (S.D. Fla. 2016) ("binding Eleventh Circuit precedent teaches that general causation is satisfied in a case involving facts like those presented here, namely, cases involving 'toxins like asbestos…'"); *Adler v. BP Expl. & Prod., Inc.,* 2020 WL 10319810, at *4 (S.D. Ala. Sept. 1, 2020) ("Where the medical community generally recognizes the toxicity of a drug or chemical at issue, a plaintiff need show only individual causation[.]"); *Waite v. AII Acq. Corp.*, 194 F. Supp. 3d 1298, 1313 (S.D. Fla. 2016) (finding "the issue of general causation resolved" in a *McClain* category one case).

"[T]he inquiry for purposes of *McClain* categorization concerns the chemical at issue, but not the dose at issue." *Williams v. Intl. Paper Co.*, 2009 WL 10678630, at *1 (S.D. Ga. July 19, 2009) (holding that "the dispositive question with regard to *McClain* categorization … is whether C102 can – without regard to a specific dose – cause those injuries"). "Therefore, when the Court assesses general causation

12

and *McClain* categorization, the particular dose that the plaintiff received is immaterial." *Id*. This makes perfect sense because the *McClain* Court made clear that questions such as "was the plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?" are components of specific causation. *McClain*, 401 F.3d at 1239.

**B.    The chemicals in this case are in *McClain* category one.**

A chemical is properly categorized in *McClain* category one when "the medical community generally recognizes the toxicity of the drug or chemical at issue." *McClain*, 401 F.3d at 1239. In *McClain*, the Court held that a combination of ephedrine and caffeine is in category two (i.e., not generally recognized as toxic), noting that "ephedrine occurs naturally … and has been used for decades for treating adults and children, especially in over-the-counter medicines." *Id*. at 1236. In a later case applying *McClain*, the Court held that Fixodent, a denture product containing zinc, is also in category two, in part because "[m]illions of consumers have regularly used Fixodent for decades without complaint" and the zinc in Fixodent "is undeniably an essential nutrient the body must have to function properly." *Chapman v. Procter & Gamble Distribg., LLC,* 766 F.3d 1296, 1304 (11th Cir. 2014) (quoting from the defendant's brief).

In contrast to Fixodent/zinc and caffeine/ephedrine, the *McClain* Court provides guidance on substances that would fall into category one: asbestos, silica, cigarette smoke, alcohol, and arsenic. 401 F.3d at 1239, 1239 fn.5. *See also Williams,*

2009 WL 10678630, at *1 (holding that chlorine dioxide (CIO2) is in *McClain* category one); *Waite v. AII Acq. Corp.*, 194 F. Supp. 3d 1298, 1312-13 (S.D. Fla. 2016) (holding that asbestos is in *McClain* category one).

Unlike Fixodent/zinc and caffeine/ephedrine that are commonly sold in retail stores and voluntarily consumed by humans, the chemicals at issue in this case are much more like the category one chemicals referenced in *McClain*, *Williams*, and *Waite*.[42] Seven of the chemicals in this case (TCE, PCE, formaldehyde, arsenic, hexavalent chromium, 1,1,1-trichloroethane and styrene) are genotoxic,[43] carcinogenic,[44] and there is no safe level of exposure.[45] "Regulatory agencies such as the FDA, European Medical Association (EMA- 32 European countries), Health Canada, and Australia state that genotoxic carcinogens are not safe, and that exposure should be limited to the greatest extent possible."[46] Additionally, scientific agencies including the International Agency for Research on Cancer (IARC), the National Toxicology Program (NTP), the Environmental Protection Agency (EPA), the Agency for Toxic Substances and Disease Registry (ATSDR), and the National Institute of Environmental Health Sciences (NIEHS) are in agreement regarding the

---

[42] In the case of arsenic, *McClain* expressly recognizes that arsenic is a category one substance. 401 F.3d at 1239 fn.5.
[43] Panigrahy Rpt. (ex. 1) at 10-12.
[44] Panigrahy Rpt. (ex. 1) at 10.
[45] Panigrahy Rpt. (ex. 1) at 23, 57.
[46] Panigrahy Rebuttal Rpt. (ex. 2) at 20.

toxicity of the chemicals in this case,[47] as are numerous court decisions.[48]

Importantly, Defendants' own causation experts, Drs. Mundt and James, appear to acknowledge the toxicity of the chemicals at issue in this case.[49] Instead of

---

[47] *See* Panigrahy Rpt. (ex. 1) at 65, 106, 147, 189, 225, 284, 298 (showing that the IARC classifies seven of the chemicals as Group 1 (carcinogenic to humans) or Group 2A (probably carcinogenic to humans); Panigrahy Rebuttal Rpt. (ex. 2) at 5 (table showing IARC, NTP and EPA classifications); Mattison Rpt. (ex. 3) at 6-9, 13-15, 19, 20 (citing EPA and ATSDR sources for his opinions); Kantor Rpt. (ex. 4) at 3 (stating that his opinions are based, in part, on toxicological reviews by ATSDR and EPA), 29 (noting his opinion on multiple sclerosis is consistent with an expert panel of the NIEHS).

[48] *See Schmucker v. Johnson Controls, Inc.,* 9 F.4th 560, 561 (7th Cir. 2021) ("trichloroethylene or TCE, is a carcinogen"); *Crofton Ventures Ltd. Partn. v. G & H Partn.*, 258 F.3d 292, 294 (4th Cir. 2001) ("trichloroethylene ("TCE") [is] a common solvent known to be carcinogenic and constituting a hazardous substance under federal and state environmental laws"); *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1053 (N.D. Cal. 2018) ("Formaldehyde has been classified as a known carcinogen"); *Villanueva v. Biter*, 12016 WL 8730882, at *2 (E.D. Cal. 2016) (taking judicial notice that "[a]rsenic is a known human carcinogen"); *Phelps Dodge Corp. v. Occupational Safety and Health Rev. Commn.*, 725 F.2d 1237, 1240 (9th Cir. 1984) (finding that the Occupational Safety and Health Review Commission "reviewed the medical evidence of carcinogenicity and other adverse health effects of inorganic arsenic in the preamble to the standard, and noted that there is no known safe level of exposure"); *Pub. Citizen Health Research Group v. Chao*, 314 F.3d 143, 146 (3d Cir. 2002) ("Disturbingly, the primary evidence of hexavalent chromium's carcinogenicity come not from animal studies, but from epidemiological studies of workers exposed to it; in short … 'the principal evidence is actual human body counts.'"); *Styrene Info. and Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71 (D.D.C. 2013) ("In short, the Report provides a rational explanation for the Secretary's decision to list styrene as a reasonably anticipated human carcinogen, and this explanation is adequately supported by the administrative record.").

[49] *See e.g.,* Mundt Rpt. (ex. 5) at 35 ("A robust body of epidemiological evidence demonstrates that high levels of inorganic arsenic in drinking water is associated with increased risk of bladder, skin and lung cancers"); *id.* at 36 ("carcinogenicity of chromium compounds is based on evidence from exposure to hexavalent chromium in approximately 50 human epidemiological studies"); *id.* at 37 ("epidemiological findings provided sufficient evidence that formaldehyde causes nasopharyngeal cancer and leukemia"); *id.* at 42 ("IARC currently classifies styrene as possibly carcinogenic to humans"); *id.* at 46 ("The IARC Monograph 106 (2014) reported that some associations had been observed between PCE and cancers of the esophagus, cervix, and NHL"); *id.* at 50 ("occupational inhalation exposures to toluene may be associated with nervous system symptoms and possibly other effects"); *id.* at 53 ("a positive association has been observed between exposure to trichloroethylene and non-Hodgkin lymphoma and liver cancer"); *id.* at 56 ("epidemiological literature demonstrates that acute, high-concentration exposure, and chronic high-level occupational exposure to TCE in air may be associated with short-term nervous system effects"); *id.* at 57 ("Several epidemiological

challenging toxicity, Defendants' experts focus on exposure level,[50] and exposure level is not relevant to determining *McClain* categorization. *Williams*, 2009 WL 10678630, at *1. In other words, Defendants' experts are treating the chemicals in this case as *McClain* category one substances where the "battleground … focuses on plaintiff-specific questions: was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?" *McClain,* 401 F.3d at 1239. Thus, as a *McClain* category one case, general causation is satisfied and the parties and experts should focus their attention on the plaintiff-specific causation issues for trial.

### C.   Regardless of *McClain* categorization Defendants have not offered adequate general causation opinions to rebut Plaintiffs' evidence.

Plaintiffs meet their burden of proof on general causation if they can show that "more likely than not" exposure to the toxic substances could cause their injuries. *See*

---

studies reported associations between TCE and various developmental effects"); *id.* at 59 ("The ATSDR Toxicological Profile on xylenes noted that one of the "primary" targets of xylene exposure is the nervous system"); *id.* at 60 ("Several occupational studies have evaluated xylenes and female reproductive endpoints"); James Tr. (ex. 8) at 24:13-23 (admitting that "it's always possible at some dose" that TCE can cause cancer and admitting that TCE "can be" a neurotoxin).

[50] *See e.g.* Mundt Rpt. (ex. 5) at 135 ("The key roles of dose and timing of exposures to human carcinogens cannot be ignored."); Mundt Tr. (ex. 6) at 58:12-16 (testifying that his process of reaching an opinion involves "whether or not a substance under certain exposure circumstances indeed or likely causes a cancer or other health outcome"); Mundt Tr. (ex. 6) at 112:2-9 (acknowledging that arsenic is a carcinogen but stating "[a]s with any carcinogen, the question is under what exposure circumstances"); James Rpt. (ex. 7) at 11 ("the likelihood of developing a disease from an alleged exposure … *are highly individualized analyses*") (emphasis by Dr. James); James Tr. (ex. 8) at 54:12-17 (describing a toxic tort case as involving "variations in exposure, variations in dose, variations in risk, and then variations in likelihood of causation, especially given their personal characteristics and individual risk factors inherent to the individual").

*Doolin v. Ford Motor Co.,* 2018 WL 4599712, at *10 (M.D. Fla. Sept. 25, 2018) (quoting

*Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So. 2d 1015, 1018 (Fla. 1984)) ("Florida courts

follow the more likely than not standard of causation"); *Oliver v. City of Orlando,* 2011

WL 2174010, at *9 (M.D. Fla. May 31, 2011), *aff'd sub nom. Oliver v. Orange County,

Fla.*, 456 Fed. Appx. 815 (11th Cir. 2012) (applying the "more likely than not standard

of causation" to both general causation and specific causation); *Avila v. Willits Envtl.

Remediation Tr.*, 2009 WL 1813125, at *4 (N.D. Cal. June 18, 2009), *aff'd,* 633 F.3d

828 (9th Cir. 2011) (holding in an environmental contamination case that a plaintiff

must "show through admissible scientific evidence that it is 'more likely than not' that

exposure to the toxic substances could cause his injuries (general causation)"). "As is

familiar in the law, 'more likely than not' is the equivalent of the legal standard of

proof known as the 'preponderance of the evidence,' which in mathematical terms

relates to a 51% probability that a proposition is proven." *In re Skanska USA Civ. S.E.

Inc.*, 577 F. Supp. 3d 1302, 1319 fn.23 (N.D. Fla. 2021).

"Where, as here, an issue is one of the kind on which expert testimony must be

presented, and the affidavit of the expert is uncontradicted, summary judgment is

proper." *Luby v. Carnival Cruise Lines, Inc.*, 633 F. Supp. 40, 42 (S.D. Fla. 1986), *aff'd

sub nom. Luby v. Carnival Cruise Lines*, 808 F.2d 60 (11th Cir. 1986); *see also Wingster v.

Head*, 318 Fed. Appx. 809, 815 (11th Cir. 2009) (unpublished) (quoting *Webster v.

Offshore Food Serv.,* 434 F.2d 1191, 1193 (5th Cir. 1970)) ("[S]ummary judgment is

appropriate when 'the trier of fact would not be at liberty to disregard arbitrarily the

unequivocal, uncontradicted and unimpeached testimony of an expert witness [whose] testimony bears on technical questions of medical causation beyond the competence of lay determination.'"); *E.C. ex rel. Crocker v. Child Dev. Schools, Inc.*, 2011 WL 4501560, at *11 (M.D. Ala. Sept. 29, 2011) ("When confronted with a reliable expert witness and his unimpeached opinion, the court is compelled to grant summary judgment on the issue of causation.").

In this case, Plaintiffs' experts have provided clear general causation opinions: First, within a "reasonable degree of scientific and medical certainty" TCE, formaldehyde, arsenic, hexavalent chromium, PCE, 1,1,1-trichloroethane and styrene cause or probably cause the human cancers that Plaintiffs have alleged.[51] Second, within a "reasonable degree of medical and toxicological certainty" it is "more likely than not" that TCE, PCE, toluene, xylenes, formaldehyde and styrene can cause congenital heart defects, limb and organ malformations, orofacial clefts, chromosomal disorders, and autism and developmental delays.[52] Third, within a "reasonable degree of medical and scientific certainty" it is "more likely than not" that PCE, TCE, toluene, xylenes and styrene can cause neurological and immunological injuries, including multiple sclerosis and Parkinson's disease.[53]

---

[51] Panigrahy Rpt. (ex. 1) at 17, 19 (noting that the chemicals are classified as either "human carcinogens" or "probable human carcinogens"), 357-358, 362-363, 363 (kidney cancer), 373 (breast cancer), 380 (blood cancers), 392 (thyroid cancer), 400 (pancreatic cancer), 408 (liver and bile duct cancers), 420 (lung cancer), 432 (testicular cancer), 439 (anal cancer), 445 (brain cancer).
[52] Mattison Rpt. (ex. 3) at 20-24.
[53] Kantor Rpt. (ex. 4) at 29, 8 (PCE summary), 15 (TCE summary), 19 (toluene summary), 21 (xylenes summary), 23 (styrene summary), 29-32 (summary of health endpoints).

Additionally, Plaintiffs' experts opine that there is no safe level of exposure for the chemicals in question.  **Dr. Panigrahy**: With respect to TCE, formaldehyde, arsenic, hexavalent chromium, PCE, 1,1,1-trichloroethane and styrene, "the scientific community assumes that a non-threshold dose-response relationship exists" and "there is no dose without a potential cancer-causing effect."[54] **Dr. Mattison**: "[T]he scientific community does not approve of speculations or assumptions that safe thresholds exist for toxicants with demonstrated systemic effects in sensitive tissues. … The toxicants discussed in this report [TCE, PCE, toluene, xylenes, formaldehyde and styrene] have been shown to exhibit toxic effects at environmentally relevant doses … [and] there is no evidence that would suggest these exposures would exhibit a dose-response threshold for developmental or reproductive endpoints."[55] **Dr. Kantor**: "[T]he scientific community has moved away from assuming a threshold of safe exposures when the chemical in question doesn't have a scientifically-grounded reason to assume safety below a specific level … … [and] there is evidence of toxic effects to the nervous system at environmentally relevant exposure levels of these chemicals [PCE, TCE, toluene, xylenes and styrene], with linear pattern responses to increasing doses…The evidence points to a gradient of exposure risk, rather than a threshold effect "[56]

---

[54] Panigrahy Rpt. (ex. 1) at 23.
[55] Mattison Rpt. (ex. 3) at 19-20.
[56] Kantor Rpt. (ex. 4) at 27-28; *see also id.* at 8 (PCE), 16 (TCE), 19 (toluene), 21 (xylenes), and 23 (styrene) (stating for each chemical that "[t]he evidence points to a gradient of exposure risk, rather than a threshold effect."

In contrast to Plaintiffs' experts, Dr. James confirmed at his deposition that he has not offered any causation opinions in this case.

Q.    Are you offering causation opinions in this case?

A.    I haven't offered a causation opinion, yes.[57]

          ***

Q.    First, you're not offering any general causation opinions regarding any exposures in this case; is that correct?

A.    I would say there's no known exposures in this case at this point. I don't know how I could offer an opinion about general causation or specific causation.[58]

          ***

Q.    You're not offering any general causation opinions regarding any alleged injuries in this case?

A.    I would say that's correct, …[59]

          ***

A.    I don't have a general causation opinion. I don't have a specific causation opinion. … I haven't done a general causation opinion … I haven't – I don't have an opinion.[60]

Nor does Dr. James directly rebut Plaintiffs' experts' opinions that the chemicals in this case have toxicities that are linear non-threshold dependent (LNT). Instead, he only criticizes the notion of LNT in general terms, and only as it relates to noncancer toxicities.[61] Nevertheless, Dr. James fails to identify a toxicity threshold for

---

[57] James Tr. (ex. 8) at 85:19-21.
[58] James Tr. (ex. 8) at 88:16-23 (objection to form omitted).
[59] James Tr. (ex. 8) at 89:6-8.
[60] James Tr. (ex. 8) at 101:12-18.
[61] *See e.g.,* James Rpt. (ex. 7) at 24 (recognizing that carcinogens have LNT dose responses but claiming that "noncancer toxicities will generally have threshold dependent dose response curves"); *id.* (recognizing "genotoxic carcinogens [as] the class of chemicals that fostered the

any of the chemicals in this case, and he does not identify any studies supporting that the specific chemicals in this case have toxicities that are threshold dependent.[62]

Turning to Defendants' second causation expert, Dr. Mundt purports to provide opinions on general causation but only under a "clear and convincing" evidence standard.[63] At his deposition, Dr. Mundt confirmed his use of a "clear and convincing" standard to evaluate causation.

> Q.   The reason I say clear and convincing is because that's the verbiage that appears in your report. In your reviews, you mention, you know, there's not clear and convincing epidemiological evidence of numerous associations. Is that a fair summary?
>
> A.   That is true. …
>
> Q.   Okay. So your opinions were based on whether the epidemiology showed that the exposures alleged had clear and convincing association casually with the endpoints at issue?
>
> A.   I generally agree with what you're saying, but I don't agree with the implication that somehow that isn't the most appropriate way to determine causality.[64]

The "clear and convincing" evidence standard is "more exacting than the 'preponderance of the evidence' standard." *Jordan v. Wilson*, 851 F.2d 1290, 1292 (11th Cir. 1988). "[A] party who has the burden of proof by clear and convincing evidence

---

origination of the LNT assumption").

[62] James Tr. (ex. 8) at 25:2-5; 28:20-22; 30:11-13; 31:16-19; 33:8-10; 35:6-8; 35:24-36:1.

[63] *See e.g.,* Mundt Rpt. (ex. 5) at 54 ("the epidemiological evidence is [sic] does not demonstrate a clear or convincing association between TCE and kidney cancer"); *id.* at 68 ("the current epidemiological evidence does not convincingly establish a causal relationship"); *id.* at 135 ("epidemiological evidence does not clearly demonstrate that any of the seven industrial chemicals identified clearly or convincingly causes several of the identified specific cancers"); *id.* at 34, 36, 43, 68, 158.

[64] Mundt Tr. (ex. 6) at 52:23-53:13 (objection to form omitted).

must persuade the jury that his or her claim is highly probable." *U.S. v. Owens*, 854 F.2d 432, 435-36 fn.8 (11th Cir. 1988).

Accordingly, because Dr. Mundt applied a "clear and convincing" evidence standard to determine if chemical exposures could cause disease, he fails to provide an opinion to rebut Plaintiffs' experts. Stated differently, Plaintiffs only need to prove that causation is "more likely than not" while Dr. Mundt says that causation does not reach a standard of "highly probable" – leaving a gap between "more likely than not" and "highly probable" that is uncontradicted. Without an expert opinion to fill this uncontradicted gap, summary judgment is proper. *Luby*, 633 F. Supp. at 42 (summary judgment is proper when movant's expert is uncontradicted).

Additionally, like Dr. James, Dr. Mundt only criticizes the LNT model in general terms,[65] and does not appear to form any of his own opinions about specific toxicity thresholds for the chemicals at issue in this case.

In sum, Plaintiffs' causation experts have presented unrebutted opinions that the chemicals at issue are capable of causing certain health endpoints, and that there is no safe level of exposure for these chemicals. Accordingly, no reasonable jury could find for Defendants on the issue of general causation, and partial summary judgment will serve the purpose of narrowing the issues and speeding up the litigation. *Ayers*, 316 F. Supp. at 1327 (summary judgment is proper when "no reasonable jury could find for the nonmoving party"); *Kearney*, 2009 WL 3398377, at *1 ("court may enter

---

[65] *See e.g.,* Mundt Rpt. (ex. 5) at 18 (using a hypothetical about drinking water to criticize the LNT model).

a partial summary judgment order … to narrow the issues for trial"); Fed. R. Civ. P. 56, Advisory Committee Notes (partial summary judgment "serves the purpose of speeding up litigation").

## CONCLUSION

There are two bases for granting partial summary judgment in Plaintiffs' favor on the issue of general causation: (1) the chemicals at issue in this case are in *McClain* category one, meaning that general causation is satisfied; and (2) Defendants fail to offer adequate expert opinions on general causation to rebut Plaintiffs' experts' opinions, leaving the latter uncontradicted.

Respectfully submitted,

Date: October 11, 2022

*/s/ T. Michael Morgan*
T. Michael Morgan
FL Bar No. 62229
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Frank M. Petosa
FL Bar No. 972754
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
8151 Peters Road, 4th Floor
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 327-5366
F: (954) 327-3018

Rene F. Rocha*
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
400 Poydras St., Suite 1515
New Orleans, LA 70130
rrocha@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

Michael F. Ram*
mram@forthepeople.com
Marie N. Appel*
mappel@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6923

*Pro Hac Vice
Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 11, 2022 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ T. Michael Morgan
T. Michael Morgan
FL Bar No. 62229