# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| VERVICIA HENDERSON et al., <br><br>     Plaintiffs, <br><br> v. <br><br> LOCKHEED MARTIN CORPORATION; <br> NBCUNIVERSAL MEDIA, LLC; <br> UNIVERSAL CITY PROPERTY <br> MANAGEMENT COMPANY III, LLC; and <br> UNIVERSAL CITY DEVELOPMENT <br> PARTNERS LTD., <br><br>     Defendants. | Case No. 6:21-cv-1363-37DCI |

## LOCKHEED MARTIN'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO ESTABLISH GENERAL CAUSATION

Pursuant to Federal Rule of Civil Procedure 56, Lockheed Martin moves for summary judgment on all of Plaintiffs' claims for failure to establish general causation.

## SUMMARY

Plaintiffs have failed to create a genuine issue of material fact on general causation for two reasons: (1) even taking their experts' opinions at face value, Plaintiffs have failed to offer any evidence of the exposure conditions they might plausibly have experienced if their allegations were true, the conditions under which any such exposure would begin to pose even an "appreciable" risk of harm, or any estimate of the risk accompanying *any* dose of *any* substance relevant to this case; and (2) Plaintiffs' general-causation experts' testimony is unreliable for the reasons addressed in Lockheed Martin's contemporaneously filed *Daubert* motions.

If this case were to go to trial, a jury would ultimately have to decide whether it is *more likely than not* that substances originating from Lockheed Martin's Sand Lake Road Complex caused or contributed to Plaintiffs' illnesses.  Plaintiffs would therefore have to introduce evidence enabling reasonable jurors to assess *probabilities*—not possibilities—of harm.  Without such evidence, it would become the duty of the Court to direct a verdict in favor of Defendants.

Toxic-tort cases require two types of causation evidence to meet this probability standard: general and specific.  General causation evidence lays the foundation.  When sufficient, it establishes the exposure conditions under which a substance poses material risk—that is, risk sufficient for a reasonable jury to conclude that a person who experienced those conditions and later developed the relevant illness in the absence of other risk factors *probably* did so substantially due to the exposure.  Only with this understanding can a jury move on to assess specific causation, considering whether the plaintiff experienced those exposure conditions and, if so, whether other risk factors were at least as likely to have caused or contributed to the illness.

Here, all of Plaintiffs' general-causation experts testified that exposure conditions affect the health risks posed by the substances they considered.  While they all maintained that there are no doses that pose *no* risk, each expert opined that "low" doses (a term used only in the abstract) pose risk that is very low—in some cases "infinitesimally small."  What's more, no expert could estimate the level of increased risk, if any, that accompanies *any* dose of *any* substance relevant to this case.  And

none would opine on the exposure conditions at which the risk posed by any substance becomes even "appreciable."

Compounding this problem, Plaintiffs have not provided Lockheed Martin—or even their own experts—with any samples from the locations of their alleged exposures. There is likewise no evidence that they have attempted any modeling or tried to reconstruct even the highest level of exposure to *any* substance that *any* Plaintiff might plausibly have encountered if the allegations in their Complaint were true. Thus, none of their experts could say what case-relevant exposure conditions might look like, and they made no attempt to tailor their opinions to any exposure levels.

For these reasons, the Court could accept Plaintiffs' expert testimony at face value and summary judgment would still be warranted. Even if Plaintiffs were later to offer estimates of their alleged exposure conditions, no reasonable juror would be able to assess, based on Plaintiffs' general-causation experts' testimony, where the risk posed by those conditions falls on the spectrum from "infinitesimally small" to something more "appreciable." Jurors would be forced to resort to rank speculation, which cannot support a valid verdict.

Alternatively, establishing general causation requires admissible expert testimony. As explained in Lockheed Martin's contemporaneously filed *Daubert* motions, none of Plaintiffs' experts' opinions fit this case, and each bears its own indicia of unreliability—Dr. Panigrahy's extensive plagiarism from inapposite sources, Dr. Mattison's focus on "feasibility" instead of assessing whether the substances and illness he considered have "true cause-and-effect relationships," Dr. Kantor's

wholesale failure to explain his Bradford Hill methodology, and so on.  For these and other reasons, the Court should exclude Plaintiffs' experts' testimony under Federal Rule of Evidence 702 and grant summary judgment on all dependent claims.

Finally, Plaintiffs have admittedly abandoned their attempt to prove claims relating to 27 of the substances identified in their complaint, which independently compels summary judgment on all claims based on those substances.

## MATERIAL FACTS

**Plaintiffs' claims.**  In their Complaint, the 67 Plaintiffs initially claimed to have been exposed to 34 different substances as a result of operations at Lockheed Martin's Sand Lake Road Complex ("SLRC").   (*See* Doc. 89 ¶¶ 19–91 (Plaintiff-specific exposure allegations), 127–61 (identification of substances of concern).)  They further claimed that those alleged exposures caused them or close family members to develop one or more of dozens of different adverse health conditions.  (*Id.* ¶¶ 192–268.)

**This Court's general-causation and PFS orders**.  In its Case Management and Scheduling Order, this Court staggered discovery and briefing deadlines.  (Doc. 81 at 4–5.)  General-causation expert, discovery, and motions deadlines fell first, with specific-causation and other deadlines following in three bellwether phases.  (*See id.*)  The Court also limited written and document discovery but directed Plaintiffs to complete Plaintiff Fact Sheets.  (Doc. 107.)  For Plaintiffs claiming personal injuries or requesting medical monitoring as a result of an alleged exposure, the Fact Sheets required identification of the relevant substances, exposure routes, exposure locations,

exposure durations, and health conditions.  (Doc. 107-1 at 11.)  The Fact Sheets and this Court's implementing order also required the production of all "sampling documents or results that support or refute this exposure allegations." (*Id.*)

**Discovery and PFS responses.**  65 of the 67 Plaintiffs produced Fact Sheets.[1] Of them, 59 claimed that they or their family members experienced exposures at or near the Golf Channel office complex, which is located about half a mile from the boundary of SLRC.  The other six Plaintiffs claimed exposures at locations farther away—four at their residences and two at a Universal Studios building across Interstate 4.  The dates of their alleged exposures ranged from 1963 to 2021.  Plaintiffs did not produce any documents showing sampling from the alleged exposure locations, or any other locations outside of the SLRC boundaries.  Plaintiffs' counsel subsequently confirmed that no such sampling exists.[2]

**Plaintiffs' experts**.  The deadline for serving expert reports on general causation coincided with the deadline for serving expert reports on class certification in *Grayson*.  On the day of that deadline, Plaintiffs served reports from several experts.   Three experts' proffered opinions expressly aimed at general causation: (1) Dr. Dipak Panigrahy, whose opinions concern certain cancers; (2) Dr. Donald Mattison, whose opinions concern congenital and developmental delays; and (3) Dr. Daniel Kantor,

---

[1]    Two Plaintiffs, Brenda Jackson and Clifton Reynolds Jr., have not completed Fact Sheets despite notices of delinquency and are thus the subject of a motion to dismiss (Doc. 134).

[2]    (Ex. B at 11:6–16 (September 20, 2022 Hr'g Tr.).)

whose opinions concern central nervous system and neurological conditions, most notably multiple sclerosis and Parkinson's disease.

Plaintiffs also disclosed a short report from a toxicologist named Dr. Ronald Kendall.  The discussion section of his report is only five and a half pages long.  In it, Dr. Kendall writes that he "reviewed the reports of Dr. Donald Mattison, Dr. Daniel Kantor, and Dr. Dipak Panigrahy, along with the underlying materials upon which those experts have relied, and share[s] their opinions."[3]  He did not, however, disclose the reasons or bases for his own parallel analyses, if any, nor did he attempt to add any new substance-specific analyses.[4]

Dr. Kendall goes on to conclude that emissions from SLRC "significantly caused or contributed to increased risks of diseases in chronically exposed individuals."[5]  But he cites no sampling in support of this exposure conclusion.  As for modeling, Dr. Kendall writes that he "reviewed and relied upon the opinions of Ranajit Sahu," an expert disclosed only in *Grayson* (presumably for class-certification purposes).  But Dr. Sahu did not attempt any modeling either; he opined only that modeling *could* be performed, but he has not performed it.[6]  Dr. Kendall appears to base his exposure conclusions most on an opinion from another of Plaintiffs' experts, the statistician Dr. Charles Cowan, who tabulated public death records and concluded

---

[3]   (Doc. 150-1 (Initial Kendal Report) at 5.)

[4]   (*See id.*)

[5]   (*Id.* at 10.)

[6]   (Ex. A (Sahu Dep. Tr. at 92:13–93:16).)

that mortality rates are elevated in the 32819 area code encompassing SLRC. Dr. Cowan, however, disavowed offering any exposure or causation opinions.[7]

Thus, Plaintiffs' general-causation case turns on the proffered testimony of Drs. Panigrahy, Mattison, and Kantor. Their analyses and opinions share common characteristics. Plaintiffs did not ask these experts to make any assumptions about case-relevant exposure levels, nor did they provide the experts with any framework to determine potentially relevant exposure conditions themselves.[8]  No expert could estimate any dose—even the *highest* dose—of any substance that any Plaintiff might plausibly have experienced if the allegations in their Complaint were true.[9]  None made any effort to tailor his literature review to studies of exposures comparable to

---

[7]   (Doc. 150-5 ¶ 36.)

[8]   (Doc. 136-3 (**Panigrahy**) at 96:19-96:21 ("Q.  Have the plaintiffs asked you to make any assumptions about exposure levels?  A.  No."); *id.* at 96:22-97:4 ("Q.  Have the plaintiffs given you any framework within which to evaluate exposure levels that are relevant in this case? MR. ROCHA: Object to form. THE WITNESS: No. . . ."); Doc. 135-4 (**Mattison**) at 61:6–11 ("Q.  Do I understand correctly that for your general causation opinions, neither the plaintiffs nor their other experts provided you any estimate of the amount, intensity or duration of any plaintiffs alleged exposure to any substance?  A.  That's correct."); Doc. 138-3 (**Kantor**) at 48:23-49:6 ("Q. . . . What do you understand about the plaintiffs' exposure allegations in this case?  A.  I do not know specifics of their exposure allegations, and that wasn't my understanding of what we're looking at at this stage of the litigation.").)

[9]   (Doc. 136-3 (**Panigrahy**) at 87:17-87:25 ("Q. . . . Do you have a scientific estimate of the highest inhaled dose of TCE that a Golf Channel worker could plausibly have experienced if the allegations in the plaintiffs' complaint were true?  A.  No, I can't answer that, because I don't have the exposure concentration."); *id.* at 89:2-89:8 ("Q.  Is your answer the same for any of the substances you considered?  A.  Correct.  Q.  Okay.  And is your answer the same for any exposure route, thermal contact, ingestion, or otherwise?  A.  Correct."); Doc. 135-4 (**Mattison**) at 61:17–23 ("Q.  [Y]ou did not in your reports estimate at any level of precision[,] high or low, the amount, intensity or duration of any plaintiff[']s alleged exposure to any substance; right?  A.  That's correct."); Doc. 138-3 (**Kantor**) at 49:22-50:11 ("Q.  Do you have a scientific estimate of the highest inhaled dose of PCE that any of the plaintiffs might plausibly have experienced if the allegations in their complaints were true?  A.  No. Q.  Same question for TCE?  A.  No.  Q.  Toluene?  A.  No.  Q.  Xylenes?  A.  No.  Q.  Styrene?  A. No.  Q.  Any solvent mixture?  A.  No.").)

those alleged in this case.[10]  Every expert opined that the dose of the substances he

reviewed affects the risk of an adverse health outcome,[11] yet none of them attempted

to model, graph, or otherwise characterize the allegedly linear dose-response

relationships.[12]  Consequently, no expert could say how much increased risk, if any,

accompanies any dose of any substance he reviewed.[13]  At "low" doses, the most any

---

[10]   (Doc. 136-3 (**Panigrahy**) at 88:1-88:11 ("Q.  [D]id you make any effort to, for instance, identify comparable exposures in any literature to anyone in, for instance, an office building outside of an industrial facility? MR. ROCHA:  Object to form. THE WITNESS:  No. . . ."); Doc. 135-4 (**Mattison**) at 65:19–24 ("Q.  So when you were evaluating the studies listed in your expert reports, you did not have any estimates of the plaintiffs['] exposures in this case against which to compare those studies; right? MR. ROCHA:  Objection.  THE WITNESS:  Yes."); Doc. 138-3 (**Kantor**) at 58:5-58:17 ("Q.  Did you do anything to assess whether or to what extent analyses of occupational exposures are relevant to exposures at a location like the Golf Channel?  A.  No.").)

[11]   (Doc. 136-3 (**Panigrahy**) at 98:20-99:7 (testifying that an LNT dose-response relationship, which he claimed all of the substances he reviewed exhibit, is "just a linear extrapolation," meaning "the higher the dose, the more higher the chance of getting cancer"); Doc. 135-4 (**Mattison**) at 62:20–24 ("Q.  Do you agree that exposure amount, intensity, and duration influence health risks that accompany that exposure?  MR. ROCHA:  Objection.  THE WITNESS:  Yes."); (Doc. 135-3 at 54:10-54:13 ("Q.  Okay.  For at least some substances, the dose makes [the] poison, right? A.  Yeah, I think -- yes.  And I think that's all substances."); Doc. 138-1 (**Kantor** report) at 27 ("[I]t is appropriate to assume that risk increases in a linear, non-threshold fashion at low doses.").)

[12]   (Doc. 136-3 (**Panigrahy**) at 102:1-102:11 ("So you personally did not model the linear relationship, if any, between any of the substances and any of the health outcomes you analyzed in your expert report, right?  A.  Correct. Q.  . . . You did not use any scientific methodology to graph that linear relationship on which you opine, right?  A.  Correct."); Doc. 135-3 (**Mattison**) at 60:1-60:5 ("Q.  Okay.  For the substances and health outcomes that you opine exhibit a linear, no-threshold dose-response relationship, you have not actually modeled that relationship, have you? A.  No, not for these compounds."); (Doc. 138-3 (**Kantor**)  at 90:2-90:15 ("Q.  Okay.  For the substances and health outcomes that you opine exhibit a linear no-threshold dose response, you have not attempted to model that relationship, right?  A.  Correct.  Q.  So you didn't try to graph the line, for instance, in any way, right?  A.  Correct.  Q.  You don't know the slope of any such line, right?  A.  Correct. Q.  You don't know the curve of any such line, right?  A.  Correct.").)

[13]   (Doc. 136-3 (**Panigrahy**) at 102:17-102:24 ("So you do not have a quantitative estimate of how much the change in any dose of any substance in your report would change the incidence of any health outcome in your report, right?  A.  Well, correct. . . ."); Doc. 135-3 (**Mattison**) at 60:15-61:14 (testifying that he could not say how changes in dose affect changes in incidence of illness, and that the most he was willing to say is that it is "feasible that the responses in [his] report could follow the exposures in your report"); Doc. 138-3 (**Kantor**) at 92:4-92:14 ("For any dose of PCE, can you tell me how much increased risk of developing MS accompanies that dose?  Or is the most you can say some positive but non-zero risk accompanies it?  A.  That's correct.  Q.  That the most you can say is some

expert was willing to say is that the accompanying risk is "not zero."[14]

Most importantly, Drs. Panigrahy, Mattison, and Kantor were uniformly unable to describe the exposure conditions under which *any* substances begin to pose a likely, or even appreciable, risk of harm.  Dr Panigrahy would say only that all exposure conditions pose at least a small risk:

> Q.  Is it fair to say that you don't have an opinion regarding the dose at which an exposure to one of the substances in your expert report goes from being unlikely to cause one of the health outcomes in your report to having some appreciable likelihood of causing one of the health outcomes in your report?  [*Counsel objects.*]  THE WITNESS:  Correct. So because these are genotoxic chemicals, there's no threshold.  So there's -- any dose can have even a small risk of cancer.

(Doc. 136-3 at 121:7-121:20.)  Dr. Panigrahy further acknowledged that, if his opinions were true, the risk that accompanies a low-dose exposure "might be infinitesimally small."  (*See id.* at 107:24-108:8, 113:12-113:18.)  Similarly, Dr. Mattison testified that understanding which exposures are likely to cause harm would require a dose-response characterization that he did not perform:

> Q.  We're concerned in part in this case with whether an exposure to a substance can be a substantial contributing cause to a health outcome.

---

positive but non-zero risk accompanies that dose? A.  Correct.  Q.  Is that true for all of the substances and all of the health outcomes in your report?  A.  Yes.").)

[14]   (Doc. 136-3 (**Panigrahy**) at 122:11-122:19 ("Q.  Okay.  Is it fair to say that the most you're willing to say about the level of risk that accompanies a low-dose exposure to any of the substances in your report is that the risk is not zero? MR. ROCHA: Object to form. THE WITNESS:  Correct, correct.  At a small dose, because there's no threshold in a linear response, there can be a small risk of cancer and then the risk would go with increasing dose."); Doc. 135-3 (**Mattison**) at 61:20-62:4 ("Q. So if I were to ask you how much of an increased risk of autism accompanies a particular dose through inhalation by a parent, is the most you can say not zero?  The risk is not zero?  A.  That's feasible."); *cf.* Doc. 138-3 (**Kantor**) at 91:11–18 ("Q.  Okay.  So then going back to my specific question, if I'm interested in determining how much increased risk of MS accompanies any particular dose of PCE, is the most you could tell me today that the risk is not zero?  A.  What I can tell you is that an exposure more likely than not can contribute or cause MS, but not what that level of exposure is.").)

> Do you understand that?  A.  Yes.  Q.  So for some substances there are doses at which a substance is unlikely to be a substantial contributing cause of a health outcome, right?  A.  Well, you would have to look at the dose-response relationship and try to understand what would happen as the exposure diminishes.  But the hazard for toxicity still exists. . . .
>
> Q.  Okay.  And I believe you testified you haven't performed that sort of characterization for the dose-response relationship between any substance in your report and any health outcome in your report, right?  A.  Right.  The question was does -- is it feasible that as the doses or the exposure goes down, will there still be an effect.

(Doc. 135-3, 57:17-58:3, 63:9-63:15.)  Dr. Kantor was most clear, stating outright that he has no opinion on the conditions under which harm from the substances he reviewed becomes likely:

> Q.  So can you tell me when, in your view, exposures to any of these substances go from being unlikely to cause or contribute to a health outcome to being likely to cause or contribute to a health outcome?  A.  I do not offer opinions about what that -- what that level is.

(Doc. 138-3 at 93:15-24.)

Among them, Drs. Panigrahy, Mattison, and Kantor offered opinions on a total of only nine substances—seven of the 34 identified in Plaintiffs' Complaint (PCE, TCE, toluene, xylene, arsenic, hexavalent chromium, and 1,1,1-trichloroethane) and two that were never disclosed in a pleading (styrene and formaldehyde).  Plaintiffs have elected not to proceed with claims concerning the other 27 substances.

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A mere 'scintilla' of evidence supporting the

opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "Evidence inadmissible at trial cannot be used to avoid summary judgment." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1312 (11th Cir. 2014) (quoting *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007)).

## ARGUMENT

### I.   Even if Plaintiffs' experts' opinions were reliable, Plaintiffs have failed to establish a genuine issue of material fact on general causation.

Even accepting Plaintiffs' experts' opinions at face value and overlooking their unreliability, Plaintiffs have failed to introduce evidence from which a reasonable jury could conclude that an exposure to any relevant substance, at any exposure level, could *probably* have caused any relevant harm. The Court should thus grant summary judgment in favor of Lockheed Martin.

"Summary judgment should be granted where the evidence is such that it would require a directed verdict for the moving party." *Anderson*, 477 U.S. at 251 (cleaned up). Under the Florida law applicable here, "it becomes the duty of the court to direct a verdict for the defendant" unless the Plaintiff can introduce evidence that "affords a reasonable basis for the conclusion that it is ***more likely than not*** that the conduct of the defendant was a substantial factor in bringing about the result." *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (emphasis added) (quoting *Gooding*

*v. Univ. Hosp. Bldg., Inc.,* 445 So. 2d 1015, 1018 (Fla. 1984)).  "A ***mere possibility*** of such causation is not enough"; a directed verdict is required whenever "the matter remains one of pure speculation or conjecture, or the ***probabilities*** are at best evenly balanced." *Id.* (emphasis added).

Exposures are the focus of this probability-based standard when a plaintiff alleges a toxic tort—a "civil wrong arising from exposure to a toxic substance." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1196 n.6 (11th Cir. 2010) (citation omitted).  The "wrong" typically takes the form of a disease, and the "likelihood that a given disease or injury was induced because of exposure to one or more chemicals depends in large part on the size of that exposure."  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 507 (Fed. Judicial Center, 3d. ed. 2011).

This is so because of dose-response relationships, the hallmark of which is that "a change in amount, intensity, or duration of exposure" is typically "associated with a change—either an increase or decrease—in risk of disease."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005).  Most dose-response relationships have thresholds "such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual."  *Id.* at 1242 (citation omitted). Even under the linear no-threshold ("LNT") hypothesis Plaintiffs' experts advance here, disease risks decrease with decreasing doses, *see* REFERENCE MANUAL at 642, down to the point of being "infinitesimally small," (Doc. 136-3 at 110:14-:25, 113:12-18).  Thus, "[u]nderstanding exposure is essential to understanding whether the toxic properties of chemicals have been or will be expressed."  REFERENCE MANUAL at 507.

To create a genuine issue of material fact sufficient to preclude summary judgment, a toxic-tort plaintiff must therefore introduce evidence that exposure to substances originating from the defendant *more likely than not* caused or contributed substantially to the plaintiff's injury. *See, e.g.*, *Guinn*, 602 F.3d at 1256. This requires, among other things, that the plaintiff "demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance.'" *McClain*, 401 F.3d at 1241 (quoting *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996)). In other words, plaintiffs must introduce proof of both "general causation" and "specific causation." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1303 (11th Cir. 2014).

Because exposure conditions affect substances' risk, demonstrating "the levels of exposure that are hazardous to human beings generally" requires evidence tailored to case-relevant exposure conditions. The Eleventh Circuit and others adopted this phrasing of the general-causation standard from the Eight Circuit's *Wright* opinion. *See McClain*, 401 F.3d at 1241 (quoting *Wright*, 91 F.3d at 1106); *see also, e.g.*, *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (same).[15] And as the Eighth Circuit has made clear, "generally" in this context means demonstrating "that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings

---

[15] The Eleventh Circuit also uses the Fifth Circuit's rearticulation of the *Wright* standard. *See McClain*, 401 F.3d at 1241 (citing *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)). As phrased by the Fifth Circuit, "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen*, 102 F.3d at 199 (citing *Wright*, 81 F.3d at 1107).

subjected to *the same level of exposure as the plaintiff*." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928 (8th Cir. 2001) (emphasis added) (citing *Wright*, 91 F.3d at 1106).

Illustratively, the Second Circuit reads the same general-causation requirement (that "exposure can cause the type of ailments from which [the plaintiff] claims to suffer") to require evidence that advances a "hypothesis" on potential harms resulting from case-relevant exposure conditions. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002). In a case in which a bridge painter claimed that occupational exposure to xylene harmed his central and peripheral nervous systems, the Second Circuit applied this dose-specific general-causation standard:

> As succinctly summarized by the district court, plaintiffs needed to offer admissible expert causation testimony to establish the following hypothesis: that exposure to xylene in amounts averaging 500 to 2000 ppm on August 28, 1995 and each of preceding three workdays, and for three to five hour periods on intermittent days in the preceding thirty days can, as a general matter, cause the complex of [central nervous system] and [peripheral nervous system] symptoms that [the plaintiff] alleges.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269–70 (2d Cir. 2002) (affirming *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001)).

As U.S. District Judge Rodgers recently explained in a decision affirmed by the Eleventh Circuit, a "'general causation opinion that [a substance] can be harmful at some level that the Plaintiffs were not potentially exposed to . . . is simply not helpful to the trier of fact . . . .'" *In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243, at *3 (11th Cir. Jan. 11, 2022) (affirming and quoting the district court's "well-reasoned" decision to exclude an "unhelpful" general causation opinion in *In re Deepwater Horizon Belo Cases*, No. 3:19-cv-963, 2020 WL 6689212 (N.D. Fla. Nov. 4,

2020)).  And evidence establishing only a possibility—not an appreciable probability— of harm at case-relevant exposure levels is just as insufficient.

For these reasons, the failures by Drs. Panigrahy, Mattison, and Kantor to tailor their opinions to case-relevant exposure conditions—or even attempt to opine on exposure conditions presenting even an "appreciable" risk of harm—mean that Plaintiffs have not satisfied the general-causation standard.

Plaintiffs' experts, in their non-litigation work, understandably value disease prevention.  And each, in defending his opinions in this case, pointed out that in other contexts (e.g., policymaking or regulatory advisory contexts) causation assessments are acceptable even when offered at high levels of abstraction, uncertainty, or imprecision.  All of that may be true, but, as the Eighth Circuit explained in *Wright*, the standard of proof in toxic-tort cases is higher:

> A legislature might well altogether outlaw a substance on the ground that it is known to involve a risk of appreciable harm to human beings, without having precise data on the question of how much harm, or what kind of harm, some specific amount of that substance might reasonably be expected to cause to some particular kinds of persons or even to an average or an ordinary person. . . .

> Whatever may be the considerations that ought to guide a legislature in its determination of what the general good requires, courts and juries, in deciding cases, traditionally make more particularized inquiries into matters of cause and effect.  Actions in tort for damages focus on the question of whether to transfer money from one individual to another, and under common-law principles . . . that transfer can take place only if one individual proves, among other things, that it is ***more likely than not*** that another individual has caused him or her harm.  It is therefore not enough for a plaintiff to show that a certain chemical agent ***sometimes*** causes the kind of harm that he or she is complaining of.  At a minimum, we think that there must be evidence from which the factfinder can

> conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered.

*Id.* (emphasis added); *see also Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1247 (11th Cir. 2018) (explaining that regulatory agencies often set standards that are "protective," not "predictive" of dangerous exposure levels, and they employ "different calculations and burdens of proof" in "setting exposure standards for the general public" (citing *McClain*, 401 F.3d at 1249–50)).  Meeting the general-causation standard does "not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has ***probably*** caused a particular plaintiff the kind of harm of which he or she complains."  *Wright*, 91 F.3d at 1107 (emphasis added); *cf. Williams*, 889 F.3d at 1248 ("To be clear, we have never required an expert to 'give precise numbers about a dose-response relationship' . . . [b]ut we do require an expert to lay a 'reliable groundwork for determining the dose-response relationship.'" (quoting *McClain*, 401 F.3d at 1241 & n.6)).

Plaintiffs might argue that considerations of case-relevant exposure conditions go only to specific causation.  As a threshold matter, this argument is incompatible with the *Wright* standard.  The Eleventh Circuit also squarely rejected the same argument when it affirmed Judge Rodger's exclusion of expert general-causation testimony that a substance could be "harmful at some level that the Plaintiffs were not potentially exposed to."  *See In re Deepwater Horizon BELO Cases*, 2022 WL 104243, at *3 (11th Cir. Jan. 11, 2022) ("Appellants argue that the district court did not

adequately consider the distinction between general and specific causation with respect to Dr. Williams's opinions. We disagree.").  District courts have been even clearer:

> The requirement that a general causation expert identify the level of exposure differs from specific causation, which addresses whether the toxin actually caused the plaintiff's injury.  In order for a general causation expert to opine that a toxin is capable of causing injury in the general population, he or she ***must identify the level to which the plaintiff was exposed in order to evaluate whether that level is capable of causing harm***. Thus, an expert cannot opine as to general causation in a toxic tort case without information as to the relevant exposure and the standard by which to assess its harmfulness.

*Thiele v. DSM Food Specialties, USA, Inc.*, No. C18-4081-LTS, 2022 WL 94938, at *9 (N.D. Iowa Jan. 10, 2022) (emphasis added) (citing *Bonner*, 259 F.3d at 928); *see also Downs v. DSM Food Specialties USA, Inc.*, No. 1:18-cv-00033, 2021 WL 6133743, at *5 (S.D. Iowa Oct. 28, 2021) ("The Court is careful to note that . . . general causation does not require individualized proof. . . . [But the Plaintiff's expert] does have to determine what Plaintiffs' actual level of exposure . . . would have been—or at least the level of exposure of someone working in a similar capacity to Plaintiffs at the [relevant] plant—to be able to opine that these chemicals are capable of causing the injuries Plaintiffs complain of." (cleaned up)).

Second, general-causation proof must lay the foundation for specific-causation proof.  Specific-causation proof must not only establish that the plaintiff was "exposed to a sufficient amount of the substance in question to elicit the health effect in question," it also must "rule out" the health effect's potential alternative causes. *McClain*, 401 F.3d at 1242, 1252 (citations omitted).  Here, no expert has testified that

any Plaintiff developed a "signature" disease such that the outcome itself indicates its cause (e.g., how mesothelioma is thought to indicate asbestos exposure). *McMunn v. Babcock & Wilcox Power Generation Group, Inc.*, 869 F.3d 246, 271 (3d Cir. 2017). Thus, Plaintiffs will have to would have to address alternative causation as part of their specific-causation proof.

The most common methodology (and perhaps the only reliable methodology) for assessing alternative causation is to perform a "differential etiology," a two-step process of "ruling in" possible causes of the relevant illness and then "ruling out" all possible causes but one. *Hendrix*, 609 F.3d at 1195–97. But to "rule in" a substance, its capacity to cause the Plaintiff's illness must have been established at the general-causation stage. *See id.* at 1195 ("With regard to the first step, the district court must ensure that, for each possible cause the expert 'rules in' at the first stage of the analysis, the expert's opinion on general causation is 'derived from scientifically valid methodology.'" (citation omitted)). Further, the general-causation evidence must establish a basis for estimating the risk posed by exposures to "ruled in" substances because, when "ruling out" potential causes, a specific-causation expert must have a basis to assess the relative risk of each risk factor. *See Guinn*, 602 F.3d at 1257 (holding that, even if a specific-causation expert's opinions had been admissible, they still failed to establish a genuine issue of material fact because the plaintiff "had multiple risk factors that could have been the sole cause" of her illness, and her specific-causation expert "was unable to determine the relative risk of each factor").

Consider how the specific-causation phase of this case might proceed based on

Plaintiffs' general-causation experts' testimony.  Assuming for the sake of argument that Plaintiffs were able later in this case to model their alleged exposures and reconstruct doses of substances they allegedly encountered, one of two things would happen: Plaintiffs would either then attempt to estimate the risk associated with those reconstructed doses, or they would not and would proceed instead with their general-causation evidence as is.

To perform new dose-response assessments at that point would be to offer general-causation opinions months—or perhaps even years, depending on the Bellwether phase of the case—after the general-causation deadline.  Tellingly, Drs. Panigrahy, Mattison, and Kantor all agreed when evaluating whether a substance has the capacity to cause a certain harm, tailoring that evaluation to particular exposure conditions does not change it from a general- to a specific-causation analysis. An expert does not need to know *anything* about any plaintiff to evaluate whether a specific dose of a substance can cause a specific harm.  The expert would still employ non-individualized methodologies—typically a literature review focused on the dose-response relationship or epidemiological studies, as opposed to a differential diagnosis or another specific-causation methodology that requires attention to plaintiff-specific medical and behavioral information.  *See Chapman*, 766 F.3d at 1309  (discussing general and specific causation methodologies).  Further, discovery in this case was not bifurcated; it was staggered.  Plaintiffs were free to—and did—conduct discovery into operations and emissions at SLRC.  Nothing stopped them from using the results of this discovery—or information from exposure assessments that should have occurred

as part of a pre-suit investigation—to model potential exposure conditions and use the results to perform dose-response characterizations. They evidently chose not to do so.

Alternatively, with the general-causation opinions as is, specific causation is a lost cause. Building from Plaintiffs' general-causation experts, a specific causation expert would never be able to say whether the risk accompanying any alleged exposure is even appreciable. The expert, and consequently the jury, could thus never non-speculatively "rule in" a substance or compare a substance's "relative risk" to that of other potential causes. Summary judgment on specific causation would be assured from the failures at the general-causation stage. *See Guinn*, 602 F.3d at 1257.

The Court need not decide whether there are cases in which the general-causation standard could be met without opinions tailored to case-relevant exposure conditions. This is not, for instance, a case in which the plaintiffs have attempted to identify the lowest exposure level posing a material risk and later intend to prove exposures exceeding that level. Plaintiffs did not do that here, nor did they approach the problem of exposure conditions from the other direction, estimating the highest level of exposure any Plaintiff might plausibly have experienced and then assessing whether an exposure at that level poses a level of risk material enough for a jury to conclude that such an exposure would *likely* have caused or contributed to a relevant illness.

Finally, Dr. Kendall's opinions offer no value to the general-causation inquiry here. Because he merely echoes Dr. Kantor's analyses without presenting any independent analyses of the exposure conditions under which any substance poses an

appreciable risk of harm, he is unhelpful to any jury.  Indeed, Dr. Kendall's opinion that emissions from SLRC might have caused elevated mortality rates in the surrounding zip code *presumes* general causation, it does not address it.

In sum, even accepting their experts' opinions as true, Plaintiffs cannot introduce evidence from which a reasonable jury could conclude that an exposure to a substance originating from SLRC could be the *probable* cause of any Plaintiffs' adverse health condition.  Plaintiffs' general-causation evidence at best allows only speculation, requiring summary judgment in Lockheed Martin's favor.  *See, e.g.*, *Guinn*, 602 F.3d at 1256

## II.   Plaintiffs' general causation experts' opinions should be excluded as unhelpful and unreliable, which would require entry of summary judgment.

Alternatively, this Court should grant summary judgment in favor of Lockheed Martin because Plaintiffs' general-causation experts' opinions are inadmissible for the reasons addressed in Lockheed Martin's contemporaneously filed *Daubert* motions.

Proof of general causation "requires expert testimony."  *McClain*, 401 F.3d at 1237; *see also Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) ("Toxic tort cases, such as this one, are won or lost on the strength of the scientific evidence presented to prove causation.").  To be admissible, expert testimony must be "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*."  *Chapman*, 766 F.3d at 1304.  "Evidence inadmissible at trial cannot be used to avoid summary judgment."  *Id.* at 1312 (citation omitted).

The proffered opinions of Drs. Panigrahy, Mattison, and Kantor share several deficiencies in common.  Most notably, their uniform failure to tailor their opinions to case-relevant exposure conditions precludes their opinions from "fitting" this case.  The reasons for this fit failure overlap substantially with the reasons why their opinions fail to create a genuine issue of material fact even if taken at face value.  There could be cases in which a lack of fit might warrant exclusion of a general-causation expert but not summary judgment (e.g., a case in which only one of multiple experts on the same substance/response relationship is excluded), but this is not one of them.

Likewise, Drs. Panigrahy, Mattison, and Kantor all failed to reliably apply at least one of the Eleventh Circuit's "indispensable" general-causation methodologies.  *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9 ("Three 'primary' scientific methodologies are recognized by the Eleventh Circuit as 'indispensable' to proving general causation in a toxic tort case: (1) epidemiological evidence, (2) dose-response relationship, and (3) the background risk of disease." (citing *Chapman*, 766 F.3d at 1308)).  None attempted a meaningful background-risk assessment.  Each "laid no reliable groundwork for determining the dose-response relationship," essentially opining only that "*any* level of [a substance] poses 'an unreasonable risk of harm,'" which "signals a methodology problem."  *McClain*, 401 F.3d at 1240–41.  And Drs. Mattison and Kantor failed to adequately explain and reliably execute their epidemiological analyses, while Dr. Panigrahy plagiarized the overwhelming majority of his from inapposite sources.  Dr. Kendall's tag-along, conclusory opinions reduce to nothing but *ipse dixit* and are thus facially unreliable.

All of Plaintiffs' Florida causes of action require expert testimony to prove causation. *See Williams*, 889 F.3d at 1243 (following exclusion of expert testimony as unreliable, affirming the resulting entry of summary judgment on "six causes of action under Florida law . . . negligence, gross negligence, strict liability, strict liability failure to warn, strict liability for 'prohibited discharge' of pollutants, and medical monitoring and environmental testing). This is true regardless of whether the claims are direct (i.e., claims by the Plaintiff who claims to have experienced an exposure and consequently developed an illness or requires medical monitoring) or derivative (e.g., claims for loss of consortium). *See Stone v. United States*, 373 F.3d 1129, 1132 (11th Cir. 2004) ("Because the United States could not be found negligent as to [the plaintiff], the district court did not err by holding that her parents' derivative loss of consortium claims likewise failed as a matter of law." (citing *Faulkner v. Allstate Ins. Co.*, 367 So. 2d 214, 217 (Fla. 1979))).

As addressed in the Parties' Stipulated Fact Sheet Summary and Plaintiff-Specific Designation of General Causation Experts (Ex. C), exclusion of each primary general-causation expert would require summary judgment on the following Plaintiffs' claims:

- **Dr. Panigrahy**: Exclusion of Dr. Panigrahy's opinions in their entirety would require summary judgment on the claims of (1) Arthur Anderson; (2) Patricia Anderson; (3) David Berry; (4) Adam Bracket (5) Elizabeth Bracket; (6) Justin Brunelle; (7) Meredith Brunelle; (8) Andrew Ebert; (9) Christine Eidemiller; (10) Richard Eidemiller; (11) Katherine Flury; (12) Donald Goertz; (13) Elaine Goldschmidt; (14) Victor Goldschmidt; (15) Logan Goodson; (16) Brendan Havens; (17) Craig Henderson; (18) Vervicia Henderson; (19) Andrew Innes; (20) Morgan Innes; (21) Brian Kemp; (22) Kelly Kemp; (23) Kevin Kiely; (24) Jeffrey

Muddell; (25) Stephanie Muddell; (26) Marie Outing; (27) Patricia Ramsey; (28) Deborah Reese; (29) Renee Ross; (30) Kirsten Sheen; (31) Wendy Stone; (32) Helen Tosti; (33) John Tosti; and (34) Brenda White. (Doc. X (table rows 1–7, 11–21, 26–27, 33–35, 42–47, 54, 59–61, 65).)  Exclusion of Dr. Panigrahy's opinions would also require summary judgment on Naoyuki Komatsu's direct claim concerning leukemia. (*Id.* (table row 37).)  Mr. Komatsu's loss-of-consortium claim depends on the opinions of Dr. Mattison.  (*Id.*)  Exclusion of Dr. Panigrahy's opinions would also require summary judgment on the claims of Brenda Jackson and Clifton Reynolds Jr., who did not complete Fact Sheets (*see* Doc. 134) but who alleged direct and derivative claims concerning lung cancer (Doc. 89 ¶¶ 29–30, 207–09.)

- **Dr. Mattison**:  Exclusion of Dr. Mattison's opinions in their entirety would require summary judgment on the claims of (1) Aubrey Carp; (2) Aubrey Carp-Schursky; (3) Dawn Iacovino; (4) Michael D. Iacovino; (5) Michael L. Diacovino; (6) Benjamin Johnson; (7) Drew Johnson; (8) Jennifer Johnson; (9) Naho Komatsu; (10) Ryo Komatsu; (11) Ana Saperstein; (12) Ari Saperstein; (13) Jordan Schursky; (14) William Siegrist; (15) Jack Turk; (16) Theodore Turk; and (17) Cristina Turk-Eichstaedt. (*Id.* (table rows 8–9, 23–25, 28–30, 36, 38, 50, 51, 53, 57, 62–64).)  Exclusion of Mattison's opinions would also require summary judgment on (1) Kristi Hujik's claim concerning infertility (her multiple sclerosis claim would depend Dr. Kantor); (2) Naoyuki Komatsu's loss-of-consortium claim (Mr. Komatsu's leukemia claim depends on Dr. Panigrahy); (3) Eric Saperstein's loss-of-consortium claim (his multiple sclerosis claim depends on Dr. Kantor); (4) Amanda Siegrist's loss-of-consortium claim concerning Austin Siegrist's autism (her claim concerning his juvenile idiopathic arthritis ("JIA") depends on Dr. Kantor); and (5) Austin Siegrist's autism claim (his JIA claim depends on Dr. Kantor).  (*Id.* (table rows 22, 37, 52, 55–56).)

- **Dr. Kantor**: Exclusion of Dr. Kantor's opinions in their entirety would require summary judgment in the claims of (1) Donna DeMilt; (2) Laura Juda; (3) Mark Juda; (4) Ann McGarry; (5) Michael McGarry; (6) Eric Rutledge; (7) Emilio San Martin; and (8) Brian Slusarz. (*Id.* (table rows 10, 31–32, 40–41, 48–49, 58).)  Exclusion of Dr. Kantor's opinions would also require summary judgment on (1) Kristi Hujik's multiple sclerosis claim (her infertility claim depends on Dr. Mattison); (2) Eric Saperstein's multiple sclerosis claim (his loss-of-consortium claim depends on Dr. Mattison); (3) Amanda Siegrist's loss-of-consortium claim concerning Austin Siegrist's JIA (her claim concerning his autism

depends on Dr. Mattison); and (5) Austin Siegrist's JIA claim (his autism claim depends on Dr. Mattison).  (*Id.* (table rows 22, 52, 55–56).)

And of course, exclusion of the opinions of Drs. Panigrahy, Mattison, and Kantor requires summary judgment on all of Plaintiffs' claims.

## III.   Summary judgment should be granted on claims based on Plaintiffs' abandoned substances.

Finally, Plaintiffs have not even attempted to offer general-causation support concerning almost eighty percent of the substances (27 of 34) that they alleged in their Complaint form bases for their claims.  Those substances are the following:

| Abandoned Substances | | |
|---|---|---|
| Vinyl Chloride | 1,1-Dichloroethane | Methylnaphthalene |
| Methylene Chloride | 1,2-Dichloroethane | Benzo(a)pyrene |
| Benzene | 1,1-Dichloroethene | Polychlorinated biphenyl |
| Chlorobenzene | 1,2-Dichloroethene | Dichlorodiphenyltrichloroethane |
| Ethylbenzene | 1,1,2-Trichloroethane | 1,4-Dioxane |
| 1,2-Dichlorobenzene | Chloroform | Dioxins |
| 1,3-Dichlorobenzene | 1,2-Dichloropropane | Perfluoroalkyls |
| Carbon Disulfide | Dichlorobromomethane | Cadmium |
| Carbon Tetrachloride | Bis(2-ethylhexyl)phthalate | Lead |

Plaintiffs' abandonment of these substances provides another independent basis for summary judgment on all related claims (i.e., Plaintiffs' claims that these abandoned substances could have caused or substantially contributed to any relevant ailment).

## CONCLUSION

For the reasons expressed above, Lockheed Martin respectfully requests that this Court enter summary judgment in favor of Lockheed Martin.

Dated: October 11, 2022

Francis A. Citera*
citeraf@gtlaw.com
Gretchen N. Miller*
millerg@gtlaw.com
**GREENBERG TRAURIG, LLP**
77 West Wacker Dr., Ste. 3100
Chicago, Illinois 60601
Telephone: (312) 456-6583
Facsimile: (312) 899-0320

*Specially admitted*

Respectfully submitted,

/s/
David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Christopher Torres (FBN 0716731)
torresch@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
Raymond Jackson (FBN 1028350)
jacksonra@gtlaw.com
Christopher R. White (FBN 1022219)
whitech@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd., Ste. 1900
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

*Attorneys for Defendant Lockheed Martin Corporation*

## CERTIFICATE OF SERVICE

I certify that on October 11, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ David Weinstein
Attorney