Report of Robert C. James, Ph.D.
In the matters of

*Henderson v. Lockheed Martin Corp.*, No. 6:21-cv-1363-37DCI (M.D. Fla.),
*Vandestreek v. Lockheed Martin Corp.*, No. 6:21-cv-1570-37DCI (M.D. Fla.), and
*Davis v. Lockheed Martin Corp.*, No. 6:22-cv-81-37DCI (M.D. Fla.)

_____

Robert C. James, Ph.D.

Date: 4/14/23

*Henderson v. Lockheed Martin Corp.*, No. 6:21-cv-1363-37DCI (M.D. Fla.)

## 1.0    Introduction

I have been asked to respond to the latest round of opinions expressed in the reports submitted by the Plaintiffs' experts.  A new report submitted by Dr. Sahu finally lists his model-estimated outdoor air concentrations at the Golf Channel location for five of Plaintiffs' many original chemicals of concern.  The chemicals for which he estimated outdoor air concentrations at the Golf Channel were arsenic, hexavalent chromium, trichloroethylene, perchloroethylene, and styrene.  Relying upon on Dr. Sahu's speculative and unfounded mischaracterization of what these exposure concentrations represent, several medical experts have submitted specific causation reports discussing each Plaintiff's alleged injuries.

As I noted in my first report there is a basic four step procedure for determining whether an alleged disease or injury was caused by a chemical present in their environment.  The first three steps involve: 1) the identification of all sources of that chemical in the environment, 2) the measurement or modeling of the relevant exposures, and 3) a dose estimation using either direct measurement or a reasonably reliable form of dose reconstruction. These steps are always performed first because all chemicals are toxic at some dose, but not all doses of a chemical are likely to induce a specific toxicity. For this reason, exposure assessments are performed first to determine if the exposure in question was sufficient to warrant consideration of its potential health consequences.  This is the standard procedure by which state and federal environmental protection agencies evaluate environmental exposures to chemicals and by which state and federal agencies monitor or evaluate workplace chemical exposures. I have never been involved in a toxic tort litigation like this one where general causation is alleged and argued before the alleged exposures were identified to create the necessity of assessing the possible consequences of these exposures. In this case, Plaintiffs have "put the cart before the horse."

One reason why I previously emphasized this four-step procedure should be followed in this case on my first report was demonstrated by information summarized in Appendix D of my first report. This Appendix described and demonstrated the ubiquitous presence of volatile organic compounds (VOC), and that of numerous other chemical carcinogens, that are common to our residential, recreational, commercial and workplace microenvironments. This fact was emphasized because industrial emissions, or those generated during remediation, do not always generate exposures or risks that are as high or higher than those contributed by mobile sources and indoor air sources (e.g., Chakraborty, 2012; Chan, 1991; Wallace, 1990), and because outdoor sources of chemical exposure tend to be lower than the chemical exposures and risks found in our own indoor air environments (e.g., Wallace ,1990; Thomas et al., 1991; Wallace et al., 1993).

Nonetheless, the first set of Plaintiffs' expert reports ignored the likelihood of this possibility and failed to discuss the Plaintiffs' exposures or doses in any meaningful way — that is they did not discuss measured, modeled, anticipated, or even plausible exposures or doses. Instead, these reports speculated about general causation issues without knowing which chemicals were present at sufficient levels to warrant these or any health concerns. By reversing the order of aforementioned four-step procedure for evaluating an alleged environmentally caused injury, Plaintiffs never demonstrated that in fact the alleged exposures were unusual and of a magnitude that raised legitimate health concerns for those exposed to them.

Now, after the Parties and Court have expended substantial time and resources on the first round of reports, Plaintiffs' fate and transport expert, Dr. Sahu, has finally produced his estimate of the outdoor air exposure concentrations at the Golf Channel that Plaintiffs will be attributing to the defendant (see Table 20 on page 79 of Dr. Sahu's new report). Instead of letting the medical/toxicology experts determine what significance they might attach to his hypothetical estimates of the exposures he attributes to Defendant, Dr. Sahu created his own unique definition of what represented a 'background exposure level' for each chemical. But as I will show this representation is nothing but a canard with no meaningful scientific or factual basis.

Surprisingly, each of Plaintiffs' medical experts chose to adopt Dr. Sahu's misleading and inaccurate portrayal of the exposure estimates he modeled using inaccurate assumptions. According to the relative ratios he created, Dr. Sahu stated that the alleged emission levels at the Golf Channel were much higher than 'background levels' <u>when in fact they are not</u>. As I will subsequently show, Dr. Sahu's modeled concentrations at the Golf Channel for the remaining constituents of concern (CoCs) are as low as or are much lower than actual measurements of their presence in the outdoor airs of Florida and throughout the United States. So, by choosing to rely upon Dr. Sahu's novel mischaracterization on what his exposure levels represent, Plaintiffs' medical experts reached false and scientifically unreliable specific-causation conclusions, as the following examples amply illustrate.

Dr. Sahu's modeled outdoor exposure levels for the Golf Channel location (listed in his Table 20) actually produce average outdoor estimated concentrations of 0.17 parts-per-trillion (ppt) for trichloroethylene (TCE), 0.4 ppt for styrene, and 4.37 ppt for PCE. These are not exposure levels that raise concerns of any kind for any health condition for the presence of these chemicals in the general environment. In fact, as I show in more detail later in this report, as US citizens, we all have been consistently exposed to higher ambient levels of these chemicals for decades, especially those living in urban environments. More importantly, the largest exposure and dose of these chemicals has long come from either our indoor air environments or the foods we eat.

To place Dr. Sahu's average concentration for PCE into some perspective, I simply note the Plaintiffs have offered two studies as part of their dose response evidence for PCE. These

studies involved persons exposed to higher than ambient PCE concentrations because they lived near dry-cleaning establishments (Schreiber et al., 2002; Storm et al., 2011). Notably, however, these two studies also reported the ambient PCE air levels for their respective control populations (i.e., individuals not exposed to dry-cleaning emissions and exposed only to the ambient urban air): a mean of 10 mg/m$^3$ (1,470 ppt) was listed for the control group in the Schreiber et al. study; and a geometric mean value of 2.9 mg/m$^3$ (427 ppt) was reported in the study by Storm and colleagues.  These two measurements of US ambient indoor air PCE concentrations, although taken in different decades, are still some **98- to 336-times higher** than the average of the annual outdoor modeled air PCE concentrations reported by Dr. Sahu.

Similar relative exposure comparisons exist for TCE. Table 1.3 and the text at page 40 of the IARC (2014) monograph on TCE indicates the average U.S. outdoor air concentration in the 1980s was about 1.5 mg/m$^3$ (or 279 ppt) and in the 1990s was about 0.8 mg/m$^3$ (or 149 ppt).  These levels are **1,641-times and 876-tines higher**, respectively, than the average of Dr. Sahu's estimated average TCE air concentrations for the Golf Channel property.  In contrast, Dr. Sahu used the novel ratios he created in his Table 22 to imply his TCE levels for the Golf Channel property were higher than background some years. (Although I would note the average and median values calculated from the annual average TCE concentrations listed in his Table 20 are both less than his own selected background concentration.)

Another example illustrating why Dr. Sahu's ratios are a mischaracterization of Plaintiffs' alleged exposures is seen in one of the alleged dose response papers that Plaintiffs' experts submitted. The Lehman et al. (2002) study submitted by Plaintiffs' experts measured the concentrations of various VOCs in the bedrooms of the children enrolled in this study.  The levels of TCE and PCE measured in the indoor air of the homes in this study are listed in the following table.  The ratios I have calculated for this table compare the measured levels in the Lehman study to the median value of Dr. Sahu's estimated concentrations for the Golf Channel as listed in his Table 20.  These ratios show the median bedroom TCE and PCE concentrations were **759-times and 184-times higher**, respectively, than the median of Dr. Sahu's model derived concentrations. Even the 25th percentile bedroom levels of TCE and PCE were some two orders of magnitude higher than Dr. Sahu's median outdoor exposure level for the Golf Channel. Thus, Plaintiffs' own dose response literature indicates indoor air exposure levels can be expected to be much higher than Dr. Sahu's modeled outdoor air exposure levels, a fact well established in the general literature on this issue.

**TCE and PCE Levels Measured in the Bedroom Air of Children**

|  | 25th percentile | Median | 75th percentile |
|---|---|---|---|
| TCE Concentration (mg/m$^3$) | 0.2 | 0.6 | 1.0 |
| **Ratio* (Lehman/Sahu)** | **253x** | **759x** | **1,266x** |
| PCE Concentration (mg/m$^3$) | 1.8 | 3.4 | 7.3 |
| **Ratio* (Lehman/Sahu)** | **97x** | **184x** | **395x** |

**\*** This ratio is (Lehman's measured indoor air concentration)/(Sahu's median Golf Channel outdoor air concentration)

Dr. Panigrahy claims to have reviewed epidemiology and toxicology literature discussed in the 2019 IARC monograph on styrene. IARC (2019), however, reported the average styrene air concentration measured at 20 test stations located in urban areas was approximately 0.2 ppb (200 ppt). This average styrene concentration is 500-times higher than the average of the Golf Channel styrene concentrations modeled by Dr Sahu. In fact, his modeled styrene concentrations were all **well below the analytical detection limit of the measurement method** used in this study. The 2019 IARC monograph also noted that the median of residential personal air sampling results were higher than outdoor air concentrations of styrene and generally fell within a range of 1-4 mg/m$^3$ (i.e., 235 ppt to 939 ppt). These residential styrene exposures were **588- to 2,348-times higher** than the average of the Sahu-modeled styrene concentrations listed in his Table 20 for the Golf Channel. Additionally, I point to another one of Plaintiffs' dose response papers, the Werder et al. (2018) study. In the introduction section of this paper the authors make the following comments about environmental styrene exposures (emphasis added):

> *Inhalation of tobacco smoke, off-gassing of building materials and consumer products, and vehicle and industrial emissions accounts for over 90% of styrene exposure in the general population . . . **Among smokers, cigarettes are considered the dominant source of styrene exposure, and smoking is the single most important individual predictor of human exposure to styrene**. **Styrene is released into the air from automobile exhaust, cigarette smoke, photocopiers and printers, and industries using or manufacturing styrene**. The Gulf region is home to a prolific petrochemical industry, many styrene-emitting industries, and over half of all U.S. styrene production, potentially exposing Gulf residents to a high intensity of environmental styrene emissions . . . . **In the U.S. general population, daily exposure to styrene in air is estimated to be 18–54 μg/person, and indoor air usually contains higher levels of styrene than outdoor air.***

So, not only does this reference submitted by Plaintiffs note there are a number of other sources of styrene exposure common to our air environments, but also that indoor air levels usually exceed outdoor air levels, that office photocopiers and printers are sources of styrene exposure, and finally that our air environments yield daily styrene exposures of approximately 18–54 μg/person per day. By comparison the average workday exposure to styrene for the Plaintiffs at the Golf Channel that can be attributed to defendant's emissions according to Dr. Sahu would only be about 17.2 ng/day[1] (one nanogram, or ng, is 1/1,000th of a microgram, or mg). Thus, the "average daily Sahu styrene exposure" the plaintiffs received is some **1,047- to 3,140 times lower** than the daily exposure level of styrene estimated for the typical US citizen. Put differently, Dr. Sahu's has suggested the ratios in his Table 22 show that his modeled exposures are several thousand times *higher* than "background" while a study selected by Plaintiffs' own experts shows that these exposures are, in fact, really several thousand-times *lower*. In short, is clear that Dr. Sahu's definition of what

---

[1] This calculation assumes that on average 10 m$^3$ of air are inhaled each workday.

represents a "background exposure" to styrene misrepresents the actual background styrene exposure/dose by some million-fold.

Given the above, it is clear from just a quick purview of just the environmental exposure sections provided by IARC and just a few of dose response papers submitted by Plaintiffs themselves, that the Plaintiffs who worked at the Golf Channel would not have received any usual or meaningful environmental exposure to TCE, PCE, or styrene because of Defendant's activities even if it is assumed Dr. Sahu's model produced accurate concentrations, which I understand from Lockheed Martin's other experts it does not. Yet Plaintiffs' medical experts are now attributing all of Plaintiffs' injuries or diseases to just Defendant's emissions alone when in fact each Plaintiff has incurred far greater exposure to these same chemicals from other environmental sources. Furthermore, these greater exposures incurred by each Plaintiff occurred decades before they worked at the Golf Channel as well as during their tenure there. Thus, the consistent opinion being offered by each of Plaintiffs' medical experts, that Defendant's emissions are the only identifiable cause of each Plaintiff's injury defies medical and scientific logic when the actual relevance of these exposure levels is made known. It indicates these experts do not understand how environmental exposures to chemicals present in the environment originate, they misunderstand the typical major sources of these chemical exposures, or that they did not consider information provided in their own cited literature. Because all of Plaintiffs' medical experts relied upon Dr. Sahu's mischaracterization of Plaintiffs' alleged exposures in forming their opinions, all of Plaintiffs' specific causation analysis are fatally flawed.

After reviewing the new reports submitted Plaintiffs' medical experts, I find the specific causation opinions that were offered are scientifically/medically flawed and are clearly unreliable. One cannot offer a reliable specific causation opinion that fails to comprehensively consider and reliably eliminate alternative exposures and alternative causes' the simple "omission of consideration" specific causation approach that has been adopted by Plaintiffs' medical experts is not a scientifically reliable methodology. Plaintiffs' new expert reports provide obvious examples of why forming opinions based only on a specified, limited focus of possible causes and exposures that ignores current and past chemical exposures linked to all environments an individual has inhabited will always lead to an erroneous and spurious specific causation opinion.

In the following sections of this report, I will provide additional information demonstrating why Dr. Sahu's hypothetical definition of background concentrations of the chemicals of concern was incorrect and is not relevant to the medical causation issues alleged in this case. I will illustrate the Plaintiffs' chemical exposures they wish to attribute to the Defendant are *de minimis* when the Plaintiffs' total daily and lifetime exposures to these chemicals is considered. Likewise, their total daily exposure to other hazardous chemicals that also have a ubiquitous presence in the microenvironments we inhabit will also be discussed briefly.

5

To be clear, I maintain that Plaintiffs have failed to scientifically establish that the five remaining chemicals of concern are capable of causing any of the Plaintiffs' alleged injuries or diseases under any meaningful exposure conditions, and I understand that opinion to be shared by other experts in this case (e.g., Dr. Mundt). But if these substances were capable of causing the Plaintiffs' injuries, a reliable specific causation analysis would have to account for alternative sources of exposure to these substances and substances like them (e.g., substances that share the genotoxic or mutagenic characteristics that Plaintiffs' experts opine initiate or promote development of the relevant health conditions). These alternative potential causes of Plaintiff's alleged conditions cannot be excluded from the proper specific causation analysis simply because the Plaintiffs' medical experts failed to consider them.

Also in my report, the risks for each Plaintiff alleged to be attributable to Defendant's activities is also presented, as well as the risks associated with other chemical exposures they had prior to the injury they are alleging in this case. All of these comparisons and the information from which they are derived fail to implicate Defendant's emissions as a significant or medically meaningful causal factor in the development of Plaintiffs' diseases.

## 2.0    Environmental Exposures to Plaintiff's Three VOC Chemicals

In his report, Dr. Sahu states that the ratios he calculates in his Table 22 show that his model-estimated outdoor air concentrations at the Golf Channel are exceedances of the background level of exposure to these chemicals that is experienced daily by the typical Floridian. It is impossible, however, to reconcile this statement with the reality of how low his model-estimated exposure levels actually were, which any air-modeler with Dr. Sahu's experience would or should have realized.

At page 80 of his report, Dr. Sahu states — "*Since I am not aware of actual monitored levels of background concentrations on a median annual average basis, I relied on USEPA's reported NATA values for Florida[87] in order to compare model concentrations for these HAPs.*" But this comparison here is patently absurd and has no rational basis. One must ask, why did he ignore actual air measurements in Florida, and in the United States, when suggesting what should represent a background exposure level? Instead of this logical comparison, Dr. Sahu compared his USEPA AERMOD (an air model) estimated <u>annual average concentrations</u> to the <u>median concentration</u> generated by a different set of model-generated air data (the USEPA's NATA data for Florida). Why would he choose to compare computer generated mean (average) values to computer generated median values (i.e., the middle value when a data set is ordered from least to greatest)? His estimated exposure levels at the Golf Channel are yearly annual average concentrations; why then isn't the logical comparison of these values to the annual average concentrations recorded at air <u>monitoring</u> stations within the State of Florida? This comparison would provide an actual and relevant measure of what represents a background level in outdoor

within the state of Florida. But Dr. Sahu's chosen NATA-generated "background values" are surprisingly and suspiciously low. And his subsequent comparison of these values to his modeled concentrations for the Golf Channel location, although they too are low, ensures his "background ratios" will make it appear as though Defendant's alleged emissions were high when in fact they are not.

As stated earlier, if Dr. Sahu had just reported the air concentrations he had derived in his Table 20 ("Annual Average Concentrations at the Golf Channel Receptor Location"), then each of the medical or other health experts would be left to determine the relevance of these exposures. If this had been the case, I have no doubt they would have been forced to reach entirely different, and perhaps separate, assessments of the significance to attach to each Plaintiff's alleged exposure. But by adopting a hypothetical level for background, Dr. Sahu suggests his annual average outdoor hexavalent chromium and styrene concentrations were somehow 100- to >1,000-fold higher than background, that arsenic was sometimes 10 to >100-times higher background, and that the TCE and PCE sometimes several times higher than background. Thus, Dr. Sahu created an illusory exposure situation for the Plaintiffs' medical experts to adopt that actually never existed and has no scientifically reliable basis.

In the following text in this section of my report, I will expose the myth Dr. Sahu has tried to create with his "background exposure ratios" listed in his Table 22. When one compares the "Sahu outdoor air exposure estimates" at the Golf Channel to actual measurements of these chemicals in the rural, suburban, and urban outdoor air of Florida, one finds the Sahu-derived exposure levels do not represent an unusual nor an elevated level of outdoor air exposure to these three VOCs. I will then show that past outdoor levels of these VOCs were no doubt higher. And more importantly, I will show what USEPA scientists discovered decades ago, that indoor air has long contained higher levels of these and other VOCs. Thus, the fact that Plaintiffs' medical experts chose to focus solely on mythical outdoor elevations of styrene, TCE, and PCE means their causation assessments are incomplete and have been performed in error.

## 2.2    Chemical Concentrations in the Outdoor Air of Florida

In Dr. Sahu's new report he listed his model-estimated annual average concentrations at the Golf Channel for 1995-2020 in his Table 20. These model-derived concentrations have been reproduced as Table 1.

**Table 1**

**Dr. Sahu's Model-derived Outdoor Air VOC Concentrations (µg/m³) at the Golf Channel**

| Year | TCE | PCE | Styrene |
|---|---|---|---|
| 1995 | 1.76E-03 | 1.42E-02 | 2.87E-03 |
| 1996 | 3.32E-03 | 2.43E-02 | 4.25E-03 |
| 1997 | 2.21E-03 | 2.04E-02 | 3.66E-03 |
| 1998 | 1.35E-03 | 2.18E-02 | 2.82E-03 |
| 1999 | 1.48E-03 | 1.95E-02 | 2.73E-03 |
| 2000 | 2.16E-04 | 5.47E-03 | 6.84E-04 |
| 2001 | 7.23E-04 | 7.82E-03 | 1.27E-03 |
| 2002 | 7.93E-04 | 5.94E-03 | 1.08E-03 |
| 2003 | 8.96E-04 | 5.76E-03 | 1.06E-03 |
| 2004 | 2.51E-03 | 1.12E-02 | 2.06E-03 |
| 2005 | 1.95E-03 | 8.03E-03 | 1.52E-03 |
| 2006 | 1.39E-03 | 9.88E-03 | 1.85E-03 |
| 2007 | 1.25E-03 | 9.37E-03 | 1.83E-03 |
| 2008 | 7.60E-04 | 1.47E-02 | 2.84E-03 |
| 2009 | 8.16E-04 | 1.66E-02 | 3.21E-03 |
| 2010 | 6.24E-04 | 1.25E-02 | 2.41E-03 |
| 2011 | 8.66E-04 | 1.96E-02 | 3.54E-03 |
| 2012 | 8.00E-04 | 1.74E-02 | 3.01E-03 |
| 2013 | 5.54E-05 | 4.89E-02 | 3.26E-04 |
| 2014 | 6.44E-05 | 5.97E-02 | 5.68E-04 |
| 2015 | 2.10E-06 | 1.04E-01 | 2.36E-04 |
| 2016 | 1.57E-06 | 6.09E-02 | 1.16E-05 |
| 2017 | 1.93E-06 | 8.76E-02 | 3.15E-04 |
| 2018 | 1.51E-06 | 4.22E-02 | 4.61E-04 |
| 2019 | 1.33E-06 | 5.10E-02 | 2.14E-04 |
| 2020 | 1.54E-06 | 7.35E-02 | 2.36E-05 |
| **Minimum** | **1.33E-06** | **5.47E-03** | **1.16E-05** |
| **Maximum** | **3.32E-03** | **1.04E-01** | **4.25E-03** |
| **Mean** | **9.17E-04** | **2.97E-02** | **1.72E-03** |
| **Median** | **7.97E-04** | **1.85E-02** | **1.68E-03** |

An adapted reproduction of Dr. Sahu's Table 20.

At the bottom of this table, I have listed for the sake of convenience the minimum, maximum, mean, and median values for each VOC in this dataset.  The mean and median values will aid comparisons to relevant data made elsewhere in this section of my report.

If one wants to consider what level of chemical exposure represents ambient air conditions in an area, the best indication would be actual measurements of that chemical in outdoor air samples collected in that area or in surrounding areas like it.  To get an idea of what ambient outdoor air concentrations were in Florida I retrieved air monitoring data from air monitoring stations located within the state.  Because there are only a limited number of these, and as I did not originally find data for the Orlando area, so I selected the closest air monitoring station, one located in Winter Park, Florida.[2]  This location would seem to provide a reasonable indication of ambient or background conditions for the Plaintiffs for the following reasons:

- The downtown of Winter Park is approximately only 5.2 miles north of the Orlando downtown area, and 3 miles north of the Orlando city limits.  It is approximately 15 miles north and slightly east of the Golf Channel location.

- According to information provided on the internet, Winter Park has the following desirable urban characteristics:

    o Winter Park is known for its old-world charm, elegant homes, quaint bricked streets, extensive tree canopy, first-class shopping and dining experiences, world-class museums, Rollins College, its historic Hannibal Square district, Winter Park Village, and nationally ranked schools.

    o The city is 10-square miles, with quaint bricked streets and an extensive tree canopy.  The city has 75 large and smaller parks and what is described as an expansive chain of lakes.

    o Established in the early 1900s, it is one most affluent areas and cities in the state of Florida.  It is also a smaller urban area with a population of just over 30,000, and did not appear to be significantly influenced by any major point source of pollution.

    o As chemical exposures typically have an inverse relationship with both city size and socioeconomic status, Winter Park would seem to be an area whose ambient air comparisons are likely equivalent to or better than those of Orlando or the Golf Channel.

- Winter Park's distance from the Golf Channel is probably sufficient to eliminate any influences that might be attributable to emissions from defendant's property or activities.

---

[2] With the help of Defendant's other experts I have now seen data for Orange County.  As I did not have time to fully incorporate these data here, I have chosen to keep my original illustrations in this part of my report and show the Figures of the new data I have received elsewhere in this report.

Table 2A summarizes concentrations recorded at the Winter Park monitoring station for TCE and PCE. Unfortunately, as I initially found no styrene measurements for Florida, it was not included. In Table 2A, Winter Park's ambient air concentrations for the TCE, and PCE are listed and then compared to the same NATA-derived median value that Dr. Sahu adopted as his hypothetical background concentration for Florida.

**Table 2A**

**Outdoor Air Concentrations of TCE and PCE Measured at Winter Park, Florida**

| Year of Measurement | Winter Park's PCE Levels ($\mu g/m^3$) | Winter Park PCE/SMV[#] | Winter Park's TCE Levels ($\mu g/m^3$) | Winter Park TCE/SMV[#] |
|---|---|---|---|---|
| 2005 | 0.405 | **25** | 0.081 | **66** |
| 2006 | 0.364 | **23** | 0.103 | **84** |
| 2007 | 0.164 | **10** | 0.074 | **61** |
| 2008 | 0.185 | **12** | 0.048 | **39** |
| 2010 | 0.299 | **19** | 0.035 | **29** |
| 2011 | 0.129 | **8** | 0.043 | **35** |
| 2012 | 0.130 | **8** | 0.026 | **21** |
| 2013 | 0.134 | **8** | | |
| 2014 | 0.173 | **11** | | |
| 2015 | | **0** | | |
| 2016 | 0.133 | **8** | | |

PCE: perchloroethylene; TCE: trichloroethylene; Note: Blank cells indicate data was not reported for that year. #SMV: Sahu's median background values listed in his Table 21. This ratio shows how many times higher the recorded value was compared to Dr. Sahu's hypothetical NATA-derived background value for Florida.

As this table amply demonstrates, applying Dr. Sahu's version of background to the outdoor air in Winter Park suggests this city also had elevated levels of TCE and PCE during the same general time interval. Of interest, however, is the fact that Dr. Sahu's "background ratios" for his modeled PCE exposure levels at the Golf Channel were 1.5 or less during the years 1995-2012 while those at Winter park ranged from 8 to 25. Similarly, Dr. Sahu's touted "background ratio" for his estimated TCE exposure levels at the Golf Channel ranged between 0.0 and 2.72 while the Winter Park "background ratios" were consistently 21- and 84-times higher than "background" during the years it was measured. Thus, applying the same spurious "background ratios" to the air in Winter Park, Dr. Sahu and Plaintiffs other experts would no doubt argue the residents of this affluent and desirable city have also incurred undesirable exposures to TCE and PCE given that the ambient TCE and PCE concentrations at Winter Park were many times worse than those modeled for the Golf Channel. But a review of additional air monitoring data in Florida shows this would be just

10

another spurious conclusion one might reach if they were to use Dr. Sahu's NATA-derived median to represent background exposure levels in Florida. As I show next, neither the outdoor air concentrations measured at Winter Park nor those Dr. Sahu estimated for the Golf Channel are unusual or elevated outdoor air levels for these two chemicals in Florida.

In Table 2B, I have listed the recorded concentrations for five additional carcinogenic VOCs also measured in the outdoor air at Winter Park (as well as at other locations in Florida). Each of these exhibit genotoxicity or other "Key Characteristics" comparable to those Plaintiffs' experts opine initiate or promote the development of relevant cancers or other relevant health conditions; for this reason, even if the Plaintiffs' experts had established reliable general-causation relationships between the substances of concern and the health outcomes of concern (which, as I addressed in my prior report, they have not), any subsequent specific-causation opinion would necessarily have to consider exposures to other substances with comparable characteristics. These data demonstrate that simply focusing on just five hazardous air pollutants (HAPs) as the Plaintiffs have done, is an oversimplification of the chemical exposures and potential cancer risks any individual working and/or living within the state of Florida may experience. I raise this issue here now because I will continue to demonstrate why such a limited focus is a fundamental flaw in the specific causation reports submitted by all of Plaintiffs' medical experts.

**Table 2B**

**Concentrations\* of Other HAPs Present in the Outdoor Air of Winter Park, Florida**

| Year | Benzene | 1,3-Butadiene | Carbon Tetrachloride | Chloroform | Methylene Chloride |
|------|---------|---------------|----------------------|------------|--------------------|
| 2005 | 0.799 | 0.170 | 0.561 | 0.143 | 0.383 |
| 2006 | 0.643 | 0.120 | 0.589 | 0.233 | 0.391 |
| 2007 | 0.583 | 0.069 | 0.530 | 0.178 | 0.326 |
| 2008 | 0.519 | 0.063 | 0.549 | 0.157 | 0.444 |
| 2010 | 0.512 | 0.060 | 0.531 | 0.127 | 0.286 |
| 2011 | 0.425 | 0.050 | 0.510 | 0.128 | 0.272 |
| 2012 | 0.424 | 0.047 | 0.518 | 0.132 | 0.339 |
| 2013 | 0.353 | 0.037 | 0.508 | 0.132 | 0.339 |
| 2014 | 0.474 | 0.049 | 0.509 | 0.147 | 0.348 |
| 2016 | 0.382 | 0.044 | 0.467 | 0.136 | 0.303 |

Note: Blank cells indicate data was not reported for that year * All concentrations were rounded off to three significant numbers.

Returning to the question, is the outdoor air of Winter Park representative of the air throughout the State of Florida? To answer this question the air measurements reported for other cities within Florida are provided in the following two Tables. Table 3 lists the means of the air measurements for different locations throughout Florida and the type of monitoring situation it represents (i.e., is it a rural, suburban, or urban location). The number of samples collected at each location is provided in the parentheses following the name of the location. Winter Park and Valrico

were highlighted only because they were listed as rural or urban (city center) while the other eight locations are suburban areas.

**Table 3**

**Mean Levels (μg/m³) of the TCE and PCE at Different Locations in Florida**

| Monitor Location by city | Land Use Type/Location-Setting | TCE | PCE |
|---|---|---|---|
| Fort Lauderdale (5) | Residential/Suburban | 8.42E-02 | 1.46E-01 |
| Davie (10) | Commercial/Suburban | 1.67E-01 | 2.90E-01 |
| Coconut Creek (9) | Residential/Suburban | 1.90E-01 | 3.00E-01 |
| Dania (4) | Residential/Suburban | 8.48E-02 | 1.12E-01 |
| Tampa, USMC Reserve (5) | Commercial/Suburban | NR | 1.51E-01 |
| Tallahassee (5) | Commercial/Suburban | 8.37E-02 | 2.44E-01 |
| St. Petersburg, Azalea Park (14) | Residential/Suburban | 5.33E-02 | 1.16E-01 |
| Pinellas Park (12) | Residential/Suburban | 5.16E-02 | 1.37E-01 |
|  |  |  |  |
| **Winter Park (10)** | **Commercial/Urban** | **5.84E-02** | **2.05E-01** |
| **Valrico (13)** | **Residential/Rural** | **4.02E-02** | **7.96E-02** |
|  |  |  |  |
| **Means of All Florida Data** |  | **9.75E-02** | **1.69E-01** |
| **Means for Golf Channel data** |  | **9.17E-04** | **2.97E-02** |

Adapted from the USEPA database attached to this report. *These are descriptors used in this database. Note: Only those locations reporting three or more years of measurements are shown in this table.  The mean of all Florida data includes measurements reported for all locations. NR means no data reported for this chemical

In Table 3 the mean value for TCE at most Florida locations was some 100-fold higher than the mean level for the Golf Channel.  The mean value for the rural location of Valrico was even 44-fold higher than Golf Channel mean. For PCE the mean value at the rural location of Valrico was almost 3-times higher for all suburban and urban locations in Florida was 5- to 10-times higher than that for the Golf Channel.

The data in Table 3 clearly show Dr. Sahu's portrayal of what represents a "background" exposure concentration for Florida residents is inaccurate and clearly misleading.  After comparing his estimated exposures for the Golf Channel to NATA modeled data he suggested the Plaintiffs' PCE exposure levels had been higher than 97-99% of the NATA modeled exposures in Florida. But as Table 3 shows, this comparison is not relevant and is seriously misleading.  In short, Dr. Sahu has created a myth by suggesting his spurious "background ratios" reflect elevated exposures, a suggestion that was unfortunately adopted by Plaintiffs' medical experts. But this suggestion has no factual basis.  Instead, actual outdoor air measurements indicate the exposures estimated for the Golf Channel were substantially less than measured background levels for TCE and PCE in Florida.

Table 4 provides a summary of the outdoor concentrations for other HAPs present in Florida's air. Again, the five chemicals that are the Plaintiffs' only focus of this lawsuit are not the only genotoxic or otherwise relevant (according to Plaintiffs' experts) chemicals the Plaintiffs and other Floridians would have been exposed to from the outdoor air they have worked and lived in, and this is a serious flaw in the specific causation reports offered by Plaintiffs' medical experts.

**Table 4**

**Mean Concentrations\* ($\mu g/m^3$) of Other HAPs in the Outdoor Air of Florida**

| Monitor Location | Benzene | 1,3-Butadiene | Carbon Tetrachloride | Chloroform | Methylene Chloride |
|---|---|---|---|---|---|
| Fort Lauderdale (5) Suburban | 0.947 | 0.0770 | 0.0483 | 0.235 | 0.707 |
| Davie (10) Suburban | 0.789 | 0.0839 | 0.518 | 0.234 | 1.150 |
| Coconut Creek (9) Suburban | 0.704 | 0.0698 | 0.496 | 0.324 | 1.98 |
| Dania (4) Suburban | 1.170 | | 0.491 | 0.163 | 0.831 |
| Tampa, USMC (5) Suburban | 0.653 | 0.0933 | 0.562 | 0.131 | 0.342 |
| Tallahassee (5) Suburban | 0.615 | | 0.433 | 0.130 | 0.952 |
| St. Petersburg, Azalea Park (14) | 0.579 | 0.0857 | 0.518 | 0.157 | 0.351 |
| Pinellas Park (12) Suburban | 0.702 | 0.0967 | 0.512 | 0.193 | 0.961 |
| Winter Park (10) Urban, city center | 0.511 | 0.0708 | 0.527 | 0.151 | 0.345 |
| Valrico (13), Rural | 0.433 | 0.0585 | | 0.144 | 1.30 |
| **Mean for all Florida Data\*\*** | **0.667** | **0.0792** | **0.508** | **0.191** | **0.881** |

\* This value represents to mean for that location. \*\*This value is the mean for all Florida data, and not just for the cities represented in this table.

## 2.3    VOC Concentrations in Outdoor Air Throughout the U.S.

Besides the air monitoring data for Florida, studies had been measuring and reporting the levels of various chemicals common to the outdoor air in this and other states. The information from these studies will be discussed briefly and draws on information summarized in Appendices G and H. The Plaintiffs have mistakenly suggested the concentrations estimated by Dr. Sahu for outdoor air at the Golf Channel represented an unusual and high level of exposure to their five

CoCs. But as I will show this suggestion is not true when compared to past exposures levels, especially when their indoor air microenvironments are considered.

### 2.3.1   Past Trichloroethylene (TCE) Outdoor Air Levels

Appendix G describes some of the sources of TCE for both outdoor and indoor air. There are many different sources of this chemical (e.g., see Table G3) and include many different manufacturing or commercial enterprises involving industries requiring the degreasing of metal products, machinery, or transport equipment as well as those involved with graphic arts and building/home construction to name just a few. For many years in past decades TCE was considered a highly useful solvent with desirable properties, and its widespread use led to its ubiquitous presence in both our indoor and outdoor environments. Because its use declined over time, past outdoor levels of this chemical were much higher than they are today. And the Plaintiffs' alleged exposure to this chemical while working at the Golf Channel must be viewed within the perspective of the likely far greater magnitude of their past outdoor and indoor air exposure levels. For example, the following table from IARC shows how TCE levels in the US slowly declined between 1985 and 1998 (IARC, 2014). But by comparison, the mean TCE concentration for the Golf Channel is approximately 1,000-fold lower than the U.S. average TCE concentration for 1994. And highest TCE estimate for the Golf Channel that occurred in the year 1996 (0.00332 $\mu g/m^3$) was 195-times lower than the US average concentration for that year.

| Table 1.3 Mean concentrations[a] of trichloroethylene in air in the USA, by year | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
| Concentration ($\mu g/m^3$) | 1.4 | 1.39 | 1.68 | 4.87 | 1.69 | 1.84 | 2.86 | 1.37 | 1.12 | 0.95 | 0.78 | 0.65 | 0.74 | 0.88 |

[a] Representing about 1200 measurements in 25 states
From Wu & Schaum (2000)

Table 5 reproduces data which have also been presented in Appendix G. Table G4A compares Dr. Sahu's mean TCE concentration for the Golf Channel to the data reported by Wu and Shaum (2000) that was just presented above as IARC's Table 1.3. The Wu and Shaum (2000) data were collected from the state and local environmental agencies of 25 states. The means are reproduced in Table 5 along the ratio showing just how much higher these average concentrations were compared to the average TCE level estimated for the Golf Channel property. As Table 5 reveals, Dr. Sahu's average TCE concentration at the Golf Channel was **some 709- to 5,310-times lower** than the average U.S. air concentration for years 1985-1998.

**Table 5**

**Mean TCE Concentrations in the US from 1985-1998[a]**

| Year | Number of samples | Mean U.S. Level ($\mu g/m^3$) | Times higher than the mean for Dr. Sahu's Estimates |
|------|------|------|------|
| 1985 | 11 | 1.4 | **1,527** |
| 1986 | 21 | 1.39 | **1,516** |
| 1987 | 53 | 1.68 | **1,832** |
| 1988 | 57 | 4.87 | **5,,310** |
| 1989 | 96 | 1.69 | **1,843** |
| 1990 | 59 | 1.84 | **2,006** |
| 1991 | 70 | 2.86 | **3,119** |
| 1992 | 76 | 1.37 | **1,494** |
| 1993 | 84 | 1.12 | **1,221** |
| 1994 | 89 | 0.95 | **1,036** |
| 1995 | 146 | 0.78 | **851** |
| 1996 | 150 | 0.65 | **709** |
| 1997 | 129 | 0.74 | **807** |
| 1998 | 115 | 0.88 | **960** |

Source: Wu and Shaum (2000).

Table 6 is additional data from Appendix G and is data that was summarized in the ATSDR (2019) review on TCE. This table lists the 50th and 95th percentiles of the mean TCE concentrations measured at different locations throughout the U.S. as well as the maximum TCE measurement recorded each year. This dataset essentially extends the time interval of TCE measurements listed in Table 5. The values here for 1998 and 1999 are slightly lower because the median of the individual mean values is being reported for a larger number of measurements collected each year. Still, up to and through the year 2011 the TCE concentrations are **more than 100-times higher than Dr. Sahu's mean modeled concentration at the Golf Channel**.

15

**Table 6**

**Percentile Distribution of Annual Mean Trichloroethylene Concentrations Measured in Ambient Air at Locations Across the United States 1998-2018**

| Year | Number of U.S. locations | 50th | | 95th | | Maximum | |
|------|------|------|------|------|------|------|------|
| | | (µg/m$^3$) | Times higher than GC[a] | (µg/m$^3$) | Times higher than GC[a] | (µg/m$^3$) | Times higher than GC[a] |
| 1998 | 132 | 0.161 | **176** | 0.757 | **825** | 5.515 | **6,014** |
| 1999 | 170 | 0.161 | **176** | 0.848 | **925** | 4.377 | **4,773** |
| 2000 | 187 | 0.161 | **176** | 1.053 | **1148** | 7.384 | **8,052** |
| 2001 | 205 | 0.134 | **146** | 0.521 | **568** | 12.883 | **14,048** |
| 2002 | 259 | 0.134 | **146** | 1.343 | **1464** | 18.403 | **20,067** |
| 2003 | 250 | 0.161 | **176** | 1.343 | **1464** | 6.911 | **7,536** |
| 2004 | 264 | 0.134 | **146** | 1.128 | **1230** | 5.773 | **6,295** |
| 2005 | 328 | 0.145 | **158** | 0.961 | **1048** | 6.627 | **7,226** |
| 2006 | 298 | 0.134 | **146** | 0.682 | **744** | 5.714 | **6,231** |
| 2007 | 317 | 0.134 | **146** | 0.489 | **533** | 4.028 | **4,392** |
| 2008 | 288 | 0.134 | **146** | 0.580 | **632** | 6.149 | **6,705** |
| 2010 | 540 | 0.113 | **123** | 0.859 | **937** | 6.659 | **7,261** |
| 2011 | 518 | 0.102 | **111** | 0.806 | **879** | 16.862 | **18,387** |
| 2012 | 512 | 0.081 | **88** | 0.806 | **879** | 5.800 | **6,325** |
| 2013 | 477 | 0.081 | **88** | 0.806 | **879** | 17.130 | **18,679** |
| 2014 | 444 | 0.081 | **88** | 0.752 | **820** | 2.792 | **3,044** |
| 2015 | 220 | 0.005 | **5** | 0.097 | **106** | 1.289 | **1.406** |
| 2016 | 209 | 0.005 | **5** | 0.124 | **135** | 0.556 | **606** |
| 2017 | 178 | 0 | 0 | 0.053 | **58** | 0.326 | **355** |
| 2018 | 159 | 0 | 0 | 0.069 | **75** | 0.383 | **418** |

Source: ATSDR (2019) - Table G5 combined tables 6-5 and 6-6 on pages 323-324. [a] The measured US air concentrations were compared to the mean value of Dr. Sahu's model estimated TCE concentrations for the Golf Channel (0.000917 µg/m$^3$).

Overall, the data in Table 6 are also quite consistent with the data for Florida air that were presented in Table 3. Thus, it is clear from the data in Tables 3 and 6 that outdoor air TCE exposures throughout Florida and the U.S. have been 100- to 1,00-fold higher than the mean of the TCE concentrations Dr Sahu estimated for the Golf Channel for most of the time interval covered by his estimates and were likely even higher in preceding years as Table 5 indicates.

**2.3.2   Past Perchloroethylene (PCE) Outdoor Air Levels**

Appendix G lists various possible sources of TCE for both outdoor and indoor air environments (see Tables G9 and G10). Because PCE has many commercial uses, and as has long

been major dry-cleaning solvent, PCE is present in the outdoor air of any residential, suburban, or urban environments.  Table 3 revealed PCE levels in a rural environment of Florida were still several times higher than the mean PCE level Dr. Sahu estimated for the Golf Channel, and Florida's mean suburban air levels were some 5 to 10-fold higher.  As indicated by Table 7, in past years the levels of PCE in outdoor environments were typically higher than those measured in more recent years.  Table 7 lists the levels reported Appendix G that were reported in the literature before the year 2000.  In addition, it contains studies discussed in Appendix H also published before the year 2000, with the exception of Dawson and McAlary (2005), a study that summarized data from 18 studies most of which had sampled outdoor air before 2003.

**Table 7**

**Levels of PCE in Outdoor Reported at Various Locations Throughout the U.S.**

| Year | Location | Concentration ($\mu g/m^3$) | Times higher than Dr. Sahu's value* |
|------|----------|------------------------------|-------------------------------------|
| From Table G13 | | | |
| 1980/1981 | 7 US cities | 1.97-4.01 | **66-135** |
| 1981/1982 | Three New Jersey cities | 1.63-3.13 | **55-105** |
| 1984 | Portland, Oregon | 0.40–2.10 | **13-71** |
| 1983/1984 | Philadelphia, Pennsylvania | 5.2 | **175** |
| From Tables Appendix H | | | |
| 1986 | Bayonne/Elizabeth, NJ | 3.72 | **125** |
| 1987 | Bayonne/Elizabeth, NJ | 3.3/8.0 | **111-269** |
| 1987 | Los Angeles, CA | 1.7/9.0 | **57-303** |
| 1987 | Pittsburg, Antioch, CA | 0.24 | **8** |
| 1999 | NHEXAS study of Region 5 | 2.49 | **84** |
| 2005 | Dawson and McAlary | 0.9 | **30** |

The measured US air concentrations were compared to the mean value of Dr. Sahu's reported concentrations (0.0297 $\mu g/m^3$). All ratios were rounded to the nearest whole integer.

Table 8 is a summary of information provided in ATSDR's recent review on PCE (ATSDR (2019), addressed in Appendix G.  It reports the 2006 ambient air concentrations of PCE for many states, including Florida.  Given the different environments of these states I note that the measured PCE levels in these states were quite similar.

17

**Table 8**

**Tetrachloroethylene Concentrations Measured in Ambient Air for 2006**

| Number of samples | State | µg/m³ | Times > GC value* |
|---|---|---|---|
| 21–70 | CA | 0.050–0.64 | **2-22** |
| 61 | CO | 0.34 | **11** |
| 61 | DC | 0.35 | **12** |
| 58–59 | DE | 0.09–0.44 | **3-15** |
| **42–61** | **FL** | **0.10–0.69** | **3-23** |
| 19–61 | GA | 0.10–0.45 | **3-15** |
| 59 | HI | 0.34 | **11** |
| 21–26 | IA | 0.24–0.48 | **8-16** |
| 60–61 | IL | 0.34–0.76 | **11-26** |
| 41–61 | IN | 0.17–0.19 | **6** |
| 33–61 | KY | 0.77–0.88 | **26-30** |
| 51–52 | MA | 0.19–0.22 | **6-7** |
| 56–61 | MD | 0.24–0.36 | **8-12** |
| 21–50 | MI | 0.26–1.10 | **9-37** |
| 41–58 | MN | 0.09–6.65 | **3-224** |
| 59 | MO | 0.17 | **6** |
| 59–66 | MS | 0.14–0.18 | **5-6** |
| 43–58 | NC | 0.24–0.58 | **8-20** |
| 26–31 | NH | 0.17–0.23 | **6-8** |
| 53–58 | NJ | 0.12–0.35 | **4-12** |
| 40–56 | NY | 0.17–3.32 | **6-112** |
| 41 | OK | 0.2 | **7** |
| 24–61 | OR | 0.34 | **11** |
| 37–61 | PA | 0.17–0.39 | **6-13** |
| 40–57 | PR | 0.09–0.25 | **3-8** |
| 53–61 | RI | 0.15–0.32 | **5-11** |
| 60/59 | SC/UT | 0.17/0.17 | **6** |
| 59–61 | SD | 0.07–0.08 | **2-3** |
| 44–45 | TN | 0.06–0.08 | **2-3** |
| 42–61 | TX | 0.17–0.37 | **6-12** |
| 57–60 | VA | 0.20–1.67 | **7-56** |
| 23–54 | VT | 0.34–0.37 | **11-12** |
| 61 | WI | 0.34 | **11** |
| 43–51 | WV | 0.13–0.39 | **4-13** |

Source: ATSDR (2019).  **\***The measured US air concentrations were compared to the mean value for the Golf Channel (0.0297 µg/m³) as estimated for Dr. Sahu's dataset.  All ratios were rounded off to three significant numbers.

Table 9, like Table 6 did for TCE, again provides more recent measurements of PCE in outdoor air. It provides both 50th and 95th percentiles of the means reported each year, and the maximum concentration recorded that year. The ratio is the percentile of U.S. mean that year or the maximum value divided by the mean value for the Golf Channel data. This ratio again demonstrates the estimated concentrations for the Golf Channel are not unusual for outdoor air or nor were they unusually high as was suggested by Dr. Sahu.

**Table 9**

**Percentile Distribution of Annual Mean Tetrachloroethylene Concentrations Measured in Ambient Air at Locations Across the United States**

| Year | Number of U.S. locations | 50th | | 95th | | Maximum | |
|------|------|------|------|------|------|------|------|
| | | $\mu g/m^3$ | 50th/GC mean | $\mu g/m^3$ | 95th/GC mean | $\mu g/m^3$ | Maximum/GC mean |
| 2010 | 304 | 0.102 | **3.4** | 0.5236 | **18** | 1.36 | **46** |
| 2011 | 292 | 0.0952 | **3.2** | 0.408 | **14** | 1.088 | **37** |
| 2012 | 287 | 0.0748 | **2.5** | 0.4148 | **14** | 1.36 | **46** |
| 2013 | 264 | 0.068 | **2.3** | 0.3536 | **12** | 1.292 | **44** |
| 2014 | 245 | 0.0578 | **1.9** | 0.2924 | **10** | 1.972 | **66** |
| 2015 | 224 | 0.0748 | **2.5** | 0.374 | **13** | 4.012 | **135** |
| 2016 | 205 | 0.0748 | **2.5** | 0.442 | **15** | 1.904 | **64** |
| 2017 | 174 | 0.0272 | **0.9** | 0.3332 | **11** | 0.952 | **32** |
| 2018 | 155 | 0.0204 | **0.7** | 0.3672 | **12** | 3.06 | **103** |

Source: ATSDR (2019). The measured US air concentrations were compared to Dr. Sahu's reported mean concentration of 0.0297($\mu g/m^3$). All ratios were rounded off to two or three significant numbers.

To summarize, the presence of PCE in outdoor U.S. air was clearly higher in past decades and only in recent years have PCE levels even approached the levels estimated by Dr. Sahu for the Golf Channel. Thus, like TCE, Plaintiffs past outdoor air PCE exposures were likely much greater than those they might have experienced while working at the Golf Channel, and it will subsequently be shown that indoor air levels of PCE were likely much higher.

### 2.3.3   Past Styrene Outdoor Air Exposure Levels

As with the other two VOCs the various sources of styrene exposure are discussed in Appendix G (see Tables G15-17). Its presence in outdoor air may result from the production styrene-butadiene rubber, the manufacture of reinforced plastics, boat building facilities, and

photocopying operations.  Unfortunately, both the IARC (2109) and ATSDR (2010) reviews on this chemical provided only limited information on the background levels of this chemical.  Table G18 lists a few refences indicating the mean for suburban environments typically ranges between 0.1 to 0.5 µg/m$^3$ which would **be 58-291 times the mean value for Dr. Sahu's estimated concentration** at the Golf Channel.  Similarly, the IARC (2019) reviewed reported a mean value of 0.2 ppb over the six years of 1989-1995 from 20 urban air monitoring station in California that used a detections limit of 0.1 ppb.  This average **is some 200-fold higher than the maximum value of Dr. Sahu's estimated levels**.  Because styrene is released during the combustion of organic matter styrene measurements were taken in 1979 at the Pennsylvania Turnpike Allegheny Mountain Tunnel.  This study reported styrene levels of tunnel intake air was less 0.1 µg/m$^3$ but was increased by traffic to 1.1-6.6 µg/m$^3$ inside the tunnel (640-3,837-times Dr. Sahu's mean value).  Although the focus of the studies summarized in Appendix H was primarily indoor air, personal, and breath measurements of VOCs, a number of these studies did report outdoor air levels of styrene and these are listed in (Table 10).

**Table 10**

**Mean Outdoor Air Styrene Concentrations Reported in Appendix H**

| Year | Location | Mean (µg/m$^3$) | Times higher than Dr. Sahu's value* |
|------|----------|-----------------|-------------------------------------|
| 1986 | Bayonne/Elizabeth, NJ | 0.9 | **524** |
| 1987 | Bayonne/Elizabeth, NJ (winter/summer -daytime)) | 1.70/1.20 | **988/698** |
| 1987 | Los Angeles, CA (winter/spring- daytime) | 2.30/1.50 | **1,337/872** |
| 1987 | Pittsburg, Antioch (spring-daytime) | 0.83 | **482** |
| 2004 | Outdoor school, MN | 0.05 | **29** |
| 2008 | Ann Arbor, MI Ypsilanti, MI Dearborn, MI (summer/winter) | 0.02/0.05 0.04/0.03 0.03/0.08 | **12/29 23/17 17/47** |

These measured US air concentrations were compared to the men of Dr. Sahu's reported concentrations (0.00172 µg/m$^3$).  All ratios were rounded off whole integers.

It appears that styrene, like TCE and PCE, was present in outdoor air at higher levels before the year 2000 than in more recent years.  Although the easily obtained data shown above is limited, **all measured values were more than 1-3 orders of magnitude higher than those estimated for the Golf channel by Dr. Sahu.**  So, it is highly unlikely that the Golf Channel estimates were actually higher than those common to ambient air in Florida as Dr. Sahu has suggested.  More importantly, and as is discussed in Appendix H, indoor air exposure levels for the three VOCs of

concern to Plaintiffs are greater than those found in outdoor air.  In fact, as shown in Appendix H, even a person's exhaled breath may contain higher concentrations of styrene.

## 2.4      VOCs Present in Indoor Air Microenvironments

A major flaw in the Plaintiffs' allegations is their focus on the outdoor air concentrations of 5 CoCs they allege come from the Defendant's property.  The three VOC chemicals have long been present in indoor air environments at levels higher than those estimated by Dr. Sahu.  This is because there are indoor sources that add to the levels present in the outdoor air (see Appendix H).  In addition, most individuals spend more time in indoor microenvironments.  And many individuals who like the Plaintiffs work indoors will typically spend about 90% or more of their time indoors.  Because indoor air contains higher concentrations of most VOCs, and typically contains a larger number of different chemicals, indoor air represents a greater exposure to the VOCs and HAPs in our air environments and it generates the larger portion of the total daily inhalation dose for these compounds.

Appendix H summarizes some of the currently available data on indoor air exposure levels for some chemicals known both as VOCs and HAPs.  But as noted in that appendix, the number of chemicals and their respective concentrations may vary across studies, in part because each study selects different target chemicals to measure, and in part because different detection limits may exist for the analytical method used relative the size of the air sample collected.  For all studies described below the number of chemicals reported is just a subset of the different chemicals that likely were actually measured and/or possibly present in the air sampled.

### 2.4.1    The USEPA's TEAM Studies

The USEPA initiated its TEAM (Total Exposure Assessment Methodology) studies because recent studies had suggested indoor air posed the greater chemical exposure hazard for many VOC chemicals.  The intended goal of the TEAM program was to provide information that would allow for a more accurate estimation of the public's total exposure to selected toxic/hazardous chemicals present in our ambient environments. The approach used by the USEPA was to select participants having a predetermined probability that would generate a representative assessment of the chemical exposure levels for the entire population of that area.

Several consistent observations emerged from the TEAM studies and studies like them performed by scientists not affiliated with the USEPA.  One was the fact that because indoor air concentrations are higher for many VOCs, the personal monitoring data for an individual typically reflected their indoor air levels.  Second, because the personal monitoring data measures the average concentration of a chemical inhaled throughout the day, the exhaled breath measurements often taken also typically contain higher concentrations of VOCs than that person's outdoor air.

Third, ratios of the indoor/outdoor air concentrations of a chemical indicate which microenvironment posed the major source of exposure to that chemical. When the ratio was near 1.0 the predominant and perhaps sole source of the chemicals is the outdoor environment. When the ratio becomes greater than about 1.5, the indoor air environment represents the greater exposure to that chemical. Fourth, and somewhat surprisingly, the initial TEAM studies found that chemical concentrations measured in census tracts that were in close proximity to major point sources emitting a particular chemical were not significantly different from those in census tracts farther away. So, distance from a point source was not a significant determinant of the air concentration of the chemical within the general area of the urban environment.

To illustrate these concepts data for one of the earliest of the TEAM studies summarized in Appendix H is reproduced below in Tables 11A-C. These tables show the rank order of measured chemical concentrations are generally Personal > Breath $\geq$ Outdoor air.

### Table 11A

**Overnight Personal Air VOC Concentrations ($\mu$g/m$^3$) in Bayonne/Elizabeth Residents**

| VOC | Mean | Median | 75th percentile | 95th percentile |
|---|---|---|---|---|
| Chloroform | 8.73 | 3.30 | 7.90 | 24.0 |
| 1,1,1-Trichlorethane | 113 | 16.9 | 38.0 | 180.0 |
| Benzene | 29.7 | 15.0 | 32.0 | 73.0 |
| Carbon Tetrachloride | 13.9 | 1.50 | 2.44 | 18.0 |
| **TCE** | 7.27 | 2.25 | 4.80 | 22.5 |
| **PCE** | 11.3 | 6.35 | 12.0 | 35.0 |
| **Styrene** | 2.68 | 1.75 | 3.0 | 6.20 |
| Dichlorobenzene | 56.0 | 3.80 | 13.0 | 260.0 |
| Ethylbenzene | 12.6 | 6.3 | 12.0 | 35.0 |
| o-xylene | 15.7 | 4.9 | 8.7 | 27.0 |
| m,p-xylene | 54.6 | 14.0 | 25.0 | 87.0 |

Adapted from Wallace (1986).

### Table 11B

**Breath VOCs Concentrations ($\mu$g/m$^3$) of Bayonne/Elizabeth Residents**

| VOC | Mean | Median | 75th percentile | 95th percentile |
|---|---|---|---|---|
| Chloroform | 3.12 | 1.80 | 3.70 | 11.5 |
| 1,1,1-Trichlorethane | 15.0 | 6.60 | 13.0 | 42.0 |
| Benzene | 18.7 | 12.0 | 24.0 | 56.0 |
| Carbon Tetrachloride | 1.31 | 0.69 | 2.25 | 20.0 |
| **TCE** | 1.77 | 0.88 | 1.80 | 5.9 |
| **PCE** | 13.3 | 6.80 | 12.9 | 44.0 |

| VOC | Mean | Median | 75th percentile | 95th percentile |
|---|---|---|---|---|
| **Styrene** | 1.15 | 0.79 | 1.25 | 3.0 |
| Dichlorobenzene | 8.10 | 1.30 | 3.50 | 44.0 |
| Ethylbenzene | 4.58 | 2.90 | 5.30 | 12.0 |
| o-xylene | 3.35 | 2.20 | 3.70 | 9.2 |
| m,p-xylene | 8.95 | 6.36 | 11.0 | 21.0 |

Adapted from Wallace (1986)


**Table 11C**

**Overnight Outdoor Air VOCs Concentrations ($\mu g/m^3$) of Bayonne/Elizabeth Residents**

| VOC | Mean | Median | 75th percentile | 95th percentile |
|---|---|---|---|---|
| Chloroform | 1.22 | 0.66 | 1.40 | 4.80 |
| 1,1,1-Trichlorethane | 5.41 | 4.50 | 8.40 | 12.0 |
| Benzene | 8.61 | 6.70 | 11.0 | 24.0 |
| Carbon Tetrachloride | 1.16 | 0.81 | 1.30 | 2.50 |
| **TCE** | 2.13 | 1.30 | 3.0 | 7.50 |
| **PCE** | 3.72 | 2.60 | 4.10 | 15.0 |
| **Styrene** | 0.90 | 0.61 | 0.94 | 2.80 |
| Dichlorobenzene | 1.54 | 1.20 | 1.69 | 4.0 |
| Ethylbenzene | 3.76 | 2.90 | 5.30 | 11.0 |
| o-xylene | 3.97 | 2.90 | 5.50 | 11.0 |
| m,p-xylene | 11.0 | 9.90 | 16.0 | 26.0 |

Adapted from Wallace (1986).


Appendix H summarizes a number of studies that provide measured VOC concentrations in indoor air environments, personal monitoring samples that provide an average exposure concentration from the individual's different activities and environments, exhaled breath, and sometimes concurrent outdoor air measurements.  The measured concentrations for four of the chemicals that were reported in a number of these studies are listed in the Table 12.


**Table 12**

**Personal Air Concentrations of Studies Reviewed in Appendix H**

| A. Personal Monitoring Measurements | | | | |
|---|---|---|---|---|
| **Study** | **Benzene** | **Styrene** | **TCE** | **PCE** |
| Wallace (1986) - median | 15.0 | 1.75 | 2.25 | 6.35 |
| Hartwell et al. (1987)<br>- lowest median for Elizabeth/Bayonne, NJ* | 3.9 | 1.20 | | 5.90 |
| Hartwell et al. (1987)<br>- lowest median for Los Angeles, CA* | 7.20 | 1.50 | | 3.40 |

| A. Personal Monitoring Measurements | | | | |
|---|---|---|---|---|
| **Study** | **Benzene** | **Styrene** | **TCE** | **PCE** |
| Hartwell et al. (1987)<br>- median for Pittsburg/Antioch, CA* | 6.30 | 0.83 | | 2.2 |
| Wallace et al. (1987)<br>- median for Greensboro, NC | 9.8 | 1.4 | 1.5 | 3.3 |
| Wallace et al. (1987)<br>- median for Devils Lake, SD | | | 0.50 | 5.0 |
| Clayton et al. (1999)<br>- median Region 5 state measurements | 5.37 | | 0.63 | 1.98 |
| Heavener et al. (1996)<br>- median of nonsmoking/smoking homes | 2.97/3.87 | 0.98/1.05 | 0.24/0.22 | 1.87/2.01 |
| Heavener et al. (1996)<br>- median nonsmoking/smoking workplaces | 2.16/3.81 | 1.64/1.91 | 1.30/0.70 | 1.38/2.31 |
| Adegate et al. (2004)<br>- median (school children) | 1.8 | 0.5 | 0.25 | 0.40 |
| Sax et al. (2006)<br>- (means) NY students | (3.82) | (1.22) | (1.78) | (8.75) |
| Sax et al. (2006)<br>- (means) LA students | (4.64) | (1.13) | (0.26) | (2.64) |
| **B. Home Indoor Air Measurements** | | | | |
| **Study** | **Benzene** | **Styrene** | **TCE** | **PCE** |
| Clayton et al. (1999)<br>- measurements from Region 5 states | 4.35 | | 0.56 | 1.89 |
| Adegate et al. (2004)<br>- median (school children) | 2.15 | 0.75 | 0.25 | 0.45 |
| Dawson and McAlary (2005)<br>- mean of 18 study medians | 2.5 | | 0.30 | 1.8 |
| Sax et al. (2006)<br>- (means) for NY students | (2.75) | (0.98) | (0.90) | (6.60) |
| Sax et al. (2006)<br>- (means) LA students | (3.87) | (1.10) | (0.22) | (2.04) |
| Batterman et al. (2007)<br>- (mean) value | (2.0) | (1.0) | | (0.6) |
| Jia et al (2008)<br>- median summer Ann Arbor, MI | 0.94 | 0.17 | (0.03) | 0.28 |
| Jia et al (2008)<br>- median summer Ypsilanti, MI | 1.05 | 0.43 | (0.07) | 0.28 |
| Jia et al (2008)<br>- median summer Dearborn, MI | 1.25 | 0.32 | (0.04) | 0.59 |
| **C. Outdoor Air Measurements** | | | | |
| **Study** | **Benzene** | **Styrene** | **TCE** | **PCE** |
| Wallace (1986) - median | 6.70 | 0.61 | 1.30 | 2.60 |
| Hartwell et al. (1987)<br>- lowest median for Elizabeth/Bayonne, NJ* | 5.30 | 0.36 | | 3.30 |
| Hartwell et al. (1987)<br>- lowest median for Los Angeles, CA* | 3.10 | 0.63 | | 1.70 |
| Hartwell et al. (1987)<br>- median for Pittsburg/Antioch, CA* | 1.30 | 0.18 | | 0.24 |
| Wallace et al. (1987)<br>- median for Greensboro, NC | 0.4 | 0.1 | 0.2 | 0.7 |
| Wallace et al. (1987) | | | | |

| A. Personal Monitoring Measurements | | | | |
|---|---|---|---|---|
| **Study** | **Benzene** | **Styrene** | **TCE** | **PCE** |
| - median for Devils Lake, SD | | | | 0.69 |
| Clayton et al. (1999) - medians from Region 5 states | 2.92 | | 0.32 | 1.24 |
| Adegate et al. (2004) - median (school children) | 1.20 | 0.05 | 0.25 | 0.25 |
| Sax et al. (2006) - (means) for NY students | (1.82) | (0.30) | (0.24) | (4.69) |
| Sax et al. (2006) - (means) LA students | (3.32) | (0.65) | (0.12) | (1.69) |
| Jia et al (2008) - median summer Ann Arbor, MI | 0.70 | 0.01 | (0.04) | 0.18 |
| Jia et al (2008) - median summer Ypsilanti, MI | 0.72 | 0.02 | (0.05) | 0.11 |
| Jia et al (2008) - median summer Dearborn, MI | 0.93 | 0.03 | (0.04) | 0.28 |

\* Represents the daytime measurement in this study.

The measured concentrations in Table 12 are reproduced in Table 13 (found on the next two pages) and were used to calculate the ratio of the study median (or mean) concentration to the Golf Channel median (or mean) concentration.

**Table 13**

**Median (Mean) Concentrations of VOCs Measured in Different Studies and the Ratios of these Measurements to the Respective Value for the Golf Channel Dataset**

| A. Personal Monitoring Measurements | | | | | | |
|---|---|---|---|---|---|---|
| Study | Styrene | | TCE | | PCE | |
| | $\mu g/m^3$ | > GC median (mean) | $\mu g/m^3$ | > GC median (mean) | $\mu g/m^3$ | > GC median (mean) |
| Wallace (1986) | 1.75 | **1042** | 2.25 | **2823** | 6.35 | **343** |
| Hartwell et al. (1987) E/B | 1.20 | **714** | | | 5.90 | **319** |
| Hartwell et al. (1987) LA | 1.50 | **893** | | | 3.40 | **184** |
| Hartwell et al. (1987) P/A | 0.83 | **494** | | | 2.2 | **119** |
| Wallace et al. (1987) NC | 1.4 | **833** | 1.50 | **1882** | 3.3 | **178** |
| Wallace et al. (1987) SD | | | 0.50 | **627** | 5.0 | **270** |
| Clayton et al. (1999) | | | 0.63 | **790** | 1.98 | **107** |
| Heavener et al. (1996) nonsmoking homes | 0.98 | **583** | 0.24 | **301** | 1.87 | **101** |
| Heavener et al. (1996) smoking | 1.05 | **625** | 0.22 | **276** | 2.01 | **109** |
| Heavener et al. (1996) nonsmoking workplaces | 1.64 | **976** | 1.30 | **1631** | 1.38 | **75** |
| Heavener et al. (1996) Smoking workplaces | 1.91 | **1137** | 0.70 | **878** | 2.31 | **125** |
| Adegate et al. (2004) | 0.5 | **298** | 0.25 | **314** | 0.40 | **22** |
| Sax et al. (2006) NY | (1.22) | **(705)** | (1.78) | **(1941)** | (8.75) | **(295)** |
| Sax et al. (2006) LA | (1.13) | **(653)** | (0.26) | **(284)** | (2.64) | **(64)** |

25

| B. Indoor Air Measurements | | | | | | |
|---|---|---|---|---|---|---|
| Study | Styrene | | TCE | | PCE | |
| | µg/m³ | > GC median (mean) | µg/m³ | > GC median (mean) | µg/m³ | > GC median (mean) |
| Clayton et al. (1999) | | | 0.56 | **703** | 1.89 | **102** |
| Adegate et al. (2004) | 0.75 | **446** | 0.25 | **314** | 0.45 | **24** |
| Dawson/McAlary (2005) | | | 0.30 | **376** | 1.8 | **97** |
| Sax et al. (2006) NY | (0.98) | **(566)** | (0.90) | **(981)** | (6.60) | **(222)** |
| Sax et al. (2006) LA | (1.10) | **(636)** | (0.22) | **(240)** | (2.04) | **(69)** |
| Batterman et al (2007) | 1.0 | **595** | | | 0.6 | **32** |
| Eklund et al. (2008) | (0.2) | **(116)** | (0.8) | **(872)** | 26 | **1405** |
| Jia et al (2008) AA | 0.17 | **101** | (0.03) | **(33)** | 0.28 | **15** |
| Jia et al (2008) Y | 0.43 | **256** | (0.07) | **(76)** | 0.28 | **15** |
| Jia et al (2008) DB | 0.32 | **190** | (0.04) | **(44)** | 0.59 | **32** |
| **C. Outdoor Air Measurements** | | | | | | |
| Study | Styrene | | TCE | | PCE | |
| | µg/m³ | > GC median (mean) | µg/m³ | > GC median (mean) | µg/m³ | > GC median (mean) |
| Wallace (1986) - median | 0.61 | **363** | 1.3 | **1,631** | 2.60 | **141** |
| Hartwell et al. (1987) E/B | 0.36 | **214** | | | 3.30 | **178** |
| Hartwell et al. (1987) LA | 0.63 | **375** | | | 1.70 | **92** |
| Hartwell et al. (1987) P/A, | 0.18 | **107** | | | 0.24 | **13** |
| Wallace et al. (1987) NC | 0.1 | **60** | 0.2 | **251** | 0.7 | **38** |
| Wallace et al. (1987) SD | | | | | 0.69 | **37** |
| Clayton et al. (1999) | | | 0.32 | **402** | 1.24 | **67** |
| Adegate et al. (2004) | 0.05 | **30** | 0.25 | **314** | 0.25 | **14** |
| Sax et al. (2006) NY | (0.30) | **(173)** | (0.24) | **(262)** | (4.69) | **(158)** |
| Sax et al. (2006) LA | (0.65) | **(376)** | (0.12) | **(131)** | (1.69) | **(57)** |
| Jia et al (2008) AA | 0.01 | **6** | (0.04) | **(44)** | 0.18 | **10** |
| Jia et al (2008) Y | 0.02 | **12** | (0.05) | **(55)** | 0.11 | **6** |
| Jia et al (2008) DB | 0.03 | **18** | (0.04) | **(44)** | 0.28 | **15** |

All numbers in parentheses represent mean values rather than a median values.

The ratios in Table 13 again emphasize Plaintiffs' alleged Golf Channel exposures to these three VOCs would virtually certainly have been substantially smaller by comparison to their exposures to these chemicals in indoor air or an individual's daily average exposure concentration as indicated by the personal monitor data. And again, the outdoor air TCE and PCE concentrations reported in the more recent of these studies (from 1999 on) are essentially the same as those reported for Florida air in Table 3.

Also included in Appendix H are summaries of studies measuring chemical concentrations in the exhaled breath of study participants. One of these studies is reproduced here because it involved PCE, while many other studies examine both exogenous and endogenous chemicals expelled in our exhaled breath. The study by Liu et al. (2022) measured PCE in the exhaled breath of residents living in the area of Martinsville, Indiana. The goal of the study was to investigate the possibility that increases in PCE exposure via vapor intrusion from PCE groundwater plumes in the area could be detected by an individual's breath concentrations of PCE. The authors concluded

there were no significant differences between the breath PCE concentrations measured for individuals living within a plume area versus those living outside the plume areas. Perhaps this was due to the small numbers collected for those living outside the plume. Nonetheless, of interest in this case are the breath PCE concentrations themselves. Because as will be shown in a subsequent section of this report the Plaintiffs' lifetime risks from the alleged PCE exposure they wish to attribute to Defendant were all less than $10^{-9}$. This Table 14 is another and more recent illustration of why past total and indoor air PCE exposures are a key consideration for the Plaintiffs as **just the exhaled breath air in this study poses a far greater risk from PCE than does Plaintiffs alleged PCE exposures from the Defendant**. And at the average concentration measured in the control adult group, the average person in this control group exceeds all of the plaintiffs' PCE risks in about 21 days.

**Table 14**

**PCE Breath Concentrations ($\mu g/m^3$) Measured in Martinsville Indiana Residents**

| Type of Resident (N) | Mean PCE Breath Concentration | Median PCE Breath Concentration | Increase > Dr. Sahu's Mean PCE Value | Increase > Dr. Sahu's Median PCE Value | Lifetime Risk for the Average Breath* Concentration |
|---|---|---|---|---|---|
| Inside Plume (15) | 6.8 | 4.5 | 228x | 243x | $1.5 \times 10^{-6}$* |
| Outside of Plume (3) | 3.9 | 3.8 | 131x | 205x | $1 \times 10^{-6}$* |
| Control Adults (44) | 4.6 | -- | 155x | -- | $1.2 \times 10^{-6}$ |

Adapted from Liu et al. (2022). * This risk was calculated using the average of the mean and median concentrations.

### 2.4.2   Summary

More than thirty years ago the USEPA initiated studies intending to estimate the average person's total exposure to the HAPs and other VOCs typically present in our outdoor air. The results of these and other studies are routinely discussed in the environmental exposure sections of key toxicological reviews like those published by IARC, the USEPA, and ATSDR. Thus, it is both curious and surprising that evidently none of the Plaintiffs' experts consulted documents like these to understand the actual magnitude of Dr. Sahu's exposure estimates before rendering their opinions. Instead they adopted his "background ratios" as though this was an actual indication these exposures were unusually high. But as I have shown using the "Sahu background ratios" suggests all areas in Florida have incurred unusually high environmental exposure to these same chemicals, when in fact the levels estimated for the Golf Channel are typical of the outdoor air in this state and elsewhere within the United States.

More importantly, the findings of TEAM studies and others like them fundamentally impact the Plaintiffs' claims three ways. First, it is clear the mean or median levels of styrene, TCE, and

27

PCE reported in the past represent exposures incurred by all of us that were higher when these studies were initiated than they are today. Second, it is clear that indoor environments have always posed a greater source of exposure to these three VOCs than outdoor air. For people that work indoors, like the Plaintiffs did, indoor air exposure provides the dominant total exposure and largest portion of the daily dose to these chemicals. For example, based on early TEAM study findings Wallace estimated the indoor air exposure to TCE and PCE accounted for 75% and 78%, respectively, of the total exposure to the two chemicals (Wallace, 1990, Wallace, 1993). In fact, in the discussion section of his 1990 review discussing benzene, PCE, and dichlorobenzene exposures in the environment, Wallace stated the USEPA's major problem for improving air quality was indoor air, stating (Wallace, 1990; emphasis added):

> *For each of the **three chemicals** discussed above, the traditional sources of emissions (mobile sources, industry) have accounted for only 2-20% of total human exposure. This same conclusion has been documented for a number of other volatile organic chemicals: **styrene,** xylenes, ethylbenzene, trimethylbenzenes, chloroform, **trichloroethylene**, α-pinene, limonene, decane, undecane, etc. For most of these chemicals, the major sources of exposure have been identified (personal activities, consumer products, building materials) but cannot be regulated under existing environmental authorities.*

> ***This situation has led to a peculiar perception of risk. The public perceives indoor air pollution as considerably less risky than, say hazardous wastes sites (environment, August 1988) whereas experts at EPA put indoor air and consumer products exposure at the top of the list of health risks***, *with hazardous waste sites near the bottom. Nonetheless, the amount of resources devoted to these two problems reflect the public perception, not that of the experts.*

The third impact that the TEAM and related indoor air studies have on the Plaintiffs' allegations is the fact that indoor air contains many other HAPs and carcinogens as well. For example, the studies in Appendix H report exposures we all incur for a lifetime to benzene, 1,2-butadiene, carbon tetrachloride, and methylene chloride to name but a few. Ignoring dietary carcinogens ignores more carcinogens and possible causes of the Plaintiffs' diseases based on Plaintiffs' experts' opinions, including their theories of biological plausibility. In fact, Wallace's 1993 review noted estimates of the lifetime cancer risks from all VOC exposures fell in the $10^{-3}$ risk range and that risk estimates for our daily exposures to pesticides fell in the $10^{-4}$ risk range. Thus, like my example using PCE breath levels in Table 14, the Plaintiffs' risks posed by the alleged exposures to the 5 COCs are small and *de minimis* when compared to their total environmental exposures to these and other carcinogenic or potentially carcinogenic substances. But Plaintiffs' medical experts performed their analyses after focusing only on the small exposures that Dr. Sahu erroneously suggested were elevated. They failed to even consider the importance of past

exposures to these same chemicals and ignored past and concurrent exposures to additional carcinogens that are characteristically comparable to the 5 COCs and are known to be ubiquitous to our indoor and outdoor microenvironments. Neither the cause of, nor the contribution to, the plaintiffs' diseases can be adequately evaluated in this manner.

**2.5    Air Monitoring Data for Orange County and Within the United States**

As indicated earlier, after discussing the issue of air data the USEPA has collected in Florida with Defendants air modeling experts, I asked Michael Ballinger for his assistance.  He provided me with the following figures which are found in his report.  These figures clearly show Dr. Sahu's model-estimated concentrations for the Golf Channel were well within Florida's ambient exposure ranges for these chemicals, and further illustrate the specious nature of Dr. Sahu's "background ratios" and his suggestion that the Plaintiffs' had been exposed to unusually high concentrations of these chemicals, when in fact they had not.

In each of the following Figures 1A-1E the shaded blue represents the range for the 10th to 90th percentile of U.S. concentrations.  The purple lines represent Orange county measurements by year, the black line is the corresponding National median value for that year, and the green line is Dr. Sahu's model-estimated annual average concentration.

**Figure 1A. Comparison of Dr. Sahu's Modeled Results of Styrene to EPA's Air Monitoring Archive Data**



**Figure 1B. Comparison of Dr. Sahu's Modeled Results of PCE to EPA's Air Toxics Trends**



**Figure 1C. Comparison of Dr. Sahu's Modeled Results of TCE to EPA's Air Toxics Trends**



**Figure 1D. Comparison of Dr. Sahu's Modeled Results of Arsenic to EPA's Air Toxics Trends**



**Figure 1E.  Comparison of Dr. Sahu's Modeled Results of Chromium to EPA's Air Toxics Trends**



**3.0    Arsenic and Chromium**

**3.1    Arsenic**

**3.1.1   Dr. Sahu's Model-Estimated Arsenic Concentrations at the Golf Channel**

As with the other VOCs in this case, in his report Dr. Sahu states that the ratios he calculates (shown in his Table 22) to represent arsenic exposures in outdoor air at the Golf Channel exceed the background levels of arsenic that are experienced daily in Florida (represented by his use of the NATA modeled data as background). But like the VOCs in this case, the levels of arsenic modeled by Dr. Sahu for Golf Channel outdoor air are not unusual or high when compared to normal background levels and our daily doses of this element. Dr. Sahu's model-estimated annual average levels of arsenic at the Golf Channel for the period 1995 through 2020 (his Table 20), are reproduced in Table 15. In addition, I calculated the minimum, maximum, mean, and median concentrations of arsenic for the Sahu dataset.

**Table 15**

**Dr. Sahu's Model-Derived Outdoor Air Arsenic Concentrations at the Golf Channel**

| Year | Arsenic ($\mu$g/m$^3$) |
|---|---|
| 1995 | 1.89E-04 |
| 1996 | 2.80E-04 |
| 1997 | 2.42E-04 |
| 1998 | 1.86E-04 |
| 1999 | 1.80E-04 |
| 2000 | 4.52E-05 |
| 2001 | 8.37E-05 |
| 2002 | 7.16E-05 |
| 2003 | 7.00E-05 |
| 2004 | 1.36E-04 |
| 2005 | 1.00E-04 |
| 2006 | 1.23E-04 |
| 2007 | 1.21E-04 |
| 2008 | 1.88E-04 |
| 2009 | 2.12E-04 |
| 2010 | 1.59E-04 |
| 2011 | 2.34E-04 |
| 2012 | 1.99E-04 |
| 2013 | 2.96E-03 |

| Year | Arsenic ($\mu g/m^3$) |
|---|---|
| 2014 | 6.33E-03 |
| 2015 | 2.63E-03 |
| 2016 | 3.88E-03 |
| 2017 | 2.52E-03 |
| 2018 | 0.00E+00 |
| 2019 | 0.00E+00 |
| 2020 | 0.00E+00 |
| **Minimum** | **0.00E+00** |
| **Maximum** | **6.33E-03** |
| **Mean** | **8.13E-04** |
| **Median** | **1.83E-04** |

Source: Adapted from Dr. Sahu's Table 20.

In this matter, Dr. Sahu is claiming the Golf Channel Plaintiffs' alleged exposures to arsenic from Defendant's emissions were far above the median "background" exposures of arsenic he predicted for Florida based on modeled Florida NATA concentrations. Dr. Sahu stated that the USEPA NATA median annual average level of arsenic for Florida is $1.72 \times 10^{-5}$ $\mu g/m^3$. However, as I have stated earlier, the best indicator of exposures are actual ambient air measurements taken for that chemical in outdoor air samples collected in that area or in surrounding areas like it. I retrieved air monitoring data from air monitoring stations located in Florida. I selected the two closest air monitoring stations to the Lockheed site, one located in Winter Park, Florida, and the other located on Primrose Avenue in Orlando, Florida. In Table 16, the yearly ambient air levels of arsenic measured at these two locations are listed and compared to Dr. Sahu's NATA model-derived median value he used for his "hypothetical arsenic background ratio calculations."

**Table 16**

**Outdoor Air Concentrations of Arsenic Measured at Winter Park, Florida and Primrose Avenue, Florida**

| Year of Measurement | Winter Park's Arsenic Levels ($\mu g/m^3$) | Winter Park's Arsenic/SMV[#] | Primrose Avenue's Arsenic Levels ($\mu g/m^3$) | Primrose Park's Arsenic/SMV[#] |
|---|---|---|---|---|
| 2008 | | | 0.00077 | **45** |
| 2009 | | | 0.00072 | **42** |
| 2010 | | | 0.00058 | **34** |
| 2011 | | | 0.00062 | **36** |
| 2012 | 0.00095 | **55** | | |
| 2013 | 0.00073 | **42** | | |
| 2014 | 0.00083 | **48** | | |

| Year of Measurement | Winter Park's Arsenic Levels (µg/m³) | Winter Park's Arsenic/SMV[#] | Primrose Avenue's Arsenic Levels (µg/m³) | Primrose Park's Arsenic/SMV[#] |
|---|---|---|---|---|
| 2015 | 0.00062 | **36** | 0.00062 | **36** |
| 2016 | 0.00052 | **30** | 0.00052 | **30** |

Note: Blank cells indicate data was not reported for that year. SMV: Sahu's median background arsenic value listed in his Table 21 (0.0000172 µg/m³). #This ratio shows how many times higher the recorded value was compared to Dr. Sahu's hypothetical NATA-derived background level for arsenic.

As the preceding table shows, if one uses Dr. Sahu's assumed background arsenic (NATA, modeled) level then the two locations in/near Orlando, FL, would be assumed to have "elevated" levels of arsenic during the same time period of interest in this case. **The ratios of Winter Park's and Primrose Avenue's arsenic air levels ranged from 30- to 55-fold and 30- to 45-fold, respectively, for the years measured**. This shows that the NATA modeled data chosen by Dr. Sahu for arsenic was far lower than the actual measured outdoor air levels of arsenic near the Golf Channel area where the Plaintiffs worked. And as was shown earlier with the VOCs, the levels recorded at the air monitoring stations in Orlando and Winter Park are similar to the levels measured elsewhere in the within Florida (see Table 17). So, even if one assumed Dr. Sahu's modeled concentrations were correct and they were adding the ambient air levels of arsenic in this area, the total arsenic concentration would still be less than the average measured at Pinellas Park (1.47-vs-1.67) and would represent only 25% increase against the Florida mean concentration of 1.16 ng/m³.

**Table 17**

**Measured Outdoor Air Concentrations of Arsenic in Florida**

| Monitor Location by city | Land Use Type/ Location-Setting | Arsenic (µg/m³) |
|---|---|---|
| Tampa - USMC Reserve (5) | Commercial/Suburban | 8.22E-04 |
| Orlando (6) | Commercial/Suburban | 6.40E-04 |
| Winter Park (5) | Commercial/Urban | 7.30E-04 |
| Saint Petersburg - Azalea Park (12) | Residential/Suburban | 1.20E-03 |
| Valrico (13) | Residential/Rural | 1.19E-03 |
| Pinellas Park (12) | Residential/Suburban | 1.67E-03 |
| **Mean for All Florida** | | **1.16E-03** |

I will now compare the hypothetical "dose" from the mean air concentration estimated by Dr. Sahu to the daily doses we all receive from other common sources of arsenic. Dr. Sahu's

estimated <u>mean</u> daily dose of arsenic would equate to 8.13 ng/day (0.00813 µg/day) based on the mean of the arsenic concentrations listed in his Table 20 and assuming an inhalation volume of 10 $m^3$ air during an 8-hour period. Similarly Dr. Sahu's corresponding <u>median</u> arsenic concentration would result in an arsenic dose 1.83 ng/day (or 0.00183 µg/day). By comparison, the ATSDR (2007) Toxicological Profile for Arsenic states the mean levels in ambient air in the United States in urban areas range from 20 to 30 ng/m³ with a range of daily intakes from 400 to 600 ng/day, or 49- to 74-fold higher than Dr. Sahu's modeled mean arsenic level, and 219- to 328-fold higher than the Golf Channel median dose. The average air in Florida would appear to be lower than elsewhere in United States given the measured levels in Table 17, yielding an average daily dose 23.2 ng/day. Still, the median value for the Sahu dataset poses a dose of 1.8 ng/day, or a dose more than 12-times lower.

### 3.1.2   Other Sources of Exposures to Arsenic and The Resulting Doses

Arsenic is a naturally occurring substance that is found in the Earth's crust. It can be found in ambient air, mainstream and environmental tobacco smoke, drinking water, food, commercial products, and occupational settings. It is found in the human body and can be found in hair, nail, teeth, toenails, and other various tissues (ATSDR, 2007). Arsenic compounds have been used historically in medicine. Inorganic arsenic was used as a therapeutic agent through the mid-twentieth century for conditions including chronic asthma, psoriasis, and leukemia. Inorganic arsenic used in Western medicine mostly ended in the 1970s, but renewed interest was shown in the use of arsenic trioxide, and it is currently used for the treatment of acute promyelocytic leukemia (ATSDR, 2007; TEVA, 2023). Other exposures and uses of arsenic can be found in Appendix G. Still, the main source of arsenic intake (focusing only on the more toxic form of arsenic, i.e., inorganic arsenic) is the diet, with some of our intake coming from drinking water. Figure 1 below shows the food types that contribute to total arsenic intake. Figure 2 shows the contributions of various food types to our total inorganic arsenic intake (Xue et al., 2010).



**Figure 2.** Contributions of food groups to inorganic arsenic intake. (Source: Xue et al., 2010).

Because dietary source of arsenic generates our largest daily doses of arsenic, the average daily intakes of inorganic arsenic reported in various studies are listed below in Table 18. The averages among studies vary depending on the population being evaluated and the assumptions made about the contribution of the food type (e.g., seafood vs. other food groups) to inorganic arsenic intake.

**Table 18**

**Mean Daily Dietary Intakes of Inorganic Arsenic**

| Exposure Scenario (Assumptions) | Daily arsenic intake based (μg/day)[#] | Ratio of daily arsenic intake/daily intake based on Dr. Sahu's estimate* | Source |
|---|---|---|---|
| Mean daily intake of iAs in 969 US men and women (Assumptions: iAs was 1.5% tAs in fish, 20% of tAs in shellfish, 100% of the tAs in all other foods) | 10.22 | 1,257 | MacIntosh et al. (1997) |
| Average daily intake of iAs for US adults | 14.0 | 1,722 | Yost et al. (1998) |
| Average daily intake of iAs for Canadians | Men – 12.7 Women – 8.1 | Men – 1,562 Women – 996 | Yost et al. (1998) |
| Range of average dietary iAs intakes for adults (FDA Total Diet Study, 1991-1997) Males & Females– age 25 to 70+ (Assumes 10% tAs in seafood and 100% in all other foods is iAs.) | 6.38-12.54 | 785-1,542 | Tao and Bolger (1998) |
| US mean exposure of iAs: Food | Men–3.56 Women–2.75 | Men–438 Women–338 | Meacher et al. (2002) |
| Mean intake of iAs in the United States diet (Schoof et al., 1999b) | 3.2 | 394 | as cited in ATSDR (2007) |
| Upper and lower bound intake of mean iAs for average consumers (based on data from 19 European countries) (Assumes iAs in 7 main food categories is 70% of tAs; and iAs is 0.03 mg/kg in fish and 0.1 mg/kg in seafood) | 9.1–39.2 | 1,193–4,822 | EFSA (2009) |
| Mean US adult iAs intake: Diet | 4.26 | 524 | Boyce et al. (2008) |
| Mean US iAs intake 20 to ≥50 yrs old: iAs daily intake from food[&] (Assumed to 10% of tAs in food was iAs) | 2.1 | 258 | Xue et al. (2010) |
| Range of mean dietary intake of iAs for adult groups (adults, elderly, very elderly; data from 17 European countries. (Used data that measured iAs in fish & seafood and that 70% tAs in other foods was iAs) | 6.3–26.6 | 749–3,272 | EFSA (2014) |

tAs: total arsenic; iAs: inorganic arsenic. [#]Based on body weight of 60 kg for females and 70 kg for males, where necessary. *Sahu's estimated mean daily dose of arsenic based on the concentrations listed in his Table 20 (mean = 0.000813 μg/m$^3$) and assuming inhalation of 10 m$^3$ air in an 8-hour period would equate to a reported 0.00813 μg/day intake of arsenic from Lockheed emissions. [&]Based on modeling for dietary arsenic with the Stochastic Human Exposure and Dose Simulation–Dietary (SHEDS-Dietary) model, based on data from the National Health and Nutrition Examination Survey. [@]9 different speciation scenarios for iAs ranging from 0% marine sources/100% terrestrial to 25% marine sources/50% terrestrial.

I calculated the average of these daily dietary inorganic arsenic values from the various studies in Table 18 to obtain an overall average daily inorganic arsenic dose from all of the studies. For studies that provided a range of means, I used the midpoint, and for studies that provided data for men and women, I calculated an average for that data. The average is 9.7 µg/day. Assuming a body weight of 70 kg, this would equate to an average daily dose of 0.00014 mg/kg-bw/day.  Then, applying the USEPA oral slope factor of 1.5 per mg/kg-day results in a lifetime cancer risk of 2 x $10^{-4}$. The daily dose of arsenic one would receive from inhaling 10 m³ of air containing Dr. Sahu's mean arsenic estimate would be 0.00813 µg/day. **This dose is 1,193-fold lower than the dose of inorganic arsenic one would receive just from the diet each day**.

Table 19 lists the total background arsenic risk from diet, air, and total risk for each Plaintiff.  The total background arsenic risk for each Plaintiff is then compared to their Golf Channel risks based on the outdoor air estimates generated by Dr. Sahu in Table 20.

**Table 19**

**Each Plaintiff's Total Dietary and Inhalation Dose**

| Plaintiff | Arsenic Risk Air Concentration* | Arsenic Risk from Diet** | Total Background Arsenic Risk |
|---|---|---|---|
| David Berry | 3.62E-06 | 1.52E-04 | 1.56E-04 |
| Brian Kemp | 2.94E-06 | 1.24E-04 | 1.27E-04 |
| Kristen Sheen | 3.03E-06 | 1.28E-04 | 1.31E-04 |
| Morgan Innes | 2.32E-06 | 9.75E-05 | 9.98E-05 |
| Wendy Stone | 2.91E-06 | 1.22E-04 | 1.25E-04 |
| N. Komatsu | 3.86E-06 | 1.62E-04 | 1.66E-04 |

*Exposure to mean Florida ambient air from Table 17 (1.16E-03 µg/m³) was multiplied times the unit risk factor of 4.3E-03 to get the lifetime risk. Each Plaintiff's specific risk was dependent on the age their cancer was diagnosed. ** The dietary risk accumulated by the time of their diagnosis was based on the average dietary intake of 9.7 µg/day.

**Table 20**

**Comparing Plaintiffs' Total Risks from Background Diet + Air Exposure to Arsenic to Risks from Arsenic Exposure Attributed to the Time Worked at the Golf Channel**

| Plaintiff | Total Background Risk from Inorganic Arsenic* | Total Golf Channel Risk from Arsenic** | Ratio of Total Background/Total GC |
|---|---|---|---|
| David Berry | 1.56E-04 | 1.90E-07 | 821 |
| Brian Kemp | 1.27E-04 | 1.69E-08 | 7,541 |
| Kristen Sheen | 1.31E-04 | 4.24E-08 | 3,079 |
| Morgan Innes | 9.98E-05 | 4.22E-07 | 237 |
| Wendy Stone | 1.25E-04 | 2.74E-08 | 4,573 |
| N. Komatsu | 1.66E-04 | 2.85E-07 | 581 |

*From Table 19. **From Section 4.0. The arsenic concentrations used here are Dr. Sahu's uncorrected model-estimates.

There are serious flaws in Dr. Sahu's model, as will be discussed in detail by Defendant's other experts. It is my current understanding the corrected exposure concentrations of arsenic are actually zero $\mu g/m^3$, in other words – no exposure to arsenic from the SLRC. And as discussed in Section 4.0 of my report, because there is no arsenic exposure attributable to SLRC, the cancer risks from arsenic are therefore zero. Therefore, none of the six above-mentioned Plaintiffs are at any increased cancer risk from arsenic that is attributable the SLRC.

## 3.2    Chromium

### 3.2.1    Dr. Sahu's Model-Estimated Chromium Concentrations at the Golf Channel

In this case Dr. Sahu also modeled hexavalent chromium (Cr6+) for the outdoor air at the Golf Channel to represent the Plaintiffs' alleged exposure to Defendant's emissions. The second column of Table 21 below provides the "Cr6+" air concentrations at the Golf Channel that Dr. Sahu modeled and provided in Table 22 of his report. As will be discussed in other Defendant expert reports, the concentrations and the composition (i.e., valence) of chromium in air were incorrectly characterized by Dr. Sahu. These errors led to an over-estimation of the total amount of chromium concentrations in the air as well as the types of chromium that might have been present in air (trivalent vs. hexavalent). In addition, it is my understanding that the chromium levels that Dr. Sahu modeled were actually a mixture of chromium compounds. Table 21 also shows the revised chromium compound concentrations provided by Dr. Ballinger. The difference between Dr. Sahu's modeled original numbers are up to ~18,000-fold higher than the corrected numbers ranges up, indicating that any cancer risks calculated from his initial chromium values would be serious over-estimates for the Plaintiffs.

## Table 21

### Dr. Sahu's Model-Derived Outdoor Air Cr6+ Concentrations at the Golf Channel

| Year | Dr. Sahu's "Cr6+" ($\mu g/m^3$)* | Revised Chromium Compounds ($\mu g/m^3$)** |
|---|---|---|
| 1995 | 8.91E-03 | 0.00E+00 |
| 1996 | 1.32E-02 | 7.30E-07 |
| 1997 | 1.15E-02 | 3.08E-06 |
| 1998 | 8.84E-03 | 1.99E-06 |
| 1999 | 8.55E-03 | 1.95E-06 |
| 2000 | 2.14E-03 | 4.38E-07 |
| 2001 | 3.95E-03 | 4.10E-07 |
| 2002 | 3.39E-03 | 5.64E-07 |
| 2003 | 3.31E-03 | 5.83E-07 |
| 2004 | 6.46E-03 | 1.12E-06 |

| Year | Dr. Sahu's "Cr6+" ($\mu g/m^3$)* | Revised Chromium Compounds ($\mu g/m^3$)** |
|---|---|---|
| 2005 | 4.76E-03 | 9.25E-07 |
| 2006 | 5.80E-03 | 8.55E-07 |
| 2007 | 5.74E-03 | 9.92E-07 |
| 2008 | 8.89E-03 | 1.23E-06 |
| 2009 | 1.01E-02 | 2.68E-06 |
| 2010 | 7.55E-03 | 1.37E-06 |
| 2011 | 1.11E-02 | 2.60E-06 |
| 2012 | 9.38E-03 | 8.34E-07 |
| 2013 | 2.35E-03 | 0.00E+00 |
| 2014 | 3.18E-03 | 3.63E-07 |
| 2015 | 2.45E-03 | 3.29E-07 |
| 2016 | 1.23E-03 | 8.43E-07 |
| 2017 | 1.47E-03 | 9.08E-07 |
| 2018 | 1.36E-03 | 2.36E-07 |
| 2019 | 1.86E-03 | 1.94E-06 |
| 2020 | 5.11E-05 | 1.28E-06 |
| **Minimum** | 5.11E-05 | 0.00E+00 |
| **Maximum** | 1.32E-02 | 3.08E-06 |
| **Mean** | 5.67E-03 | 1.09E-06 |
| **Median** | 5.25E-03 | 8.82E-07 |

*Dr. Sahu modeled chromium compounds.
**Dr. Ballinger modeled chromium compounds.
Source: Adapted from Dr. Sahu's Table 20 and Dr. Ballinger's table.

Dr. Sahu is claiming that the Golf Channel Plaintiffs reported $Cr^{+6}$ exposures from the Defendant's emissions were far above his median "background" exposure of arsenic he provided for Florida (based on modeled Florida NATA concentrations). In Table 21 of his report, Dr. Sahu provided a USEPA NATA median annual average background air concentration for hexavalent chromium for Florida of $3.78 \times 10^{-6} \mu g/m^3$ or $0.00378 ng/m^3$. Again, the best measures of exposures are actual ambient air measurements taken for a particular chemical collected in that area or in surrounding areas similar to it.

The United States (national) median for $Cr^{+6}$ measured in air for the years 2005-2012 ranges from 1.91E-02 to 3.93E-02 $\mu g/m^3$ based on the Air Toxics data site.[3]  By comparison, the median of the corrected Sahu chromium values of 8.82E-07 $\mu g/m^3$. This means that the Plaintiffs'

---

[3] https://gispub.epa.gov/air/trendsreport/2019/#air_toxics_trends.

exposure to chromium compounds would have been approximately 21,655- to 44,558-fold lower than the concentrations modeled by Dr. Sahu using his overestimated assumptions.

The average daily intake of hexavalent chromium has been estimated to range from 3E-05 to 9E-05 mg/kg/day (Health Canada, 2016; Thompson et al., 2023). Assuming a body weight of 70 kg, this would equal a daily dose of 2.1 to 6.3 µg/day. The dietary dose of the hexavalent chromium ranged between 192,661 and 577,982-times the daily inhalation dose any Plaintiff would have allegedly received while working at the Golf Channel (using the mean values of the corrected numbers in Table 21 or 1.09E-05 µg = 1.09E-06 µg/m³ x 10m³ air/workday).

## 4.0    Plaintiffs' Chemical Exposures and Risks

## 4.1    The Purpose of Following Regulatory Risk Estimates

Appendix C in my first report discussed in some detail the current regulatory risk assessment process but I will reiterate points made in this Appendix here for the convenience of the reader.   The USEPA's mission is the regulation of the chemical exposures that we incur each day from other various environments.   One way they accomplish this goal is by setting safe exposure guidelines and providing toxicity constants that can be used to estimate the potential risk associated with a specific exposure.   The USEPA risk assessment approach is controlled substantially by the precautionary principle which essentially means the uncertainties associated with both the exposure assessment and hazard assessment portions of the risk assessment is reduced by incorporating conservative (i.e., health-protective) procedures. This approach helps ensure Agency-recommended exposure guidelines have reduced the potential risk of the exposure to an acceptably safe level even for sensitive subpopulations.   The outcome of these conservative procedures is ultimately the derivation of a health-protective dose and exposure guidelines.   But the procedures they have adopted also mean their exposure guidelines do not predict the actual human health outcome, a fact the agency has conceded (see Appendix C for more discussion on this issue).   Instead, USEPA risk assessment procedures are designed to provide a reasonable degree of confidence that any exposure at or below the allowable level will be safe because of the conservative, health protective measures incorporated into that exposure guideline.   However, the exposure guidelines derived from these risk assessments do not estimate the degree of potential harm, if any, that might be associated with those exposures that are above the guideline.   This would require a different kind of analysis.   Given this, it becomes clear that the only scientifically valid use of these risk assessment procedures, and the risk estimates generated by them, is to either exclude concern for the exposure or to exclude a particular chemical as the likely or possible cause of a particular effect.   Here, the conservative exaggeration of risk associated with them means that when the hypothetical risks are shown to be sufficiently small or *de minimis* (e.g., within or below the acceptable risk range), the knowledge that they are more likely even smaller than the value being shown allows one to comfortably exclude that exposure as a possible cause of an individual's disease.   In contrast, and like any screening tool, where the theoretical estimate of risk is high and

possibly of some health concern, the uncertainty and exaggeration of risk associated with the theoretical number calculated means that the user cannot be certain whether a hazard is present, or whether the exposure is still adequately safe but contains a smaller margin of safety.  In this situation, the risk assessor or the scientist/physician using these hypothetical risk estimates must go back and develop a more critical and reliable analysis that reduces the uncertainty and exaggeration associated with USEPA default procedures.

To summarize, regulatory risk assessments are "protective" but not "predictive"; therefore, their only legitimate use in a toxic tort case like this one is to determine if health concerns for the alleged exposures can be reasonably excluded because they represent an acceptably low risk.  This kind of assessment will be performed in this section of my report.

**4.2    A Brief Explanation of the Regulatory Risk Assessment Procedures**

As described in more detail in Appendix C, the safety or risk of an exposure can be assessed for both non-cancer and cancer endpoints, but the assessment methods, outputs, and how they are interpreted are different.  For airborne carcinogens the air exposure concentration is multiplied by a unit risk factor to calculate the risk.  The USEPA's inhalation unit risk factors (IURs) are derived in concentration units of $\mu g/m^3$, and represent the risk associated with a lifetime of exposure (70 years) to a 1.0 $\mu g/m^3$ concentration.  For example, if chemical X had an inhalation IUR of $3 \times 10^{-6}$ $\mu g/m^3$, and if the average lifetime exposure concentration of the exposed individual was 1.5 $\mu g/m^3$, then the estimated risk would be $4.5 \times 10^{-6}$.  This risk would mean that no more than 4.6 excess tumors would be expected to develop per 1,000,000 people exposed, if their exposures were all day, every day, for a lifetime.  As seen elsewhere in this report, a cancer risk of this magnitude may be expressed three ways.  These are as 4.5 cases per 1,000,000 (or 4.5/1,000,000) or it may also be expressed as $4.5 \times 10^{-6}$ or when using scientific notation as is typically used performing calculations as 4.5E-06.  All three risk expressions are equivalent to the same level of risk.  IURs (and cancer slope factors used for oral exposures) are determined by the USEPA for compounds they conclude to be carcinogenic.  They are based on specific target organs observed in either animal species (e.g., based on rodent bioassays) or humans (e.g., from occupational studies involving high exposures).

For non-cancer endpoints, the relative safety of a chemical concentration is determined by calculating the Hazard Quotient (HQ) for that level of exposure.  The HQ is simply a ratio created by dividing the exposure concentration of the chemical by its respective USEPA reference concentration (RfC), or the dose divided by the reference dose (RfD) for oral exposures (USEPA, 1989).  Equations 1 and 2 below how this kind of calculation is performed:

$$HQ = \frac{C}{RfC} \qquad [\text{Eq. 1}]$$

$$or$$

$$HQ = \frac{D}{RfD} \qquad [Eq.\ 2]$$

Where:

HQ = hazard quotient
D = dosage (mg/kg-day) estimated to result from exposure via the relevant route
C = concentration determined from exposure assessment measuring/estimating the level of exposure
RfD = Reference dose (mg/kg-day)
RfC = Reference concentration (mg/m$^3$)

The RfCs and RfDs used to calculate the HQs associated with different chemical exposures are conservative, health-protective values determined by the USEPA based on their evaluation of the toxicity information for the chemical. The USEPA's (2022) definition of the RfD and RfC are as follows:

*Reference Dose (RfD): An estimate (with uncertainty spanning perhaps an order of magnitude) of a daily oral exposure for a chronic duration (up to a lifetime) to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime. It can be derived from a NOAEL, LOAEL, or benchmark dose, with uncertainty factors generally applied to reflect limitations of the data used.*

*Reference Concentration (RfC): An estimate (with uncertainty spanning perhaps an order of magnitude) of a continuous inhalation exposure for a chronic duration (up to a lifetime) to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime. It can be derived from a NOAEL, LOAEL, or benchmark concentration, with uncertainty factors generally applied to reflect limitations of the data used.*

The RfD and RfC are based on most sensitive endpoint, in the most sensitive species tested.  The point of departure (POD), or lowest dose of the dose response curve used in the derivation of these two toxicity constants, can be either a no-observed-adverse-effect-level (NOAEL) or the lowest-observed-adverse-effect-level (LOAEL) (defined below) (USEPA, 2022):

*No-Observed-Adverse-Effect Level (NOAEL): The highest exposure level at which there are no biologically significant increases in the frequency or severity of adverse effect between the exposed population and its appropriate control; some effects may be produced at this level, but they are not considered adverse or precursors of adverse effects.*

*Lowest-Observed-Adverse-Effect Level (LOAEL): The lowest exposure level at which there are biologically significant increases in frequency or severity of adverse effects between the exposed population and its appropriate control group.*

After selection of the POD for the most sensitive endpoint in the most sensitive species, the USEPA then divides the NOAEL or LOAEL it has selected by a number uncertainty factors (UFs) and possibly modifying factor (MF) to further reduce the final dose or concentration that becomes the RfD or RfC to ensure it will be health protective.  The use of these uncertainty (safety) factors which reduce the final RfD/RfC are used to account for variations among and between species, for extrapolating between subchronic to chronic exposures, and other dose-extrapolation issue that create potential uncertainty for the extrapolation being made.  By basing the RfC (or RfD) on the most sensitive endpoint to start with, a safe concentration/dose is derived, which if the chemical concentration/dose in the environment meets, or is lower than, the exposure of interest will be considered safe from all noncancer toxicities the chemical might be capable of inducing.  The following figure taken from Appendix C is a graphic illustration of why doses or concentrations at or below the RfD or RfC should be protective of all toxicities.  [The example in this figure uses dose to calculate an RfD rather than concentration to calculate an RfC, but the concept is the same.]

## Figure 1



The HQ is designed to be a conservative, if not somewhat overly health-protective, value.  As noted by the USEPA (2023), HQ values, unlike cancer risks, are not expressed as a probability of an individual having an adverse effect. Rather exposures at or below the reference level (i.e., HQ = 1) are not likely to be associated with **any** adverse health effects.  While the potential for an adverse effect occurring increases as the HQ increases above 1, this potential is dependent upon

the reduction of the margin of safety it causes, and the human relevance of the endpoint selected and its dose-response curve.  And the potential hazard of an exposure with an HQ greater than 1.0 requires another, detailed dose-response assessment.  So, regarding an HQ greater than 1.0, the USPA has simply stated: "*The HQ, however, should not be interpreted as a probability of adverse effects*.  The USEPA has made similar statements in its Risk Assessment Guidance for Superfund (RAGS) document (USEPA, 1989).

Using these procedures and USEPA toxicity constants (i.e., RfCs or UIRs) I will calculate either the HQ or cancer risk for each Plaintiff, depending upon whether their alleged injury is a noncancer or cancer injury, in the subsections 4.3 and 4.4 of this report.  For the Plaintiffs alleging a noncancer injury, I will assess the highest concentration for each chemical for the years they worked at the Golf Channel using the exposure concentrations listed in Table 20 of Dr. Sahu's report.  For the Plaintiffs alleging a cancer injury I will calculate the total risks for each chemical for the years they worked at the Golf Channel again using the exposure concentrations in Dr. Sahu's report.

As I previously explained in my first report, and as other experts in this litigation (e.g., Dr. Mundt) have also opined, Plaintiffs' experts have failed to establish scientifically reliable general-causation relationships between the remaining chemicals of concern and the diseases relevant to this litigation.  Nevertheless, as the risk estimates below indicate the modeled concentrations Plaintiffs claim to have experienced would not place at a material risk of developing any cancer or noncancer outcome.  So, even if one were to assume the general causation opinions of Plaintiffs' experts that remain at issue were real and exhibited dose-response relationships comparable to the most sensitive endpoint selected, the HQ analyses below show the Dr. Sahu's modeled exposures are simply too low to pose a material health risk.

### 4.3    Hazard Quotients for Plaintiffs Claiming Noncancer Diseases

**<u>Donna DeMilt</u>**

According to the specific causation report of Dr. Kantor, Donna was born 7/07/54 in Nyack, New Jersey.  During her earlier adulthood (1976-1997) she had lived in several different locations including years of residence in Bordeaux, France, Cincinnati OH, and Springfield NJ.  In September of 1997 she moved to Vero Beach, Florida, and lived there until June 2008 when she relocated to the Orlando area to begin working at the Golf Channel.  She worked as an executive assistant at the Golf Channel from 2/2008 to 5/2019 but was diagnosed with multiple sclerosis (MS) in 2015.  According to Table 20 of Dr. Sahu's report, the yearly average outdoor air levels of TCE, PCE, and styrene at the Golf Channel location he is attributing to the Defendant up to the time of her diagnosis are shown in the following table.  The bolded chemical concentrations in this table identify the highest model-estimated air level during her tenure at the Golf Channel.

**Annual Average Concentrations
at the Golf Channel Location (μg/m³)**

| Year | TCE | PCE | Styrene |
|------|------|------|---------|
| 2008 | 7.60E-04 | 1.47E-02 | 2.84E-03 |
| 2009 | 8.16E-04 | 1.66E-02 | 3.21E-03 |
| 2010 | 6.24E-04 | 1.25E-02 | 2.41E-03 |
| 2011 | **8.66E-04** | 1.96E-02 | **3.54E-03** |
| 2012 | 8.00E-04 | 1.74E-02 | 3.01E-03 |
| 2013 | 5.54E-05 | 4.89E-02 | 3.26E-04 |
| 2014 | 6.44E-05 | 5.97E-02 | 5.68E-04 |
| 2015 | 2.10E-06 | **1.04E-01** | 2.36E-04 |

To simplify the hazard quotient calculations that follow for each plaintiff, I have assumed they worked every day at the Golf channel and was exposed to the maximum outdoor exposure level reported for any given year during the years they worked there. I did not reduce the estimated average daily exposure concentration for any chemical by the time they were not at the Golf Channel location. Thus, the hazard quotient calculations in the following table are based on conservative overestimates of the average daily exposures to these chemicals the plaintiffs would have experienced.[1]

Dr. Kantor's report suggests Donna began experiencing MS symptomology as early as 2011. For this reason, I could have calculated the hazard quotients based on this year. However, I used the maximum concentration reported in any year up to the time of her diagnosis. As already discussed in section 4.2, air concentrations with a hazard quotient (HQ) that is less than 1.0 is a safe exposure level for that chemical, and one not expected to induce any of the chemical's noncancer toxicities. The HQs derived for Donna DeMilt's maximum exposure concentrations ranged between less than 3/1,000[th] to less than 1/100,000[th] the USEPA's estimate of the acceptably safe air concentrations for these three chemicals. As such, these HQs indicate the alleged exposures from Defendant's property could not have caused or significantly contributed to Ms. DeMilt's multiple sclerosis (MS) or any other noncancer health concern.

---

[1] Typically, a more reasonable estimate of their average exposure concentration would assume either that only worked 5/7 days a week, or with vacations, holidays, etc.. would not work more than 250 days/year. Either more accurate exposure assumption would the average concentration used in the HQ calculation to approximately 71% or 68%, respectively, of the average exposure concentration I assumed.

**Maximum Hazard Quotients for Donna DeMilt's Alleged Exposures**

| Year | TCE | PCE | Styrene |
|---|---|---|---|
| Maximum Exposure Concentration ($\mu$g/m$^3$) | 8.66-04 | 1.04E-01 | 3.54E-03 |
| Reference Concentration ($\mu$g/m$^3$) | 2 | 40 | 1,000 |
| Maximum HQs for the 2008-2019 Exposure Interval | 0.00043 | 0.0026 | 0.000004 |

**Eric Rutledge**

According to the report of Dr. Kantor, Eric was born 1/24/72 in Independence, Missouri. He completed high school and college in Michigan. In February of 2001, Eric moved to Florida and started working for the Golf Channel as a director. He worked there until the year 2020. However, he was diagnosed with MS on 3/14/2014. Thus, the relevant years of his alleged exposures are those leading up to his diagnosis (i.e., 2001-2014). According to Dr. Sahu's report, the relevant yearly average outdoor air levels of TCE, PCE, and styrene attributable to the Defendant during this time interval are shown in the following table. The highlighted chemical concentrations identify the highest modeled air level for any given year at the Golf Channel during the time interval relevant to the initiation of his disease.

**Annual Average Concentrations
at the Golf Channel Location ($\mu$g/m$^3$)**

| Year | TCE | PCE | Styrene |
|---|---|---|---|
| 2001 | 7.23E-04 | 7.82E-03 | 1.27E-03 |
| 2002 | 7.93E-04 | 5.94E-03 | 1.08E-03 |
| 2003 | 8.96E-04 | 5.76E-03 | 1.06E-03 |
| 2004 | **2.51E-03** | 1.12E-02 | 2.06E-03 |
| 2005 | 1.95E-03 | 8.03E-03 | 1.52E-03 |
| 2006 | 1.39E-03 | 9.88E-03 | 1.85E-03 |
| 2007 | 1.25E-03 | 9.37E-03 | 1.83E-03 |
| 2008 | 7.60E-04 | 1.47E-02 | 2.84E-03 |
| 2009 | 8.16E-04 | 1.66E-02 | 3.21E-03 |
| 2010 | 6.24E-04 | 1.25E-02 | 2.41E-03 |
| 2011 | 8.66E-04 | 1.96E-02 | **3.54E-03** |
| 2012 | 8.00E-04 | 1.74E-02 | 3.01E-03 |
| 2013 | 5.54E-05 | 4.89E-02 | 3.26E-04 |
| 2014 | 6.44E-05 | **5.97E-02** | 5.68E-04 |

Again, I simplified the following hazard quotient calculations by assuming he worked every day at the Golf channel and was exposed to the maximum outdoor exposure level reported for highlighted years in the preceding table. I did not reduce his average daily exposure

concentration for any chemical by the amount of time he was not at the Golf Channel location. The hazard quotient for all noncancer toxicities at the maximum concentration of each chemical is calculated in the table shown on the next page. Any air concentration with a HQ that is less than 1.0 represents an exposure level to that chemical that does not induce a noncancer toxicity of any kind. The HQs derived for Eric Rutledge's maximum exposure attributable to the Defendant ranged between less than 2/1,000[th] to less than 1/100,000[th] the USEPA's estimate of a safe air concentration for these three chemicals. Therefore, these HQs indicate the alleged exposures did not cause or significantly contribute to Mr. Rutledge's disease.

**Maximum Hazard Quotients for Eric Rutledge's Alleged Exposures**

| Year | TCE | PCE | Styrene |
|---|---|---|---|
| **Maximum Exposure Concentration ($\mu g/m^3$)** | 2.51E-03 | 5.97E-02 | 3.54E-03 |
| **Reference Concentration ($\mu g/m^3$)** | 2 | 40 | 1,000 |
| **HQ** | 0.0013 | 0.0015 | 0.0000035 |

All HQ calculations were rounded off to two significant digits.

**Eric Saperstein**

According to the report of Dr. Kantor, Eric was born 5/26/72 in Maine but moved to Florida (location not specified) during his infancy. He worked at the Golf Channel as a production Manager and Senior Director from just prior to 1995 until 2008. It is unclear to me from Dr. Kantor's description which date his symptomology was sufficiently representative of his MS, a condition apparently not officially diagnosed until 2020. Thus, the relevant years of his alleged exposures include all years he worked at the Golf Channel. According to Dr. Sahu's report, the relevant yearly average outdoor air levels of TCE, PCE and styrene attributable to the Defendant during this time interval are shown in the following table. The highlighted chemical concentrations shown in this table identify the highest modeled air level for any given year at the Golf Channel during the time interval relevant to the initiation of his disease.

**Annual Average Concentrations**
**at the Golf Channel Location ($\mu g/m^3$)**

| Year | TCE | PCE | Styrene |
|---|---|---|---|
| 1995 | 1.76E-03 | 1.42E-02 | 2.87E-03 |
| 1996 | **3.32E-03** | **2.43E-02** | **4.25E-03** |
| 1997 | 2.21E-03 | 2.04E-02 | 3.66E-03 |
| 1998 | 1.35E-03 | 2.18E-02 | 2.82E-03 |
| 1999 | 1.48E-03 | 1.95E-02 | 2.73E-03 |
| 2000 | 2.16E-04 | 5.47E-03 | 6.84E-04 |
| 2001 | 7.23E-04 | 7.82E-03 | 1.27E-03 |
| 2002 | 7.93E-04 | 5.94E-03 | 1.08E-03 |

| Year | TCE | PCE | Styrene |
|------|-----|-----|---------|
| 2003 | 8.96E-04 | 5.76E-03 | 1.06E-03 |
| 2004 | 2.51E-03 | 1.12E-02 | 2.06E-03 |
| 2005 | 1.95E-03 | 8.03E-03 | 1.52E-03 |
| 2006 | 1.39E-03 | 9.88E-03 | 1.85E-03 |
| 2007 | 1.25E-03 | 9.37E-03 | 1.83E-03 |
| 2008 | 7.60E-04 | 1.47E-02 | 2.84E-03 |

As stated above, I simplified the hazard quotient calculations that follow by assuming he worked every day at the Golf Channel and was exposed to the maximum outdoor exposure level reported for highlighted years in the preceding table.   I did not reduce his average daily exposure concentration for any chemical by the amount of time he was not at the Golf Channel location. The HQ for all noncancer toxicities at the maximum concentration for each chemical is calculated in the next table.  The HQs derived for Eric Saperstein's maximum exposure to these chemicals attributable to the Defendant ranged between less than 2/1,000[th] to less than 1/100,000[th] the USEPA's estimate of a safe air concentration for these three chemicals.  As such these HQs indicate the alleged exposures did not cause or significantly contribute to Mr. Saperstein's disease.

**Maximum Hazard Quotients for Eric Saperstein's Alleged Exposures**

| Year | TCE | PCE | Styrene |
|------|-----|-----|---------|
| **Maximum Exposure Concentration ($\mu g/m^3$)** | **3.32E-03** | **2.43E-02** | **4.25E-03** |
| **Reference Concentration ($\mu g/m^3$)** | **2** | **40** | **1,000** |
| **HQ** | **0.0017** | **0.00061** | **0.0000035** |

All HQ calculations were rounded off to two significant digits.

## Kristi Hujik

According to the report of Dr. Kantor, Kristi was born 2/26/73 in Danbury, Connecticut. She attended college in Pennsylvania, and had lived in Bristol, Connecticut and Clermont, Florida prior to her move to Leesburg, Florida when she started working at the Golf Channel. Kristi's work tenure at the Golf Channel was from August 2003 through some date in 2020. According to Dr. Kantor's medical records for Ms. Hujik, she was effectively diagnosed with MS in December of 2016. According to Dr. Sahu's report, the relevant yearly average outdoor air levels of TCE, PCE and styrene attributable to the Defendant during this time interval are shown in the following table. The highlighted concentrations identify the highest modeled air level for any given year at the Golf Channel during the time interval relevant to her claim.

**Annual Average Concentrations
at the Golf Channel Location ($\mu g/m^3$)**

| Year | TCE | PCE | Styrene |
|------|------|------|---------|
| 2003 | 8.96E-04 | 5.76E-03 | 1.06E-03 |
| 2004 | **2.51E-03** | 1.12E-02 | 2.06E-03 |
| 2005 | 1.95E-03 | 8.03E-03 | 1.52E-03 |
| 2006 | 1.39E-03 | 9.88E-03 | 1.85E-03 |
| 2007 | 1.25E-03 | 9.37E-03 | 1.83E-03 |
| 2008 | 7.60E-04 | 1.47E-02 | 2.84E-03 |
| 2009 | 8.16E-04 | 1.66E-02 | 3.21E-03 |
| 2010 | 6.24E-04 | 1.25E-02 | 2.41E-03 |
| 2011 | 8.66E-04 | 1.96E-02 | **3.54E-03** |
| 2012 | 8.00E-04 | 1.74E-02 | 3.01E-03 |
| 2013 | 5.54E-05 | 4.89E-02 | 3.26E-04 |
| 2014 | 6.44E-05 | 5.97E-02 | 5.68E-04 |
| 2015 | 2.10E-06 | **1.04E-01** | 2.36E-04 |
| 2016 | 1.57E-06 | 6.09E-02 | 1.16E-05 |

As with all previous Plaintiff dose and noncancer risk evaluations, I simplified the HQ calculations using the same basic exposure assumptions. The hazard quotient for all noncancer toxicities at the maximum concentration of each chemical is calculated in the next table.  Any air concentrations with a HQ that is less than 1.0 represents an exposure level to that chemical that does not induce any noncancer toxicity of any kind.  The HQs derived for Kristi Hujik's maximum exposure to these chemicals attributable to the Defendant ranged between less than 3/1,000[th] to less than 1/100,000[th] the USEPA's estimate of a safe air concentration for these three chemicals. As such these HQs indicate the alleged exposures did not cause or significantly contribute to Ms. Hujik's disease.

**Maximum Hazard Quotients for Kristi Hujik's Alleged Exposures**

| Year | TCE | PCE | Styrene |
|------|------|------|---------|
| **Maximum Exposure Concentration ($\mu g/m^3$)** | **2.51E-03** | **1.04E-01** | **3.54E-03** |
| **Reference Concentration ($\mu g/m^3$)** | **2** | **40** | **1,000** |
| **HQ** | **0.0013** | **0.0026** | **0.0000035** |

All HQ calculations were rounded off to two significant digits.

50

**Michael McGarry**

According to the report of Dr. Kantor, Michael was born 7/13/1966 in Hartford, Connecticut. He moved who moved to Tampa, Florida in 1991. He worked at the Golf Channel as a videographer from 1995 to 2010. In the summer of 2016, he was diagnosed with Parkinson's disease (PD). According to Dr. Sahu's report, the relevant yearly average outdoor air levels of TCE, PCE and styrene attributable to the Defendant during this time interval are shown in the following table. The highlighted chemical concentrations shown in this table identify the highest modeled air level for any given year at the Golf Channel during the time interval relevant to his disease.

**Annual Average Concentrations
at the Golf Channel Location (µg/m3)**

| Year | TCE | PCE | Styrene |
|------|-----|-----|---------|
| 1995 | 1.76E-03 | 1.42E-02 | 2.87E-03 |
| 1996 | **3.32E-03** | **2.43E-02** | **4.25E-03** |
| 1997 | 2.21E-03 | 2.04E-02 | 3.66E-03 |
| 1998 | 1.35E-03 | 2.18E-02 | 2.82E-03 |
| 1999 | 1.48E-03 | 1.95E-02 | 2.73E-03 |
| 2000 | 2.16E-04 | 5.47E-03 | 6.84E-04 |
| 2001 | 7.23E-04 | 7.82E-03 | 1.27E-03 |
| 2002 | 7.93E-04 | 5.94E-03 | 1.08E-03 |
| 2003 | 8.96E-04 | 5.76E-03 | 1.06E-03 |
| 2004 | 2.51E-03 | 1.12E-02 | 2.06E-03 |
| 2005 | 1.95E-03 | 8.03E-03 | 1.52E-03 |
| 2006 | 1.39E-03 | 9.88E-03 | 1.85E-03 |
| 2007 | 1.25E-03 | 9.37E-03 | 1.83E-03 |
| 2008 | 7.60E-04 | 1.47E-02 | 2.84E-03 |
| 2009 | 8.16E-04 | 1.66E-02 | 3.21E-03 |
| 2010 | 6.24E-04 | 1.25E-02 | 2.41E-03 |

As with the previous Plaintiff dose and noncancer risk evaluations, I simplified the HQ calculations using the same basic exposure assumptions. The HQ for all noncancer toxicities at the maximum concentration of each chemical is calculated in the next table. The HQs derived for Michael McGarry's maximum exposures attributable to the Defendant ranged between less than 2/1000[th] to less than 1/100,000[th] the USEPA's derivation of the safe air concentration for these three chemicals. As such these HQs indicate the alleged exposures did not cause or significantly contribute to Michael McGarry's case of PD.

**Maximum Hazard Quotients for Michael McGarry's Alleged Exposures**

| Year | TCE | PCE | Styrene |
|---|---|---|---|
| Maximum Exposure Concentration ($\mu g/m^3$) | 3.32E-03 | 2.43E-02 | 4.25E-03 |
| Reference Concentration ($\mu g/m^3$) | 2 | 40 | 1,000 |
| HQ | 0.0017 | 0.00061 | 0.0000043 |

All HQ calculations were rounded off to two significant digits.

As is revealed in the preceding HQ calculations for each Plaintiff, the exposures attributed to Defendant were all below the safe exposure concentrations derived for each VOC by the USEPA. So, even if I were to assume there was sufficient epidemiologic evidence these chemicals were capable of causing the alleged injuries at higher doses, which I do not, the exposures attributable to Defendant were too small to represent a possible cause of these injuries. Also, contradicting the Plaintiffs' allegations is the fact that, as I demonstrated earlier in sections 2.0 and 3.0 of this report, their indoor air exposures during and prior to working at the Golf Channel were much higher. So again, even if one were to assume the general causation opinions of Plaintiffs' experts were somehow credible, it would mean that the Plaintiffs' injuries were caused by other sources of exposure to these chemicals and the serious adverse effects leading to these injuries occurred prior to their working at the Golf Channel.

**4.4    Exposure Related Cancer Risks for Plaintiffs Making Cancer Claims**

**4.4.1    Cancer Risks for Plaintiffs Calculations Assuming the Exposure Concentrations in Dr. Sahu's Report**

Using Dr. Sahu's average annual outdoor concentrations of arsenic, hexavalent chromium, styrene, TCE, and PCE the cancer risks for one year of exposure at that concentration reported in Dr. Sahu's Table 20 are listed for each chemical by year in the following Table. The cancer risk for each year of exposure was calculated using the air concentration reported for that year in Table 20 of Dr. Sahu's report and the USEPA's inhalation unit risk factor.[4] The Plaintiffs' average daily exposure was assumed to be equivalent to one half the total daily inhalation volume 20 $m^3$ or 10 cubic meters per workday. It was then assumed each Plaintiff received only 2 weeks of vacation each year and had no holidays off that fell within their workweek for a total of 250 days at work each year (i.e., 50/52 weeks for 5/7days/week = 250/365 days at work each year). The very small yearly cancer risks for each chemical for each year Dr. Sahu estimated an exposure concentration are shown in the table below.

---

[4] Because the USEPA has not calculated one for styrene, the styrene inhalation unit risk factor was converted from one developed California OEHHA's yielding an IUR for styrene of 7.4E-06 per $\mu g/m^3$.

**Cancer Risk Estimates for Plaintiff's Alleged Chemical
Exposures: By Year at the Golf Channel Location***

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 1995 | 5.23E-07 | 3.98E-09 | 3.53E-11 | 1.81E-11 | 1.04E-10 |
| 1996 | 7.75E-07 | 5.89E-09 | 6.66E-11 | 3.09E-11 | 1.54E-10 |
| 1997 | 6.75E-07 | 5.09E-09 | 4.43E-11 | 2.59E-11 | 1.33E-10 |
| 1998 | 5.19E-07 | 3.91E-09 | 2.71E-11 | 2.77E-11 | 1.02E-10 |
| 1999 | 5.02E-07 | 3.79E-09 | 2.97E-11 | 2.48E-11 | 9.88E-11 |
| 2000 | 1.26E-07 | 9.51E-10 | 4.33E-12 | 6.96E-12 | 2.48E-11 |
| 2001 | 2.32E-07 | 1.76E-09 | 1.45E-11 | 9.95E-12 | 4.60E-11 |
| 2002 | 1.99E-07 | 1.51E-09 | 1.59E-11 | 7.56E-12 | 3.91E-11 |
| 2003 | 1.94E-07 | 1.47E-09 | 1.80E-11 | 7.33E-12 | 3.84E-11 |
| 2004 | 3.79E-07 | 2.86E-09 | 5.03E-11 | 1.42E-11 | 7.46E-11 |
| 2005 | 2.79E-07 | 2.10E-09 | 3.91E-11 | 1.02E-11 | 5.50E-11 |
| 2006 | 3.41E-07 | 2.59E-09 | 2.79E-11 | 1.26E-11 | 6.70E-11 |
| 2007 | 3.37E-07 | 2.55E-09 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 5.22E-07 | 3.95E-09 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| 2009 | 5.93E-07 | 4.46E-09 | 1.64E-11 | 2.11E-11 | 1.16E-10 |
| 2010 | 4.43E-07 | 3.34E-09 | 1.25E-11 | 1.59E-11 | 8.73E-11 |
| 2011 | 6.52E-07 | 4.92E-09 | 1.74E-11 | 2.49E-11 | 1.28E-10 |
| 2012 | 5.51E-07 | 4.19E-09 | 1.60E-11 | 2.21E-11 | 1.09E-10 |
| 2013 | 1.38E-07 | 6.23E-08 | 1.11E-12 | 6.22E-11 | 1.18E-11 |
| 2014 | 1.87E-07 | 1.33E-07 | 1.29E-12 | 7.59E-11 | 2.06E-11 |
| 2015 | 1.44E-07 | 5.53E-08 | 4.21E-14 | 1.32E-10 | 8.54E-12 |
| 2016 | 7.22E-08 | 8.16E-08 | 3.15E-14 | 7.75E-11 | 4.20E-13 |
| 2017 | 8.63E-08 | 5.30E-08 | 3.87E-14 | 1.11E-10 | 1.14E-11 |
| 2018 | 7.98E-08 | 0.00E+00 | 3.03E-14 | 5.37E-11 | 1.67E-11 |
| 2019 | 1.09E-07 | 0.00E+00 | 2.67E-14 | 6.49E-11 | 7.75E-12 |
| 2020 | 3.00E-09 | 0.00E+00 | 3.09E-14 | 9.35E-11 | 8.54E-13 |

*Note: The cancer risks calculated for hexavalent chromium, arsenic, TCE and PCE use
inhalation unit risk factors from IRIS.

That the yearly risks calculated in this table for each chemical are *de minimis* is seen when
compared to the very large and real risk we all face of developing cancer in our lifetimes.  Based
on the most recent data reported by the American Cancer Society, the probability of developing
invasive cancer[5] for men is 40.9% (or $4.1x10^{-1}$) and 39.1% in women or $3.9x10^{-1}$) (Siegel et al.,
2022).

---

[5] Excludes basal cell and squamous cell skin cancers and *in situ* cancers (except urinary bladder cancer).

**David Berry**

According to the report submitted by Dr. Judy Schmidt, David Berry was born 5/15/69 and worked at the Golf Channel from 2015 through 2020, the year he was diagnosed with testicular cancer.  Based on this exposure interval the cancer the risks he would have experienced for each chemical for each year he worked at the Golf Channel as well as the total accumulated risks for each chemical are listed in the following table.

**Cancer Risk Estimates for David Berry 's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 2015 | 1.44E-07 | 5.53E-08 | 4.21E-14 | 1.32E-10 | 8.54E-12 |
| 2016 | 7.22E-08 | 8.16E-08 | 3.15E-14 | 7.75E-11 | 4.20E-13 |
| 2017 | 8.63E-08 | 5.30E-08 | 3.87E-14 | 1.11E-10 | 1.14E-11 |
| 2018 | 7.98E-08 | 0.00E+00 | 3.03E-14 | 5.37E-11 | 1.67E-11 |
| 2019 | 1.09E-07 | 0.00E+00 | 2.67E-14 | 6.49E-11 | 7.75E-12 |
| 2020 | 3.00E-09 | 0.00E+00 | 3.09E-14 | 9.35E-11 | 8.54E-13 |
| **Total Lifetime Cancer risk** | **4.94E-07** | **1.90E-07** | **2.00E-13** | **5.33E-10** | **4.57E-11** |

**Brian Kemp**

According to Dr. Schmidt's report Brian was born 9/27/68. Mr. Kemp worked at the Golf Channel from 2006 through 2010 when he was diagnosed with hairy cell leukemia. Based on this exposure interval his yearly risks and total accumulated cancer risks for each chemical are listed in the following table.

**Cancer Risk Estimates for Brian Kemp's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 2006 | 3.41E-07 | 2.59E-09 | 2.79E-11 | 1.26E-11 | 6.70E-11 |
| 2007 | 3.37E-07 | 2.55E-09 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 5.22E-07 | 3.95E-09 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| 2009 | 5.93E-07 | 4.46E-09 | 1.64E-11 | 2.11E-11 | 1.16E-10 |
| 2010 | 4.43E-07 | 3.34E-09 | 1.25E-11 | 1.59E-11 | 8.73E-11 |
| **Total Lifetime Cancer risk** | **2.24E-06** | **1.69E-08** | **9.71E-11** | **8.02E-11** | **4.40E-10** |

**Kristen Sheen**

According to Dr. Schmidt's report Kristen was born on 7/10/66.  While she worked at the Golf Channel from 1995 through 2020, her breast cancer was diagnosed in 2008.  Based on the relevant exposure interval of 1995-2008, her yearly cancer risks and total accumulated cancer risks for each chemical are listed in the following table.

**Cancer Risk Estimates for Kristen Sheen's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|---|---|---|---|---|---|
| 1995 | 5.23E-07 | 3.98E-09 | 3.53E-11 | 1.81E-11 | 1.04E-10 |
| 1996 | 7.75E-07 | 5.89E-09 | 6.66E-11 | 3.09E-11 | 1.54E-10 |
| 1997 | 6.75E-07 | 5.09E-09 | 4.43E-11 | 2.59E-11 | 1.33E-10 |
| 1998 | 5.19E-07 | 3.91E-09 | 2.71E-11 | 2.77E-11 | 1.02E-10 |
| 1999 | 5.02E-07 | 3.79E-09 | 2.97E-11 | 2.48E-11 | 9.88E-11 |
| 2000 | 1.26E-07 | 9.51E-10 | 4.33E-12 | 6.96E-12 | 2.48E-11 |
| 2001 | 2.32E-07 | 1.76E-09 | 1.45E-11 | 9.95E-12 | 4.60E-11 |
| 2002 | 1.99E-07 | 1.51E-09 | 1.59E-11 | 7.56E-12 | 3.91E-11 |
| 2003 | 1.94E-07 | 1.47E-09 | 1.80E-11 | 7.33E-12 | 3.84E-11 |
| 2004 | 3.79E-07 | 2.86E-09 | 5.03E-11 | 1.42E-11 | 7.46E-11 |
| 2005 | 2.79E-07 | 2.10E-09 | 3.91E-11 | 1.02E-11 | 5.50E-11 |
| 2006 | 3.41E-07 | 2.59E-09 | 2.79E-11 | 1.26E-11 | 6.70E-11 |
| 2007 | 3.37E-07 | 2.55E-09 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 5.22E-07 | 3.95E-09 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| **Total Lifetime Cancer risk** | **5.60E-06** | **4.24E-08** | **4.13E-10** | **2.27E-10** | **1.11E-09** |

**Morgan Innes**

According to Dr. Schmidt's report Morgan was born 6/21/87.  She worked at the Golf Channel from 2000 through 2019.  She was diagnosed with Hodgkin's lymphoma in 2020.  Based on her exposure interval her yearly risks and total accumulated cancer risks for each chemical are listed in the following table.

**Cancer Risk Estimates for Morgan Innes's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|---|---|---|---|---|---|
| 2000 | 1.26E-07 | 9.51E-10 | 4.33E-12 | 6.96E-12 | 2.48E-11 |
| 2001 | 2.32E-07 | 1.76E-09 | 1.45E-11 | 9.95E-12 | 4.60E-11 |
| 2002 | 1.99E-07 | 1.51E-09 | 1.59E-11 | 7.56E-12 | 3.91E-11 |
| 2003 | 1.94E-07 | 1.47E-09 | 1.80E-11 | 7.33E-12 | 3.84E-11 |

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|---|---|---|---|---|---|
| 2004 | 3.79E-07 | 2.86E-09 | 5.03E-11 | 1.42E-11 | 7.46E-11 |
| 2005 | 2.79E-07 | 2.10E-09 | 3.91E-11 | 1.02E-11 | 5.50E-11 |
| 2006 | 3.41E-07 | 2.59E-09 | 2.79E-11 | 1.26E-11 | 6.70E-11 |
| 2007 | 3.37E-07 | 2.55E-09 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 5.22E-07 | 3.95E-09 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| 2009 | 5.93E-07 | 4.46E-09 | 1.64E-11 | 2.11E-11 | 1.16E-10 |
| 2010 | 4.43E-07 | 3.34E-09 | 1.25E-11 | 1.59E-11 | 8.73E-11 |
| 2011 | 6.52E-07 | 4.92E-09 | 1.74E-11 | 2.49E-11 | 1.28E-10 |
| 2012 | 5.51E-07 | 4.19E-09 | 1.60E-11 | 2.21E-11 | 1.09E-10 |
| 2013 | 1.38E-07 | 6.23E-08 | 1.11E-12 | 6.22E-11 | 1.18E-11 |
| 2014 | 1.87E-07 | 1.33E-07 | 1.29E-12 | 7.59E-11 | 2.06E-11 |
| 2015 | 1.44E-07 | 5.53E-08 | 4.21E-14 | 1.32E-10 | 8.54E-12 |
| 2016 | 7.22E-08 | 8.16E-08 | 3.15E-14 | 7.75E-11 | 4.20E-13 |
| 2017 | 8.63E-08 | 5.30E-08 | 3.87E-14 | 1.11E-10 | 1.14E-11 |
| 2018 | 7.98E-08 | 0.00E+00 | 3.03E-14 | 5.37E-11 | 1.67E-11 |
| 2019 | 1.09E-07 | 0.00E+00 | 2.67E-14 | 6.49E-11 | 7.75E-12 |
| **Total Lifetime Cancer risk** | **5.66E-06** | **4.22E-07** | **2.75E-10** | **7.61E-10** | **1.03E-09** |

**Wendy Stone**

According to Dr. Schmidt's report, Wendy was born 9/5/67.  She began working at the Golf Channel in 1998 and worked there up through June of 2008 when she was diagnosed with breast cancer. Based on the relevant exposure interval of 1998-2008, her yearly cancer risks and total accumulated cancer risks for each chemical are listed in the following table.

**Cancer Risk Estimates for Wendy Stone's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|---|---|---|---|---|---|
| 1998 | 5.19E-07 | 3.91E-09 | 2.71E-11 | 2.77E-11 | 1.02E-10 |
| 1999 | 5.02E-07 | 3.79E-09 | 2.97E-11 | 2.48E-11 | 9.88E-11 |
| 2000 | 1.26E-07 | 9.51E-10 | 4.33E-12 | 6.96E-12 | 2.48E-11 |
| 2001 | 2.32E-07 | 1.76E-09 | 1.45E-11 | 9.95E-12 | 4.60E-11 |
| 2002 | 1.99E-07 | 1.51E-09 | 1.59E-11 | 7.56E-12 | 3.91E-11 |
| 2003 | 1.94E-07 | 1.47E-09 | 1.80E-11 | 7.33E-12 | 3.84E-11 |
| 2004 | 3.79E-07 | 2.86E-09 | 5.03E-11 | 1.42E-11 | 7.46E-11 |
| 2005 | 2.79E-07 | 2.10E-09 | 3.91E-11 | 1.02E-11 | 5.50E-11 |
| 2006 | 3.41E-07 | 2.59E-09 | 2.79E-11 | 1.26E-11 | 6.70E-11 |

56

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 2007 | 3.37E-07 | 2.55E-09 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 5.22E-07 | 3.95E-09 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| **Total Lifetime Cancer risk** | **3.63E-06** | **2.74E-08** | **2.67E-10** | **1.52E-10** | **7.15E-10** |

## Naoyuki Komatsu

According to Dr. Schmidt's report Naoyuki was born 12/4/60. Mr. Komatsu began worked at the Golf Channel from 2002 and worked there through March of 2015 at which point he was diagnosed with acute lymphoblastic leukemia. Based on this exposure interval his yearly risks and total accumulated cancer risks for each chemical are listed in the following table.

**Cancer Risk Estimates for Naoyuki Komatsu's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 2002 | 1.99E-07 | 1.51E-09 | 1.59E-11 | 7.56E-12 | 3.91E-11 |
| 2003 | 1.94E-07 | 1.47E-09 | 1.80E-11 | 7.33E-12 | 3.84E-11 |
| 2004 | 3.79E-07 | 2.86E-09 | 5.03E-11 | 1.42E-11 | 7.46E-11 |
| 2005 | 2.79E-07 | 2.10E-09 | 3.91E-11 | 1.02E-11 | 5.50E-11 |
| 2006 | 3.41E-07 | 2.59E-09 | 2.79E-11 | 1.26E-11 | 6.70E-11 |
| 2007 | 3.37E-07 | 2.55E-09 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 5.22E-07 | 3.95E-09 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| 2009 | 5.93E-07 | 4.46E-09 | 1.64E-11 | 2.11E-11 | 1.16E-10 |
| 2010 | 4.43E-07 | 3.34E-09 | 1.25E-11 | 1.59E-11 | 8.73E-11 |
| 2011 | 6.52E-07 | 4.92E-09 | 1.74E-11 | 2.49E-11 | 1.28E-10 |
| 2012 | 5.51E-07 | 4.19E-09 | 1.60E-11 | 2.21E-11 | 1.09E-10 |
| 2013 | 1.38E-07 | 6.23E-08 | 1.11E-12 | 6.22E-11 | 1.18E-11 |
| 2014 | 1.87E-07 | 1.33E-07 | 1.29E-12 | 7.59E-11 | 2.06E-11 |
| 2015 | 1.44E-07 | 5.53E-08 | 4.21E-14 | 1.32E-10 | 8.54E-12 |
| **Total Lifetime Cancer risk** | **4.96E-06** | **2.85E-07** | **2.56E-10** | **4.37E-10** | **9.25E-10** |

### 4.4.1   Summary

A summary of the total risks from each chemical that was allegedly incurred by each plaintiff based on the exposure concentrations reported by Dr. Sahu for the Golf Channel is seen Table 22.

**Table 22**

**Total Lifetime Risks For Each Plaintiff Using Dr. Sahu's Concentrations By Chemical**

| Plaintiff | Cr+6 | Arsenic | TCE | PCE | Styrene |
|---|---|---|---|---|---|
| David Berry | 4.94E-07 | 1.90E-07 | 2.00E-13 | 5.33E-10 | 4.57E-11 |
| Brian Kemp | 2.24E-06 | 1.69E-08 | 9.71E-11 | 8.02E-11 | 4.40E-10 |
| Kristen Sheen | 5.60E-06 | 4.24E-08 | 4.13E-10 | 2.27E-10 | 1.11E-09 |
| Morgan Innes | 5.66E-06 | 4.22E-07 | 2.75E-10 | 7.61E-10 | 1.03E-09 |
| Wendy Stone | 3.63E-06 | 2.74E-08 | 2.67E-10 | 1.52E-10 | 7.15E-10 |
| Naoyuki Komatsu | 4.96E-06 | 2.85E-07 | 2.56E-10 | 4.37E-10 | 9.25E-10 |

A review of the cancer risks for each Plaintiff demonstrates their lifetime risks were all less then $1/1,000,000$ ($1 \times 10^{-6}$) for four of the chemicals of concern (CoCs), i.e., those lifetime risks for arsenic, TCE, PCE and styrene.  Given that the risk levels are all less than a one-in-a-million lifetime risk, a level of risk below which the USEPA does not express concern for or consider mitigating the exposure, I conclude that arsenic, TCE, PCE, and styrene did not cause or contribute to any the Plaintiff's alleged cancers.

The hexavalent chromium risks are not much higher and are all below the one-in-a-hundred thousand risk level.  Here too I would conclude that a lifetime risk of this magnitude did not contribute to any of the Plaintiff's cancers for several reasons. First, they would all be below the midpoint of the acceptable risk range used by the USEPA to calculate acceptably safe exposure concentrations (see discussion in Appendix C) and are lower, for example, than the average risk associated with the USEPA's drinking water standards (see Appendix D).  Second, the risk levels estimated for hexavalent chromium, are also far lower than those risks an individual has of developing cancer, and so, are not a likely cause of any one individual's cancer.  Third, the only cancers known to be caused by this chemical were not seen in any of the Plaintiffs.  Finally, I was unconvinced the hexavalent chromium concentrations estimated by Dr. Sahu were reliable.  His arsenic concentrations were near typical background levels for Florida.  Likewise the levels for TCE and PCE were lower than background measurements in Florida.  So, the hexavalent chromium concentrations stood out as unusually high for an environmental exposure level to this particular chemical, especially given its uses at Defendant's facility.

Having had the opportunity to discuss this matter with Defendant's fate and transport experts, I am now convinced Dr. Sahu's estimates for this chemical in particular, are seriously flawed and unreliable due to his adopting inappropriate assumptions that he then used in the air model he developed.  Still, for the sake of argument, I have calculated the hexavalent chromium risks shown above as shown Table 22. However, using information conveyed to my counsel, I

currently understand that more reliable hexavalent chromium and arsenic risk estimates at the Golf Channel Location by year are those listed in Table 23, found on the next page.  Based on these corrected concentrations, the total risks from each chemical for each plaintiff become those listed in the next table.  The corrected cancer risks for each Plaintiff indicates their lifetime risks for each chemical approximated, or were less than, a $10^{-9}$ risk level (1/1,000,000,000) for all five CoCs. Risks this low are so far below the $1 \times 10^{-6}$ risk level that the USEPA would not express any health concerns for these exposures and would not consider mitigating the source of these exposures. Therefore, I once again emphasize that the alleged arsenic, hexavalent chromium, TCE, PCE, and styrene exposures at the Golf Channel attributed to the Defendant did not cause or contribute to any of the Plaintiff's alleged cancers.

**Corrected\* Cancer Risk Estimates for Plaintiff's Alleged Chemical Exposures: By Year at the Golf Channel Location**

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 1995 | 0.00E+00 | 0.00E+00 | 3.53E-11 | 1.81E-11 | 1.04E-10 |
| 1996 | 4.29E-11 | 0.00E+00 | 6.66E-11 | 3.09E-11 | 1.54E-10 |
| 1997 | 1.81E-10 | 0.00E+00 | 4.43E-11 | 2.59E-11 | 1.33E-10 |
| 1998 | 1.17E-10 | 0.00E+00 | 2.71E-11 | 2.77E-11 | 1.02E-10 |
| 1999 | 1.14E-10 | 0.00E+00 | 2.97E-11 | 2.48E-11 | 9.88E-11 |
| 2000 | 2.57E-11 | 0.00E+00 | 4.33E-12 | 6.96E-12 | 2.48E-11 |
| 2001 | 2.41E-11 | 0.00E+00 | 1.45E-11 | 9.95E-12 | 4.60E-11 |
| 2002 | 3.31E-11 | 0.00E+00 | 1.59E-11 | 7.56E-12 | 3.91E-11 |
| 2003 | 3.42E-11 | 0.00E+00 | 1.80E-11 | 7.33E-12 | 3.84E-11 |
| 2004 | 6.58E-11 | 0.00E+00 | 5.03E-11 | 1.42E-11 | 7.46E-11 |
| 2005 | 5.43E-11 | 0.00E+00 | 3.91E-11 | 1.02E-11 | 5.50E-11 |
| 2006 | 5.02E-11 | 0.00E+00 | 2.79E-11 | 1.26E-11 | 6.70E-11 |
| 2007 | 5.82E-11 | 0.00E+00 | 2.51E-11 | 1.19E-11 | 6.63E-11 |
| 2008 | 7.22E-11 | 0.00E+00 | 1.52E-11 | 1.87E-11 | 1.03E-10 |
| 2009 | 1.57E-10 | 0.00E+00 | 1.64E-11 | 2.11E-11 | 1.16E-10 |
| 2010 | 8.04E-11 | 0.00E+00 | 1.25E-11 | 1.59E-11 | 8.73E-11 |
| 2011 | 1.53E-10 | 0.00E+00 | 1.74E-11 | 2.49E-11 | 1.28E-10 |
| 2012 | 4.90E-11 | 0.00E+00 | 1.60E-11 | 2.21E-11 | 1.09E-10 |
| 2013 | 0.00E+00 | 0.00E+00 | 1.11E-12 | 6.22E-11 | 1.18E-11 |
| 2014 | 2.13E-11 | 0.00E+00 | 1.29E-12 | 7.59E-11 | 2.06E-11 |
| 2015 | 1.93E-11 | 0.00E+00 | 4.21E-14 | 1.32E-10 | 8.54E-12 |
| 2016 | 4.95E-11 | 0.00E+00 | 3.15E-14 | 7.75E-11 | 4.20E-13 |
| 2017 | 5.33E-11 | 0.00E+00 | 3.87E-14 | 1.11E-10 | 1.14E-11 |
| 2018 | 1.39E-11 | 0.00E+00 | 3.03E-14 | 5.37E-11 | 1.67E-11 |

| Year | Cr+6 | Arsenic | TCE | PCE | Styrene |
|------|------|---------|-----|-----|---------|
| 2019 | 1.14E-10 | 0.00E+00 | 2.67E-14 | 6.49E-11 | 7.75E-12 |
| 2020 | 7.51E-11 | 0.00E+00 | 3.09E-14 | 9.35E-11 | 8.54E-13 |

*Corrected using information conveyed to me by counsel according to an analysis performed by one of the Defendant's fate and transport expert.

**Table 23**

**Total Lifetime Risks For Each Plaintiff Using Corrected Golf Channel Concentrations**

| Plaintiff | Cr+6 | Arsenic | TCE | PCE | Styrene |
|-----------|------|---------|-----|-----|---------|
| David Berry | 3.25E-10 | 0.00E+00 | 2.00E-13 | 5.33E-10 | 4.57E-11 |
| Brian Kemp | 4.18E-10 | 0.00E+00 | 9.71E-11 | 8.02E-11 | 4.40E-10 |
| Kristen Sheen | 8.73E-10 | 0.00E+00 | 4.13E-10 | 2.27E-10 | 1.11E-09 |
| Morgan Innes | 1.13E-09 | 0.00E+00 | 2.75E-10 | 7.61E-10 | 1.03E-09 |
| Wendy Stone | 6.49E-10 | 0.00E+00 | 2.67E-10 | 1.52E-10 | 7.15E-10 |
| Naoyuki Komatsu | 8.48E-10 | 0.00E+00 | 2.56E-10 | 4.37E-10 | 9.25E-10 |

## 4.5    Comparing Plaintiffs' Total Background Inhalation Risks From TCE, PCE and Styrene to Incremental Risks Allegedly Attributable to Working at the Golf Channel

Although I do not believe the concentrations Dr. Sahu estimated at the Golf Channel can cause or contribute to the Plaintiffs' cancers, I note that this was a presumption made by all of Plaintiffs' medical experts.  Therefore, I will illustrate an inherent flaw found in each of these reports that produces an obvious error in the logic used to derive their specific causation opinions. All of Plaintiffs' experts have ignored the fact that Plaintiffs incurred higher background exposures to these same chemicals for indoor air as well as from the outdoor air prior to their start of work at the Golf Channel.  Thus, Plaintiffs' experts are attributing causation to their smaller alleged work-related exposures/doses of these chemicals and have ignored completely the much larger exposures/doses to these same chemicals that would necessarily have occurred decades earlier from both indoor and outdoor air.  In addition, each Plaintiff would necessarily have continued to incur higher background indoor air exposures to these same chemicals during the time they worked at the Golf Channel

Air concentration data for the three VOCs were presented in section 2.0, Appendix G, and Appendix H.  Using this information an estimate of the average air concentration each Plaintiff was exposed to during their life up to the time their cancer was diagnosed were derived for both

indoor air and outdoor air environments (see Appendix I).  These indoor and outdoor air exposures were then used to compute the risks posed by their total environmental exposures to these three VOCs.  The description of this assessment is provided in Appendix I.  The final two summary tables of these risk estimates in this Appendix are provided in the following two tables.  In Table 24 are listed the total lifetime risks for each Plaintiff's from their total ambient indoor and outdoor exposures to styrene, TCE and PCE.

**Table 24**

**Each Plaintiff's Cancer Risk From
Their Ambient Exposures to TCE, PCE, and Styrene***

| Plaintiff | TCE | PCE | Styrene# |
|-----------|-----|-----|----------|
| David Berry | 9.08E-06 | 9.71E-07 | 8.83E-06 |
| Brian Kemp | 9.05E-06 | 9.55E-07 | 8.24E-06 |
| Kristen Sheen | 9.68E-06 | 1.02E-06 | 8.71E-06 |
| Morgan Innes | 3.87E-06 | 4.28E-07 | 4.43E-06 |
| Wendy Stone | 9.33E-06 | 9.82E-07 | 8.38E-06 |
| Naoyuki Komatsu | 1.14E-05 | 1.20E-06 | 1.05E-05 |

*Note: the risks shown here are those calculated in Appendix I and come from Table I-5.  #I have just become aware of Florida measurements for outdoor styrene levels, and reserve the right to amend this analysis for styrene should it become necessary to do so.

Table 25 compares the total ambient risks for each Plaintiff shown in Table 24 to their total Golf Channel risk from TCE, PCE, and styrene that were derived in section 4.4 using Dr. Sahu's model-estimated outdoor air concentrations for these chemicals.  The ratio of these two risks is computed in the last column of this table.

**Table 25**

**Comparing Plaintiffs Total Risks From All Background Air Exposures to TCE, PCE
and Styrene to Those Risks Attributed to the Time They Worked at the Golf Channel**

| Plaintiff | Total Background Risk from TCE+PCE+ Styrene | Total Golf Channel Risk from TCE+PCE+ Styrene | Ratio of Total Background/Total GC |
|-----------|---------------------------------------------|-----------------------------------------------|-----------------------------------|
| David Berry | 1.89E-05 | 5.79E-10 | 32,630 |
| Brian Kemp | 1.82E-05 | 6.17E-10 | 29,557 |
| Kristen Sheen | 1.94E-05 | 1.75E-09 | 11,089 |
| Morgan Innes | 8.73E-06 | 2.07E-09 | 4,225 |

| Plaintiff | Total Background Risk from TCE+PCE+ Styrene | Total Golf Channel Risk from TCE+PCE+ Styrene | Ratio of Total Background/Total GC |
|---|---|---|---|
| Wendy Stone | 1.87E-05 | 1.13E-09 | 16,485 |
| N. Komatsu | 2.31E-05 | 1.62E-09 | 14,247 |

Table 25 reveals the ratio of each Plaintiff's total background risk for each individual VOC as shown in Table 24 was likely more than 1,000-times larger than each Plaintiffs' risk attributed to emissions from Defendant's property.  Thus, it seems self-evident that the TCE, PCE, and styrene allegedly emitted from Defendant's property would neither have caused nor significantly contributed to Plaintiffs' cancers as Plaintiffs' medical experts are now alleging.

I note this remains true, even if one assumes, as Plaintiffs' medical experts apparently have, that there exists scientifically reliable evidence that these substances can cause each type of cancer each Plaintiff has.  In addition, I would note that even if one were to assume each Plaintiffs' *de minimis* risk levels attributable to Defendant reflect a level of risk somehow capable of causing these cancers, then the origin of each Plaintiffs' cancers would have been their larger exposures to these VOCs each Plaintiff incurred prior to working at the Golf Channel (see indoor and out air exposure levels in section 2.0, and Appendices G and H).

## 4.6    Comparing Plaintiffs' Golf Channel Risks to Their Total Background Risks From Other Ubiquitous Carcinogens Also Present in their Environments

Plaintiffs allege that their cancers were somehow caused by their exposures to chemicals released from Defendant's facility during the time that Plaintiffs worked at the Golf Channel. Plaintiffs' experts are alleging, particularly Dr. Panigrahy, that carcinogenic chemicals not known to cause the types of cancer the Plaintiffs developed, somehow were the cause these cancers.  Given Dr. Panigrahy's general causation report, in which he opined 7 different chemicals caused or contributed to more cancers than are represented in the Henderson case alone, he essentially opined that all carcinogenic chemicals, especially those exhibiting any of the TKCs, are what is called a "Pancarcinogen," i.e., a carcinogen than can cause cancer in every organ/tissue.  Should he deny this is his premise, it will be interesting to see what scientific basis is used for this denial, and whether these principles or procedures apply to any of his original 7 purported pancarcinogens. The rest of Plaintiffs' medical experts have either adopted some of his opinions, or their opinions rest heavily upon the fact that the COCs in this case have genotoxic properties, and that all genotoxic substances allegedly have linear, nonthreshold (LNT) dose response curves.  However, as I stated in my first report, adopting this approach eliminates the ability of Plaintiffs' medical experts to exclude other genotoxic carcinogens (or any chemical purportedly having an LNT dose response curve) as a potential alternative cause to consider, particularly if there is an obvious confounder that also has a ubiquitous presence in our general environments like the three VOCs they allege were potential causes.

62

In all cases where harm is allegedly to be caused by an environmental exposure to chemicals, there exist two major classes of potential confounders: (1) the individual's exposure to all other chemicals that are ubiquitously present in the different environments where they have spent or will spend time throughout their lives, and (2) other known risk factors for their alleged disease/injury that stem from their lifestyle choices, their inherited genetics, and/or current or prior health conditions. The first class of potential confounders – other chemical exposures – is (unfortunately) much larger than most people would typically expect.  But because these confounders must be identified and evaluated as part of any proper specific causation analysis, I had already noted in my prior Appendix D (and have reiterated above), this would likely become a serious problem during the specific causation phase of the Plaintiffs' cases.

As I will now show, this is clearly the problem Plaintiffs face given the *de minimis* exposures and risks that have been attributed to Defendant.  A review of the specific causation reports submitted by Plaintiffs' medical experts shows each one essentially focused only on the alleged exposures attributed to Defendants after being misled by the "background exposure ratios" Dr. Sahu listed in his Table 22.  But none of Plaintiffs' experts can argue that these were the only carcinogenic exposures that each Plaintiff has been exposed to via their own different microenvironments.  And a reasonable and reliable specific causation analysis is not performed using the "exclusion by omission of consideration" approach that all Plaintiffs' medical experts appear to have adopted.

As noted in one of my prior appendices, Appendix D, each of us is exposed to many different carcinogenic substances on a daily basis.  Here I will just identify a just few carcinogens well known to be present in everyone's different microenvironments.  Then I will estimate the risks each Plaintiff had incurred by the time their cancer was diagnosed that naturally stems from their ambient exposures to these other potential chemical causes of their cancer using well recognized ambient exposure levels for other genotoxic carcinogens all the Plaintiffs have been exposed to. These chemicals are discussed in more detail in Appendix J, and only portions of this information are here reiterated for the purpose of estimating each Plaintiff's risks from different exposures they have had to these carcinogens.

### 4.6.1   1,3-Butadiene

1,3-Butadiene (BD) is colorless gas that is an important petrochemical manufactured in high volumes and used to the manufacture synthetic rubber and thermoplastic resins. BD is also formed during the incomplete combustion of fossil fuels and biomass, and the USEPA estimates these two sources contribute over 98% of the total amount of BD emitted into our ambient air. Therefore, it is one of the many ubiquitous VOC air contaminants always present in our indoor and outdoor air environments. 1,3-Butadiene was classified a Group 1 carcinogen by IARC in

2008, and it is one of the 187 chemicals defined as a hazardous air pollutant (HAP) by the USEPA. 1,3-Butadiene is a genotoxic carcinogen and its metabolism by CYP2E1 generates a number of different reactive and direct acting mutagenic epoxide metabolites. It also has a number of the other ten key characteristics that are so favored by Plaintiffs' expert, Dr. Panigrahy (see Krewski et al., 2019).

A 2007 study evaluating the 17 most common air pollutants ranked the top three cancer risk hazards from this group as benzene, formaldehyde, and butadiene.  Ambient air concentrations of 1,3-butadiene in U.S. cities are reported to range as high as 2.0 $\mu g/m^3$ with an average concentration of 0.13 $\mu g/m^3$. These exposure levels represent lifetime cancer risks of $6x10^{-5}$ and $3.9x10^{-6}$, respectively.

Similarly, the concentrations of 1,3-butadiene measured inside a car and the air just outside a moving vehicle were found to be 7.9 and 3.0 $\mu g/m^3$, respectively.  Based on these measurements the lifetime risk associated the BD concentrations exposures that result from driving or riding in a car would be $2.37x10^{-4}$, and that from walking near areas of traffic would be $9x10^{-5}$.  While these risks are reduced by the smaller percentage of time engaged in each activity, if it is assumed one spends an average of one hour a day driving (to work, shopping, recreational activities, etc.) and that an average of one $m^3$ of air is inhaled during that hour, the lifetime risk associated with this single activity would be $1.18x10^{-5}$.

Because indoor air levels of 1,3-butadiene are generally higher than outdoor air, and because most people like the Plaintiffs have spent more time indoors than outdoor because they work in indoor environments, the BD risks from indoor environments are substantially larger than those from outdoor environments.  A recent study reported the BD concentrations in a nonsmoking home would represent a lifetime risk of $1.5x10^{-5}$ (1.5E-05) while that for smoker's home would be $5.1x10^{-5}$.

Using the lifetime 1,3-butadiene risks estimates associated with just three common, daily activities that were just discussed, the risks each Plaintiff is likely to have accumulated from each of these is shown on the next page in Table 26. For outdoor air activities a concentration of 0.13 $\mu g/m^3$ with lifetime risk of $3.9 x 10^{-6}$ was used. For all indoor air activities the average risk reported for a nonsmoking home of $1x10^{-5}$ was assumed, and for driving or riding one hour a day in a car the lifetime risk of $1.18 x 10^{-5}$ was assumed. [Note: For those unfamiliar with scientific notation a risk of 1x10-6 = 1E-06 in the following table.]

Table 26 indicates the lifetime risks posed by the ubiquitous air pollutant 1,3-butadiene were much higher than additional VOC risks allegedly associated their having worked at the Golf Channel.

**Table 26**

**Plaintiffs Lifetime Cancer Risks from Only Three Sources of Exposure to 1,3-Butadiene\***

| Plaintiff (yrs) | Time Spent Outdoors# | Time Spent Indoors& | In car for 1-hour per day>age 18** | Total Risk from 1.3-Butadiene |
|---|---|---|---|---|
| David Berry (50.8yrs) | 2.83E-07 | 9.80E-06 | 5.55E-06 | **1.56E-05** |
| Brian Kemp (41.25yrs) | 2.30E-07 | 7.96E-06 | 3.94E-06 | **1.21E-05** |
| Kristen Sheen (42.5yrs) | 2.37E-07 | 8.20E-06 | 4.15E-06 | **1.26E-05** |
| Morgan Innes (32.5yrs) | 1.81E-07 | 6.27E-06 | 2.45E-06 | **8.90E-06** |
| Wendy Stone (40.8yrs) | 2.26E-07 | 7.87E-06 | 3.86E-06 | **1.20E-05** |
| N. Komatsu (54.1yrs) | 3.01E-07 | 1.04E-05 | 6.11E-06 | **1.68E-05** |

\* Corrects all lifetime risk by [(total years to diagnosis)/70]. # Assumes 10% of time is spent outdoors. & Assumes 90% of the time was spent indoors in a nonsmoking environment. BD concentration while at school, work, etc. assumed to be the same as that of home concentration. ** In car for one hour per = 1m3 air inhaled or 1/20th the daily average.

Thus, it is not possible for Dr. Panigrahy to rule out their common daily exposures to 1,3-butadiene as an alternative chemical cause of each Plaintiffs' cancer. Each Plaintiff's risk from 1,3-butadiene ranged between 4,301- to 27,000-times higher than that the total risk from their TCE, PCE, and styrene exposures combined while at the Golf Channel. So, each Plaintiff's exposure to the ubiquitous air pollutant 1,3-butadiene essentially eliminates any likelihood their alleged work-related exposures to these three VOCs would be a reasonable cause of their cancers.

### 4.6.2   Benzene

All of us are exposed to measurable levels of benzene each day through many different routes of exposure. Benzene is a group 1 carcinogen, and as indicated in Appendix J, has eight of the TKC's according to a review by IARC scientists see the reproduced figure on the next page. The USEPA IRIS inhalation unit risk range for benzene is $2.2 \times 10^{-6}$ to $7.8 \times 10^{-6}$ per $\mu g/m^3$ (the midpoint of this range is $5.0 \times 10^{-6}$ and will be used in the following calculations). The oral slope factor range is $1.5 \times 10^{-2}$ to $5.5 \times 10^{-2}$ per mg/kg-day (the midpoint of this range is $3.5 \times 10^{-2}$ per mg/kg-day and will be used in the following calculations).[6]

As was amply illustrated in Appendix H, benzene is present in both indoor and outdoor air environments, and Plaintiffs' ambient exposure concentrations on a $\mu g/m^3$ basis to this carcinogen are higher than those estimated by Dr. Sahu for styrene, TCE or PCE, especially those benzene

---

[6] USEPA. 2000. IRIS. Benzene. Quantitative Estimation of Carcinogenic Risk from Oral and Inhalation Exposure. https://iris.epa.gov/ChemicalLanding/&substance_nmbr=276. Accessed 20 March 2023.

exposures occurring before the year 2000. Benzene is another air pollutant generated by different sources of combustion, so traffic and smoking represent major sources of exposure to this carcinogen. In addition, studies have shown it is emitted by many products used at home or in the workplace.

Before discussing the ambient risks posed by this carcinogen, I would note that Smith et al. (2016) (see Figure 3 below) evaluated the TKC information available on benzene and concluded it had 8/10 key characteristics of carcinogens which play such an important part of Dr. Panigrahy's opinions.

**Figure 3**
**An Overview of How Benzene Might Induce Eight of the Ten KCCs**



Source: Smith et al. (2016).

The benzene air concentrations measured in various US cities as reported by ATSDR (2007) are listed in Table J6 of Appendix J.  For the studies reporting benzene levels before 1997, the mean concentrations reported in these studies ranged between 3.2 and 14.1 $\mu g/m^3$.  Using the lowest mean concentration of 3.2 $\mu g/m^3$ the lifetime risk would be $1.6 \times 10^{-5}$ (1.6E-05).

As discovered in the USEPA's TEAM studies, indoor air concentrations of benzene are always higher than the surrounding outdoor air because of additional sources on benzene in indoor environments.  For example, in Appendix J a 1988 study reported an average indoor air benzene concentration of 16.5 $\mu g/m^3$ based on 2,128 measurements and an average outdoor benzene concentration of 9.0 $\mu g/m^3$ indoor based on 5,411 measurements.  The lifetime risks associated

66

with these levels would be 8.25 x $10^{-5}$ and 4.5 x $10^{-5}$, respectively.  Similarly, a 1989 study by Wallace reported a median concentration of 7.0 $\mu g/m^3$ for nonsmoking homes, which represents a risk of 3.5 x $10^{-5}$ (3.5E-05) for lifetime exposure to this concentration.  Six years later, the average benzene level in nonsmoking homes reported in a 1996 study was 4.12 $\mu g/m^3$, a level that poses a lifetime risk of 2.0.6 x $10^{-5}$ (2.06E-05).  In the past, indoor microenvironments like bars were almost always frequented by smokers, and a 1989 study measuring the benzene air levels in a bar recorded a range of 25.8 to 36.1 $\mu g/m^3$.  The average of these two concentrations represents a lifetime risk as high as 1.55 x $10^{-4}$.  So, some past microenvironments provided larger exposures to benzene.

One activity representing an unexpectedly high exposure to benzene is pumping gasoline into one's car. A study measuring the exposures levels associated with this activity reported a mean benzene concentration of 2,875 $\mu g/m^3$, and median refueling time of 3 minutes.  Using an inhalation rate generally assumed by the USEPA of 20 $m^3$ of air inhaled per day, the dose of benzene inhaled while pumping gas would be about 122 $\mu g$ of benzene per refueling event (2,875 $mg/m^3$ x 0.014 $m^3$/min x 3 minutes = 0.121 mg = 121 $\mu g$). If a person refuels weekly, the average daily benzene dose would be approximately 17.3 $\mu g$/day and the lifetime risk for this daily dose would be 8.65x$10^{-6}$ (8.65E-06) [i.e., (0.0173 mg/70 kg) x 3.5E-02 per mg/kg-day]).

Similarly, spending an hour a day in car for the purpose of driving to work, shopping, recreation, church, etc. yields a daily benzene dose of 22.76 $\mu g$/day (see Appendix J). The lifetime risk associated with this common activity ([0.02276 mg/70 kg] x [3.5 x $10^{-2}$ per mg/kg/day]) is 1.14x$10^{-5}$ (1.14E-05).

Because benzene is an organic chemical common to plants. It has been measured in many food items, and concentrations typically range from the low ppb to as high as several hundred ppb (see Table J9 in Appendix J). Although food as a source of benzene exposure is typically considered to be smaller than other sources, assuming the higher concentrations of benzene listed in for some food items, and assuming a four-ounce portion was consumed daily, would generate lifetime risks above 1x$10^{-6}$ for some food items (see Appendix J).

The 2020 paper by Slingers and colleagues measured levels of benzene in the breath of volunteers. The mean value (and the range) for benzene was listed 2.56 $\mu g/m^3$ (with a range 0.512 – 18.56).  Although these breath concentrations are lower than those measured in past years as part of the TEAM studies, the risk associated with this more recent average benzene breath concentration would still be: 2.56 x (5.0 x $10^{-6}$ per $\mu g/m^3$) x (10/70) = 1.83 x$10^{-6}$ for every decade your alive.

In an attempt to derive an average indoor air concentration the personal air and indoor air measurements in Table 12 (section 2.0) were averaged. The personal air samples for benzene are

a measure of the person's average exposure concentrations throughout the day, and so, may be lower than their average indoor air concentrations because of their time spent outdoors. The mean concentration for these 20 measurements was 4.28 $\mu g/m^3$ and poses a lifetime risk of 2.14x10$^{-5}$. Given than this level much lower than those reported in the some of the early TEAM studies when higher values were occurring in the 1980s and 1990s, and given the fact that it is only a little higher than the lowest outdoor level reported Table J6 for pre-2000 measurements (3.2 $\mu g/m^3$), it seems to be a conservative, if not low, average indoor air concentration to assume as the Plaintiff's past indoor air exposures to benzene. The two other benzene exposure scenarios included in the following table are spending 1 hour a day riding in or driving a car once the Plaintiff turns 18 years of age, and pumping gasoline for their car once every two weeks after they turn 18. The risk estimates for these three typical benzene exposure scenarios are found on the next page in Table 27.

**Table 27**

**Plaintiffs Lifetime Cancer Risks From Only Three Sources of Exposure to Benzene\***

| Plaintiff (yrs) | Time Spent Indoors# | In a car 1-hour per day > age 18 | Pumps gas every 2 weeks > age 18 | Total Risk from Benzene |
|---|---|---|---|---|
| David Berry (50.8yrs) | 2.54E-05 | 5.34E-06 | 2.03E-06 | 3.28E-05 |
| Brian Kemp (41.25yrs) | 2.06E-05 | 3.79E-06 | 1.44E-06 | 2.58E-05 |
| Kristen Sheen (42.5yrs) | 2.13E-05 | 3.99E-06 | 1.51E-06 | 2.68E-05 |
| Morgan Innes (32.5yrs) | 1.63E-05 | 2.36E-06 | 8.96E-07 | 1.95E-05 |
| Wendy Stone (40.8yrs) | 2.04E-05 | 3.71E-06 | 1.41E-06 | 2.55E-05 |
| N. Komatsu (54.1yrs) | 2.71E-05 | 5.88E-06 | 2.23E-06 | 3.52E-05 |

\*Corrects all lifetime risk by [(total years to diagnosis)/70].  # Assumes 90% of time is spent indoors

Table 27 indicates the lifetime risks posed by the ubiquitous air pollutant benzene were much higher than the VOC risks (TCE, PCE, styrene) estimated for each Plaintiff while they worked at the Golf Channel (i.e., compare the total benzene risk in Table 23 to the Plaintiffs total Golf Channel risks listed in Table 21). Each Plaintiffs' benzene risk, depending upon the Plaintiff, was more than 2,300- to greater than 17,000-fold higher than their combined alleged risks from TCE, PCE, and styrene attributed to the Defendant. In fact, each Plaintiff's total risk from benzene was greater than the risk posed by any one of the five CoCs. So, I do not believe it will be possible for Dr. Panigrahy, under his apparent "pancarcinogen" approach, to rule out their common daily exposures to benzene as an alternative chemical cause of, or contributor to, each Plaintiffs' cancer. Therefore, exposure to this background air pollutant is another ubiquitous carcinogen whose environmental presence essentially eliminates any likelihood Plaintiffs alleged exposures to TCE,

PCE or styrene while working at the Golf Channel would be a reasonable and likely cause of their cancers.

### 4.6.3    Nitrosamines and Acrylamide: Potent Carcinogens in Our Foods

Nitrosamines are a class of compounds whose members are reactive, genotoxic carcinogens.  In his recent publication, Fishbein et al. (2021), Dr. Panigrahy discusses how nitrosamines (frequently referring to two of the better known and more extensively studied nitrosamine compounds - *N*-nitrosodimethylamine [NDMA] and *N*-nitrosodiethylamine [NDEA]) play a "critical role" in the initiation stage of cancer.  But the nitrosamines as a group represent over 24 known and suspected human carcinogens.  His publication also offers other opinions about the carcinogenic effects of nitrosamines and indicates they have many of the ten key characteristics (TKCs) of carcinogens that he believes are so important when considering exposure to carcinogenic compounds (see the statements made by Dr. Panigrahy about these carcinogens in Fishbein et al. (2019), see also Krewski et al. 2019).

We are all exposed daily to a number of different nitrosamine compounds, and NDMA can be found in foods, drinking water (disinfection byproducts), whiskey and beer, drinking water, breast milk and formula, cosmetics and personal care products, indoor and outdoor air, cigarette smoke, rubber and latex products, some pharmaceuticals, and pesticides.  However, the recent ATSDR (2022) profile on NDMA notes that the largest source of NDMA for most individuals is from endogenous production that occurs from naturally occurring precursors in the body or in the diet (nitrite in foods and drinking water).   In fact, recent literature indicates endogenous nitrosamine formation may account for 97% of the total *N*-nitrosamines (or TNA) burden an individual has (with the other 3% coming from exogenous sources).

A review of the different levels of exposure to nitrosamines was performed by Chowdhury (2014).  The average dose estimate for our endogenously formed nitrosamines was associated with a lifetime risk of $10.81 \times 10^{-3}$.  Our exposures to exogenous sources of nitrosamines poses an additional risk of $4.96 \times 10^{-5}$ (see Table J3 in Appendix J).

Acrylamide is another genotoxic carcinogen present in many foods and beverages that we consume (see Table J11 in Appendix J).  Acrylamide is produced as a by-product of the Maillard reaction during the cooking process of starchy foods (especially plant-based in origin such as potato and cereal products, coffee beans) when they are processed at high temperatures. And like nitrosamines and formaldehyde, our bodies generate endogenous doses of acrylamide at an estimated rate of 0.2 to 0.4 μg/kg-day.  The cancer risk associated with our dietary intakes of acrylamide have been reported for the diets of different countries, as follows:

- Dybing and Sanner (2003) estimated acrylamide intakes for male and female Norwegians to be 0.49 and 0.46 μg/kg-bw/day, respectively. Based on these intake rates the authors estimated the excess risk for cancer from a lifetime daily intake of acrylamide for males to be 6 x $10^{-4}$.

- Schettgen et al. (2003), estimated an intake of 60 μg acrylamide per day for non-smokers in the general German population and estimated this corresponded to a cancer risk of between 6 x $10^{-4}$ and 3.6 x $10^{-3}$, using either the World Health Organization (WHO) or USEPA slope factor for acrylamide, respectively.

- Doerge et al. (2008), authors from the USFDA, have estimated excess cancer risk of between 1 x $10^{-4}$ and 4 x $10^{-4}$ for individuals consuming foods containing acrylamide.

Added to these risks is the average endogenously formed dose of 3.0E-04 mg/kg-day which posed a lifetime risk of 1.5 x $10^{-4}$ using the USEPA slope factor of 5.0E-01 per mg/kg-day.

Table 28 contains the estimated cancer risks for each Plaintiff assuming the reported average doses/risks for our daily sources of exposure to nitrosamines and acrylamide.

**Table 28**

**Plaintiffs Lifetime Cancer Risks for Both Nitrosamines and Acrylamide from Endogenous and Exogenous sources\***

| Plaintiff (yrs) | Endogenous Nitrosamines | Exogenous Nitrosamines | Endogenous Acrylamide | Exogenous Acrylamide[#] |
|---|---|---|---|---|
| David Berry (50.8yrs) | 7.84E-03 | 3.60E-05 | 1.09E-04 | 1.81E-04 |
| Brian Kemp (41.25yrs) | 6.37E-03 | 2.92E-05 | 8.84E-05 | 1.47E-04 |
| Kristen Sheen (42.5yrs) | 6.56E-03 | 3.01E-05 | 9.11E-05 | 1.52E-04 |
| Morgan Innes (32.5yrs) | 5.02E-03 | 2.30E-05 | 6.96E-05 | 1.16E-04 |
| Wendy Stone (40.8yrs) | 6.30E-03 | 2.89E-05 | 8.74E-05 | 1.46E-04 |
| N. Komatsu (54.1yrs) | 8.35E-03 | 3.83E-05 | 1.16E-04 | 1.93E-04 |

\*Corrects all lifetime risk by [(total years to diagnosis)/70]. [#]Used the midpoint in the range of risks i.e., 2.5x$10^{-4}$.

Just the exogenous risks associated with our daily dietary exposures to either nitrosamines or acrylamide are larger than each Plaintiff's risk from their alleged Golf Channel exposures to any of Plaintiffs' 5 COCs. Thus, I do not find it possible for Dr. Panigrahy to rule out their common daily exogenous exposures to nitrosamines or acrylamide as an alternative chemical cause of each Plaintiffs' cancer. The background exogenous nitrosamine risk for each Plaintiff is larger than

their combined TCE + PCE + styrene risk from the Golf Channel that were listed in Table 23 by more than four orders of magnitude. Similarly, the exogenous acrylamide risk for each Plaintiff is approximately 5 orders of magnitude greater than their alleged Golf Channel risk from the three VOCs. Thus, the risk posed by both carcinogens eliminates the probability that Plaintiffs' cancers were caused by Plaintiffs 5 CoCs, especially for the three VOC chemicals (TCE, PCE, and styrene).

### 4.6.4   VOCs Present in Our Exhaled Breath

Since the initiation of the TEAM studies decades ago we have been measuring the levels of different chemicals emitted by an individual's breath. This kind of data may serve one of two purposes. One is an indication of the individual's average exposure to chemicals present in their different environments, i.e., it may be used as a surrogate measure of what a personal sampler might have indicated. The second is a measurement of chemicals endogenously generated in the body that might be used to reflect changes in important biochemicals reactions and pathways as occur in certain diseases. Recent measurements of breath concentrations of VOCs have reported what might be considered surprising levels of carcinogenic VOCs being exhaled by study volunteers. For example, Smith et al (2007) report a study of 30 volunteers who gave breath samples at weekly intervals for 6 months in which were measured the following seven target compounds: ammonia, acetone, methanol, ethanol, isoprene, isopropanol, and acetaldehyde. Acetaldehyde is of interest because as Dr. Panigrahy's recent publication (Fishbein et al. 2021) noted acetaldehyde is the genotoxic metabolite of ethanol, stating — *Two of the most common human carcinogens are alcohol and tobacco, . . . While ethanol is not genotoxic nor mutagenic, its metabolite acetaldehyde is a potent local carcinogen.* The breath concentration of acetaldehyde reported in Smith et al (2007) represents a lifetime cancer risk of $8.7 \times 10^{-5}$.[7]

The study of Molchalski et al. (2013) used mass spectroscopy to identify and measure the VOCs present in the blood and breaths of 28 healthy individual volunteers. Besides identifying the measurable presence of 74 different compounds in both sample types, this study reported concentrations of various VOCs of between 0.2 and 2,500 ppb in breath. A concentration range of 0.22-4.5 ppb with a mean of 0.92 ppb was reported for styrene. Converting these ppb levels into concentrations in units of $\mu g/m^3$ the recorded values become a range of 0.94 to 19.17 $\mu g/m^3$ with a mean value of 3.92 $\mu g/m^3$. The mean styrene breath concentration was twice that of the mean for room air which might possibly suggest an endogenous component to the exhaled concentration. The mean breath concentration for styrene is 2,265-fold higher than Dr. Sahu's mean level for the Golf Channel of 0.00172 $\mu g/m^3$, and the lifetime styrene cancer risk associated with the mean styrene breath concentration would be $2.9 \times 10^{-5}$. Two other compounds of interest reported in this study are 1,3-butadiene and benzene. The range of the 1,3-butadiene concentrations in the exhaled

---

[7] Example calculation: median acetaldehyde breath concentration of 22 ppb or 39.6 $\mu g/m^3$ x [2.2 x $10^{-6}$ per $\mu g/m^3$ (IUR)] = 8.7 x $10^{-5}$ (excess cancer risk).

breath samples were between 0.44 to 3.54 µg/m$^3$ (0.2 and 1.6 ppb) with a mean concentration of 1.77 µg/m$^3$ (0.8 ppb).  The breath benzene concentrations ranged from 0.51 to 18.53 µg/m$^3$ (0.16 to 5.8 ppb) with a mean of 2.56 µg/m$^3$ (0.8 ppb).  The corresponding lifetime risk associated with the mean 1,3-butadiene and benzene breath concentrations measured in this study would be 5.3x10$^{-5}$ and 1.28x 10$^{-5}$,[8] respectively.

Table 29A computes the cancer risks associated with these chemicals assuming the reported mean levels of each chemical in recent studies is representative of the average concentration in each plaintiff's breath throughout their lifetime.  The risks listed in this table are those they would have accumulated prior to the diagnosis of their cancer.

**Table 29A**

**Plaintiffs Lifetime Cancer Risks from Four VOCs Measured in in Human Breath\***

| Plaintiff | Acetaldehyde | Styrene | 1,3-butadiene | Benzene |
|---|---|---|---|---|
| David Berry | 6.31E-05 | 2.1E-05 | 3.85E-05 | 9.43E-06 |
| Brian Kemp | 5.13E-05 | 1.7E-05 | 3.12E-05 | 7.66E-06 |
| Kristen Sheen | 5.28E-05 | 1.8E-05 | 3.22E-05 | 7.89E-06 |
| Morgan Innes | 4.04E-05 | 1.3E-05 | 2.46E-05 | 6.04E-06 |
| Wendy Stone | 5.07E-05 | 1.7E-05 | 3.09E-05 | 7.58E-06 |
| N. Komatsu | 6.72E-05 | 2.2E-05 | 4.10E-05 | 1.00E-05 |

\*Corrects all lifetime risk by [(total years to diagnosis)/70].

Table 29B lists the total for the combined breath risks for each plaintiff and compares this value to each plaintiff's total VOC risk for their alleged Golf Channel exposures as listed in Table 25.  The combined risks in Table 29B are substantially higher than the total Golf Channel TCE + PCE + styrene risks for each Plaintiff.  In fact, even the risks of the four individual chemicals listed in Table 29A are higher than the total Golf Channel TCE + PCE + styrene risks for each Plaintiff. (compare the risks for each chemical in Table 29A to the 2nd column in Table 29B for each plaintiff).  I would further note that both relative risk comparisons would remain true even if I had assumed the concentrations for the four VOCs measured in human breath were ten-fold lower.  Finally, I would point out the combined risk for the reported breath concentrations of these four VOCs as shown in Table 29B is also substantially greater than each plaintiff's combined risk from all five CoCs allegedly attributed to defendant by Dr. Sahu.

---

[8] The USEPA IRIS inhalation unit risk for 1,3-butadiene is 3 x 10$^{-5}$ per µg/m$^3$ (https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?substance_nmbr=139). The USEPA IRIS inhalation unit risk range for benzene is 2.2 x 10$^{-6}$ to 7.8 x 10$^{-6}$ per µg/m$^3$; the midpoint of this range is 5.0 x 10$^{-6}$ and was used to calculate the cancer risk (https://iris.epa.gov/ChemicalLanding/&substance_nmbr=276).

**Table 29B**

**Plaintiffs Lifetime Combined Cancer Risks
From Four VOCs Measured in in Human Breath**

| Plaintiff | Total Breath Risk from Acetaldehyde+ Styrene+1,3-Butadiene + Benzene | Total Golf Channel Risk from TCE+PCE+ Styrene | Ratio of Total Breath/Total GC Risk |
|---|---|---|---|
| David Berry | **1.32E-04** | 5.79E-10 | **228,117** |
| Brian Kemp | **1.07E-04** | 6.17E-10 | **173,825** |
| Kristen Sheen | **1.11E-04** | 1.75E-09 | **63,143** |
| Morgan Innes | **8.45E-05** | 2.07E-09 | **40,821** |
| Wendy Stone | **1.06E-04** | 1.13E-09 | **93,876** |
| N. Komatsu | **1.41E-04** | 1.62E-09 | **86,827** |

**\***Corrects all lifetime risk by [(total years to diagnosis)/70].

So, once again another consideration of the Plaintiffs likely exposures to other carcinogenic chemicals present in their environments essentially eliminates any concern for their alleged additional Golf Channel exposures to TCE, PCE and styrene. And it further illustrates why it is not possible for Dr. Panigrahy to rule out their common daily exposures to other chemicals present in the environment as alternative chemical causes of each Plaintiffs' cancer. And again this is example that underscores why the narrow focus of the specific causation analyses offered by Plaintiffs' medical experts is fatally flawed

**4.7     Summary**

The Plaintiffs' medical experts were evidently seriously misled by Dr. Sahu's report which suggests Plaintiffs had been exposed to concentrations of the 5 COCs that were much higher than background level in Florida when in fact they were not. I have shown the HQs calculated for these exposures do not elicit any health concern for these exposures. The cancer risk estimated for each plaintiff likewise eliminate these exposures as probable/possible causes of each Plaintiff's cancer. The conclusions are reached using Dr. Sahu's exaggerated exposure levels. Thus, as is standard risk assessment practice, if concern for an exposure can be ruled out using worst-case assumptions, then more refined and reasonable exposure estimates are not really necessary.

Further, as I have shown, the Plaintiffs' and their medical experts face additional problems with the allegations and expert opinions offered. Using recognized exposure levels for the chemicals of concern in this case demonstrates the exposure/doses attributed to the Defendant cannot represent a reasonably probable cause of any health condition when other sources of these

same chemicals in both the indoor and outdoor air environments of the Plaintiffs are 3-4 orders of magnitude higher.  In addition, Plaintiffs were clearly exposed to other genotoxic carcinogens. When the exposures levels and risk are considered for these chemicals, it is clear Plaintiffs were exposed to higher doses/risks from these other carcinogens as well.  But Plaintiffs medical experts reached their specific causation opinions by assuming the exposure attributable to defendant were meaningful when in fact they were not, and by ignoring the fact Plaintiffs have incurred higher exposures and risks from these same chemicals as well as other carcinogens from their indoor and outdoor microenvironments.  It is clear the myopic focus adopted by Plaintiffs' medical experts and used to form their specific causation opinions has created fatal flaws in these analyses.

Specific causation is not performed by stating no other potential causes were identified when, in fact, other potential causes were not comprehensively considered or evaluated.  Plaintiffs' experts' alleged exclusion of alternatives by "omission of consideration" is not a proper methodology.  As I have noted elsewhere, the importance of understanding the dose of a chemical that is necessary to induce toxicity, and the additional consideration of other potentially confounding chemical exposures, are fundamental concepts recognized by the judiciary (see Reference Manual on Scientific Evidence, 3rd edition, Federal Judicial Center, 2011. Note: the bold text is emphasis I added):

> First, "the dose makes the poison"; this implies that all chemical agents are intrinsically hazardous—**whether they cause harm is only a question of dose**. Even water, if consumed in large quantities, can be toxic. Second, each chemical or physical agent tends to produce a specific pattern of biological effects that can be used to establish disease causation.

And,

> A dose–response study also permits the determination of another important characteristic of the biological action of a chemical — the no observable effect level (NOEL). **The NOEL sometimes is called a threshold, because it is the level above which observable effects in test animals are believed to occur and below which no toxicity is observed.**

And,

> **An exposure assessment should also look for competing exposures**.

And,

> **Moreover, human populations are exposed to many other chemicals and risk factors, making it difficult to isolate the increased risk of a disease that is the result of exposure to any one chemical**.

**5.0     The Flawed Specific Causation Reports Submitted by Plaintiffs Medical Experts**

Having reviewed the specific causation reports submitted by the Plaintiffs' medical experts I found them to be medically and scientifically unreliable.  Essentially each report assumed that because Dr. Sahu had spuriously suggested that the CoC exposures in the outdoor air at the Golf Channel were elevated orders of magnitude above background, all of Plaintiffs' medical experts erroneously assumed this was true.  But this was not true. Then as none of these experts could identify any alternative cause in the medical records, they each essentially concluded the alleged exposures represented the only possible cause of the alleged injuries. But as I have shown in this report, the Plaintiffs' alleged exposures while working at the Golf Channel were neither high nor unusual outdoor air exposures.  Instead they were at background or lower. And while I have no doubt that Defendant's fate and transport experts will have more to say about the assumptions used by Dr. Sahu, and the unjustified opinions he reached using them, I find the erroneous concentrations he reported still do not pose a meaningful level of cancer risk or likelihood of inducing some noncancer disease.  Thus, as is typical for many individuals seeking a physician's care, if causes other than the alleged exposures cannot be identified the Plaintiffs' diseases are considered idiopathic.

**5.1     Plaintiffs' Medical Experts for Cancer**

**5.1.1   Dr. Schmidt**

A review of the medical oncology report submitted by Dr. Judy Schmidt demonstrates she did not form her own, independent evaluation of the alleged exposures and the possible health consequences of these exposures.  She concedes early in her report she relied on opinions reach by Dr. Sahu and Dr. Panigrahy.  If these opinions had been absent she would be left with only the few potential risk factors she did mention but did not seriously consider in this case as the cause of that plaintiff's cancer.  For example, in the early pages of her report she states (emphasis added):

> ***According to Dr. Panigrahy, these chemicals are genotoxic***. *In other words,* ***these chemicals mutate human DNA, and are direct initiators of human cancer. The mechanistic properties of these chemicals also promote and proliferate cancer, and create cancer stimulative cellular environments, as described more fully by Dr. Panigrahy***. *As a result of these mechanistic properties, and consistent with public health agencies throughout the world,* ***Dr. Panigrahy states that there is likely no threshold in the dose-response relationship and therefore there is no dose without a potential cancer causing effect.***

And

> *Hexavalent chromium, arsenic, styrene, tetrachloroethylene and trichloroethylene* ***can cause or contribute to the development of various human cancers, including breast cancer, blood cancers (e.g., Hodgkin's lymphoma and leukemias) and testicular cancer.*** *They are potent human carcinogens*.

And,

> *According to Dr. Sahu's air modeling and background analysis, the Plaintiffs addressed in this report were chronically exposed to among the highest airborne hexavalent chromium and arsenic concentrations in the entire State of Florida. Plaintiffs were regularly exposed to annual averages of hexavalent chromium at the Golf Channel that were multiple times higher than the annual averages in any of the Florida census tracts modeled by the EPA. Plaintiffs were also chronically exposed to annual average levels of arsenic and styrene that were higher than 99% of census tracts modeled by the EPA.* Additionally, Plaintiffs were chronically exposed to annual average airborne levels of TCE and PCE that were more than twice as high as annual average background levels. I will describe each Plaintiff's exposure further in subsequent sections. *These chronic carcinogenic exposures would give me grave concern as a clinician, and compel me to investigate whether such exposures may have a causal role in a patient's cancer diagnosis.*

But when considering possible alternative causes of each Plaintiffs' cancer, Dr. Schmidt relied upon standard sources and not any authoritative sources indicating what each chemical is known to cause.  Thus, she cannot tell you where others might disagree with Dr. Panigrahy or what the basis of this disagreement would be. Therefore, her opinions in this case do not actually provide a second, concurrent opinion, rather it is a kind of "me too opinion, given what I was told kind of opinion."

Ultimately, Dr. Schmidt renders a similar analysis of each Plaintiff's cancer, and suggests the alleged exposures for the Golf Channel are the only potential cause.  Importantly, she never in her report did she account for the possibility that these were idiopathic cases of cancer.  The specific causation analyses for each plaintiff were basically the following:

- For Mr. Berry her report stated the only identifiable cause of his testicular cancer was his alleged exposure to genotoxic carcinogens from Lockheed Martin.  While she notes this type of cancer is increasing in the general population, and that the "factors responsible for this are unclear," and while she also notes the "exact etiology of seminoma is unknown," she does not seriously consider the likelihood that Mr. Berry's cancer was most likely idiopathic.

- For Kirsten Sheen the report of Dr. Schmidt noted her heterogeneously dense breast tissue could be a contributing factor.  She did note that Ms. Sheen not having had children was a risk factor, which was also noted by Dr. Panigrahy's report.  But in her final analysis it is unclear if she ignored this risk factor.  Dr. Schmidt then concluded the chemical exposure from Lockheed Martin "was, more likely than not, a substantial contributing cause of Kristen Sheen's breast cancer."  However, I would note at page 15 of her report she also stated— "Chemicals with occupational exposure and biological evidence relevant to breast cancer include: ethylene oxide, styrene, 1,3 butadiene, aromatic amines and acrylamide." If that is true, I have already shown, Ms. Sheen's background exposure to 1,3-butadiene poses a greater risk than did the chemicals from Lockheed Martin, meaning Dr. Schmidt must now consider this chemical as a more likely potential cause of Ms. Sheen's breast

cancer and the breast cancers that occurred in two other Plaintiffs.  Finally, I note that Dr,
Schmidt's report indicates the risk of getting breast cancer is 2.1% (2.1E-02 or $2.1 \times 10^{-2}$)
by the age of 49.  While Ms. Sheen was 42 years of age when diagnosed, and her risk of
breast cancer was lower than 2.1%, it would likely still be far higher than that I have
estimated for her alleged exposures, or even 1,3-butadiene.  Thus, given the risk associated
with her age, nulliparity, and background exposure 1,3-butadiene, Dr. Schmidt's has no
reasonable medical or scientific basis to suggest an exposure posing a risk well below one
in a million somehow made a substantial contribution to Ms. Sheen's breast cancer.

- For Wendy Stone Dr. Schmidt's report states — "Wendy Stone's medical and personal
  histories reveal that she may have two alternative minor risk factors for breast cancer:
  heterogeneously dense breast tissue and a family history of breast cancer in a second degree
  relative." And "Ms. Stone had no risk factors for the development of breast cancer except
  her genotoxic exposure from Lockheed Martin."  It is unclear how she eliminated these
  two minor risk factors.  Are these factors that pose a chance of getting cancer that is even
  smaller than that posed by the alleged Lockheed Martin exposures?  If so, how did she
  determine this? And while she identified 1,3-butadiene as a potential risk factor, she failed
  to consider what environmental exposures to this chemical the plaintiff might have had.
  Finally,

- For Naoyuki Komatsu her reports states: "He has no known risk factors for ALL spare his
  genotoxic exposure from Lockheed Martin. Exposure to genotoxic chemicals from
  Lockheed Martin was, more likely than not, a substantial contributing cause of his
  leukemia." But her report also states (emphasis added): "*Certain chemical exposures - The
  risk of ALL may be increased by exposure to certain chemotherapy drugs and certain other
  chemicals, including **benzene**.*"   As with butadiene, I have already shown his background
  exposure to benzene posed a risk much greater than did the alleged exposures related to his
  work at the Golf Channel.  So, in the case of Mr. Komatsu' evaluation she has ignored two
  potential alternative environmental causes posing a far greater risk, and therefore greater
  likelihood of being the causes of this cancer simply because she failed to completely evaluate
  all of his environmental exposures. And as in her analyses of the previous Plaintiffs did not
  consider or account for idiopathic causes of this cancer

- Regarding the Hodgkin's lymphoma of Morgan Innes the Schmidt report discussed
  potential risk factors which were not considered as potential cause Ms. Innes' cancer.  And
  the possibility this cancer resulted from idiopathic causes not assessed.

- For Brian Kemp's hairy cell leukemia (HCL) her report finds no identifiable risk factors
  for this rare disease. Ultimately she defers to Dr. Panigrahy's opinion that the alleged
  exposures are chemicals that can cause HCL.  This is apparently on the basis that the five
  CoCs are genotoxic, but many other genotoxic chemicals are ubiquitously present in our
  environments and foods, as I have previously shown, that were given no consideration here.
  It is my understanding that little is known about the causes of HCL, but Dr. Schmidt made
  no attempt to account for the possibility that Brian's cancer was the result of idiopathic
  causes of HCL.

To summarize, Dr. Schmidt's opinions depend on the scientifically unreliable modeling opinions offered by Dr. Sahu and the scientifically unreliable general causation opinions offered by Dr. Panigrahy. Further, Dr. Schmidt fails to reliably address dose, fails to reliably account for other recognized risk factors, and fails for all Plaintiffs to exclude the possibility that each Plaintiff's cancer originated from idiopathic causes.

### 5.1.2   Dr. Panigrahy

Dr. Panigrahy again reiterate his many reasons why he believes the five COCs can cause any cancer alleged by the Plaintiffs (as well as the cancers of other Plaintiffs not in the Henderson case - see his general causation report). And he, like Dr. Schmidt, identified other possible co tributing causes in the medical histories of some patients, but in the end he states he found no reasonable alternative cause for these cancers. So, his opinions rest on three foundations, his general causation analysis, and modeling by Dr. Sahu, and his purported exclusion of all other possible causes.

While I have criticized the lack of science in all three analyses, I would note that in this case even if one assumed Dr. Panigrahy's general causation opinions were correct, which I do not, he provided no dose-response analysis that shows why exposures as low as those allegedly incurred by the Plaintiffs can represent a reasonable probable cause of anyone's cancer. For none of the five CoCs did Dr. Panigrahy show dose-response information demonstrating these chemicals cause these cancers at parts per trillion levels of exposure. Importantly, even if he could, I have shown past exposures the Plaintiffs experienced were far higher and pose greater risks. So, if Dr. Panigrahy remains adamant that these five chemicals can cause Plaintiffs cancers at exposure levels as low as those modeled by Dr. Sahu, then each Plaintiff's past exposures to these same chemicals is the more reasonable alternative cause he cannot eliminate. In addition, as I noted in my first report, because he repeatedly opines all genotoxic carcinogens are capable of initiating cancer in any tissue, he therefore has no basis for excluding the many other genotoxic carcinogens his own publication discusses that we are known to be exposed to. I showed that by considering just a few of the many ubiquitous genotoxic carcinogens present in each Plaintiff's environment, that would also have to be alternative candidate causes for him to consider, as the general environments of the Plaintiff contained exposures to many genotoxic chemicals posing a greater risk of cancer than the alleged Lock heed Martin exposures. Given this undeniable fact, a simple probability of causation analysis would show, as my section 4.0 illustrates, the alleged Lockheed Martin exposures were not significant contributors to any of these cancers, if at all.

### 5.1.3   Summary

To summarize, the opinions offered by the Plaintiffs medical experts regarding the cancers Plaintiffs developed were reached by adopting a specific, narrow, and limited focus on potential

chemical causes. They were not based on a recognized set of general causation conclusions, and there was no dose-response assessment showing the alleged risk incurred by each Plaintiff rose to a level that made the alleged exposure a reasonable potential cause to consider. Whenever a risk factor was mentioned, no probability of causation analysis was performed to demonstrate if that risk factor represented the most likely cause or not. Instead, alternative possible causes, especially given Dr. Panigrahy's theories and methodologies, were simply removed using an "exclusion by omission of consideration" approach to specific causation.

While I have no doubt that Defendant's fate and transport experts will have much to say about the assumptions used by Dr. Sahu, and the opinions he reached using them, the issue of general and specific causation are not based whose interpretation of what definition of background is the most correct. Specific causation in particular is based on an accurate exposure/dose-response analysis of each chemical in question showing the exposure was sufficient to cause cancer. And yet surprisingly, not one of the Plaintiffs' medical experts provided any explanation showing why the concentrations listed in Table 20 of Dr. Sahu's report could actually be a reasonable cause of anyone's cancers or noncancer injuries. They provide no scientific basis explaining why exposures approximating risks of one million or less, using the Dr. Sahu's exaggerated concentrations, somehow makes that chemical a more likely than not cause of a disease that has a far higher background rate in the United States. Instead, Dr. Panigrahy merely argues all exposures carry some risk and never quantifies the magnitude of the alleged risk. He also fails to mention not all small risks will meaningfully contribute to a cancer, but both he and Dr. Schmidt dismissed potential alternative causes as weak candidate causes without any scientifically reliable basis.

I have demonstrated in portions of this report, and in the new attached appendices, that the Plaintiffs, like all of us, were exposed to the same chemicals in their diet or indoor environments to much higher exposure levels of these same chemicals and for a longer total period of time. Similarly, if one assumes Dr. Panigrahy's premises are right, then working to identify and eliminate other risk factors would seem to be a waste of time as all US adults have already incurred greater exposures to these chemicals than the ones he is alleging caused the cancers in this case.

## 5.2    Noncancer Experts

### 5.2.1    Dr. Warburton

Dr. Warburton's brief opinion is also based on the opinions of Drs. Panigrahy and Sahu. Like Dr. Schmidt he did not perform his own general causation analysis. His premise is basically that genotoxic carcinogens induced the kind of genetic changes in the parents produced the birth defects observed in their children. But, even if genotoxic substances cause the conditions he assessed, Dr. Warburton never considered exposures to other genotoxic substances known to present in the parents' environments. Thus, no real exclusion of alternative potential cause is

actually present in his analysis.  His opinions reduce to the assertion that something must have caused the genetic changes that result in these diseases, and taking the narrow focus directed by other experts, only one possibility was considered.  But he never demonstrates these chemicals induce the genetic changes responsible at the concentrations alleged in this case.   More importantly, as I have shown other genotoxic exposures posing a greater chance of inducing some genetic changes were also present in the parents' environments.  So, given his basic premise of disease causation, they cannot be excluded.  In short, his specific causation analysis has the same fatal flaws described above.

### 5.2.2   Dr. Kantor

In my earlier report, I commented on a number of deficiencies and contradictions in Dr. Kantor's general causation report, as did Dr. Mundt.  For these Plaintiffs, greater limitations and flaws in his opinions have been clarified.  I have shown the exposure he claims caused the Plaintiff's disease in the Plaintiffs he evaluated, were not capable of causing these given that Hazard Quotients for each chemical are far less than 1.0.  In addition, I have shown the Plaintiffs were exposed to higher levels of these same chemicals before they began work at the Golf Channel and while they worked at the Golf Channel.  Appendices D and H demonstrate other VOC/solvent chemicals were also present in their environments, and again at higher levels of exposure.  So, the *de minimis* exposures attributed to the Golf Channel cannot even represent a meaningful contributing cause if one chooses to assume his general causation opinions were correct.  And like the preceding experts, Dr. Kantor failed to demonstrate why the exposure level at the Golf Channel, being at or below background levels for just the outdoor air component of our total daily doses of these chemicals was large enough to be capable of causing these diseases.  His vague statement that some risk exists at all doses is an insufficient basis for satisfying this necessary step in his specific causation determination.  And whether he intended to or not, once the myth of Dr. Sahu's modeled exposures being above background vanishes, as it will, his argument that exposures/doses this small cause this disease indirectly means any solvent exposure causes this disease and identifying the specific cause is impossible.

### 6.0     Additional Comments

I note that in his most recent report Dr. Panigrahy continues to apply his novel general causation theories and to place an undue emphasis on the "ten key characteristics" of cancer.  I addressed some of the flaws in this type of analysis in my first report, and I have added two additional appendices that illustrate how Dr. Panigrahy's opinions are contradicted by other scientists that have spent more time analyzing issues he raises in his reports.

In Appendix K, the procedure IARC uses in its general causation analyses is illustrated so that it can be compared to the "novel Panigrahy method." This provides a clear demonstration of why I have stated his approach would not be endorsed by IARC, nor do I believe it would be in the general epidemiology community, and it is certainly inconsistent with the principles of evidence-based medicine which the methodology used to determine general causation in medicine. Appendix K also clearly demonstrates that the very organization and scientists who conceptualized the "ten key characteristics" (TKC) — to provide consistent summaries of mechanistic information considered as part of an overall carcinogenicity evaluation — do not over-emphasize their importance like Dr. Panigrahy does.

Appendix L provides a brief summary of styrene toxicology. The detailed mechanistic information accumulated for styrene's induction of mouse tumors is provided. It shows that of the possible 8 TKCs it has, only one is key in the development of lung tumors in mice. Thus, as I had stated earlier, while describing various possible MOAs (modes of action) might round out a consideration of the mechanistic information on a chemical, it still does not indicate the exact, detailed adverse outcome pathway (AOP) responsible for causing tumor formation. This problem was noted by other scientists as discussed in my first report. The detailed mechanistic information in this appendix also indicates low exposure levels of styrene would not produce enough styrene oxide to pose a meaningful genotoxic hazard or risk. This illustrates once again that summarizing MOA data measured at high *in vitro* concentrations can become irrelevant at lower doses as the transitions to more limited cellular changes induced by a chemical at lower concentrations begin to change the effect outcome.

## 7.0     References

Adgate, J. L., Church, T. R., Ryan, A. D., Ramachandran, G., Frederickson, A. L., Stock, T. H., Morandi, M. T., Sexton, K. Outdoor, indoor, and personal exposure to VOCs in children. EHP 112,14 (2004): 1386-92. doi:10.1289/ehp.7107

ATSDR. 2007. Toxicological Profile for Arsenic." Agency for Toxic Substances and Disease Registry, Division of Toxicology, Atlanta, GA.

ATSDR. 2007. Toxicological Profile for Benzene. Division of Human Health Services.

ATSDR. 2010. Toxicological Profile for Styrene. Division of Human Health Services.

ATSDR. 2019. Toxicological Profile for Trichloroethylene. Division of Human Health Services.

Batterman, S., Jia, C., Hatzivasilis, G. Migration of volatile organic compounds from attached garages to residences: a major exposure source. Environmental research vol. 104,2 (2007): 224-40. doi:10.1016/j.envres.2007.01.008.

Boyce, C. P., Lewis, A. S., Sax, S. N., Eldan, M., Cohen, S. M., Beck, B. D. "Probabilistic analysis of human health risks associated with background concentrations of inorganic arsenic: use of a margin of exposure approach." Human and Ecological Risk Assessment 14.6 (2008): 1159-1201.

Chakraborty J. Cancer risk from exposure to hazardous air pollutants: spatial and social inequities in Tampa Bay, Florida. International journal of environmental health research. 2012 Apr 1;22(2):165-83.

Chan, C.-C., H. Ozkaynak, J.D. Spengler and L. Sheldon.  1991.  Driver exposure to volatile organic compounds, CO, ozone, and NO2 under different driving conditions.  Environ. Sci. Technol  25:964-972.

Clayton, C. A., Pellizzari, E. D., Whitmore, R. W., Perritt, R. L., Quackenboss, J. J. National Human Exposure Assessment Survey (NHEXAS): distributions and associations of lead, arsenic and volatile organic compounds in EPA region 5. Journal of Exposure Analysis and Environmental Epidemiology vol. 9,5 (1999): 381-92. doi:10.1038/sj.jea.7500055.

Dawson HE, McAlary T. 2009. A compilation of statistics for VOCs from post-1990 indoor air concentration studies in North American residences unaffected by subsurface vapor intrusion. Groundwater Monitoring & Remediation. 29(1):60-9.

Doerge DR, Young JF, Chen JJ, DiNovi MJ, Henry SH. 2008. Using dietary exposure and physiologically based pharmacokinetic/pharmacodynamic modeling in human risk extrapolations for acrylamide toxicity. Journal of Agricultural and Food Chemistry. 56(15):6031-8.

Dybing E, Sanner TJ. 2003. Risk assessment of acrylamide in foods. Toxicological Sciences. 75(1):7-15.

EFSA Panel on Contaminants in the Food Chain (CONTAM). 2009. "Scientific Opinion on arsenic in food." EFSA Journal 7.10 (2009): 1351.

Eklund, B. M., Burkes, S., Morris, P., Mosconi, L. Spatial and temporal variability in VOC levels within a commercial retail building. Indoor Air vol. 18,5 (2008): 365-74. doi:10.1111/j.1600-0668.2008.00537.x

European Food Safety Authority. 2014. Dietary exposure to inorganic arsenic in the European population. EFSA Journal 12.3: 3597.

Gunderson, Ellis L. "Dietary intakes of pesticides, selected elements, and other chemicals: FDA Total Diet Study, June 1984–April 1986." Journal of AOAC International 78.4 (1995): 910-920.

Gunderson, Ellis L. "FDA Total Diet Study, July 1986-April 1991, dietary intakes of pesticides, selected elements, and other chemicals." Journal of AOAC International 78.6 (1995): 1353-1362.

Hartwell, T. D., Pellizzari, E. D., Perritt, R. L., Whitmore, R. W., Zelon, H. S. Comparison of volatile organic levels between sites and seasons for the total exposure assessment methodology (TEAM) study. Atmospheric Environment (1967) 21.11 (1987): 2413-2424.

Health Canada. 2016. Guidelines for Canadian Drinking Water Quality. Guideline Technical Document. Chromium. Pub. Number: 160192

Heavner, David L., Walter T. Morgan, and Michael W. Ogden. Determination of volatile organic compounds and respirable suspended particulate matter in New Jersey and Pennsylvania homes and workplaces. Environment International 22.2 (1996): 159-183.

IARC. 2014. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Volume 106. Trichloroethylene, Tetrachloroethylene, and Some Other Chlorinated Agents. IARC; Lyon.

IARC. 2019. Monographs on the Evaluation of Carcinogenic Risks to Humans. Volume 121. Styrene, styrene-7,8-oxide, and quinolone. IARC; Lyon.

Jia, Chunrong, Stuart Batterman, and Christopher Godwin. 2008. VOCs in industrial, urban and suburban neighborhoods, Part 1: Indoor and outdoor concentrations, variation, and risk drivers. Atmospheric Environment 42.9: 2083-2100.

Krewski D, Rice JM, Bird M, Milton B, Collins B, Lajoie P, Billard M, Grosse Y, Cogliano VJ, Caldwell JC, Rusyn II. 2019. Concordance between sites of tumor development in humans and in experimental animals for 111 agents that are carcinogenic to humans. Journal of Toxicology and Environmental Health, Part B. 22(7-8):203-36.

Kurzius-Spencer, M., Burgess, J. L., Harris, R. B., Hartz, V., Roberge, J., Hung, S., Hsu, C., O'Rourke, MK. "Contribution of diet to aggregate arsenic exposures—an analysis across populations." Journal of exposure science & environmental epidemiology 24.2 (2014): 156-162.

Lehmann I, Thoelke A, Rehwagen M, Rolle-Kampczyk U, Schlink U, Schulz R, Borte M, Diez U, Herbarth O. The influence of maternal exposure to volatile organic compounds on the

cytokine secretion profile of neonatal T cells. Environmental Toxicology: An International Journal. 2002;17(3):203-10.

MacIntosh DL, Williams PL, Hunter DJ, Sampson LA, Morris SC, Willett WC, Rimm EB. 1997. Evaluation of a food frequency questionnaire-food composition approach for estimating dietary intake of inorganic arsenic and methylmercury. Cancer epidemiology, biomarkers & prevention: a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology. 6(12):1043-50.

Meacher, D. M., Menzel, D. B., Dillencourt, M. D., Bic, L. F., Schoof, R. A., Yost, L. J., Eickhoff, J. C., Farr, C. H. 2002. "Estimation of multimedia inorganic arsenic intake in the US population." Human and Ecological Risk Assessment 8.7 (2002): 1697-1721.

Mochalski P, King J, Klieber M, Unterkofler K, Hinterhuber H, Baumann M, Amann A. 2013. Blood and breath levels of selected volatile organic compounds in healthy volunteers. Analyst. 138(7):2134-45.

National Academies Press. 2011. Federal Judicial Center. Reference manual on scientific evidence.

Sax, S. N., Bennett, D. H., Chillrud, S. N., Ross, J., Kinney, P. L., Spengler, J. D. 2006. A cancer risk assessment of inner-city teenagers living in New York City and Los Angeles. Environmental health perspectives vol. 114,10: 1558-66. doi:10.1289/ehp.8507..

Schettgen T, Weiss T, Drexler H, Angerer J. 2003. A first approach to estimate the internal exposure to acrylamide in smoking and non-smoking adults from Germany. International journal of hygiene and environmental health. 206(1):9-14.

Schreiber JS, Hudnell HK, Geller AM, House DE, Aldous KM, Force MS, Langguth K, Prohonic EJ, Parker JC. Apartment residents' and day care workers' exposures to tetrachloroethylene and deficits in visual contrast sensitivity. Environmental Health Perspectives. 2002 Jul;110(7):655-64.

Siegel RL, Miller KD, Wagle NS, Jemal A. 2023. Cancer statistics, 2023. CA: a cancer journal for clinicians. 73(1):17-48.

Slingers G, Goossens R, Janssens H, Spruyt M, Goelen E, Vanden EM, Raes M, Koppen G. Real-time selected ion flow tube mass spectrometry to assess short-and long-term variability in oral and nasal breath. Journal of Breath Research. 2020 Jun 30;14(3):036006.

Smith D, Turner C, Španěl P. 2007. Volatile metabolites in the exhaled breath of healthy volunteers: their levels and distributions. Journal of Breath Research. 1(1):014004.

Smith MT, Guyton KZ, Gibbons CF, Fritz JM, Portier CJ, Rusyn I, DeMarini DM, Caldwell JC, Kavlock RJ, Lambert PF, Hecht SS. Key characteristics of carcinogens as a basis for organizing data on mechanisms of carcinogenesis. Environmental health perspectives. 2016 Jun;124(6):713-21.

Storm JE, Mazor KA, Aldous KM, Blount BC, Brodie SE, Serle JB. Visual contrast sensitivity in children exposed to tetrachloroethylene. Archives of Environmental & Occupational Health. 2011 Jul 1;66(3):166-77.

Tao SS, Michael Bolger P. 1999. Dietary arsenic intakes in the United States: FDA total diet study, September 1991-December 1996. Food Additives & Contaminants. 16(11):465-72.

TEVA. 2021.Trisenox (Arsenic trioxide) injection. https://www.trisenox.com/.

Thomas KW, Pellizzari ED, Perritt RL, Nelson WC. Effect of dry-cleaned clothes on tetrachloroethylene levels in indoor air, personal air, and breath for residents of several New Jersey homes. Journal of Exposure Analysis and Environmental Epidemiology. 1991 Oct 1;1(4):475-90.

Thompson CM, Proctor DM, Harris MA. 2023. Letter to "Chepelev et al. Establishing a quantitative framework for regulatory interpretation of genetic toxicity dose-response data: Margin of exposure case study of 48 compounds with both in vivo mutagenicity and carcinogenicity dose-response data". Environ Mol Mutagen. doi: 10.1002/em.22537. Epub ahead of print. PMID: 36916184.

USEPA. 1989. Guidance for Superfund Volume I. Human Health Evaluation Manual. (Part A). EPA/540/1-89/002. December 1989.

USEPA. 2022. IRIS Glossary. https://www.epa.gov/iris/iris-glossary.

USEPA. 2023. Risk Assessment for Other Effects. https://www.epa.gov/fera/risk-assessment-other-effects.

Wallace L, Özkaynak H, Spengler J, Pellizzari E, Jenkins P. Indoor, outdoor and personal air exposures to particles, elements and nicotine for 178 southern California residents. Proceedings of Indoor Air. 1993;93(3):445-50.

Wallace L. Major Sources of Exposure to Benzene and Other Volatile Organic Chemicals 1, 2. Risk Analysis. 1990 Mar;10(1):59-64.

Wallace, L. A., Pellizzari, E. D., Hartwell, T. D., Sparacino, C., Whitmore, R., Sheldon, L., Zelon, H., Perritt, R. 1987. The TEAM (Total Exposure Assessment Methodology) Study: personal exposures to toxic substances in air, drinking water, and breath of 400 residents of New Jersey, North Carolina, and North Dakota. Environmental Research. 43(2): 290-307. doi:10.1016/s0013-9351(87)80030-0.

Wallace, L.A., Pellizzari, E.D., Hartwell, T.D., Whitmore, R., Sparacino, C. and Zelon, H. 1986. Total Exposure Assessment Methodology (TEAM) Study: personal exposures, indoor-outdoor relationships, and breath levels of volatile organic compounds in New Jersey. Environment International, 12(1-4), pp. 369-387.

Wallace, Lance. Major Sources of Exposure to Benzene and Other Volatile Organic Chemicals 1, 2. Risk Analysis 10.1 (1990): 59-64.

Wu C, Schaum J. Exposure assessment of trichloroethylene. 2000. Environmental Health Perspectives. 108(suppl 2):359-63.

Xue, J., Zartarian, V., Wang, S., Liu, S. V., Georgopoulos, P. "Probabilistic Modeling of Dietary Arsenic Exposure and Dose and Evaluation with 2003-2004 NHANES Data." Environmental health perspectives vol. 118,3 (2010): 345-50. doi:10.1289/ehp.0901205

Yost, L. J., Schoof, R. A. and Aucoin, R. "Intake of inorganic arsenic in the North American diet." Human and Ecological Risk Assessment: An International Journal 4.1 (1998): 137-152.

*Vandestreek v. Lockheed Martin Corp.*, No. 6:21-cv-1570-37DCI (M.D. Fla.)

## 8.0    The Materials I Reviewed

- Karyn Vandestreek et al. v. Lockheed Martin Corporation et al. – Amended Complaint and Demand for Jury Trial.
- Rule 26 Report of Dipak Panigrahy, MD
- Rule 26 Report of Ronald J. Kendall, PhD (Dated June 6, 2022)
- Rule 26 Report of Nicholas Butowski, MD (dated January 13, 2022)
- Rule 26 Report of Tim McAuley, MS, PhD (dated February 10, 2023)
- Rule 26 Report of Michael Ballenger, PE, CM
- Rule 26 Report of Steven Mattingly, MS
- Rule 26 Report of Shahrokh Rouhani, PhD, PE
- Rule 26 Report of Henry Friedman, MD

## 8.1    My Understanding of the Case

It is my understanding that in the matter of Vandestreek et al. v. Lockheed Martin Corporation et al., the Plaintiff Karyn Vandestreek, as a Personal Representative of the Estate of Mr. Daniel Vandestreek, is claiming that Mr. Vandestreek developed brain cancer, specifically Grade IV Glioblastoma, as a result of his approximate eight-year exposure to vinyl chloride due to emissions from the Lockheed Martin plant near Tangelo Park. According to the materials I reviewed, Mr. Vandestreek worked at his landscape nursery business, Orlando Outdoors, which was located 600 feet across the street from the Sand Lake Road Complex (SLRC) l at 5001 West Sand Lake Road. He worked at his business from 2011 until 2018. The complaint described his work as follows: "The nature of Mr. Vandestreek's business involved the design, installation, and maintenance of turf grasses, mulching products and plants which required him to work onsite and outdoors daily, for long hours, in close proximity to the Sand Lake Road Complex." Mr. Vandestreek was diagnosed with his tumor, which is also described as glioblastoma multiforme (GBM) by Dr. Butowski, on October 23, 2018, at the age of 41 and died on April 29, 2020, at the age of 43.

## 8.2    Glioblastoma Multiforme

Glioblastoma multiforme is the most commonly occurring brain tumor in adults. The average annual age-adjusted incidence rate of GBM is 3.19 per 100,000 persons in the United States. It comprises 45.2% of malignant primary brain and CNS tumors. GBM only has a median survival time of 15 months. Primary *de novo* GBMs account for 80% of the GBMs, occurring in older patients with a mean age of 62-64 years. Secondary GBMs occur from lower-grade astrocytoma or oligodendroglioma and are seen in younger patients with a mean age of 45.

Secondary GBMs are typically found in the frontal lobe, have a lesser degree of necrosis and a better prognosis than primary GBMs. GBM is more common in men compared to women and more common in Whites than Blacks. GBM is reported to be sporadic but has been linked with prior therapeutic irradiation, with the latency being between a few years to several decades (Tamimi and Juweid, 2017; Kanderi and Gupta, 2022). Other factors associated with GBM are decreased susceptibility to allergy, immune factors and immune genes, and some nucleotide polymorphisms (Tamimi and Juweid, 2017).

### 8.3     The Reports Submitted by Plaintiff's Experts

I have reviewed the report submitted by the Plaintiff's three experts. The report submitted by Dr. Tim McAuley is an attempt to recreate the Plaintiff's workplace exposure to vinyl chloride (and possibly other chlorinated VOCs) that is alleged to have occurred during remediation activities that occurred at the Lockheed Martin facility. The report by Dr. Ronald J. Kendall, a toxicologist, speculates why he believes it is biologically plausible that vinyl chloride may be capable of causing brain cancer. His report also appears to suggest there are other chemicals he may believe also represent biologically plausible causes to consider. The report submitted by Nicholas Butowski, MD, the medical expert represents his specific causation analysis after relying upon the reports and opinions submitted by the other two experts. The reports and opinions of these three experts address different aspects of the specific causation analysis that is necessary in this case.  Dr. McAuley's report must provide the dose of vinyl chloride the plaintiff received. As Dr. Butowski stated in his report he relied upon Dr. Kendall for general causation, and Dr. Kendall's report must provide the general causation evidence necessary to make vinyl chloride a reasonable potential cause for the medical expert to consider. Dr. Butowski's report should take this information and determine if the alleged cause was in fact capable of causing the Plaintiff's disease, and the extent to which other alternative causes or risk factors of the disease can be excluded or remain as other contributing causes. In addition, one of these latter two experts should provide evidence that the exposure/dose received by the plaintiff was sufficient to have made vinyl chloride a reasonable potential cause to add to Dr. Butowski's specific causation analysis in the first place. But neither expert performed this step and just essentially speculate that anything is possible. I found additional serious deficiencies in each of these reports that I will discuss in more detail below. Given the serious limitations and flaws in the information provided to and relied upon by Dr. Butowski, I found no reasonable scientific/medical basis was provided in these reports to support Dr. Butowski's final opinion — *Therefore, to within a reasonable degree of medical certainty, Mr. Vandestreek's exposure history due to emissions from the SLRC remains as the leading causal factor of his development of glioblastoma.*

**8.4     The Plaintiff's Expert Dr. Kendall Failed to Prove Vinyl Chloride is a Known Cause of Glioblastoma**

Dr. Kendall's report was the general causation analysis relied upon by Dr. Butowski who stated — *I then considered the reasonableness of the ability of the identified toxins to cause GBM, which was researched and discussed in the reports authored by Dr. Kendall.* There are two major flaws in Dr. Kendall's analysis. The first is that he performed a selective and limited analysis of the available vinyl chloride epidemiology. He repeatedly cites to older studies of vinyl chloride cohorts, and ignores the findings provided by updates of these studies. This is not a proper causation methodology for two reasons. One is that early in a cohort being studied, the number of expected deaths is based on the small numbers available and may provide false increases and deficiencies in a disease that that does not accurately reflect the final outcome when the mortality of the cohort has fully matured. Over time the total mortality increases, and the initial 'picture' of what diseases is actually increased or decreased in it changes. In addition, over the lifetime of the facility, the manufacturing processes and chemical use at a facility may change. This may eliminate known or unknown confounding exposures, or change the disease incidence as improved industrial hygiene practices lower chemical exposures.

The carcinogenic potential of vinyl chloride In humans Is largely based on the results observed in two large, multicentric cohort studies, one of which was carried out in the United States and the other in Europe. While brain cancer appeared to be elevated in early analyses of the cohort in this country, the more recent epidemiologic evidence gathered from updates of the cohort studies has indicated, however, this observation was most likely an anomaly, the origin of which is not clear. For example, in its 2008 evaluation of the then available vinyl chloride epidemiology IARC (2008) noted that the excess of brain cancer observed initially among workers of the North American cohort was greatest in those who worked in plants before 1946. In contrast, no excess of brain cancer mortality or incidence was being observed in the European multicenter study. In the European cohort update the lack of any brain cancer risk was bolstered by the fact that no trends in the SMR were seen with respect to time since first employment, duration of employment, cumulative exposure, or calendar period of hire, and the fact that brain cancer risk was similar for those who had been autoclave workers (greatest exposure) and those who had not. This IARC monograph also noted the 2003 meta-analysis performed by Boffetta based on five studies was not significant. While an increase was observed this was due solely to the North American cohort, and no trend with duration of exposure was seen in either of the two large cohorts. The lack of a consistent observation of a brain cancer elevation in different cohorts, one that does not persist as the cohorts mature, and one that does not increase with the duration of exposure are key observations by the IARC working group that completely invalidate the hypothesis Dr. Kendall's reports attempt to offer. The fact that he should have been aware of these limitations further undermines the credibility of his reports.

The only target organ for which there is clear and convincing evidence that vinyl chloride causes cancer in humans is the liver.  In its most recent update IARC (2012) reached the following conclusions: *There is sufficient evidence in humans for the carcinogenicity of vinyl chloride. Vinyl chloride causes angiosarcoma of the liver, and hepatocellular carcinoma.*  Regarding Dr. Kendall's brain cancer hypothesis, the IARC working group again found no causal association for brain cancer and stated:

> *There is contradictory evidence that exposure to vinyl chloride is associated with malignant neoplasms of connective and soft tissue, and **inconsistent or scanty evidence** that it is associated with cancers of the lung, **brain**, lymphohaematopoietic system, and breast, or with melanoma of the skin.*

And,

> *The Working Group **did not find strong evidence for associations** of exposure to vinyl chloride with cancers of the **brain** or the lymphatic and haematopoeitic tissues, with melanoma of the skin…"*

Finally, I note that in its list of "Carcinogenic agents with *sufficient evidence* in humans" and "Agents with *limited evidence* in humans," IARC does not list vinyl chloride as a being associated with brain cancer for either category (IARC, 2023).  In fact, the only agent listed by IARC are "X- and Gamma-radiation" as having sufficient human evidence and "Radiofrequency electromagnetic fields" having limited evidence in humans as shown below in a screenshot reproduction of the IARC table listing which agents are known causes of specific types of cancer.

| **List of classifications by cancer sites with *sufficient* or *limited evidence* in humans, *IARC Monographs* Volumes 1–132[a]** | | |
|---|---|---|
| **Cancer site** | **Carcinogenic agents with *sufficient evidence* in humans** | **Agents with *limited evidence* in humans** |
| **Eye, brain, and central nervous system** | | |
| Eye | Human immunodeficiency virus type 1 (infection with) <br> Ultraviolet emissions from welding <br> Ultraviolet-emitting tanning devices | Solar radiation |
| Brain and central nervous system | X- and Gamma-radiation | Radiofrequency electromagnetic fields (glioma and acoustic neuroma) |

Source: List of Classifications by Cancer Site (IARC, 2023).

The fact that after all of the many general causation assessments performed by IARC and given the fact that many of the carcinogens IARC has evaluated are lipophilic chemicals that are bioactivated in the body by P450 enzymes to electrophilic, genotoxic carcinogens, and the fact that ultimately none of the many carcinogens evaluated by IARC is a recognized cause of brain cancer

is strong evidence against both Dr. Kendall's flawed general causation analysis, and his hypothetical mechanism.

The second major flaw in Dr. Kendall's speculation that vinyl chloride causes brain cancer in humans occurs in his hypothetical mechanism. Here he simply states that because like almost all chemicals vinyl chloride distributes to most if not all tissues, and so reaches the brain. Then because the brain has some level of the cytochrome P-450 isozyme CYP2E1, an oxidative enzyme that generates the epoxide metabolite of vinyl chloride, chloroethylene oxide, he states the brain has the "potential" to convert vinyl chloride to its mutagenic and carcinogen metabolite. But the hypothesis he proposed ignored several other key facts. First, he failed to discuss the detoxification pathways for epoxide intermediates like epoxide hydrolases and glutathione transferases. Epoxide hydrolases are detoxification enzymes that like the cytochrome P-450 enzyme are present in the microsomal cell fraction where CYP2E1 would be found. So, Dr. Kendall did not mention epoxide intermediates of vinyl chloride may be detoxified right in the same area of the cell structure where they are formed. Any epoxide intermediates reaching a cell's cytoplasm may then be detoxified via glutathione conjugation by glutathione transferases. But when he cited Farin et al (1993) as a study of the presence of CYP enzymes in the brain he failed to mention and consider the presence of important detoxification mechanisms also noted in this paper. There are a number of enzymes involved in the biotransformation of chemicals, and these may be found throughout the body. But the mere presence of these enzymes, some bioactivating a chemical and some detoxifying the chemical, in one tissue or another provides no indication of the balance between these enzymatic systems, nor the ultimate outcome of these reactions within a tissue. Simply postulating the presence of CYP2E1 in brain tissue, as Dr. Kendall does, skips many steps in the potential outcome he Is suggesting. For example, high levels of CYP2E1 are present In lung tissue. And he argued that with inhalation vinyl chloride is absorbed in the lungs by-passing the liver and the first -pass effect seen with many chemicals absorbed orally. So, why then isn't vinyl chloride recognized as a lung carcinogen in those workers receiving such high exposure levels of vinyl chloride? The same question may be posed for the kidney, another organ with relatively high CYP levels compared to most tissues. In short, suggesting the presence of one biotransformation enzyme in the brain as somehow providing a mechanistic basis for inducing brain cancer by a chemical is an overly simplistic speculation unless additional evidence is provided. To shorten this discussion, I simply note that in its 2008 evaluation of vinyl chloride the IARC scientists, when discussing possible mechanisms, noted that studies of DNA etheno adducts in the rat observed increased levels of etheno adducts in different rat organs, such as the liver, lung, and kidney, and in lymphocytes but not in the brain. Thus, studies in this species indicates there is no basis to suggest the mere presence of CYP enzymes in the brain provides a sufficient reason to postulate vinyl chloride exposure can induce mutations in the brain.

To summarize, Dr. Kendall's report failed to support his premise that it is biologically plausible to assume vinyl chloride might be capable of inducing brain cancer in humans, and he

did not provide a sufficient or thorough general causation analysis. He selectively cited weaker, older epidemiology studies, and ignored the evidence presented in updates that provide more reliable information. His approach is simply not a one endorsed by epidemiologists or an agency like IARC whose recognized experts routinely perform general causation assessments. This limitation of Dr. Kendall's assessment, and other problems with it, are stated clearly in the preamble in Volume 130 (IARC, 2022) outlining their view of accepted methodologies for assessing general causation:

> *The Working Group <u>considers all pertinent epidemiological studies</u>, cancer bioassays in experimental animals, and mechanistic evidence, as well as pertinent information on exposure in humans.* (at page 12, emphasis added)

And,

> At page 19 the Preamble in the Monograph notes that when there are multiple publications on a single cohort, as arises when follow-ups of a particular human cohort are published, states (emphasis added) — *Usually in such situations, <u>only the most recent, most comprehensive, or most informative report is reviewed in detail</u>.* And on page 19 IARC states — *Chance, which is also called random variation, can produce misleading study results. <u>This variability in study results is strongly influenced by the sample size: smaller studies are more likely than larger studies to have effect estimates that are imprecise</u>.*

And, beginning at page 23, IARC discusses how carcinogenic responses observed in animals provides biologic plausibility that the chemical may cause cancer in humans. But they note there is no tissue concordance —*The inference of potential carcinogenic hazard to humans **does not imply tumour site concordance across species** (Baan et al., 2019)*. I had noted this limitation with species extrapolations earlier in Appendix C.

In short, Dr. Kendall's report and opinions did not provide Dr. Butowski with a sufficient scientific or medical basis for selecting vinyl chloride as a possible cause of the Plaintiffs' glioblastoma.

## 8.5   The Expert Report by Dr. McAuley Indicates the Alleged Exposure to Vinyl Chloride Was Insufficient to Have Caused a Cancer of Any Kind

I have reviewed the report submitted by Dr. McAuley and will illustrate that even using this worst-case analysis of the vinyl chloride exposure Mr. Vandestreek allegedly incurred, there is still no reasonable basis for assuming it was a potential cause of his brain cancer. However, based on my understanding from Defendant's fate and transport experts, Dr. McAuley made some assumptions in his report that would have led to an over-estimation of vinyl chloride exposures. Two of these errors are:

- Three of the four vinyl chloride sources at SLRC had been taken out of operation in 2006. Dr. McAuley's modeling time frame began in 2011, so his inclusion of data from these

three sources would have resulted in an over-estimation of vinyl chloride exposure concentrations for Mr. Vandestreek which would have been zero some years.

- He only calculated maximum 1-hour AERMOD values, rather than annual averages, the only appropriate exposure metric for the issue under consideration in this case. So his exposure assessment would not reflect the likely average exposure the Plaintiff might have incurred over the 70,000 hour timeframe McAuley modeled. In addition, many of the time points he relied on occurred at hours when Mr. Vandestreek would not have been exposed, e.g., 2 a.m., 4 a.m., 5 a.m. in the morning.

Still for the sake of argument I analyzed the potential health impact created by the alleged exposure levels.

Dr. McAuley used USEPA's AERMOD air dispersion model to estimate Mr. Vandestreek's vinyl chloride exposure for the time period he worked at Orlando Outdoors. I calculated the average (mean) vinyl chloride concentration of the maximum values that were estimated for the eight years Mr. Vandestreek was alleged to have been exposed using the concentrations provided in Table 2 of Dr. McAuley's report. The average of his maximal exposure levels would be 0.000065 $\mu g/m^3$ (or 0.065 $ng/m^3$) for the eight years the Plaintiffs was allegedly exposed.

Assuming Mr. Vandestreek had an 8-year (2011-2018) workplace exposure[9] to 0.000065 $\mu g/m^3$ vinyl chloride and applying the USEPA's inhalation unit risk factor (UIR) for vinyl chloride of 4.4 x $10^{-6}$ per $\mu g/m^3$)[10], the lifetime cancer risk associated with this worst-case exposure assessment have been 1.12 x $10^{-11}$ (USEPA, 2000). This is a ~1 in one hundred billion (100,000,000,000) cancer risk. Because there are only ~7.9 billion individuals currently living on Earth[11], this would mean that "more likely than not" no individual would develop cancer from an exposure carrying this level of risk (i.e., 7.9 billion people*1.12. x$10^{-11}$ risk = 0.088 or a less than 1/11 chance a single person would develop cancer).

<u>Comparisons of Vandestreek's Alleged Exposure to Thresholds Reported for Vinyl Chloride</u>
<u>*A. Hairdressers*</u>

Although most past commercial uses of vinyl chloride were discontinued by its 1974 ban by the Consumer Product Safety Commission, it was previously used as a propellant in aerosol cans and as an ingredient in a number of drugs and cosmetics. Vinyl chloride was also important

---

[9] It is assumed that Mr. Vandestreek was exposed for 7 work-years/70-year lifetime, 8 hours/day, 5 days/week, 50 weeks/year, and inhaled 10m$^3$ air/workday.
[10] An inhalation unit risk of 4.4 x $10^{-6}$ per 1 $\mu g/m^3$ vinyl chloride in air means that no more than ~4 excess tumors would be expected per 1,000,000 people if they were exposed all day, every day, for a continuous lifetime during adulthood to a 1.0 $\mu g/m3$ exposure concentration.
[11] https://www.census.gov/popclock/.

in industry due to its flame retardant properties, and for this or other properties was used in the manufacture of polymers, wire and cable coatings, packaging materials, furniture and automobile upholstery, wall covering, automotive parts, housewares, phonographic records, flexible films, and vinyl chloride-vinylidene chloride copolymer food packaging films (ATSDR, 1989). Other past potential sources of vinyl chloride have included drinking water (small amounts where PVC pipes have not been treated to adequately remove vinyl chloride monomer); some foods (limited amounts from migration of PVC food wrappings and containers; vinegar; edible oils); new cars with plastic interiors. Cigarettes and cigars are reported to contain vinyl chloride (ATSDR, 1989).

I mention these because by the late 1960s and early 1970s its use as an aerosol propellent in cans of hairspray raised an issue of the cancer risks posed by its past use in commercial and home hair salons. To estimate this risk Sahmel et al. (2009) used Monte Carlo modeling to determine the levels of vinyl chloride that commercial and home salons would have had from vinyl chloride's use in hairspray. Assuming a market-share fraction of vinyl-chloride containing hairsprays, it was then estimated that the commercial salons would have had a 95th percentile daily time-weighted average exposure of about 0.3 ppm and about 0.1 ppm for home salons. The 95th percentiles cumulative lifetime exposure of hairdressers was estimated to be 2.8 ppm-years for home salon scenarios, and 2.0 ppm-years for small, medium, and large salon scenarios. Then assuming all hairsprays used in salons contained vinyl chloride, the 95th percentile cumulative dose was estimated to be 52- to 79-ppm-years. Based on this conservative analysis, Sahmel et al. (2009) concluded that all of their estimated lifetime doses (calculated as ppm-years of exposure) were well below an estimated threshold dose for hepatic angiosarcoma of about 300-500 ppm-years. They then noted this finding was consistent with the fact that liver cancer and angiosarcoma were not elevated in the five epidemiology studies of hairdressers. Because the exposures to hairdressers in this study were orders of magnitude higher than that alleged for Mr. Vandestreek, the results of this study also suggest he would not get cancer from vinyl chloride.

*B. Vinyl Chloride Workers*

The Mundt et al. (2017) study provided an update on the mortality of 9,951 men employed between 1942 and 1972 at 35 vinyl chloride or polyvinyl chloride plants who were followed through December 31, 2013.  These investigators reported the risk of angiosarcoma of the liver (ASL) and primary hepatocellular carcinoma (HCC) were only increased among workers with "very high estimated cumulative exposures, that is, over 1000 parts per million-years, and after long latencies (median latency was 36 and 48 years, respectively, for ASL and HCC)."  Important with respect to Mr. Vandestreek's case, Mundt et al. (2017) found that there was no increased risk for brain cancer in association with association to vinyl chloride exposure.  Mundt et al. (2017) concluded (emphasis added):

*Despite imprecise cumulative exposure estimates, strong associations between cumulative exposure to VC and risk of ASL and HCC were observed, with clear evidence of exposure thresholds. No ASL was reported among workers exposed to*

> *<63 ppm-years and only one ASL was reported among workers with cumulative exposure 63 to <287 ppm-years (likely underestimated due to limited work history data). Therefore, **ASL tended not to occur in workers with cumulative exposure below approximately 250 ppm-years. Risk of HCC was not increased among workers accumulating less than approximately 1000 ppm-years of VC exposure.***

And,

> ***Very high cumulative VC exposure was strongly associated with both increased ASL and HCC; however, risks were not increased among workers with cumulative exposure estimates below 1000 ppm-years.*** *This threshold is approximately 25 times greater than would be accrued over a working lifetime at today's exposure limit of 1.0 ppm, in place since 1975. In fact, **no ASL death has been identified in this cohort among workers first employed since 1969**. On the other hand, risks of ASL and HCC were highly elevated among workers with cumulative VC exposure exceeding 5000 ppm-years, roughly 125 times a working lifetime at today's exposure limit.*

Because the risk of vinyl chloride-associated cancer (i.e., angiosarcoma, not brain cancer) is measured in terms of "ppm-years" (a function of concentration and duration of exposure), I calculated Mr. Vandestreek's alleged 8-year duration of exposure to his average vinyl chloride exposure concentration of 0.000065 μg/m$^3$ or 0.0000000254 ppm x 8 years = 2.03x10$^{-7}$ ppm-years. This can then be compared to the threshold for vinyl chloride-related cancers mentioned in Mundt et al. (2017) (not brain cancer, which is not known to be causally related to vinyl chloride exposure in humans) of 250 ppm-years for ASL. Mr. Vandestreek's estimated dose is more than 1,230,000,000-fold lower than the 250 ppm-year threshold for vinyl-chloride related ASL. Again, as vinyl chloride has not been concluded to be causally related to brain cancer in humans, this comparison is a likely over-estimate of Mr. Vandestreek's risk of brain cancer from this chemical. I further note, tumors causally related to vinyl chloride exposure have a long latency time, e.g., 36 and 48 years, respectively, for ASL and HCC, as stated by Mundt et al. (2017). By comparison, in Mr. Vandestreek's case his cancer apparently was diagnosed in 2017 while he was still working at Orlando Outdoors, and he had only been reportedly exposed to vinyl chloride for approximately 7-8 years. This does not fit with the known temporality of tumors known to be caused vinyl chloride, particularly as it is well known that tumor latency tends to increase as the exposure decreases. Therefore, there are strong dose and temporality arguments against the Plaintiff's premise his cancer was caused by his alleged vinyl chloride exposure.

## 8.6    The Reports of Dr. Kendall Raised the Issue of Other Chemicals Being Possible Causes of Brain Cancer

In his latest report Dr. Kendall states — *There is evidence in the scientific literature that occupational exposure to chemicals, such as carbon tetrachloride, were associated with the development of glioblastoma multiforme, the brain cancer that developed in Mr. Vandestreek (Nelson, et al., 2012).   In addition, there is further evidence of the chemical relationship to the development of primary brain cancers, including glioma, in humans (Lee, et al., 1996). For*

*instance, men with high consumption of cured foods containing N-nitroso compounds were twice as likely to develop brain cancer than controls.* In his earlier Vandestreek report he also suggested methylene chloride was a possible cause. Finally, because his hypothesized mechanism is CYP2E1 in the brain may that bioactivate vinyl chloride to a reactive, carcinogenic metabolite, I have included 1,3-butadiene as a chemical fitting his speculative possible mechanism. And like vinyl chloride this chemical is bioactivated to a reactive, genotoxic metabolite and is also a known to be a human carcinogen.

Table 1, found on the next page, provides a summary of the outdoor concentrations for other various hazardous air pollutants (HAPs) present in Florida's air. This demonstrates Plaintiff's experts selective focus on the vinyl chloride, as the sole outdoor air exposure to a genotoxic carcinogen, is unsupportable. This is a serious flaw in the specific causation analysis offered by Plaintiff's experts.

In Table 2, I have calculated Mr. Vandestreek's lifetime cancer risk from his potential exposure to just these four VOCs that are present in the outdoor air of Florida. His lifetime risk from his known exposure to each chemical is far higher than any risk from Mr. Vandestreek incurred from his alleged exposure to vinyl chloride. The ratio of risks from each exposure to these carcinogens common to Florida air were between 461- to 174,407-fold higher than his worst-case vinyl chloride risk. Combined, the total risk from these four carcinogens poses a combined risk that was 458,521-fold higher than the risk from vinyl chloride being attributed to the SLRC.

**Table 1**

**Mean Concentrations\* ($\mu$g/m$^3$) of Other HAPs in the Outdoor Air of Florida**

| Monitor Location | Benzene | 1,3-Butadiene | Carbon Tetrachloride | Methylene Chloride |
|---|---|---|---|---|
| Fort Lauderdale (5) Suburban | 0.947 | 0.0770 | 0.0483 | 0.707 |
| Davie (10) Suburban | 0.789 | 0.0839 | 0.518 | 1.150 |
| Coconut Creek (9) Suburban | 0.704 | 0.0698 | 0.496 | 1.98 |
| Dania (4) Suburban | 1.170 | | 0.491 | 0.831 |
| Tampa, USMC (5) Suburban | 0.653 | 0.0933 | 0.562 | 0.342 |
| Tallahassee (5) Suburban | 0.615 | | 0.433 | 0.952 |
| St. Petersburg, A.P. (14) | 0.579 | 0.0857 | 0.518 | 0.351 |
| Pinellas Park (12) Suburban | 0.702 | 0.0967 | 0.512 | 0.961 |
| Winter Park (10) Urban, | 0.511 | 0.0708 | 0.527 | 0.345 |
| Valrico (13), Rural | 0.433 | 0.0585 | | 1.30 |
| **Mean for all Florida Data\*\*** | **0.667** | **0.0792** | **0.508** | **0.881** |

\* This value represents to mean for that location.
\*\*This value is the mean for all Florida data, and not just for the cities represented in this table.

**Table 2**

**Excess Cancer Risks Associated with the Inhalation of Four Commonly
Found Carcinogens Measured in Florida's Outdoor Air**

| Chemical Detected in Florida Ambient Air | Mean Concentration Detected in Florida ($\mu g/m^3$) | USEPA IRIS Inhalation Unit Risk (IUR per $\mu g/m^3$)* | Vandestreek's Lifetime Inhalation Cancer Risk# | Ratio of Excess Risk McAuley's Total VC Risk for Mr. Vandestreek** |
|---|---|---|---|---|
| Benzene | 0.667 | 5.0E-06 | $1.95 \times 10^{-6}$ | 174,407 |
| 1,3-Butadiene | 0.0792 | 3.0E-05 | $1.39 \times 10^{-6}$ | 124,255 |
| Carbon tetrachloride | 0.508 | 6.0E-06 | $1.79 \times 10^{-6}$ | 159,398 |
| Methylene chloride | 0.881 | 1.0E-08 | $5.69 \times 10^{-9}$ | 461 |
| **Combined chemical risk** | | | **$5.14 \times 10^{-6}$** | **458,521** |

*IURs from https://www.epa.gov/iris. **Mr. Vandestreek's cancer risk for 8-year exposure based on mean concentration from Dr. McAuley's modeled concentrations equal to $1.12 \times 10^{-11}$. All of these lifetime risks are based on a 41 year exposure interval, i.e., all exposures he accumulated during his lifetime up to the year his cancer was diagnosed.

Last, as Dr. Kendall suggested nitrosamines as a group of reactive chemicals that could cause brain cancer I note the paper by Chowdhury (2014), which is discussed in Appendix J, calculated a lifetime risk from our daily exogenous exposures to nitrosamines of $4.96 \times 10^{-5}$. The lifetime risk from endogenously formed nitrosamines was more than 200-times higher. Still, Mr. Vandestreek would have accumulated a total risk from just his exogenous exposure to nitrosamines of about $2.9 \times 10^{-5}$ by the time his cancer had been diagnosed. This risk is more than a million fold higher than his alleged vinyl chloride risk.

Before leaving issue of the Plaintiff's *de minimis* risk associated with his alleged vinyl chloride exposure, I would also note these alleged vinyl chloride exposures would not represent atypical exposure for the state of Florida or within the United States. A limited number of measured vinyl chloride air concentrations have reported from Florida and are available from the USEPA's Air Toxics program. These outdoor vinyl chloride concentrations come from air monitoring conducted in nearby Winter Park, FL, see Figure 1.



**Figure 1.** Vinyl chloride concentrations (ng/m$^3$) at Winter Park, FL ambient air monitoring site (purple dots) compared to the National median (black line) and 10th and 90th National percentiles (blue shaded area) for the years measured (USEPA Air Toxics).

In Figure 1 the measured vinyl chloride levels in nearby Winter Park, FL (purple dots) ranged from 10.7 to 43.6 ng/m$^3$. The United States average concentration reported ranged from 26.9 to 51.8 ng/m$^3$ during this period of time, while Figure 1 show the U.S. median concentration ranged between 5.5 to 41.2 mg/m$^3$ (black line), and 10th – 90th percentile of the U.S. concentrations (blue shaded area) ranged between 3.2 – 120.5 ng/m$^3$. During this same interval Dr. McAuley's concentrations, which ranged from 0.04 to 0.1 ng/m$^3$ would fall in the white area below (i.e., the area between zero and the 10th percentile line). So, this figure illustrates Mr. Vandestreek's alleged workplace exposure concentrations, based on assumptions that exaggerated the magnitude of the exposure, would still have been far below other exposures occurring in Florida and the United States.

Another perspective is provided in Table 3. This table lists the measured vinyl chloride concentrations for three years at Winter Park, FL, and the average measured U.S. concentrations for the years 2003 through 2016. The ratio provided in the third column of this table shows that comparison to these concentrations to average of the maximum levels Dr. McAuley's estimated for Mr. Vandestreek of 0.000065 µg/m$^3$.

**Table 3**

**The Ratio of Vinyl Chloride Concentrations in Florida and the U.S.
Compared to the Mean of the Maximum Values Modeled for Mr. Vandestreek**

| Location | Vinyl Chloride Concentration ($\mu g/m^3$) | Ratio of Ambient Air VC Level/ the Mean of McAuley's maximum VC Levels* | Source |
|---|---|---|---|
| **Winter Park, FL** | | | USEPA Air Toxics** |
| 2006 | 0.043633 | 670 | |
| 2007 | 0.014262 | 219 | |
| 2008 | 0.010708 | 165 | |
| **Average U.S. air concentration** | | | USEPA Air Toxics** |
| 2003 | 0.042368 | 652 | |
| 2004 | 0.038455 | 592 | |
| 2005 | 0.042421 | 653 | |
| 2006 | 0.026915 | 414 | |
| 2007 | 0.031116 | 479 | |
| 2008 | 0.034088 | 524 | |
| 2009 | 0.037455 | 576 | |
| 2010 | 0.035162 | 541 | |
| 2011 | 0.036119 | 556 | |
| 2012 | 0.038709 | 596 | |
| 2013 | 0.041477 | 638 | |
| 2014 | 0.041190 | 634 | |
| 2015 | 0.051840 | 798 | |
| 2016 | 0.046719 | 719 | |

*0.000065 $\mu g/m^3$ vinyl chloride. **https://gispub.epa.gov/air/trendsreport/2019/#toxics.

## 8.7    Dr. Butowski's Specific Causation Analysis for Mr. Vandestreek is Seriously Flawed and Reaches an Unsupportable Conclusion

The brief report submitted by Plaintiff's medical expert, Dr. Butowski, was not rigorous and as I have shown has failed to address all of the relevant facts. First, there is no recognized authority that has concluded vinyl chloride is a known cause of brain cancer in humans. Instead, IARC, an Agency that would be considered a recognized authority on the subject of general causation, does not consider vinyl chloride to be a chemical known to cause brain cancer, nor at present has it listed any chemical as a cause of brain cancer. The superficial epidemiological analysis provided by Dr. Kendall did not provide the kind of evidence that would suggest the scientists of the various IARC working groups that have evaluated vinyl chloride several times failed to consider all of the information, or somehow made an obvious methodological error. In

99

addition, Dr. Butwoski states on the last page of his report that (emphasis added) — *Based on my review of records, interrogatory answers and the statement of Mrs. Vandestreek Mr. Vandestreek was otherwise missing any of the aforementioned risk factors for glioblastoma or regular exposure to other known carcinogens*.  But as I have shown, Mr. Vandestreek was exposed to other carcinogens daily at work and throughout his lifetime.  Two of these chemicals were mentioned by Dr, Kendall (carbon tetrachloride and methylene chloride) as chemicals that like vinyl chloride might also be considered potential brain carcinogens. The other two chemicals are human carcinogens, which like vinyl chloride are known to cause cancer elsewhere in the body, but also like vinyl chloride are bioactivated to reactive epoxide intermediates by CYP2E1. So, given Dr. Kendall's loose mechanism by which a chemical might be capable of inducing brain cancer, they would require consideration as well. All four of these carcinogens to which Mr. Vandestreek was exposed to throughout his lifetime posed a substantially greater risk of inducing cancer than did vinyl chloride.  Yet neither Dr. Kendall nor Dr. Butowski evaluated any exposures to other chemical carcinogens, and in the performance of a differential diagnosis a reasonable opinion is not reached if one fails to consider all potential alternative causes, known or unknown.

In addition, nowhere in the reports submitted by Drs. Butowski or Kendall did either expert demonstrate why one should expect vinyl chloride, at the levels of exposure allegedly incurred by the plaintiff, to be capable of inducing cancer of any kind. The Plaintiff's level of accumulated exposure to vinyl chloride was more than a billion times lower than the level of exposure required to induce the types of cancer this chemical is known to be capable of causing. Similarly, given the fact that DNA adducts were not seen in the brains of rats exposed vinyl chloride levels higher than Mr. Vandestreek's suggest his lower exposure levels will also not induce mutations in the brain. This is a clear contradiction of Dr. Butowski's opinion that — *Furthermore, the level of exposure to vinyl chloride presented by Mr. Vandestreek's work across the street from the SLRC over the time period of 2011-18 (as shown by Dr. McCauley's Report) was sufficient in both amount and chronic duration to expose him, via inhalation, to quantities of vinyl chloride that would induce genetic mutations and a primary brain cancer.*  But again, this was another opinion Dr. Butowski offered without any supporting evidence or any indication of how he might possibly reach this conclusion.

Given all of the above, there simply is no scientific basis or support for Dr. Butowski's final statement — *Therefore, to within a reasonable degree of medical certainty, Mr. Vandestreek's exposure history due to emissions from the SLRC remains as the leading causal factor of his development of glioblastoma.*  Instead, all of the available evidence contradicts this statement.  Given that there is insufficient medical evidence to implicate vinyl chloride as a possible cause, and as Dr. Butowski identified no other possible cause to consider, this cancer would appear to be just another idiopathic case of glioblastoma.

**Disclaimer**:  To prevent any mischaracterizations of this report or my opinions on certain subjects later I note the following. I used the USEPA risk assessment approach in this report not because I believe it an accurate portrayal of the actual human risk from chemical exposures, but because its health protective procedures, which tend to exaggerate risk, make it scientifically justifiable to use USEPA risk assessment procedures to rule out causation associated with small risks (see my original Appendix for more details). I also do not agree that all genotoxic chemicals pose some risk at all doses (also discussed in my previous report and appendices).  However, as Plaintiffs' Experts have adopted this position, I have shown that applying this worst-case presumption leads to an obvious contradiction of their opinions via the relative risk comparisons performed in this report.

## 8.8     References

Agency for Toxic Substances and Disease Registry. Syracuse Research Corporation. *Toxicological Profile for Vinil Chloride*. Agency for Toxic Substances and Disease Registry, Syracuse Research Corporation, 1989.

Arsenic, E. P. A. "inorganic (CASRN 7440-38-2): Carcinogenicity assessment for lifetime exposure." *Washington, DC: Integrated Risk Information System (IRIS), US Environmental Protection Agency* (1998).

Kanderi, Tejaswi, and Vikas Gupta. "Glioblastoma multiforme." *StatPearls [Internet]*. StatPearls Publishing, 2021.

Mundt, Kenneth A., et al. "Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013." *Occupational and Environmental Medicine* 74.10 (2017): 709-716.

Sahmel, Jennifer, et al. "The use of multizone models to estimate an airborne chemical contaminant generation and decay profile: occupational exposures of hairdressers to vinyl chloride in hairspray during the 1960s and 1970s." *Risk Analysis: An International Journal* 29.12 (2009): 1699-1725.

Tamimi, Ahmad Faleh, and Malik Juweid. "Epidemiology and outcome of glioblastoma." *Exon Publications* (2017): 143-153.

US EPA. "Toxicological Review of Vinyl Chloride (CAS No. 75–01–4) in Support of Summary Information on the Integrated Risk Information System (IRIS)." (2000).

*Davis v. Lockheed Martin Corp.*, No. 6:22-cv-81-37DCI (M.D. Fla.)

I have reviewed the experts report submitted in the *Davis v. Lockheed Martin Corp.* case. In his report, Dr. Sahu speculates TCE, PCE, and styrene exposures Carol Davis might have occupationally experienced, and Dr. Kantor opines that those exposures likely caused Carol Davis's multiple sclerosis (MS).

Based on Dr. Kantor's report it is my understanding that Carol Davis was born in New York on 7/25/1957.  She moved to East Orange at about 7 years of age. At almost 24 years of age she began work at the Lockheed Martin Sand Lake Facility in February of 1981 and worked there until about 1998.  Dr. Kantor states she gave birth to children in 1984 and 1987, and that both had behavioral issues which he does not describe.  Dr. Kantor states that by the mid 1980s Carol Davis began having neurologic symptoms but was not diagnosed with multiple sclerosis (MS) until 1992 after seeing a neurologist, Dr. Stephen Rosenberg.  Apparently, Mrs. Davis' diseases was a very aggressive form of MS.  At the time of diagnosis, she was having difficulty walking, and used a cane, and by 2011 she required bilateral assistance.  Between 2017-2018 she developed a difficulty in swallowing and had to be intubated to avoid the risk of aspiration pneumonia.  She passed away 1/4/2020 at the age of 69.

Dr. Kantor states that Mrs. Davis had no significant identifiable risk factors.  He concludes this was not an idiopathic case of MS on the basis of its severity and her exposure to solvents chemicals where she worked.  Dr. Kantor relies upon Dr. Sahu's opinion that Carol Davis was exposed to levels of Styrene, PCE, TCE, Toluene, Xylene, and other solvents far above background exposures in the general population.  Dr. Kantor also incorporates and relies on the following opinion from Dr. Sahu:

> *Her occupational exposures to these and other solvents was qualitatively similar to epidemiological studies showing significantly increased risks of Multiple Sclerosis in workers exposed to organic solvents in the course of their employment. However, unlike the workers in those epidemiological studies, Mrs. Davis was additionally exposed to TCE, PCE and other solvents through vapor intrusion and emissions from air stripping towers. Therefore, Mrs. Davis had additional sources of environmental exposures, over and above her occupational exposures, and likely had higher exposures than workers studied in epidemiological studies.*

Then, after purporting to perform a differential etiology analysis, Dr. Kantor concluded that "occupational exposure to chemicals at Lockheed Martin's Sand Lake Road Facility caused and/or contributed to Carol Davis's MS."

Dr. Sahu's report is largely anecdotal speculation as to what Mrs. Davis's exposure levels might have been, if any.  Nowhere in his report does he state what concentrations of these solvents

Mrs. Davis was allegedly exposed to while working at Lockheed Martin (Dr. Sahu focuses largely on her work in the Microelectronics Center (MEC)), nor does he state what the alleged exposure levels were from remediation activities or his vapor intrusion exposure scenario. I have reviewed the epidemiological studies on which Dr. Sahu relied in his "qualitative" exposure assessment. Exposure in these studies was basically assessed as a yes/no answer to exposure, and the concentrations and of the specific solvents in these studies is generally unknown. Likewise, Dr. Sahu provides no estimated indoor air exposure concentrations—let alone doses—to which he alleges the Plaintiff was occupationally exposed. Consequently, there is no objective or scientifically reliable basis for Dr. Sahu's "qualitative" comparison. What's more, some of the studies reported no association, or no significant association, or weak associations. What's more, some of the studies reported no association, or no significant association, or weak associations, so even if it were possible to match the conditions experienced by the study subjects to the conditions allegedly experienced by Mrs. Davis, there would still be no basis for inferring that those conditions could cause MS. Dr. Mundt expounds further on the lack of epidemiological support for Dr. Sahu's and Dr. Kantor's "qualitative" comparison.

Dr. Sahu then alleges that Mrs. Davis experienced exposures to solvents released by remediation activities and possibly the vapor intrusion of buried solvents, but these exposure levels are also not quantified. In my experience, occupational exposure concentrations of these VOC/solvent chemicals would typically be greater than those present in the indoor air of homes, shops, etc., and indoor concentrations are typically greater than those found in outdoor air. Recently, I reviewed Dr. Sahu's calculations for outdoor air in the *Henderson* matter, where all sources of emissions from SLRC were considered. These exposure concentrations were generally at or lower than area ambient outdoor air concentrations and were orders of magnitude lower than indoor air concentrations. Dr. Sahu offers no explanation for why, in this context, remediation activities or vapor intrusion exposures would be expected to have a significant impact on the Plaintiff's alleged occupational exposure.

To reiterate, there is nothing in either report providing any quantitative estimates of Mrs. Davis's alleged exposures to TCE, PCE, styrene, or any other substance. Drs. Sahu and Kantor opinions reduce to an *assumption* that Mrs. Davis's alleged exposures approximated exposure levels in the epidemiology studies they cited (which, again, do not support causal inferences), but Mrs. Davis's claims require *proof* of exposure, not *assumptions* of exposure. To some extent, Dr. Kantor's analysis reflects circular reasoning known as *post hoc, ergo propter hoc*. Mrs. Davis developed MS while she was allegedly exposed to chemicals, so Dr. Kantor fallaciously reasons that the exposure conditions were sufficient to cause her MS.

In the end, Dr. Kantor has simply opined the Plaintiff developed MS because she was exposed to solvents, but his general causation conclusion was contested. The dose the Plaintiff received, or the dose required to cause MS is not stated here. This is not standard practice in

toxicological or specific causation analyses.  In his reports he has stated there are believed to be both environmental and genetic factors, but if not all of these are presently known they cannot be considered or eliminated, a situation in medicine that always limits the stated certainty that no other risk factors were present.  Some of Mrs. Davis' case description suggests the possibility of a strong genetic component, i.e., early onset and unusual severity.  He relied upon an exposure assessment submitted by Dr. Sahu whom I have already found may adopt unreliable procedures to exaggerate the relative importance a particular exposure pathway. So given the above, I see no relevant exposure information being provided by Dr. Sahu's report.

In summary, Dr. Kantor has simply opined Mrs. Davis developed MS because she was exposed to solvents, but he has laid neither the general causation nor the specific causation foundation for this opinion.  He does not state the PCE, TCE, or styrene doses she allegedly received, nor does he provide any scientifically reliable evidence of any dose known to cause MS. This fails to comport with toxicological or specific causation analytical standards.  Further, he states that there are believed to be both environmental and genetic factors in MS development. But if not all of these factors are presently known, they cannot be considered or eliminated—a situation in toxicology and medicine that always limits the stated certainty that no other risk factors were present.  So, I see no relevant exposure information being provided by Dr. Sahu's report, and no scientifically reliable basis for Dr. Kantor's purported differential etiology analysis.

**Appendix G**

**Appendix G**
**Background Exposures to Chemicals of Concern**

## 1.0      Introduction

We are all exposed to chemicals throughout our entire lives. Most individuals in the United States likely have or, at some point in their lives had, measurable concentrations of non-carcinogenic and carcinogenic chemicals in their bodies (e.g., blood or tissues), including some of the chemicals of concern in this matter. As mentioned elsewhere in this report, we can be exposed to these chemicals in food, drinking water, indoor and outdoor air, soil, and consumer products, as well as from exposures in the workplace. Even Dr. Panigrahy states in a recent paper that he co-authored that there are more than 8,000 compounds that have been identified as carcinogens, with over 1,400 chemicals and chemical groups being "known or likely carcinogens" (Fishbein et al., 2021). And with regard to the chemicals of concern in this matter, Dr. Panigrahy's publication, for example, even discusses trichloroethylene (TCE) and how individuals can be exposed to this in "daily routines in house cleaning compounds."

The following section of this Appendix will briefly describe the various sources of exposure to the chemicals of concern (trichloroethylene, tetrachloroethylene, styrene, inorganic arsenic, chromium, and vinyl chloride) that occur as part of everyday life. These easily obtained reference materials describe sources and exposures have been ignored the plaintiffs' experts which has biased their attempt to suggest the sole or major source of these chemicals' presence in the proposed class area would be Lockheed Martin.

## 2.0      Trichloroethylene (TCE)

### 2.1      Measured TCE Air Concentrations

In Tables G1, G2, and G3 below are examples of sources of exposure to trichloroethylene from food and the environment, products, and the workplace and Tables G4, G5, and G6 are exposure concentrations in air. The factor used for converting TCE concentrations to $\mu g/m^3$ to ppb or vice versa was 1 ppb of TCE = 5.37 $\mu g/m^3$.  ATSDR (2019) noted that in studies that have measured trichloroethylene in indoor and outdoor air, as well as personal breath samples, it was determined that indoor air was a larger contributor compared to outdoor air:

> *Trichloroethylene levels monitored in expired breath of 190 New Jersey residents were correlated with personal exposure levels, which were consistently higher than outdoor air levels and were instead <u>attributed to indoor air levels</u> (Wallace et al. 1985). <u>Other studies have expanded upon and confirmed these findings, concluding that indoor air is a more significant exposure source of trichloroethylene than outdoor air, even near major point sources such as chemical plants</u> (Adgate et al.*

*2004a, 2004b; Clayton et al. 1999; Kinney et al. 2002; Wallace 1986; Wallace et al. 1986a, 1986b, 1986c, 1986d). Wallace et al. (1989) reported air concentrations for four homes (nine samples per home) in North Carolina and found that <u>indoor air concentrations of trichloroethylene in all homes were consistently higher than the outdoor concentrations.</u> In fact, trichloroethylene did not have a measurable median outdoor air concentration, while median indoor values ranged from 0.95 to 26 μg/m³ (0.2–4.8 ppb).* (Emphasis added)

**Table G1**

**Sources of Background Exposure to Trichloroethylene in Food and the Environment**

| Exposure Sources | |
|---|---|
| Outdoor air | Fruit-flavored cereal |
| Indoor air | Peanut butter |
| Drinking water | Avocado |
| Groundwater | Popcorn |
| Sea water | Orange |
| Rainwater | Coleslaw |
| Soil | Sweet roll |
| Sediment | Potato chips |
| Dust | Margarine |
| Cheese | Butter |
| Nuts | Chocolate chip cookies |
| Ground beef | Apple pie |
| Banana | Chicken nuggets |
| Cream cheese | French fries |
| Frankfurters | Cheese pizza |
| Chocolate cake with icing | Bologna |
| Tuna | Cake doughnuts with icing |
| | Breast milk |

Source: IARC (2014); ATSDR (2019).

**Table G2**

**Sources of Exposure to Trichloroethylene from Products**

| Products | |
|---|---|
| Cleaning solvent | Typewriter correction fluids |
| Metal degreaser | Paint removers |
| Dry-cleaning fluid | Leather and fabric treatments |
| Automotive products | Paint-related products |
| Wood stains | Extraction solvent for greases, oils, fats, waxes, and tars |
| Varnishes and finishes | |
| Lubricants | Inhalation anesthetic* |
| Adhesives | Fumigant* |
| Spot remover | Extractant for decaffeinating coffee* |

*Former uses. Source: IARC (2014); ATSDR (2019).

**Table G3**

**Potential Occupational Exposures to Trichloroethylene**

| Occupations |
|---|
| Degreasing (e.g., in metal manufacturing, printing and related support activities, textile-furnishing mills, and plastic-product manufacturing) |
| Industries producing metal products, machinery, and transport equipment |
| Graphic arts |
| Chemical manufacturing |
| Construction |
| Wholesale and retail trades |
| Restaurants and hotels |
| Personal and household services |
| Dry-cleaning operations |
| Textile processing industry (to scour cotton, wool, and other fabrics) |
| Aircraft maintenance |
| Industrial processes (pulp and paper) |

Source: IARC (2014); ATSDR (2019).

**Table G4a**

**Mean TCE Concentrations in the US from 1985-1998[a]**

| Year | n | Mean Concentration | |
|---|---|---|---|
| | | ($\mu$g/m$^3$) | Times higher than Sahu[b] |
| 1985 | 11 | 1.4 | 1527 |
| 1986 | 21 | 1.39 | 1516 |
| 1987 | 53 | 1.68 | 1832 |
| 1988 | 57 | 4.87 | 5310 |
| 1989 | 96 | 1.69 | 1843 |
| 1990 | 59 | 1.84 | 2006 |
| 1991 | 70 | 2.86 | 3119 |
| 1992 | 76 | 1.37 | 1494 |
| 1993 | 84 | 1.12 | 1221 |
| 1994 | 89 | 0.95 | 1036 |
| 1995 | 146 | 0.78 | 851 |
| 1996 | 150 | 0.65 | 709 |
| 1997 | 129 | 0.74 | 807 |
| 1998 | 115 | 0.88 | 960 |

Source: Wu and Shaum (2000).

**Table G4b**

**Mean TCE Concentrations in the US from 1985-1998 based on Land Use[a]**

| Land Setting and Use | n | Mean Concentration | |
|---|---|---|---|
| | | ($\mu$g/m$^3$) | Times higher than Sahu[b] |
| Rural | 93 | 0.42 | 458 |
| Suburban | 500 | 1.26 | 1374 |
| Urban | 558 | 1.61 | 1756 |
| Agricultural | 31 | 1.08 | 1178 |
| Commercial | 430 | 1.84 | 2006 |
| Forest | 17 | 0.1 | 109 |
| Industrial | 186 | 1.54 | 1679 |
| Mobile | 39 | 1.5 | 1636 |
| Residential | 450 | 0.89 | 970 |

[a]Data were gathered from state and local environmental agencies across 25 states.
[b]Concentrations were compared to Dr. Sahu's reported mean concentration of 0.00917($\mu g/m^3$)

**Table G5**

**Percentile Distribution of Annual Mean Trichloroethylene Concentrations Measured in
Ambient Air at Locations Across the United States 1998-2018**

| Year | Number of U.S. locations | Median (50th) | | 95th | | Maximum | |
|------|------|------|------|------|------|------|------|
| | | ($\mu g/m^3$) | Times higher than Sahu[a] | ($\mu g/m^3$) | Times higher than Sahu[a] | ($\mu g/m^3$) | Times higher than Sahu[a] |
| 1998 | 132 | 0.161 | 176 | 0.757 | 825 | 5.515 | 6014 |
| 1999 | 170 | 0.161 | 176 | 0.848 | 925 | 4.377 | 4773 |
| 2000 | 187 | 0.161 | 176 | 1.053 | 1148 | 7.384 | 8052 |
| 2001 | 205 | 0.134 | 146 | 0.521 | 568 | 12.883 | 14048 |
| 2002 | 259 | 0.134 | 146 | 1.343 | 1464 | 18.403 | 20067 |
| 2003 | 250 | 0.161 | 176 | 1.343 | 1464 | 6.911 | 7536 |
| 2004 | 264 | 0.134 | 146 | 1.128 | 1230 | 5.773 | 6295 |
| 2005 | 328 | 0.145 | 158 | 0.961 | 1048 | 6.627 | 7226 |
| 2006 | 298 | 0.134 | 146 | 0.682 | 744 | 5.714 | 6231 |
| 2007 | 317 | 0.134 | 146 | 0.489 | 533 | 4.028 | 4392 |
| 2008 | 288 | 0.134 | 146 | 0.580 | 632 | 6.149 | 6705 |
| 2010 | 540 | 0.113 | 123 | 0.859 | 937 | 6.659 | 7261 |
| 2011 | 518 | 0.102 | 111 | 0.806 | 879 | 16.862 | 18387 |
| 2012 | 512 | 0.081 | 88 | 0.806 | 879 | 5.800 | 6325 |
| 2013 | 477 | 0.081 | 88 | 0.806 | 879 | 17.130 | 18679 |
| 2014 | 444 | 0.081 | 88 | 0.752 | 820 | 2.792 | 3044 |
| 2015 | 220 | 0.005 | 5 | 0.097 | 106 | 1.289 | 1406 |
| 2016 | 209 | 0.005 | 5 | 0.124 | 135 | 0.556 | 606 |
| 2017 | 178 | 0 | 0 | 0.053 | 58 | 0.326 | 355 |
| 2018 | 159 | 0 | 0 | 0.069 | 75 | 0.383 | 418 |

Source: ATSDR (2019); Combined tables 6-5 and 6-6, pg 323-324.
[a]Concentrations were compared to Dr. Sahu's reported mean concentration of 0.00917($\mu g/m^3$)

**Table G6**

**Ambient Air Concentrations in the U.S. From Individual Studies**

| Year | Location | Concentration | | Source Relied on by ATSDR |
|------|------|------|------|------|
| | | ($\mu g/m^3$) | Times higher than Sahu[a] | |
| NS | Northern Hemisphere Outdoor | 0.027-0.054 | NA | Class and Ballschmitter 1986; Fabian 1986 |
| 1984 | Portland, Oregon Outdoor | 0.24-3.9 | NA | Ligocki et al. 1985 |
| 1983-1984 | Philadelphia, Pennsylvania Outdoor | Mean - 2.1 | 2290 | Sullivan et al. 1985 |

G - 4

| 1981-1982 | Three New Jersey cities<br>Outdoor | 1.13-3.17 | NA | Harkov et al. 1984 |
|---|---|---|---|---|
| 1980-1981 | Outdoor:<br>Houston, Texas; St. Louis, Missouri; Denver, Colorado; Riverside, California; Staten Island, New York; Pittsburgh, Pennsylvania; and Chicago, Illinois | 0.52-1.21 | NA | Singh et al. 1982 |
| 1991-1998 | 25 sites across Minnesota<br>Outdoor | Mean - 0.43<br>Median - 0.21<br>Range - <0.04-25.31 | 469<br>264<br>NA | Pratt et al. 2000 |
| NS | Six landfill sites in New Jersey<br>Outdoor | Average - 0.043-13.05<br>Max - 66.05 | NA<br>19,904 | Harkov et al. 1985 |
| NS | Office building in North Carolina<br>Indoor | Median – 27 | 33,898 | Hartwell et al. 1985 |
| NS | School in Washington DC<br>Indoor | Median - 0.74 | 929 | Hartwell et al. 1985 |
| NS | Elderly home in Washington DC<br>Indoor | Median - 0.82 | 1,030 | Hartwell et al. 1985 |
| NS | University lab<br>Indoor | NS - 42.96 | 46,845 | Nicoara et al. 1994 |
| NS | 185 homes in Arizona<br>Indoor | Max – 24 | 7,232 | Gordon et al. 1999 |
| NS | 8 out of 100 homes monitored in New Jersey<br>Indoor | Range - <1.8-13<br>95th %ile – 2.74 | NA<br>545 | Weisel et al. 2008 |
| NS | Over 100 stores in Boston, Ma<br>Indoor | Mean – 0.43<br>Max - 115 | 469<br>34,655 | Loh et al. 2006 |
| NS | 20 restaurants in Boston, Ma<br>Indoor | Mean – 0.23<br>Max - 118 | 251<br>35,559 | Loh et al. 2006 |
| NS | Elementary School near an industrial facility in Clark County, Georgia | NS - Indoor – 0.92<br>NS - Outdoor – 0.72 | 1003<br>785 | Martin et al. 2005 |
| NS | Local business near an industrial facility in Clark County, Georgia | Indoor - 0.59-1.85<br>Outdoor – 1.30-4.59 | NA | Martin et al. 2005 |
| NS | Three homes near an industrial facility in Clark County, Georgia | Indoor - 0.21-4.66<br>Outdoor – 0.03-0.05 | NA | Martin et al. 2005 |

G - 5

| NS | 73 personal, 101 indoor, and 100 outdoor samples from the Minnesota Children's Pesticide Exposure Study (MCPES) | Mean | | Adgate et al. 2004a |
|---|---|---|---|---|
| | | Personal – 0.8<br>Indoor – 0.6<br>Outdoor – 0.6<br>Range – 0.2-1.4 | 872<br>654<br>654<br>NA | |
| NS | Outdoor home air, indoor school air, indoor home air, and personal air of 113 children from two inner-city schools in Minneapolis, Minnesota During the School Health Initiative: Environment, Learning, Disease (SHIELD) study | Median | | Adgate et al. 2004b |
| | | Summer – 0.1 | 125 | |
| | | Winter – 0.3 | 377 | |
| NS | Toxic Exposure Assessment, Columbia/Harvard (TEACH) study students in west central Harlem, New York City | Mean | | Kinney et al. 2002 |
| | | Winter – 36 students | | |
| | | Outdoor home – 0.36<br>Indoor home – 1.26<br>Personal – 2.62 | 393<br>1,374<br>2,857 | |
| | | Summer – 31-40 students | | |
| | | Outdoor home – 0.24<br>Indoor home – 0.32<br>Personal – 0.51 | 262<br>349<br>556 | |
| NS | EPA Region 5 | Mean | | Clayton et al. 1999 |
| | | Personal – 5.27<br>Indoor – 3.84<br>Outdoor – 1.11 | 5,747<br>4,187<br>1210 | |
| NS | 541 indoor air samples from four large buildings at NASA Ames Research Center at the southern end of San Francisco Bay* | Median – 0.895<br>Max – 1.69 | 1,124<br>509 | Brenner 2010 |
| NS | Tollbooth at the Baltimore Harbor Toll Plaza | Indoor | | Sapkota et al. 2005 |
| | | Median – 3.11<br>Max – 6.89 | 3,905<br>2,076 | |
| | | Outdoor | | |
| | | Median – 0.06<br>Max – 0.56 | 75<br>169 | |
| 1981-1987 | General Population in 5 cities in NJ, NC, ND, CA: | Range - 0.083-1.78 | NA | Rappaport & Kupper 2004 |

G - 6

|  | Bayonne | Mean - 2.2 | 2,399 |  |
|  | Elizabeth | Mean - 3.5 | 3,817 |  |
|  | Greensboro | Mean - 1.1 | 1,200 |  |
|  | Devils Lake | Mean - 0.5 | 545 |  |
|  | Los Angeles | Mean - 1.6 | 1,745 |  |
| NS | North America – remote background | Mean - <0.02 | <22 | McCarthy et al. 2006 |
| NS | Ambient air at six sites in Seattle, WA | Mean – 0.21 Range – SD, 0.23 | 229 NA | Wu et al. 2011 |
| NS | 80 homes in Missoula, MT | Median – 0.02 Range - <0.001-4.6 | 25 NA | Ward et al. 2009 (units assumed to be in $\mu g/m^3$ by IARC) |

Source: ATSDR (2019), IARC (2014)
[a]Mean, Median, or Max concentrations were compared to Dr. Sahu's reported mean concentration of
0.00917($\mu g/m^3$), median 0.0007965($\mu g/m^3$) or max 0.003318($\mu g/m^3$); ranges were not compared = NA; single
measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.

## 2.2    Exposure/Dose Estimates Stated in ATSDR (2019)

### Air

"Assuming a typical air concentration range of 100–500 ppt and a breathing rate of 20 $m^3$
air/day, the average daily air intake of trichloroethylene can be estimated at 11–33 µg/day."
(ATSDR 2019). Based on multiple studies, ATSDR concluded indoor air was a more significant
source of exposure than outdoor air as well as near point sources (ATSDR 2019). This could
potentially be due to new construction, solvents, or consumer products used indoors (ATSDR
2019).

### Drinking water/Soil

"Average daily water intake of trichloroethylene can be estimated at 2–20 µg/day, assuming a
typical concentration range of 2–7 ppb and consumption of 2 L water/day" (ATSDR 2019).

### Smokers

TCE was found to be below the limit of detection (0.012 ng/ml) in blood samples from smokers
and non-smokers measured between 2013-2014 (ATSDR 2019).

### Food

USEPA 2001 reported food exposure is possible however it is probably low. An estimate was not
determined due to a lack of reliable estimates in available foods (EPA 2001). From 1996 to 2000,
TCE was measured in various foods ranging from cheese to meat to vegetables to fast food and

ranged from 2 – 140 ppb (ATSDR 2019). "Various samples of U.S. margarine were found to contain trichloroethylene levels of 440–3,600 ng/g (ppb)" (ATSDR 2019).

## 3.0    Perchloroethylene (PCE)

### 3.1    Measured PCE Air Concentrations

In Tables G7, G8, and G9 are examples of sources of exposure to perchlororethylene from food and the environment, products, and the workplace. Tables G10, G11, and G12 report air concentrations of PCE in the US. The factor used to convert PCE from $\mu g/m^3$ to ppb and vice versa was 1 ppb of tetrachloroethylene = 6.8 $\mu g/m^3$.

**Table G7**

**Sources of Background Exposure to Tetrachloroethylene in Food and the Environment**

| Exposure Sources | |
|---|---|
| Indoor air | Hazardous waste sites |
| Outdoor air | Residing near dry cleaning facilities |
| Drinking water | Recently dry-cleaned clothes |
| Rainwater | Corn muffin mix |
| Surface water | Yellow corn meal |
| Food | Fudge brownie mix |
| Breast milk | Cake mix |

Source: IARC (2014); ATSDR (2019).

**Table G8**

**Sources of Exposure to Tetrachloroethylene from Products**

| Products | |
|---|---|
| Vapor degreaser | Printing ink |
| Chemical intermediates | Glues |
| To clean prints and negatives of cinema film | Sealants |
| Typewriter correction fluid | Polishes |
| Carpet stain-removal products | Lubricants |
| Antihelminthic agent | Silicones |

*Former uses. Source: IARC (2014); ATSDR (2019).

**Table G9**

**Potential Occupational Exposures to Tetrachloroethylene**

| Occupations |
|---|
| Dry-cleaning |
| Metal-cleaning |
| Textile industry |
| Printing industry |

| Occupations |
| --- |
| Testing in the coal industry |
| Catalytic reforming process in petroleum refineries |

Source: IARC (2014); ATSDR (2019).

**Table G10**

**Tetrachloroethylene Concentrations in Ambient Air for 2006**

| Number of samples | State | Concentration | |
| --- | --- | --- | --- |
| | | $\mu g/m^3$ | Times higher than Sahu[a] |
| 21–70 | CA | 0.050–0.64 | NA |
| 61 | CO | 0.34 | 11.45 |
| 61 | DC | 0.35 | 11.78 |
| 58–59 | DE | 0.09–0.44 | NA |
| 42–61 | FL | 0.10–0.69 | NA |
| 19–61 | GA | 0.10–0.45 | NA |
| 59 | HI | 0.34 | 11.45 |
| 21–26 | IA | 0.24–0.48 | NA |
| 60–61 | IL | 0.34–0.76 | NA |
| 41–61 | IN | 0.17–0.19 | NA |
| 33–61 | KY | 0.77–0.88 | NA |
| 51–52 | MA | 0.19–0.22 | NA |
| 56–61 | MD | 0.24–0.36 | NA |
| 21–50 | MI | 0.26–1.10 | NA |
| 41–58 | MN | 0.09–6.65 | NA |
| 59 | MO | 0.17 | 5.72 |
| 59–66 | MS | 0.14–0.18 | NA |
| 43–58 | NC | 0.24–0.58 | NA |
| 26–31 | NH | 0.17–0.23 | NA |
| 53–58 | NJ | 0.12–0.35 | NA |
| 40–56 | NY | 0.17–3.32 | NA |
| 41 | OK | 0.2 | 6.73 |
| 24–61 | OR | 0.34 | NA |
| 37–61 | PA | 0.17–0.39 | NA |
| 40–57 | PR | 0.09–0.25 | NA |
| 53–61 | RI | 0.15–0.32 | NA |
| 60 | SC | 0.17 | 5.72 |
| 59–61 | SD | 0.07–0.08 | NA |
| 44–45 | TN | 0.06–0.08 | NA |
| 42–61 | TX | 0.17–0.37 | NA |
| 59 | UT | 0.17 | 5.72 |

| 57–60 | VA | 0.20–1.67 | NA |
| 23–54 | VT | 0.34–0.37 | NA |
| 61 | WI | 0.34 | 11.45 |
| 43–51 | WV | 0.13–0.39 | NA |

Source: ATSDR (2019) Table 6-3, pg. 284.

[a]Mean concentrations were compared to Dr. Sahu's reported mean concentration of 0.029703($\mu$g/m$^3$); ranges were not compared = NA; single measured concentrations were compared to Dr. Sahu's mean.

**Table G11**

**Percentile Distribution of Annual Mean Tetrachloroethylene Concentrations Measured in Ambient Air at Locations Across the United States**

| Year | Number of U.S. locations | 50th | | 95th | | Maximum | |
|---|---|---|---|---|---|---|---|
| | | $\mu$g/m$^3$ | Times higher than Sahu[a] | $\mu$g/m$^3$ | Times higher than Sahu[a] | $\mu$g/m$^3$ | Times higher than Sahu[a] |
| 2010 | 304 | 0.102 | 3.4 | 0.5236 | 17.6 | 1.36 | 46 |
| 2011 | 292 | 0.0952 | 3.2 | 0.408 | 13.7 | 1.088 | 37 |
| 2012 | 287 | 0.0748 | 2.5 | 0.4148 | 14.0 | 1.36 | 46 |
| 2013 | 264 | 0.068 | 2.3 | 0.3536 | 11.9 | 1.292 | 43 |
| 2014 | 245 | 0.0578 | 1.9 | 0.2924 | 9.8 | 1.972 | 66 |
| 2015 | 224 | 0.0748 | 2.5 | 0.374 | 12.6 | 4.012 | 135 |
| 2016 | 205 | 0.0748 | 2.5 | 0.442 | 14.9 | 1.904 | 64 |
| 2017 | 174 | 0.0272 | 0.9 | 0.3332 | 11.2 | 0.952 | 32 |
| 2018 | 155 | 0.0204 | 0.7 | 0.3672 | 12.4 | 3.06 | 103 |

Source: ATSDR (2019) Table 6-4, pg. 285.

[a]Concentrations were compared to Dr. Sahu's reported mean concentration of 0.029703($\mu$g/m$^3$)

**Table G12**

**Ambient Air Concentrations of Tetrachlorethylene in the US**

| Year | Location | Concentration | | Source Relied on by ATSDR |
|---|---|---|---|---|
| | | $\mu$g/m$^3$ | Times higher than Sahu[a] | |
| 1984 | Portland, Oregon | 0.40–2.10 | NA | Ligocki et al. 1985 |
| 1983-1984 | Philadelphia, Pennsylvania | 5.2 | 175 | Sullivan et al. 1985 |
| 1981-1982 | Three New Jersey cities | 1.63-3.13 | NA | Harkov et al. 1984 |

G - 10

| | | | | |
|---|---|---|---|---|
| 1980-1981 | Houston, Texas; St. Louis, Missouri; Denver, Colorado; Riverside, California; Staten Island, New York; Pittsburgh, Pennsylvania; and Chicago, Illinois | 1.97-4.01 | NA | Singh et al. 1982 |
| NS | Three industrialized areas. Total Exposure Assessment Methodology(TEAM) study | 0.24-9.0 | NA | Hartwell et al. 1987 |
| NS | Contaminated site in Colorado | Indoor – 0.15-3.5 Outdoor – 0.01-1.3 | NA | ATSDR 2006 |
| NS | Residential homes in San Antonio, Texas | Max - <0.13-1.50 | NA | Johnston and Gibson 2013, 2014 |
| NS | Two inner-city schools in Minneapolis, Minnesota | 0.3 | 10.1 | Adgate et al. 2004 |

Source: ATSDR (2019), IARC (2014)
[a]Mean, Median, or Max concentrations were compared to Dr. Sahu's reported mean concentration of
0.029703($\mu$g/m$^3$), median 0.018450($\mu$g/m$^3$) or max 0.104480($\mu$g/m$^3$); ranges were not compared = NA; single
measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.

## 3.2   Exposure/Dose Estimates Stated in ATSDR (2019) and EPA (2001)

### Daily Dose
"Total tetrachloroethylene intake for Canadians has been estimated to range from 1.2 to 2.7
$\mu$g/kg/day" (ATSDR 2019).

### Air
"Indoor air exposure (assuming 20 hours/day) from the use of household products containing
tetrachloroethylene and from recently dry-cleaned clothes accounted for 1.2–1.9 $\mu$g/kg/day"
(ATSDR 2019). EPA (2001) reported inhalation in urban settings to be 0.08-0.2 mg/d (80-200
$\mu$g/d).

ATSDR (2019) reported an estimate that shower air would contain an average of 1 ppm (1000
ppb or 6.8 $\mu$g/m$^3$) and that the air above the bathtub would contain an average of 0.725 ppm (725
ppb or 4,930 $\mu$g/m$^3$) if the water contained 1 mg tetrachloroethylene/L.

### Drinking water/Soil/Food
"Drinking water and food consumption contributed 0.002–0.03 and 0.12–0.65 $\mu$g/kg/day
respectively. Data were not sufficient to estimate tetrachloroethylene intake from soil" (ATSDR
2019). EPA (2001) reported drinking water ingestion to be 0.1-2 $\mu$g/d.

Daily intake estimates were also reported by EPA (2001) in dairy (0-4 µg/day), meat (0-1 µg/day), fats/oils (0-9 µg/day).

## Smoking

A study reported in ATSDR (2019) concluded blood levels were positively correlated with airborne tetrachloroethylene levels, while the smoking status (smoker versus nonsmoker) did not affect the relationship between personal air levels and blood levels of the subjects. This was based on blood and personal air samples from the 2003-2004 and 1999-2000 NHANES survey (ATSDR 2019)

## Breastmilk

"Assuming that a 7.2-kg infant ingests 700 mL of breast milk/day, the infant dose would range from 0.08 to 0.82 mg/kg/day. The infant dose estimated from background exposure (24 hours at 0.004 ppm or 4 ppb) was 0.001 mg/kg/day" (ATSDR 2019). A PBPK model was used to determine infant intake using the following exposure scenarios "low concentrations were 8 hours at about 6 ppm (exposure concentration of counter workers, pressers, and seamstresses – 6000 ppb) and 16 hours at 0.004 ppm (residential background - 4 ppb), and for the high concentration, exposure scenarios were 8 hours at 50 ppm (50,000 ppb) and 16 hours at 0.004 ppm (4 ppb) (residential background)" (ATSDR 2019).

Another model predicted lower exposures after considering changes in maternal exposures (ATSDR 2019). The same scenarios were used which resulted in 0.032 mg/kg/day in the low concentration scenario.

## 4.0    Styrene

### 4.1    Measured Styrene Air Concentrations

Tables G13, G14, and G15 indicate various sources of exposure to styrene from food and the environment, products, and the workplace.   Table G16 through Table G22 indicate concentrations of styrene found in the air, food, and other sources. The factor used to convert styrene concentrations from $\mu g/m^3$ to ppb and vice versa was 1 ppb = 4.26 $\mu g/m^3$.

### Table G13

### Sources of Background Exposure to Styrene in Food and the Environment

| | | |
|---|---|---|
| Indoor air | Frankfurters, beef | Quarter pound hamburger, |
| Outdoor air | Chocolate cake with icing | cooked |
| Drinking water | Tuna canned in oil | Margarine |
| Groundwater | Fruit flavored cereal | Sandwich cookies |
| Surface water | Eggs, scrambled | Butter |

| | | |
|---|---|---|
| Soil | Peanut butter | Chocolate chip cookies |
| Food stored in polystyrene containers | Avocado, raw | Sour cream |
| | Popcorn, popped in oil | Apple pie, fresh/frozen |
| Vehicle exhaust | Blueberry muffin | Chicken nuggets |
| Cigarette smoke | Strawberries, raw | Graham crackers |
| Breast milk | Orange, raw | French fries |
| Cheddar cheese | Coleslaw with dressing | Cheese pizza |
| Mixed cuts | Sweet roll/Danish | Bologna |
| Ground beef | Potato chips | Olive/safflower oil |
| Pork bacon | Popsicle | Sugar cookies |
| Cream cheese | | Cake doughnuts with icing |

Source: IARC (2019); ATSDR (2010).

**Table G14**

**Sources of Exposure to Styrene from Products**

| Products | |
|---|---|
| Packaging | Office supplies |
| Food and beverage packaging | Packaged foods |
| Building insulation | Laser printers and copiers |
| Cushion packaging | Insulation for electrical uses (i.e., wiring and appliances) |
| Production of tires | |
| Carpet backing | Fiberglass |
| Construction materials | Plastic pipes |
| Video cassettes | Automobile parts |
| | Drinking cups and other "food-use" items |

*Former uses.
Source: IARC (2019); ATSDR (2010).

**Table G15**

**Potential Occupational Exposures to Styrene**

| Occupations | |
|---|---|
| Production and processing of reinforced plastics | Reinforced plastics factories |
| | Boatbuilding facilities |
| Production of styrene-butadiene rubber | Polystyrene factories |
| Production of styrene monomer and polymers | Styrene-polyester resin facilities |
| Firefighter | Varnish workers |
| Photocopy operations | |

Source: IARC (2019); ATSDR (2010).

**Table G16**

**Ambient Styrene Concentrations in Representative Air Samples**

| Location | Concentration | |
|---|---|---|

| | μg/m³ | | Times higher than Sahu[*] | | Source Relied on by ATSDR |
|---|---|---|---|---|---|
| | Maximum | Mean | Maximum | Mean | |
| Indoor | | | | | |
| Indoors, unspecified | 6,500 | 0.4–8.9 0.3–50 | 1,529,412 | NA | EPA 1987e, 1988c; Fishbein 1992; Sakaguchi and Akabayashi 2003; Shields and Weschler 1992; Wallace et al. 1986a |
| New homes | 14.3 | 0.9–2.6 | 3,365 | NA | Hodgson et al. 2000 |
| Remodeled buildings | 167 | 0.1–10.1 | 39,294 | NA | Rothweiler et al. 1992; Zabiegala 1999 |
| Photocopy centers | 12000[a]; 220[b] | 7000[a]; 89[b] | 2,823,529; 51,765 | 4,058,043; 51,595 | Stefaniak et al. 2000; Leovic et al. 1996, 1998 |
| Restaurants | 3.3 | 1.6 | 776 | 928 | Vainiotalo et al. 2008 |
| Minnesota Children's Pesticide Exposure Study (1997) | NS | 1.4 | NS | 812 | Adgate et al. 2004 |
| Outdoor | | | | | |
| Rural/suburban | 53 | 0.28–0.34[c];0.43 | 12,471 | NA; 249 | EPA 1988c; Graedel 1978; Islam and Stancheva 1999; Kinney et al. 2002 |
| Urban | 2,500 | 0.29–3.8;20 | 588,235 | NA | EPA 1987e, 1988c; Fishbein 1992; Grosjean and Fung 1984; Grosjean et al. 1998; Harkov et al. 1985; Wallace et al. 1986b |
| Industrial source areas | 25 | 1.3[c]–2.1 | 5,882 | NA | EPA 1978, 1983, 1988c |
| Municipal waste sites | 6,100 | No data | 1,435,294 | NS | Assmuth and Kalevi 1992; Eitzer 1995 |
| Hazardous waste sites | 65 | 1.1–6.4 | 15,294 | NA | Harkov et al. 1985; La Regina and Bozzelli 1986 |
| Hazardous waste sites in New Jersey | NS | 66 | NS | 38,262 | LaRegina et al. 1986 |

G - 14

| | | | | |
|---|---|---|---|---|
| Tunnels | 46 | 1.1–6.6[d] | 10,824 | NA | Hampton et al. 1983; Zielinska et al. 1996 |
| Minnesota Children's Pesticide Exposure Study (1997) | NS | 0.5 | NS | 290 | Adgate et al. 2004 |
| Minnesota | 1.49 | 0.1 | 351 | 58 | Pratt et al. 2000[c] |

Source: ATSDR (2010) Table 6-2, pg. 161.

[*]Mean, Median, or Max concentrations were compared to Dr. Sahu's reported mean concentration of 0.001725($\mu$g/m³), median 0.001675($\mu$g/m³) or max 0.004250($\mu$g/m³); ranges were not compared = NA; single measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.

[a]Value provided is the emission rate, as $\mu$g/hour; the emission rate was measured during operation of copier in test chambers.

[b]Value provided is the emission rate, as $\mu$g/hour; the emission rate was measured during the idle phase of copier operation in test chambers.

[c]Median value

[d]Range of values, no mean given.

[e]Results from 1400 out of 2507 samples where styrene was above the limit of detection over 8 years.

### Table G17

### Ambient Styrene concentrations in air reported in Banton et al. 2019

| Year | Location | Concentration | | Source Relied on by Banton et al. 2019 |
|---|---|---|---|---|
| | | $\mu$g/m³ | Times higher than Sahu[a] | |
| Indoor | | | | |
| NS | Smoking and non-smoking homes in Columbus, Ohio | Means - Smoking – 0.211 Non-smoking – 1.47 | 122 852 | Heavner et al. 1995 |
| 1980–1987 | The Total Exposure Assessment Methodology (TEAM) studies conducted in homes located in New Jersey and California during fall and winter | Means - Smoking – 2.2 Non-smoking – 1.1 | 1,275 638 | Wallace and Pellizzari 1986[b] |
| 2004 | Homes of non-smoking residences in Boston, MA | 50th %ile – 0.46 95th %ile – 3.30 | 275 1913 | Dodson et al. 2008 |
| 2004 | Homes of non-smoking residences in New Jersey | 50th %ile – <2.1 95th %ile – 2.11 Max – 5.1 | <1254 1223 1200 | Weisel, et al. 2008 |
| 2004-2005 | Homes of non-smoking residences in Southeastern, MI | 50th %ile – 0.30 Mean – 0.51 Max – 6.6 | 179 296 1,553 | Jia et al. 2008 |
| 2006 | Homes of non-smoking residences in Detroit, MI | 50th %ile – 1.20 95th %ile – 2.80 Mean – 1.6 Max – 16.4 | 716 1,623 928 3,859 | Johnson et al. 2010 |

| 2010 | Homes of non-smoking residences in Detroit, MI | 50th %ile – 0.45<br>Mean – 0.69<br>Max – 5.8 | 269<br>400<br>1,365 | Chin et al. 2014 |
|---|---|---|---|---|
| 2010 | Homes of smoking residences in Detroit, MI | 50th %ile – 0.56<br>Mean – 0.86<br>Max – 6.46 | 334<br>499<br>1520 | Chin et al. 2014 |
| Outdoor | | | | |
| NS | Urban area, Paterson, New Jersey | Means-<br>Commercial – 0.28<br>Industrial – 0.16<br>Mobile – 0.17 | 162<br>93<br>99 | Yu et al. 2014 |
| 2013 | Urban areas across US | Mean – 0.32<br>Median – 0.9<br>Range 0.02-140 | 186<br>537<br>NA | EPA 2015 |
| 2012-2016 | Monitoring stations across US from the EPA Air Quality System database | 5-year average – 0.21<br>Range – 0.17-0.24 | 122<br>NA | EPA 2017a |

[a]Mean, Median (50th), or Max concentrations were compared to Dr. Sahu's reported mean concentration of 0.001725($\mu g/m^3$), median 0.001675($\mu g/m^3$) or max 0.004250($\mu g/m^3$); ranges were not compared = NA; single measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.
[b]Differences were not observed when home were more open during the spring and summer season.

## Table G18

## Styrene concentrations in personal air for adults

| Year | Location | Concentration | | Source Relied on by Banton et al. 2019 |
|---|---|---|---|---|
| | | $\mu g/m^3$ | Times higher than Sahu[a] | |
| 1999 | Minneapolis-St. Paul, MN | 50th %ile – 0.7<br>Mean – 1.1 | 418<br>638 | Sexton et al. (2004b) |
| 1999-2000 | Los Angeles CA, Elizabeth NJ, and Houston TX | 50th %ile – 0.6<br>95th%ile – 5.5<br>Mean – 1.5 | 358<br>3,188<br>870 | Weisel et al. (2005) |
| 2000-2001 | South Baltimore, MD | 50th %ile – 1.3<br>Mean – 3.8<br>Max – 51.3 | 776<br>2,203<br>12,071 | Buckley et al. (2005) |
| 2000-2001 | Hampden, MD | 50th %ile –1.3<br>Mean – 2.0<br>Max – 6.4 | 776<br>1,159<br>1,506 | Buckley et al. (2005) |
| 2004-2005 | Boston, MA | 50th %ile –0.6<br>95th%ile – 6.0<br>Mean – 2.4 | 358<br>3,478<br>1,391 | Dodson et al. (2008) |
| 2004-2006 | Waterfront South (Camden, NJ) | 50th %ile – 0.1<br>95th%ile – 0.8<br>Mean – 0.3 | 60<br>464<br>174 | Lioy et al. (2011) |
| 2004-2006 | Copewood-Davis (Camden, NJ) | 50th %ile – 0.2<br>95th%ile – 1.0<br>Mean – 0.4 | 119<br>580<br>232 | Lioy et al. (2011) |

G - 16

| 2005-2007 | Detroit, MI | 50th %ile – 1.3<br>Mean – 1.9<br>Max –9.6 | 776<br>1,101<br>2,259 | Williams et al. (2009) |

<sup>a</sup>Mean, Median (50th), or Max concentrations were compared to Dr. Sahu's reported mean concentration of 0.001725(μg/m³), median 0.001675(μg/m³) or max 0.004250(μg/m³); ranges were not compared = NA; single measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.

**Table G19**

**Styrene Concentrations in Food**

| Food | Number of detections | Minimum (ppb) | Maximum (ppb) |
|---|---|---|---|
| American cheese | 4 | 2 | 11 |
| Cheddar cheese | 3 | 4 | 70 |
| Mixed meat cuts | 14 | 21 | 104 |
| Ground beef | 6 | 4 | 13 |
| Pork bacon | 7 | 6 | 85 |
| Cream cheese | 2 | 2 | 3 |
| Frankfurters, beef | 8 | 4 | 77 |
| Chocolate cake with icing | 12 | 7 | 57 |
| Tuna canned in oil | 1 | 2 | 2 |
| Fruit flavored cereal | 3 | 2 | 10 |
| Eggs, scrambled | 6 | 5 | 10 |
| Peanut butter | 13 | 16 | 38 |
| Avocado, raw | 8 | 3 | 550 |
| Popcorn, popped in oil | 3 | 2 | 2 |
| Blueberry muffin | 10 | 8 | 141 |
| Strawberries, raw | 9 | 12 | 350 |
| Orange, raw | 2 | 2 | 3 |
| Coleslaw with dressing | 1 | 2 | 2 |
| Sweet roll/Danish | 13 | 13 | 91 |
| Potato chops | 6 | 2 | 16 |
| Popsicle | 3 | 4 | 11 |
| Quarter pound hamburger, cooked | 6 | 4 | 27 |
| Margarine | 10 | 9 | 20 |
| Sandwich cookies | 14 | 15 | 165 |
| Butter | 12 | 11 | 28 |
| Chocolate chip cookies | 12 | 15 | 111 |
| Sour cream | 3 | 5 | 30 |
| Apple pie, fresh/frozen | 9 | 10 | 40 |

G - 17

| Chicken nuggets | 12 | 10 | 66 |
| Graham crackers | 6 | 4 | 21 |
| French fries | 12 | 8 | 68 |
| Cheeseburger, quarter pound | 5 | 5 | 22 |
| Cheese pizza | 6 | 3 | 23 |
| Bologna | 7 | 2 | 78 |
| Cheese and pepperoni pizza | 7 | 8 | 20 |
| Olive/safflower oil | 11 | 3 | 54 |
| Sugar cookies | 14 | 24 | 142 |
| Cake doughnuts with icing | 10 | 6 | 45 |
| Turkey sausage | NS | NS | 100 |
| Cheeses | NS | NS | 5,000 |
| Cinnamon[a] | NS | NS | 40,000 |

Source: ATSDR (2010) Table 6-3, pg. 164
[a]styrene is a natural component

**Table G20**

**Styrene Concentrations from Other Sources**

| Source | Concentration | Source Relied on by ATSDR |
|---|---|---|
| Cigarette smoke | 18-48 ug/cigarette | IARC 1979; WHO 1983 |
| Polystyrene packing materials | <100 - >300 ppm | EPA 1985a |
| Polystyrene packing materials | 5-30 ppb | Tang et al 2000 |
| Polystyrene packing materials – since 1980s | 2.6-163 ug/kg | Ganualdi et al 2014 |
| Polystyrene packing materials - yogurt | 5.5-150 ppb | Withey 1976 |
| Polystyrene packing materials - water | 0.5-46.4 ppb | Al-Mudhaf et al. 2009 |

Source: IARC (2019); ATSDR (2010)

**Table G21**

**Styrene daily intakes via inhalation**

| Age group | Mean inhalation rate (m³/day) | Body weight (kg) | Styrene intake (mg/kg bw-day) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Central tendency | | | Upper bound | | |
| | | | Non-smoking | Passive | Active | Non-smoking | Passive | Active |
| <1 month | 3.6 | 4.8 | 3.90E-04 | 4.70E-04 | No Data | 1.20E-03 | 1.40E-03 | |
| 1 < 3 months | 3.5 | 5.9 | 3.10E-04 | 3.70E-04 | | 9.30E-04 | 1.10E-03 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3 < 6 months | 4.1 | 7.4 | 2.90E-04 | 3.50E-04 | | 8.60E-04 | 1.00E-03 | No Data |
| 6 < 12 months | 5.4 | 9.2 | 3.10E-04 | 3.70E-04 | | 9.20E-04 | 1.10E-03 | |
| 1 < 2 years | 8 | 11.4 | 3.60E-04 | 4.40E-04 | | 1.10E-03 | 1.30E-03 | |
| 2 < 3 years | 8.9 | 13.8 | 3.40E-04 | 4.00E-04 | | 1.00E-03 | 1.20E-03 | |
| 3 < 6 years | 10.1 | 18.6 | 2.80E-04 | 3.40E-04 | | 8.50E-04 | 1.00E-03 | |
| 6 < 11 years | 12 | 31.8 | 2.00E-04 | 2.40E-04 | | 5.90E-04 | 7.10E-04 | |
| 11 < 16 years | 15.2 | 56.8 | 1.40E-04 | 1.70E-04 | | 4.20E-04 | 5.00E-04 | |
| 16 < 21 years | 16.3 | 71.6 | 1.2E-04 | 1.40E-04 | 3.20E-04 | 3.60E-04 | 4.30E-04 | 9.60E-04 |
| Adult | 15.7 | 80 | 1.0E-04 | 1.20E-04 | 2.80E-04 | 3.10E-04 | 3.70E-04 | 8.30E-04 |

Source: Banton et al. 2019 Table 11 pg, 94

## 4.2     Exposure/Dose Estimates Stated in ATSDR (2010) and Banton et al. (2010)

### Air

ATSDR (2010) estimated the average person may be incur a dose of a ranging of 1.7 to 850 µg/day styrene from indoor air. Daily inhalation exposure for the general population was estimated at 18-54 µg/person for a total of 18.2-55.2 µg/day (0.3-0.8 ug/kg body weight), equivalent to 6.7-20.2 mg/year (ATSDR 2010; IARC 2019). Worst-case exposure estimate for air was determined to be 65,000 µg/day (ATSDR 2010). Styrene intakes were estimated by Banton et al. (2010) in Table G23.

### Food

Styrene intake from food packaging migration was estimated to range from 1-35 µg/day per person (ATSDR 2010; IARC 2019). General food consumption of styrene was estimated to range from 0.8-4.5 mg/person annually or 0.2-1.2 µg/person daily (ATSDR 2010). Worst-case exposure estimate for food was determined to be 30 µg/day (ATSDR 2010). Average intakes from dietary exposure were reported in Banton et al. 2019 using data from Cao et al. (2018) (Table G21). A six-month weighted average was determined for infants given breastmilk or formula (Banton et al. 2019). The mean intake for formula fed infants was 0.00012 mg/kg bw/day (95th%ile – 0.00017 mg/kg bw/day) and in breast-fed infants was 0.00009 mg/kg bw/day (95th%ile – 0.00012 mg/kg bw/day) (Banton et al. 2019).

### Table G22

### Average dietary exposures to styrene for different age groups

| Age groups | mg/day | mg/kg bw-day |
|---|---|---|

| | | |
|---|---|---|
| 6–11 months | 0.00140 | 0.0002 |
| 1 year | 0.0033 | 0.00022 |
| 2–3 years | 0.0057 | 0.00038 |
| 4–8 years | 0.0077 | 0.00031 |
| 9–13 years | 0.0095 | 0.00021 |
| 14–18 years | 0.01 | 0.00017 |
| 19–30 years | 0.011 | 0.00015 |
| 31–50 years | 0.011 | 0.00016 |
| 51–70 years | 0.011 | 0.00015 |
| 71+ years | 0.0081 | 0.00012 |

Source: Banton et al. 2019 Table 12, pg. 95

**Drinking water**

Worst-case exposure estimate for exposure to styrene from drinking water was determined to be 0-0.5 ug/day (ATSDR 2010).

**Smoke**

IARC (2019) and ATSDR (2019) report cigarette smoke is a major source of styrene for smokers and exposure is 6 times higher than non-smokers. IARC (2019) reported an estimate that styrene concentrations in the blood would increase 0.01 ng/mL per cigarette per day. IARC (2019) reported "intake of styrene due to 20 cigarettes was estimated to exceed the total daily intake from food and air in a single day".

**5.0    Inorganic Arsenic**

**5.1    Measured Inorganic Arsenic Air Concentrations**

Tables G23, G24, and G25 provide example sources of exposure to arsenic from food and the environment, products, and the workplace.  In tables G26 and G27, the concentration of inorganic arsenic in air and other sources are reported. Table G28 outlines multiple daily arsenic intake values. ATSDR (2007) reported the main source of arsenic is food and the major form consumed in seafood is organic arsenobetaine:

> *You normally take in small amounts of arsenic in the air you breathe, the water you drink, and the food you eat. Of these, <u>food is usually the largest source of arsenic</u>. The predominant dietary source of arsenic is seafood, followed by rice/rice cereal, mushrooms, and poultry. While seafood contains the greatest amounts of arsenic, for fish and shellfish, this is <u>mostly in an organic form of arsenic called arsenobetaine that is much less harmful.</u>* (Emphasis added)

**Table G23**

**Sources of Background Exposure to Arsenic in Food and the Environment**

| Exposure Sources | |
|---|---|
| Soil* | Instant cocoa |
| Air | Dairy products |
| Surface water | Poultry |
| Seawater | Grain and grain products |
| Fish | Mushrooms |
| Shellfish | Fruit juices |
| Shrimp | Rice and rice products |
| Meat | Seaweeds (commercially available) |
| Cereal | Fats and oils |
| Vegetables | Chocolate bars |
| Fruits | Breast milk |
| Flour | Cigarette smoke |
| Instant coffee | Wine |

*Arsenic is the 20th most common element in the earth's crust.
Source: IARC (2012); ATSDR (2007).


**Table G24**


**Sources of Exposure to Arsenic from Commercial Products**

| Products |
|---|
| CCA-treated wood |
| Metallic pigments in the form of salts or lakes |
| Pesticides |

CCA: Chromated copper arsenate.  Source: IARC (2012); ATSDR (2007).


**Table G25**


**Potential Occupational Exposures to Arsenic**

| Occupations |
|---|
| Smelting of non-ferrous metal, in which arseniferous ores are used |
| Coal-fired power plants |
| Battery assembly |
| Preparation of or work with pressure-treated wood |
| Glass and glass-product manufacturing |
| Electronics industry. |
| Non-ferrous base metal industries |
| Non-ferrous metal (except aluminum) production and processing |
| Manufacture of wood and wood and cork products except furniture |
| Construction |
| Sawmills and wood preservation |
| Farms |
| Iron and steel mills and ferro-alloy manufacturing |
| Oil and gas extraction |
| Metal ore mining |

| Occupations |
| --- |
| Semiconductor manufacturing |
| Basic chemical manufacturing |
| Workers involved in harvesting and ginning cotton may be exposed to arsenic |
| Working with CCA-treated timber. |
| Joinery machines |

Source: IARC (2012); ATSDR (2007).

**Table G26**

**Ambient Arsenic Concentrations in Air**

| Year | Location | Concentration (ng/m$^3$) | Times higher than Sahu[a] | Source Relied on by ATSDR |
| --- | --- | --- | --- | --- |
| NS | Across the US | Means - Remote: <1-3 Urban: 20-30 | NA | Davidson et al. 1985; EPA 1982c; IARC 1980; NAS 1977a |
| 1990 | Lower 48 states – total emissions (excluding dust) | Median: 20 | 109 | Rosenbaum et al. 1999 |
| 1992-1993 | Nahant, Massachusetts | Remote: 0.007–1.9 Rural: 1.0–28 Urban: 2–2,320 Annual average – 1.2 | NA NA NA 1 | Schroeder et al. 1987 |
| 1982-1993 | Great Lakes region | Mean: 4.2-9.6 | | Pirrone and Keeler 1996 |
| NS | Large cities – 24 hours (location not stated) | Max: <100 | <357 | EPA 1984a |
| 1990 | Midwestern states – aerosols and cloud water at 1.2-3 km altitude | Mean: 1.6±0.9 | 2 | Burkhard et al. 1994 |
| 1990 | Mayville, New York | Mean: 1.0±0.5 | 1 | Burkhard et al. 1994 |
| 1987 | Four sites in San Joaquin Valley, California – sodium arsenite used on grapes | Max 15-20 meters from edge of field: 260 Max at 4 community sites: 76 Urban background site: 3 | 927 271 11 | Baker et al. 1996 |
| NS | Atmosphere near nonferrous metal smelters | Max: 2,500 | 9817 | IARC 1980; NAS 1977a; Schroeder et al. 1987 |

| NS | Indoor public places (e.g., cafeteria, coffee house, music club, Amtrak train, and several restaurants) with environmental tobacco smoke | Range: 0.1-1 Mean: 0.4±0.3 | NA 0.49 | Landsberger and Wu 1995 |
|----|----|----|----|----|
| NS | University office and library without environmental tobacco smoke | <0.13 | <0.16 | Landsberger and Wu 1995 |
| 1999 | 46 high school students from West Central Harlem, New York City, NY | Means - Home outdoor: 0.37 Home indoor: 0.4 Personal air: 0.45 | 0.46 0.49 0.55 | Kinney et al. 2002 |
| NS | Arizona - National Human Exposure Assessment Survey (NHEXAS) | Indoor: 3.4-22.3 Outdoor: 3.5-25.7 | NA | O'Rourke et al. 1999 |
| NS | Emission factors from cigarette smoke | Mean 0.018±0.003 ug/cigarette Range: 0.015-0.023 ug/cigarette | NA | Landsberger and Wu 1995 |

Source: ATSDR (2007).
[a]Mean, Median (50th), or Max concentrations were compared to Dr. Sahu's reported mean concentration of 0.813(ng/m³), median 0.183(ng/m³) or max 0.0.2803(ng/m³); ranges were not compared = NA; single measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.


**Table G27**


**Arsenic Concentrations from Other Sources**

| Source | Inorganic | Concentration (mg/kg) | Source Relied on by ATSDR |
|----|----|----|----|
| Cigarette | NS | 1.5 ug/cigarette | EPA 1998j |
| Seafood | Yes | <1-2 ng/g | Schoof et al. 1999a |
| Raw rice | Yes | 74 ng/g | Schoof et al. 1999a |
| Flour | Yes | 11 ng/g | Schoof et al. 1999a |
| Grape juice | Yes | 9 ng/g | Schoof et al. 1999a |
| Spinach – cooked | Yes | 6 ng | Schoof et al. 1999a |

Source: ATSDR (2007)

## 5.2     Exposure/Dose Estimates Stated in ATSDR (2007)

<u>Air</u>

An estimated daily intake of arsenic from ambient air was determined to range from 0.4-0.6 µg/day if the air contained 20-30 ng/m$^3$ arsenic (ATSDR 2007). Smokers were estimated to intake 12 µg of arsenic per day if an individual smoked two packs per day (ATSDR 2007). Inorganic or organic arsenic was not stated for either estimate.

<u>Drinking Water</u>

ATSDR (2007) reported most arsenic in drinking water is inorganic and an estimated intake was 5 µg/day. This could range from 10-100 µg/day depending on the arsenic content in the geographical areas (ATSDR 2007).

<u>Food</u>

Daily dietary intake across multiple age groups of inorganic arsenic ranged from 8.3-14 µg/day (ATSDR 2007). ATSDR (2007) assumed "65% of the arsenic in poultry and meat is inorganic, at a mean level of chicken consumption of 60 g/person/day, people may ingest an estimated 1.38–5.24 µg/day of inorganic arsenic from chicken."  However, only 10% of the arsenic found in the edible parts of marine fish and shellfish is inorganic and less is known about freshwater fish (ATSDR 2007). A market basket survey in the US estimated inorganic dietary intake ranges from 1-20 µg/day (mean intake 3.2 µg/day) (ATSDR 2007). The FDA Diet Study determined the mean estimated average daily consumption of inorganic arsenic was 10.22 µg/day with a range of 0.93–104.89 µg/day (ATSDR 2007).

**Table G28**

**Mean Daily Dietary Intake of Arsenic for Selected U.S. Population Groups**

| Mean daily intake (µg/kg body weight/day) | 1984–1986 | 1986–1991 | 1991–1997 |
|---|---|---|---|
| Provisional tolerable daily intake (PTDI)[a] | 2.1 | 2.1 | 2.1 |
| 6–11 months | 0.82 | 0.5 | 0.31 |
| 2 years | 1.22 | 0.81 | 1.8 |
| 14–16 years, female | 0.54 | 0.36 | 0.41 |
| 14–16 years, male | 0.6 | 0.39 | 0.24 |
| 25–30 years, female | 0.66 | 0.44 | 0.44 |
| 25–30 years, male | 0.76 | 0.51 | 0.72 |
| 60–65 years, female | 0.71 | 0.46 | 1.08 |
| 60–65 years, male | 0.74 | 0.48 | 1.14 |

Source: ATSDR (2007) Table 6-5, pg. 357
[a]No agreement has been reached on a maximum acceptable intake for total arsenic; the FAO/WHO has assigned a PTDI for inorganic arsenic of 2.1 µg/kg body weight for adults. Data from FDA studies. FDA does not recommend daily intake levels for Arsenic.

G - 24

## 8.0    Chromium VI

### 8.1    Measured Chromium VI Air Concentrations

Tables G29, G30, and G31 below list examples of sources of exposure to hexavalent chromium from food and the environment, products, and the workplace. Table G32 lists concentrations of hexavalent chromium in air.

**Table G29**

**Sources of Background Exposure to Hexavalent Chromium in Food and the Environment**

| Exposure Sources |
| --- |
| Soil (under oxidizing conditions)* |
| Surface water |
| Groundwater |
| Cigarette smoke |

*Occurs naturally in the Earth's crust.
Source: IARC (2012); ATSDR (2012)

**Table G30**

**Sources of Exposure to Hexavalent Chromium from Products**

| Products | |
| --- | --- |
| pigment for textile dyes | in pickling |
| paints | in leather tanning |
| varnishes | in synthetic perfumes |
| oil colors | in photography |
| inks | in process engraving and lithography |
| plastics | in pyrotechnics |
| corrosion inhibitors | chromium plating |
| wood preservatives | photomechanical processing |
| metal finishing and | chrome-pigment production |
| chrome plating | wool preservative formulations |
| leather tanning | drilling muds |
| impurity in Portland cement | water treatment |
| primer pigments | high-temperature batteries |
| graphic art supplies | in safety matches |
| fungicides | as a corrosion inhibitor in metal-joining |
| mordant for dyeing | compounds |
| manufacture of alizarin | ceramics |
| potassium chromic sulfate and catalysts | fuses |
| oil purification | ignition control devices |

Source: IARC (1990, 2012); ATSDR (2012).

**Table G31**

**Potential Occupational Exposures to Hexavalent Chromium**

| Occupations |
|---|
| Production, use, and welding of chromium-containing metals and alloys |
| Electroplating |
| Production and use of chromium-containing compounds, such as pigments and paints, catalysts, chromic acid, tanning agents, and pesticides |
| Manufacture of fabricated metal products |
| Manufacture of machinery |
| Personal and household services |
| Manufacture of transport equipment |
| Welding |
| Printing and support activities |
| Architectural/structure metal manufacturing |
| Agricultural, construction, mining machinery manufacturing |
| Specialty trade contractors |
| Boiler, tank, and container manufacturing |
| Industrial machinery repair |
| Auto repair |
| Steel product manufacturing |
| Aluminum production |
| Metal ore mining |
| Coating, engraving, and heat treating treating. |

Source: IARC (2012); ATSDR (2012).

**Table G32**

**Ambient Hexavalent Chromium Concentrations in Air**

| Year | Location | Concentration ($ng/m^3$) | Times higher than Sahu[a,b] | Source Relied on by ATSDR |
|---|---|---|---|---|
| 1990 | Residences in Hudson County, New Jersey | Indoor<br>Mean: 1.2<br>Range: 0.38-3000 | 0.21<br>NA | Falerios et al. 1992 |
| 1990 | Industrial sites in Hudson County New Jersey | Indoor<br>Mean: 3<br><br>Outdoor<br>Mean: 9.9 | 0.53<br><br>1.74 | Falerios et al. 1992 |
| 1990 | Background in Hudson County New Jersey | Mean: 1.2<br>Range: 0.2-3.8 | 0.21<br>NA | Scott et al. 1997a |

Source: ATSDR (2012). [a]Mean concentrations were compared to Dr. Sahu's uncorrected dataset which had a reported mean concentration of 5.6738 ($ng/m^3$); ranges were not compared. [b]The values for hexavalent chromium would generates ratios 1-3,000 times higher Dr. Sahu's corrected mean of 0.001 ($ng/m^3$). = NA; single measured concentrations, 95th percentiles, or if not stated (NS) were compared to Dr. Sahu's mean.

G - 26

## 5.2    Exposure/Dose Estimates Stated in ATSDR (2008,2012)

### Air
Daily intake of chromium from ambient air (<0.01-0.03 μg/m³) to be <0.2-0.6 μg (ATSDR 2012). Species of chromium was not stated. A previous ATSDR report estimated main daily intake from air was <0.2-0.4 ug (ATSDR 2008)

### Drinking water
Daily intake of chromium from tap water (<1 ug) to be <4 ug (ATSDR 2012). Species of chromium was not stated. A previous ATSDR report estimated main daily intake from water was 2 μg (ATSDR 2008)

### Food
Daily intake of chromium from diets consisting of 25-43% fat was estimated to range from 25-244 ug and average 76 μg (ATSDR 2012). Species of chromium was not stated. A previous ATSDR report estimated main daily intake from food was 60 μg (ATSDR 2008).

### Smoke
"The chromium content in cigarette tobacco from the United States has been reported to be 0.24–6.3 mg/kg, but neither the chemical form nor the amount of chromium in tobacco smoke is known. People who use tobacco products may be exposed to higher-than-normal levels of chromium." (ATSDR 2012).

## 6.0    Vinyl Chloride

### 6.1    Measured Vinyl Chloride Air Concentrations
Tables G33 though G36 list vinyl chloride concentrations in various environmental media and food.

### Table G33

### Vinyl Chloride Detected in Samples Throughout the United States from 2011 to 2021

| Type | Number of samples | Number of positive | Concentration range |
|---|---|---|---|
| Ambient air | 58 | 0 | 0.039–0.052 ppb (detection limit) |
| Indoor air | 4 | 0 | 0.039–0.052 ppb (detection limit) |
| Ground water[a] | 6,838 | 254 | 0.2–7,380 ppb; 0.1–20 ppb (lower quantification limit) |
| Surface water[a] | 1,358 | 0 | <0.02–5.0 ppb (lower quantification limit) |
| Wastewater | 2 | 0 | 0.1 ppb (lower quantification limit) |
| Leachate | 48 | 0 | 0.5–1.0 ppb (lower quantification limit) |
| Sediment | 306 | 1 | 1,300 ppb; 0.5–1,000 ppb (lower quantification limit) |

| Soil | 45 | 4 | 2.4–9.6 ppb (values are below reporting limit) |

Source: ATSDR (2023) Table 5-4, pg. 142
[a] Samples reported are from 2017 to 2021.

**Table G34**

**Ambient Vinyl Chloride Concentrations in Air**

| Year | Location | Concentration ($\mu g/m^3$) | Source Relied on by ATSDR |
|------|----------|----------------------------|--------------------------|
| 2001-2002 | Background air toxics for North America | <0.02 | McCarthy et al. 2006 |
| NS | Southwest Memphis, residential, surrounded by industry | Mean: 0.02 | Jia and Foran 2013 |
| 2000-2017 | Dention Airport South, Texas | 0.03-0.10 | Lim and John 2020 |
| 2011-2021 | 58 ambient air and 4 indoor air samples Palermo Wellfield Superfund Site, as reported in the EPA STOrage and RETrieval (STORET) database | Not detected (detection limit: 0.1-0.14) | WQP 2021 |
| **2013** | **Ambient air quality at >5,000 active monitors across the US** | **24-hour max: 0.01-6.06** | **EPA 2014b** |
| NS | Flowback pits used to store natural gas drilling hydraulic fracturing waste | 0.12-12 | Bloomdahl et al. 2014 |
| **1975** | **Indoor air of two new cars** | **0.4-1.2 ppm** | **EPA 1976b** |
| 1994-2009 | Indoor air from 13 vapor intrusion sites | 0.021-35 | Burk and Zarus 2013 |
| NS | Ambient air of residences near landfills | <5-30.7 (<0.002-0.012 ppm) | Baker and MacKay 1985; Stephens et al. 1986 |
| NS | Residences near a hazardous waste site in Southern California | Max: 1.040 (0.4 ppm) | Stephens et al. 1986 |

| NS | Residences near a hazardous waste site in Southern California | 2.6-23.4 (0.001-0.009 ppm) | Miller and Beizer 1985 |
|---|---|---|---|
| **NS** | **General ambient air** | **<0.02** | **McCarthy et al. 2006** |

Source: ATSDR (2023).

**Table G35**

**Vinyl Chloride Concentrations from Other Sources**

| Source | Concentration | Source Relied on by ATSDR |
|---|---|---|
| Cigarette smoke | 5.6-27.3 ng/cigarette | Hoffmann et al. 1976 |
| Cigarette smoke | Max 34.8 ng/cigarette | Zenzen et al. 2012 |
| Cigarettes | <12.4-18 ng/cigarette | Zenzen et al. 2012 |
| Electrically Heated Cigarette Smoking Systems | <6.31-8.04 ng/cigarette | Zenzen et al. 2012 |
| Food packaging | <1 ppb – 275* ppb | WHO 1999 |

Source: ATSDR (2023).
*Max value was not measured in a food contact material.

**References**

ATSDR. 2007. Toxicological Profile for Arsenic. U.S. Department of Health and Human Services. Public Health Service.

ATSDR. 2008. Case Studies in Environmental Medicine (CSEM) Chromium Toxicity. U.S. Department of Health and Human Services. Public Health Service.

ATSDR. 2010. Toxicological Profile for Styrene. U.S. Department of Health and Human Services. Public Health Service.

ATSDR. 2012. Toxicological Profile for Chromium. U.S. Department of Health and Human Services. Public Health Service.

ATSDR. 2019. Toxicological Profile for Tetrachloroethylene. U.S. Department of Health and Human Services. Public Health Service.

ATSDR. 2019. Toxicological Profile for Trichloroethylene. U.S. Department of Health and Human Services. Public Health Service.

ATSDR. 2023. Toxicological Profile for Vinyl Chloride. Draft for Public Comment. U.S. Department of Health and Human Services. Public Health Service.

Banton MI, Bus JS, Collins JJ, Delzell E, Gelbke H-P, Kester JE, Moore MM, Waites R, and Sarang SS. (2019). Evaluation of potential health effects associated with occupational and environmental exposure to styrene – an update. Journal of Toxicology and Environmental Health, Part B. 22(1-4): 1-130.

EPA Environmental Protection Agency. 2001. Sources, Emission, and Exposure for Trichloroethylene (TCE) and Related Chemicals. Report number: EPA/600/R-00/099.

Fishbein A, Hammock BD, Serhan CN, Panigrahy D. 2021. Carcinogenesis: Failure of resolution of inflammation? Pharmacology & Therapeutics. 218:107670.

IARC International Agency for Research on Cancer. 1990. Chromium, Nickel, and Welding. IARC Monographs on the Evaluation of Carcinogenic Risk to Humans. Vol. 49. International Agency for Research on Cancer, Lyon, France.

IARC International Agency for Research on Cancer. 2012. Arsenic, Metals, Fibres, and Dusts. IARC Monographs on the Evaluation of Carcinogenic Risk to Humans. Vol. 100C. International Agency for Research on Cancer, Lyon, France.

IARC International Agency for Research on Cancer. 2014. Trichloroethylene, Tetrachloroethylene and some other Chlorinated Agents. IARC Monographs on the Evaluation of Carcinogenic Risk to Humans. Vol. 106. International Agency for Research on Cancer, Lyon, France.

IARC International Agency for Research on Cancer. 2019. Styrene, Styrene-7,8-Oxide, and Quinoline. IARC Monographs on the Evaluation of Carcinogenic Risk to Humans. Vol. 121. International Agency for Research on Cancer, Lyon, France.

Wu C and Schaum J. 2000. Exposure Assessment of Trichloroethylene. Environmental Health Perspectives. 108(suppl2): 359-363.

**Appendix H**

**Measured Environmental Levels of VOCs**

Appendix H

## Measured VOC Levels in the Environment

**1.0     Introduction**

For decades the class of chemicals known as Volatile Organic Compounds (VOCs) have had a ubiquitous presence in the many different microenvironments (i.e., work, residential, school, outdoors, etc.) we spend time in.  They are emitted from commercial enterprises that manufacture the products we buy, they are emitted from the many commercial products we buy and use, they are emitted from all fuel burning transportation vehicles, and they are emitted indoors from various sources (e.g., cooking, furniture, rugs, drapes, polished wood floors and wood furniture, dry-cleaned clothes, and many cleaning or furniture products).  Some VOCs may also be present in our food either from packaging or food processing activities.  Thus, indoor air quality has become an important issue because most individuals spend about 90% of their time indoors, and because indoor air typically contains higher concentrations of some VOCs, a higher total level of VOCs, and a larger number of different VOC chemicals than outdoor air.  In addition, airborne VOCs have become an important segment of the national air toxics program, and many are listed as 'hazardous air pollutants' (HAPs) in this program because of their common environmental presence and long-term toxicities.

The following tables summarize the air measurements of different VOCs found in different indoor and outdoor air environments. This clearly demonstrates their ubiquitous presence and provides ambient exposure levels of the VOCs of interest in this case as well as other VOCs that may represent potential alternative causes of Plaintiffs diseases/injuries.  The primary focus of the data summarized in the following tables was the recorded levels of TCE, PCE and styrene as these are Plaintiffs stated VOC chemicals-of-concern (CoCs) given the modeled air estimates submitted in Dr. Sahu's report.  In most tables, however, other VOCs common to indoor or outdoor environments are also reported, e.g., the human carcinogens benzene and 1,3-butadiene, other halogenated VOCs that like PCE are Group 2 carcinogens, and some common aliphatic or aromatic solvent compounds.  Thus, the information provided in the tables presented in this appendix give a better description of the VOC exposures each plaintiff had experienced in their lifetime up to the time the injury they are alleging was diagnosed or became symptomatic.

It should be noted, however, that while the number of VOCs and concentrations reported these tables vary, this stems in part from the fact that these studies selected different target chemicals to measure and had different detection limits depending upon the analytical method used and the size of the air sample collected.  It should also be recognized that in no study were the measurements of every one of the vast number of chemicals that have been found in indoor air attempted.  Thus, in all studies described below the number of chemicals recorded was just a subset of the number of different chemicals that likely were actually present in the air being sampled.  In addition, because detection limits varied across these studies the recorded mean and median values listed in these studies may have been affected somewhat by the study's design; and this issue is

likely to have impacted outdoor measurements more frequently because outdoor levels are always equivalent to or lower than the levels of VOCs present the indoor air at that locale.

## 1.0    The USEPA's TEAM Studies

Wallace (1986) is one of the earliest papers discussing the goals, experimental design, and study findings of the USEPA's TEAM (Total Exposure Assessment Methodology) studies.  The USEPA started these studies in response to a limited number of earlier studies suggesting while many chemicals were present in both outdoor air and indoor air, indoor air might represent the greater chemical exposure.  As a result of these initial findings the USEPA initiated the TEAM studies with the long-term goal of providing information that would allow an estimation of the public's total exposure to selected toxic/hazardous chemicals present in the ambient environment.  Their approach was to select participants with a predetermined probability that they would be representative of the entire population within the urban area they lived in.  Once representative participants were selected measurements of the concentrations of 20-30 organic chemicals in samples collected from indoor or outdoor air, a participant's exhaled breath, and their water supply.  Using this data the agency could then determine frequency distributions of exposure, the relative importance of each route of exposure, and how activity patterns and specific microenvironments impacted the total exposure or dose for a specific chemical.

Wallace (1986) describes measurements collected from residents living in the urban area of Elizabeth and Bayonne, New Jersey.  Participants were selected to be representative of different urban locations, ethnicity, socioeconomic status, and proximity to point sources of chemical emissions.  Out of 5,500 possible households 618 persons were classified as eligible for the study of which 355 participants were selected for this study as they completed their measurements of the target chemicals in their indoor and outdoor air, exhaled breath, and water supply.  Eleven chemicals from the target list were found frequently in all samples and the results for these compounds formed the report of this study.  Tables H1A-C on the following pages summarize the breath, personal air, and outdoor air concentrations of these 11 chemicals.

Several interesting observations are reached from these three tables.  First, it is clear indoor air concentrations are higher than those measured outdoors because the personal monitoring results were much higher than those measured in the outdoor air.  Second, because the personal monitoring result reflects the average concentration of chemical inhaled throughout the day, the exhaled breath concentrations were also higher than outdoor air.  Third, the ratios of the indoor/outdoor air concentration of each chemical indicates which environment represents the major source of exposure to that chemical.  When the ratio is near 1.0 the predominant sources contribute to outdoor air concentrations.  When the ratio becomes greater than 1.0-1.5 it indicates indoor air exposure sources of the chemical are greater than those present in the outside ambient air.  Last, the authors found unexpectedly that chemical concentrations measured in census tracts in close

Appendix H

proximity to major point sources emitting a particular chemical were not significantly different from those in census tracts farther away. Thus, distance from a point source was not a significant determinant of the air concentration of the chemical within the general area of the urban environment.

**Table H1A**

**Breath VOCs Concentrations ($\mu$g/m$^3$) of Bayonne/Elizabeth Residents**

| VOC | Mean | Median | 75th percentile | 95th percentile |
|-----|------|--------|-----------------|-----------------|
| Chloroform | 3.12 | 1.80 | 3.70 | 11.5 |
| 111-Trichlorethane | 15.0 | 6.60 | 13.0 | 42.0 |
| Benzene | 18.7 | 12.0 | 24.0 | 56.0 |
| Carbon Tetrachloride | 1.31 | 0.69 | 2.25 | 20.0 |
| **TCE** | 1.77 | 0.88 | 1.80 | 5.9 |
| **PCE** | 13.3 | 6.80 | 12.9 | 44.0 |
| **Styrene** | 1.15 | 0.79 | 1.25 | 3.0 |
| Dichlorobenzene | 8.10 | 1.30 | 3.50 | 44.0 |
| Ethylbenzene | 4.58 | 2.90 | 5.30 | 12.0 |
| o-xylene | 3.35 | 2.20 | 3.70 | 9.2 |
| m,p-xylene | 8.95 | 6.36 | 11.0 | 21.0 |

Adapted from Wallace (1986)

**Table H1B**

**Overnight Personal Air VOC Concentrations ($\mu$g/m$^3$) in Bayonne/Elizabeth Residents**

| VOC | Mean | Median | 75th percentile | 95th percentile |
|-----|------|--------|-----------------|-----------------|
| Chloroform | 8.73 | 3.30 | 7.90 | 24.0 |
| 111-Trichlorethane | 113 | 16.9 | 38.0 | 180.0 |
| Benzene | 29.7 | 15.0 | 32.0 | 73.0 |
| Carbon Tetrachloride | 13.9 | 1.50 | 2.44 | 18.0 |
| **TCE** | 7.27 | 2.25 | 4.80 | 22.5 |
| **PCE** | 11.3 | 6.35 | 12.0 | 35.0 |
| **Styrene** | 2.68 | 1.75 | 3.0 | 6.20 |
| Dichlorobenzene | 56.0 | 3.80 | 13.0 | 260.0 |
| Ethylbenzene | 12.6 | 6.3 | 12.0 | 35.0 |
| o-xylene | 15.7 | 4.9 | 8.7 | 27.0 |
| m,p-xylene | 54.6 | 14.0 | 25.0 | 87.0 |

Adapted from Wallace (1986)

Appendix H

**Table H1C**

**Overnight Outdoor Air VOCs Concentrations (μg/m³) of Bayonne/Elizabeth Residents**

| VOC | Mean | Median | 75th percentile | 95th percentile |
|---|---|---|---|---|
| Chloroform | 1.22 | 0.66 | 1.40 | 4.80 |
| 111-Trichlorethane | 5.41 | 4.50 | 8.40 | 12.0 |
| Benzene | 8.61 | 6.70 | 11.0 | 24.0 |
| Carbon Tetrachloride | 1.16 | 0.81 | 1.30 | 2.50 |
| **TCE** | 2.13 | 1.30 | 3.0 | 7.50 |
| **PCE** | 3.72 | 2.60 | 4.10 | 15.0 |
| **Styrene** | 0.90 | 0.61 | 0.94 | 2.80 |
| Dichlorobenzene | 1.54 | 1.20 | 1.69 | 4.0 |
| Ethylbenzene | 3.76 | 2.90 | 5.30 | 11.0 |
| o-xylene | 3.97 | 2.90 | 5.50 | 11.0 |
| m,p-xylene | 11.0 | 9.90 | 16.0 | 26.0 |

Adapted from Wallace (1986)

In 1987 Hartwell and colleagues published another set of VOC measurements as part of the USEPA's efforts determine the levels of population exposures to chemicals present in urban environments.  This investigation collected personal, indoor air, and outdoor air samples from residents of Bayonne/Elizabeth New Jersey (approximate population – 109,000), Los Angeles County California (approximate population – 359,000), and Pittsburgh/Antioch in Contra County California (approximate population – 91,000).  The next five tables summarize the breath, personal monitoring, and outdoor air concentrations of these different urban environments.  Again the rank order of each chemical's concentration in these samples was generally personal air > exhaled breath > outdoor air.

**Table H2A**

**A. Median Concentrations (μg/m³) in Breath Samples By Location and Season**

| VOC | Elizabeth/Bayonne (Winter/Summer) | Los Angeles (Winter/Spring) | Pittsburg/Antioch (Spring) |
|---|---|---|---|
| Benzene | 5.70/2.50 | 3.10/4.20 | 1.80 |
| Ethylbenzene | 1.30/1.70 | 0.80/0.54 | 0.44 |
| Total Xylenes | 3.98/4.20 | 3.04/1.86 | 1.46 |
| **Styrene** | 0.24/0.75 | 0.17/0.16 | 0.49 |
| Dichlorobenzene | 1.20/1.30 | 0.54/0.60 | 0.86 |
| chloroform | 0.07/2.30 | 0.10/0.03 | 0.04 |
| 111-Trichloroethane | 2.3/5.2 | 6.3/3.75 | 0.09 |
| **PCE** | 4.5/4.10 | 5.8/4.0 | 2.0 |

Adapted from Hartwell et al. (1987)

4

**Table H2B**

**B. Median Concentrations (μg/m³) in Overnight Personal Air By Location and Season**

| VOC | Elizabeth/Bayonne (Winter/Summer) | Los Angeles (Winter/Spring) | Pittsburg/Antioch (Spring) |
|---|---|---|---|
| Benzene | 14.0/8.50 | 15.0/4.45 | 4.40 |
| Ethylbenzene | 5.30/4.90 | 7.90/2.50 | 1.90 |
| Total Xylenes | 25.0/18.4 | 31.7/11.25 | 8.30 |
| **Styrene** | 1.30/1.40 | 2.80/0.84 | 0.71 |
| Dichlorobenzene | 4.20/3.20 | 2.60/0.84 | 0.53 |
| chloroform | 2.20/0.88 | 1.59/0.67 | 0.03 |
| 111-Trichloroethane | 17.5/12.0 | 26.0/7.20 | 4.30 |
| **PCE** | 6.60/5.50 | 8.30/1.90 | 1.8 |

Adapted from Hartwell et al. (1987)

**Table H2C**

**C. Median Concentrations (μg/m³) in Overnight Outdoor Air By Location and Season**

| VOC | Elizabeth/Bayonne (Winter/Summer) | Los Angeles (Winter/Spring) | Pittsburg/Antioch (Spring) |
|---|---|---|---|
| Benzene | 3.8/11.0 | 19.0/2.50 | 1.70 |
| Ethylbenzene | 4.0/2.5 | 2.75/1.80 | 0.66 |
| Total Xylenes | 14.2/12.55 | 43.0/9.2 | 1.69 |
| **Styrene** | 0.53/0.41 | 4.20/0.57 | 0.23 |
| Dichlorobenzene | 0.65/1.30 | 1.70/0.50 | 0.25 |
| chloroform | 0.04/0.08 | 0.63/0.03 | 0.62 |
| 111-Trichloroethane | 1.40/4.70 | 29.0/4.60 | 2.10 |
| **PCE** | 1.30/1.90 | 7.35/1.31 | 0.25 |

Adapted from Hartwell et al. (1987)

**Table H2D**

**Median Concentrations (μg/m³) in Daytime Personal Monitor By Location and Season**

| VOC | Elizabeth/Bayonne (Winter/Summer) | Los Angeles (Winter/Spring) | Pittsburg/Antioch (Spring) |
|---|---|---|---|
| Benzene | 14.0/3.90 | 15.0/7.20 | 6.30 |
| Ethylbenzene | 8.20/4.20 | 8.0/6.0 | 2.90 |
| Total Xylenes | 34.90/18.10 | 33.0/22.0 | 13.60 |
| **Styrene** | 1.70/1.20 | 2.30/1.50 | 0.83 |
| Dichlorobenzene | 5.80/0.922.30 | 2.20/0.92 | 0.91 |
| chloroform | 2.20/0.75 | 1.0/0.30 | 0.30 |
| 111-Trichloroethane | 26.0/6.60 | 29.0/11.0 | 5.50 |
| **PCE** | 9.7/5.90 | 8.20/3.40 | 2.20 |

Appendix H

Adapted from Hartwell et al. (1987)

**Table H2E**

**Median Concentrations (μg/m$^3$) in Daytime Outdoor Air By Location and Season**

| VOC | Elizabeth/Bayonne (Winter/Summer) | Los Angeles (Winter/Spring) | Pittsburg/Antioch (Spring) |
|---|---|---|---|
| Benzene | 5.30/6.40 | 14.0/3.10 | 1.30 |
| Ethylbenzene | 4.10/1.90 | 7.10/1.90 | 0.40 |
| Total Xylenes | 13.60/7.70 | 28.90/8.95 | 1.57 |
| **Styrene** | 0.61/0.36 | 1.90/0.63 | 0.18 |
| Dichlorobenzene | 0.71/0.94 | 0.97/0.40 | 0.15 |
| chloroform | 0.09/0.13 | 0.28/0.03 | 0.03 |
| 111-Trichloroethane | 1.50/5.50 | 20.0/5.30 | 2.20 |
| **PCE** | 8.0/3.30 | 9.0/1.70 | 0.24 |

Adapted from Hartwell et al. (1987)

Wallace et al. (1987) summarizes data from the second phase of the previous study (Harwell et al., 1987) and compares the results of the large target population in an industrial/chemical manufacturing area (Elizabeth/Bayonne, NJ) to the results of two smaller studies (25 participants) representing two urban populations located in nonchemical manufacturing areas. Greensboro, North Carolina, was selected because its population size is similar to that of Elizabeth/Bayonne, New Jersey (population 131,000). The second population chosen was a small, rural, agricultural town far from industry (Devils Lake, South Dakota, population 7,000). The personal air and breath concentrations measured in these studies are provided in Table 3 on the next page. The results indicate the personal air and breath concentrations of VOCs measured for residents of both populations were similar and essentially unaffected by population size. In contrast, the outdoor air measurements of these chemicals in Greensboro were about 5 to 10-fold lower than for personal air (data not shown), and at Devils Lake outdoor concentrations were about ten-fold lower than in Greensboro (data not shown). Thus, this study found the indoor air environments were quite similar in these two locations even though the ambient outdoor conditions were not. In addition, the personal and breath concentrations for residents of Greensboro and Devils Lake were similar to those measured for the populations of Elizabeth/Bayonne, Loas Angeles County, and Contra County as shown in the previous study (Harwell et al., 1987). The combined results of these two studies indicate indoor air levels of VOCs, and hence personal exposure levels, were similar across the nation, regardless of location, in the early to mid-1980s.

Wallace et al. (1987) concluded that serval hypotheses regarding indoor sources of VOCs were generated by this and previous studies. One observation was that concentrations of benzene, ethylbenzene, xylenes, and styrene were higher in the breath of smokers, and recent studies had confirmed these VOCs were present in significant amounts in cigarette smoke. Another observation was that the use of hot water was the main source of chloroform in home air.

Appendix H

**Table H3**

**Median Concentrations (μg/m³) Personal Air and Breath Samples By Location**

| VOC | Greensboro, NC | | Devils Lake, SD | |
|---|---|---|---|---|
| | Personal Air | Breath | Personal Air | Breath |
| 111-trichloroethane | 32* | -- | 25* | 9.3 |
| Benzene | 9.8 | 15 | -- | 56 |
| m,p-Xylene | 6.9 | 3.8 | 6.2 | 4.5 |
| **TCE** | 1.5 | 0.54 | 0.50 | 0.89 |
| **PCE** | 3.3 | 3.9 | 5.0 | 8.0 |
| **Styrene** | 1.4 | 0.4 | -- | 0.52 |
| p-Dichlorobenzene | 2.6 | 1.2 | 1.7 | 0.82 |
| Ethylbenzene | 2.5 | 1.5 | 2.1 | 1.4 |
| o-Xylene | 3.6 | 1.2 | 2.7 | 2.7 |
| Chloroform | 1.7 | 0.67 | 0.38 | 2.9 |

Adapted from Wallace et al. (1987)

A third observation was that persons who reported visiting a dry cleaner had twice the level PCE in their breath as those who did not. Based on these findings these investigators estimated that indoor air PCE levels at these businesses must be at least 1,000 μg/m³, and indoor air studies of dry cleaners indicated PCE indoor air levels of up to 10,000 μg/m³ at these establishments. A related observation was that PCE exposures were also elevated by wearing dry-cleaned clothes and storing those clothes at home. Similarly, persons filling their gas tanks with gasoline had twice as much benzene on their breath as persons who did not. Thus, it was estimated the breathing zone while pumping gas were likely more than 1,000 μg/m³, and this prediction was confirmed by a study measuring benzene air levels while refueling that found benzene concentrations as high as 3,000 μg/m³. Another observation was that many homes had indoor air levels of dichlorobenzene, and that indoor air was the predominant source of exposure to this chemical. Common household sources of this chemical carcinogen were found to be products like mothballs and room air deodorizers. Finally, it was noted that indoor air typically contains higher concentrations of many VOCs than outdoor air; thus, indoor sources of VOCs generate indoor air concentrations that outweigh outdoor exposure levels created by major point sources like chemical plants and refineries. Likewise visiting specialty shops (e.g., dry cleaners, hobby shops, gas stations, etc.) are significant exposures sources for specific VOCs.

The Thomas et al (1991) study confirmed the hypothesis that dry-cleaned clothes become a significant source of PCE exposure when brought home as noted earlier by Wallace (1987). In this investigation 11 homes were monitored for 3-5 days to study the impact of dry-cleaned clothes on residential PCE air concentrations. In the following table the maximum PCE concentrations measured in indoor air and breath of residents is shown for 8 homes.

Appendix H

**Table H4**

**Maximum PCE Concentrations ($\mu g/m^3$) in Eight Homes: Impact of Dry-Cleaned Clothes**

| | | Test Homes | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | G | H |
| Maximum PCE Level Before Introducing Dry-Cleaned Clothes | | | | | | | | |
| Living area air | | 6 | 27 | 9 | 35 | 5 | 10 | 7 |
| Bedroom air | | 7 | 64 | 7 | 37 | 7 | 11 | 7 |
| Personal Air | | NM | NM | 11 | 34 | 22 | 8 | 10 |
| Exhaled Breath | | 6 | 28 | 9 | 30 | 7 | 10 | 3 |
| Maximum PCE Level After Introducing Dry Cleaned Clothes | | | | | | | | |
| Living area air | | 181 | 142 | 45 | 297 | 97 | 56 | 37 |
| Bedroom air | | 116 | 198 | 50 | 262 | 96 | 40 | 50 |
| Personal Air | | 185 | 303 | 53 | 244 | 198 | 42 | 90 |
| Exhaled Breath | | 35 | 58 | 14 | 61 | 29 | 17 | 9 |
| *Number of garments* | | *5* | *4* | *4* | *10* | *9* | *8* | *4* |
| *Home Volume ($m^3$)* | | *180* | *210* | *260* | *190* | *230* | *320* | *320* |
| *Mean air Exchange Rate ($hr^{-1}$)* | | *1.3* | *1.0* | *0.49* | *0.31* | *1.0* | *0.70* | *0.83* |

Adapted Thomas et al. (1991) (Note; Data for Homes F&I are not shown as  dry cleaned clothes had no impact on indoor air levels.)

The results in this table indicate the average maximum breath concentration before clothes were introduced was 12.75 $\mu g/m^3$, and after clothes were introduced was the average maximum breath concentration had increased to 29.375 $\mu g/m^3$.  This, the introduction of cry-cleaned clothes into the home increased the PCE exposure an average 2.3-fold in 8 homes listed in this table.  The authors of this study found the change in indoor air PCE concentrations was increased by the number of garments brought home divided by the air exchange rate.  The authors of the study noted that the source strengths did not correspond well with the number of garments cleaned.  The finding that two homes had PCE levels that were not substantially impacted by dry-cleaned clothes (home-F and home-I in this study) in this study may stem from the fact that some clothe may have a lower retention of PCE when cleaned.  Additional factors that could affect emission rates were garment type and fabric, cleaning method and storage conditions.  This study found that personal air levels were often highest when the individual wore a dry-cleaned garment, and at these times personal air levels generally exceeded indoor air levels during these periods.

In 1990 Wallace reviewed the information gleaned from various TEAM studies and other sources and summarized the then current findings regarding the major sources of exposure to VOCs.  Benzene had been measured in the outdoor air inhabited by about 630 people living in five different US locations and had averaged 6.0 $\mu g/m^3$.  A second study of 39 cities suggested this outdoor level was consistent expectation for US cities when it measured a median morning

concentration that also 6.0 μg/m³.  For the typical US resident another 10.0 μg/m³ of benzene exposure was due to indoor sources and personal activities.  For outdoor air it was found that mobile sources were more important than large point sources and accounted for approximately 85% of the benzene preset in outdoor air.  Similarly, a study of 39 cities with heavy petrochemical industries (e.g., Houston, Beaumont, Lake Charles, etc.) did not have benzene outdoor air levels that were substantially different from cities without petrochemical plants. Studies in Germany and the US indicated smoking increases the median indoor air concentration by about 4.0 μg/m³.  Unpublished data also indicated the indoor air of cars averaged about 40 μg/m³ benzene during the daily commute in Los Angeles.  Another study found more than 200 products emitted benzene with paints and adhesives representing typical sources.

For PCE the Wallace (1990) review noted that while the two heavily urbanized areas of Elizabeth/Bayonne (NJ) and Los Angeles had measured personal air levels of 14-28 μg/m³, the four other urban areas (Baltimore, Antioch/Pittsburg, Devils Lake, Greensboro) had lower, more consistent levels ranging between 6-9 μg/m³, with an average of a little over 7 μg/m³.  The increased impact of visiting a dry-cleaning establishment and bringing home dry-cleaned clothes as discussed above was again noted.  Figure 2 of this publication shows personal air and indoor activities accounted for about 78% of one's estimated exposure to PCE.  This review then briefly discusses a third chemical; the para-dichlorobenzene contained in moth repellants and indoor deodorizing products, found to be in the indoor air of many homes and offices.   Last, it is noteworthy that in the Discussion section of his review article Wallace points out the conundrum at that point in time facing the USEPA's efforts to improve air quality.  His statement on the subject is the following:

> For each of the three chemicals discussed above, the traditional sources of emissions (mobile sources, industry) have accounted for only 2-20% of total human exposure.  This same conclusion has been documented for a number of other volatile organic chemicals: styrene, xylenes, ethylbenzene, trimethylbenzenes, chloroform, trichloroethylene, α-pinene, limonene, decane, undecane, etc.  For most of these chemicals, the major sources of exposure have been identified (personal activities, consumer products, building materials) but cannot be regulated under existing environmental authorities.
> This situation has led to a peculiar perception of risk.  The public perceives indoor air pollution as considerably less risky than, say hazardous wastes sites (environment, August 1988) whereas experts at EPA put indoor air and consumer products exposure at the top of the list of health risks, with hazardous waste sites near the bottom.  Nonetheless, the amount of resources devoted to these two problems reflect the public perception, not that of the experts.

Wallace (1993) is another review updating the results the general findings of the USEPA's TEAM studies.  Several major points made in this review are of particular interest to allegations made by the Plaintiffs and their experts.  One was the observation that about 75% of the

9

population's exposure to TCE was from indoor air even though none of the major emitting sources had yet been identified. Women appeared to have higher exposures than men, and cosmetics and typewriter correction fluids were two sources that had been found to contain TCE. He noted that several attempts to estimate the cancer risk all VOC exposures with a general agreement that the upper bound lifetime risks for the carcinogenic VOCs appeared to be in the $10^{-3}$ risk range. A similar risk estimate was made for exposures to pesticides with a slightly lower estimate for all lifetime exposures of $10^{-4}$. The risk from all VOCs was stated to approximate the risks posed by radon and environmental tobacco smoke, although it was recognized these latter two substances were probably better-defined human risks.

## 2.0    Other Studies Recording Indoor Air, Outdoor Air, and Personal Measurements

Clayton et al. (1999) reported the results of field study performed under the USEPA's National Human Exposure Assessment Survey (NHEXAS) in Region 5. The target study population consisted of persons residing in six states (Illinois, Indiana, Ohio, Michigan, Minnesota, Wisconsin). The study's population exposures are expressed as mean and median values for the chemicals listed in the following table. The four VOCs chemicals measured were benzene, Chloroform, PCE and TCE. The mean and median values reported for these four VOCs are shown in the following Table. The average PCE concentration in indoor air was 195-times the mean value for outdoor air at the Golf Channel. The average TCE concentration in indoor air was more than 4,000-times the mean value for outdoor air at the Golf Channel. The mean concentrations of PCE and TCE in the outdoor air of this study were approximately 84- and 1,200 times higher, respectively, than the mean values Dr. Sahu model for the outdoor air at the Golf Channel.

**Table H5**

**Chemical Concentrations Measured in the NHEXAS study In Region 5**

| Chemical | Personal Air Mean & (median) | Indoor Air Mean & (median) | Outdoor Air Mean & (median) |
|---|---|---|---|
| Benzene ($\mu g/m^3$) | 7.52 (5.37) | 7.21 (4.35) | 3.61 (2.92) |
| Chloroform ($\mu g/m^3$) | 2.34 (1.95) | 2.64 (2.13) | 1.57(0.86) |
| PCE ($\mu g/m^3$) | 31.92 (1.98) | 5.82 (1.89) | 2.49 (1.24) |
| TCE ($\mu g/m^3$) | 5.27 (0.63) | 3.84 (0.56) | 1.11 (0.32) |

Adapted From Clayton et al. (1999)

Adegate et al. (2004) characterized the VOC air concentrations in four different microenvironments children inhabit daily. The 113 children participating in this investigation were part of the SHIELD (School Health Initiative: Environment, Learning, and Disease) study initiated by the University of Minnesota. The three microenvironments VOC in which selected VOCs were measured were the child's home, school, and the outdoor air at school. A fourth measurement

Appendix H

collected was the individual's breathing zone monitor a sample reflecting the average exposure from all microenvironments the child visited that day.  Table 6A listed the average time each child reportedly spent in the different microenvironments they inhabited each day.  The results of this study are similar to those of other studies indicating except for those individuals who work outdoors, or who can enjoy a greater than average time spent on outdoor recreational activities, most US citizens like the plaintiffs are individuals spend about 90% of their time indoors.

**Table H6A**

**Weighted Percentage of each Day in each Microenvironment
For the 113 Children During Both Seasons**

| Time spent in location/activity | Mean Percent time $\pm$ SD |
|---|---|
| Inside at home | 65% $\pm$ 6.6% |
| Inside at school | 25% $\pm$ 4.4% |
| Inside another place | 3.2% $\pm$ 5.4% |
| Outside at home | 1.2% $\pm$ 2.0% |
| Outside at school | 1.3% $\pm$ 1% |
| Outside at another place | 0.7 %$\pm$ 1.3% |
| Traveling in a vehicle | 3.6 %$\pm$ 1.0% |
| Indoors with smokers | 1.3% $\pm$ 3.8% |
| In vehicle with smokers | 0.1 $\pm$ 0.2% |

Adapted from Adegate et al. (2004)

Table 6B, shown on the next page, lists the concentrations of chemicals from this study that that were selected for this appendix, and each was measured by the four different sample types (outdoor air, indoor school air, indoor home air, and personal monitor). Consistent with other studies, the home indoor air in this study contained levels for several of the VOCs that were much higher than present in the outdoor ambient air.  Of particular interest to the causation issues in this case, the home air concentrations in this study for styrene, PCE and TCE were all much higher than the average of Dr. Sahu's modeled-estimated concentrations for the outdoor air at the golf channel.  Dr. Sahu's median concentration for TCE was 7.97E-04 $\mu g/m^3$, for PCE was 1.85E-02 $\mu g/m^3$, and styrene was 1.68E-03 $\mu g/m^3$.  So the residential air of inhaled by the children in this study contained a styrene concentration that was 446-times higher than the outdoor air of the Golf Channel.  The median home air TCE levels inhaled by these children were more than 321-times higher than the outdoor air of the Golf Channel.   The median home air PCE levels inhaled by the children were 24-times higher than those modeled for Golf Channel by Dr. Sahu.  Of interest in the fact that the outdoor air concentrations for these three chemicals although lower than their home air, all three chemicals in the outdoor air of this study were still higher than those estimated for the outdoor air at the Golf Channel by Dr. Sahu.  The outdoor air styrene concentration was

11

still almost 30-fold higher, TCE remained about 321-times higher, and the PCE concentration was 13.5-times higher.

**Table H6B**

**The Median\* Air Concentrations (μg/m³) of the VOCs in
Various Microenvironments Inhabited by the 113 Children in this Study**

| VOC | Outdoors | Indoor School | Indoor Home | Personal Monitoring Measurement |
|---|---|---|---|---|
| **Aromatic VOCs** | | | | |
| Benzene | 1.2 | 0.6 | 2.15 | 1.8 |
| Ethylbenzene | 0.55 | 0.45 | 1.0 | 0.95 |
| Toluene | 2.65 | 2.25 | 8.55 | 7.7 |
| m/p-Xylenes | 2.15 | 1.75 | 3.5 | 3.3 |
| o-Xylene | 0.75 | 0.6 | 1.15 | 1.05 |
| **Styrene** | **0.05** | 0.1 | **0.75** | 0.5 |
| | | | | |
| **Chlorinated VOCs** | | | | |
| Carbon tetrachloride | 0.5 | 0.55 | 0.55 | 0.5 |
| Chloroform | 0.1 | 0.15 | 0.35 | 0.85 |
| p-Dichlorobenzene | 0.15 | 0.5 | 0.8 | 1.15 |
| Methylene Chloride | 0.25 | 0.35 | 0.35 | 0.35 |
| **PCE** | **0.25** | 0.3 | **0.45** | 0.4 |
| **TCE** | **0.25** | 0.15 | **0.25** | 0.25 |

Adapted from Adegate et al. (2004). \*All concentrations presented here are the average of the Winter and Spring measurements recorded in this study.

Dawson and McAlary (2005) is a review article that summarizes the results on 18 studies measuring VOCs concentrations in indoor air samples collected in residences throughout North America.  Indoor air was the focus of this study because it has been recognized that most individuals spent a large portion of time in their own homes.  The authors note the sources of VOCs found in home air be introduced to via the storage and use of consumer products (e.g., cleaners, air fresheners, aerosols, mothballs, scented candles, and insect repellants), emissions from building materials (e.g., carpets, insulation, paint, and wood finishing products), combustion processes (e.g., smoking, cooking, and home heating), and occupant activities (e.g., craft hobbies, home improvements, automotive repairs).  The states or provinces where these measurements were collected in these 18 studies includes: New jersey, New York, Massachusetts, California, Colorado, Illinois, states in Region 5, Arizona, Texas, and Pennsylvania.  Table 7 lists the arithmetic mean (average) of the 25th, 50th (median), and 75th percentile as reported by all 18 studies.  The average median value reported in these 18 studies was 0.9 μg/m³ for PCE, exposure level is 30-fold higher than the median outdoor air level of PCE at the Golf Channel as modeled by Dr. Sahu.  The average

median value for these 18 studies was 0.30 µg/m³ for TCE, an average exposure concentration that was 375-times higher than the median outdoor air level for TCE at the Golf Channel as estimated by Dr. Sahu.

**Table H7**

**VOC Concentrations (µg/m³) in North American Residences**

| VOC | Mean of the 25th percentiles | Mean of the 50th Percentiles (medians) | Mean of the 75th Percentiles |
|---|---|---|---|
| Benzene | 1.9 | 2.5 | 4.5 |
| Ethylbenzene | 0.8 | 2.0 | 3.0 |
| Toluene | 9.0 | 13 | 25 |
| Total Xylenes | 4.3 | 7.7 | 13.3 |
| | | | |
| Carbon tetrachloride | 0.3 | 0.5 | 0.7 |
| Chloroform | 0.5 | 1.1 | 2.2 |
| 1,1,1-Trichloroethane | 0.5 | 1.9 | 2.7 |
| **PCE** | BDL | **0.9** | **1.8** |
| **TCE** | BDL | **0.3** | **0.3** |

Adapted from Dawson and McAlary (2005)

The study by Sax et al. (2006) compared the VOC exposures incurred by high school students living in Los Angeles to those living New York city.  All participants were nonsmoking teenagers living in nonsmoking homes.  Table 8n lists the means of the measured concentrations derived from personal monitoring samples, indoor air samples, and the outdoor air measurements.

**Table H8**

**Mean VOC Levels Measured in the Student's Microenvironments: Comparing NY to LA**

| VOC | Personal Air | Indoor Air | Outdoor |
|---|---|---|---|
| *New York* | | | |
| 1,3-Butadiene | 0.97 | 1.01 | 0.13 |
| Acetaldehyde | 17.4 | 16.7 | 3.41 |
| Benzene | 3.82 | 2.75 | 1.82 |
| Formaldehyde | 21.4 | 17.7 | 3.53 |
| **Styrene** | 1.22 | 0.98 | 0.30 |
| 1,4-Dichlorobenzene | 41.7 | 75.0 | 4.59 |
| Carbon tetrachloride | 0.60 | 0.60 | 0.58 |

Appendix H

| Chloroform | 2.85 | 2.96 | 0.24 |
|---|---|---|---|
| Methylene chloride | 6.90 | 9.02 | 1.35 |
| **PCE** | 8.75 | 6.60 | 4.69 |
| **TCE** | 1.78 | 0.90 | 0.24 |
| Arsenic (ng/m$^3$) | 0.45 | 0.40 | 0.37 |
| Chromium (ng/m$^3$) | 1.99 | 0.55 | 0.44 |
| *Los Angeles* | | | |
| 1,3-Butadiene | 0.47 | 0.41 | 0.12 |
| Acetaldehyde | 14.6 | 13.0 | 3.83 |
| Benzene | 4.64 | 3.87 | 3.32 |
| Formaldehyde | 22.4 | 19.3 | 4.08 |
| **Styrene** | 1.13 | 1.10 | 0.65 |
| 1,4-Dichlorobenzene | 36.6 | 47.4 | 2.65 |
| Carbon tetrachloride | 0.56 | 0.52 | 0.53 |
| Chloroform | 0.47 | 0.63 | 0.07 |
| Methylene chloride | 2.40 | 2.0 | 1.06 |
| **PCE** | 2.64 | 2.04 | 1.69 |
| **TCE** | 0.26 | 0.22 | 0.12 |
| Arsenic (ng/m$^3$) | 0.42 | 0.44 | 0.43 |
| Chromium (ng/m$^3$) | 2.16 | 1.41 | 3.02 |

Adapted from Sax et al. (2006).


Batterman et al. (2007) is study that investigated the impact an attached garage had on indoor home air concentrations of a number of VOC compounds because many household and non-household products are stored there, and because other studies have shown that BTEX and other petroleum-based VOCs are present in garages because of the vehicles stored there. Although this study measured many more VOCs than shown in the following table, only a few of the more commonly reported VOCs are listed below in Table 9. The reported values represent the average (mean) value for the 15 residences sampled in this study. It should be noted that the mean home air concentration of styrene 580-times higher than the mean concentration in the outdoor air at the Golf Channel as estimated by Dr. Sahu; and the mean home air concentration of PCE was 20-times higher than the mean PCE concentration in the outdoor air at the Golf Channel as estimated by Dr. Sahu. Similarly, the mean garage air concentrations of styrene and PCE were 357- and 16-times, respectively, the mean concentrations for these two VOCs derived for the outdoor air at the Golf Channel from the model-estimated concentrations provide by Dr. Sahu.

Appendix H

**Table H9**

**VOC Levels Measured in Outdoor Air, Home Air and Garage Air**
**(the mean value in units of μg/m$^3$)**

| VOC | Home Air Level | Outdoor Air | Garage Air |
|---|---|---|---|
| Benzene | 2.0 | 0.4 | 36.6 |
| Ethylbenzene | 2.3 | 0.2 | 28.0 |
| Toluene | 26.5 | 1.2 | 214.3 |
| o,m,p-Xylenes | 11.2 | 0.9 | 152.0 |
| Octane | 0.9 | BDL | 6.3 |
| Trimethylbenzene | 1.1 | 0.1 | 12.4 |
| Naphthalene | 8.3 | BDL | 8.9 |
| **Styrene** | **1.0** | BDL | 0.6 |
| Chloroform | 0.3 | BDL | BDL |
| 1,1,1-Trichloroethane | 5.4 | BDL | 1.3 |
| Carbon tetrachloride | 1.4 | 0.9 | 1.3 |
| **PCE** | **0.6** | BDL | 0.3 |

Adapted from Batterman et al. (2007)

The 2008 study by Eklund measured et al. (1996) the levels of different VOCs at 10 different stores that were part of a shopping center (strip mall) located in New Jersey. The 130 samples collected indoors yielded over 7500 target VOC concentrations. Some of these were detected infrequently leaving 28 chemicals detected more than 10% of the time. For about a dozen chemicals the indoor air levels were relatively high and these compounds yielded measured levels > 100 μg/m$^3$. In contrast, the outdoor samples yielded 1500 data points of which 23 VOCs were detected more than 10% of the time. All 23 frequently identified outdoor chemicals were part of the 28 chemicals frequently measured in the indoor air of the mall, but their individual levels were < 5 μg/m$^3$ in most of the outdoor samples. Table 10 summarizes the mean, median, and 90th percentile values for chemicals of potential interest in this case. The median concentration of PCE was 1,410-times higher than the median value reported for Dr. Sahu's estimates. The mean PCE level was 14,500-times higher than the mean value for Dr. Sahu's projections for the Golf Channel; and the 90th percentile was 7,020-times the maximum PCE concentration estimated by Dr. Sahu. Similarly, the mean TCE concentration was about 870-times higher than the mean TCE value of Dr. Sahu's TCE projections for the Golf Channel, and the 90th percentile TCE level in this study was 632-times higher than the maximum TCE value estimated by Dr Sahu. And the mean concentration of styrene in this study was 116-times higher than the mean value reported for Dr. Sahu's estimates, and the 90th percentile concentration of styrene in this study was 141-times the maximum styrene concentration reported by Dr. Sahu.

15

Appendix H

**Table H10**

**VOC Concentrations (μg/m³) Measured in 10 Shops at a Strip Mall**

| VOC | Mean Value | Median Value | 90th Percentile Value |
|---|---|---|---|
| Acetone | 5,510 | 31.8 | 25,400 |
| Benzene | 1.2 | 1.4 | 2.5 |
| Ethylbenzene | 0.6 | 0.7 | 1.8 |
| Toluene | 144 | 6.4 | 638 |
| Total Xylenes | 3.5 | 2.5 | 6.8 |
| Isopropyl alcohol | 493 | 6.2 | 676 |
| Ethanol | 918 | 480 | 2,490 |
| n-Hexane | 3.2 | 1.3 | 4.3 |
| **Styrene** | 0.2 | NR | 0.8 |
| Carbon tetrachloride | 0.1 | NR | 0.6 |
| Chloroform | 0.5 | NR | 1.0 |
| **PCE** | 432 | 26 | 730 |
| **TCE** | 0.8 | NR | 2.1 |

Adapted from Eklund et al. (2008).  * This value eliminates the NDs in shop #2 and is 10% higher than when all measurements are included. NR reflects the fact that a value was not reported.

The shops in the mall that were major emission sources of the different chemicals detected in the indoor air of the shopping mall were determined by the air measurements in that shop.  The jewelry store (store #1) was a major source of isopropyl alcohol. The nail salon (store #2) was major source of acetone, ethanol, ethyl acetate, isopropyl alcohol, and toluene. Stores #3, #4, #9, and #10 were restaurants and all four businesses were major sources of ethanol. Store #5 was a clothes rental business and a major source of PCE as was store #6 a dry cleaner.  Store #7 was an optician and a major source of ethanol and isopropyl alcohol.  Store #8 was a video rental shop was the fifth major source of ethanol.  The authors stated their results indicate VOC concentrations can vary both spatially and temporally in a large, multi-compartment building if the source of the chemical is within a defined indoor space.  This study also revealed that inter-building migration of VOCs can be significant.

The study by Jia et al. (2008) examined and compared VOC levels in three different Michigan cites by measuring levels at 159 locations.  They selected Ann Arbor as it is largely a suburban community, Ypsilanti because it is more urbanized and has commercial activity, and Dearborn because it is densely populated and a highly industrialized city.  Tables 11 A and 11B list the median and average outdoor air concentrations in each city for the target chemicals of this study.  These values can be compared the concentrations listed in Tables 11 C and 11D found on the following page which are the median and average indoor air concentrations in each city for the target chemicals of this study.

16

Appendix H

**Table H11A**

**Median Outdoor VOC Concentrations (μg/m³) By City and Season**

| VOC | Ann Arbor Summer/Winter | Ypsilanti Summer/Winter | Dearborn Summer/Winter |
|---|---|---|---|
| Benzene | 0.7/1.08 | 0.72/0.83 | 0.93/1.44 |
| Ethylbenzene | 0.20/0.28 | 0.24/0.24 | 0.60/0.73 |
| Toluene | 0.78/1.59 | 1.42/1.37 | 3.36/3.68 |
| Total Xylenes | 0.87/1.27 | 1.05/1.11 | 3.05/3.57 |
| Naphthalene | 0.16/0.17 | 0.12/0.11 | 0.24/0.38 |
| **Styrene** | 0.01/0.03 | 0.02/0.02 | 0.03/0.07 |
| Chloroform | 0.06/0.06 | 0.04/0.06 | 0.04/0.07 |
| 1,1,1-Trichloroehane | 0.07/0.09 | 0.00/0.11 | 0.08/0.10 |
| **PCE** | 0.18/0.15 | 0.11/0.16 | 0.28/0.41 |
| **TCE** | 0.00/0.04 | 0.00/0.05 | 0.00/0.04 |

Adapted from Jia et al. (2008)

**Table H11B**

**Average Outdoor VOC Concentrations (μg/m³) By City and Season**

| VOC | Ann Arbor Summer/Winter | Ypsilanti Summer/Winter | Dearborn Summer/Winter |
|---|---|---|---|
| Benzene | 0.71/1.49 | 0.77/0.86 | 1.0/1.71 |
| Ethylbenzene | 0.39/0.48 | 0.25/0.27 | 0.72/0.86 |
| Toluene | 1.15/2.46 | 1.56/1.42 | 3.98/4.28 |
| Total Xylenes | 1.88/2.17 | 1.11/1.29 | 3.94/4.31 |
| Naphthalene | 0.34/0.26 | 0.14/0.15 | 0.29/0.42 |
| **Styrene** | 0.02/0.05 | 0.04/0.03 | 0.03/0.08 |
| Chloroform | 0.06/0.06 | 0.04/0.06 | 0.05/0.14 |
| 1,1,1-Trichloroethane | 0.06/0.09 | 0.04/0.11 | 0.08/0.10 |
| **PCE** | 0.21/0.25 | 0.19/0.18 | 0.43/0.57 |
| **TCE** | 0.01/0.05 | 0.01/0.05 | 0.01/0.04 |

Adapted from Jia et al. (2008)

17

Appendix H

**Table H11C**

**Median Indoor VOC Concentrations (μg/m$^3$) By City and Season**

| VOC | Ann Arbor Summer/Winter | Ypsilanti Summer/Winter | Dearborn Summer/Winter |
|---|---|---|---|
| Benzene | 0.94/1.06 | 1.05/1.12 | 1.25/1.83 |
| Ethylbenzene | 0.70/0.77 | 1.31/0.77 | 1.09/1.63 |
| Toluene | 5.62/5.99 | 13.96/9.06 | 7.56/6.43 |
| Total Xylenes | 2.75/3.69 | 5.19/3.93 | 4.64/5.95 |
| Naphthalene | 0.89/0.63 | 1.13/0.57 | 0.92/1.10 |
| **Styrene** | 0.17/0.23 | 0.43/0.22 | 0.32/0.45 |
| Chloroform | 0.13/0.08 | 0.60/0.32 | 0.68/0.76 |
| 1,1,1-Trichloroehane | 0.08/0.08 | 0.00/0.09 | 0.08/0.07 |
| **PCE** | 0.28/0.21 | 0.28/0.25 | 0.59/0.51 |
| **TCE** | 0.00/0.04 | 0.00/0.04 | 0.00/0.04 |

Adapted from Jia et al. (2008)

**Table H11D**

**Average (Mean) Indoor VOC Concentrations (μg/m$^3$) By City and Season**

| VOC | Ann Arbor Summer/Winter | Ypsilanti Summer/Winter | Dearborn Spring/Fall |
|---|---|---|---|
| Benzene | 3.15/2.77 | 4.06/1.98 | 2.05/3.09 |
| Ethylbenzene | 3.25/1/37 | 2.65/1.29 | 1.73/2.59 |
| Toluene | 16.54/12.22 | 28.00/11.74 | 13.08/15.00 |
| Total Xylenes | 15.68/6.43 | 12.87/6.44 | 7.94/12.03 |
| Naphthalene | 3.50/1.41 | 6.16/6.25 | 1.90/3.76 |
| **Styrene** | 0.42/0.35 | 0.90/0.46 | 0.44/0.60 |
| Chloroform | 0.24/0.22 | 0.75/0.48 | 1.17/1.35 |
| 1,1,1-Trichloroethane | 0.31/0.50 | 1.97/0.19 | 0.15/0.13 |
| **PCE** | 0.71/0.87 | 0.46/0.61 | 1.34/1.29 |
| **TCE** | 0.03/0.06 | 0.07/0.10 | 0.04/0.06 |

Adapted from Jia et al. (2008)

Jai et al. (2008) state most of indoor/outdoor ratios for the chemicals they measured fell between 1-10.  d-limonene (data not shown), a chemical present in a number of household products, was the exception with a ratio of more than 100.  The authors stated that chemical with an indoor/outdoor ratio of 1.0 comes from outdoor sources only.  Chemicals with indoor/outdoor ratios between 1.5-10 are chemical with both indoor and outdoor sources, but the indoor sources produce higher concentrations within that confined space and indoor air poses a greater exposure tothat chemical.  Chemicals having a ratio greater than 10 are chemicals whose source(s) of exposure originate predominantly or almost exclusively indoors.  Of interest to this case, and an observation seen in other studies, is the fact that the styrene ratio is always about 10-fold or greater.  Thus, indoor microenvironments pose a greater styrene hazard than outdoor microenvironments regardless of the city an individual resides in.

A second observation from this study that is of interest is the fact that the median outdoor level of styrene was 0.02 $\mu g/m^3$ in the two cities with little or no industry (Ann Arbor and Ypsilanti), a level that is still almost 12-times higher than the median styrene value Dr. Sahu estimated for the outdoor air at the Golf Channel.  More to the point, however, the median indoor styrene air levels of Ann Arbor homes (the suburban city of this study) was ten times higher than outdoor air in that city, and so, was 120-times higher than the median styrene value Dr. Sahu estimated.  Thus, this study clearly indicates two limitations of the styrene exposure concentration Dr. Sahu calculated for the plaintiffs.  First, given that the outdoor styrene levels in these two cities are higher than Dr. Sahu's estimates, the styrene exposure plaintiffs incurred are NOT a thousand times higher than background; a fact indicated in other studies as well.  Second, the problem for plaintiffs' styrene allegation is the fact that indoor environments always contain higher levels of styrene than outdoor air environments, and therefore dominate the daily styrene dose a typical individual not working with styrene experiences.  Both findings indicate styrene is not a reasonable potential cause of the Plaintiff's diseases.  Similar comparisons are seen with PCE and TCE, the estimates reported by Dr. Sahu are clear indications that the chemicals coming from the defendant's property are not the likely causes of Plaintiffs' injuries.  Jai and colleagues also reviewed literature published after the year 2000 reporting VOC levels in other cities.  A comparison of the city outdoor air pollutant levels measured in these other studies showed the results recorded by Jia et al (2008) fell in the intermediate exposure level category, and so, are typical of most urban environments not heavily impacted by industry.  Higher levels were reported only for cities like New York city and Los Angeles.

Chin et al. (2014) measured the levels of various VOCs in the home of children with asthma.  In Table 12 the mean, median and maximum VOC concentrations for the 126 households in this study that were sampled 325-times.  The mean styrene home air concentration in these 126 households was 407-times higher than the mean styrene level in the outdoor air at the Golf Channel as estimated by Dr. Sahu.  The mean PCE home air level was about 24-times that of the outdoor air at the Golf Channel, and the mean home air level of TCE was 76-times that of the outdoor air

at the Golf Channel.  Comparing the median values similar excesses are observed.  The median styrene concentration in homes for these children was 315-times the median estimated for the Golf Channel.  The median PCE home concentration inhaled by these children was 14-times that estimated for the outdoor air at Golf Channel, and the median TCE level was 50-times the median outdoor air level at the Golf Channel.

**Table H12**

**VOC Concentrations (μg/m³) in Households of Children With Asthma**

| VOC | Mean | Median | Maximum |
|-----|------|--------|---------|
| Benzene | 2.25 | 1.45 | 27.93 |
| Ethylbenzene | 1.72 | 1.08 | 22.47 |
| Toluene | 11.62 | 6.02 | 179.84 |
| Total Xylenes | 8.36 | 4.43 | 128.94 |
| Naphthalene | 7.88 | 0.97 | 200.58 |
| **Styrene** | **0.70** | **0.53** | **2.72** |
| 1,2-Dichlorobenzene | 40.01 | 0.64 | 2,126 |
| Chloroform | 0.36 | 0.08 | 7.07 |
| 1,2-Dichloroethane | 0.34 | 0.20 | 3.93 |
| Methylene chloride | 0.54 | 0.35 | 7.85 |
| 1,1,1-Trichlorethane | 0.26 | 0.19 | 4.47 |
| Dibromochloromethane | 0.11 | 0.10 | 0.43 |
| Bromodichloromethane | 0.38 | 0.37 | 0.87 |
| **PCE** | **0.71** | **0.26** | **13.70** |
| **TCE** | **0.07** | **0.04** | **1.48** |

Adapted from Chin et al, (2014)

## 3.0    Some Additional VOC Studies

Heavener et al. (1996) used personal samples to investigated differences in exposure level to VOC chemicals between smoking and nonsmoking microenvironments.  This study enlisted 104 self-reported nonsmoking married women from the Philadelphia area and measured 33 VOC compounds in their work and home environments.  The author reported that 3.4% of the TVOC levels at home and 0.8% at work were attributable to smoking. Also that 11.4% of the benzenes and 13.4% of the styrene was attributable to ETS in smoking homes, while only 11.5% and 6.2%, respectively, was attributable to ETS in smoking workplaces.   The measured VOCs of interest in the various microenvironments are listed Table 13 which is found on the next page.  The median styrene level in nonsmoking homes was 583-times higher than the median outdoor air styrene level estimated by Dr. Sahu. The median PCE and TCE levels in nonsmoking homes were 101- and 300-

times higher, respectively, than those predicted by Dr. Sahu for the outdoor air at the Golf Channel.
The median styrene, PCE and TCE concentrations in the nonsmoking workplaces were 976-, 75-
and 1,625-times higher than the median concentrations in the outdoor air at the Golf Channel for
these three chemicals as estimated by Dr. Sahu.

**Table H13**

**VOCs Measured in Smoking and Nonsmoking Homes (μg/m³)**

| VOC | Median | | Mean | | Maximum | |
|---|---|---|---|---|---|---|
| | Non-Smoking | Smoking | Non-Smoking | Smoking | Non-Smoking | Smoking |
| 1,3-Butadeine | 0.54 | 0.93 | 0.86 | 1.17 | 12.07 | 4.14 |
| Benzene | 2.97 | 3.87 | 4.12 | 4.25 | 33.39 | 9.93 |
| Toluene | 16.72 | 21.27 | 23.26 | 25.97 | 102.1 | 74.24 |
| Ethylbenzene | 3.65 | 3.40 | 4.79 | 3.63 | 25.94 | 10.46 |
| Total-Xylenes | 8.42 | 9.45 | 14.31 | 10.49 | 128.38 | 27.74 |
| **Styrene** | **0.98** | 1.05 | **1.57** | 1.41 | 9.90 | 4.94 |
| Dichlorobenzene | 0.58 | 0.91 | 5.18 | 16.77 | 121.86 | 302.28 |
| Chloroform | 0.28 | 0.23 | 0.60 | 0.85 | 2.90 | 5.98 |
| **PCE** | **1.87** | 2.01 | **3.93** | 7.21 | 65.61 | 139.81 |
| **TCE** | **0.24** | 0.22 | **0.75** | 0.86 | 7.40 | 9.48 |
| **TVOC** | **1,021** | 1,158 | **1,339** | 1,333 | 13,726 | 3,703 |

**VOCs Measured in Smoking and Nonsmoking Workplaces (μg/m³)**

| VOC | Median | | Mean | | Maximum | |
|---|---|---|---|---|---|---|
| | Non-Smoking | Smoking | Non-Smoking | Smoking | Non-Smoking | Smoking |
| 1,3-Butadeine | 0.57 | 1.18 | 0.60 | 1.29 | 1.63 | 3.86 |
| Benzene | 2.16 | 3.81 | 0.38 | 7.33 | 9.71 | 101.18 |
| Toluene | 9.63 | 21.50 | 17.94 | 59.06 | 110.26 | 570.12 |
| Ethylbenzene | 3.43 | 4.18 | 5.87 | 6.19 | 66.26 | 23.42 |
| Total-Xylenes | 6.15 | 9.75 | 14.86 | 15.65 | 297.76 | 75.37 |
| **Styrene** | **1.64** | 1.91 | **2.12** | 2.88 | 12.88 | 8.40 |
| Dichlorobenzene | 0.55 | 1.08 | 1.46 | 10.73 | 23.44 | 136.0 |
| Chloroform | 0.21 | 0.35 | **0.88** | 0.91 | 14.23 | 134.74 |
| **PCE** | **1.38** | 2.31 | **8.16** | 16.26 | 281.61 | 199.59 |
| **TCE** | **1.30** | 0.70 | **4.51** | 6.37 | 79.71 | 134.74 |
| **TVOC** | **821** | 1,243 | **1,741** | 2,604 | 18,068 | 17,876 |

Adapted from Heavener et al. (1996)

Appendix H

### 3.1     VOCs in Bioeffluents

Commonplace chemicals in the household are not the only contributors to the organic load in indoor air; biological processes contribute to indoor air quality too.   Humans emit several organic compounds as a result of their normal bodily processes and VOCs have been detected in the breath as well as other bodily fluids including the blood (n=379), breath (n=1,488), feces (n=443), milk (n=290), saliva (n=549), semen (n=196), skin (n=623), and urine (n=444).  Together these chemicals are called the human volatilome (Drabinkska et al., 2021). A searchable free-access database of breath-borne and other volatilome-related chemicals exists on USEPA's "distributed structure searchable toxicity" (DSSTox) database available on its CompTox Chemicals Dashboard[1].

One such study by Phillips et al. (1999) evaluated the VOCs in the breath of 50 normal volunteers.  These authors found an average of 204 VOCs in the breaths of these individuals (with a range of 157 to 241 different VOCs per individual breath). The authors state in the DISCUSSION section of this paper that - *More than 200 different VOCs were observed in most breath samples, and more than 3000 different VOCs were observed at least once.  These numbers probably represent an underestimate of the total number of VOCs in normal human breath, since the assay was limited to $C_4$ to $C_{20}$ VOCs within the trapping range of the sorbent traps.*

Fenske and Paulson (1999) measured levels of VOCs in human breath.  A number of the VOCs measured by these authors had concentrations that ranged into the hundreds of ppb ($\mu g/m^3$) range.  Fenske and Paulson (1999) state that in healthy individuals, the main VOCs in the breath are isoprene (range 33-1,616 $\mu g/m^3$), acetone (range 3-4,466 $\mu g/m^3$), ethanol (range 25-1,884 $\mu g/m^3$), and methanol (range 210-2,621 $\mu g/m^3$).  Table 2 in the paper by Fenske and Paulson (1999) shows the $\mu g/m^3$ VOCs from breath can build up in crowded conditions and the authors estimated that in crowded microenvironments like airplanes and cars, VOC levels of 500-1,000 $\mu g/m^3$ may accumulate.

The NRC (1981) had earlier summarized the emission rates for several bioeffluents as follows (Table H14 on the next page).  The sum of all of the above VOC average emission rates amounts to a total of 329.4 mg/person-day.   Then using a USEPA default inhalation (and exhalation) volume of 20 $m^3$ of air per person-day the average TVOC concentrations in the exhaled breath would be 16,470 $\mu g/m^3$ based on to these measurements.

---

[1] https://comptox.epa.gov/dashboard/.

Appendix H

**Table H14**

**Emission Rates of Organic Bioeffluents from Humans**

| Effluent | Emission Rate = mg/person-day |
|---|---|
| Acetone | $50.7 \pm 27.3$ |
| Acetaldehyde | $6.2 \pm 4.5$ |
| Acetic acid | $3.6 \pm 3.6$ |
| Allyl alcohol | $19.9 \pm 2.3$ |
| Amyl alcohol | $21.9 \pm 20.8$ |
| Butyric acid | $44.6 \pm 21.5$ |
| Diethyl ketone | $20.8 \pm 11.4$ |
| Ethyl acetate | $25.4 \pm 4.8$ |
| Ethyl alcohol | $44.7 \pm 21.5$ |
| Methyl alcohol | $74.4 \pm 5.0$ |
| Phenol | $9.5 \pm 1.5$ |
| Toluene | $7.4 \pm 4.9$ |

Source: NRC (1981).

Delfino et al. (2003) provided comparative levels in outdoor air and the exhaled breath of asthmatic school children living in Huntington Park area of east Los Angeles county (see Table H15). This area was stated to have among highest VOC levels recorded in the Los Angeles area basin as it is flanked by major freeways and trucking routes.

**Table H15**

**VOCs measured in Outdoor Air and the Breaths of Asthmatic Children**

| A. Outdoor Air Concentrations ($\mu g/m^3$) | | | |
|---|---|---|---|
| VOC | Mean | Median | 90th percentile |
| Benzene | 5.67 | 5.42 | 9.24 |
| Toluene | 26.9 | 26.3 | 43.2 |
| Total Xylenes | 17.76 | 16.68 | 27.74 |
| **Styrene** | 0.51 | 0.43 | 0.85 |
| p-Dichlorobenzene | 0.96 | 1.20 | 1.80 |
| Methylene chloride | 4.30 | 3.12 | 8.66 |
| **PCE** | 3.52 | 3.05 | 6.09 |
| A. Breath Concentrations ($\mu g/m^3$) | | | |
| VOC | Mean | Median | 90th percentile |
| Benzene | 2.19 | 1.56 | 3.51 |
| Toluene | 8.28 | 5.70 | 15.19 |
| Total Xylenes | 5.68 | 3.68 | 7.72 |
| **Styrene** | 1.51 | 1.37 | 2.90 |

23

| p-Dichlorobenzene | 36.29 | 1.56 | 225.3 |
| Methylene chloride | 2.73 | 1.75 | 3.83 |
| **PCE** | 4.40 | 1.99 | 5.59 |

Adapted from Delfino et al. (2003)

The study by Smith et al (2007) discussed two studies that measured VOC levels in the exhale breath of volunteers.  In the larger and longer of the two studies reviewed, 30 volunteers gave breath samples at weekly intervals for 6 months.  A total of seven target compounds were measured: ammonia, acetone, methanol, ethanol, isoprene, isopropanol, and acetaldehyde.  The median concentration of acetaldehyde in this study was 22 ppb (39.6 $\mu$g/m$^3$).  This breath concentration represents a lifetime cancer risk of $8.7 \times 10^{-5}$.

The study of Molchalski et al. (2013) used g.c.-mass spectroscopy to identify and measure the VOCs present in the blood and breaths of 28 healthy individual volunteers.  This study identified the measurable presence of 74 different compounds in both sample types. and reported concentrations of various VOCs between 0.2 and 2,500 ppb for various compounds identified.  A concentration range of 0.937 to 19.17 $\mu$g/m$^3$ (a mean value of 3.92 $\mu$g/m$^3$).  The two other compounds in this study interest in this case were 1,3-butadiene and benzene.  The range (and mean) of the 1,3-butadience concentrations in the exhaled breath samples were 0.44 to 3.54 (1.76 $\mu$g/m$^3$), respectively.  The mean breath concentration for styrene is 2,265-fold higher than Dr. Sahu's mean level for the Golf Channel, and the lifetime styrene cancer risk associated with this concentration would be $2.9 \times 10^{-5}$.  The range (and mean) of the benzene concentrations in the exhaled breath samples were 0.51 to 18.56 (2.56 $\mu$g/m$^3$), respectively.  The corresponding lifetime risk associated with the mean 1,3-butadience breath concentration measured in this study would be $5.3 \times 10^{-5}$.  The corresponding lifetime risk associated with the mean benzene breath concentration measured in this study would be $5.6 \times 10^{-6}$.

Liu et al. (2022) measured PCE in the exhaled breath of residents living in Martinsville, Indiana.  This object of study as estimates the PCE exposure resulting from the vapor intrusion associated with groundwater plumes in the area.  Martinsville is a small community of 11,000 residents and is a city located in central Indiana.  The potentially responsible parties for groundwater contamination were dry cleaning enterprises in the area.  The authors stated there were no significant differences between the breath PCE concentrations measured for individuals living within a plume area versus those living outside the plume areas.  The measured breath PCE concentrations of 35 individuals living in plume areas had average and median concentrations of 6.8 and 4.5 $\mu$g/m$^3$, respectively.  By comparison, the mean and median PCE breath concentrations of three residents living outside the plume areas were 3.9 and 3.8 $\mu$g/m$^3$, respectively.  Table 3 of this publication lists the breath and personal air sample PCE measurements of reported in various previous studies and the present one.  In this table a group of 44 adult controls in the present study had a geometric mean PCE breath concentration of 4.6 $\mu$g/m$^3$, while the level in the 33 children of

the control group had geometric mean concentration of 3.7 μg/m$^3$.  A comparison of these PCE concentrations to those estimated by Dr. Sahu are provided below in Table H16.

**Table H16**

**PCE Breath Concentrations (μg/m$^3$) Measured in Martinsville Indiana Residents**

| Type of Resident (N) | Mean PCE Breath Concentration | Median PCE Breath Concentration | Increase > Dr. Sahu's Mean PCE Value | Increase > Dr. Sahu's Median PCE Value | Lifetime Risk for the Average Breath* Concentration |
|---|---|---|---|---|---|
| Inside Plume (15) | 6.8 | 4.5 | 228x | 243x | 1.5x10$^{-6}$* |
| Outside of Plume (3) | 3.9 | 3.8 | 131x | 205x | 1x10$^{-6}$* |
| Control Adults (44) | 4.6 | -- | 155x | -- | 1.2x10$^{-6}$ |
| Control Children (33) | 3.7 | -- | 125x | -- | 9.6x10$^{-7}$ |

Adapted from Liu et al. (2022).  * This risk was calculated using the average of the mean and median concentrations.

## 4.0     VOCs: Sources and TVOC Levels

### 4.1     Introduction

The plaintiffs' experts in this matter are claiming the plaintiffs' minimal exposures to the solvents TCE, PCE, and styrene are somehow causally related to the various cancer and non-cancer claims in this case. But at the same time, plaintiffs' experts also use the terms "solvents," "organic solvents", and "volatiles organic compounds" (or VOCs) interchangeably when referring to the plaintiffs' exposures. In reality, VOCs encompass a broad array of compounds, each of which has its own name, structure, molecular formula, molecular weight, CAS (Chemical Abstracts Service) number, chemical and physical properties, uses, and beneficial and/or adverse effects.

The presence of many VOCs – both carcinogenic and non-carcinogenic – in both indoor and outdoor air is a common occurrence and is to be expected given the many uses of these compounds.  In fact, thousands of different VOCs have been detected in indoor air - *There are thousands of VOCs that volatilize into the air at room temperature; over 5,000 have been identified in indoor air* (Haghighat and De Bellis, 1993). It has been known for decades that air sampling indoors or outdoors with modern methods commonly provides the investigator with a long list of VOCs (e.g., Jarke, et al., 1981; Burton, 1997; USEPA TEAM[2] studies).

### 4.2     Sources of VOCs in Indoor Air

---

[2] TEAM Studies = USEPA Total Exposure Assessment Methodology Studies.

As a consequence of the common occurrence of chemicals in our air, we are all exposed to formaldehyde and other aldehydes, alcohols, ketones, terpenes, aromatics, and aliphatics (to name but a few chemical classes) on a daily basis. These chemicals are off-gassed from the many different consumer or household products, construction materials, fabrics, and additional items that are found in residences and other indoor air environments (vehicles, offices, businesses, hospitals, etc.) resulting in a varied but constant exposure to many different solvent and VOC chemicals  on a daily basis.  The many VOCs emitted by these different consumer/household products are summarized in Tables H17 through H22.

**Table H17**

**Examples of Organic Compound Types and Potential Indoor Sources**

| Pollutant Type | Example | Indoor Sources |
|---|---|---|
| Aliphatic hydrocarbons | Propane, butane, hexane, limonene. | Cooking and heating fuels, aerosol propellants, cleaning compounds, refrigerants, lubricants, flavoring agents, perfume base. |
| Halogenated hydrocarbons | Trichloroethylene, tetrachloroethylene, 1,1,1-trichloromethane, chloroform, methylene chloride, and PCBs. | Aerosol propellants, fumigants, pesticides, refrigerants, and degreasing, dewaxing, and dry-cleaning solvents, tap water, appliances, transformers, plasticized vinyl tile. |
| Aromatic hydrocarbons | Benzene, toluene, xylenes, styrene. | Paints, varnishes, glues, cleaners, gasoline and other petroleum products. |
| Alcohols | Ethanol, methanol. | Window cleaners, paint thinners, cosmetics, adhesives, human breath. |
| Ketones | Acetone. | Lacquers, varnishes, polish removers, adhesives. |
| Aldehydes | Formaldehyde, acetaldehyde. | Fungicides, germicides, disinfectants, textiles, paper, cardboard, particle board, cosmetics, flavoring agents, permanent press clothes, fabrics etc. |
| Miscellaneous | Toluene diisocyanate. Phthalic acid anhydride, trimellitic acid, triethylene tetramine. Sodium dodecyl sulfate. | Polyurethane foam aerosols. Epoxy resins. Carpet shampoo. |

Appendix H

Source: Adapted from Angle (1988).


### Table H18


### VOCs Identified in Consumer Products and Building Materials

| Material/Product | Major Organic Compounds Identified |
|---|---|
| Silicone caulk | Methyl ethyl ketone, butyl propionate, 2-butoxyethanol, butanol, benzene, toluene |
| Floor adhesive (water based) | Nonane, decane, undecane, dimethyloctane, 2- methylnonane, dimethylbenzene |
| Particleboard | Formaldehyde, acetone, hexanal, propanol, butanone, benzaldehyde, benzene |
| Moth crystals | p-Dichlorobenzene |
| Floor wax | Nonane, decane, undecane, dimethyloctane, trimethylcyclohexane, ethylmethylbenzene |
| Wood stain | Nonane, decane, undecane, methyloctane, dimethylnonane, trimethylbenzene |
| Latex paint | 2-Propanol, butanone, ethylbenzene, propylbenzene, 1,1'-oxybisbutane, butylpropionate, toluene |
| Furniture polish | Trimethylpentane, dimethylhexane, trimethylhexane, trimethylheptane, ethylbenzene, limonene |
| Polyurethane floor finish | Nonane, decane, undecane, butanone, ethylbenzene, dimethylbenzene |
| Room freshener | Nonane, decane, undecane, ethylheptane, limonene, substituted aromatics (fragrances) |

Source: Tichenor and Mason (1988).

Appendix H

## Table H19

### Source of Indoor Organic Compounds

| SOURCES OF INDOOR ORGANIC COMPOUNDS | | | |
|---|---|---|---|
| Based on Tucker (ref. 33; see explanatory note at end of this table) and other sources | | | |
| Compound[a] | Formula | Substantiated Sources[b] | Potential Sources[c] |
| Formaldehyde | $CH_2O$ | Unvented radiant gas space heaters, upholstery fabric, latex-backed fabric, plywood, particleboard, carpets, paneling, new clothing, fiberglass, paper plates & cups, ceiling panels, airducts, unvented range-top burner, unvented gas oven, urea foam insulation, floor covering, wallpaper, caulking compounds, jointing compound, floor varnish, adhesive, fiberboard, chipboard, linoleum, floor lacquer, calcium silicate sheet, gypsum board, tobacco smoke | |
| Methylene chloride | $CH_2Cl_2$ | Paint removers, aerosol finishers | |
| Carbon tetrachloride | $CCl_4$ | Grease cleaners | |
| Chloroform | $CHCl_3$ | Water, clothes washer | |
| Bromoform | $CHBr_3$ | | Medicinals |
| Trichlorofluoro-methane (F-11) | $CCl_3F$ | Refrigerant | |
| Tetrachloroethylene | $C_2Cl_4$ | Dry cleaning | |
| 1,1,1-Trichloroethane | $C_2H_3Cl_3$ | Dry cleaning, cleaning fluid | |
| Trichloroethylene | $C_2HCl_3$ | | Solvent for paints and varnishes, degreasing in dry cleaning |
| Acetic acid | $C_2H_4O_2$ | Tobacco smoke | Food preservative, cooking, solvent for gums, resins, caulks, sealants, glazing compounds, volatile oils |
| Acetaldehyde | $C_2H_4O$ | | Perfumes, flavors, dyes, tobacco smoke |
| Ethanol | $C_2H_6O$ | Fiberboard | Solvent, antifreeze, tobacco smoke |
| Isopropanol | $C_3H_8O$ | Particleboard | Antifreeze, solvent for gums, shellac, essential oils, cosmetics |

28

Appendix H

| Compound | Formula | Substantiated Sources | Potential Sources |
|---|---|---|---|
| Acetone (propanone) | $C_3H_6O$ | Lacquer solvent | Tobacco smoke |
| Pyruvic acid | $C_3H_4O_3$ | | Medicinal ointments |
| Ethylacetate | $C_4H_8O_2$ | Linoleum floor covering | Artificial fruit essences; solvent for varnishes & lacquers; used in manuf. perfumes & artificial leather |
| Diethylamine | $C_4H_{11}N$ | | Used in resins, dyes, pharmaceuticals; used in manuf. rubber |
| Dimethylacetamide | $C_4H_{10}ON$ | | Solvent for organic reactions |
| n-Butylacetate | $C_6H_{10}O_2$ | Floor lacquer | |
| i-Butylacetate | $C_6H_{10}O_2$ | Floor lacquer | |
| 1,4-Dioxane | $C_4H_8O_2$ | | Solvent for many oils, waxes, dyes, cellulose acetate |
| n-Butanol | $C_4H_{10}O$ | Edge sealing, moulding tape, jointing compound, cement flagstone, linoleum floor covering, floor lacquer | Flavors, perfumes, industrial cleaners, paint removers |
| i-Butanol | $C_4H_{10}O$ | Edge sealing, moulding tape, jointing compound, cement flagstone, linoleum floor covering, floor lacquer | Tobacco smoke |
| 2-Butanone (MEK) | $C_4H_8O$ | Floor/wall covering, calcium silicate sheet, fiberboard, caulking compounds, particleboard, tobacco smoke | Synthetic resins, tobacco smoke |
| 2-Ethoxy-ethanol (Cellosolve) | $C_4H_{10}O_2$ | Epoxy paint, latex paint, poly-urethane varnish | |
| Pentane | $C_5H_{12}$ | Tobacco smoke | |
| 1-Amyl alcohol | $C_5H_{12}O$ | | Solvent in organic synthesis |
| Propyl acetate | $C_5H_{10}O_2$ | | Flavors, perfumes, plastics |
| n-Hexane | $C_6H_{14}$ | Chipboard, gypsum board, insulation board, floor covering, wallpaper, tobacco smoke | |
| Cyclohexane | $C_6H_{12}$ | Tobacco smoke | Solvent for lacquers and resins, paint & varnish remover |
| Cyclohexanone | $C_6H_{10}O$ | | Solvent for many resins and for DDT, also for fats & waxes |
| Hexanal | $C_6H_{12}O$ | Polyurethane wood finish | |
| 4-Methyl-2-Pentanone | $C_6H_{12}O$ | Floor/wall covering, tobacco smoke | |
| Methylcyclopentane | $C_6H_{12}$ | Tobacco smoke | |

29

| Compound | Formula | Substantiated Sources | Potential Sources |
|---|---|---|---|
| 2-Methylpentane (isohexane) | $C_6H_{14}$ | Chipboard, gypsum board, insulation foam, floor covering, wall paper, tobacco smoke | |
| 3-Methylpentane | $C_6H_{14}$ | Tobacco smoke | |
| Benzene | $C_6H_6$ | Smoking, adhesives, spot cleaners, paint remover, particleboard, tobacco smoke | |
| Chlorobenzene | $C_6H_5Cl$ | | Solvent for paint; used in manuf. DDT & phenol |
| o-Dichlórobenzene | $C_6H_4C_{l2}$ | Deodorizers, moth crystals | |
| m-Dichlorobenzene | $C_6H_4C_{l2}$ | Deodorizers, moth crystals | |
| p-Dichlorobenzene | $C_6H_4C_{l2}$ | Deodorizers, moth crystals | |
| Hexachlorobenzene | $C_6Cl_6$ | Fungicide | |
| Tetrachlorophenol | $C_6H_2Cl_4O$ | Wood preservative | |
| 2-Ethoxyethylacetate | $C_6H_{12}O_3$ | Floor lacquer, epoxy paints | |
| Pentachlorophenol | $C_6HCl_5O$ | Wood preservative, disinfectant, fungicide | Paints, wallpaper adhesive, textiles, wood finishes, leather tanning, canvas, rope, paper, carpet shampoo |
| Iso-butylacetate | $C_6H_{12}O_2$ | | Flavorings, solvent |
| Butylacetate | $C_6H_{12}O_2$ | Floor lacquer | |
| Toluene | $C_7H_8$ | Solvent-based adhesive, water-based adhesive, edge sealing, moulding tape, wallpaper, jointing compound, calcium silicate sheet, floor covering, vinyl coated wallpaper, caulking compounds, paint, chipboard, linoleum floor covering, kerosene heaters, tobacco smoke | |
| Butyl acrylate | $C_7H_{11}O_2$ | | Used as monomer in manuf. of polymers & resins for textile & leather finishes |
| Heptane | $C_7H_{16}$ | Floor covering, floor varnish, kerosene heaters | |
| Benzaldehyde | $C_7H_5O$ | Fiberboard, particleboard | |
| Ethylbenzene | $C_8H_{10}$ | Floor/wall covering, insulation foam, chipboard, caulking compounds, jointing compound, fiberboard, calcium silicate sheet, adhesives, floor lacquer, grease cleaners | |
| Styrene | $C_8H_8$ | Insulation foam, jointing compound, fiberboard, tobacco smoke | |

Appendix H

| Compound | Formula | Substantiated Sources | Potential Sources |
|---|---|---|---|
| Xylenes | $C_8H_{10}$ | Adhesives, jointing compound, wallpaper, caulking compounds, floor covering, floor lacquer, grease cleaners, shoe dye, tobacco smoke, kerosene heaters, varnish, kerosene heaters | |
| Nonane | $C_9H_2O$ | Wallpaper, caulking compounds, floor covering, chipboard, adhesives, cement flagstone, jointing compound, floor varnish, kerosene heaters, floor wax | |
| Ethyl toluene | $C_9H_{12}$ | Floor wax | |
| o-Ethyltoluene | $C_9H_{12}$ | Floor wax | |
| m,p-Ethyltoluene | $C_9H_{12}$ | Floor wax | |
| m-Ethyltoluene | $C_9H_{12}$ | Floor wax | |
| Quinolone | $C_9H_7N$ | | Used in manuf. of dyes; solvent for resins |
| Isoquinolone | $C_9H_7N$ | | Used in synthesis of dyes and insecticides, rubber accelerator |
| Indane (hydrindene) | $C_9H_{10}$ | | Constituent of coal tar |
| 1,2,3 Trimethylbenzene | $C_9H_{12}$ | Floor/wall covering, floor wax | |
| 1,2,4 Trimethylbenzene | $C_9H_{12}$ | Floor/wall covering, linoleum floor covering, caulking compounds, vinyl coated wallpaper, jointing compound, cement flagstone, floor varnish, chipboard, floor wax | |
| 1,3,5 Trimethylbenzene | $C_9H_{12}$ | Caulking compounds, floor/wall covering, floor wax | |
| n-Propylbenzene | $C_9H_{12}$ | Adhesives, floor/wall covering, chipboard, paint, caulking compounds, insulation foam, kerosene heaters | |
| n-Butylbenzene | $C_{10}H_{14}$ | | Solvent |
| Limonene | $C_{10}H_{16}$ | Paint, adhesives, chipboard, detergents | |
| Pinene | $C_{10}H_{16}$ | | Used in manuf. of camphor, insecticides, solvents, plasticizers, & perfumes |
| a-Pinene | $C_{10}H_{16}$ | Cement flagstone, fiberboard, gypsum board, adhesive, insulation sheets, chipboard, calcium silicate sheet | |
| a-Terpinene | $C_{10}H_{16}$ | | Oil of lemon |
| Camphene | $C_{10}H_{16}$ | | Occurs in many essential oils |
| Camphor | $C_{10}H_{16}O$ | Moth crystals | |
| Naphthalene (Tetralin) | $C_{10}H_{12}$ | Moth crystals | |

31

Appendix H

| Compound | Formula | Substantiated Sources | Potential Sources |
|---|---|---|---|
| Undecane | $C_{11}H_{24}$ | Wallpaper, gypsum board, floor/ wall covering, joint compound, chipboard, floor varnish, paints, paint removers | |
| Dodecane | $C_{12}H_{26}$ | Floor varnish, floor/wall covering, kerosene heaters | |
| 4-Phenylcyclohexene | $C_{12}H_{14}$ | Latex-backed carpet | |
| Nonylphenol isomers | $C_{15}H_{24}O$ | | Used in manuf. of lubricating oil additives, resins, plasticizers, & surface active agents |
| Dibutylphthalate | $C_{16}H_{22}O_4$ | Plastics | |

NOTES:
[a] Selected compounds that have been measured in indoor air and that may have come from material sources.
[b] Source types for which quantitative data on emissions have been obtained by chamber tests, or for which qualitative data are available (e.g., from headspace testing).
[c] Source types known to contain the compound. Not all products of the source type will necessarily have the compound, however.

Source: Levin (1989).


**Table H20**


**VOCs Found at High Levels in Emission Samples**

| Building Material | VOC |
|---|---|
| *Interior Exposure* | |
| Carpet | Aromatic hydrocarbons, aliphatic hydrocarbons, cyclohexenylbenzene |
| Linoleum tile | Aromatic hydrocarbons, aliphatic hydrocarbons, toluene |
| Vinyl cove molding | Toluene, aliphatic hydrocarbons, aromatic hydrocarbons |
| Vinyl edge molding | Aromatic hydrocarbons, toluene |
| Large diameter telephone cable | Pentane, 2-butanone, aliphatic hydrocarbons, aromatic hydrocarbons, toluene, undecanol, 2,6-bisphenol |
| Small diameter telephone cable | Aliphatic hydrocarbons, aromatic hydrocarbons, 3,3-dimethylbutanone, toluene, dimethylpentene, undecanol, cyclopentane, 2,6-bisphenol |
| Black rubber molding | 1,6-Dichloro-1,5-cyclooctadiene, aliphatic hydrocarbons, aromatic hydrocarbons, phenolic compounds |
| Particle board | Pentanal, methylpentanal, aliphatic hydrocarbons |
| *Building shell* | |
| Tar paper | Naphthalene |
| Duct insulation | Trimethylhexene, aliphatic hydrocarbons |
| Polystyrene foam insulation | 2-Butene-1-ol, pentane, 1,2-dimethylcyclopropane, benzonitrile, benzaldehyde |
| Exterior mineral board | Dioctylphthalate |
| Water repellant mineral board | Ethylhexanol, nonanal |
| PVC pipe | Diethylphthalate, trimethylhexene, aliphatic hydrocarbons, aromatic hydrocarbons |
| *Solvent-Based Materials* | |

Appendix H

| Building Material | VOC |
|---|---|
| Cove adhesive | Toluene, octane, aliphatic hydrocarbons |
| Carpet adhesive | Aliphatic hydrocarbons, aromatic hydrocarbons |
| Latex caulk | Aliphatic hydrocarbons, aromatic hydrocarbons |
| Linoleum tile cement | Aliphatic hydrocarbons, trichlorotrifluoromethane |
| Latex paint | Aliphatic hydrocarbons, octanone, nonanone |
| Urethane insulant | Toluene, trimethylhexene |
| Primer/adhesive | Aliphatic hydrocarbons |

Source: Source: U.S. Environmental Protection Agency (USEPA).  1988.  Indoor Air Quality in Public Buildings: Volume II.  Research Triangle Institute, Research Triangle Park, NC.


As another example, Steinmann et al. (2010) detected an array of 133 different VOCs from 25 different fragranced consumer products including laundry products, personal care products, cleaning supplies, and air fresheners.  Interestingly, these authors found that products labeled as "green" had emissions that were similar to products not labeled as such.  The most commonly detected chemicals in these products are listed in Table 21

**Table H21**

**Most Commonly Detected VOCs in Fragranced Consumer Products\***

Limonene

α-pinene

β-pinene

Ethanol

2,4-Dimethyl-3-cyclohexene-1- carboxaldehyde (Triplal 1)

Benzyl acetate

Acetone

Delta-4-carene, cis-2-carene, trans-2-carene, or delta-3-carene

o-, m-, or p-Cymene

Camphene

Ethyl butanoate

α-Terpinene

Acetaldehyde

Camphor

3,6-Dimethyl-3-cyclohexene-1- carboxaldehyde (Triplal extra)

Delta-4-carene, cis-2-carene, trans-2-carene, or delta-3-carene

Linalool

β-Phellandrene

Gamma-terpinene

\*Most prevalent compounds listed first. Source: Steinmann et al. (2010).

Appendix H

**Table H2**

**Number of Chemicals Identified and Principal Chemicals
Present in Products Tested and Locations Sampled**

| Product | #[a] | Principal chemicals[b] |
|---|---|---|
| perfume #1 | 55 | linalool, limonene, ethanol, β-citronellol |
| perfume #2 | 24 | linalool, a-terpineol, limonene, benzyl acetate |
| perfume #3 | 28 | linalool, unknown, 1,8-cineole, neryl acetate |
| cologne #1 | 49 | limonene, linalool, β-phenethyl alcohol |
| cologne #2 | 45 | limonene, a-guaiene, C15H24 |
| bar soap #1 | 54 | limonene, α,β-pinene, linalool |
| bar soap #2 | 40 | limonene, linalool, other alcohols |
| shampoo | 25 | linalool, benzyl acetate, β-citronellol |
| hairspray #1 | 19 | fluor compounds, benzaldehyde, silane compound |
| hairspray #2 | 17 | unknown, butene, butane, ethanol, $C_{11}H_{24}O$, isopentone, a-terpineol, isobutane |
| shaving cream | 17 | limonene, propanal |
| after shave lotion | 19 | menthol, β-citronellol |
| solid deodorant #1 | 34 | hexamethylcyclotrisiloxane , trimethylsilane, limonene, linalool |
| solid deodorant #2 | 12 | limonene |
| spray deodorant | 26 | silane compounds, limonene |
| hand lotion | 22 | unknown, linalool |
| nail color | 18 | camphor, unknown, alcohol? (c) |
| nail enamel remover #1 | 12 | benzyl alcohols, linalool, β-citronellol, limonene, β-phenethyl alcohol |
| nail enamel remover#2 | 14 | limonene, ethyl acetate, a-terpinolene, nerol, $C_{10}H_{18}O$ |
| detergent powder | 20 | α-terpineol, linalool |
| bleach powder | 25 | α-terpineol, linalool, $C_{12}H_{22}0_2$ (acetate) |
| fabric softener #1 | 23 | benzyl acetate, limonene, y-methyl ionone, linalool, ethanol |
| fabric softener #2 | 28 | $C_{12}H_{22}0_2$ (acetate), linalool, α-terpineol, β-citronellol, $C_{14}H_{22}O$ (alcohol) |
| dishwashing liquid #1 | 19 | limonene, ethanol, acetone |
| dishwashing liquid #2 | 15 | limonene, styrene |
| dishwasher detergent | 19 | terpinyl acetate |
| liquid air freshener | 29 | linalool, limonene, alcohol, $C_{10}H_{18}O$, $C_{10}H_{20}O$ |
| solid air freshener | 24 | alcohols, limonene, $C_{10}H_{18}O$ (?), camphor |
| spray air freshener | 16 | fluor compound, limonene, $C_{15}H_{24}$, ethanol |
| correction fluid | 16 | trichloroethylene, ethylene dichloride |
| paint remover | 8 | toluene, methylene chloride |
| department store | 25 | toluene, p-dichlorobenzene, ethanol |
| clothing store | 28 | ethanol, isopropanol |
| shopping mall | 29 | ethanol, isopropanol |
| potpourri shop | 33 | ethanol, toluene |
| craft/hobby store #1 | 31 | isopropanol, l,l,l-trichloroethane |
| craft/hobby store #2 | 31 | isopropanol, unknown |
| auto part shop | 30 | toluene, methylene chloride, tetrachloroethylene |

| Product | #[a] | Principal chemicals[b] |
|---|---|---|
| tire shop | 17 | l,l,l-trichloroethane |
| tire warehouse | 27 | l,l,l-trichloroethane |
| carpet store | 24 | 1,1,1-trichloroethane |
| grocery, detergents | 28 | limonene, tetrachloroethylene |
| grocery, pet foods | 18 | limonene, tetrachloroethylene |
| health club | 17 | ethanol, silane compound |
| room air freshener | 14 | p-dichlorobenzene, ethanol |
| closet with cedar chips | 22 | ethanol, limonene |
| new shower curtain | 16 | decane, ethylene dichloride |

(a) Number of chemicals identified in headspace or canister sample. (b) In order of relative amounts.
(c) Identification tentative.Source: Wallace (1991).

## 4.3    Concentrations of TVOCs Detected in Indoor Air

Below are concentrations of numerous VOCs detected in indoor air in different studies.  As seen in the table H23 below, styrene was detected in indoor air at a mean of 1.0 µg/m$^3$, which is 581-fold above the mean of Dr. Sahu's modeled values for styrene for the Golf Channel outdoor air.  The mean of PCE values were 2.2 and 21 µg/m$^3$, with a median from another study of 5 µg/m$^3$. These values are 1,279-, 12,209-, and 2,976-fold higher than the respective mean and median values Dr. Sahu modeled for the Golf Channel.  Mean and median values of TCE of 7 and 5 were reported which are 7,634- and 6,274-fold higher than the mean and median TCE values modeled by Dr. Sahu for the Golf Channel.

**Table H23**

**Concentrations of Organic Compounds Detected in Air**

| VOC | Mean (range) in µg/m$^3$ | Reference |
|---|---|---|
| 2-butanone | (1-80) | 3 |
| 2-butoxyethanol | 1 | 2 |
| 2-ethylhexanol | 2 | 1 |
| 2-methylhexane | 5; 8 | 1; 5 |
| 3-methylhexane | 2* | 1 |
| 3-methylpentane | 5 | 1 |
| 4-meth. 2-pentanone | 1 | 1 |
| 1,2-dichloroethane | (0.2-27) | 3 |
| 1,2-dimethylbenzene | 12 | 2 |
| 1,3-dichlorobenzene | <0.5*; 24 | 1; 2 |
| 1,4-dichlorobenzene | 5*; 24; (0.5-34) | 1; 2; 3 |

Appendix H

| VOC | Mean (range) in μg/m³ | Reference |
|---|---|---|
| 1,4-dimethylbenzene | 38 | 2 |
| 1,4-dioxane | 4 | 2 |
| 2,4-dimethylpentane | 12 | 5 |
| 1,1,1-trichloroethane | 10; 267; (0.8-18) | 1; 2; 3 |
| 1,2,3-trichlorobenzene | 1* | 1 |
| 1,2,3-trimethylbenzene | 2 | 1; 2 |
| 1,2,4-trichlorobenzene | 1* | 1 |
| 1,2,4-trimethylbenzene | 10; 3 | 1; 2 |
| 1,3,5-trichlorobenzene | <0.5*; 0.5 | 1; 2 |
| 1,3,5-trimethylbenzene | 5; 4 | 1; 2 |
| 1,1,2,2-tetrachloroethane | 0.1 | 2 |
| a-Pinene | 10; 3 | 1; 2 |
| a-terpinene | 5 | 1 |
| acetaldehyde | 10*; 16 | 1; 5 |
| acetone | 19; (4-34); 31 | 2; 3; 5 |
| benzaldehyde | 7 | 2 |
| benzene | 10; 16; (3-30); 14 | 1; 2; 3; 4 |
| bromodichloromethane | (nd-3) | 3 |
| butanal | 1 | 1 |
| carbon tetrachloride | 3; (trace-4) | 2; 3 |
| chlorobenzene | 1; 28 | 1; 5 |
| chloroform | 15*; 4; (nd-6) | 1; 2; 3 |
| cumene | 0.9 | 2 |
| cyclohexane | 10*; 5 | 1; 2 |
| decamethylcyclopentasiloxane | 3 | 2 |
| decane | 20; 5 | 1; 2 |
| dichloromethane | <10* | 1 |
| dimethylcyclopentane | 3* | 1 |
| dodecane | 5 | 1 |
| ethane | 31 | 5 |
| ethenylbenzene | 6 | 2 |
| ethylbenzene | 10; 13; (1-82) | 1; 2; 3 |

Appendix H

| VOC | Mean (range) in µg/m³ | Reference |
|---|---|---|
| formaldehyde | 40; 61; nd; 16 | 1; 2; 4; 5 |
| heptane | 10; 13; 12 | 1; 4; 5 |
| hexadecane | 1 | 1 |
| hexanal | 1 | 1 |
| hexanaldehyde | 6 | 5 |
| hexane | 10; (nd-113); 722 | 1; 3; 5 |
| i-butane | 102 | 5 |
| isobutanol | 2 | 1 |
| isopropylbenzene | 1 | 1 |
| limonene | 30; 18 | 1; 4 |
| methyl cyclohexane | 10* | 1 |
| methyl ethyl ketone | 1; 27 | 1; 2 |
| methylene chloride | (3-53) | 3 |
| *n*-butane | 100 | 5 |
| *n*-butanol | 1 | 1 |
| *n*-butylbenzene | 1* | 1 |
| *n*-pentadecane | 1 | 1 |
| *n*-propylbenzene | 3 | 1 |
| naphthalene | 2 | 1 |
| nonane | 10; 6; 8.4 | 1; 2; 4 |
| *o*-methylethylbenzene | 5 | 1 |
| octane | 5; 4; 8 | 1; 2; 4 |
| *p*-methyl, isopropylbenzene | 1* | 1 |
| pentadecane | 2 | 2 |
| pentane | 12 | 5 |
| propane | 78 | 5 |
| propionaldehyde | 3 | 5 |
| ß-pinene | 1 | 1 |
| **styrene** | **1*** | 1 |
| **tetrachloroethylene** | **5*; 21; (1-96); 2.2** | 1; 2; 3; 4 |
| tetrachloromethane | 20* | 1 |
| tetradecane | 2; 7 | 1; 2 |
| toluene | 80; 28; (5-111); 82 | 1; 2; 3; 4 |

Appendix H

| VOC | Mean (range) in μg/m³ | Reference |
|---|---|---|
| **trichloroethylene** | **5*; 7; (0.2-6)** | 1; 2; 3 |
| tridecane | 10; 11 | 1; 2 |
| undecane | 10; 5; 8.7 | 1; 2; 4 |
| xylene (*m,p*) | 20; (4-302); 17 | 1; 3; 4 |
| xylene (*o-*) | 10; (1-323); 11 | 1; 3; 4 |

ND: not detected * Concentration at the 50th percentile.

[1] Stolwijk, J.A.J. 1990. Assessment of population exposure and carcinogenic risk posed by volatile organic compounds in indoor air. Risk. Analysis. 10:49-57.

[2] Shah, J.J. and H.B. Singh. 1988. Distribution of volatile organic chemicals in outdoor and indoor air. Environ. Sci. Tech. 12:1381-1388.

[3] Gammage, R.B., C.E. Higgins, W.G. Driebelbis, M.R. Guerin, M.V. Buchanan, D.A. White, G. Olerich, and A.R. Hawthorne. 1988. Measurement of volatile organic compounds (VOC) in eight east Tennessee homes. Oak Ridge National Laboratory. Report No. ORNL-6286.

[4] Montgomery, D.D. and D.A. Kalman. 1989. Indoor/outdoor air quality: Reference pollutant concentrations in complaint-free residences. J. Appl. Ind. Hyg. 4:17-20.

[5] Lewis, C.W., R.B. Zweidinger, and R.K. Stevens. 1990. Apportionment of residential indoor aerosol, VOC, and aldehyde species to indoor and outdoor sources. Indoor Air '90. Proceedings of the 5th International Conference on Indoor Air Quality and Climate. Toronto, July 29-August 3, 1990.

Table H24 shows levels of various VOCs that were measured while driving a car.  Some of these compounds were identified earlier in a figure found in Appendix D.

**Table H24**

**VOC Concentrations Measured while Driving a Car**

| Chemical | Car VOCs (μg/m³) | |
|---|---|---|
| | Mean | Maximum |
| isobutane | 9.1 | 281.7 |
| n-butane | 54.3 | 588.4 |
| 1,3-butadiene | 3.3 | 17.2 |
| isopentane | 68.7 | 510.8 |
| n-pentane | 30.8 | 682.3 |
| 2-methylpentane | 25.0 | 417.4 |
| hexane | 13.6 | 154.5 |
| cyclohexane | 1.2 | 12.0 |
| benzene | 11.6 | 42.8 |
| 2,2,4-trimethylpentane | 17.0 | 95.3 |
| n-heptane | 1.3 | 25.1 |
| 2,3,3-trimethylpentane | 5.3 | 21.4 |

38

Appendix H

| | | |
|---|---|---|
| 2,3-dimethylhexane | 2.0 | 7.8 |
| toluene | 46.5 | 118.9 |
| n-octane | 1.9 | 5.0 |
| 2,3-dimethylheptane | 0.3 | 0.9 |
| ethylbenzene | 8.8 | 21.8 |
| m/p-xylene | 30.5 | 76.3 |
| n-nonane | 0.6 | 4.8 |
| o-xylene | 11.4 | 27.6 |
| 1,3,5-trimethylbenzene | 4.7 | 12.0 |
| n-decane | 1.5 | 6.7 |
| 1,2,4-trimethylbenzene | 15.6 | 39.0 |
| n-undecane | 1.9 | 7.2 |
| **TVOCs =** | **366.9** | **3,176.9** |

ND:  Not Detected
Source: Chan et al. (1991).


## 4.4    Total VOCs in Indoor Air

In the past, the measurement of the concentrations of total VOCs (TVOCs) in indoor air
was of particular interest and several studies evaluated the concentrations of total VOCs (TVOCs)
in indoor air environments during the later 1980s and early 1990s (see Table H24). For example,
the study by Montgomery and Kalman (1989) measured VOC concentrations in 17 complaint-free
homes in Rushton, WA.  These authors found the TVOC levels ranged from 330-2,500 $\mu$g/m$^3$ in
smoking homes and were slightly lower (160-2,100 $\mu$g/m$^3$) in non-smoking homes.  Gammage et
al. (1988) measured total VOC levels in the indoor air of eight homes in Tennessee, and reported
TVOC levels ranged from 90 to 3,670 $\mu$g/m$^3$ with a mean of 1,000 $\mu$g/m$^3$.


**Table H25**

**Concentrations of Volatile Organic Compounds (VOCs) in Ambient Indoor Air**

| Cite | Compound | Range (mean) in $\mu$g/m$^3$ |
|---|---|---|
| Montgomery and Kalman (1989) (complaint free) | TVOC | 165-2,500 (710) $\mu$g/m$^3$ |
| Gammage et al. (1988) | TVOCs | 90-3,670 (1,000) $\mu$g/m$^3$ |
| Hogdson et al. (1991) | TVOCs | 2,061–11,000 $\mu$g/m$^3$ |
| Wallace et al. (1990) (indoor and personal air) | TOCs | 1,400-3,800 $\mu$g/m$^3$ |
| Tsuchiya (1988) | TVOC | 100-64,000 $\mu$g/m$^3$ |

TVOCs: total volatile organic compounds.
TOCs: total organic compounds.


Hodgson et al. (1991) measured the concentrations of VOCs in a new office building over
a 14-month period.  With concentrations ranging up to 11,000 $\mu$g/m$^3$ Hodgson et al. (1991) noted

*– In general, hydrocarbons such as those that dominate the VOC in this building are considered to have low toxicity. For example, the occupational threshold limit values for exposures to nonane and gasoline are 200 ppm (1,050,00 μg/m³) and 300 ppm (900,000 μg/m³), respectively. The toxicological data for isoparaffinic hydrocarbons recently have been summarized. These data indicate that both the acute and chronic toxicity of isoparaffinic hydrocarbons in animals and humans are very low.*

Tsuchiya (1988) reported the TVOC levels in residences and businesses as generally ranging from between a low of 100 to high of 5,000 μg/m³. But Tsuchiya (1988) did find several samples had TVOC levels higher than 10,000 μg/m³, with one sample having a TVOC concentration of 64,000 μg/m³.

Wallace et al. (1990) measured VOC levels for 2,500 personal, indoor, and outdoor air samples for several U.S. cities. Median indoor air TVOCs levels for personal samples and indoor air ranged between 1,400 and 3,800 μg/m³. But a maximum individual concentration of 108,000 μg/m³ was reported for one daytime personal air sample for a New Jersey resident.

Recently, Pacienca et al. (2018) conducted a systematic review of TVOCs levels in four different indoor microenvironments: schools, housing, offices, and spaces. This review article summarizes and compares studies reporting VOC levels measured in different countries and climates published between 1996 through 2014. The noted the following generalities: VOC levels were higher in housing and office environments, housing tended to a higher number of compounds, the VOC levels varied by study which was probably a reflection of different study designs and analytical measurements, VOC concentrations tended to be higher in cold seasons which may reflection changes in ventilation, no significant differences were seen among studies from different continents, benzene and toluene were more influenced by traffic in southern regions, indoor/outdoor rations were larger than 1.0 for nearly all VOCs identified in different environments, outdoor VOC concentrations from different continents may be explained by differences in their traffic patterns and meteorology. The authors concluded most VOCs identified indoors are linked to indoor sources and the specific behaviors and activities of the occupants. It was suggested that VOC levels could be reduced by avoiding redecoration, new furniture, deodorants, perfumes, cleaners, burning candles and smoking indoors.

Appendix H

# References

Adgate, J. L., Church, T. R., Ryan, A. D., Ramachandran, G., Fredrickson, A. L., Stock, T. H., Morandi, M. T., Sexton, K. 2004. Outdoor, indoor, and personal exposure to VOCs in children. EHP 112,14:1386-92. doi:10.1289/ehp.7107

Batterman, S., Jia, C., Hatzivasilis, G.  2007. "Migration of volatile organic compounds from attached garages to residences: a major exposure source." Environmental Research 104:224-40. doi:10.1016/j.envres.2007.01.008

Chin, J.-Y., Godwin, C., Parker, E., Robins, T., Lewis, T., Harbin, P., Batterman, S. "Levels and sources of volatile organic compounds in homes of children with asthma." Indoor air vol. 24,4 (2014): 403-15. doi:10.1111/ina.12086

Clayton, C. A., Pellizzari, E. D., Whitmore, R. W., Perritt, R. L., Quackenboss, J. J. "National Human Exposure Assessment Survey (NHEXAS): distributions and associations of lead, arsenic and volatile organic compounds in EPA region 5." Journal of exposure analysis and environmental epidemiology vol. 9,5 (1999): 381-92. doi:10.1038/sj.jea.7500055

Dawson, Helen E., and Todd McAlary. "A compilation of statistics for VOCs from post-1990 indoor air concentration studies in North American residences unaffected by subsurface vapor intrusion." Groundwater Monitoring & Remediation 29.1 (2009): 60-69.

Delfino, R. J., Gong, H., Linn, W. S., Hu, Y., Pellizzari, E. D. "Respiratory symptoms and peak expiratory flow in children with asthma in relation to volatile organic compounds in exhaled breath and ambient air." Journal of exposure analysis and environmental epidemiology vol. 13,5 (2003): 348-63. doi:10.1038/sj.jea.7500287

Eklund, B. M., Burkes, S., Morris, P., Mosconi, L. "Spatial and temporal variability in VOC levels within a commercial retail building." Indoor air vol. 18,5 (2008): 365-74. doi:10.1111/j.1600-0668.2008.00537.x

Hartwell, T. D., Pellizzari, E. D., Perritt, R. L., Whitmore, R. W., Zelon, H. S. "Comparison of volatile organic levels between sites and seasons for the total exposure assessment methodology (TEAM) study." Atmospheric Environment (1967) 21.11 (1987): 2413-2424.

Heavner, David L., Walter T. Morgan, and Michael W. Ogden. "Determination of volatile organic compounds and respirable suspended particulate matter in New Jersey and Pennsylvania homes and workplaces." Environment International 22.2 (1996): 159-183.

Jia, Chunrong, Stuart Batterman, and Christopher Godwin. "VOCs in industrial, urban and suburban neighborhoods, Part 1: Indoor and outdoor concentrations, variation, and risk drivers." Atmospheric Environment 42.9 (2008): 2083-2100.

Liu, S., Yan, E. Z., Turyk, M. E., Katta, S. S., Rasti, A. F., Lee, J. H., Alajlouni, M., Wallace, T. E., Catt, W., Aikins, E. A. "A pilot study characterizing tetrachloroethylene exposure with

Appendix H

exhaled breath in an impacted community." Environmental pollution (Barking, Essex: 1987) vol.
297 (2022): 118756. doi:10.1016/j.envpol.2021.118756

Mochalski, P., King, J., Klieber, M., Unterkofler, K., Hinterhuber, H., Baumann, M., Amann, A.
"Blood and breath levels of selected volatile organic compounds in healthy volunteers." The
Analyst vol. 138,7 (2013): 2134-45. doi:10.1039/c3an36756h

Sax, S. N., Bennett, D. H., Chillrud, S. N., Ross, J., Kinney, P. L., Spengler, J. D. "A cancer risk
assessment of inner-city teenagers living in New York City and Los Angeles." Environmental
health perspectives vol. 114,10 (2006): 1558-66. doi:10.1289/ehp.8507

Thomas, K. W., Pellizzari, E. D., Perritt, R. L. "Effect of dry-cleaned clothes on
tetrachloroethylene levels in indoor air, personal air, and breath for residents of several New
Jersey homes." Journal of exposure analysis and environmental epidemiology vol. 1,4 (1991):
475-90.

Wallace, L. A., Pellizzari, E. D., Hartwell, T. D., Sparacino, C., Whitmore, R., Sheldon, L.,
Zelon, H., Perritt, R. "The TEAM (Total Exposure Assessment Methodology) Study: personal
exposures to toxic substances in air, drinking water, and breath of 400 residents of New Jersey,
North Carolina, and North Dakota." Environmental research vol. 43,2 (1987): 290-307.
doi:10.1016/s0013-9351(87)80030-0

Wallace, L. A., Pellizzari, E. D., Hartwell, T. D., Whitmore, R., Sparacino, C., Zelon, H. "Total
Exposure Assessment Methodology (TEAM) Study: personal exposures, indoor-outdoor
relationships, and breath levels of volatile organic compounds in New Jersey." Environment
International 12.1-4 (1986): 369-387.

Wallace, Lance. "Major Sources of Exposure to Benzene and Other Volatile Organic Chemicals
1, 2." Risk Analysis 10.1 (1990): 59-64.

# Appendix I

Appendix I

## 1.0     Estimated Plaintiff VOC Concentrations for Indoor and Outdoor Air

From the data presented in Appendices G and H, some of which was summarized in section 2.0, it is evident that indoor and outdoor air concentrations for the styrene, TCE, and PCE have declined over the past four decades.  Using this information a reasonable estimate of the average air concentration each plaintiff was exposed to during their lifetime will be derived and used to estimate the risks posed by their total environmental exposures to these VOCs up to the year they were diagnosed with cancer.

### Styrene

Using the styrene concentrations listed in Table 10 and the nonduplicated data in Table 12 of section 2.0, the average outdoor air styrene concentration for measurements recorded before 1/1/2000 is 0.921 $\mu$g/m$^3$.

Using the mean values reported in Tables H6B, H10 and H11, the average reported outdoor styrene air concentration after 1/1/2000 was estimated to be 0.080 $\mu$g/m$^3$.

The mean indoor styrene air concentration before 1/1/2000 used averages for 3 cities (day and night personal samples) in Table H2B&D, and Table H3 for an average of 1.358 $\mu$g/m$^3$.

The mean indoor air level after 1/1/2000 used values reported in Tables H6B, H9, H10, and using the average values for the 3 cities listed in Table H11D which produced an average concentration of concentration of 0.589 $\mu$g/m$^3$.

### TCE

The mean outdoor TCE levels before 1/12000 was based on table G4 averaged 1.59 $\mu$g/m$^3$. The post 2000 TCE outdoor levels were derived from Table G4 and averaged 0.118 $\mu$g/m$^3$.

The mean indoor TCE level pre2000 used Table H1B, H3 (personal measurements from two cities), and H5, averaged 3.278 $\mu$g/m$^3$.

The post 2000 TCE indoor levels were derived from Table 12 and averaged 0.152 $\mu$g/m$^3$.

### PCE

The mean outdoor PCE levels pre2000 Tables H1, H2C&E H3, H7 averaged 2.320 $\mu$g/m$^3$. Post 2000 outdoor air PCE levels were derived combined Table 12 and G11 for an average of 0.116 $\mu$g/m$^3$.

The mean indoor PCE level pre2000 used Table H1, the averages for the 3 cities (day and night personal samples) in Table H2B&D, and Table H7 averaged 5.663 $\mu$g/m$^3$.

Post 2000 indoor air PCE levels were derived from Table 12 and averaged 0.662 $\mu$g/m$^3$.  (I note that the Wallace et al. (1991) review of TEAM results indicated a good estimate for PCE

Appendix I

indoor/personal air was 12 $\mu g/m^3$ and that for outdoor air was 3 $\mu g/m^3$. So, the lower average values I have selected are conservative.)

These preceding average concentrations for indoor and outdoor air for the years before and after 1/1/2000 are listed in Table I-1.

**Table I-1**

**TCE, PCE, and Styrene Average Air Concentrations
By Microenvironment and Time Interval**

| Years | TCE | PCE | Styrene |
|---|---|---|---|
| Outdoor air ($\mu g/m^3$) | | | |
| Before 1/1/2000 | 1.59 | 2.320 | 0.921 |
| After 1/1/2000 | 0.118 | 0.116 | 0.080 |
| Indoor air ($\mu g/m^3$) | | | |
| Before 1/1/2000 | 3.278 | 5.663 | 1.358 |
| After 1/1/2000 | 0.152 | 0.662 | 0.589 |

8*(0.152*(0.11

Applying the same inhalation unit risk factors used to calculate the Plaintiff VOC risks allegedly attributable to Defendant in section 4.0, the risks for the two exposure intervals are listed in Table I-2. These risks were calculated using the assumption that generally 90% of the time these individuals were indoors and 10% of the time they were outdoors.

**Table I-2**

**Risk Per Year of Exposure for TCE, PCE, and Styrene
By Microenvironment and Time Interval**

| Years | TCE | PCE | Styrene |
|---|---|---|---|
| **Outdoor air** | | | |
| Before 1/1/2000 | **9.31E-08** | **8.62E-09** | **9.74E-08** |
| After 1/1/2000 | **6.91E-09** | **2.97E-10** | **8.46E-09** |
| Total Outdoor Risk | | | |
| **Indoor air** | | | |
| Before 1/1/2000 | **1.92E-07** | **2.10E-08** | **1.44E-07** |
| After 1/1/2000 | **8.90E-09** | **2.46E-09** | **6.23E-08** |
| Total Indoor Risk | | | |
| **O/I Combined Air Risk per year** | | | |
| **Before 1/1/2000** | **2.85E-07** | **2.97E-08** | **2.41E-07** |
| After 1/1/2000 | **1.58E-08** | **2.76E-09** | **7.07E-08** |

Appendix I

Using information supplied by Plaintiffs' own medical experts the total number of years that preceded their cancer diagnosis was calculated.  The total was then separated into the number of years lived before 1/1/2000 and the number of years after that date up to the year their cancer was diagnosed.  The total number of years for each plaintiff for these two periods of time are summarized in Table I-3.

**Table I-3**

**Number of Years Before and After 1/1/2000**
**Each Plaintiff Was Exposed to Ambient Levels of TCE, PCE, and Styrene**

| Name | Years to 1/1/2000 | Years to Dx |
|------|-------------------|-------------|
| David Berry | 30.8 | 20 |
| Brian Kemp | 31.25 | 10 |
| Kristen Sheen | 33.5 | 9 |
| Morgan Innes | 12.5 | 20 |
| Wendy Stone | 32.3 | 8.5 |
| Naoyuki Komatsu | 39.1 | 15 |

Taking the yearly risks for each VOC for the two periods of exposure under consideration (Table I-2), and the total number of years each plaintiff was exposure during these two time intervals, the cancer risk from each chemical for each Plaintiff was calculated for the two exposure periods of interest.

**Table I-4**

**Cancer Risks from Years Before and After 1/1/2000 That**
**Each Plaintiff Incurred from Their Ambient Exposures to TCE, PCE, and Styrene**

| Plaintiff | TCE | | PCE | | Styrene | |
|-----------|-----|-----|-----|-----|---------|-----|
| | Before 2000 | After 2000 | Before 2000 | After 2000 | Before 2000 | After 2000 |
| David Berry | 8.77E-06 | 3.16E-07 | 9.13E-07 | 5.51E-08 | 7.42E-06 | 1.41E-06 |
| Brian Kemp | 8.90E-06 | 1.58E-07 | 9.27E-07 | 2.76E-08 | 7.53E-06 | 7.07E-07 |
| Kristen Sheen | 9.54E-06 | 1.42E-07 | 9.93E-07 | 2.48E-08 | 8.07E-06 | 6.37E-07 |
| Morgan Innes | 3.56E-06 | 3.16E-07 | 3.71E-07 | 5.51E-08 | 3.01E-06 | 1.41E-06 |
| Wendy Stone | 9.19E-06 | 1.34E-07 | 9.58E-07 | 2.34E-08 | 7.78E-06 | 6.01E-07 |
| Naoyuki Komatsu | 1.11E-05 | 2.37E-07 | 1.16E-06 | 4.13E-08 | 9.42E-06 | 1.06E-06 |

3

Appendix I

The summed total risks that were incurred by each Plaintiff up to the time of their diagnosis are listed in Table I-5 for each chemical.

**Table I-5**

**Each Plaintiff's Total Indoor + Outdoor
Cancer Risk From Their Ambient Exposures to TCE, PCE, and Styrene**

| Plaintiff | TCE | PCE | Styrene |
|---|---|---|---|
| David Berry | 9.08E-06 | 9.68E-07 | 8.83E-06 |
| Brian Kemp | 9.05E-06 | 9.54E-07 | 8.24E-06 |
| Kristen Sheen | 9.68E-06 | 1.02E-06 | 8.71E-06 |
| Morgan Innes | 3.87E-06 | 4.26E-07 | 4.43E-06 |
| Wendy Stone | 9.33E-06 | 9.81E-07 | 8.38E-06 |
| Naoyuki Komatsu | 1.14E-05 | 1.20E-06 | 1.05E-05 |

Table I-6 lists the total cancer risk incurred each Plaintiff's from their ambient exposures to TCE, PCE, and styrene and the alleged exposures Dr. Sahu attributes to Defendant.  The ratio of these two exposures is also calculated for each Plaintiff.

**Table I-6**
**Each Plaintiff's Total Risk From TCE, PCE, and Styrene
From Their Ambient and Alleged Additional Golf Channel Exposures**

| Plaintiff | Total Background Risk from TCE+PCE+ Stryene | Total Golf Channel Risk from TCE+PCE+ Stryene | Ratio of Total Background/Total GC |
|---|---|---|---|
| David Berry | 1.89E-05 | 5.79E-10 | 32,626 |
| Brian Kemp | 1.82E-05 | 6.17E-10 | 29,554 |
| Kristen Sheen | 1.94E-05 | 1.75E-09 | 11,088 |
| Morgan Innes | 8.73E-06 | 2.07E-09 | 4,224 |
| Wendy Stone | 1.87E-05 | 1.13E-09 | 16,484 |
| N. Komatsu | 5.59E-06 | 1.62E-09 | 14,245 |

4

**Appendix J**

**Alternative Genotoxic Chemical Causes**

**Some Genotoxic Alternative Causes of the Plaintiffs Cancers
and the Risk Associated With Ambient Exposure to Them**

**1.0      Nitrosamines**

I note that a group of compounds mentioned in Dr. Panigrahy's recent paper (Fishbein et al., 2021) as being intimately involved in carcinogenesis is the class of compounds known as nitrosamines[1] – compounds which are commonly occurring and to which we are all exposed.  In his recent publication, Fishbein et al. (2021), Dr. Panigrahy discusses how nitrosamines (frequently referring to two of the better known and more extensively studied nitrosamine compounds - *N*-nitrosodimethylamine (NDMA) and *N*-nitrosodiethylamine (NDEA) play a "critical role" in the initiation stage of cancer.  His publication also offers other opinions about the carcinogenic effects of nitrosamines and indicates they have many of the ten key characteristics (TKCs) of carcinogens that he believes are important modes of action for carcinogenic compounds.  For example, the following text is taken from just pages 4-12 of this paper (emphasis added in some places):

> *Carcinogens including nitrosamines and aflatoxins can initiate or stimulate tumor growth and metastasis via multiple mechanisms including inflammation.*

And,

> ***Initiators of carcinogenesis*** *include radiation, certain chemotherapeutics and chemicals such as aflatoxin, urethane, tryptophan metabolites, and* ***nitrosamines,*** *can cause an irreversible genetic modification in a normal cell leading to cancer.*

And,

> *Carcinogens (e.g. aflatoxins,* ***nitrosamines,*** *asbestos, dioxins, tobacco, and alcohol) can* ***initiate and stimulate cancer progression through various mechanisms including inflammation, oxidative stress, DNA damage, cytotoxicity, acute or chronic injury, and subsequent regenerative proliferation via cell death*** *(e.g. apoptosis).*

And,

> ***NDMA induces cancer via a dose-response. NDMA has demonstrated highly carcinogenic, mutagenic,*** *and teratogenic activity. Nitrosamines have been associated with an increased risk of many cancers including gastric, esophageal, nasopharyngeal, and bladder cancers. N-nitroso compounds are used as a prototype carcinogens to induce various types of cancer in animal models, including liver, lung, bile duct and pancreatic. . . .* ***NDMA causes cancer both as a single dose and with long-term exposure to lower quantities***.

And,

> *Examples of genotoxic carcinogens include NDMA or 4,4'-methylenedianiline (MDA) which bind directly to DNA generating adducts, DNA damage, and*

---

[1] Nitrosamines, also referred to as *N*-nitrosamines, are a family of at least 300 compounds that have a nitroso group bonded to an amine.

Appendix J

*mutations. . . **Nitrosamines, including NDMA, are mutagenic, genotoxic, and carcinogenic, even at low doses***.

And,

*. . . **nitrosamines including NDMA stimulation inflammation via oxidative stress and immune response***.

And,

***Human carcinogens include a wide range of substances from alcohol, nitrosamines**, aflatoxins, **physical stressors** (e.g. UV and ionizing radiations), and **infections include viruses**-, bacteria- and parasites-induced infections (e.g. HIV, hepatitis, HPV and H. pylori). Infections, tobacco smoking, carcinogens (e.g. aflatoxins, **nitrosamines**, polycyclic aromatics), alcohol, obesity, inflammatory bowel disease and other diseases **with a chronic inflammatory component** have been associated with various cancers.*

And,

*In a large matched case–control study of pancreatic cancer, a significant positive association was found for NDEA, NDMA and pancreatic cancer (Zheng et al., 2018). Moreover, extensive studies have demonstrated the cytotoxicity, genotoxicity, carcinogenicity, mutagenicity, as well as reproductive and developmental toxicity of nitrosamines.*

And,

***Parasite infection results in immune responses to generate nitrosamines (NDMA) in human.***

And,

***Genotoxic carcinogens, such as NDMA, can induce DNA double strand breaks in the comet assay and induce transformation of nontumorigenic cells, such as NIH3T3 fibroblasts, to cancer causing cells**. Genotoxicity induced by NDMA is further demonstrated in extrahepatic tissues of rats by the persistence of DNA damage in the lung, liver, kidney and nasal cavity. **Also, N-nitroso compounds such as NDMA activate ras oncogenes, which play a pro-tumorigenic role in the development of various cancers** (e.g., colon) (Tricker & Preussmann, 1991). DNA damage induced by NDEA increases micronuclei due to DNA breakage that could not be repaired, leading to an increase in chromosomal aberrations, and apoptotic cell death which can lead to cancer (Aiub et al., 2011; Fishbein et al., 2020).*

And,

***NDMA activates the PI3K-Akt/PKB pathway in human neutrophils which activates pro-inflammatory transcription factors NF-κB, c-Jun, and FosB involved in nitric oxide (NO) production** (through modulation of inducible nitric oxide synthase (iNOS) expression) **Thus, nitrosamines including NDMA stimulate inflammation via oxidative stress and an immune response**. The association between N-nitroso precursors and esophageal cancer may be modified by inflammation (Rogers et al., 1995). NDEA stimulates inflammatory cell infiltration (e.g. lymphocytes, neutrophils, eosinophils, and Kupffer cells), pro-inflammatory cytokines, including the IL-1 and IL-6 signaling pathway, as well as oxidative stress and proliferation in the liver, stomach and colon including cyclooxygenase (COX-2) expression in hepatic tissues. Thus, inflammation plays a critical role in carcinogen-induced cancers.*

2

And,

> *Interestingly, neutrophils can also generate further production of N-nitroso carcinogens during intestinal inflammation promoting colon carcinogenesis.*

And,

> ***Red meat, known to contain multiple carcinogenic compounds including nitrosamines, polycyclic aromatic hydrocarbons (PAHs), and heterocyclic aromatic amines (HAAs)***, *increases the risk of human cancers via lipid peroxidation, inflammation, and generation of reactive oxygen species.*

And,

> *N-nitroso compounds and their metabolism stimulate pro-inflammatory reactive oxygen species causing cellular injury. . . . Oxidative stress-induced cell injury plays a crucial role in NDEA-induced carcinogenesis as a single necrogenic dose of NDEA enhances levels of hepatic lipid peroxidation (LPO) and conjugated dienes as markers of oxidative stress.*

And,

> ***The genotoxic activity of nitrosamine compounds such as NDMA can stimulate pathways of oxidative stress and inflammation leading to carcinogenesis***. *NDMA stimulates reactive oxygen species and induces toxicity including a dramatic change in the body weight of animals. The NDMA-induced genotoxic activity and DNA damage in cancer cells can be measured by DNA strand breaks and oxidative DNA damage induced by intracellular reactive oxygen species (ROS). ROS are an important mechanism for tumor promotion and oxidative stress. As a consequence of NDEA induced oxidative and nitrosative DNA damage inflammatory markers such as IL-1β and TNF-α are significantly elevated in liver, stomach and colon. The NDMA-mediated increase in NO production may also contribute to oxidative stress, a factor in the pathophysiology of numerous immune disorders.*

And,

> *NDMA-induced liver fibrosis results in the enhanced oxidative stress leading to the generation of oxyradicals which can bind to proteins and cellular constituents. Further, oxidative stress and ROS can lead to fibrosis and abnormal healing following injury which can lead to cellular transformation and carcinogenesis.*

As the preceding excerpts from his own paper clearly indicate, Dr. Panigrahy considers nitrosamines to be potent carcinogens having many TKCs properties in addition to their genotoxic/mutagenic activity.

As mentioned earlier, we are all exposed to nitrosamine compounds, and NDMA can be found in (Westin, 1990; Chowdhury, 2014; Gushgari and Halden, 2018; Pinprayoon and Mae, 2019; ATSDR, 2022):

- Food (from pickling, storing in humid condition, smoking with nitrogen, high temperature drying, nitrate or nitrite curing, or presence of naturally occurring precursors that yield NDMA or other nitrosamines)
- Drinking water

- Malt beverages (beer, whiskey)
- Breast milk and formula
- Cosmetics and personal care products (shampoo, hair conditions, color toners, shower gel, children's bath and health care products, facial cleaners and masks)
- Indoor and outdoor air (tobacco smoke, inhalation while showering/bathing, inhalation while swimming in chlorinated pool, interior of new car materials)
- The workplace (rubber production)
- Mainstream and environmental tobacco smoke (ETS) and tobacco products
- Rubber and latex products (including pacifiers, balloons, rubber gloves, rubber bakeware, rubber gaskets in drinking water systems)
- Pharmaceutical products, and
- Pesticides.

NDMA can be formed in drinking water via reaction between disinfectants such as chlorine and chloramines and ammonia, alklyamines, or nitrosating compounds. Nitrosamines, including NDMA, can also be formed in our bodies (i.e., endogenous), and that endogenously formed nitrosamines originate from the following sources (Chowdhury, 2014; Gushgari and Halden, 2018; ATSDR, 2022):

- Formed from nitrate and nitrite, e.g., sodium nitrite used as preservative;
- Nitrite formed in humans from oral reduction of salivary nitrate, with vegetables and drinking water being the main sources of nitrate intake;
- Inhalation of ambient nitrogen oxides;
- Cell-mediated nitrosation;
- Bacterial nitrosation;
- Chronic inflammatory conditions result in over-production of nitrosating agents, e.g., precancerous conditions of gastric and esophageal cancer.

The ATSDR (2022) Toxicological Profile on NDMA states the largest source of NDMA for most individuals is from endogenous production that occurs from naturally occurring precursors in the body or in the diet (nitrite in foods and drinking water).  Gushgari and Halden (2018) state that recent literature indicates endogenous nitrosamine formation may account for 97% of the total *N*-nitrosamines (or TNA, group of over 24 known and suspected human carcinogens) burden an individual has (with the other 3% coming from exogenous sources).

The ATSDR (2022) has reported the concentrations of NDMA in various foods and beverages (see Table 1 on the next page).

Appendix J

## Table 1

### Detection of NDMA in Foods and Beverages

| Food item | Concentration |
|---|---|
| Foods other than meat and poultry[a] (µg/kg) | |
|     Dairy (milk, butter, cottage cheese) | 0.14–0.76 |
|     French fries | 0.24 |
|     Margarine | 0.26 |
|     Refried beans | 0.33 |
|     Breads (rolls, bagels, muffins) | 0.5 |
|     Fried fish | 1.69 |
|     Sauerkraut | 6.60 |
|     Oysters | 11.39 |
| Meat and poultry products[b] (µg/kg) | |
|     Lamb products | 1.0 |
|     Sausage products | 0.1–3.6 |
|     Hot dogs | 0.2–2.2 |
|     Ham products | 0.1–4.9 |
|     Poultry products | 0.5–5.0 |
|     Pork products | 0.1–4.9 |
|     Bacon products | 0.3–20.2 |
|     Chorizo | ND–109.4 |
| Alcoholic beverages (µg/L) | |
|     Alcoholic beverages (beer, wine)[a] | 0.25–2.02 |
|     U.S. beer[c] | 0.145 |
|     Beers produced other countries[c] | 0.118–0.225 |
|     Lager[d] | 0.105 |
|     Ale[d] | 0.108 |
|     Dark beer[d] | 0.055 |
|     Light beer[d] | 0.05 |

[a]As reported in literature review published by Stuff et al. (2009) based on publications dated between 1988 and 2006; country of origin not limited.
[b]As reported in literature review published by Lee (2019) based on publications dated between 1986 and 2018 that reported levels in foods in the United States or in other countries with predominantly Western diets.
[c]Fan and Lin (2018).
[d]Baxter et al. (2007).
Source: ATSDR (2022).

Chowdhury (2014) reported NDMA levels in drinking water, various foods, cosmetics, and ETS (Table 2). Using the data in Table 1, various human exposure scenarios, and the slope factor for NDMA, Chowdhury (2014) then calculated the excess cancer risks for NDMA (as shown in Table 2). In his study, Chowdhury (2014) used the endogenous NDMA daily doses estimated by Fristachi and Rice (2007) of the USEPA, which were 9.9 µg/day and 22.9 µg/day for children and

Appendix J

adults, respectively.[2] Chowdhury (2014) adjusted these doses for bodyweight, life expectancy, and averaging time for a range of daily doses of between 1.65 x 10$^{-4}$ to 2.87 x 10$^{-4}$ mg/kg-day with an average of 2.12 x 10$^{-4}$ mg/kg-day. Excess cancer risks from endogenous NDMA were calculated from these estimated daily doses.[3]

The excess cancer risk from just the endogenously formed NDMA portion of our total daily exposure to these compounds has been estimated to an average estimated risk of 10.81x10$^{-3}$ with a minimum and maximum range of 8.42 to 14.64 x10$^{-3}$ as shown on the next page in Table 2 (Chowdhury, 2014).  Added to this endogenous exposure and risk are nitrosamines various exogenous sources of exposure to these compounds that are common to a typical urban or residential environment.

**Table 2**

**Estimates of statistical distributions for NDMA concentrations in drinking water and other food items.**

| Source | Unit | Min | Mean | Max | Std dev | Distribution | References |
|---|---|---|---|---|---|---|---|
| Drinking water | ($\mu$g/L) | 0.001 | 0.0069 | 0.630 | 0.021 | Ln (–5.636, 0.976) | CDHS (2006); Charrois and Hrudey (2007); USEPA (2012); MOE (2007) |
| Meat and meat products | ($\mu$g/kg) | 0.1 | 0.28 | 0.37 | | T(0.1, 0.28, 0.37) | CEPA (1999); Fristachi and Rice (2007); Biaudet *et al.* (1994) |
| Milk products | ($\mu$g/kg) | 0.03 | 0.32 | 0.70 | | T(0.03, 0.32, 0.70) | Sen and Seaman (1981); Biaudet *et al.* (1994); |
| Vegetables and fruits | ($\mu$g/kg) | | 0.075 | | | | Fristachi and Rice (2007) |
| Cereals | ($\mu$g/kg) | 0.11 | 0.145 | 0.18 | | T(0.11, 0.145, 0.18) | Biaudet *et al.* (1994) |
| Fish | ($\mu$g/kg) | 0.1 | 0.37 | 0.82 | | T(0.1, 0.37, 0.82) | Sen *et al.* (1985); Biaudet *et al.* (1994) |
| ETS (Ca) | ($\mu$g/m$^3$) | 0.01 | 0.05 | 0.1 | | T(0.01,0.05, 0.1) | CEPA (1999) |
| Beer | ($\mu$g/L) | 0.073 | 0.10 | 0.20 | | T(0.073, 0.10, 0.2) | Scanlan *et al.* (1990); Sen *et al.* (1996); Baxter *et al.* (2007) |
| Baby food | | | 0.0544 | | | | Hrudey *et al.* (2013) |
| Cosmetics | ($\mu$g/kg) | | 10 | | | | Spiegelhalder and Preussmann (1984) |

\* LN: Log normal distribution (natural logarithm of median, standard deviation);
T: Triangular distribution (minimum, average, maximum); Min: minimum; Max: maximum; Std dev: standard deviation.

Source: Chowdhury (2014).

---

[2] Chowdhudry (2014) also considered the average NDMA daily intakes estimated by Hrudey et al. (2013) which ranged from 1.4 x 10$^{-3}$ to 35 x 10$^{-3}$ mg/kg-day with an average of 14.84 x 10$^{-3}$ mg/kg-day (levels that were ~70-fold higher than the estimates of Fristachi and Rice, 2007). Using the data from Hrudey et al. (2013) resulted in a cancer risk upper limit per million that exceeded 1 million (which cannot occur).
[3] Excess cancer risks were calculated using the NDMA oral slope factor of 51 per mg/kg-day.

Appendix J

**Table 3**

**Sources of NDMA Exposure in the United States/Canada and the
Resulting Estimated Lifetime Cancer Risks Associated With These Exposures**

| Source | Risk Per Million | | | |
| --- | --- | --- | --- | --- |
| | Average | Standard deviation | Minimum | Maximum |
| Meat | 15.9 | 3.97 | 5.7 | 29.1 |
| Milk | 10.9 | 4.44 | 1.2 | 25.3 |
| Fruit | 8.4 | 0.90 | 6.0 | 12.4 |
| Environmental tobacco smoke | 3.6 | 4.15 | 0.1 | 74.1 |
| Beverages | 3.1 | 0.77 | 1.4 | 6.4 |
| Fish | 2.7 | 1.00 | 0.6 | 6.3 |
| Cereals | 2.1 | 0.34 | 1.2 | 3.8 |
| Baby food | 1.5 | 0.15 | 1.0 | 2.0 |
| Cosmetics | 0.8 | 0.20 | 0.4 | 1.5 |
| Drinking water | | | | |
| dermal | 0.5 | 0.67 | 0.0 | 10.8 |
| ingestion | 0 | 0 | 0.0 | 0 |
| Sub-total | 0.5 | 0.67 | 0.0 | 10.8 |
| **Exogenous  total** | **49.6** | | **17.7** | **171.7** |
| **Endogenous cancer risk** | **10,812** | | **8,415** | **14,637** |

Source: Chowdhury (2014).

Given that it is well established that humans can be exposed to a wide variety of carcinogenic nitrosamines from both exogenous or endogenous sources throughout their lives (Gushgari and Halden, 2018), Dr. Panigrahy's failure to mention or consider nitrosamines like NDMA as a likely alternative cause for some or all of the cancers that plaintiffs developed is puzzling given that his own publication discusses the clear cancer hazards that are posed by these chemicals.  The risks listed Table 2 are approximately 3-6 orders of magnitude higher than the risks estimated for the plaintiffs' alleged exposure to the 5 CoCs in this case.  Thus, is not clear how Dr. Panigrahy is able to rule out plaintiffs well known exposures to nitrosamines as a potential alternative cause of the plaintiffs' cancers; especially since he believes (based on his general concepts outlined in his reports in this case) that all carcinogens that exhibit KCCs makes them likley candidates for causing cancer in any tissue, and potentially at any dose in an individual.

## 2.0    1,3-Butadiene

1,3-Butadiene (BD) is colorless gas and important petrochemical manufactured in high volumes primarily as a co-product of the steam cracking of hydrocarbon streams to produce ethylene (IARC, 2008).  Its main major commercial uses are in the manufacture of synthetic rubber and thermoplastic resins (Chen and Zhang, 2022).  BD is also formed during the incomplete

combustion of fossil fuels and biomass and is one of the many ubiquitous VOC air contaminants of our ambient air environments.  BD was found to cause lymphohematopoietic cancers in workers and was classified as a known human carcinogen by the USEPA in 2002 and later listed as a Group 1 carcinogen by IARC in 2008 (Chen and Zhang, 2022).  BD is also one of the 187 chemicals defined as hazardous air pollutants (HAPs) by the USEPA and so its air ambient air concentration is frequently monitored.  Chen and Zhang (2022) recently published review of BD's toxicology and environmental presence updating prior evaluations published by either the USEPA or IARC, and the following key points can be found in the Chen and Zhang (2022) and IARC (2008) reviews:

- There are several sources of BD that lead to its ubiquitous presence in ambient air environments including: industrial emissions, the manufacture of rubber and resins, automobile exhaust, tobacco, miscellaneous fires, and cooking. The EPA estimates contributions from the two major sources, automobiles (78.8%) and miscellaneous fires (19.6%), contribute over 98% of the total BD amount emitted to ambient air leaving only about 1.6% from its commercial manufacturing uses. Thus, BD is a carcinogenic air contaminant present in every urban environment and has been for decades.

- Cigarette smoke, as a combustion product, contains significant amount of BD, and cigarette smoke can be the primary source of BD in indoor air in some microenvironments. Another important source of BD is smoke from heated cooking oils and combustion sources.

- In recent years new sources of BD have been identified and include emissions from oil or natural gas extraction, pyrolysis of waste plastics, the pulp and paper industry, domestic waste landfills, household laser processing machines, electrosurgery operations emissions, and from some plants and a soil bacterium species. The smoke generated during electrosurgery can generate very high BD levels in the operating room microenvironment, and levels up to 42 mg/m$^3$ (19.1 ppm) have been recorded.

- A 2012 USEPA document reported the mean concentrations of BD in U.S. cities ranged between 0.1-2.0 μg/m$^3$ with an average of 0.13 μg/m$^3$.  Rural areas are typically an order of magnitude lower and ranged between 0.002-0.125 μg/m$^3$. In an urban setting the commercial sites located close to the street typically have higher levels than residential sites more distant to heavy traffic patterns.

- Automobile exhaust is the major urban source of BD and typically the indoor car air microenvironment will represent the highest exposure level encountered each day.  One recent study of this microenvironment reported a BD concentration of 7.9 μg/m$^3$.  By comparison, a study of the air surrounding moving vehicles measured an average level of 3.0 μg/m$^3$ with a maximum of 6.9 μg/m$^3$. So, the amount of time one spends driving impacts their total daily exposure to this carcinogen.

- Smoking is a major source of BD in residential air, and a mean level of 1.7 μg/m$^3$ has been reported for homes of smokers, a level that was 3.4 times higher than in homes of nonsmokers.  It has been estimated that a BD dose of 15-67 μg/day can originate from

Appendix J

ETS alone. Similarly, the IARC 2008 monograph cited a study indicating mainstream smoke contained approximately 20–40 µg of BD per cigarette and that side stream smoke contained 80–130 µg BD per cigarette; levels of BD in a smoky indoor microenvironment were typically 10-20 µg/m$^3$.

- Most people send a majority of their time indoors, and so indoor microenvironments contribute the largest percentage of one's daily dose of BD. Using personal monitoring measurements two studies have shown indoor air represents about 51-86% of the total dose.

- In Table 3, found on the following page, are various exposure concentrations of BD as reported by IARC (2008) for different indoor and outdoor microenvironments.

**Table 3**

**Mean concentrations of 1,3-Butadiene in Different Microenvironments**

| Microenvironment | No. samples | mean ± SD (µg/m$^3$) |
|---|---|---|
| Home | 64 | 1.1 ± 1.9 |
| Office | 12 | 0.3 ± 0.2 |
| Restaurant | 6 | 1.5 ± 0.8 |
| Public house | 6 | 3.0 ± 2.0 |
| Department store | 8 | 0.6 ± 0.4 |
| Cinema | 6 | 0.6 ± 0.3 |
| Perfume store | 3 | 0.9 ± 0.1 |
| Library | 6 | 0.4 ± 0.2 |
| Laboratory | 8 | 0.2 ± 0.1 |
| Train station | 12 | 2.2 ± 1.7 |
| Road with traffic | 12 | 1.8 ± 0.9 |
| Car | 35 | 7.9 ± 4.7 |
| Bus 18 | 18 | 1.7 ± 0.9 |
| Smoking home | 32 | 1.7 ± 2.5 |
| Nonsmoking home | 32 | 0.5 ± 0.3 |

Adapted from (IARC, 2008 citing the study by Kim et al. (2001) of locations in the United Kingdom

- 1,3-Butadiene is a relatively potent carcinogen, and the USEPA unit risk factor is 3x10$^{-5}$ per µg/m$^3$,[4] which is higher than those that have been derived for TCE (4.1 x 10$^{-6}$ per µg/m$^3$), PCE (2.6 x 10$^{-7}$ per µg/m$^3$) and is comparable to California's unit risk factor for styrene. Using the inhalation unit risk factor for BD, the lifetime risk associated with the

---

[4] USEPA. 2002. IRIS. 1,3-Butadiene. Quantitative Estimation of Carcinogenic Risk from Inhalation Exposure. https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?substance_nmbr=139. Accessed 20 March 2023.

preceding ambient air concentrations reported for BD results in the following lifetime risk estimates:

- o  Ambient air concentrations of 1,3-butadiene in U.S. cities ranged as high as 2.0 $\mu g/m^3$ with an average concentration of 0.13 $\mu g/m^3$. These exposure levels represent lifetime cancer risks of $6x10^{-5}$ and $3.9x10^{-6}$, respectively. Estimates for smaller towns and rural areas pose a lower cancer risk from 1,3-butadiene of approximately $1x10^{-6}$.

- o  The concentrations for 1,3-butadiene measured inside a car and the air just outside a moving vehicle were 7.9 and 3.0 $\mu g/m^3$, respectively. Based on these measurements the risk associated with driving is $2.37x10^{-4}$ and for walking near traffic is approximately $9x10^{-5}$. While these risks are reduced by the percent of time engaged in each activity, an hour a day performing these activities would add significantly to one's indoor and outdoor ambient air exposures and therefore their estimated cancer risk.

- o  Because indoor air levels of 1,3-butadiene are generally higher than outdoor air, one study estimated the range of risks for residential air to be $4.2x10^{-5}$ to $5.3x10^{-4}$ using material balance modeling. But according to the levels listed in the preceding table, living in a smoking home poses a lifetime risk from 1,3-butadiene of $5.1x10^{-5}$ versus the risks associated with living in a nonsmoking home of only $1.5x10^{-5}$.

- o  Given its ambient concentrations and high cancer potency, 1,3-butadiene generally poses one of the higher risks among air pollutants. The Chen and Zhang (2022) review cited the 2007 study by Loh and colleagues as showing that among 17 air pollutants the top three cancer risks resulted from benzene, formaldehyde and butadiene and the risks posed by these three chemicals fell in $10^{-5}$ to $10^{-4}$ risk range. Similarly, this review cited a study reported by McCarthy et al. that — used *the EPA national ambient air quality data for the period 2003 through 2005 and found that among 65 air toxics, concentrations of benzene, carbon tetrachloride, arsenic, BD, and acetaldehyde exceeded the $10^{-6}$ benchmark level at most sites in the United States*.

- •  BD is a genotoxic carcinogen and its metabolism by CYP2E1 generates a number of different reactive and direct acting mutagenic epoxide metabolites (IARC, 2008).

Dr. Panigrahy's failed to consider ambient exposures and risks posed by 1,3-butadiene as a likely alternative cause the cancers that plaintiffs developed. Given that this carcinogen is ubiquitous to out indoor and outdoor environments, failing to consider this chemical as a potential alternative cause is a clear and serious flaw in his specific causation analysis. The lifetime risks posed by this ubiquitous air pollutant are much higher for than the risks estimated for each plaintiff for the 5 CoC present allegedly attributable to the defendant, especially as plaintiffs will have been exposed to this chemical for longer period than they were to defendant's alleged emissions. Thus,

Appendix J

is not clear to me how Dr. Panigrahy is able to rule out common exposures to 1,3-butadiene as another potential alternative chemical cause of the plaintiffs' cancers.

## 3.0     Benzene

Benzene is an example of a chemical that is common to our everyday life and is found in essentially in all work and residential microenvironments.  All of us are exposed to measurable levels of benzene each day through many different routes of exposure.  The scientific literature provides many examples of the benzene concentrations the typical individual is exposed to at the workplace, in indoor and outdoor air, during various activities, and from the ingestion of certain foods.   Benzene is classified as a known human carcinogen and is associated with acute myelogenous leukemia (AML).   Thus, benzene is another example of a commonly occurring carcinogenic compound that Dr. Panigrahy failed to consider as a potential alternative cause for the cancers the plaintiffs developed.

Before discussing the ambient risks posed by this carcinogen, I would like to note that Smith et al. (2016) (see Figure 1 below) evaluated the TKC information available on benzene.

**Figure 1**

**An Overview of How Benzene Might Induce Eight of the Ten KCCs**



Source: Smith et al. (2016).

11

These authors reported there is evidence that benzene is associated with eight of the 10 KCCs.  So, one again it is not clear how Dr. Panigrahy could have not aware of the widespread nature of benzene in the environment when he considered alternate causes of the plaintiffs reported illnesses and diseases.

The USEPA IRIS inhalation unit risk range for benzene is $2.2 \times 10^{-6}$ to $7.8 \times 10^{-6}$ per $\mu g/m^3$ and the oral slope factor range is $1.5 \times 10^{-2}$ to $5.5 \times 10^{-2}$ per mg/kg-day.[5]  The concentrations of benzene, doses of benzene, and estimated cancer risks from these exposures are discussed below.

- As mentioned, benzene is ubiquitous in our general indoor and outdoor environments. The general population is exposed to benzene via outdoor air largely as the result of the exhaust fumes emitted from gasoline and diesel-powered vehicles (ATSDR, 2007). But other combustion sources, nearby gasoline stations, and local industries may also contribute the local outdoor air exposure concentrations. Residences inhabited by smokers and those with attached garages tend to have higher indoor air benzene levels than those that do not. Some of the sources of benzene exposure are shown in Table 4.

**Table 4**

**Sources of Benzene Exposure (Including Both Past and Present)**

| | |
|---|---|
| • Burning coal and oil<br>• Gasoline vapors from service stations<br>• Motor vehicle exhaust<br>• Wood-burning fires<br>• Smoking<br>• Petroleum refining operations<br>• Chemical production facilities<br>• Oil storage facilities<br>• Underground gasoline leaks<br>• Crude oil seeps<br>• Fires, including forest fires<br>• Shoe manufacturing<br>• Rotogravure printing<br>• Off-gassing from particleboard | • Some household products containing petroleum-based chemicals such as carpet glue, textured carpet liquid detergents, paints, furniture wax<br>• Products such as trade and industrial paints, rubber cement, adhesives, lubricants, paint removers, and rubber goods<br>• Various foods and beverages<br>• Waste sites<br>• Plant volatiles<br>• Ambient air<br>• Smoke-filled bars<br>• Wood stoves<br>• Kerosene heaters<br>• Contaminated drinking water<br>• Surface water |

[5] USEPA. 2000. IRIS. Benzene. Quantitative Estimation of Carcinogenic Risk from Oral and Inhalation Exposure. https://iris.epa.gov/ChemicalLanding/&substance_nmbr=276. Accessed 20 March 2023.

Appendix J

| | |
|---|---|
| • Auto-related exposures such as auto travel, pumping gasoline, and attached garages<br>• Tobacco smoking and environmental (second-hand) tobacco smoke<br>• Consumer products such as paint strippers, denatured alcohol, carburetor cleaners, and rubber cement | • Coastal surface water<br>• Groundwater<br>• Rainwater |

Sources: Wallace (1989); ATSDR (2007).

- Wallace (1989b) reported that the National Air and Space Administration reported that ~400 various products (e.g., adhesives, marking pens, tapes, etc.) emitted benzene vapors ranging from 0.01 to 140 µg/g.

- Table 5 on the next page shows the estimated daily doses of benzene individuals may receive from common environmental sources of benzene exposure.

**Table 5**

**Estimated Daily Benzene Doses by Ambient Source of Exposure***

| Source | Daily Dose of Benzene |
|---|---|
| Inhalation of Outdoor and Indoor Air | 180—1,300 µg/day |
| Food | 1.4 µg/day |
| Smoking 10 cigarettes/day | 600 µg/day |
| Passive smoking (ETS) | 50 µg/day |
| Automobile–related activities** | 50 µg/day |
| **Total (Range)** | **881—2,001.4 µg/day** |

*Adapted from WHO (1993).  **This WHO estimate was based on data provided in Wallace (1989b).

*Benzene in Air*

- Based on TEAM studies, population-weighted personal exposures to benzene were higher than outdoor air levels in all cities, regardless of whether the area was urban-industrial or rural. The mean personal exposure was 15 µg/m$^3$ versus a mean outdoor level of 6 µg/m$^3$ (Wallace 1989a).  Wallace (1989a) stated that these data indicated activities in the home or the personal activities of individuals produce higher indoor exposures and doses of benzene that do outdoor exposure sources.

13

Appendix J

- Urban benzene air levels measured in various US cites as reported by ATSDR (2007) are listed in Table 6. Chronic exposure to outdoor urban air benzene concentrations in Table 6 would result in cancer risks of about one in a million ($10^{-6}$) to greater than one in a hundred thousand ($10^{-5}$).  For example, a lifetime exposure to lowest mean values, those measured for New York State in 2013 (0.26-0.93 $\mu g/m^3$) would result in a risk range of 5.7 x $10^{-7}$ to 2.0 x $10^{-6}$.  Chronic exposure to the mean concentration of 14.1 $\mu g/m^3$ reported for Staten Island would equate to a risk range of 3.1 x $10^{-5}$.  Chronic exposure to the range of means reported for thirteen U.S. urban sites sampled in 1996-1997 (3.2-16.0 $\mu g/m^3$) would represent a risk range of 7x$10^{-6}$ to 3.5x$10^{-5}$.

**Table 6**

**Reported Urban Outdoor Air Benzene Concentrations\***

| Urban Location | Date Samples Collected | Average Level (range) $\mu g/m^3$ | Average Level (range) ppb | # Samples Collected |
|---|---|---|---|---|
| San Francisco, CA | 1984 | 8.3 (2.6-16.6) | 2.6 (0.8–5.2) | 6 |
| USEPA survey in 39 US urban cities | 1984-1986 | 6.7 (1.9-21.1) | 2.1 (0.6–6.6)\*\* | 812 |
| Houston, TX | 1986 | 12.0 (3.8-59.7)¶ | 3.75 (1.2–18.7)¶ | 14 |
| St. Louis, MO | 1985 | 5.9 (2.6-16.6)\*\* | 1.85 (0.63–12.1)\*\* | 18 |
| Denver, CO | 1986 | 13.1 (9.6-21.1) | 4.1 (3.0-6.6) | 13 |
| Philadelphia, PA | 1985 | 3.2 (1.0-9.6)\*\* | 1.0 (0.32–3.0)\*\* | 13 |
| Manhattan, NY | 1986 | 5.6 (2.8-16.9) | 1.75 (0.88–5.3) | 12 |
| Staten Island, NY | 1984 | 14.1 (0.3-108.6) | 4.4 (0.1–34) | Not stated |
| Chicago, IL | 1986 | 11.0 (2.0-16.1)\*\* | 3.45 (0.63–5.05)\*\* | 14 |
| Boston, MA | 1990-1991 | 3.4 (0.4-108.6) | 1.06 (0.1-34) | Not stated |
| 13 US urban sites\*\*\* | 1996-1997 | >3.2 to <16.0 | >1 to < 5 | Not stated |
| Anchorage, AK | | 3.7–17.4 | 1.2-5.4 | 11 sites |
| California | | 10.5 | 3.3 | Not stated |
| 6 states – Region 5 Personal air | | Mean (50th and 90th) 7.52 (5.4, 13.7) 7.21 (4.4, 13.0) | Mean (50th and 90th) 2.4 ppb (1.7, 4.3) 2.4 ppb (1.4, 4.0) | 386 402 |
| New York City Outdoor | 2002 | Winter 2.55 ± 1.40 Summer 1.31 ± 1.01 | Winter 0.80 ± 0.44 ppb Summer 0.41 ± 0.32 ppb | 36 35 |
| New York City Outdoor | 2013 | New York State (range of means) 0.26-0.93 | New York State (range of means) 0.08-0.29 ppb | Not stated |

\*Adapted from ASTDR (2007, 2015).

¶Assumed median value given the obvious typographical error (i.e., median listed as 37.5) in Table 6-2 (ATSDR, 2007).

\*\*Median value.

\*\*\*13 sites tested: Baton Rouge, Louisiana; Brownsville, Texas; Brattleboro, Vermont; Burlington, Vermont; Camden, New Jersey; El Paso, Texas; Garyville, Louisiana; Galveston, Texas; Hanville, Louisiana; Port Neches, Texas; Rutland, Vermont; Underhill, Vermont; and Winooski, Vermont.

- Wallace et al. (1985) in the TEAM studies measure personal exposures, indoor, outdoor, and breath levels of various VOCs for 355 individuals in New Jersey.  Table 7 shows the percent of the population who had benzene concentrations that were measurable in air. The maximum benzene concentration detected was 510 mg/m$^3$ (overnight personal air). The average (mean) breath concentration of 31 μg/m$^3$ reported in study, if a chronic occurrence would represent a lifetime risk of 6.8x10$^{-5}$.

**Table 7**

**Percentage of Population with Benzene Levels Measurable**

|  | Breath | Overnight Personal Air | Daytime Personal Air | Overnight Outdoor Air | Daytime Outdoor Air |
|---|---|---|---|---|---|
| Geometric mean (+ SE) (μg/m$^3$) | 8.2±1.22 | 12±1.09 | 11±1.12 | 4.1±1.23 | 3.8±1.20 |
| Mean (± SE) (μg/m$^3$) | 19±1.4 | 31±5.0 | 27±1.4 | 8.6±1.2 | 9.5±0.8 |
| Maximum (μg/m$^3$) | 200 | 510 | 270 | 91 | 44 |

- Shah and Singh (1988) reported average and median benzene concentrations for *indoor* sites of 16.5 and 10.0 μg/m$^3$ with lower and upper quartiles of 3.3 and 21.0 μg/m$^3$ based on 2,128 measurements.  Shah and Singh (1988) reported average and median benzene concentrations for *outdoor* sites of 9.0 and 5.3 μg/m$^3$ with lower and upper quartiles of 2.0 and 10.7 μg/m$^3$ based on 5,411 measurements (including remote, rural, suburban, urban, and source-dominated).

- Heavner et al. (1996) measured VOCs, including benzene, in New Jersey and Pennsylvania homes and workplaces for 104 nonsmoking married women (Table 8).  According to the authors, 11.4% and 11.5% of benzene levels were attributable to environmental tobacco smoke in smoking homes and smoking workplaces, respectively.

**Table 8**

**Benzene Concentration in Smoking and Nonsmoking Homes and Workplaces**

|  | Nonsmoking Home (μg/m$^3$) | Smoking Home (μg/m$^3$) |
|---|---|---|
| # Samples | 61 | 32 |
| Median | 2.97 | 3.87 |
| Mean | 4.12 | 4.25 |
| Minimum | 0.55 | 0.93 |
| Maximum | 33.39 | 9.93 |
|  |  |  |
|  | Nonsmoking Work (mg/m$^3$) | Smoking Work (mg/m$^3$) |

| # Samples | 51 | 29 |
|-----------|-----|-----|
| Median | 2.16 | 3.81 |
| Mean | 2.40 | 7.33 |
| Minimum | 0.38 | 1.23 |
| Maximum | 9.71 | 101.18 |

Source: Heavner et al. (1996).

*Tobacco Smoke*

- There are a number of different ambient sources of benzene exposure that contribute to our total daily environmental exposure/dose of benzene. Of these, smoking is generally recognized as the largest source of benzene exposure/dose.

  o Wallace (1989a) also reported median levels of benzene in homes with smokers were 10.5 $\mu g/m^3$ and those without smokers were 7 $\mu g/m^3$.

  o Another study reported smokers had an average benzene breath level of 16.0 $\mu g/m^3$ (the range of geometric means was 14-21 $\mu g/m^3$) versus 2.5 $\mu g/m^3$ (range of geometric mean, 0.8-5.3 $\mu g/m^3$) for nonsmokers (Wallace and Pellizzari, 1986; Wallace et al., 1987).

  o Wester et al. (1986) reported that the benzene levels in the breaths of smokers in San Francisco and Stinson Beach, CA, averaged 22 to 39 $\mu g/m^3$ and from 6 to 8 $\mu g/m^3$ among non-smokers.

  o Gordon et al. (2002) measured the concentrations of benzene in the breath of smokers and non-smokers in an experiment in which smokers smoked four cigarettes in the presence of non-smokers (with a 20- to 25-minute interval between each cigarette) in a small, unventilated room. The average benzene peak level in smokers' breath was 522 $\mu g/m^3$. The breath benzene levels decreased after smoking ceased. Under the conditions of their experiment, the average benzene level from environmental tobacco smoke was 19.9 $\mu g/m^3$. However, the authors note this level is higher than has been reported in other studies. These authors did note that the maximum breath concentration reported in the TEAM study was only 47 $\mu g/m^3$ for smokers who smoked >50 cigarettes per day.

  o Nazaroff and Singer (2004) estimated a non-smoker living with a smoker had an incremental inhalation intake of about 14-31 $\mu g$ benzene/day. Median benzene concentrations in 343 homes of smokers were 10.6 $\mu g/m^3$ compared to 7.0 $\mu g/m^3$ in 185 homes of non-smokers (Wallace and Pellizzari, 1986).

  o The indoor air of a bar contained 25.8 to 36.1 $\mu g/m^3$ (8.08-11.3 ppb) benzene (Brunnemann et al., 1989, as cited in ATSDR, 2007 and WHO, 1993).

- o Wallace (1989a) reported a smoker receives ~57 µg of benzene per cigarette, and the average benzene in the breath of smokers was 14 µg/m$^3$ compared to 2 µg/m$^3$ among nonsmokers (Wallace, 1989a). The cancer risk range associated breath concentrations would be from 4.4 x 10$^{-6}$ to 3.1x10$^{-5}$.

- o Also, the additional daily dose of benzene for the pack-a-day smoker would be 1,140 µg of benzene a day (57 µg x 20 cigarettes = 1,140 µg).

*Food*

- The following food items have had the reported benzene concentrations listed in Table 9 (shown on the next page).  For example, Fleming-Jones and Smith (2003) analyzed 70 foods for VOCs and found benzene at detectable levels in all foods with the exception of American cheese and vanilla ice cream.

**Table 9**

**Benzene in Food**

| Food | Concentration |
|---|---|
| Cheddar cheese | 20-47 ppb |
| Mixed nuts | 1-6 ppb |
| Ground beef | 9-190 ppb |
| Pork bacon | 2-17 ppb |
| Banana, raw | 11-132 ppb |
| Frankfurters, beef | 2-11 ppb |
| Cream cheese | 1-17 ppb |
| Chocolate cake icing | 2-23 ppb |
| Tuna canned in oil | 4-13 ppb |
| Fruit flavored cereal | 2-21 ppb |
| Eggs scrambled | 2-40 ppb |
| Eggs hardboiled | 500-1,900 ppb |
| Peanut butter | 2-25 ppb |
| Raw avocado | 3-30 ppb |
| Popcorn popped in oil | 4-22 ppb |
| Blueberry muffin | 3-8 ppb |
| Raw strawberries | 1 ppb |
| Carbonated cola | 1-138 ppb |
| Raw orange | 11-15 ppb |
| Coleslaw with dressing | 11-102 ppb |
| Sweet Danish roll | 3 ppb |
| Potato chips | 2-7 ppb |
| Fruit flavored sherbet | 3-61 ppb |
| Quarter pound hamburger cooked | 4-47 ppb |
| Margarine | 7 ppb |
| Sandwich cookies | 1-39 ppb |
| Butter | 4-22 ppb |
| Chocolate chip cookies | 1-8 ppb |
| Sour cream | 3-15 ppb |

Appendix J

| Food | Concentration |
|------|---------------|
| Apple pie | 2-11 ppb |
| Chicken nuggets/fast food | 2-5 ppb |
| Graham crackers | 1-9 ppb |
| French fries/fast food | 2-56 ppb |
| Cheeseburger quarter pound | 5-44 ppb |
| Cheese pizza | 1-2 ppb |
| Bologna | 2-44 ppb |
| Cheese & pepperoni pizza | 8-30 ppb |
| Olive/safflower oil | 1-46 ppb |
| Sugar cookies | 8-30 ppb |
| Cake doughnuts w/icing | 3 ppb |
| Popsicle | 1-10 ppb |
| Haddock | 100-200 ppb |
| Jamaican Rum | 120 ppb |
| Heat-treated canned beef | 2 ppb |
| Butter | 0.5 ppb |

Sources: Drill and Thomas (1978); Fleming-Jones and Smith (2003); ATSDR (2007).

- While food is considered a route of exposure for benzene that is small, and so, not typically considered in risk assessments, the following food items have had reported benzene levels such that a four-ounce serving of the food would represent a dose of benzene that would present risks that are larger than risks posed by the concentration of the CoCs calculated by Dr. Sahu.

  - For example, a four-ounce serving of coleslaw, a food item that may have benzene concentrations as high as 102 ppb, would yield a benzene dose of 11.6 μg-benzene/serving. The cancer risk for an individual consuming coleslaw daily for a 70 kg individual would be 0.0116 mg/70 kg x ($1.5 \times 10^{-2}$ per mg/kg/day) = $2.5 \times 10^{-6}$ to $9.1 \times 10^{-6}$.

  - A four-ounce serving of raw banana, may have benzene concentrations as high as 132 ppb, would produce a dose of 15.0 μg-benzene/serving. The cancer risk for this daily benzene dose for a 70 kg individual would be 0.015 mg/70 kg x ($1.5 \times 10^{-2}$ or $5.5 \times 10^{-2}$ per mg/kg/day) = $3.2 \times 10^{-6}$ to $1.2 \times 10^{-5}$.

  - A four-ounce meal of ground beef, which can contain as much as high as 190 ppb benzene, would produce a benzene dose of 21.5 μg-benzene/serving. The cancer risk for this daily dose for a 70 kg individual would be 0.022 mg/70 kg x ($1.5 \times 10^{-2}$ or $5.5 \times 10^{-2}$ per mg/kg/day) = $4.7 \times 10^{-6}$ to $1.7 \times 10^{-5}$.

- According to an older document produced for the USEPA, the daily dietary benzene intake was estimated to be as high as 250 μg (NCI 1977, as cited in Drill and Thomas, 1979).

*Auto-Related Activities*

- Another benzene source is from automobile-related activities. When pumping gasoline, the benzene exposure concentration is about 1 ppm or 3,195 $\mu g/m^3$ (Wallace, 1989a,b).

- Tironi et al. (1986, as cited in Johnson et al., 2007) reported breathing zone benzene levels as high as 1.1 ppm (3,514 $\mu g/m^3$) during refueling at gas stations.

- WHO (1993) reports that levels up to 10,000 $\mu g/m^3$ (3.13 ppm) during refueling have been measured (but no source was mentioned).

- Egeghy et al. (2000) reported the mean benzene exposure at gas pumps while refueling was 2,875 $\mu g/m^3$ (range <76 to 36,000 $\mu g/m^3$) and the median time to refuel a car was 3 minutes (range of 1-10 minutes).  Using an inhalation rate generally assumed by the USEPA, 20 $m^3$ of air inhaled per day, the dose of benzene inhaled while pumping gas would be about 122 $\mu g$ of benzene per refueling event (2,875 $mg/m^3$ x 0.014 $m^3$/min x 3 minutes = 0.121 mg = 121 $\mu g$). If a person refuels weekly, the average daily benzene dose would be approximately 17.3 $\mu g/day$.  The lifetime risk range for this daily dose is (0.0173 mg/70 kg x [1.5 x $10^{-2}$ or 5.5 x $10^{-2}$ per mg/kg/day]) = 3.7x $10^{-6}$ to 1.4 x $10^{-5}$.

- Wallace (1989b) estimated that the daily intake of benzene resulting from driving one's own car is about 40 $\mu g/day$.  Similarly, Lawryk and Weisel (1996) reported volatile organic compounds (VOC) concentrations (including benzene) in passenger compartments for commuters in suburban New Jersey and New York.  The commuter exposure levels measured in their study, as well as exposure levels they noted, were reported in other studies in Table 10.

### Table 10

#### Mean In-Vehicle Benzene Levels ($\mu g/m^3$ and ppb)

|  |  | Raleigh[**] | | Los Angeles[+] | | New Jersey/ New York[#] | |
|---|---|---|---|---|---|---|---|
|  | Boston 1989 Urban* | 1988 Urban | 1988 Highway | 1987 Urban | 1988 Urban | 1991-2 Suburban | 1991-2 Urban |
| Benzene | 17.0 $\mu g/m^3$ 5.3 ppb | 13.6 $\mu g/m^3$ 4.3 ppb | 9.9 $\mu g/m^3$ 3.1 ppb | 31.2 $\mu g/m^3$ 9.7 ppb | 50.4 $\mu g/m^3$ 15.8 ppb | 13.4 $\mu g/m^3$ 4.2 ppb | 20.6 $\mu g/m^3$ 6.5 ppb |

* Chan et al. 1991a. Environ. Sci. Toxicol. ** Chan et al. 1991b. J. Air Waste Manage. Assoc. + SCAQMD. 1989.
# Lawryk and Weisel. 1996. Source: Lawryk and Weisel (1996).

Assuming an individual spends 1 hour a day commuting and inhaling 1 $m^3$ air/hour, these driving conditions would result in daily benzene doses of between 9.9 and 50.4 $\mu g/day$ (based on data provided in Table 10).  Excluding the highest and lowest values the average

Appendix J

of the five intermediate measurements is 22.76 µg/day.  The lifetime risk range for this daily dose is (0.02276 mg/70 kg x [1.5 x 10$^{-2}$ or 5.5 x 10$^{-2}$ per mg/kg/day]) = a lifetime risk range of 4.9x 10$^{-6}$ to 1.8 x 10$^{-5}$.

- Schupp et al. (2006) report that benzene levels in automobiles have been reported as ranging from 13 and 560 µg/m$^3$ (citing Eikmann et al., 1992, Jo and Park, 1999, Lawryki and Weisel, 1996, Moriske, 2002, Riediker et al., 2003).

- Jo and Park (1999) measured benzene levels in automobiles (1991 Hyundai Elantra; 1996 Daewoo Prince sedan; 1992 Kia Pride; and a 1995 Hyundai Sonota sedan), buses, and at fixed sites in Korea.  The mean levels of benzene in the interiors of cars and buses and the local ambient air were 60.2 ± 50.9 µg/m$^3$, 21.3 ± 19.2 µg/m$^3$, and 7.3 ± 6.5 µg/m$^3$, respectively. For the cars, the mean benzene levels ranged from 36.2 ± 16.2 µg/m$^3$ to 108 ± 70.4 µg/m$^3$. Car #3 had higher benzene levels (it was a carbureted engine) while the other 3 had electronic fuel injectors.

  - Cars #1 and 2 had mean benzene levels of 106 ± 70 µg/m$^3$ and 42 ± 26 µg/m$^3$ (urban route) when using low (windows and vents closed, AC on) and high (front windows and vents open, fans on, AC off) ventilation inside the car, respectively. On rural routes, the cars had 71 ± 64 µg/m$^3$ and 14 ± 7 µg/m$^3$ on low and high ventilation, respectively. Benzene concentrations in the winter and summer were 41.3 ± 22.7 µg/m$^3$ and 73.6 ± 61.2 µg/m$^3$, respectively. The authors stated that the differences between their results and results from other studies (e.g., studies in Raleigh, NC, and New York and New Jersey, etc.) might be due to vehicle types, driving route, driving period, vehicle ventilation, driving speed, fuel composition, and regional driving conditions such as temperature and turbulence variability. Assuming that 1.0 m$^3$ of air is inhaled while commuting each day, this study suggests daily doses of benzene associated with driving in a car or bus may vary from 21.3 to 108 µg/day, depending upon the specific vehicle used for transportation.  So the risk range for this study ranges from the risk levels calculated above for Table 10 at the lowest dose to risk range that is 4.75-times higher at the highest dose

- It should be noted that persons driving taxis, buses, and trucks as part of their employment would receive even higher average daily doses of benzene because they are in a vehicle for much longer periods of time.  Assuming an occupational inhalation volume of 10 m$^3$ of air per eight-hour work shift, the preceding exposure concentrations reported for vehicles in different studies would generate occupational driving doses that are on the order of more than 200 to 1,000 µg/day.

- Thomas et al. (1993) reported that average benzene concentrations in home with attached garage or smokers to be 2- to 5-fold higher than outdoor concentrations for most homes. Based on all subjects/homes sampled, mean benzene levels in homes ranged from 3.7 ± 2.0

to 36 ± 12 µg/m$^3$. Mean personal exposures were reported to be 7.6 ± 5.7 to 31 ± 8.1 µg/m$^3$. Mean breath levels ranged from 1.6 ± 0.8 to 44 ± 24 µg/m$^3$. Benzene concentrations in garages ranged from 3 to 196 µg/m$^3$. Mean outdoor levels ranged from 4.8 ± 3.1 to 12 ± 3.3 µg/m$^3$. Wallace et al. (1989a) estimated an average intake of 150 µg benzene/day for "other personal" exposures to benzene, including emissions from surface coatings, consumer products, and emissions from autos in attached garages, etc.

*Breath*

- The Slingers et al. (2020) paper reports ambient breath levels of benzene in typical US citizens. In this paper the mean value (and the range) for benzene is listed in concentration units of ppb: 0.8 (0.16-5.8) ppb or 2.56 (0.512 – 18.56) µg/m$^3$. The resulting risk for the average breath concentration assuming a 20-year exposure at work and home would be: 2.56 x (2.2 x 10$^{-6}$ per µg/m$^3$) x (20/70) = a 1.61 x10$^{-6}$.

*Summary*

In summary, the lifetime cancer risks from various microenvironment exposures to the carcinogenic compound benzene were orders of magnitude higher than the risks calculated for the three VOC chemicals whose yearly concentrations were modeled by Dr. Sahu. Given its reported genotoxic and other TKC properties, ubiquitous environmental presence, and the doses/risks of benzene plaintiffs no doubt accumulated over the years prior to the diagnosis of their cancer, benzene represents another carcinogenic alternative cause that Dr. Panigrahy ignored in his limited analysis for alternative potential causes to the plaintiffs' illnesses,

**4.0    Acrylamide**

Acrylamide is another example of a compound that has been classified as an IARC Group 2A carcinogen (probably carcinogenic to humans) that is also considered genotoxic. Acrylamide is present in many common foods and beverages that we consume (see Table 11 on the next page). Acrylamide is produced as a by-product of the Maillard reaction during the cooking process of starchy foods (especially plant-based in origin such as potato and cereal products, coffee beans) when they are processed at high temperatures (Pedreschi et al., 2013). The European Food Safety Authority (EFSA) (2015) estimated the mean and 95th percentile dietary acrylamide exposures ranged between 0.4 to 1.9 µg/kg-bw/day and 0.6 to 3.4 µg/kg-bw/day, respectively.

Appendix J

## Table 11

### Acrylamide Levels in Different Food and Food Product Groups from Norway, Sweden, Switzerland, the United Kingdom, and the United States

| Food/product group | Acrylamide levels (µg/kg)[a] | | |
|---|---|---|---|
| | Mean[b] | Median | Minimum-Maximum |
| Crisps, potato/sweet potato[c] | 1,312 | 1,343 | 170–2,287 |
| Chips, potato[d] | 537 | 330 | <50–3,500 |
| Batter based products | 36 | 36 | <30–42 |
| Bakery products | 112 | <50 | <50–450 |
| Biscuits, crackers, toast, etc. | 423 | 142 | <30–3,200 |
| Breakfast cereals | 298 | 150 | <30–1346 |
| Crisps, corn | 218 | 167 | 34–416 |
| Bread, soft | 50 | 30 | <30–162 |
| Fish and seafood products, crumbled, battered | 35 | 35 | 30–39 |
| Poultry or game, crumbed, battered | 52 | 52 | 39–64 |
| Instant malt drinks | 50 | 50 | <50–70 |
| Chocolate powder | 75 | 75 | <50–100 |
| Coffee powder | 200 | 200 | 170–230 |
| Beer | <30 | <30 | <30 |

[a]The limits of detection and quantification varied among laboratories; values reported as less than a value are below the limit reported by the laboratory.
[b]Mean and median values were calculated where individual data were available; sample sizes were extremely small, particularly for some food categories; where the mean and median are different, it reflects the skewed distribution of the underlying data that were collected in different countries and may represent different food items within the larger category.
[c]Products that are thinly sliced and fried (such as potato chips).
[d]Products that are more thickly sliced (such as French fries). Source:
WHO 2002 as cited in ATSDR (2012).

Cigarette smoke is another source of acrylamide exposure having concentrations in mainstream smoke that range from 497.1 to 4,168 ng/cigarette. Other potential sources of acrylamide exposure can include drinking water treated with polyacrylamides containing acrylamide as a residual, polyacrylamide-containing cosmetics with acrylamide as a residual, and industrial exposures, e.g., laboratories (Rietjens et al., 2022).

The endogenous formation of acrylamide by the body's biochemical reactions has also been discovered in animal as well as human studies.   And this source of acrylamide would be in addition to all exogenous (e.g., dietary, smoking, etc.) exposures as has been noted by Rietjens et al. (2022), who stated (emphasis added):

> Based on human exposure biomarker dosimetry, this **endogenous background exposure** has been estimated to **contribute about 0.2–0.4 μg AA/kg bw/day to overall exposure**, indicating a **similar level as the average exogenous consumer exposure associated with food intake**. Thus, in addition to exogenous exposure to AA as a PRC [process-related contaminant] in foods, **sustained endogenous exposure to AA clearly must be considered** (Goempel et al. 2017; Goerke et al. 2019; Ruenz et al. 2016; Watzek et al. 2012b).

The cancer risk from exposure to acrylamide for different dietary intakes of acrylamide has been estimated by different authors.

- Dybing and Sanner (2003) estimated acrylamide intakes for male and female Norwegians to be 0.49 and 0.46 μg/kg-bw/day, respectively. Based on these intake rates the authors estimated the excess risk for cancer from a lifetime daily intake of acrylamide for males to be $6 \times 10^{-4}$.

- Schettgen et al. (2003), estimated an intake of 60 μg acrylamide per day for non-smokers in the general German population and estimated this corresponded to a cancer risk of between $6 \times 10^{-4}$ and $3.6 \times 10^{-3}$, using either the World Health Organization (WHO) or USEPA slope factor for acrylamide, respectively.

- Doerge et al. (2008), authors from the USFDA, have estimated excess cancer risk of between $1 \times 10^{-4}$ and $4 \times 10^{-4}$ for individuals consuming foods containing acrylamide.

As with the other aforementioned compounds, it is not evident how Dr. Panigrahy is ruling out the plaintiff's dietary and other exposure to acrylamide as a potential alternative cause of the plaintiffs' cancers.  It is metabolized in the body to a reactive epoxide metabolite, glycidamide, that is responsible for its genotoxicity and carcinogenicity.

Appendix J

**References**

Agency for Toxic Substances and Disease Registry (ATSDR). 2007. Toxicological Profile for Benzene. US Department of Health and Human Services.

Chan, C.-C., H. Ozkaynak, J.D. Spengler and L. Sheldon.  1991.  Driver exposure to volatile organic compounds, CO, ozone, and NO2 under different driving conditions.  Environ. Sci. Technol  25:964-972.

Jamall, I.S. and C.C. Willhite. 2008. Is benzene exposure from gasoline carcinogenic. J. Environ. Monit. 10:176-187.

Kreider, M.L., et al. 2010. Benzene exposure in refinery workers: ExxonMobil Joliet, Illinois, USA (1977-2006). Toxicology and Industrial Health. 26(10):671-690.

Lawryk, N.J. and C.P. Weisel. 1996. Concentrations of volatile organic compounds in the passenger compartments of automobiles. Environ. Sci. Technol. 30:810-816.

Panko, J.M., et al. 2009. Occupational exposure to benzene at the ExxonMobil refinery at Baton Rouge, Louisiana (1977–2005). JOEH.  6(9):517-529.

Wallace, L.A. 1989a. The Total Exposure Assessment Methodology (TEAM) Study: An Analysis of exposures, sources, and risks associated with four volatile organic chemicals. J. American College of Toxicology. 8:883-889.

Wallace, L.A. 1989b. Major sources of benzene exposure. Environ. Health Perspect.  82:165-169.

Wallace, L.A., E. Pellizzari, T.D. Hartwell, R. Perritt, and R. Ziegenfus. 1987. Exposures to benzene and other volatile compounds from active and passive smoking. Arch. Environ. Health. 42:272-279.

# Appendix K

## A Comparison of IARC's Methodologies
## to Dr. Panigrahy's Methodologies

Appendix K

## 1.0 The Panigrahy General Causation Methodology Is Not Similar to the IARC Methodology

While the main authoritative groups (IARC, USEPA, NTP, European Union, etc.) do reach general causation assessments regarding a chemical's carcinogenic hazard(s) after reviewing all of the available epidemiology and toxicology (i.e., animal responses and mechanistic considerations), the final decision relies predominantly on the epidemiologic evidence with limited influence from toxicologic and mechanistic considerations. In contrast, Dr. Panigrahy misleads his audience by implying he applies a general causation methodology and weight of the evidence that is similar to the approaches used by IARC applies, but as will be demonstrated in fact they are very dissimilar methods that reach decidedly different conclusions.

In many instances he reached his general causation opinion by ignoring the weight of the evidence provided by the stronger epidemiologic studies, choosing instated to emphasize a single study that carried limited or no overall weight in IARC's causal analysis of the same chemical (e.g., his conclusion that formaldehyde induces brain cancer). Part of his unorthodox methodology is to make speculative assumptions that exaggerate the importance of the weaker epidemiologic evidence and limited mechanistic information he reviews as support for his opinion (e.g., his general causation opinions for 1,1,1-trichloroethane). In particular, he constantly exaggerates the importance of the available ten key characteristics (TKC) information, and the limited impact this should have on a general causation conclusion. On this issue 'method' is distinctly different from the way IARC considers it. The following discussions will review the methods IARC applies as it evaluates the three different information streams (epidemiology, animal studies, mechanistic studies), to demonstrate the clear differences between the 'IARC methodologies' and the 'Panigrahy methodologies' for establishing general causation. These differences demonstrate his novel approach is neither scientifically objective nor one recognized within the general scientific community. Instead, his approach can be easily described as a litigation-driven and litigation-specific approach.

## 1.1 The Specifics of IARC's General Causation Methodology

Because Volume 130 of the IARC Monograph series was published in 2022, the very year of Dr. Panigrahy's general causation report, it offers a contemporaneous description of IARC's approach. Information that will help the court understand the IARC general causation methodology is described below first, and all statements quoted directly from this IARC monograph are italicized in the following text along with the page number it can be found on. After this discussion a summary of the major problems with Panigrahy's opinions and testimony are summarized against the backdrop of the correct causation methodology, and the limited impact the TKC data has currently had on IARC's classifications of chemicals whose human evidence is insufficient to establish causation.

Appendix K

Inside the first cover page this monograph notes how long the IARC monograph program has existed and the other US and European agencies that assist in the funding of this program. This is an indication that the methodologies used by IARC are recognized and supported by regulatory agencies in the US and Europe. This page also states the following near the bottom of the page (in reference to possible plagiarism).

> *Permissions and rights: Some rights reserved. This work is available under the Creative Commons Attribution-NonCommercial-NoDerivs 3.0 IGO licence (CC BY-NC-ND 3.0 IGO;* https://creativecommons.org/licenses/by-nc-nd/3.0/igo/).
> *Under the terms of this licence, you may copy and redistribute the work for non-commercial purposes, provided the work is appropriately cited, as indicated below.*

And,

> *Third-party materials: If you wish to reuse material from this work that is attributed to a third party, such as tables, figures or images, it is your responsibility to determine whether permission is needed for that reuse and to obtain permission from the copyright holder. The risk of claims resulting from infringement of any third-party-owned component in the work rests solely with the user.*

On page 1 of this monograph the discussion is entitled "Note to the Reader" and states the following (bold text represents emphasis I added).

> *The evaluations of carcinogenic hazard in the IARC Monographs on the Identification of Carcinogenic Hazards to Humans series are made by international working groups of independent scientists.* **The IARC Monographs classifications do not indicate the level of risk associated with a given level or circumstance of exposure. The IARC Monographs do not make recommendations for regulation or legislation.**
> **Anyone who is aware of published data that may alter the evaluation of the carcinogenic hazard of an agent to humans is encouraged to make this information available to the IARC Monographs programme, International Agency for Research on Cancer, 150 cours Albert Thomas, 69372 Lyon Cedex 08, France, or via email at** imo@iarc.who.int**, in order that the agent may be considered for re-evaluation by a future Working Group.**
> *Although every effort is made to prepare the monographs as accurately as possible, mistakes may occur.* **Readers are requested to communicate any errors to the IARC Monographs programme. Corrigenda are published online on the relevant webpage for the volume concerned** (IARC Publications: https://publications.iarc.fr/).

Given Dr. Panigrahy's general causation assessment for 1,1,1-trichlorethane (TCA) concludes TCA causes many different cancer types in humans, TCA, he should be asked why he has not conveyed his starkly different general causation opinions to IARC, which in 2019 did not reach this conclusion. In fact, his opinions on the carcinogenic hazards of each chemical he evaluated differ significantly and substantially for those the IARC working groups reached.

The Preamble for this monograph — the section describing how IARC evaluates chemical causation — is found on pages 7-42. Here the IARC Monograph states — *The Preamble to the IARC Monographs describes the objective and scope of the programme, general principles and*

*procedures, and scientific review and evaluations. The IARC Monographs embody principles of scientific rigour, impartial evaluation, transparency, and consistency. The Preamble should be consulted when reading a Monograph or a summary of a Monograph's evaluations.*

Once one understands the information discussed this preamble, it is clear Dr. Panigrahy has reached his general causation opinions by ignoring IARC methodologies and the limited probative value of the different kinds on information streams being evaluated (i.e., the animal or human data).  His opinions as to what human cancers are caused by the seven chemicals he evaluated in his first report are for the most part never consistent with the IARC evaluations of the cancer hazards posed by these chemicals.  A major difference lies in the fact that Dr. Panigrahy has greatly exaggerated the number of cancer types known to be causally associated with the exposures that were high enough to induce a specific type of human cancer.  Because his methodology is unique/nonstandard, Dr. Panigrahy should have to defend the error rate of this unique methodology, something he cannot do other than to concede his opinions are consistently different from those reached by IARC's working groups of recognized international experts.  For example, at the bottom of page 7 and the top of page 8, the IARC Preamble states (bold text represents emphasis I added) — *IARC's process for developing Monographs, which has evolved over several decades, involves the engagement of international, interdisciplinary Working Groups of expert scientists,* **the transparent synthesis of different streams of evidence (exposure characterization, cancer in humans, cancer in experimental animals, and mechanisms of carcinogenesis), and the integration of these streams of evidence into an overall evaluation and classification according to criteria developed and refined by IARC.**

Throughout the Preamble it is clear to the reader that the epidemiology evaluation, animal cancer bioassay evaluation, and a consideration of mechanistic information are performed as three separate and distinct evaluations.  In contrast, Dr. Panigrahy's first report incorrectly applied information from the three different information streams to all of the Hill criteria, a method specific for evaluation the human evidence.  His 'method' cherry-picks human, animal, or mechanistic data and treats the three different streams of evidence as though they are completely interchangeable parts when applying the Hill criteria.  They are not, and it is not the IARC methodology to do so.  In fact, how the evidence is evaluated differs for each of these three different streams of information when IARC working groups analyze the currently available data.

In addition, at page 12, which is an overview of IARC's scientific review and evaluation process, the monograph states — *The Working Group* **considers all pertinent epidemiological studies, cancer bioassays in experimental animals, and mechanistic evidence,** *as well as pertinent information on exposure in humans.*  In contrast, the Panigrahy assessment frequently cherry-picked a single study as the sole information he relied upon (e.g., his brain cancer assessment of formaldehyde, his kidney cancer assessment of TCA), ignoring all other pertinent data that is available on the chemical because it contradicted the opinion he wished to reach.

On pages 13-15 the Preamble discusses the steps and principles of performing a **systematic review**, a procedure that has been criticized as unnecessary by Dr. Kendall and others.  A systematic review is basically just a careful attempt to collect all potentially relevant literature before starting the analysis; so, plaintiff experts' attempts to disparage the process make no sense. These pages discuss the lengths IARC goes to identify all relevant/informative studies and then develop summaries of each study's design and its results while highlighting notable strengths and limitations of each study.  Panigraphy did not perform these steps and throughout his assessments he selectively fails to mention or discuss the findings of key papers because they provide evidence contrary to his ultimate opinion.  I do note that on page 45 of his 2nd report, Dr. Panigrahy again states he analysis of the epidemiologic evidence is like that used by IARC (emphasis added:

> *In my original report, I cited the original publications with primary studies, meta-analysis, reviews, and the IARC monographs.* ***My methodology in analyzing the epidemiology studies was like that of IARC (documented earlier in this rebuttal report)****. I identified key epidemiological studies via PUBMED searches and studies also reviewed by the Working Group members.* ***For each selected study, the exposure assessment approach, along with its strengths and limitations, was summarized in my original report and outlined here in the following tables****.*

While he states he identified key epidemiology studies using PUBMED searches he typically did not mention or discuss what studies after a specific IARC evaluation date he subsequently identified and added to his analysis.  And the strengths and limitations of each were frequently never mentioned when he described the studies he relied upon in his first report.  Instead, in his original report he frequently ignored the findings of studies reviewed by the IARC Working Group, especially when they contradicted or did not support the opinion he wants to reach.  Last, a quick review of his CV did not show any relevant publications of his with the word "review," "systematic," "meta," "causation," "causal," "evidence," etc. in the titles.

The process by which the human studies are selected and evaluated starts at page 18 with a section entitled — *2. Studies of cancer in humans*.  The discussion here notes the fact that well conducted cohort and case-control studies provide most of the evidence. While ecological studies may also be considered it is noted that because this study type does not have information on individual exposure and outcome that they are more prone to confounding and exposure misclassification (in my appendix on causation methods there are quotes from other epidemiologists outlining why these studies do not establish causation). This study design has additional limitations and is generally considered useful only for generating a hypothesis whereas cohort and case-control studies are needed to prove the hypothesis.  In its Preamble the Monograph states in the middle of page 19 — *The uncertainties that surround the interpretation of case reports, case series, and ecological* **studies typically make them inadequate, except in rare instances as described above, to form the sole basis for inferring a causal relationship**. *However, when*

Appendix K

*considered together with cohort and case–control studies, these types of study may support the judgement that a causal relationship exists.* In addition, in subsection (b) on page 19 the Preamble in the Monograph notes that when there are multiple publications on a single cohort, as arises when follow-ups of a particular human cohort are published — *Usually in such situations, **only the most recent, most comprehensive, or most informative report** is reviewed in detail*.

At the bottom of page 19 the text starts a section entitled "Assessment of study quality and informativeness". The following comments in this section of the Preamble are instructive as the 'Panigrahy general causation discussion' violates all IARC considerations. For example, the preamble states (bold and/or underlined text is emphasis we added):

- *Study quality is assessed as part of the structured expert review process undertaken by the Working Group. **A key aspect of quality assessment is consideration of the possible roles of chance and bias in the interpretation of epidemiological studies**.* (p. 19)

- *Chance, which is also called random variation, **can produce misleading study results**. **This variability in study results is strongly influenced by the sample size: smaller studies are more likely than larger studies to have effect estimates that are imprecise.**** (p. 19) [For example, Dr. Panigrahy ignored this principle in his brain cancer evaluation when he argued a small, weak study IARC considered insufficiently reliable, the Anttila study. Dr. Panigrahy concluded this single study was a sufficient basis for his conclusion that TCA can cause brain cancer, IARC concluded it was not and cited additional contradictory evidence that Dr. Panigrahy failed to mention.]

- *Confidence intervals around a study's point estimate of effect are used routinely to indicate the range of values of the estimate that could easily be produced by chance alone.* (pp.19-20)

- *Biases that require consideration are varied but are usually categorized as selection bias, information bias (e.g. error in measurement of exposure and diseases), and confounding (or confounding bias). **An association between the purported causal factor and another factor that is associated with an increase or decrease in incidence of disease can lead to a spurious association or absence of a real association of the presumed causal factor with the disease**. When either of these occurs, confounding is presen*t (p. 20)

Besides consideration of the possibility that chance, bias, or confounding affected the reported epidemiological results, the Preamble notes that when assessing study quality the following should be considered — study description, study population, outcome measurement, exposure measurement, assessment of potential confounding, potential sources of bias, and statistical methodology (IARC's brief descriptions of these different considerations are provided on pp. 20-21). These considerations are generally lacking in Dr. Panigrahy's simplistic assessments.

On pages 22-23 the Preamble then discusses how in reaching a judgment about the available human evidence the Working Group considers several aspects of the body of evidence, citing the Hill criteria and subsequent publications of causal inference by Rothman et al. (2008) and Vanderbroucke et al. (2016).  The discussion that follows is clearly about the Hill criteria, and IARC emphasizes the following criteria — strength of association, consistency of association, temporality, dose-response, experiment (where a decline in risk is seen after exposure ceases, but rarely can it be evaluated in observational studies), and coherence.  [Note the criterion of "biologic plausibility" is not discussed here and is subsequently mentioned on page 23 when the available animal evidence is being evaluated.  Thus, IARC evaluates the human and animal evidence as I have depicted the general causation process in Appendix F on my first report.]  In addition, it is noted that whenever there exist several high-quality studies that found either no positive association or an inverse association for a specific cancer type, then a judgment may be made that the evidence suggests a lack of carcinogenic hazard for that cancer type.

Section 3 of the Preamble (beginning on p. 23) — *3. Studies of cancer in experiment animals* — discusses how the animal evidence is evaluated. Here it makes two key points.  These are (emphasis added):

- *For some agents, carcinogenicity in experimental animals was demonstrated before epidemiological studies identified their carcinogenicity in humans. **Although this observation cannot establish that all agents that cause cancer in experimental animals also cause cancer in humans, it is biologically plausible** that agents for which there is* sufficient evidence of carcinogenicity in experimental animals *(see Part B, Section 6b) present a carcinogenic hazard to humans. **Accordingly, in the absence of additional scientific information, such as strong evidence that a given agent causes cancer in experimental animals through a species-specific mechanism that does not operate in humans** (see Part B, Sections 4 and 6; <u>Capen et al., 1999</u>; <u>IARC, 2003</u>), these agents are considered to pose a potential carcinogenic hazard to humans.*  (pp.23-24). [Note: IARC gives those situations where the same detailed mechanism (i.e., showing specific chemical-induced effects believed to be the biologic changes that lead to the cancer) exists in both humans and animals may carry considerable weight in an IARC analysis.  Otherwise the mode-of-action observations like the TKCs Dr. Panigrahy continually invokes are only considered informative because they are suggestive of biologic plausibility, but the actual predictive power of these findings is unclear and the human evidence is still the determinant factor in the final hazard classification of the chemical.]

And,

- *The inference of potential carcinogenic hazard to humans **<u>does not imply tumour site concordance across species</u>** (<u>Baan et al., 2019</u>).*  (p. 24; emphasis added).  [Note: that in his brain cancer assessment Panigrahy cited a single animal study of PCE as providing sufficient evidence of a human cancer risk under the Hill criterion of "Consistency."  Not only is this a misuse of this particular Hill criterion, but there is no objective, reasonable basis for this assumption as IATC has just noted.]

Appendix K

In the remaining preamble discussion regarding the animal evidence it is clear to the reader that the animal evidence provides only a simple dichotomous 'yes/no' answer that the chemical can induce cancer in an animal species. The animal evidence either provides a suggestion of "biologic plausibility" (i.e., a possibility it happens but not a probability it happens) or it does not. So, animal evidence cannot be used as the appropriate kind of data that may be used as sufficient information to answer any of the Hill criteria other than biologic plausibility. Therefore, it is clear IARC's general causation method is decidedly different from the 'Panigrahy method' which applied animal or mechanistic data liberally throughout the different Hill criteria generally omitting any consideration of the epidemiologic evidence for or against that criterion. Thus, his general causation methodology is nothing like that of IARC's, or any another agency for that matter.

At pages 26-27 the Preamble discusses how IARC uses mechanistic information (*4. Mechanistic evidence* section) and why it adopted a summarization of data relevant to the TKCs of carcinogens. Regarding the fact that human carcinogens (Group 1 carcinogens) have some of the TKCs the Preamble states (see page 26, near bottom of the right-hand column and then onto page 27; in some places bold and /or underlined text was added as emphasis of the IARC statement being quoted):

- *First, it was noted that human carcinogens often share one or more characteristics that are related to the multiple mechanisms by which agents cause cancer.*

- *Second,* ***different human carcinogens may exhibit a different spectrum of these key characteristics*** ***and operate through distinct mechanisms***.

- *Third, for many carcinogens evaluated before Volume 100, few data were available on some mechanisms of recognized importance in carcinogenesis, such as epigenetic alterations.*

- ***Fourth, there was no widely accepted method to search systematically for relevant mechanistic evidence****, resulting in a lack of uniformity in the scope of mechanistic topics addressed across earlier IARC monograph evaluations.*

- ***To address these challenges****,* ***the key characteristics of human carcinogens were introduced to facilitate systematic consideration of mechanistic evidence in IARC Monographs evaluations*** *(Smith et al., 2016; Guyton et al., 2018).*
And**,**
   ***So, the TKCs were introduced to facilitate a*** ***systematic consideration*** ***of mechanistic evidence***.

- ***The list of key characteristics and associated endpoints may evolve, based on the experience of their application and as new human carcinogens are identified***.

- *Key characteristics are distinct from the "hallmarks of cancer", which relate to the properties of cancer cells* (Hanahan & Weinberg, 2000, 2011).

- ***Key characteristics are also distinct from hypothesized mechanistic pathways**, which describe a sequence of biological events postulated to occur during carcinogenesis*.

- *As such, the evaluation approach based on key characteristics, outlined below, "avoids a narrow focus on specific pathways and hypotheses and provides for a broad, holistic consideration of the mechanistic evidence.*

- *In addition, **evidence that falls outside of the recognized key characteristics of carcinogens, reflecting emerging knowledge or important novel scientific developments on carcinogen mechanisms, may also be included***.

So, it is clear from the Preamble's description what the TKCs are and what they are not. While they have become a systematic consideration in the overall analysis, nothing about them provides clear, convincing proof the chemical in question is a human carcinogen. Neither do it indicate which human tissues will be affected nor which key characteristic is actually part of the mechanism by which the chemical indicates cancer in animals (e.g., see Append J and its discussion of styrene's mechanism). They are merely a listing of biologic effects that may or may not be operative in the exact mechanistic steps by which the chemical induces cancer in humans. In addition, they are not used in place of an alternative mechanism based on a well-developed sequence of biologic events postulated to demonstrate how the carcinogenesis of a specific chemical originates.

Section 5 of the Preamble (*5. Summary of data reported*) begins on page 29 where it discusses how the summary data from the different information streams are reported. This section makes several key statements that contradict the approach used by Panigrahy. These are (bold and/or underlined text is added for emphasis):

- In subsection (b) entitled "Cancer in Humans" the preamble states — *Results of epidemiological studies pertinent to an evaluation of carcinogenicity in humans are summarized. **The overall strengths and limitations of the epidemiological evidence base are highlighted to indicate how the evaluation was reached. The target organ(s) or tissue(s) in which a positive association between the agent and cancer was observed are identified.** Exposure–response and other quantitative data may be summarized when available. **When the available epidemiological studies pertain to a mixed exposure, process, occupation, or industry, the Working Group seeks to identify the specific agent considered to be most likely to be responsible for any excess risk**. The evaluation is focused as narrowly as the available data permit.*

- In the subsection (c) entitled "Cancer in Animals" the Preamble states — ***Results pertinent to an evaluation of carcinogenicity in experimental animals are summarized to indicate how the evaluation was reached.*** *For each animal species, study design, and route of administration, there is a statement about whether an increased incidence, reduced latency, or increased severity or multiplicity of neoplasms or pre-neoplastic lesions was observed, and the tumour sites are indicated. Special conditions resulting in tumours, such as prenatal exposure or single-dose experiments, are mentioned.* ***Negative findings, inverse relationships, dose–response patterns, and other quantitative data are also summarized.***

- In the subsection (c) entitled "Mechanistic Evidence" the Preamble states — ***Results pertinent to an evaluation of the mechanistic evidence on carcinogenicity are summarized to indicate how the evaluation was reached. The summary encompasses the informative studies on absorption, distribution, metabolism, and excretion; on the key characteristics with adequate evidence for evaluation; and on any other aspects of sufficient importance to affect the overall evaluation,*** *including on whether the agent belongs to a class of agents for which one or more members have been classified as carcinogenic or probably carcinogenic to humans,* ***and on criteria with respect to tumours in experimental animals induced by mechanisms that do not operate in humans***. ***For each topic addressed, the main supporting findings are highlighted from exposed humans, human cells or tissues, experimental animals, or in vitro systems. When mechanistic studies are available in exposed humans, the tumour type or target tissue studied may be specified.*** *Gaps in the evidence are indicated (i.e. if no studies were available in exposed humans, in in vivo systems, etc.).* ***Consistency or differences of effects across different experimental systems are emphasized***.

From the preceding text found in the preamble, it is clear the evidence in the different data streams (i.e., exposure, human cancer, animal cancer, mechanistic) are handled and evaluated separately, not together and interchangeably as Dr. Panigrahy did in his general causation report. This fact is further clarified and emphasized in Table 4 in the IARC monograph, shown on the next page, which summarizes how IARC develops its Carcinogenic Hazard classifications based on the findings provided in the separate data streams. It is noted in Table 4 that studies involving *in vitro* human cell studies and animal *in vivo* or *in vitro* studies using animal tissues are not data of sufficient strength to change the hazard ranking. IARC no doubt makes this delineation because of the basic uncertainties associated with extrapolations based on animal or *in vitro* data. For example, the slides the follows IARC's Table 4 describes how IARC does use TKC data. This slide comes from a talk given by Dr. Guyton of IARC to explain and illustrate just how TKC data might impact the final hazard classification.

Appendix K

**Table 4 Integration of streams of evidence in reaching overall classifications (the evidence in bold italic represents the basis of the overall evaluation)**

| Stream of evidence | | | Classification based on strength of evidence |
|---|---|---|---|
| Evidence of cancer in humans[a] | Evidence of cancer in experimental animals | Mechanistic evidence | |
| *Sufficient* | Not necessary | Not necessary | Carcinogenic to humans (Group 1) |
| Limited or Inadequate | *Sufficient* | *Strong (b)(1) (exposed humans)* | |
| *Limited* | Sufficient | Strong (b)(2–3), Limited, or Inadequate | Probably carcinogenic to humans (Group 2A) |
| Inadequate | *Sufficient* | *Strong (b)(2) (human cells or tissues)* | |
| *Limited* | Less than Sufficient | *Strong (b)(1–3)* | |
| Limited or Inadequate | Not necessary | *Strong (a) (mechanistic class)* | |
| *Limited* | Less than Sufficient | Limited or Inadequate | Possibly carcinogenic to humans (Group 2B) |
| Inadequate | *Sufficient* | Strong (b)(3), Limited, or Inadequate | |
| Inadequate | Less than Sufficient | *Strong (b)(1–3)* | |
| *Limited* | *Sufficient* | *Strong (c) (does not operate in humans)[b]* | |
| Inadequate | *Sufficient* | *Strong (c) (does not operate in humans)[b]* | Not classifiable as to its carcinogenicity to humans (Group 3) |
| All other situations not listed above | | | |

[a]   Human cancer(s) with highest evaluation.
[b]   The *strong evidence that the mechanism of carcinogenicity in experimental animals does not operate in humans* must specifically be for the tumour sites supporting the classification of *sufficient evidence in experimental animals.*

Source: IARC (2022).



It is clear from the preceding slide developed by authors describing the IARC process, that the TKC data must be observed in chemically exposed populations (i.e., "exposed humans"), not by *in vitro* studies or animal studies, to provide sufficient mechanistic evidence to move a classification from Group 2A into Group 1. All other kinds of TKC, whether it is considered strong, or of lesser evidence, is not enough suggestive mechanistic evidence to overcome limited or inadequate human data. IARC's evaluation of Nightshift Work (shown on the next page) provides an example of this situation.



The preceding information about the IARC evaluation process provides a clear and unequivocal illustration that Dr. Panigrahy's approach to general causation is wrong and grossly speculative, it does not follow IARC principles, and will not represent a consensus scientific opinion on the issue of general causation. In the preceding table and slides it is clearly emphasized that animal evidence and mechanistic data, while important findings for a biologic plausibility assumption, these information streams generally will not add significantly to the evaluation or alter the available human evidence, be it *sufficient* or *insufficient*, to establish general causation. When the human evidence is clear, the animal and mechanistic data are not even necessary considerations. When the human evidence is either insufficient or inadequate to make a causal determination of human hazard/risk, the animal and mechanistic data may provide a sufficient basis for upgrading the classification to known human carcinogen only if the mechanistic changes believed to be key have also been observed in exposed human populations.

Appendix K

For those situations where the human evidence is limited or inadequate, but the animal evidence is sufficient, IARC may increases a Group 3 chemical to 2B, or a 2B chemical up to Group 2A, if the mechanistic evidence is strong (in human cells or tissue, or strong mechanistic class), as shown below in the next two slides taken from the Guyton talk.





In all remaining situations, these latter two data streams represent information that falls only under the Hill criterion of "Biologic Plausibly," and do not meaningfully impact the lack of clear, convincing human evidence. So, typically the animal and mechanistic data provide limited additional

information in the overall analysis, as it is not known if species agreement in the target organ(s) affected will be anything more than coincidental, and what value the MOA data adds to the conclusion is unclear.  [Note there has been some controversy in the scientific community in the limited cases that IARC did use mechanistic information to overrule the lack of convincing human data.  In fact, formaldehyde represents a case where newer mechanistic data indicates the human data may be wrong (unrecognized bias, confounding etc.) as formaldehyde-induced DNA adduct formation in stem cell tissue is absent in bone marrow.  Thus, evidence of initiation by formaldehyde in blood forming tissues appears to be absent.].

Besides this table, my earlier limited discussion of the problems with Dr. Panigrahy's misuse of TKC data (see 1st James report at pages 47-48) added opinions from other scientists who argued IARC should not use the TKCs by itself, or in lieu of human data, to reach a positive general causation conclusion until the error rates for such extrapolations are known.  The points I made then were the following:

- **Dr. Panigrahy is the first professional, to my knowledge, to apply this novel procedure to conclude human causation can be satisfied by this kind of data alone when the epidemiologic data are absent or insufficient, or to conclude which tissue/organs will be affected by a chemical.** The scientists proposing the TKC protocol have not suggested it can be used for these purposes (neither has IARC, the first scientific group to propose them and then adopt their use). For example, the IARC Preamble (2019) discusses several areas it considers as topics for mechanistic evidence (not only TKC):

  - Absorption, distribution, metabolism, and excretion (or ADME);
  - TKC evidence;
  - Other evidence, including quantitative structure activity relationship (QSAR), information on novel developments on carcinogens mechanisms (e.g., Capen et al., 1999, IARC, 2003, information on thyroid, kidney, bladder, or other tumors in animals induced by mechanisms that do not operate in humans).

  Further, the Preamble notes the limitations of the high-throughput data (emphasis added) — *High-content and high-throughput in vitro data can serve as an additional or supportive source of mechanistic evidence (Chiu et al., 2018; Guyton et al., 2018), although large-scale screening programmes measuring a variety of end-points were designed to evaluate large chemical libraries in order to prioritize chemicals for additional toxicity testing rather than to identify the hazard of a specific chemical or chemical group.*

- It remains unknown which combination of the TKC measures now provide a sufficient basis for assuming the chemical under evaluation might also cause cancer in humans at some dose. For example, Krewski et al. (2019) did a survey of 86 chemicals, lifestyle factors, and manufacturing processes that IARC had previously classified by as human carcinogens (i.e., Group 1). On average these agents had only four of the TKCs. While genotoxicity was the most commonly observed of the 10 TKCs factors, it was the only KC observed more than 50% of the time (i.e., genotoxicity was present 85% of the time). This is not surprising as an early focus of the chemicals analyzed by IARC focused largely on

13

reactive, genotoxic chemicals because scientists initially believed the sole existence or absence of this mode of action determined whether or not a chemical cause cancer in humans. **However, we have since learned that a chemical may be classified as genotoxic and still not induce cancer in animals**.

The other 9 TKCs were all observed to be present less than 50% of the time, with seven characteristics present less than 40% of the time. So, as with the conundrum we faced earlier when it was discovered that not all genotoxic chemicals were carcinogens, the question becomes how do we use additional characteristics that are seen much less frequently in this framework to reliably predict which chemicals with some collection TKC features will be human carcinogens? IARC's answer to this question is to look for identifiable patterns that may become useful to predictions of which chemicals will be likely be shown to be a human cancer hazard. At present, however, no patterns have been identified.

- After the initial proposal to systematically consider more MOA data, the reliability of this assessment list has been viewed with skepticism and concern in the scientific community (e.g., Trosko et al., 2017; Bus 2017; Becker et al., 2017; Doe et al. 2019; Smith et al., 2021).

  o The analysis by Becker et al. (2017) found that using assay techniques designed to measure 7 of the 10 TKCs could not effectively distinguish between 48 carcinogenic and noncarcinogenic substances. At least for now, this problem would seem to effectively eliminate its reliable use in a human causation analysis.

  o It is also instructive to review comments made by in the Doe et al. (2019) publication, a reference cited in Dr. Panigrahy's own recent publication (Fishbein et al., 2021)[1]. Doe et al. (2019) stated the following concerning the limited use of TKC approach for carcinogen classification (bold text is added emphasis to the quotes from Doe):

    *Another approach has been described by Smith et al. (2016) who put forward the concept of the key characteristics of carcinogens (KCs). They have analysed the properties shown by chemicals that have been classified as carcinogens and determined that they show one or more of 10 key characteristics.* ***However, Smith et al. (2016) and Guyton et al. (2018) did not analyse the incidence of one or more KCs in chemicals that did not induce tumors, so the value of their analysis is limited. In addition, they did not attempt any quantitative analysis of the relationship of the in vivo carcinogenic effect***.
    And,

---

[1] At page 4 of the Fishbein et al. (2010) the authors cite the Doe paper, stating — *The carcinogenic potential of a compound is its ability to induce neoplasia via genotoxicity, cytotoxicity, proliferation, and inflammation depending on dose and duration of exposure (Doe et al., 2019)*. So, in his own publications Panigrahy does recognize the importance of considering dose and that even this biologic effect is dose dependent. For this reason the potential risk of effects seen at high doses cannot be reliably extrapolated in a linear fashion, for as the dose diminishes biologic pressures that contribute and promote the carcinogen risk are lost causing the risk to decline in a sublinear fashion or become zero.

> *The KCs describe an event or events which <u>could play a role in a</u>*
> <u>*range of adverse effects,*</u> *including, but not solely, the induction of*
> *tumors. <u>The mere presence of one or more KC cannot lead to the</u>*
> <u>*arbitrary classification as a "carcinogen"*</u>. (Emphasis added)

Thus, in his own peer-reviewed publications he is aware of papers identifying the limitations associated with over-reliance on the TKC data, but in court he ignores these limitations.

In short, the TKC protocol represents a new and novel but untested data consideration whose initial use was to provide a more systematic consideration of possible MOAs. It has never, however, been proposed as a surrogate for, or a replacement of, a proper human causation assessment. Dr. Panigrahy's use of it in this case and for this purpose is in clear violation of its intended use and grossly exaggerates the relevance and impact this kind of data has on a more objective causation analysis like those performed by IARC.

## 1.2    A Brief Summary Comparison of the Differences in the Conclusions Reached by IARC and Dr. Panigrahy for the Seven Chemicals-of-Concern (CoCs) he Initially Evaluated.

As already noted, IARC evaluates the human, animal, and mechanistic data separately and then subsequently combines this information in its final opinion. IARC does not believe each evidence stream carries the same weight in the overall analysis, and in recent IARC evaluations performed the TKC data led to an upgraded carcinogen classification for only 2/34 or (5.8%) of the chemicals evaluated with this kind of data (Guyton et al. 2018). For both TCAB and tetrabromobisphenol-A the strong TKC findings in human studies led IARC scientists to upgrade tetrabromobisphenol-A from a 2B to a 2A hazard ranking even though the human data were inadequate. In contrast, TCAB was upgraded solely by the fact it is structurally similar to a group of AhR agonist chemicals that are considered to be human carcinogens, and it was found to activate the Ah receptor (this would be Hill's criterion of *Analogy*). Thus, it belongs to a class of chemicals believed to induce cancer in humans by this general mode of action, but even this strong mechanistic information was not enough to conclude it was a human carcinogen.

In contrast, Dr. Panigraphy opined the three out of seven of his CoC chemicals IARC had already evaluated and classified as Group 2 cancer hazards all somehow belonged in Group 1 (known human carcinogen). But 2/3 of the chemicals he upgraded had been recently evaluated by IARC, and during the timeframe IARC had begun compiling and summarizing its TKC database. So, IARC's scientists did not find the TKC data compelling enough to alter the cancer classifications of either chemical (styrene and TCA), while in contrast Dr. Panigrahy opined the TKC data alone was sufficient to conclude each chemical was a human carcinogen. So, Dr. Panigrahy is clearly exaggerating the relative importance the TKC data play in a general causation

15

assessment.  In addition, Dr. Panigraphy did not rank the TKC data as strong, moderate, or weak while IARC gives each KC factor one of these rankings for the data available on that chemical.

IARC also does not believe the fact that carcinogens have different TKC features means that when more than one carcinogen is present in an exposure the TKC data means the carcinogens will behave synergistically.  Dr. Panigraphy consistently argues they will.  But this is not a key chemical interaction of carcinogens IARC would dismiss if they thought it occurred.  Rather IARC believes because it is unknown what role, if any, each KC feature my play in the exact mechanism by which the chemical induces cancer, the ultimate impact of the combined presence of other chemicals contributing additional TKCs to a mixture of different carcinogens would also be unknown and unpredictable.

In the IARC approach the Hill criteria are applied only to the available epidemiology data (with the exception of *biologic plausibility*, and possibly to a more limited extent in *coherence of the evidence*).  In contrast, because there is insufficient or no epidemiologic evidence to satisfy the Hill criteria on all 7 of his chemicals for each cancer type seen in the plaintiffs, Dr. Panigrahy developed his own, unique, and untested causation methodology.  His 'causation method' is not recommended or used by any authoritative body (not IARC, NTP, USEPA etc.).  Moreover, as his endpoint specific general causation opinions illustrate this method eliminates the need for any epidemiologic considerations altogether.

IARC focuses and relies upon all of the available, quality epidemiology studies.  While weaker designs are reviewed and possibly discussed, the better designed studies always carry the greatest weight in an IARC analysis.  In contrast, Dr. Panigrahy frequently discussed a weak study (e.g., Antilla and brain cancer for TCA) or a nonsignificant association (e.g., his brain cancer and formaldehyde analysis), ignoring all evidence to the contrary and concluding that such limited evidence carries substantial weigh in 'his final opinion' under his strength of association criterion assessment.

Panigrahy assumes the target organ affected in animal studies can be used as presumptive evidence the chemical will also cause cancer at that site in humans.  But as shown above, IARC does not make the presumption and recognizes there may be significant differences between the animal and human responses/risks following exposure to the chemical.  So, IARC always evaluates epidemiology studies under the Hill criterion of *consistency;* in contrast, Dr. Panigraphy believes a simple observation that the same cancer type was seen in an animal study for just one of his 7 CoCs somehow satisfies the *consistency* criterion under Hill for all 7 chemicals even though in fact it would contribute nothing to the analysis under this specific Hill criterion.

IARC recognizes the difference between having an established mechanism for cancer induction versus just the availability evidence on the TKCs.  Dr. Panigrahy does not (e.g., he ignored the considerable mechanistic evidence for styrene's tissue-specific induction of animal

Appendix K

tumors) and instead, consistently claims that a chemical with any combination of these ten key characteristics provides sufficient evidence the chemical will cause cancer in humans and carries this further to any human tissue.  But this argument, one he repeatedly used in his 1st report. also brings all possible carcinogenic exposures/doses present in any environment each plaintiffs visited, into his specific causation analysis.

IARC does not consider evidence of tumor formation in one tissue or cell line to be sufficient evidence that the chemical will cause tumors in another tissue or cell line.  Dr. Panigrahy draws no distinction and in fact argues an effect seen in one tissue is evidence cancer is induced in all tissues.

IARC does not believe animal *in vivo/in vitro* studies or *in vitro* human data for the TKCs provides KC information strong enough to consider upgrading a chemical classification when the human data are insufficient. Dr. Panigrahy does not recognize any such limitation to TKC data, any level of evidence available in any one of these factors was all he needed to upgrade that chemical to a human carcinogen.  The clearest example of this was his analysis of TCA.  Dr. Panigrahy opined the TKCs supported his decisions to concluded TCA was a human carcinogen, whereas IARC conclude the TKC data were inconsistent and weak.

IARC never suggests human carcinogens can cause cancer in all tissues, IARC recognizes carcinogens cause a specific pattern of responses.  Panigraphy treats his 7 CoCs as 'pancarcinogens' and assumes each chemical causes/contributes to cancer in every tissue it reaches (i.e., all tissues).  For example, Panigraphy used intestinal tumor formation as evidence one chemical can cause anal tumors.  In many instances the lack of evidence for tissue specific effect for any of his 7 CoCs is completely ignored, and his criterion fulfillment for the group of chemicals rests on evidence for one or only a few of the seven chemicals. His extrapolations for these 7 chemicals, and his opinions that they all cause/contribute to every cancer type experienced by the plaintiffs' is a clear violation of accepted causal methodologies, and it clearly does not agree with conclusions reached by authoritative bodies like IARC.  Instead, it appears to be litigation driven approach to provide litigation driven opinions.

> o The 'method' he uses to reach his opinions on most of the cancers and most of these chemicals is so subjective and uses such a low bar of evidence that it is impossible for him to argue that all other chemical carcinogens do not also cause these same cancers (how would he differentiate?).  Thus, a specific causation opinion in this case becomes impossible for the plaintiffs as no dose information will be provided by the plaintiffs on the 8,000 other carcinogen Panigraphy's recent publication has stated exist.

Appendix K

IARC recognizes not all chemical exposures will be sufficient to induce evidence of carcinogenicity.  Panigraphy opines there is no safe dose/exposure for carcinogens.[2]  Here he ignores considerable scientific evidence that shows that even for genotoxic carcinogens the adverse effect changes as the dose is diminished for two reasons.  First, the risk will not be linear over all doses because the initiation and promotional characteristics of the carcinogen have different dose-response curves and thresholds.  Promotional effects will occur at higher doses and have higher and definite thresholds. So, even if initiation events are still occurring, the biological changes that allow mutated cells to grow and metastasize are lost as the dose declines, and the rate of tumor formation changes in a nonlinear manner and risk declines nonlinearly and approaches or becomes zero. Second, the biologic changes that cause a high rate of tumor formation at higher doses also occur in shorter length of time. decline the time to tumor formation lengthens. Thus, lower doses generally require a longer interval for tumor appearance; this has even been demonstrated with potent genotoxic carcinogens.  Thus, as the latency period extends a temporal threshold can also be reached, i.e., the organism dies from other causes before the cancer develops. But Dr. Panigrahy basically ignored both issues when rendering his opinions.

To summarize the basic differences between the IARC and Panigrahy causation methodologies I provide the following table comparing the kind of information used to satisfy the Hill criteria under both methodologies.

**IARC's Cancer Target Organ Causation Method -vs-
Dr. Panigrahy's Target Organ Causation Method**

| Hill Criterion | IARC Method (Epidemiology Driven) | Unique Panigrahy Method (MOA Driven) |
|---|---|---|
| *Strength of Association* | Only sufficient evidence provided by better designed human studies (cohort/case-control) are used. | Any human study will do, especially in his target organ analyses.  Here he may rely upon limited ecological studies or a single observation.  A lack of consistent evidence for a specific effect is not a limitation or hindrance in Panigrahy method.  He places great weight on this criterion despite the fact there is no causal association between the chemical and the target organ in most of his assessments.  In all instances he is unable to identify an epidemiology study he can refer to for all 7 of his chemicals of concern (CoCs). |

---

[2] But a dose where the risk is so low as to be *de minimis* provides a *de facto* safe dose.  This is how regulators handle carcinogens believed to be genotoxic.

Appendix K

| Hill Criterion | IARC Method (Epidemiology Driven) | Unique Panigrahy Method (MOA Driven) |
|---|---|---|
| *Consistency* | | Considers consistency satisfied without human data, which he almost never discussed under this criterion in his analyses. If the chemical induces cancer in any animal species in the organ of interest he opined this satisfied the criterion of consistency. He frequently opined that the fact he considers all 7 CoCs to be human carcinogens satisfied this criterion. Thus, his reasoning is circular. Data for any one of his 7 CoCs was frequently considered to represent sufficient evidence for the entire group. |
| *Specificity* | Specific human cancer type is consistently observed (or a specific pattern of cancer types is consistently seen). | Typically he argued the variety of cancers observed in animal and human studies precludes use of this criterion. He always gives this criterion little weight in his analyses. |
| *Temporality* | A given in the epidemiology studies to be analyzed for without it a causation analysis cannot even proceed. | It has to be given in the animal and human studies he analyzes, or he wouldn't even consider the study. So, he always states this criterion is satisfied. Again he is using a type of circular reasoning. |
| *Biological Gradient* | Important if seen in better epidemiology studies (experimental animal studies not a consideration here). This criterion may or may not contribute to the overall evaluation depending upon whether evidence is available. | He generally used animal or mechanistic studies only under this criterion. Because he uses animal/MOA data this criterion is be default satisfied and always contributes in his analyses. He always assigns great weight to this criterion because it is an easy given the way he analyzes this criterion. |
| *Biologic Plausibility* | Animal studies and MOA considerations. Only strong KC data in exposed human populations can lead to a possible upgrade of the cancer hazard classification. | Uses MOA data predominantly but e does not evaluate or consider the strength of the TKC data like IARC working groups do. Any *in vitro* human or animal KC derived data from any tissue type is used here, and moderate, weak and inconsistent mechanistic data is used to upgrade the classification of the chemical to a known human carcinogen by Panigrahy.[3] |

---

[3] For example, IARC concluded the mechanistic data for 111-trichlororethane (TCA) was suggestive but incoherent (inconsistent) and did not feel it added to the classification of this chemical. Dr. Panigrahy concluded this evidence was sufficient to conclude that it is biologically plausible that TCA is a human carcinogen.

Appendix K

| Hill Criterion | IARC Method (Epidemiology Driven) | Unique Panigrahy Method (MOA Driven) |
|---|---|---|
| *Coherence* | Confidence in a causal interpretation of the evidence from studies of cancer in humans is enhanced if it is coherent with physiological and biological knowledge, including information about exposure to the target organ, latency and timing of the exposure, and characteristics of tumor subtypes. | Here he simply argues the cancer induced by these carcinogens is consistent with the generally known facts and biology of cancer in general.[4] But this is not what this criterion is about (again he is simply arguing biologic plausibility). Then adds MOA considerations. But his supporting information is largely speculative here because it frequently does not involve studies on the target organ of interest for all 7 chemicals and does not involve data from exposed human populations. He always gives a strong positive weight to this criterion. |
| *Experiment* | Because the epidemiology studies available are observational studies not human experiments, there is generally no information that allows this criterion to be assessed for most chemicals. | Argues animal and MOA studies add support here but gives little weight to this criterion. |
| *Analogy* | Generally, there is no evidence available that is responsive to this criterion, and requires a combination of human and mechanistic evidence.  For this reason this criterion is rarely considered by IARC as only a few chemicals have the kind of information that qualify for this consideration. | Again he argues the fact these chemicals cause cancer in animals and in some cases or humans somehow satisfies this criterion. He always states this criterion is satisfied by the evidence.  He typically assigns moderate weight to this criterion despite the fact he is using the wrong kind of evidence (TKC data and carcinogen classifications) to satisfy this criterion. |

---

[4] Note that this is a meaningless observation –by default the manner in which they induce cancer is generally consistent with how cancer is induced whether we understand the exact mechanism or not. But this criterion is about other issues that are not considered by Panigrahy.

**2.0    Specific Examples Illustrating The Differences Between the IARC's General
Causation Conclusions Versus Opinions Offered By Dr. Panigrahy**

**2.1    The Limitations/Errors in Dr. Panigrahy's General Causation Analysis for Brain
Cancer**

**2.1.1    General Comments**

Perhaps the best illustration of just how divergent the general causation opinions of by Dr, Panigrahy are compared to those offered by IARC, an agency he compares his methodological approach to, is to compare his general causation analysis and opinions to those reached by IARC on this subject.

Panigrahy states in his general causation analysis that all 7 chemicals he analyzed can cause or contribute to brain cancer.  His analysis consisted of evaluating the evidence for TCE, formaldehyde, arsenic, hexavalent chromium, PCE, 1,1,1-trichloroethane (TCA), and styrene. This obvious illustration of why his analysis reached flawed and spurious opinions is to simply review what IARC has listed as brain carcinogens on its <u>website</u>[5] which published an up-to-date summary of its recognized causes of cancer by tumor type.  This table is shown below and lists only radiation as a known cause of human brain cancer (i.e., having "sufficient evidence" in humans).  Starkly absent is their conclusion that any chemical they had ever evaluated was ever considered by IARC as a chemical capable of causing brain cancer.  In fact, no chemicals are listed as having even limited evidence (see screenshot from IARC document below).

| List of classifications by cancer sites with *sufficient* or *limited evidence* in humans, *IARC Monographs* Volumes 1–132[a] | | |
|---|---|---|
| **Cancer site** | **Carcinogenic agents with *sufficient evidence* in humans** | **Agents with *limited evidence* in humans** |
| **Eye, brain, and central<br>  nervous system** | | |
| Eye | Human immunodeficiency virus type 1<br>  (infection with)<br>Ultraviolet emissions from welding<br>Ultraviolet-emitting tanning devices | Solar radiation |
| Brain and central nervous system | X- and Gamma-radiation | Radiofrequency electromagnetic<br>  fields (glioma and acoustic<br>  neuroma) |

Source: IARC. Agents Classified by the IARC Monographs, Volumes 1–132. <u>List of Classifications by Cancer Site</u>.

---

[5] <u>https://monographs.iarc.who.int/wp-content/uploads/2019/07/Classifications_by_cancer_site.pdf</u>.

Appendix K

As shown and discussed in some detail in the general comments on Dr. Panigrahy's unique causation methodology in section 1.0, one cannot use animal or mechanistic data as kind of evidence that is sufficient to support of general causation, and these two different evidence streams are only relevant under the Hill criterion of biologic plausibility. In stark contrast to IARC's stated methods his analysis, he inappropriately applies the Hill criteria at least four different ways in general causation assessments. These are:

1. First, his causation analysis considers all 7 chemicals at once. This is an inappropriate use of the Hill criteria which was originated by an epidemiologist as an analytical tool for evaluating the human evidence for one substance at a time.
   a. Dr, Panigrahy stand out as the only scientist I have ever come across that has evaluated multiple chemicals from different chemicals classes together as though any evidence for one chemical satisfies that criterion for other chemicals.

2. The only criterion under which Panigrahy evaluates the epidemiology of these 7 chemicals was the single Hill criterion 'strength of the association.' For the other Hill criteria he supplants the human evidence for his chemical group with animal data, mode of action data, or a kind of circular reasoning that essentially suggest that because the carcinogens that satisfy this specific for the target organ of brain cancer. But because none of these chemicals were ever identified as brain. Carcinogens it is clear this cannot be true.

3. When analyzing a chemical for general causation conclusions each of the Hill criteria (except biologic plausibility) is a consideration of all of the available epidemiologic evidence, not just single study as Panigrahy did in his brain cancer assessment involving formaldehyde.

4. IARC would not even attempt this type of analysis when analyzing an exposure to a mixture. IARC attempts to find which chemical in the mixture causes the observed effect.

In his assessment for brain cancer he discussed only two chemicals, formaldehyde and TCE, for the Hill criterion *Strength of Evidence*. No human evidence for the other five chemicals is even mentioned. But these two unreliable and nonprobative findings for two chemically and toxicologically different substances did not satisfy the strength of evidence criterion for either chemical, let alone satisfy this criterion for all seven of Dr. Panigrahy's chemicals of concern. For the remaining Hill criteria his analysis consists largely of some combination of animal and mechanistic data because apparently he could not identify any reasonable human evidence to support each of the remaining Hill criteria. The Hill criteria cannot be misused in this manner, and the animal and mechanistic data apply only to single Hill criterion of "Biologic Plausibility." And while the animal/mechanistic data satisfy this criterion, they do so in only a yes/no manner and have no real influence on the other individual Hill criteria assessments. In short, because he failed to provide the kind of epidemiologic evidence needed to satisfy each of the Hill criteria except one, biologic plausibility, his general causation opinion for brain cancer is not only flawed, it is nonexistent.

22

### 2.1.2   Specific Comments

#### A. His Strength of the Association appraisal:

- **Error #1 – Failure to Consider All Available Epidemiologic Evidence on All Chemicals He was Evaluating**.  Under the Hill criteria one is looking for several repeated strong associations. The greater the strength of the association in a well-designed cohort study the more reliable the association is likely to be.  To reiterate, Dr. Panigrahy considered epidemiologic evidence for only 2 of the 7 chemicals he states cause brain cancer. But structurally different chemicals typically induce a different spectrum of adverse effects, and there simply is no scientific basis for assuming the epidemiologic evidence for one chemical evidence will accurately reflect all of the epidemiologic evidence for another chemical.  Therefore, his attempt to show his 'Strength of Association' criterion was satisfied was an unjustifiably incomplete and flawed effort.

- **Error #2 – Failure to Consider All Available Epidemiologic Evidence on the Two Chemicals He Did Discuss**.  At page 446 of his report Panigrahy states — *A statistically significant excess of brain and other CNS cancer was noted after exposure to formaldehyde[333]. An increased risk for central nervous system was reported from a cohort study of workers exposed to 1,1,1-trichloroethane in Finland. Workers exposed to 1,1,1-trichloroethane exhibit an increased cancer risk of the central nervous system[699].* [#333 is Hayes et al., 1990; #699 is Anttila et al., 1995] Here a knowledgeable reader would typically ask — Is he really assessing the strength criterion under Hill for each of these chemicals based on observations reported in a **single** study without mentioning or discussing any the other epidemiologic studies for that chemical?  And how does the evidence these remaining studies provide compare to that results he discusses from this single study?

  Given that IARC would never decide there was sufficient epidemiologic evidence to conclude a causal relationship existed if only a single study were available to evaluate, any knowledgeable reader would know that more epidemiology studies have exist for all seven chemicals (especially the 4/7 classified as Group 1 or known human carcinogens). So, a knowledgeable reader would know instinctively other key findings likely were ignored or not considered in Panigrahy's assessment.

- **Error #3 — Neither of the two associations he did cite provide sufficient evidence to satisfy this criterion**.
  **Formaldehyde**:
  His description of the formaldehyde study he considered is completely inaccurate (possibly a plagiarized summary sentence??). For formaldehyde Dr. Panigrahy cites his reference #333. This paper is the Hayes et al. (2009) study of embalmers and morticians. This study used a proportionate mortality design, a weaker study design because mortality excesses or deficiencies in one or more diseases alters the calculated proportionate mortality ratio (PMR).  These studies are not as accurate as those designed to calculate the more appropriate standardized mortality ratio (SMR) or standardized incidence ratio (SIR).

  Still, the reported PMR for "brain and CNS cancers" in Table II of the Hayes et al. (2009) publication was not significant, nor was it large enough to be suggestive of a relationship by itself (PMR = 1.23; 95% CI 0.80-1.84 based on 24 cases).  These cases

were among white workers; no cases were reported among nonwhite workers (0 vs. 0.8 expected).

In addition, it should be noted that PMR studies are considered hypothesis-generating studies that cannot be used to prove causation (McLaughlin and Blot, 1997). In fact, it is interesting to note what Panigrahy stated about this study in his own rebuttal comments. In his rebuttal report he states the following limitations for the Hayes et al. (1990) study: (1) "Not possible to rule out selection bias"; (2) "Bias in proportionate mortality analyses can occur"; (3) "A limitation of this study was it was not possible to rule out selection bias or to clearly relate disease risk to specific work practices and exposures."

Besides the single epidemiology study that Dr. Panigrahy cited as suggesting formaldehyde causes brain cancer, the 2006 IARC monograph update of formaldehyde (IARC Monograph Volume 88), which was actually cited by Panigrahy in his report (e.g., see p. 106 of his report), mentions having reviewed more that 25 cohort studies in its earlier 1995 IARC evaluation of formaldehyde.  This update now also considering the evidence provided by three cohort updates and six new studies it considered in 2006 (p. 94 of IARC, 2006).  IARC separated worker study types into those that evaluated industrial workers (e.g., formaldehyde producers, formaldehyde resin makers, plywood and particle-board manufacturers, garment workers, and abrasives industry workers) and those considered professionals that are formaldehyde-exposed (e.g., pathologists, anatomists, and embalmers).  IARC (2006) states the reason why it looked at these two types of studies separately —*This division was also made in the previous IARC monograph because of differences between these studies with regard to their findings, the nature of the exposure to formaldehyde and the potential for exposures to other carcinogens or other factors that might confound the findings*.

Table 16 which starts on page 95 of IARC's Volume 88 summarizes the mortality findings in the different studies the working group evaluated.  None of these studies observed a significant association for brain cancer. For example, the Coggon et al. (2003) study of chemical workers reported for the category 'brain and nervous system cancers' a less-than-expected SMR = 0.85 (95% CI 0.57–1.21) based on 30 cases.  Similarly, Hauptmann et al. (2003, 2004) reported an SMR = 0.92 (95% CI 0.68–1.23) based on 43 cases.  For cancers of the brain and nervous system among workers in the garment industry, Pinkerton et al. (2004) reported an SMR = 1.09 (95% CI 0.66—1.71) (non-significant) based on 19 cases. And in the fiberglass workers studied by Marsh et al. (2001) and Youk et al. (2001) the category of 'brain and nervous system' cancers yielded a SMR = 0.79 (95% CI 0.58—1.03) based on 50 cases. Thus, in reaching his conclusion that there was a 'strength of evidence' for formaldehyde and brain cancer Dr. Panigrahy has clearly ignored the negative results provided by several other stronger cohort studies identified in the 2006 updated evaluation of formaldehyde despite the fact he was aware of their analysis.  In the overall evaluation section of this monograph, the IARC working group concluded (see page 277, emphasis added) — *A number of studies have found associations between exposure to formaldehyde and cancer at other sites, including the oral cavity, oro- and hypopharynx, pancreas, larynx, lung and brain*. **However, the Working Group considered that the overall balance of epidemiological evidence did not support a causal role for formaldehyde in relation to these other cancers**. Even IARC in its latest monograph on formaldehyde (Volume 100F, 2012), which was not considered by Dr. Panigrahy, did not find causal evidence for formaldehyde exposure and brain cancer.

To summarize, for formaldehyde Dr. Panigrahy cited a single nonsignificant PMR study on formaldehyde in an attempt suggest this limited study satisfied the Hill criterion for 'Strength of Association.'  But this study's findings did not provide a significant increase in the human evidence above that already evaluated by IARC in 2006 (or in 2012) where the IARC Working Group reached the conclusion that no causal relationship existed. In fact, because IARC's previous evaluation considered other PMR studies reporting observations for brain cancer, adding a, single additional nonsignificant PMR finding would not change the weight of evidence arrived at in IRAC's slightly earlier 2006 assessment.

## 1,1,1-Trichloroethane

Dr. Panigrahy's reference #699 (Anttila et al., 1995) evaluated a 1,1,1-trichloroethane (TCA) cohort of workers exposed to one or more of three different solvents trichloroethylene (TCE), perchloroethylene (PCE), or TCA at various places of work.  It would be unclear what manufacturing process and other carcinogenic exposures might also be involved at these different work sites.  For the combined exposure cohort representing all workers ("Workers Exposed to Halogenated Hydrocarbons"), the category of "nervous system" cancers posted a non-significant SIR of 1.22 (95% CI 0.63-2.12) based on a total of 12 cancers (see their Table 2).  Most workers were exposed to TCE, so this sub-cohort was analyzed separately (see their Table 3).  Again, there was no meaningful variation in nervous system cancer risk with an SIR of 1.09 (95% CI = 0.50-2.07).  In fact, using urinary trichloroacetic acid level (U-TCA level) as a measure of worker TCE exposure, the limited dose-response analysis suggested an *inverse* relationship with dose (high TCE exposure corresponded to lower risk; see their Table 4).

In Table 5 cancer incidence in the PCE exposed and TCA exposed subcohorts were also analyzed separately, but the small number of cases prevents any reliably meaningful interpretation.  The PCE exposed workers had an SIR = 1.15 (95% CI 0.14-4.15) based on only two cancer cases.  For workers exposed to TCA, a statistically significant increase (SIR of 6.05, 95% CI 1.25-17.7) was reported for nervous system cancers, but it was based on an analysis of only 3 cases.  Thus, it likely represented an unstable SIR estimate, as indicated by the large confidence interval.  The mortality experience of the cohort is discussed on p. 800 of the study; no mention was made by the study's authors of any excess mortality from brain or nervous system cancer. This failure was, of course, because this study failed to provide any meaningful or reliable epidemiologic evidence to suggest that TCE, PCE, or TCA might be a potential cause of brain cancer.  Finally, it should be noted that Dr. Panigrahy's analysis of brain cancer and his seven chemicals of concern (CoCs) supposedly includes PCE and TCE.  As these chemicals were part of Anttila et al. (1995) study he discusses for TCE, his failure to mention the lack of similar evidence for these two chemicals in this study puzzling.  It is but one clear example of the selective bias with which he describes the epidemiology studies he chooses to discuss in his assessments.  This a clear contradiction of the principles espoused by IARC.

Given that IARC (2022) had recently evaluated TCA for any human carcinogenic potential, it is also instructive to consider how they evaluated the available epidemiologic studies for a brain cancer hazard.  At page 141 of Monograph 130 the IARC working group reached the following conclusions (emphasis added):

  
Appendix K

    *One retrospective cohort study (<u>Anttila et al., 1995</u>) and four case–control studies (<u>Heineman et al., 1994</u>; <u>Neta et al., 2012</u>; <u>Ruder et al., 2013</u>; <u>McLean et al., 2014</u>) evaluated the association between 1,1,1-trichloroethane exposure and cancers of the brain and nervous system.*

    ***Overall, there was no clear association between cancers of the brain and nervous system and exposure to 1,1,1-trichloroethane***.

And

    <u>*Neta et al. (2012)*</u> *reported no evidence of an increased risk of incident glioma with categories of exposure probability, duration, cumulative exposure, average weekly exposure, or highest exposure to 1,1,1-trichloroethane using a detailed individual exposure assessment approach.*

And,

    ***Overall, the Working Group considered that the available studies in humans were not sufficiently informative to permit a conclusion to be drawn about the presence of a causal association between exposure to 1,1,1-trichloroethane and cancers of the brain and nervous system***.

    Another study not mentioned in Panigrahy's initial report is one included in a table in his subsequent rebuttal report of "Other epidemiology studies (PCE)" is the Ruder et al. (2013)[6] study (see p. 138 of his rebuttal report).  The Ruder et al. (2013) study evaluated the risk of glioma and occupational exposure to six chlorinated solvents (carbon tetrachloride, chloroform, methylene chloride, TCE, PCE, or TCA) among 798 cases and 1,175 controls.  It is not clear why Dr, Panigrahy stated in his table that Odds Ratios (OR) were not provided for PCE, or why he did not discuss the less-than-expected ORs for gliomas shown in Table 2 of this study for occupational exposure to TCE, TCA, or methylene chloride (one of Dr. Kendall's alleged causes of brain cancer).

**Excerpt from Panigrahy's Rebuttal Report**

| Study Authors/Date | Definition of Dose | Cancer(s) | RR/OR/HR/SMR (95%CI) | Comments |
|---|---|---|---|---|
| Ruder et al. 2013 | Ever/never and estimated cumulative exposure | Glioma | Not listed for PCE | Did not increase risk of glioma |

    Now compare and contrast Dr. Panigrahy's comments about the Ruder study to the actual table of results published in the Ruder study shown on the next page. As an additional analysis, Ruder et al. (2013) evaluated 904 subjects who were genotyped for various glutathione-S-transferases (GSTs) (Ruder et al. stating that individuals with functional GST genes may convert chlorinated solvents crossing the blood-brain barrier

---

[6] Panigrahy did not include this in his reference list, but presumably this is: Ruder et al. (2013). Occup. Environ. Med. 70(2):73-80.

into cytotoxic metabolites). The analysis of these individuals showed that solvent-exposed subjects who had functional GST genes were *not* at increased risk of developing glioma (Table 4 of the study).

### Table 2 – Ruder et al. (2013)

| Chlorinated solvent | Including proxy-only interviews | | | | | | Excluding proxy-only interviews | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cases | | Controls | | | | Cases | | Controls | | | |
| | No. | % | No. | % | OR* | 95% CI | No. | % | No. | % | OR* | 95% CI |
| **Carbon tetrachloride** | | | | | | | | | | | | |
| All | 263 | 33 | 442 | 38 | 0.79 | 0.65 to 0.97 | 141 | 32 | 428 | 38 | 0.82 | 0.64 to 1.06 |
| Men | 193 | 42 | 302 | 47 | 0.85 | 0.66 to 1.08 | 107 | 44 | 291 | 47 | 0.95 | 0.69 to 1.31 |
| Women | 70 | 21 | 140 | 27 | 0.72 | 0.52 to 1.01 | 34 | 17 | 137 | 27 | 0.64 | 0.41 to 0.99 |
| **Chloroform** | | | | | | | | | | | | |
| All | 275 | 34 | 458 | 39 | 0.77 | 0.64 to 0.94 | 153 | 35 | 446 | 39 | 0.79 | 0.62 to 1.01 |
| Men | 199 | 44 | 307 | 47 | 0.86 | 0.67 to 1.09 | 110 | 45 | 298 | 48 | 0.91 | 0.67 to 1.25 |
| Women | 76 | 22 | 151 | 29 | 0.65 | 0.46 to 0.90 | 43 | 22 | 148 | 29 | 0.62 | 0.41 to 0.93 |
| **Methylene chloride** | | | | | | | | | | | | |
| All | 304 | 38 | 490 | 42 | 0.80 | 0.66 to 0.97 | 169 | 39 | 475 | 42 | 0.81 | 0.63 to 1.03 |
| Men | 222 | 49 | 332 | 51 | 0.88 | 0.69 to 1.13 | 121 | 50 | 320 | 51 | 0.90 | 0.66 to 1.23 |
| Women | 82 | 24 | 158 | 30 | 0.69 | 0.50 to 0.95 | 48 | 24 | 155 | 30 | 0.69 | 0.46 to 1.03 |
| **Tetrachloroethylene** | | | | | | | | | | | | |
| All | 299 | 37 | 500 | 43 | 0.75 | 0.62 to 0.91 | 166 | 38 | 483 | 42 | 0.78 | 0.61 to 0.99 |
| Men | 216 | 47 | 338 | 52 | 0.81 | 0.64 to 1.04 | 117 | 48 | 325 | 52 | 0.85 | 0.62 to 1.17 |
| Women | 83 | 24 | 162 | 31 | 0.66 | 0.48 to 0.91 | 49 | 25 | 158 | 30 | 0.68 | 0.46 to 1.00 |
| **Trichloroethane** | | | | | | | | | | | | |
| All | 304 | 38 | 503 | 43 | 0.75 | 0.61 to 0.90 | 173 | 39 | 491 | 43 | 0.74 | 0.58 to 0.94 |
| Men | 214 | 47 | 330 | 51 | 0.83 | 0.64 to 1.06 | 118 | 49 | 321 | 51 | 0.83 | 0.60 to 1.13 |
| Women | 90 | 26 | 173 | 33 | 0.64 | 0.47 to 0.88 | 55 | 28 | 170 | 33 | 0.63 | 0.43 to 0.93 |
| **Trichloroethylene** | | | | | | | | | | | | |
| All | 302 | 38 | 515 | 44 | 0.74 | 0.61 to 0.90 | 164 | 37 | 499 | 44 | 0.75 | 0.59 to 0.96 |
| Men | 221 | 48 | 335 | 52 | 0.88 | 0.69 to 1.12 | 122 | 50 | 323 | 52 | 0.97 | 0.71 to 1.32 |
| Women | 81 | 24 | 180 | 34 | 0.57 | 0.42 to 0.79 | 42 | 21 | 176 | 34 | 0.51 | 0.34 to 0.77 |
| **Any chlorinated solvent** | | | | | | | | | | | | |
| All | 359 | 45 | 570 | 49 | 0.82 | 0.68 to 0.99 | 202 | 46 | 553 | 48 | 0.86 | 0.68 to 1.08 |

- **Error #4 — Suggesting a single, nonsignificant observations satisfy the Hill criterion "Strength of the Association."** A review (see Taubes, 1995) more than 25 years ago by epidemiologists discussing what makes a single observation reliable stated they would not get excited about a single significant finding, especially if the increased risk was not unexpectedly large (greater than 3-fold or more). This is because it is hard to control for confounding, bias etc. in a single study. One example an initial significant 3-fold increase in pancreatic cancer with increased coffee consumption that subsequent larger, better studies showed was a spurious association. Boffetta et al. (2008) is a more recent review discussing how an initial single significant finding can ultimately be shown to be an error.

It would be clear to epidemiologists that Dr. Panigrahy's opinion that a single, nonsignificant and weak increase in a PMR value for formaldehyde somehow represents a sufficient basis for concluding there is a strong "strength of evidence" conclusion for formaldehyde has no reasonable scientific basis.  Given the many negative studies IARC evaluated that Panigrahy did not consider makes his opinion here that more untenable.

Likewise, even though he relied on the significant association reported in the Antilla study, it was based on very small numbers.  Again, this would not be a basis for epidemiologists to conclude it satisfies strength of association because it is only one study that was able to consider only a small number of cases, a feature that can produce unreliable relative risk estimates that change over time as the mortality experience matures.  That other epidemiology studies reported on brain cancer risks for this chemical that were negative further undermines his over-reliance on this single small study.  That IARC evaluated tis chemical in 2022 and concluded it does not pose a human brain risk at this time also shows he is using the Hill criteria inappropriately,

Finally, because he did not satisfy the strength of causation criteria for any chemical and provides no evidence on this issue for 5 of the chemicals he discussed it is obvious his is not applying the Hill criteria in an appropriate manner.  With no strong, convincing positive associations for any of the 7 chemicals his causation analysis fails here with a complete inability to demonstrates this criterion was satisfied.

- **Error #5 — He reports no associations (for TCE, arsenic, hexavalent chromium, PCE, or styrene) but argues insufficient evident for 2 chemicals provides sufficient, strong evidence for all 7 chemicals.**  He has no reasonable scientific method for this extrapolating the unreliable and unconvincing results for 2 chemicals as somehow providing sufficient evidence for what the other five chemicals are capable of causing.

    Known human carcinogens frequently induce different patterns of cancer types in different animal species and in humans.  Animal findings do not always predict the correct human tissue affected.  A simple review of the IARC monographs of the chemicals this organization has studied illustrates these two facts.  This is another why his analogizing what happens with one carcinogen will also happen with another carcinogen is totally unreliable.

## B. His Consistency of the Association appraisal:

- **Error #6 — He ignores the lack of consistency in the epidemiology literature**. The consistency of the association under Hill methodology refers to seeing consistent significantly positive associations in the epidemiology literature, especially across different studies and different experimental designs.  But his preceding summary for *strength of association* clearly demonstrates he did not find any consistent significantly positive associations in the epidemiology literature for brain cancer for any of the 7 chemicals.  The fact that he applies animal data for this criterion when he should be demonstrating consistent positive epidemiologic associations for each chemical illustrates he is either misusing this Hill criterion or he does not understand the how this criterion is to be analyzed because he does no reasonable epidemiologic evidence to support it.

    For this criterion he cited only a single animal study, the 1986 NTP bioassay study on PCE, even though animal species do not accurately predict the site of cancer in other animal species or humans (e.g., see my discussion on animal results by cancer type in my

appendix of regulatory risk limitations).  Note further than on page 24 of IARC monograph 130, the preamble states: *The inference of potential carcinogenic hazard to humans **does not imply tumour site concordance across species***.  Therefore, his suggestion one can assume consistency based on a coincidental finding in an animal study has no reasonable scientific basis.

- **Error #7 — He attached his own unique significance to the reported animal findings, a conclusion not shared by the NTP scientists responsible for this study**.  At page 61 of this document (NTP Technical Report Series #311) the NTP chronic bioassay study of the carcinogenic hazard PCE might pose, this document concluded the following concerning the observed gliomas in high dose rats of this study (emphasis added):

  > *Four high dose male, two high dose female, one control male, and one control female rat exhibited gliomas of the brain. The incidence of this tumor in the male high dose group is above the control incidence at this laboratory (21247, 0.8%) or in the overall Program (611,971, 0.3%). Unlike the kidney lesions described above, <u>compound-related brain tumors have never been observed in earlier NTP studies of tetrachloroethylene, trichloroethylene, or pentachloroethane. The incidences of these tumors in the high dose groups in these studies were not statistically significant, and gliomas were observed in the control groups;</u> **<u>for these reasons, the gliomas are not considered to be tetrachloroethylene-induced neoplasms</u>***.

In contrast, Panigrahy concluded this single unique and questionable observation in one rodent species was sufficient evidence to satisfy the Hill criterion of *consistency* for all 7 chemicals even though they have different chemical structures and biologic activities. But this observation was a finding not considered to be an affect attributable to PCE by scientists with recognized expertise in the evaluation of animal studies of chemical-induced carcinogenesis. And yet somehow Dr. Panigrahy opined it provides moderate support for the criterion of *consistency* and adds to his final opinion that there exists a causal association for brain cancer and this chemical. This bizarre conclusion was reached despite the fact this observation was not observed in other chronic bioassays on PCE or with similar chemicals, and even though no animal evidence in support of brain cancer was reported for the 6 other chemicals.  Once again he is analogizing/extrapolation from an unreliable observation.

## C. His Specificity Criterion Appraisal:
- **Error #8 — He Inappropriately Applies this Hill Criterion.**  Under Hill this criterion refers to observing evidence for a specific effect or pattern of effects.  But there insufficient evidence that any of the 7 chemicals caused brain cancer, a fact that argues against his opinions.  Still, he gave this criterion little weight in his evaluation when in fact it should carry no weight since it was not satisfied.

## D. His Temporality Criterion Appraisal:
- **Error #9 — He Inappropriately Applies this Hill Criterion.**  Under Hill this is the one criterion must be present or the rest of the Hill criteria need not be considered because

causation cannot be met without it and all reported associations are meritless and receive no further consideration.  It must exist before one can consider the other Hill criteria for a given chemical. It is the one necessary criterion.

So, his finding that chemical exposure always preceded the observation of cancer in all human and animal studies was a given and of essentially no probative value for it must be a satisfied before once proceed with the remainder of the Hill criteria in any causal analysis.  In addition, he failed to consider it specifically for brain cancer-specific effects for all 7 chemicals, and cannot do so because there are no convincing, consistent associations for any of these chemicals regarding human brain cancer temporality cannot be accurately considered for this tumor type.  To say temporality was evident for other biologic effects has no bearing here.  As the NTP cancer bioassay report considered the gliomas in rats not to be an effect by PCE, there is also no temporality for the animal evidence he relied upon.  Temporality simply does not exist as a consideration when there is no reasonably reliable adverse effect to consider.

## D. His Temporality Criterion Appraisal:

- **Error #10 — He Inappropriately Applies this Hill Criterion.**  Under Hill this is the one criterion must be present or the rest of the Hill criteria need not be considered because causation cannot be met without it and all reported associations are meritless and receive no further consideration.  It must exist before one can consider the other Hill criteria for a given chemical. It is the one necessary criterion.

   So, his finding that chemical exposure always preceded the observation of cancer in all human and animal studies is of no probative value for it must be a given to proceed with the remainder of the Hill criteria in any causal analysis. In addition, he has failed to consider it specifically for brain cancer-specific effects for all 7 chemicals, and cannot do so because there are no convincing, consistent associations for any of these chemicals regarding human brain cancer temporality cannot be accurately considered for this tumor type.  As the NTP cancer bioassay report considered the gliomas in rats not to be an effect by PCE, there is not temporality for the animal evidence he relied upon.  Temporality does not exist as a consideration when there is no reasonably reliable adverse effect to consider.

## E. His Biologic gradient/Dose-Response Criterion Appraisal:

- **Error #11 — He again fails to apply this criterion to the epidemiology data.**  Once again he only refers to dose-response studies in animals or to *in vitro* experiments for the TKC features.  But the *biological gradient* analysis under the Hill criteria is specific for an analysis of human evidence, in this case it requires showing a dose-response exists for positive associations with brain cancer.  Again, with no reliable positive associations to consider there is no information to evaluate under the Dose-Response criterion in his first general causation assessment.

## F. His Biologic Plausibility Criterion Appraisal:

- **Error #12 — He starts his discussion with a typographical error indicating much of his text is copied from other text, not drafted from the issue he is discussing.**  His leading sentence is clearly copied from an earlier analysis.  Here for his brain cancer appraisal he states — *As set forth in detail in the Key Characteristics section of this report,*

*there are up to 10 clear biologically plausible mechanisms for these 7 carcinogens to cause
cancer <u>including human kidney cancer</u>.*

- **<u>Error #13 — A redundant use of inappropriate data to consider under the Hill
methodology for establishing human causation.</u>**  Here again he refers to the TKC factors
as providing a plausible mechanism for cancer induction for each of the 7 chemicals rather
than demonstrating brain cancers were observed in animal species for each of his 7
chemicals.

- **<u>Error #14 — His biologic plausibility analysis is based solely on alleged mechanisms
not shown to be a sufficient basis for concluding the chemical will be a human
carcinogen</u>**.  Dr. Panigrahy cannot state which factors in his TKC analysis will actually be
relevant to the actual mechanism by which these 7 chemicals are supposed to be capable
of inducing brain cancer (again see Guyton et al., 2018, Krewski et al. 2019).  While animal
data and mechanistic data from toxicology studies can satisfy the Hill criterion of biologic
plausibility, the plausibility is that the chemical may cause cancer in humans at some
unknown dose and in some unknown tissue.  For these possible modes-of-action (MOAs)
to add to biologic plausibility in a meaningful way they should be reported in studies using
the specific tissue.  He has not shown TKC effects in brain tissue for any of his 7 chemicals.

  Perhaps a clearer and more obvious disconnect between his mechanistic evidence
for biologic plausibility is the fact that brain tumors are not observed in animals or in
humans exposed to these chemicals even though he opines his mechanistic data suggests
they do.  Thus, it is patently obvious that his extrapolation of target-organ specific effects
using his "any TKC evidence satisfies general causation for any target organ" yields
unreliable predictions and contains an unknown error rate.  This is yet another illustration
of why his methodology and assessments cannot be given serious consideration.

- **<u>Error #15 — He alleges a qualitative consistency in the animal and human responses
exists.</u>**  This relates somewhat to his preceding errors under biologic plausibility. He
subsequently states — *Thus, there are no qualitative differences in genotoxicity or
metabolism of certain carcinogens between humans and laboratory animals, and there is
no reason to believe that humans would respond qualitatively differently to these
carcinogens from animals.*  Genotoxicity, by itself, is not predictive of human
carcinogenicity.  Not all mutagens are animal or human carcinogens.  So, this is an
erroneous statement about chemical carcinogens and the reliability of finding a chemical
may be genotoxic in some test system.  Furthermore, even for the genotoxic carcinogens
these chemicals do not always induce the same, specific pattern of cancer in different
animal species, and human cancers can differ substantially from the test-animal responses.
The only qualitative commonality amongst human carcinogens is that they are also animal
carcinogens (albeit arsenic was originally believed to not be a human carcinogen merely
because it could not be shown to cause cancer in animals), but the reverse correlation is not
always true, i.e., animal carcinogens are not always human carcinogens.

- **<u>Error #16 — He erroneously assigns great weight to this criterion</u>**.  It has been shown
that 50% of all chemicals tested will induce some of cancer in animals when the chemicals
are tested at the high doses used in animal cancer bioassays.  So, animal evidence of

carcinogenicity is not particularly unique or specific observation as it may stem for the use of overtly toxic doses that create dose-specific biologic changes that produce cancer only at those doses.  Where biological plausibility adds some possible weight to a causation analysis is in those situations where the mechanism or tumor induction in animals is known and there exists mechanistic evidence humans will have the same pattern of biologic responses to the chemical. But as previously discussed, he did not demonstrate this to be true for any chemical and brain cancer.

Saying the TKC features are important to him may be his opinion, but he has failed to demonstrate why one can expect which factor or combination of factors will be relevant in the brain and induce brain cancer in humans exposed to any one of these 7 chemicals. If his were a meaningful methodology, then why is it that none of the 7 chemicals he discussed are recognized by the general medical/scientific community as brain carcinogens?  Since none of the chemicals are known brain carcinogens the weight one should assign to biologic plausibility here is zero. And once again, as none of these chemicals are recognized brain carcinogens the evidence demonstrates his blind application of the TKC endpoints does not yields a reliable prediction regarding which chemical carcinogen will induce which cancer.

### G. His Coherence Criterion Appraisal:

- **Error #17 — A redundant use of inappropriate data to consider under the Hill methodology for establishing human causation** Again this criterion under the Hill methodology refers to the findings in human not animal studies. He states that — *The cancers induced by these carcinogens are consistent with the generally known facts and biology of cancer.* This is not evidence for coherence for the induction of brain cancer, especially as no chemicals are known to cause brain cancer in humans, and he has alleged inappropriately that only one is alleged to cause brain cancer in animals.  Under coherence he should show how the overall evidence fit together to provide a sufficiently convincing causation opinion.  He has not done this, and one cannot do this with the information he has relied upon.

### H. His Experiment Criterion Appraisal:

- **Error #18 — He failed to provide sufficient evidence to satisfy this criterion.**  The criterion of experiment under Hill is not applicable for most chemical carcinogens (except possibly drugs) because we do not experiment with human subjects.  See the Hill paper for a discussion of what Hill meant as evidence that satisfies this criterion. Although Dr. Panigrahy states he gave less weight to this criterion, it is a criterion that is not applicable in most causal analyses because this kind of data almost never exists. He probably states he gave it less weight because he realizes there will be no evidence he can refer to.  Note that the criterion of *Experiment* was not even discussed by IARC in the preamble of Monograph 130 (see pages 22 and 23 where the Hill criteria are discussed) because observational epidemiology studies are by definition not human experiments and generally do not offer this kind of information.

### I. His Analogy Criterion Appraisal:

- **Error #19 — Another redundant misuse of the Hill Criteria methodology for establishing general causation in humans.**  Under Hill this criterion would deal with

structure activity relationships where the findings in a structurally similar chemical, or chemical with the same mechanism, produces a specific type of cancer and so provides an indication/prediction of what the chemical in question might do.  He did not cite any analogous brain cancer finding for one of the 7 chemicals, or for any structurally similar chemicals. Therefore, no analogies exist under the Hill methodology.  Bizarrely, even though no analogies exist for any of 7 chemicals he has evaluated, he assigned moderate weight of evidence to this criterion. So, he conclusion here is fictional.

### 2.1.3   Summary

The data Dr. Panigrahy considered under all but one of the Hill criteria involved only toxicology data, not the available epidemiology data.  This is not the proper application of the Hill criteria as the IARC discussion in its preamble aptly demonstrates.  The alleged mechanistic data he repeatedly relied upon for a number of his Hill criteria assessments is the kind of data that is only a relevant consideration under the criterion of *biologic plausibility* (as Dr. Kendall has correctly argued).  All other criteria assessments involve the human evidence.  Thus, the 'Panigrahy method' used in his general causation evaluation for brain cancer applied his own unique, nonstandard and unrecognized methodology for assessing general causation which is almost completely based on toxicology data not epidemiologic data.  He did not appropriately apply the Hill criteria and his general causations opinions on which chemicals can induce or contribute to brain cancer are not supported by any recognized authoritative scientific/medical body.

There was a clear and unequivocal ***Bias***[7] in his causation methodology. In his brain cancer assessment Dr. Panigrahy cherry-picked which human, animal, or mechanistic studies he cited as support for his opinions.  He also cherry-picked which results he emphasizes or de-emphasizes in his discussion.  For brain cancer the epidemiology studies he relied upon used weaker epidemiologic study designs and were studies known to provide a lower more limited weight of evidence, as the only literature support he cited for his opinions.  Most of available epidemiologic studies are largely ignored in his analysis nbecause they contradict or do not support his opinions. This alone is a clear violation of the Hill methodology and is inconsistent with methods used in IARC and USEPA cancer hazard evaluations. These authoritative bodies form their causal assessments based on transparently collecting, reviewing, and demonstrating how all the evidence was considered either relevant or not informative.  Not surprisingly, the causal conclusions reached by IARC for each of these 7 chemicals are significantly and substantially from those reached by Dr. Panigrahy.  Finally, the fact that his opinions in general causation report match completely the plaintiffs' litigation needs while a comparison to those reached by IARC did not, should raise concerns from the court regarding his methodology and scientific objectivity.

---

[7] The term "bias" as it is used refers to the epidemiologic definition, i.e., there is an identifiable systematic error in the design of the study or procedure.  The systematic error in the Panigrahy methodology is the fact he cherry picks the papers he relies on and cannot adequately defend his failure to discuss and consider stronger studies whose results he simply ignored.

Appendix K

## 2.2    The Limitations/Errors in Dr. Panigrahy's General Causation Analysis for Anal Cancer

### 2.2.1    General Comments

Dr. Panigrahy states colon and rectal cancers can be lumped together as they are similar tissue types and suggest this means they will respond similarly.  In his introduction on this issue he doesn't even mention anal cancer.  But when he reaches his concluding opinion he switches back from intestinal or colon cancer to rectal cancer to opine solely that his 7 chemicals all cause or contribute to anal cancer (TCE, formaldehyde, arsenic, hexavalent chromium, PCE, 1,1,1-trichloroethane, and styrene).  That he is offering an obviously a flawed analysis that led to a spurious and incorrect opinion is again self-evident evident when his causation opinions on these chemicals are compared to those published by IARC.  In 2022 IARC published a summary of table listing its recognized carcinogenic causes of human cancers by tumor type.  For anal cancer the IARC summary recognizes only viral causes of anal cancers as is shown in the Table taken from IARC below.

| List of classifications by cancer sites with *sufficient* or *limited evidence* in humans, *IARC Monographs* Volumes 1–132[a] | | |
|---|---|---|
| **Cancer site** | **Carcinogenic agents with *sufficient evidence* in humans** | **Agents with *limited evidence* in humans** |
| Rectum | Alcoholic beverages<br>Processed meat (consumption of)<br>Tobacco smoking | Asbestos (all forms)<br>Night shift work<br>Red meat (consumption of)<br>*Schistosoma japonicum* (infection with)<br>X- and Gamma-radiation |
| Anus | Human immunodeficiency virus type 1 (infection with)<br>Human papillomavirus type 16 | Human papillomavirus types 18 and 33 |
| Colon | Alcoholic beverages<br>Processed meat (consumption of)<br>Tobacco smoking<br>X- and Gamma-radiation | Asbestos (all forms)<br>Firefighter (occupational exposure as a)<br>Night shift work<br>Red meat (consumption of)<br>*Schistosoma japonicum* (infection with) |

Source: IARC. Agents Classified by the IARC Monographs, Volumes 1–132. List of Classifications by Cancer Site.

Note that IARC kept their colon, rectal and anal analyses separate rather than combining them as Dr. Panigrahy did.  Further note, that once again no chemicals are even listed as providing limited evidence of a relationship with anal cancer.  Similarly, the IARC summary table lists only alcoholic beverages, processed meat consumption, and tobacco smoking as known causes of human rectal cancer, and these three risk factors plus radiation as identified causes of human colon cancer.  So, there are substances that do have sufficient evidence to support a causal conclusion for these cancer types but there are no industrial chemicals (note: asbestos is a physical agent).  In fact, none of the

34

chemicals Panigrahy argued in his assessment provide sufficient evidence in his Hill criteria evaluation for these cancer types (colon, rectal, and anal cancer) are even listed as agents with 'limited human evidence' for these cancer types.

As already discussed in some detail above, Dr. Panigrahy's unique causation methodology relies heavily on animal or mechanism data as the sole evidence to support most of his Hill criteria opinions.  And as did in his brain cancer analysis, he inappropriately/incorrectly applied the Hill criteria to the data he discussed in his general causation opinions for anal cancer in four basic ways.

1. First, his causation analysis considers all 7 chemicals at once.  This is inappropriate. The IARC and USEPA causation reviews are clear indications these authoritative bodies would never consider an analysis of this type appropriate, not even when analyzing an exposure to a mixture. IARC (2022) in the preamble to Monograph 130 clearly stated that when a mixed exposure is involved an attempt to identify the specific chemical cause is still made. As these chemicals have been evaluated for human cancer causation independently, IARC would determine if these chemicals caused anal (or rectal/colon) cancer when present together based on what cancers the individual chemicals are known to cause anal cancer. As none of these chemicals have been concluded to be capable of causing these cancers, a mixed exposure to these chemicals would not be presumed to somehow induce this cancer type.  Because the mere presence of the TKCs for a given chemical are not used by IARC to promote a lower carcinogenic classification all the way up to Group 1 (known human cause of the cancer type), they again would not do so for a mixture of different carcinogenic chemicals.

2. Second, his only use of the few epidemiologic studies he did discuss in his anal (rectal colon) cancer causation assessment was to suggest the following:
   b. That a single epidemiology study of formaldehyde exposure reported a significant excess of colon (not rectal or anal) cancer.
   c. That several epidemiological studies of persons exposed to perchloroethylene (PCE) reported associations for colon/rectal/anal cancer via an observation of elevated associations for intestinal cancer (so now evidence in another tissue acts a surrogate response for anal cancer).
   d. For the other five chemicals he cites no epidemiological evidence of significant positive or nonsignificant associations with any of these four cancer types.  Here merely states these carcinogens show evidence for many of TKCs MOAs and so can presumably initiate and/or promote cancer in these tissues.

3. Third, he uses the sole existence of animal and/or mechanistic data in his attempt to state he can show support for most of the Hill criteria in his assessment.  The Hill criteria cannot be misused in this manner.  Animal and mechanistic data apply only to a single Hill criterion, that of "Biologic Plausibility." Further this kind of information satisfies this criterion in only a yes/no manner and has no influence on or applicability to the analyses of the human data in the other Hill criteria.

Appendix K

4.  Fourth, as shown below Panigrahy failed to provide the kind of epidemiologic evidence needed to satisfy all the Hill criteria he discussed save one, biologic plausibility.  Therefore, because his general causation opinion for anal cancer misapplied the Hill methodology it is nothing more than unsupported speculation.

Again there is a clear ***Bias***[8] in the 'Panigrahy causation' methodology as is illustrated in the specific comments section. As he did in his brain cancer assessment, Panigrahy's anal cancer assessment is based on a cherry-picked analysis of the human, animal, or mechanistic studies he has chosen to discuss or ignore as the evidentiary support for his opinions.  The available epidemiologic studies are largely ignored because they contradict or do not support his opinions. Both practices are clear violations of the Hill criteria as it applied in the IARC methodology, and in the practice of evidence-based medicine and toxicology.  Again, not surprisingly the causal conclusions reached by IARC for these 7 chemicals are significantly and substantially from those reached by Dr. Panigrahy.  For the human carcinogens IARC noted which specific types of cancer each chemical cause.  Dr. Panigrahy opined they cause every cancer type he considered.  Dr. frequently relied on findings reported in studies with weaker epidemiologic study designs, studies known to provide a lower more limited weight of evidence, as the only literature support for his opinions.  The negative evidence available in studies with stronger experimental designs and providing evidence one can place more confidence in, is completely ignored by Dr. Panigrahy. This a clear violation of accepted causation methodologies but it provides Dr. Panigrahy with a 'methodology' that allows him to conclude any opinion he desires. So, the fact that his opinions match completely the Plaintiffs' litigation needs while a comparison of those from IARC do not should raise concerns from the court regarding his methodology and his scientific objectivity.

### 2.2.2   Specific Comments

**A. His Strength of the Association appraisal:** Under the Hill criteria one is looking for several repeated strong associations. The greater the strength of the association in a well-designed cohort study the more reliable the association is likely to be.

- **Error #1 — He combines cancers found in other tissues of the digestive tract as though a response in this tissue is sufficient evidence rectal tissues will respond the same**.  In his introduction to rectal cancer he states — *The colon and rectum have similarities and are often referred to as colorectal cancers. Colorectal cancer starts in the colon or the rectum. These cancers can also be called colon cancer or rectal cancer, depending on where they start. Colon cancer and rectal cancer are often grouped together because they have many features in common[1047,1048]*  However, the studies he relied upon separated rectal cancers from colon and/or the more general category of "intestinal cancers."  However, Dr. Panigrahy chose to discuss less relevant cancer types as though they represent a finding for

---

[8] The term "bias" as it is used refers to the epidemiologic definition, i.e., there is an identifiable systematic error in the design of the study or procedure.  The systematic error in the Panigrahy methodology is the fact he cherry picks the papers he relies on and cannot adequately defend his failure to discuss and consider stronger studies whose results he simply ignored.

Appendix K

rectal or anal cancer in spite of the fact his study found no significant association for the specific category of rectal cancer [e.g., the Hayes et al. (1990) study on formaldehyde exposed cohorts (see screenshot below) and the Ruder studies on PCE exposed cohorts].

At page 439 of his report Panigraphy states — *A statistically significant excess of colon cancer (PMR = 127) was found after exposure to formaldehyde*[333]. This citation is the proportionate mortality study by Hayes et al. (2009) of embalmers and morticians. As noted elsewhere the proportionate mortality design is a weaker relative risk analysis that one that calculates an SMR or SIR. Table II of this paper (below) lists the PMRs for different cancer types. For "cancer of the rectum" the PMR for whites was not significant (PMR = 112; 95% CI 70-170) based on 22 cancer deaths with 19.6 expected. In addition, the PMR for the small nonwhite group was non-significant (PMR = 234; 95% CI 64-600) and was based on a total of only 4 rectal cancers (with 1.7 expected). It is not clear why Panigrahy failed to mention the rectum cancer PMRs.

**TABLE II. Number of Deaths Observed (Obs) and Expected (Exp) Due to Malignant Neoplasms, Proportional Mortality Ratios (PMR), and Confidence Limits (95%) Among U.S. White and Non-White Embalmers and Funeral Directors, 1975–1985**

| Causes of death (ICDA No.) | Whites | | | | Nonwhites | | | |
|---|---|---|---|---|---|---|---|---|
| | Obs | Exp | PMR | (C.L.: 95%) | Obs | Exp | PMR | (C.L.: 95%) |
| Buccal cavity and pharynx (140–149) | 26 | 21.8 | 119 | 78–174 | 4 | 3.2 | 125 | 34–320 |
| Nasopharynx (147) | 3 | 1.6 | 189 | 39–548 | 1 | 0.25 | 400 | 10–2,229 |
| Digestive organs and peritoneum | | | | | | | | |
| (150–159) | 235 | 215.1 | 109 | 96–124 | 32 | 26.9 | 119 | 81–168 |
| Esophagus (150) | 22 | 19.1 | 115 | 72–173 | 1 | 5.0 | 20 | 1–110 |
| Stomach (151) | 22 | 31.0 | 71 | 44–107 | 2 | 5.4 | 37 | 4–134 |
| Colon (153) | 95 | 80.5 | 118 | 95–144 | 16 | 6.9 | 231 | 132–376 |
| Rectum (154) | 22 | 19.6 | 112 | 70–170 | 4 | 1.7 | 234 | 64–600 |
| Liver and gall bladder (155–156) | 16 | 16.1 | 100 | 57–162 | 1 | 2.5 | 40 | 1–221 |
| Pancreas (157) | 51 | 42.7 | 119 | 89–157 | 8 | 4.8 | 167 | 72–329 |

Source: Hayes et al. (1990).

While Panigrahy is correct that authors combined the white and nonwhite data when discussing their colon cancer results (at page 643 of this paper it states) — *Excesses are also found for cancers of the digestive system among whites and nonwhites, with a statistically significant excess for* **colon cancer** *(PMR = 231) in nonwhites and in the combined study group, PMR = 127 (95% CI:104-153)* — **however, the authors' discussion on this page does not mention whether the combined rectal cancer was significant even though data specific for this cancer type is also found in Table II.** Still the colon and rectal cancer PMRs are decidedly different between the larger whites and smaller nonwhite populations raising some question about the relevance of the combined findings when neither colon nor rectal cancer amongst whites was significant. There are also questions about the smaller nonwhite population results and their susceptibility to chance, bias, or confounding (e.g., demographic differences). Furthermore, the colon and rectal cancers are separated in this study even though Panigraphy suggests they can be combined.

It is clear that Panigrahy ignored the results of other stronger cohort studies that were identified in IARC's 2006 updated evaluation of formaldehyde.  In the overall evaluation section the working group concluded (see page 277, emphasis added) — *A number of studies have found associations between exposure to formaldehyde and cancer at other sites, including the oral cavity, oro- and hypopharynx, pancreas, larynx, lung and brain.* ***However, the Working Group considered that the overall balance of epidemiological evidence did not support a causal role for formaldehyde in relation to these other cancers.*** As anal, rectal or colon cancer are not even mentioned in the summary analysis of the human cancers it is clear to the knowledgeable reader the human formaldehyde studies were NOT sufficient to support causation conclusion for these cancer types.  Thus, it is clear they did not feel formaldehyde causes anal, rectal, or colon cancer.

To summarize, Panigrahy cited the Hayes study, a PMR study that did not report a significant association for rectal cancer, as sufficient evidence under his 'strength of evidence' Hill criterion assessment.  He reached this conclusion even though it was published only three years after the 2006 update by IARC.  This IARC update had evaluated other PMR studies providing similar observations, and had reviewed and evaluated even more SMR/SIR studies, studies one can place greater confidence in.  So, the nonsignificant observation subsequently reported the Hayes et al. (2009) is clearly not enough information to alter the IARC's earlier evaluation of formaldehyde and the cancer types it causes.

- **Error #2 —  His opinion that the human evidence demonstrates PCE causes rectal cancer is similarly flawed.** Panigrahy states — *Epidemiological studies noted positive associations between PCE exposure and several cancers, including colon/rectal (intestinal)[202,679,686-690].  Ruder et al (1994) reported on a cohort study of dry-cleaning workers (1109 women, 592 men) in the mid-1980s which revealed a significant excess of intestinal cancer (26 deaths, SMR = 1.56, 95% CI = 1.02-2.29)[696]. Women had elevated SMRs for intestinal, cancer mortality[696]. This study confirms the risk of intestinal cancers with PCE in this industry[696]. Ruder et al (2001) reported on an update on a cohort of 1,708 dry-cleaning workers, identified from union records, who were exposed to PCE for at least 1 year before 1960[697]. The cohort had excess cancer mortality (271 deaths, SMR 1.25, 95% CI 1.11-1.41)[697]. PCE induced elevated SMRs for intestinal cancer[697].* But a review of the literature Panigrahy cites reveals a flawed and misleading discussion of these studies:

  - Reference #202 is the publication by Guha et al. (2012).  This brief paper summarizes the recent IARC updated evaluations of trichloroethylene (TCE) and PCE.  Nowhere in this summary does it suggest IARC concluded PCE was a human carcinogen, it was classified as a Group 2A chemical.  And nowhere in this summary is it suggested PCE has even limited evidence for anal or rectal cancer.  Thus, this paper provides <u>No Support</u> for his suggestion there exist strong associations between PCE and rectal cancer.

  - Reference 686 is the Purdue et al. (2017) study.  The title of this paper indicates this study is actually a case-control study of solvents and kidney cancer, not rectal cancer.

38

- References 687-688 are two publications by Aschengrau et al. (1998, 2002), but these studies investigated a possible association between environmental exposure to PCE via drinking water and breast cancer.  They provided no information on rectal cancer.

- Reference 689 is an ecological study by Paulu et al. (1999).  Ecological studies are a hypothesis generating study design not a hypothesis testing study design.  As the IARC 2022 preamble noted they are susceptible to bias and confounding.  This weak study attempted to examine possible associations between exposure to PCE via drinking water and four cancer types (brain, colon/rectal, lung, and pancreas)[9].  Although these investigators failed to report a single significantly elevated odds ratio for the many latency periods and different exposure levels that they evaluated for cancers of the colon/rectum, they still stated their results possibly represented an association between PCE and colon-rectum cancer.  This is a study of poor quality, and ecological studies typically do not provide the kind of sufficient evidence one needs to establish causation.

- Reference 690 is the study by Vlaanderen et al. (2013).  This study of Nordic workers exposed to either TCE or PCE examined potential associations between these two chemicals and four cancers (liver, lymphoma, multiple myeloma, and kidney) but did not even consider the issue of rectal cancer.

- References #696 & 697 are the only two occupationally exposed PCE cohorts listed as Panigrahy's literature support for this Hill criterion.  Ruder et al. (1994; his #696) is an update of the earlier Brown and Kaplan cohort of dry-cleaning union workers.  This update split the cohort into two subcohorts, one containing those union workers exposed to PCE only (PCE-only subgroup) and one containing those workers exposed to PCE and other unknown cleaning agents (PCE-plus subgroup).  Table 2 lists the SMRs and CIs for the entire cohort; Table 4 lists the SMRs and CIs for the PCE-only subcohort and the PCE-plus subcohort.  The results observed for the two subcohorts are decidedly different, and Dr. Panigrahy provided a misleading discussion of this study's results.  The PCE-only group had no elevated risks of total cancer, intestinal cancers, or rectal cancers.  The PCE-plus group had significantly elevated risks of total cancer and intestinal cancers, but not rectal cancers (see screenshot below of Table 4).

---

[9] It is noted that this study reported no evidence of an association between PCE exposure and brain cancer.  All odds ratios calculated for the brain cancer cases were 1.0 or lower (see Table 1 of this paper).  Not surprisingly this negative evidence for one of Panigrahy's 7 carcinogens was never considered or discussed in his brain cancer assessment.  In fact, PCE was not even discussed as a chemical for which any associations with brain cancer existed.  In addition, another Panigrahy reference, Ruder et al. (2013), found no brain cancer associations in workers exposed to carbon tetrachloride, chloroform, methylene chloride, trichloroethylene, tetrachloroethylene or 1,1,1-trichloroethane.  This study is a strong contradiction to his opinion that TCE, PCE and 111-TCA cause/contribute to brain cancer but also was never mentioned or discussed in Panigrahy's general causation assessment for his 7 chemicals and brain cancer.

Appendix K

**TABLE 4**

Cancer Mortality in the Perchloroethylene (PCE)-only and PCE-plus Subcohorts,* for Selected Sites

| Cancer Site | PCE-only | | | PCE-plus | | |
|---|---|---|---|---|---|---|
| | Number | Standardized Mortality Ratio | 95% Confidence Interval | Number | Standardized Mortality Ratio | 95% Confidence Interval |
| Buccal cavity and pharynx | 3 | 2.51 | 0.52–7.33 | 3 | 1.22 | 0.25–3.56 |
| Tongue | 2 | 7.25 | 0.88–26.2 | 1 | 1.75 | 0.04–9.74 |
| Digestive organs | 11 | 0.75 | 0.38–1.35 | 52 | 1.56‡ | 1.16–2.04 |
| Esophagus | 4 | 2.64 | 0.72–6.76 | 6 | 1.90 | 0.69–4.14 |
| Stomach | 0 | 0.00 | | 5 | 0.87 | 0.28–2.04 |
| Intestine, except rectum | 5 | 1.00 | 0.32–2.33 | 21 | 1.81† | 1.12–2.76 |
| Rectum | 0 | 0.00 | | 5 | 1.81 | 0.58–4.22 |
| Pancreas | 2 | 0.73 | 0.09–2.62 | 13 | 2.08† | 1.11–3.55 |

Source: Ruder et al. (1994).

Why Panigrahy reported the intestinal cancer data which is clearly marked in these tables as all intestinal cancers *minus* the rectal cancers is unfathomable, but again it he approaches general causation evaluations in a biased and deceptive manner. Because the results for the two subcohorts are decidedly different this study's result are not internally consistent, and the only objective deduction from these results is that the increased risks consistently seen in the cancer mortality of the PCE-plus group is unrelated to their PCE exposure. In addition, Table 2 provides the SMR results for the male and female subgroups (see screenshot below of Table 2). A brief review of this table indicates the slight elevation in the rectal cancer results stems from a single additional unexpected cancer occurring in the female subgroup (essentially two cancers were expected in both the male and female subgroups). Given that the total cancer deaths are 5, a very small number, this study provides absolutely no evidence that PCE causes rectal cancer and the intestinal cancers Panigrahy discusses are not relevant to this evaluation.

**TABLE 2**

Cancer Mortality for Dry-cleaning Workers (through December 30, 1990)

| Cause of Death | International Classification of Diseases Codes (9th Rev) | Entire Cohort (n = 1,701) | | | Women (n = 1,109) | | | Men (n = 592) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Deaths | Standardized Mortality Ratio | 95% Confidence Interval | Deaths | Standardized Mortality Ratio | 95% Confidence Interval | Deaths | Standardized Mortality Ratio | 95% Confidence Interval |
| Buccal and pharynx | 140–149 | 6 | 1.64 | 0.60–3.56 | 1 | 0.77 | 0.02–4.25 | 5 | 2.12 | 0.69–4.95 |
| Tongue | 141 | 3 | 3.54 | 0.73–10.4 | 0 | 0.00 | | 3 | 5.48* | 1.13–16.0 |
| Digestive organs | 150–159 | 63 | 1.31* | 1.01–1.68 | 37 | 1.48* | 1.04–2.04 | 26 | 1.13 | 0.74–1.66 |
| Esophagus | 150 | 10 | 2.14* | 1.02–3.94 | 5 | 3.24* | 1.05–7.58 | 5 | 1.60 | 0.52–3.73 |
| Stomach | 151 | 5 | 0.61 | 0.20–1.43 | 3 | 0.86 | 0.18–2.53 | 2 | 0.43 | 0.05–1.54 |
| Intestine (except rectum) | 152–153 | 26 | 1.56* | 1.02–2.29 | 17 | 1.69 | 0.98–2.70 | 9 | 1.37 | 0.63–2.61 |
| Rectum | 154 | 5 | 1.27 | 0.41–2.97 | 3 | 1.47 | 0.30–4.30 | 2 | 1.05 | 0.13–3.80 |

Source: Ruder et al. (1994).

- Ruder et al. (2001; his #697) is another update of this dry-cleaner cohort (Ruder et al., 1994; Panigrahy's #696 discussed above). For this study, he mentions an excess in deaths for the category of "All cancers" (not cancer-specific; 271 deaths, SMR = 1.25, 95% CI 1.11-1.41) and an elevated SMR for intestinal cancer. SMRs for the total cohort are provided in Table II of the study. Table IV (see below) showed SMRs for various cancer for the PCE and PCE-plus subcohorts. As with the earlier

Appendix K

evaluation of this cohort, there were still zero (0) cases of rectal cancer in the PCE-only exposed subcohort, and no significant elevation for the PCE-plus subcohort. No discussion was even provided for rectal cancer in this paper, probably because the focus of this update was those cancer types elevated in the previous update. Once again Dr. Panigrahy's discussion of the intestinal (minus rectal) cancer findings are again not relevant to the assessment of rectal/anal cancer risk he stated he was attempting.

| TABLE IV. Dry Cleaners, USA: Mortality in the PCE-only and PCE + Subcohorts[a] for Selected Causes | | | | | | |
|---|---|---|---|---|---|---|
| | **PCE-only** | | | **PCE-plus** | | |
| Cause of death | n | SMR | 95% CI | n | SMR | 95% CI |
| Tongue cancer | 3 | 9.03[c] | 1.86–26.39 | 2 | 3.04 | 0.37–10.99 |
| Esophageal cancer | 5 | 2.65 | 0.85–6.20 | 9 | 2.40[b] | 1.10–4.56 |
| Intestinal cancer | 8 | 1.18 | 0.51–2.33 | 24 | 1.63[b] | 1.04–2.42 |
| Rectal cancer | 0 | | | 7 | 2.16 | 0.86–4.45 |

Source: Ruder et al. (2001).

- **Error #3 — Suggesting single, nonsignificant observations satisfy the Hill criterion "Strength of the Association."** As I noted earlier, (see Taubes, 1995) more than 25 years ago by epidemiologists discussing what makes a single observation reliable stated they would not get excited about a single significant finding, especially if the increased risk was not unexpectedly large (greater than 3-fold or more). This is because it is hard to control for confounding, bias etc. in a single study. Boffetta et al. (2008) is a more recent review similarly discussing why an initial single significant finding can ultimately be shown to be in error.

  His contention that there is sufficient evidence for formaldehyde and PCE when his supporting studies rest solely on a PMR study of formaldehyde that did not report a significant association for rectal cancer, and a poorly designed ecological study on PCE (and unknown other environmental exposures) that failed to report a single significant association between PCE and colon-rectal cancer in the many statistical analyses these investigators performed. Although some elevated but not significant relative risk were observed in the Paulu study, the two Ruder studies of dry-cleaning workers he also discussed did not find or report any meaningful suggestion of a rectal cancer association.

  So, as he did in his brain cancer assessment, Panigrahy has again essentially based his entire argument for his strength of association criterion assessment on a single study of nonsignificant findings for the two chemicals he discusses. Such limited evidence does not represent a sufficient basis for concluding there is a "strength of evidence" conclusion under the Hill methodology for these two chemicals let alone for all 7 chemicals.

- **Error #5 — IARC's 2022 summary of known carcinogens by cancer site does NOT list any of the 7 chemicals Panigraphy evaluated as yielding even limited evidence for rectal cancer.** Clearly his methodology and sufficient level of evidence are not consistent with those employed by experienced epidemiologists.

41

**Error #6 — He reports no associations (for TCE, arsenic, hexavalent chromium, 111-TCA, or styrene) but argues the insufficient evident for the 2 chemicals he did discuss provides sufficient, strong evidence for all 7 chemicals.** For the remaining 5 chemicals he speculated the animal and mechanistic data somehow replace the lack of epidemiological evidence on the remaining 5 chemicals for the 'strength of association' Hill criterion. This is not consistent with the IARC causation method nor the Hill criteria methodology. He simply has no reasonable scientific basis for this 'leap of faith' extrapolation. Carcinogens may induce different patterns of effects both in different animal species, and animal findings do not always predict the human response. A simple review of the IARC monographs of the chemicals this organization has studied illustrates why his speculative analogy is unreliable.

**B. His Consistency of the Association appraisal:**

- **Error #7 — Ignores the lack of consistency in the epidemiology literature**. The consistency of the association under Hill methodology refers to seeing consistent significantly positive associations in the epidemiology literature, especially across different studies and different experimental designs. But his preceding summary clearly demonstrates he did not find any significantly positive associations in the epidemiology literature for rectal cancer for any of the 7 chemicals he evaluated. Therefore, he clearly cannot demonstrate a consistency in the epidemiologic literature exists for positive associations for this cancer type.

- **Error # 8 — He inappropriately cites no animal studies when he states animal studies demonstrate these chemicals induce intestinal (anal) cancer in animals.** He states — *Many animal studies have demonstrated that these carcinogens can induce intestinal (e.g., anal) cancer in animals.* But he failed to cite any references supporting this statement which suggests there either were no studies or not studies for all 7 of his chemicals of concern. Furthermore, animal pathologists would not consider intestinal tumors in animals as reasonable evidence the chemical also causes anal cancers in animals. During the performance of a chronic cancer bioassay for cancer it would be inappropriate for the pathology group to ignore the evaluation of anal tumors if present, especially if they were occurring at a significantly greater rate than the historical rates for the control animals. Thus, the lack of references indicating any of his 7 chemicals cause anal tumors shows once again has speculated inappropriately in an attempt to support the ultimate general causation opinion he desires.

  He follows the preceding unsupported statement with the following comment – *Formaldehyde induces concentration-related increases in squamous cell carcinomas (SCCs) in rats[324]. There are readily available animal models for anal cancer. Thus, exposure each of human carcinogens such as formaldehyde supports this BH criterion of causation given the increase of cancer incidence. The epidemiology studies together with the consistent association between carcinogen exposure and cancer, studied by several researchers using different study designs over several decades is significant and gives moderate support in favor of a causal association.* But the reference to formaldehyde-induced squamous cell carcinomas in rats (Monticello et al., 1996, his #324) involves nasal tumors. This study has no bearing on rectal tumor formation in this species. Thus, the

totality of his evidence under the criterion of *consistency* is that the fact that chemicals causing human cancer also cause cancers at some site in animals.  But as IARC (2022) preamble noted when the human evidence for a specific tissue is lacking it cannot be reliably predicted from the animal studies alone, not even when the target organ of interest is seen in the animal studies.[10]

## C. His Specificity Criterion Appraisal – Error #9:

- Under Hill this criterion refers to observing evidence for a specific effect or pattern of effects. Because the specific pattern of human (and animal) cancers caused by his 7 chemicals differ, a fact that argues against his opinions, he gave this criterion little weight in his evaluation.

## D. His Temporality Criterion Appraisal – Error #10:

- Under Hill this criterion is again for the epidemiology studies to be considered not for animal studies.  As stated before, without it the reported association, animal or human, is meritless and receives no consideration.  Thus, his conclusion that exposure always preceded the observation of cancer in all human and animal studies is of actual little probative value in his analysis.

## E. His Biologic Gradient/Dose Criterion Appraisal:

- **Error #11 — He again fails to apply this criterion to the epidemiology data**.  Once again it appears he is only referring to dose-response studies in animal or *in vitro* experiments for the TKC features.  Regarding the animal data, only studies involving hexavalent chromium ($Cr^{+6}$) were discussed.  No intestinal tumors were discussed for any other chemical.  There is no explanation as to why the results for chromium can be readily assumed for his other six chemicals of concern (CoCs), or how intestinal tumors in rats provides dose-response data for human anal cancer.

  Regarding his mechanistic data discussions they are also incomplete.  For example, he discussed a chromium study he states showed a dose-response relationship in the blood for oxidative stress (his #649, Hu et al., 2022).  But he does not mention here a study of a similar nature by Toraason et al. (2003) who investigated whether PCE cause oxidative stress damage in leucocytes from dry cleaners exposed occupationally.  This study reported a reduction in oxidative DNA damage was seen in those exposed to PCE compared to those launders who were not.  So, while he generalizes mechanistic studies for one of his 7 chemicals can be assumed to predict the same occurrence of effects for his remaining chemicals of concern, this negative study demonstrates errors occur after making this assumption.  Therefore, it is clear he does not know the error rate for his assumed extrapolations.

---

[10] See page 24 of the IARC 2022 preamble.  See also Haseman JK, AM Lockhart. 1993. Correlations between chemically related site-specific effects in long-term studies in rats and mice. Environ. Health Perspect. 101:50-54. Haseman JK, Huff JE. 1987. Species correlation in long-term carcinogenicity studies. Cancer Lett 37:125-132. Huff J, Haseman J. 1991. Long-term chemical carcinogenesis experiments for identifying potential human cancer hazards: Collective database of the National Cancer Institute and National Toxicology Program (1976–1991). Environ Health Perspect. 96:23-31.

- **Error #12 — <u>He reiterates his unsupported belief there are no qualitative differences between animal and humans</u>**. He subsequently states — *Thus, there are no qualitative differences in genotoxicity or metabolism of certain carcinogens between humans and laboratory animals, and there is no reason to believe that humans would respond qualitatively differently to these carcinogens from animals*. This statement is misleading because he does not mention specifically what information is measured to assess qualitative equivalence between species. Here he can only argue the gross hazard, cancer, is the same hazard seen in animals and humans, but he cannot argue the same tissues are affected or that risks per unit of dose are the same. Carcinogens do not always induce the same pattern of cancer in different animal species or even across different strains of the same species. Human cancers can differ substantially from most or all test animal responses. The only qualitative commonality is human carcinogens are also animal carcinogens (albeit arsenic was originally believed to not be a human carcinogen merely because it did not cause cancer in animals), but the reverse correlation is not always true, i.e., animal carcinogens are not always human carcinogens. His measurement of qualitative equivalence was not defined and he provided no information to support this statement.

## F. His Biologic Plausibility Criterion Appraisal:

- **Error #13 — <u>His leading sentence is clearly copied from an earlier analysis.</u>** As in his brain cancer discussion, his appraisal here for rectal cancer and the criterion of biological plausibility he states (emphasis added) — *As set forth in detail in the Key Characteristics section of this report, there are up to 10 clear biologically plausible mechanisms for these 7 carcinogens to cause cancer including human **kidney** cancer.* The remaining text clearly appears to be summary statements about the TKC effects he previously summarized when he discussed each chemical and is just another redundant discussion showing he feels "mechanistic" information allows him to conclude these chemicals (or any carcinogenic chemical) can cause cancer in very tissue of the body.

- **Error #14 — <u>His biologic plausibility analysis is based solely on alleged mechanisms not shown to be a sufficient basis for concluding the chemical will be a human carcinogen</u>**. The clear and obvious disconnect between his evidence for biologic plausibility and what ultimately occurs in animals and humans exposed to these chemicals is a clear demonstration his "TKC method" is unreliable and contains an unknown error rate. Although he consistently argues redundantly that chemicals with these characteristics can cause anal cancer, none of the chemicals has been concluded by any authoritative body of scientists to cause anal cancer in an animal species or in humans. This is a clear illustration that his methodology is seriously flawed and had an unknowable error rate.

- **Error #15 — <u>He reiterates his unsupported belief there are no qualitative differences between animal and humans</u>**. He subsequently states — *Thus, there are no qualitative differences in genotoxicity or metabolism of certain carcinogens between humans and laboratory animals, and there is no reason to believe that humans would respond qualitatively differently to these carcinogens from animals*. This statement is misleading because he does not mention specifically what information is measured to assess qualitative equivalence between species. Here he can only argue the gross hazard, cancer, is the same hazard seen in animals and humans, but he cannot argue the same tissues are affected or

that risks per unit of dose are the same.  Carcinogens do not always induce the same pattern
of cancer in different animal species or even across different strains of the same species.
These variations in species responses are even though - *there are no qualitative differences
in genotoxicity or metabolism of certain carcinogens between humans and laboratory
animals* – as he stated.  The type/pattern of human cancer induced by a chemical can differ
substantially from most or all test animal responses.  The only qualitative commonality is
human carcinogens are also animal carcinogens (again, albeit arsenic was originally
believed to not be a human carcinogen merely because it did not cause cancer in animals),
but the reverse correlation is not always true, i.e., animal carcinogens are not always human
carcinogens.  His measurement of qualitative equivalence was not defined, and he provided
no specific information to support this statement.

- **Error #16 — He assigns great weight to this criterion**.  As stated elsewhere it has been
  shown that 50% of all chemicals tested will induce some of cancer in animals when the
  chemicals are tested at high doses.  So, animal evidence of carcinogenicity is not
  particularly unique and not particularly meaningful regarding the actual human responses,
  especially at doses lower that those required to yield a carcinogenic response in the test
  animal.

  Biological plausibility really adds meaningful weight to a causation analysis only in
  situations where the mechanism or tumor induction in animal is well described and there
  exists mechanistic evidence that strongly suggests the same chain-of-events producing
  cancer in animals will be expected to occur in humans.  But he did not demonstrate this
  phenomenon exists for any of his 7 chemicals and anal cancer.  Again, as none of these
  chemicals are recognized colon, rectal, or anal carcinogens by IARC, the empirical
  evidence demonstrates his blind application of the TKC endpoints as the support for his
  opinions provides no reliable method for predicting which chemical carcinogen will induce
  cancer in a specific tissue.  If he was providing a reliable causation methodology, why then
  is it none of the 7 chemicals he discussed are recognized by the general medical/scientific
  community as anal, or even rectal, carcinogens.


## G. His Coherence Criterion Appraisal:

- **Error #15 — He again misapplies this criterion to a mix of nonspecific human, animal
  and mechanistic data**.  Again under Hill this refers predominantly to evidence from the
  epidemiology studies. He states that — *The cancers induced by these carcinogens are
  consistent with the generally known facts and biology of cancer.*  This does not show there
  is a *coherence of the evidence* for the induction of anal cancer, particularly when none of
  his chemicals is recognized as causing anal cancer in humans or animals.  The fact that the
  human and animal cancer patterns are different across his seven chemicals demonstrates
  the biologic changes induced by each chemical are not the same in every species
  contradicting his opinion that coherence is satisfied biologically.

## H. His Experiment Criterion Appraisal:

- **Error #16 — He does not understand the limited applicability of this criterion to most
  causal analysis of carcinogenic hazards**.  The criterion of experiment under Hill is not
  applicable for most chemical carcinogens (except possibly drugs) because we do not

experiment with human subjects.  Although he states he gave less weight to this criterion, it is a criterion that is not even applicable in most causal analyses because this kind of data almost never exists. The fact that hi does not seem to recognize this raise questions regarding his understanding of the Hill criteria and how they are used.

**I. His Analogy Criterion Appraisal:**

- This Hill criterion deals with structure activity relationships where the findings in structurally similar chemical, or a chemical with the same mechanism, can provide reasonably reliable insight as to what possible effects) here human carcinogenicity potential) the chemical in question might induce in humans.  As there are no chemical causes of anal cancer, or even rectal cancer, no relevant chemical analogies are even possible.  Yet even though no analogies exist he assigns moderate weight to this criterion. So, once again his opinions and the weight he applies to the evidence here is fictional.

Overall his analysis is not sufficiently transparent, and because he cannot find applicable epidemiology data, in spite of the fact they are required in the Hill methodology, he inappropriate applies toxicological evidence of unknown relevance to the human outcome in question. The data he considered under all but one of the Hill criteria involved only toxicology data not the epidemiology data that is available as he should have.  The alleged animal and mechanistic data he relied upon is the kind of data that is only a relevant consideration under the criterion of *biologic plausibility* (as Dr. Kendall has correctly argued).  All other Hill criterion assessments involve the human evidence.  To summarize, his analysis rested on his own unique, nonstandard, and unrecognized methodology for assessing general causation.  He did not appropriately apply the Hill criteria as he should have.  His general causations opinions on which chemicals can induce or contribute to anal cancer are not supported by any recognized authoritative scientific/medical body and so would not be accepted by the general medical and scientific community.  He referred to animal and MOA data without citing/providing a clear and scientifically supported mechanism detailing how these led to cancer induction at the tissue of interest.  This simplistic and subjective approach is not recognized in the scientific community as leading to conclusions that can be stated to a more probable than not certainty.

**3.0    How IARC Has Used Mechanistic Data to Upgrade Carcinogen Classifications: Past and Present.**

Dr. Panigrahy has stated repeatedly that his approach to general causation is like that used of IARC.  He has also repeatedly stated the three of his 7 carcinogens (i.e., PCE, styrene and TCA), which had been classified as Group 2 carcinogens by IARC at the time he wrote his first general causation report, are all actually human carcinogens in his opinion (which means IARC errored in not placing them in Group 1).  He reached this divergent conclusion on the basis that these chemicals have a number of then key characteristics (TKCs).  Given that Dr. Panigrahy has adopted a unique causation methodology whereby he can upgrade the carcinogen classification to Group 1, solely on the basis of the chemical of it having TKC, it is instructive to review how the

IARC working groups have used TKC data in IARC evaluations performed after the concept of the TKCs was introduced.  It is also instructive to review how mechanistic data was used to upgrade classification before the concept of summarizing TKC data was developed.

**3.1    Carcinogen Classifications Upgraded to Group 1, 2A, or 2B for Mechanistic Reasons by IARC in 2012**

As of 2012 IARC had used mechanistic considerations for several chemicals to upgrade their final carcinogen classification hazard of the chemical.  These chemicals and the mechanistic basis used to upgrade each chemical are shown below.

<u>Aristolochic acid — IARC Monograph 100A:</u>
Although there was limited human evidence for aristolochic acid alone induced cancer in humans, IARC upgraded aristolochic acid to a group 1 carcinogen on the following basis.  There was sufficient human evidence of cancer (renal and ureter cancer) for the human use of plant mixtures that contained this chemical.  There was also sufficient animal carcinogenic evidence from plant extracts containing aristolochic acid.  The same DNA mutation spectra seen in the TP53 suppressor genes of urothelial cancer tissue from patients suffering from aristolochic acid induced nephropathy had been observed in animals exposed to natural mixtures containing this chemical.  So, by the Hill criterion of *analogy* there was a sufficient basis for upgrading this chemical to Group despite the limited human evidence showing it was carcinogenic.

<u>Etoposide — IARC Monograph 100A:</u>
Although there was limited evidence that etoposide alone induces cancer in humans and inadequate animal evidence on this drug, IARC upgraded etoposide to a group 1 carcinogen on the following basis.  There was sufficient human evidence that the cancer therapeutic mixture of the drugs etoposide, bleomycin and cisplatin cause acute myelogenous leukemia in human.  In the earlier IARC evaluation of this combination there was insufficient evidence to determine which component(s) of the mixture was causing the cancer as all three drugs are genotoxic.  At the time of this re-evaluation, however, genetic evidence derived from the drug-induced cancers had been shown to mimic the kind of genetic changes associated only with etoposide's genotoxicity (11q23 translocations, and localized breaks in the MLL gene) thereby allowing the IARC working group to identify the exact culprit in the combined therapeutic regimen.

<u>Dyes metabolized to benzidine (i.e., Direct Black 38, Direct Blue 6, and Direct Brown 95) — IARC Monograph 100F:</u>
Although there was inadequate human evidence for the three dyes, this group of three dyes were upgraded by IARC to Group 1 carcinogens.  The basis for this upgrade consisted of the sufficient animal evidence for these chemicals, and the strong mechanistic evidence indicating these dyes are converted by azoreduction to the human carcinogen benzidine in both humans and animals.

<u>4,4′-Methylenebis(2-chlorobenzenamine) (MOCA) — IARC Monograph 100F:</u>
While there was inadequate evidence of carcinogenicity in human studies this chemical was upgraded to a group 1 carcinogen for the following reasons. There was sufficient animal evidence of carcinogenicity combined with metabolism and genotoxicity studies showing this substance

induced the same biologic changes seen with aromatic amines that are known to cause bladder
cancer in humans.

**Ethylene oxide — IARC Monograph 100F:**
There was only limited evidence of human carcinogenicity but sufficient animal evidence of carcinogenicity (blood cancers and possibly breast cancer).  This chemical was upgraded to Group 1 because there was strong evidence that it acts as a direct-acting alkylating agent, with both mutagenic and clastogenic effects observed at all phylogenetic levels.   Thus, the potent genotoxicity of this chemical was concluded to be a sufficiently compelling factor.

**Benzo(a)pyrene — IARC Monograph 100F:**
There were no epidemiologic studies on benzo(a)pyrene specifically.  However, a specific DNA adduct of a benzo(a)pyrene metabolite had been extensively studied, and benzo(a)pyrene exposure has been linked to mutations in the K-RAS oncogene and in the TP53 tumor suppressor gene of human lung tumors.  Given the strong and extensive experimental evidence for the carcinogenicity of benzo(a)pyrene in many animal species, which is supported by the consistent and coherent mechanistic evidence from experimental and human studies, IARC concluded there was sufficient biological plausibility to support the overall classification of benzo[a]pyrene as a human carcinogen (Group 1).  This was supported by rare use of the Hill criterion of analogy, i.e., the observation that many complex mixtures of PAHs containing benzo(a)pyrene are associated with an increased risk of human cancer.

**NNK (N′-nitrosonornicotine) and NNN (4-methylnitrosamino-1-3-pyridyl-1-butanone) — IARC Monograph 100E:**
There is inadequate evidence in humans for the carcinogenicity of N′-nitrosonornicotine (NNK) and 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone (NNN).  There is sufficient animal evidence of carcinogenicity for both chemicals. They were upgraded to group 1 because they are the two most abundant strong carcinogens in smokeless tobacco combined with the fact that their uptake and bioactivation has been clearly documented in smokeless tobacco users.

## 3.2.   The Two Carcinogens Whose Classifications were Upgraded to Group 1 for Mechanistic Reasons by IARC in 2016

**Coplanar PCB Congeners – IARC Monograph 107**
The dioxin-like PCB congeners (i.e., PCB-77, PCB-81, PCB-105, PCB-114, PCB-118, PCB-123, PCB-126, PCB-169, PCB-156, PCB-157, PCB-167, PCB-189) were classified as carcinogenic to humans (Group 1).  Although there was insufficient human evidence for these individual PCB congeners, there is strong mechanistic evidence these congeners act via an Ah-receptor mediated mechanism that is identical to the one described for the human carcinogen to 2,3,7,8-tetrachlorodibenzo-para-dioxin (TCDD), and these effects may be at least a partial explanation for human carcinogenicity observed with exposure to commercial PCB mixtures.

**2,3,4,7,8-Pentachlorodibenzofuran – IARC Monograph 107**
Although there was insufficient human evidence for this PCDF congener, there was strong animal and mechanistic evidence these this dibenzofuran congener induces cancer via the Ah-receptor mediated mechanism that has been described for the human carcinogen 2,3,7,8-tetrachlorodibenzo-para-dioxin (TCDD).

### 3.3    Carcinogen Classifications Upgraded for Mechanistic Reasons by IARC after 2016

A recent review by Guyton et al (2018) summarized the 34 chemical evaluations IARC completed in IARC monographs 112—119.  Of the 34 chemicals evaluated in these monographs, only two had their carcinogen classifications upgraded based on mechanistic considerations (2/34 = 5.8%).  In both instances that evidence from the three data streams would have led to a 2B classification of the chemical, but in these two instances the IARC working group felt there was enough mechanistic information to upgrade the chemical to 2A.  The two chemicals and the basis for the upgrade are provided below:

**Tetrabromobisphenol A — IARC Monograph 115 (2018):**
There was inadequate human evidence of carcinogenicity combined with sufficient evidence in animals. However, the IARC working group felt there was strong mechanistic information that this chemical operated through three characteristics that can be operative in humans warranting an upgrade from Group 2B to Group 2A. Specifically, evidence for human nuclear receptor mediated effects combined with the induction of oxidative stress and immunosuppression.  However, it is also notable that a minority of the working group did not support this upgrade.

**3,3',4,4'-Tetrachloroazobenzene — IARC Monograph 117 (2019):**
There is inadequate human evidence of carcinogenicity for 3,3',4,4'-Tetrachloroazobenzene (TCAB).  There is sufficient evidence that TCAB is carcinogenic in animals.  The working group upgraded this chemical from Group 2B to Group A on the basis of its ability to activate the Ah-receptor and sharing the mechanism for the human carcinogen TCDD (dioxin).

Given the Guyton et al (2018) paper had failed to find any IARC Working Group upgrading a 2A/2B chemical to a Group 1 classification (as Panigraphy did with PCE, styrene, 1,1,1-TCA) it was instructive to review the remaining monographs published to date (Volumes 120-132).  Some 50 [not including occupational exposure as firefighter] different chemicals were evaluated or re-evaluated in Volumes 120-132.  Of these 50 chemical evaluations only the classifications of 7 chemicals were upgraded by the IARC Working Group.  Five chemicals were upgraded from a classification of 2B to 2A (glycidyl methacrylate, acrolein, cobalt metal, soluble cobalt (II) salts, and trivalent antimony) based on their strong chemical reactivity, two chemicals were upgraded from Group 3 to 2B because the mechanistic data was persuasive enough to believe there should be sufficient animal evidence available should sufficient animal testing of the chemical ultimately be performed.

**Glycidyl methacrylate — IARC Monograph 127 (2021):**
There is inadequate human evidence of carcinogenicity data but sufficient animal evidence of carcinogenicity for glycidyl methacrylate.  However, the IARC Working Group concluded in the 'Evaluation and Rationale' section an upgrade from 2B to 2A was warranted given that — *There was strong mechanistic evidence, based on two distinct topics. There is strong evidence that glycidyl methacrylate belongs, based on mechanistic considerations, to a class of reactive glycidyl epoxides for which one member, glycidol, has been classified as probably carcinogenic to humans.*

Appendix K

—And— *There is also strong evidence in primary human cells that glycidyl methacrylate exhibits key characteristics of carcinogens; glycidyl methacrylate is genotoxic in all available tests in human primary cells, supported by consistent findings across several different test systems in various species.*

**Acrolein — IARC Monograph 128 (2021):**
There is inadequate human evidence of carcinogenicity data but sufficient animal evidence of carcinogenicity for acrolein.  However, the IARC Working Group concluded in the 'Evaluation and Rationale' section that a classification upgrade from 2B to 2A was warranted given that — *The* Group 2A *evaluation for acrolein is based on sufficient evidence of cancer in experimental animals and strong mechanistic evidence.  . . . .  There is* strong evidence *that acrolein exhibits multiple key characteristics of carcinogens, primarily from studies with human primary cells and studies in experimental systems, supported by studies in humans for DNA adducts.*

**Crotonaldehyde — IARC Monograph 128 (2021):**
There is inadequate human evidence and only limited animal evidence of carcinogenicity for crotonaldehyde.  But the IARC Working Group concluded in the 'Evaluation and Rationale' section that a classification upgrade from 3 to 2B was warranted given that — *The* Group 2B *evaluation for crotonaldehyde is based on strong mechanistic evidence. There is* strong evidence *in human primary cells that crotonaldehyde exhibits key characteristics of carcinogens; crotonaldehyde is electrophilic and genotoxic. It also induces oxidative stress and induces chronic inflammation in experimental systems. In addition, there is supporting evidence from studies in humans for DNA adducts.*

**Acroline — IARC Monograph 128 (2021):**
There is inadequate human evidence and only limited animal evidence of carcinogenicity for acroline.  But the IARC Working Group concluded in the 'Evaluation and Rationale' section that a classification upgrade from 3 to 2B was warranted given that — *The* Group 2B *evaluation for arecoline is based on strong mechanistic evidence. There is* strong evidence *in human primary cells that arecoline exhibits multiple key characteristics of carcinogens; arecoline is electrophilic; it is genotoxic; and it induces oxidative stress. It also alters DNA repair or causes genomic instability in experimental systems.*

**Cobalt metal — IARC Monograph 131 (not published):**
The final monograph has not been published for this meeting yet. This information is based on the Lancet summary article (Karagas et al., 2022) and the IARC Q&A (2022) document on this meeting.  Cobalt metal was classified as Group 2A based on sufficient animal evidence, and the KCC evidence was strong for human primary cells and experimental systems for oxidative stress, and in experimental systems for chronic inflammation and alterations in cell proliferation, cell death, or nutrient supply. There was inadequate evidence for cancer in humans. It had been previously evaluated in 2003 and classified as a Group 2B.

**Soluble cobalt (II) salts — IARC Monograph 131 (not published):**
The final monograph has not been published for this meeting yet. This information is based on the Lancet summary article (Karagas et al., 2022) and the IARC Q&A (2022) document on this meeting. Soluble cobalt (II) salts were classified as Group 2A based on sufficient animal evidence, and strong mechanistic evidence. In multiple studies with human primary cells, cobalt (II) salts

increased cell viability or proliferation, or the expression of vascular endothelial growth factor. There was inadequate evidence for cancer in humans. It had been previously evaluated in 2003 and classified as a Group 2B.

**Trivalent antimony — IARC Monograph 131 (2022):**
The final monograph has not been published for this meeting yet. This information is based on the Lancet summary article (Karagas et al., 2022) and the IARC Q&A (2022) document on this meeting. It was classified as a Group 2A based on limited evidence for cancer in humans, sufficient evidence for cancer in experimental animals, and strong mechanistic evidence in human primary cells for genotoxicity and in experimental systems oxidative stress, chronic inflammation, and alterations in cell proliferation, cell death, or nutrient supply. It had been previously evaluated in 1989 and classified as a Group 2B.

The preceding IARC summaries describing the basis for their upgrades indicates that simply having TKC data does not provide a sufficient basis for upgrading Group-2 carcinogens to the Group-1 category (human carcinogen classification).  Table K-1 attached to the end of Appendix K, further illustrated this point.  None of the chemicals evaluated in IARC's meeting 120-132 with sufficient animal data and insufficient human data (which has typically relegated the chemical to Group 2A or 2B classification) were upgraded to Group 1.  Dr. Panigrahy, however, evaluated 3 Group-2 chemicals, and upgraded all three to what is equivalent to a IARC Group 1 carcinogen by stating the fact these chemicals had several of the ten key characteristics made it biologically plausible to conclude they were human carcinogens.

For example, after stating PCE exhibits 7/10 KCs, Dr. Panigrahy concluded: *Given the indisputable compelling scientific evidence of carcinogenic activity in animals, evidence in human cell and tissue, substantial evidence of genotoxicity, and considerable knowledge on the many biologically plausible mechanisms of carcinogenicity of PCE, PCE can clearly cause cancer in animals and humans.* After stating 1,1,1-trichloroethane has only 4/10 KCs, Dr. Panigrahy concluded - *That it was biologically plausible that 1,1,1-trichloroethane is a human carcinogen* – because it had KC2, KC6, KC7, and KC9.  And stating styrene exhibited 8/10 KCs (KC1, KC2, KC3, KC5, KC6, KC7, KC8, and KC10) Dr. Panigrahy concluded — *Given the indisputable compelling scientific evidence of carcinogenic activity in animals, evidence in human cell and tissue, substantial evidence of genotoxicity, and considerable knowledge on the many biologically plausible mechanisms of carcinogenicity of styrene, styrene can clearly cause cancer in animals and humans.*

While only two of these three chemicals were evaluated after IARC started summarizing TKC data as part of the overall evaluation of a chemical's carcinogenic potential, the working group for the 121st meeting that evaluated styrene, after concluding styrene had strong evidence for characteristics KC1, KC2, KC8, KC10, moderate evidence for KC5 and KC7, and weak evidence for KC3, KC6, the final IARC classification remained as Group 2A.  So, like Dr. Panigrahy they noted styrene exhibits 8 of the 10 KCs, but this mechanistic information was not

Appendix K

sufficient to consider it capable of causing cancer in humans (i.e., Group 1). Similarly, at IARC's 130th meeting the IARC working group evaluated 1,1,1-trichlorethane. The working group stated that while there was considerable TKC information for this compound, the concluded it was characterized by IARC as "suggestive but incoherent" evidence for KC1, KC2, KC5, KC6, KC8, KC9; and despite IARC finding evidence for 6 of the 10 KCs (2 more than Dr. Panigrahy did) felt the classification for 1,1,1-trichlorethane should also remain 2A.

In total 49 chemicals have been evaluated since IARC began summarizing TKC data as part of its evaluation of mechanistic information. In no case was the fact the chemical had strong or moderate TKC evidence considered by IARC as a sufficient basis for moving a chemical from group 2 to a Group 1 classification. Therefore, it is clear IARC evaluates both the human and mechanistic data in a decidedly different manner than does Dr. Panigrahy, and IARC's international experts do not believe that just because a chemical may exhibit some or most of the TKCs, that finding somehow warrants concluding the chemical can cause human cancer.

**Table K-1**

**IARC Carcinogen Classification and Mechanistic Data Table Summaries for Monographs 120-132**

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|------------------------------------------------------------------------------------------------------|
| 120 | Benzene | Group 1 (AML, possibly NHL) | Sufficient human evidence for benzene & AML (possibly NHL but no others) Sufficient animal evidence | **KC1, KC2, KC3, KC5 KC7, KC8, KC10** |
| 121 | Styrene | Group 2A | Limited human evidence Sufficient animal evidence | **KC1, KC2, KC8, KC10** IARC 121 states at page 265 under the |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|--------------------------------------------------|
| | | | | section entitled 'Rational' — *In making this overall evaluation, the Working Group noted that the mechanistic and other relevant data support the classification of styrene in Group 2A.* (Moderate evidence for: KC5, KC7) (Weak evidence:  for KC3, KC6) |
| 121 | Quinoline | Group 2B | Inadequate (No) human data available, Sufficient animal evidence | **KC2 Limited mechanistic evidence** (Moderate: KC1) |
| 122 | Isobutyl nitrite | Group 2B | No human data available Sufficient animal evidence | **Limited mechanistic evidence** (Moderate: KC2, KC7) |
| 122 | Beta-Picoline | Group 3 (Not classifiable) | No human data available Limited animal evidence | **Inadequate mechanistic evidence** |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|------------------------------------------------------------------------------------------------------|
| | | | | (Limited negative data for: KC2) |
| 122 | Methyl acrylate | Group 2B | No human data available Sufficient animal evidence | **Limited mechanistic evidence** (Weak: KC2) |
| 122 | Ethyl acrylate | Group 2B | Inadequate human evidence Sufficient animal evidence | **KC6, KC10** (Moderate evidence for: KC2) |
| 122 | 2-Ethylhexyl acrylate | Group 2B | No human data available Sufficient animal evidence | **Limited mechanistic evidence** (Weak: KC2) |
| 122 | Trimethylolpropane acrylate | Group 2B | No human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Moderate: KC6; Weak: KC2) |
| 123 | 2-Chloronitrobenzene | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Moderate: KC5, KC10; Weak: KC2, KC6) |
| 123 | 4-Chloronitrobenzene | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** |

55

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|---------------------------------------------------------------------------------------------------------|
| | | | | (Moderate: KC2, KC5, KC10; Weak: KC6) |
| 123 | 1,4-Dichloro-2-nitrobenzene | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Weak: KC2) |
| 123 | 2,3-Dichloro-1-nitrobenzene | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Weak: KC2) |
| 123 | 2-Amino-4-chlorophenol | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Moderate: KC10; Weak: KC2) |
| 123 | Ortho-phenylenediamine and ortho-phenylenediamine dihydrochloride | Group 2B | Inadequate human evidence Sufficient animal evidence | **KC2** Inadequate mechanistic evidence for other KCs |
| 123 | Para-nitroanisole | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Weak: KC2) |
| 123 | N-N-dimethylacetamide | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Weak: KC2, KC10) |

56

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|------------------------------------------------------------------------------------------------------|
| 124 | Night shift work | Group 2A | Limited human evidence Sufficient animal evidence | **KC6, KC7, KC10** |
| 125 | Allyl chloride | Group 3 | Inadequate human evidence Limited animal evidence | **Limited mechanistic evidence** (Suggestive but incoherent evidence for: KC1, KC2, KC10) |
| 125 | 1-Bromo-3-chloropropane | Group 2B | Inadequate human evidence Sufficient animal evidence | **KC10** (Suggestive evidence for KC6, and Suggestive but incoherent for KC2) |
| 125 | 1-Butyl glycidyl ether | Group 2B | Inadequate human evidence Sufficient animal evidence | **KC10,** (Suggestive for KC1, KC2, and KC7) |
| 125 | 4-Chlorobenzotrifluoride | Group 2B | Inadequate human evidence Sufficient animal evidence | **Inadequate mechanistic evidence** (Suggestive evidence for: KC10; weak for KC2) |
| 125 | Glycidyl methacrylate | **Group 2A** | Inadequate human evidence | **KC1, KC2** |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|------------------------------------------------------------------|
|         |          |                      | Sufficient animal evidence | The IARC working group concluded in the 'Evaluation and Rationale' section — *There was strong mechanistic evidence, based on two distinct topics. There is strong evidence that glycidyl methacrylate belongs, based on mechanistic considerations, to a class of reactive glycidyl epoxides for which one member, glycidol, has been classified as probably carcinogenic to humans.* —And — *There is also strong evidence in primary human cells that glycidyl methacrylate exhibits key characteristics of carcinogens; glycidyl methacrylate is* |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---|---|---|---|---|
| | | | | *genotoxic in all available tests in human primary cells, supported by consistent findings across several different test systems in various species.* |
| 126 | Opium | Group 1 | Sufficient human evidence Inadequate evidence in animals | **KC2 for opium pyrolysates** (but not pure opium.) |
| 127 | Ortho-anisidine and ortho-anisidine hydrochloride | **Group 2A** | Inadequate human evidence Sufficient animal evidence | **KC1, KC2, KC10** The IARC working group concluded in the 'Evaluation and Rationale' section — *There is* strong evidence *that ortho-anisidine belongs, based on mechanistic considerations, to a class of aromatic amines for which several members have been classified as carcinogenic to humans.* It was also noted the bladder is |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---|---|---|---|---|
| | | | | generally the target organ in both animals and humans for this class of compounds. |
| 127 | Ortho-nitroanisole | **Group 2A** | Inadequate human evidence Sufficient animal evidence | **KC1, KC2** The IARC working group concluded in the 'Evaluation and Rationale' section — *There is* strong evidence *that ortho-anisidine belongs, based on mechanistic considerations, to a class of aromatic amines for which several members have been classified as carcinogenic to humans.* It was also noted the bladder is generally the target organ in both animals and humans for this class of compounds. |
| 127 | Aniline and aniline hydrochloride | **Group 2A** | Inadequate human evidence | **KC1, KC2, KC5, KC10** |

60

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|-----------------------------------|
|  |  |  | Sufficient animal evidence | The IARC working group concluded in the 'Evaluation and Rationale' section — *There is* strong evidence *that aniline belongs, based on mechanistic considerations, to a class of aromatic amines for which several members have been classified as carcinogenic to humans. There is also strong evidence that aniline exhibits key characteristics of carcinogens in experimental systems.* |
| 127 | Cupferron | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Strong suggestive evidence in vitro for: KC2, KC10) |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---|---|---|---|---|
| 128 | Acrolein | **Group 2A** | Inadequate human evidence<br>Sufficient animal evidence | **KC1, KC2, KC3, KC5, KC7, KC6, KC10**<br>The IARC working group concluded in the 'Evaluation and Rationale' section: *The* Group 2A *evaluation for acrolein is based on sufficient evidence of cancer in experimental animals and strong mechanistic evidence.* —and— *There is* strong evidence *that acrolein exhibits multiple key characteristics of carcinogens, primarily from studies with human primary cells and studies in experimental systems, supported by studies in* |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|----------------------------------------------------------------------------------------------------|
| | | | | *humans for DNA adducts.* |
| 128 | Crotonaldehyde | **Group 2B** | Inadequate human data available Limited animal evidence (one species) | **KC1, KC2, KC5, KC6** At page 244 under the heading 'Rationale" the IARC working group concluded: *The Group 2B evaluation for crotonaldehyde is based on strong mechanistic evidence. There is* strong evidence *in human primary cells that crotonaldehyde exhibits key characteristics of carcinogens; crotonaldehyde is electrophilic and genotoxic. It also induces oxidative stress and induces chronic inflammation in experimental* |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|---------------------------------------------------------------------------------------------------------|
| | | | | *systems. In addition, there is supporting evidence from studies in humans for DNA adducts.* |
| 128 | Arecoline | **Group 2B** | Inadequate (No) human data available<br>Limited animal evidence (one species) | **KC1, KC2, KC5**<br>At page 244 under the heading 'Rationale" the IARC working group concluded: *The Group 2B evaluation for arecoline is based on strong mechanistic evidence. There is* strong evidence *in human primary cells that arecoline exhibits multiple key characteristics of carcinogens; arecoline is electrophilic; it is genotoxic; and it induces oxidative stress.* |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|---------------------------------------------------------------|
| | | | | *It also alters DNA repair or causes genomic instability in experimental systems.* |
| 129 | Gentian violet | Group 2B | Inadequate (No) human data available Sufficient animal evidence | **Limited mechanistic evidence** (Suggestive but incoherent across studies: KC2) |
| 129 | Leucogentian violet | Group 3 | Inadequate (No) human data available Inadequate animal evidence | **Inadequate mechanistic evidence** (Data were stated to be scarce, p.83) |
| 129 | Malachite green | Group 3 | Inadequate (No) human data available Limited animal evidence (one species) | **Limited mechanistic evidence** (Suggestive evidence for: KC2, KC5, KC8) |
| 129 | Leucomalachite green | Group 2B | Inadequate (No) human data available Sufficient animal evidence | **Limited mechanistic evidence** At page 141 under the heading |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|---------------------------------------------------------------------------------------------------|
| | | | | 'Rationale" the IARC working group concluded: *The mechanistic evidence is* limited *for leucomalachite green because findings in experimental systems are suggestive of mutagenicity, but the studies are few in number and narrow in range.* |
| 129 | CI Direct Blue 218 | Group 2B | Inadequate (No) human data available Sufficient animal evidence | **Inadequate mechanistic evidence** (Limited evidence for: KC2) |
| 130 | 1,1,1-Trichloethane | Group 2A | Limited human evidence Sufficient animal evidence | Limited mechanistic evidence category (Suggestive but incoherent evidence for: KC1, KC2, KC5, KC6, KC8, KC9) |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---|---|---|---|---|
| 130 | 1,2-diphenylhydrazine | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Suggestive but incoherent evidence for: KC2, KC5, KC10) |
| 130 | Diphenylamine | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Suggestive but incoherent evidence for: KC2, KC5, KC7, KC10) |
| 130 | N-Methylolacrylamide | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Suggestive but incoherent evidence for: KC5, KC6, KC10) |
| 130 | Isophorone | Group 2B | Inadequate human evidence Sufficient animal evidence | **Limited mechanistic evidence** (Suggestive but inconsistent evidence for: KC2, KC5, KC7, KC10) |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|------------------------------------------------------------------------------|
| 131 [Not published] | Cobalt metal (without tungsten carbide or other metal alloys) | Group 2A [Previously 2B in 2003] | Inadequate human evidence Sufficient animal evidence [IARC Q&A, 2022] | **KC2, KC5, KC6, KC10)** [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Soluble cobalt (II) salts | **Group 2A [Previously 2B in 2003]** | Inadequate human evidence Sufficient animal evidence [IARC Q&A, 2022] | **KC5, KC6, KC7, KC10** [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Cobalt (II) oxide | Group 2B | Inadequate human evidence Sufficient animal evidence [IARC Q&A, 2022] | **Limited mechanistic evidence** [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Cobalt (II, III) oxide | Group 3 | Inadequate human evidence Inadequate animal evidence [IARC Q&A, 2022] | **Limited mechanistic evidence** [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Cobalt (II) sulfide | Group 3 | Inadequate human evidence Limited animal evidence [IARC Q&A, 2022] | **Inadequate mechanistic evidence** [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Other cobalt (II) compounds | Group 3 [Previously 2B in 1990] | Inadequate human evidence Inadequate animal evidence [IARC Q&A, 2022] | **Inadequate mechanistic evidence** |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|-----------------------------------------|
| | | | | [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Trivalent antimony | Group 2A [Previously 2B in 1989] | Limited human evidence (lung) Sufficient animal evidence [IARC Q&A, 2022] | **KC5, KC5, KC10** [IARC Q&A, 2022; Karagas et al., 2022] |
| 131 [Not published] | Pentavalent antimony | Group 3 [Not previously evaluated] | Inadequate human evidence Inadequate animal evidence [IARC Q&A, 2022] | **Limited mechanistic evidence** [IARC Q&A, 2022] |
| 131 [Not published] | Weapons-grade tungsten (with nickel and cobalt) alloy | Group 2B [Not previously evaluated] | Inadequate human evidence Sufficient animal evidence [IARC Q&A, 2022] | **Limited mechanistic evidence** [IARC Q&A, 2022] |
| 132 [Not published] | Occupational exposure as a firefighter | Group 1 | Sufficient human evidence for mesothelioma and bladder cancer; limited evidence for humans for colon cancer, prostate cancer, testicular cancer, melanoma of the skin, and non-Hodgkin lymphoma Inadequate (No) animal data available | **(KC2, KC4, KC5, KC6, KC8)** [IARC Press Release, 2022] |

Appendix K

| Meeting | Chemical | Final Classification* | Evidence | Mechanism Details (strong experimental evidence findings for different KCs are shown in bold text)** |
|---------|----------|----------------------|----------|------------------------------------------------------------------------------------------------------|
|         |          |                      | [IARC Press Release, 2022]*** |                                                                                       |

* Note: The carcinogen classifications listed in bold font represent slight upgrades based on different mechanistic considerations.  Blue font denotes the two chemicals in this series that Dr. Panigrahy upgraded to Group 1.

**Ten key characteristics of carcinogens (Smith et al., 2016, as cited in Samet et al., 2020)

  1. Is electrophilic or can be metabolically activated to an electrophile
  2. Is genotoxic
  3. Alters DNA repair or causes genomic instability
  4. Induces epigenetic alterations
  5. Induces oxidative stress
  6. Induces chronic inflammation
  7. Is immunosuppressive
  8. Modulates receptor-mediated effects
  9. Causes immortalization
  10. Alters cell proliferation, cell death, or nutrient supply

***Previously classified in 2007 as Group 2B based on limited evidence in humans (for NHL, prostate, and testicular cancer). IARC stated in the 2022 update that there was no single study that provided key evidence that was used to update the evaluation. Rather, there were >30 long-term studies of cancer among firefighters that provided new evidence to support the re-classification. The Working Group conducted a meta-analysis of all the evidence from the group of more than 20 non-overlapping cohort studies and found consistent evidence for an increased risk among firefighters for cancers at certain sites. In addition, the new mechanistic studies among firefighters found consistent and coherent evidence for five key characteristics of carcinogens, providing strong mechanistic support for the conclusions reached about elevations in cancer risk (IARC Q&A, 2022).

**Appendix L**

**Styrene Toxicology**

Appendix L

**1.0      There Is No Identifiable Cancer Risk from Environmental Exposure to Styrene**

Styrene has been recently evaluated by IARC and other groups of scientists (Rhomberg et al., 2013; Collins and Delzell, 2018; IARC, 2019; Banton et al., 2019; Mundt, 2022).  These analyses did not identify any causal relationship between occupational styrene exposure and a human cancer type of any kind.  Although IARC did give styrene a 2A classification in its carcinogenic hazard ranking system, this ranking does not convey an actual human cancer hazard or risk.  Given the limitations of the current epidemiology findings and the very limited carcinogenic hazard posed by the animal studies there simply is no reason to believe environmental exposure to this chemical carries a biologically meaningful cancer risk for any of any kind.

**1.1  The Epidemiologic Evidence on Styrene**

When reviewing the occupational exposure studies on styrene it is important to note that the studies of workers exposed in reinforced plastics industry represent the best studies for evaluating possible causal relationships (Rhomberg et al., 2013; Collins and Delzell, 2018; IARC, 2019; Banton et al., 2019; Mundt, 2022).  As outlined by Collins and Delzell (2018) there are four reasons why this industry ultimately provides the best causal information. These reasons are:

1.  Styrene exposure levels in the reinforced plastics industry were the highest occupational exposures to styrene by 1-2 orders of magnitude compared to those measured in the other two cohort types.

2.  The total number of styrene exposed workers in the combined reinforced plastics industry cohorts is 100,000 or more total workers in the combined studies.  By comparison there are only a total of 15,000 workers in the combined synthetic rubber industry cohorts and only 6,000 workers in the combined styrene/polystyrene manufacturing industry cohorts.

3.  Synthetic rubber workers experienced not only had much lower styrene exposures, but the cancer occurrence in these workplaces is confounded by co-exposures to several other carcinogenic chemicals.  Including co-exposures to benzene, butadiene, ethylene oxide, dyes, formaldehyde, acrylonitrile, carbon black, arsenicals, cadmium, vinyl chloride, asbestos and others.

4.  The reinforced plastic studies are the only cohorts that have begun to be analyzed by cancer incidence rather than the less accurate measure of carcinogenic potency, cancer mortality.

Overall, some cohort studies have observed increases in cancer endpoints of potential relevance to this case, but these findings have been inconsistent (Collins and Delzell, 2018; IARC, 2019; Banton et al., 2019; Mundt, 2022).   In addition, many studies combined different hematologic cancers together thereby failing to provide a meaningful assessment of the hematopoietic/lymphatic cancer risk, if any (IARC, 2019, see p.151; Collins and Delzell, 2018; Mundt, 2021).   None of these recent evaluations of styrene's possible carcinogenic potential concluded there existed sufficient human evidence for cancer of any kind.   And additional confounding in some studies by lifestyle risk factors that weren't controlled for (e.g., smoking, obesity) have also been identified that have further lessened concern for some of the inconsistently observed increases (Collins and Delzell, 2018; Banton et al., 2019).   When all the information relevant to styrene's epidemiology is considered, the potential human carcinogenicity of styrene remains undemonstrated and inconclusive.   Because no specific cancer hazard has been established for high occupational styrene exposure levels, there is no scientific basis for presuming lower environmental exposures pose any meaningful or quantifiable risk of cancer.

## 1.2   The Animal and Toxicologic Evidence on Styrene's Carcinogenic Potential

### 1.2.1   The Lack of Meaningful Tumor Formation in the Rat

Several reviews of styrene's toxicology have summarized the chronic bioassays performed in the rat (Rhomberg et al., 2013; Cruzan et al., 2018; IARC, 2019; Banton et al., 2019).   The IARC reviews discusses eight different chronic rat studies that examined the outcomes of styrene exposure via inhalation, gavage and drinking water as the routes of administration.   The Banton review lists a ninth study (Jersey et al., 1978), which may have a been an unpublished that IARC was unaware of.   These reviews generally note the fact that unlike the mouse there were no lung tumors induced in the rat studies, and that no consistent increase in tumorigenesis was observed in any organ in these studies (Rhomberg et al., 2013; Cruzan et al., 2018; IARC, 2019; Banton et al., 2019; Cohen et al., 2020).

The two exceptions to the complete lack of tumor induction in the rats is the 1988 study by Conti and coworkers reviewed by IARC (2019) and the Jersey study summarized by Banton et al.

Appendix L

(2019). The Conti study reported female Sprague-Dawley (SD) rats incurred mammary tumors at all doses when exposed to styrene inhalation concentrations of 35, 50, 100, 200 and 300 ppm. Of interest is the fact that the exposure duration in this study was only 12 months, and the animals were then followed for a lifetime. So, if this study's results were reliable, mammary tumors should be easily seen in those studies administering styrene lifespan of the animals as is the typical practice when conducting an animal cancer bioassay. In addition, the IARC (2019) review noted several limitations of this study. These were a limited reporting of study details, that no mortality data were included, and that no statistical analysis was performed by the authors. The combined benign and malignant mammary tumor incidence in the control animals was 34/60 animals or 57%. By comparison the increase in the combined tumor incidence after styrene exposure in this study was less than 2-fold for all exposure groups, with a high of only 83%. Still, the statistical analysis apparently performed subsequently by the IARC Working Group found the observed changes significant at the $p < 0.05$ level (IARC, 2019). The malignant tumor incidence in the controls animals of this study was 20% (6/60 animals), and the increase in styrene exposed animals was flat and variable at the three highest concentrations (e.g., 9/30, 12/30, and 9/30 animals). So, no obvious dose-response relationship was evident despite a significant trend analysis. At the time this lone positive study was published three previous rat studies had not observed any change in mammary tumor incidence including one gavage study by these same authors conducted at similar doses (Cruzan et al., 2018; see summary tables in IARC, 2019).

According to the summary table in Banton et al. (2019) the Jersey et al. (1978) also employed Sprague Dawley rats, and exposed the animal inhalation concentrations of 600 and 1,000 ppm for 20 months. This study reported an increase in mammary tumors at 600 ppm but at 1,000 ppm the tumor incidence was not different from the controls.

These two positive findings contradicted by a lack of tumorigenesis reported in the seven other studies. The strongest and most convincing inhalation study was performed by Cruzan et al. (1998). This study used a lifetime exposure duration of two years and tested inhalation concentrations of 50, 200, 500 and 1,000 ppm. No significant changes were observed at any concentration in fibroadenomas (benign tumors) of the mammary glands of the female animals. Of even greater interest, however, was the finding that the incidence of malignant mammary

tumors (adenocarcinomas) <u>was significantly decreased</u>, significant at the p < 0.001 level, by the higher levels of chronic styrene exposure. This decrease was significant by both trend analysis and by pairwise analysis of the two highest exposure levels (IARC, 2019). The Banton review also notes the total dose comparisons for each of the rat studies reveals the highest doses tested were the inhalation doses of 1,000 ppm in the Jersey and Cruzan studies, and the three oral doses of 500, 1000, and 2,000 mg/kg-day used in the 1979 NCI study with Fischer 344 rats. The highest doses tested in these three studies were all negative and 10-times higher than the highest lifetime dosage tested in the Conti study. Thus, the two studies reporting an increase in mammary tumors, are contradicted by the evidence provided in 7 other studies, were contradicted by test conditions using higher exposure and doses for longer periods of time, and were negative at the highest doses tested using two different rat strains and routes of administration.

The Cohen et al. (2020) review has noted that when pairwise statistical comparisons are made in a study like a chronic rodent bioassay, where many different outcomes are being analyzed, the level of significance applied should be reduced to minimize the generation of false positives. This was referred to as the "Haseman Rule"[1], which recommends the typical level of statistical significance of p <0.05 should reduced to p < 0.01 to account for the multiple statistical comparison being performed. This correction is especially important those tumor types with high background incidences in the control animals. The Cohen review also noted that in 2001 the FDA similarly recommended a p < 0.005 level of significance be adopted for trend analyses. These corrections would eliminate the statistical calculations made for the Conti et al. (1988) study, further lessening reliance on this study. And given the fact that the other study reporting an increase was internally inconsistent with itself as the higher exposure level was negative, and externally inconsistent with two other studies testing the same or higher total dosages, the Jersey study fails to provide reasonably reliable observations by itself.

Based on all of the preceding information, like most other recent reviews of the chronic rat bioassay results I found the weight of evidence does not indicate styrene is a mammary carcinogen in the rat (Rhomberg et al., 2013; Cruzan et al., 2018; Banton et al. 2019).

---

[1] I note that Dr. Haseman, a biostatistician, was a reviewer on many NTP carcinogenicity bioassays for decades.

## 1.2.2   Mouse Lung Tumors

The have been five bioassays using various mouse strains exposed to styrene via different routes of administration. The collective evidence from these studies reveals chronic styrene exposure induces lung tumors in the mouse (Cruzan et al. 2017; IARC, 2019; Banton et al. 2019; Cohen et al., 2020). However, these lung tumors were predominantly benign and were evident until after 18 months exposure (Cruzan et al. 2017; Cohen et al., 2020). No tumors were observed in any other organ of the mouse. Given the widespread industrial use of this chemical, the mechanistic basis for styrene's induction of lung tumors in mice has been extensively studied, and the Adverse Outcome Pathway (AOP) for this species-specific toxicity has been outlined and discussed in recent reviews (Cruzan et al., 2018; Banton et al. 2019; Cohen et al., 2020). The following is a brief summarization of the key findings in the mechanistic investigations that have produced credible evidence showing why the mouse-specific outcome does not represent a relevant human hazard.

- Key Event #1 — A careful analysis of the styrene metabolite(s) responsible for the lung tumors occurring in mice revealed the first key event in mouse lung tumor formation is the metabolism of styrene by the CYP2F2 enzyme to a ring hydroxylated metabolite. Specifically the 4-hydroxystyrene metabolite (also called 4-vinylphenol), and possible additional oxidation of this metabolite, and the proximal mouse lung carcinogens. That this is clearly the initial key event was demonstrated by the following:

  - Styrene-induced lung toxicity and tumor occurs in mice (via oral and inhalation) but not in rats (oral and inhalation). The lung toxicity is characterized by cytotoxicity, cell proliferation via mitogenicity, and subsequent later-in-life hyperplasia and lung tumors. All these effects are localized to terminal bronchioles, and area of the lung enriched with club (Clara) cells.

  - Studies using enriched isolated mouse lung cell fractions have shown styrene metabolism occurs in the club (Clara) cells and not the alveolar cells of the lung. This is consistent with the fact the mouse lung tumors originate in club cells and not alveolar cells.

  - The mouse lung toxicity of styrene (i.e., the cytotoxicity and cell proliferation/mitogenicity) is substantially reduced when mice receive the nonspecific CYP2F2 enzyme inhibitor 5-phenyl-1-pentyne.

  - Both knockout mice in which CYP2F2 has been removed, and transgenic mice containing the human isozyme form of this enzyme (CYP2F1) do not generate ring

5

hydroxylated metabolites of styrene.  Consistent with the loss of this oxidative pathway and ring hydroxylated metabolites, none of the biologic changes associated with styrene-induced lung toxicity is observed in these two mouse strains.

o   Many lines of evidence indicate 4-hydroxystryene is the putative metabolite responsible for the lung tumors observed in mice:
   ▪   Up to 8% of the urinary metabolites in the mouse (the responsive species) are ring oxidized metabolites but ring oxidized metabolites represent only 0.5% of the urinary metabolites in the rat (the nonresponsive species).
   ▪   4-hydroxystryene is a more potent lung toxicant than either styrene or styrene oxide.
   ▪   4-hydroxystryene generation is completely attenuated in the CYP2F2 knockout mouse strain, a strain that does not develop any evidence lung toxicity (lung cell proliferation).
   ▪   Administration of 4-hydroxystryrene to female knockout mice and resistant wild type WT mice still caused a 3.9-fold and 8.9-fold increase, respectively, in lung cell proliferation; a change that would promote the higher background incidence of lung tumors occurring in any responsive mouse strain.
   ▪   4-methylstryene, a chemical analog, is not metabolized to 4-hydroxystyrene and does not induce lung tumors in mice.
   ▪   Ring hydroxylated metabolites are not detectable in humans, and the transgenic humanized mice containing the human CYP2F1 isozyme do not develop the styrene-induced lung toxicity.

o   Because chemical inhibition of mouse CYP2F2, or its elimination in Knockout mice, reduce the formation of 4-hyrdoxystyrene by only about 80% there is an apparent threshold for the styrene-induced lung toxicity in mice.  This threshold is consistent with the epigenetic MOA (mitogenic proliferation) proposed for this metabolite.
   ▪   Similarly, the levels of CYP2F4 in rat lung is only 25% of the levels of CYP2F2 present in the mouse lung.  Thus, the lack of tumorigenic response in the rat is consistent with the threshold observed epigenetic MOA proposed for knockout mice.

o   Human lungs contain even lower levels of the CYP2F enzyme that rats.  In addition, human CYP2F isozyme, the CYP2F1 form, is apparently devoid of ring hydroxylating activity and ring oxidized styrene metabolites are not detected in humans following exposure to styrene.  Therefore, CYP2F2 mediated mode of action responsible for the lung tumors in mice is unlikely to occur in humans.
   ▪   Because the rat also does develop lung tumors following chronic exposure to levels of styrene higher than those measured for occupationally exposed humans, and as this nonresponsive species does generate some amount of 4-hydroxystyrene while humans do not, the species-specificity of this

toxicity also indicates humans should also be risk free like the nonresponsive species, the rat.

- o A CYP2F2 generated metabolite that induces a mitogenic driven MOA has also been postulated for two other mouse lung-specific toxicants, the pesticide fluensulfone and the anti-tubercular drug isoniazid. The results for isoniazid are of particular interest because this drug has been used for 60 years and the human doses are similar to those that induce lung tumors in mice. But an IARC analysis of patients treated with this drug found no increased risk of lung tumors or lung cancer in these patients.

- o As all three animal models that do not develop lung toxicity/tumors following chronic styrene exposure (i.e., knockout mice, transgenic humanized mice, and the rat) still have functional lung and liver CYP2E1 enzymes that generate the other styrene metabolite of interest, i.e., styrene oxide (SO), the rodent evidence strongly indicates the formation of the SO metabolite by CYP2E1 is not the proximal cause of the lung tumors seen in mice.

- o In addition, the same studies elimination of SO as the metabolite inducing the lung tumors observed in mice also indicate that the SO levels generated by CYP2E1 metabolism in these two rodent species is not sufficient to initiate tumors in any other tissue in either rodent species.

- Key event #2 — Chronic styrene exposure in the mouse induces changes in the gene expression within lung cells resulting in mitogenesis and later-in-life changes shifts in circadian clock genes. These gene changes induced by 4-hroxystyrene are linked to the mouse lung tumorigenesis.

- o These gene expression responses in mouse lung occur across various exposure durations. The pattern of genes that are upregulated is consistent with a non-genotoxic, primarily mitogenic MOA.

- o These gene changes are localized to the club cells of the mouse lung, the primary site of origin for the styrene-induced lung toxicity and subsequent increase in tumors.

- o The up regulation of genes producing the mitogenic stimulus in the lungs following styrene exposure are not observed in the either the knockout or the humanized transgenic mouse strains.

- o Thus, the genomic data affirm that the critical gateway of CYP2F2 metabolism in styrene-mediated mouse lung toxicity and tumorigenicity. Again, procedures that reduce the formation of 4-hydroxystyrene in mouse lung tissue, i.e., inhibition of CYP2F2 metabolism by the inhibitor 5-phenyl-1-pentyne or the use of knockout or humanized transgenic mice, eliminate the upregulation of the genes producing the mitogenic MOA.

Appendix L

- Key event #3 — The initiation of a mitogenic cell proliferation by gene changes induced by 4-hroxystyrene represents the primary hyperplastic response in lung tissues. Cytotoxicity is only a minor contributor to lung cell proliferation.

  o The up-regulation of these genes is associated with an organ-specific cancer promotional effect (hyperplasia) that explains the increases in lung tumors seen in responsive mouse strains.

  o Proliferation was observed in 58/67 CD-1 mice and 55/70 wild type mice (C57BL/6 strain) after styrene exposure.  No proliferative lesions were observed in either the knockout mice of the transgenic humanized mice derived from the wild strain.

  o Similarly, Sprague-Dawley rats experienced no lung hyperplasia following 2 years of exposure to 50, 100, 200 or 1,000 ppm styrene (Cruzan et al., 1998), and no lung tumors have ever been observed in this rodent species in eight chronic bioassays.

  o There was no evidence for stress-pathway responses, or for the activation of p53-mediated DNA-damage pathways that would be indicative of DNA damage caused by a reactive styrene metabolite.  This eliminates both a regenerative cytotoxicity as the promotional force and the occurrence of genotoxic insult that might represent an initiating event.

- Key event #4 — Persistent bronchiole hyperplasia ensues in lung tissue in styrene-responsive mouse strains.  Thus, a promotion (and ultimately progression) of normally occurring lung tumors is the cause of the increased incidence of lung tumors in styrene-responsive mouse strains, strains that have a high background incidence of lung tumors.

The review by Cruzan et al. (2018), after describing the evidence supporting their postulated AOP in detail (see also summary Table 10 in this paper), demonstrated the mechanistic evidence supporting the AOP would also satisfied the Hill criteria like concordance, dose-response, temporality, consistency, specificity, and biologic plausibility.  Thus, the evidence for the 4-hydroxystyrene mediated chain of events is convincing.

The recent reviews of styrene toxicology (i.e., Cruzan et al., 2018; Banton et al. 2019; Cohen et al., 2020) have also reviewed the evidence for the prior hypothesis, i.e., that the tumor inducing metabolite in rodents was reactive, genotoxic metabolite styrene oxide.  These reviews provide compelling evidence the styrene oxide metabolite is not the cause of the lung tumors seen in mice exposed to styrene.  The evidence against a role for this metabolite includes:

Appendix L

- Blood concentrations of styrene oxide (SO) have been measured male and female Sprague Dawley rats (nonresponsive species) exposed to 1000 ppm styrene (the highest styrene exposure level in the 2-year inhalation bioassay) and in male and female CD-1 mice exposed to 40 ppm styrene (the lowest tumorigenic exposure level in this mouse strain. After 6 hours of styrene exposure to both species the blood SO concentrations were 74- to 109-fold higher in rat (the nonresponsive species) compared to those measured in the mouse (the responsive species). The highest SO blood concentration measured in the rat was 185 ng/ml, the highest blood SO concentration in the mouse was 2.5 ng/ml. Thus, the occurrence of lung tumors clearly does not correlate with SO blood concentrations generated by the metabolism of styrene.

- No lung tumors were evident in eight rat studies exposing the animals to styrene via gavage, drinking water or inhalation. As shown in the preceding comment, the highest styrene doses used in all rat studies were likely to have produced higher blood SO concentrations than those occurring in the mouse. So, despite the occurrence of widespread tissue distribution of SO produced by styrene metabolism in the rat during the three different routes of administration tested did not induce lung tumors in the rat, or for that matter tumors at any other site.

  - Likewise, rat whole lung explant studies indicate SO production at the 1,000-ppm styrene concentration was 8-fold higher than that produced in the mouse lung. This study proves the lack of tumorigenesis in the rat does not stem for an inability to form SO *in situ*. And once again the formation of SO does not correlate with tumorigenesis.

- Chronic oral dosing with SO did not produce lung tumors in mice (gavage doses of 375 or 750 mg/kg, 3X/week, 2 years) or rats (gavage doses of 275 and 550 mg/kg, 3X/week, 2 years); instead, chronic oral doses with SO induced site-of-contact tumors only in the non-glandular forestomachs of the animals.

- Still, peak SO blood concentrations after oral gavage doses of 500 mg/kg SO in mice and 200 mg/kg SO in rat were 7,000 and 3,600 ng/mL, respectively. So, even in the presence of higher tissue concentrations of SO than those that are formed *in vivo* during the mouse and rat bioassays with styrene, the increased presence of SO in rat tissues was incapable of inducing lung tumors.

- The lung toxicity (as measured by lung cell proliferation) of intraperitoneal doses of 200 mg/kg SO that were observed in wild type mouse strain was completely attenuated in male and female CYP2F2 KO mice. This observation again indicates that ring hydroxylation is a necessary first step in the pathway for styrene-induced lung toxicity. So, once again the evidence indicates SO is not the proximate lung toxic metabolite of styrene in mice.

- Similarly, lung toxicity is not substantially attenuated in CYP2E1 KO mice despite a substantial reduction of SO formation in this mouse strain. So, even though the loss of

9

CYP2E1 significantly reduced SO production, this change does not appreciably alter the styrene-induced lung toxicity in mice.

- Given the above, SO is clearly not the metabolite responsible for the induction of lung tumors in mice. In fact, the amount of SO generated by styrene metabolism following chronic styrene exposure in these two rodent species apparently was incapable of inducing tumors at any site in the mice and rats once the effect of the ring hydroxylated metabolites is removed. This is again us evidence that styrene metabolism in these two rodent species does not generate enough SO to induced cancer in any tissue. The lack of tumorigenicity in turn also indicates there is a threshold in these two species for this genotoxic metabolite.

- There is a dose dependent saturation of SO formation following styrene exposure in the rat and human. PBPK modeling indicates SO concentrations cannot exceed 330 ng/mL in rats or 36 ng/mL in humans. Thus, the maximum potential blood SO concentration in humans resulting from styrene exposure is substantially less than SO blood concentrations achieved in non-tumorigenic species the rat. So once again, it is unlikely that SO formation in human is sufficient for inducing a tumorigenic response.

- While the predominant styrene metabolite in humans (95%) is styrene oxide, this metabolite is rapidly metabolized to styrene glycol or glutathione metabolites. So, only small amounts of SO reach the bloodstream to be circulated throughout the body. Human volunteers exposures for 2 hours to 50-ppm styrene produced a mean blood SO concentration of only of 0.8 ng/mL. So, after a relatively high occupational styrene exposure level; human SO blood concentrations are orders of magnitude lower than those produced by much higher inhalation levels of styrene tested in the non-tumorigenic species, the rat. They are also much lower than the higher SO levels produced by the non-lung tumorigenic oral gavage dosing of SO in mice and rats. These observations are a serious contradiction of the suggestion the SO generated during styrene exposures still poses a hypothetical carcinogenic risk for humans.

- Finally, the SO concentrations resulting from *in vivo* styrene exposures in mice, rats, and humans are <u>inconsistent</u> with the much higher concentrations of SO required to elicit positive *in vitro* genotoxic responses by this styrene metabolite. In 35/39 positive *in vitro* genotoxicity studies summarized in 1994 by IARC (Banton et al., 2019), the lowest effect concentrations (LECs) were $\geq$ 24,000 ng/ml. This is 130-fold greater concentration that the SO blood concentrations achieved in rats exposed to 1,000 PPM (see 1st bullet). The LEC concentrations are 9,600-times higher the SO blood concentration generated by the 40-ppm styrene inhalation concentration that induces lung tumors in the mouse (1st bullet). They are also 30,000 times higher than the mean SO blood concentration of measured in volunteers inhaling 50-ppm styrene (see preceding bullet. Thus, the *in vitro* genotoxicity studies for SO fail to suggest the levels of SO poses any meaningful *in vivo* genotoxic hazard in mice, rats or humans; this would be especially true for environmental exposures to styrene and effectively rule out concern for the genotoxicity of environmental styrene exposures.

○ Likewise covalent binding indices in rodents at the highest styrene exposure levels is greater in the liver than the lung, an observation that is again inconsistent with the tumorgenic response observed in rodents for this compound. These covalent binding indices were also categorized as being those consistent with a weakly genotoxic compound. These observations also indicate DNA adduct formation does not play significant role in the styrene-induced mouse lung tumors. Thus, styrene is another example of a chemical capable of forming some level of DNA adducts via a reactive metabolite that does not ultimately induce mutagenicity in the exposed species (Cohen et al., 2020)

○ Consistent with the latter conclusion the transcriptomic/gene expression changes observed by Anderson et al. (2017) in the wild-type mouse after styrene exposure are consistent only with an epigenetic proliferative MOA.  They were not indicative of a genotoxic and cytotoxic MOA, the MOA originally postulated for SO.

○ In addition, Banton et al. (2019) summarized recent analyses of the genotoxicity of styrene/SO as reviewed by Moore and others.  The general conclusions reached by these groups analyzing the genotoxicity of SO was that there is limited or no convincing evidence styrene/SO induces an *in vivo* genotoxic response in rodents. For example, the recent review of styrene's genotoxicity by Moore et al (2019) concludes with — "In conclusion, while SO is clearly mutagenic and clastogenic *in vitro*, we find no evidence that styrene or SO can induce chromosomal damage in rodents *in vivo*. We note that there are no in *vivo* gene mutation studies in rodents." Because rodents generate higher blood SO levels than humans, this conclusion would be the same for all human exposures.

Given the preceding information, it becomes clear that SO, a chemically reactive metabolite of styrene, is not a candidate cause of the lung tumors seen in mice.  Instead, a specific ring hydroxylated metabolite of styrene that induces a chronic mitogenic response in the mouse lung provides the only viable explanation for the lung tumors seen in the mouse following styrene exposure.  However, the mechanism by which this occurs in mice means this effect poses no relevant corresponding hazard for humans.

Finally, it should also be noted that styrene is just one of several chemicals that induce lung tumors in mice but not in rats and that do so by a mouse-specific mechanism that is not relevant for rats or humans (Cruzan et al., 2018; Cohen et al, 2020;).  The mouse is a rodent species that has a relatively high incidence of lung tumors that occur normally at the end of the 2-year observation period used in the typical chronic bioassay.  For example, untreated strain A (A/J) mouse develop lung tumors with an incidence that is typically 100% after two years.  The B6C3F1

mouse, a strain frequently used to test the carcinogenic potential of chemicals, has a spontaneous lung cancer incidence of combined adenomas and adenocarcinomas of approximately 28% in male animals and 8% in female animals, but these ranges may vary considerably.   Moreover, the incidence of hyperplasia and /or chronic inflammation in the B6C3F1 mouse is generally greater than 90%.   Thus, this species has a strong endogenously derived promotional pressure in the lung. The CD-1 mouse, another strain common to carcinogenicity bioassay tests has a variable spontaneous lung tumor incidence that ranges between 8% and 61% in male mice and 9% to 27% in female mice.   Similar ranges are seen in the BALB/c mouse and slightly higher incidences occur in the SWR/J mouse, but the incidence of lung tumors is much lower in the B57BL/6 (wild) strain. The development of knockout and transgenic hybrid mouse strains typically originate from a hybridization of either the B57BL/6 or the B6C3F1 mouse strains.   In contrast to the normally high incidence of spontaneous lung tumors occurring in most mouse strains, most rat strains have a much lower background lung tumor incidence of generally less than 2%.   Lung tumors in nonsmoking humans by comparison occur at an even lower rate of 1%.   So, given the generally high susceptibly of the mouse to develop lung tumors naturally, chemicals that induce an increase in lung tumors in the mouse but not the rat frequently do not pose a realistic or significant cancer hazard to man when a DNA-reactive, potent estrogenic, or immunosuppressive MOA is not involved.

While there are some basic biologic similarities between the lungs of mice and humans, there are also key and significant differences in the anatomy, physiology, pathogenesis, chemical metabolism and toxicokinetics, and in the biologic behavior of the tumors that develop in these two species (for a recent review of these differences see Cohen et al., 2020).   One major difference is the fact that the malignancy of tumors pathologically classified as lung adenomas or adenocarcinomas in the mouse appears to be generally low, and metastasis of adenocarcinomas of from the mouse lung to other organs in the mouse is infrequently observed.   In contrast, human lung carcinomas of all types frequently metastasize to other tissues.   Another key difference is that mouse lung contains high concentrations of CYP2F2 isozyme while human lung has lower levels of a different isozyme, the less active CYP2F1 form of this enzyme.   The histochemical detection of CYP2F isozyme levels in lung tissue shows a rank order of mouse (30 times higher) > rat lung tissue >> rhesus monkey (zero measurable levels).   So, for chemicals bioactivated to a toxic

metabolite by CYP2F2 in the mouse lung the risk of toxicity is smaller, if at all, in the rat and even lower, if not zero, in humans. Not surprisingly then, and for additional reasons, Cohen et al. (2020), concluded the following about the likely relevance of mouse lung tumors to human risk assessment, (emphasis added):

> *Given the high spontaneous incidences of lung tumors in mice, (1) the significant differences between mouse and human lungs and in tumor histogenesis and metastatic behavior, (2) multiple modes of action providing evidence supporting plausible mouse lung specific carcinogenicity, and (3) general lack of increased risk of mouse lung specific tumorigens in epidemiology studies, **the relevance of mouse lung tumors for predicting human cancer risk is dubious and should no longer be used for human cancer risk assessment**.*

## 1.2.    Summary of Styrene's Carcinogenic Potential

Given the information reviewed here, styrene's carcinogenic potential, as determined via chronic animal bioassays, does not appear to adequately fulfill the classification of "sufficient animal evidence" as would be typically reported by IARC, or by other entities (e.g., NTP), a conundrum first noted by Rhomberg et al. (2013). For styrene, the evidence in rats for a carcinogenic potential for this chemical is extremely limited and should be described as either negative given the numerous limitations of the Conti and Jersey studies, or only as equivocal at best. More importantly, the latest study, after administering the highest inhalation concentrations tested and for a longer period of time reported a significant decrease in mammary tumor incidence not an increase (Cruzan et al., 1998). Thus, the overall evidence provide by the rat studies is unconvincing given its inconsistencies and the stronger contradictory findings. Although the mouse data is consistent for the induction of lung tumors, this endpoint has undergone an extensive set of mechanistic studies that indicate the mechanism by which styrene induces these tumors is species-specific. Given the human pattern of styrene metabolism and the detailed AOP described for mouse tumor induction, the animal evidence in the mouse does not translate into a meaningful hazard identification for humans. The lack of a *in vivo* genotoxic risk from the levels of SO or the 4-hydroxystyrene metabolites generated in animals at the exposure levels tested further undermines the possibility of a styrene-induced cancer hazard in humans.

Appendix L

As there is no meaningful animal evidence to indicate a cancer hazard in humans, and as no causal relationship has yet been identified in workers occupationally exposed to very high air concentrations of styrene, the presumption that environmental exposure to styrene poses some human cancer risk is not a scientifically reasonable or reliable assumption. So, even though a nomologic risk estimate can be derived from the animal data, as is typically done when positive chronic bioassay results are available, the cancer risk estimates for any environmental exposure to styrene cannot be considered a reasonably reliable or accurate prediction of the actual human response to that level of exposure (see Appendix C for further discussion on this issue).

Finally, I note the mechanistic evidence presented above contradicts numerous assumptions and opinions Dr. Panigrahy has offered on this chemical. For example, of the eight key characteristics he attributes to styrene, the only detailed mechanism of styrene's carcinogenicity in animals indicates only an epigenetic increase in cell proliferation is operative. None of the other key characteristics Dr. Panigrahy stated were important played no discernible role. Similarly, he discussed at length studies suggesting styrene oxide can induce genotoxic effects in *various in vitro* studies, but the levels of styrene oxide generated in both the animal bioassay tests or in humans at occupational exposures levels are orders of magnitude below those required to induce the effects observed under the *in vitro* study conditions. It is also important to note that rodents generate much higher blood concentrations of the styrene oxide metabolite than do humans exposed to the same concentrations, and yet the styrene oxide levels produced *in vivo* by rodents effectively failed to induce cancer in any tissue in either species. But Dr. Panigrahy failed to discuss these key aspects of the styrene mechanistic information. In addition, the only key characteristic involved in the mechanism explaining the lung tumorigenesis seen in mice was cell proliferation via a mitogenic stimulus. This epigenetic effect would be expected to have threshold, and evidence of a threshold for it was observed in the mechanistic studies. So, the only clear mechanism described for styrene's oncogenic potential in animals is one that does not support his opinions on the role played by the ten key characteristics, nor does it support his hypothesis that styrene acts as a genotoxic carcinogen that has no threshold.

Appendix L

**References**

Andersen, Melvin E., et al. 2017. Assessing molecular initiating events (MIEs), key events (KEs) and modulating factors (MFs) for styrene responses in mouse lungs using whole genome gene expression profiling following 1-day and multi-week exposures. Toxicology and Applied Pharmacology 335: 28-40.

Banton M.I., Bus J.S., Collins J.J., Delzell E., Gelbke H.P., Kester J.E., Moore M.M., Waites R., and S.S. Sarang. 2019.  Evaluation of potential health effects associated with occupational and environmental exposure to styrene. J. Toxicol. Environ. Health. **22**:1-130.

Cohen S.M., Y. Zhongyu, and J.S. Bus. 2020. Relevance of mouse lung tumors to human risk assessment. J. Toxicol. Environ. Health. Part B **23**(5):214-241.

Collins J.J., and E. Delzell. 2018. A systematic review of epidemiologic studies of styrene and cancer. Curt. Rev. Toxicol. **48**: 443-470.

Cruzan G., Bus J.S., Anderson M.E., Carlson G.P., Banton M.I., S.S. Sarang, R. Waites. 2018. Based on analysis of mode of action, styrene-induced mouse lung tumors are not a human cancer concern.  Regul. Toxicol. Pharmacol. **95**:17-28

IARC. 2019.  IARC monographs on the evaluation of carcinogenic risks to humans. Volume 121. *Styrene, Styrene oxide, Quinoline*. WHO Press, World Health Organization, 20 Avenue Appia, 1211 Geneva 27, Switzerland.

Moore M.M., L.H. Pottenger and T. House-Knight. Critical review of styrene genotoxicity focused on mutagenicity/clastogenicity literature and using current Organization of Economic Cooperation and Development Guidance. Environ. Molecular Mutagen. **60**:624-663.

Mundt, K.A. 2022. In: *Phyllis Grayson, Henderson, Vandestreek, and Davis v. Lockheed Martin*

Rhomberg L.R., J.E. Goodman, and R.L. Prueitt. 2013.  The weight of evidence does not support the listing of styrene as "Reasonably anticipated to be a human carcinogen" in *NTP's Twelfth Report on Carcinogens*. Human Ecolog. Risk Assess. **19**:4-27.