# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

VERVICIA HENDERSON et al.,

     Plaintiffs,

v.

LOCKHEED MARTIN CORPORATION et al.,

     Defendants.

Case No. 6:21-cv-1363-37DCI

## LOCKHEED MARTIN'S MOTION TO EXCLUDE THE PROFFERED SPECIFIC-CAUSATION OPINIONS OF DR. DIPAK PANIGRAHY

Pursuant to Federal Rule of Evidence 702, Lockheed Martin moves to exclude the proffered specific-causation opinion testimony of Dr. Dipak Panigrahy.

### SUMMARY

Dr. Panigrahy, who previously proffered unreliable general-causation opinions, now opines that five Plaintiffs probably developed their cancers from inhaling substances they attribute to Lockheed Martin. But reliably offering such an opinion requires a "sound **dose-response assessment specifically relevant to [each plaintiff]**," *Id.* at 1245 n.2 (emphasis added), which Dr. Panigrahy did not perform:

> **Q. Is there anywhere in your expert report for any particular plaintiff where you attempted to** take the concentrations expressed in [Dr. Sahu's report] and the durations of their work and ultimately **perform a dose–response assessment** to evaluate how much increased risk would accompany inhalation of those concentrations for those durations? [**A.**] As I mentioned, **I did not do that** because it wouldn't be appropriate to do.[1]

---

[1]   (Doc. 280–1 at 124:10–20.)

Like his general-causation opinions, Dr. Panigrahy's specific-causation views are ungrounded in any reliable toxicology or epidemiology. He maintains his linear no-threshold dose-response theories, but he now admits that he has never identified any study of a relevant substance that establishes any dose known to cause a relevant cancer. Indeed, he eschews dose-specific comparisons to scientific literature altogether, claiming differences in exposure conditions make such comparisons inappropriate. This, however, flies in the face of Eleventh Circuit precedent and the science on which it is based; dose is the single most significant consideration for specific-causation analyses, and comparisons to scientific literature are the tools used to establish dose-response relationships. What's more, Dr. Panigrahy fails to perform essential background risk comparisons, ignoring idiopathic causes of Plaintiffs' cancers rather than attempting to account for them. For these and other reasons explained below, Dr. Panigrahy's opinions should be excluded as unreliable.

## ARGUMENT[2]

Dr. Panigrahy claims to have formed his specific-causation opinions using the differential etiology methodology. The role differential etiology plays in toxic tort cases is well established, as are its reliability requirements. It advances the factual-causation inquiry only under limited circumstances, and it requires reliable exposure

---

[2]    Because the opinions of Plaintiffs' specific-causation experts share the same core flaws, Section I is substantially similar in each corresponding *Daubert* motion; it uses Eleventh Circuit precedent and highly respected secondary sources to explain how reliable expert testimony can establish factual causation in valid toxic-tort cases. Section II of each Motion then provides individualized explanations of how each expert failed to meet these standards, requiring exclusion of their opinions.

and dose-response predicates.  Dr. Panigrahy never laid those predicates—nor could he have based on existing scientific data.  His opinions are thus unreliable.

## I.     Proving specific causation through differential etiology requires reliable exposure and dose-response predicates that enable reliable risk comparisons.

As in any tort claim, plaintiffs in a toxic-tort case must prove by a preponderance of the evidence that the defendant engaged in tortious conduct that caused them harm.  *See* Restatement (Third) of Torts: Phys. & Emot. Harm ("Restatement") § 28(a).  "The special problem in these cases, however, is proving the connection between a substance and development of a specific disease."  *Id.* cmt. c(1).  "In most instances, cancers and other diseases do not wear labels documenting their causation."  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 635 (Fed. Judicial Ctr., 3d. ed. 2011).  There are no biological markers or other forms of direct causal evidence.  *See id.*  Proving factual causation thus requires evidence from which jurors could draw rational, non-speculative inferences.  Restatement § 28 cmt. b; *see also Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (explaining Florida's standard for proving probable causation through non-speculative evidence).

In a toxic-tort case, "[t]his type of proof requires expert testimony."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).  "An expert who opines that exposure to a compound caused a person's disease engages in **deductive clinical reasoning**" based on **dose-specific comparisons to scientific literature**:

> The opinion is based on an assessment of **the individual's exposure, including the amount**, the temporal relationship between the exposure and disease, and other disease-causing factors.  This information is then **compared with scientific data** on the relationship between exposure and

disease. The certainty of the expert's opinion depends on the strength of the research data demonstrating a relationship between exposure and the disease **at the dose in question** and the presence or absence of other disease-causing factors (also known as confounding factors).

REFERENCE MANUAL at 665 (emphasis added). Acting "as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury," the court must assess each step of the expert's deductive reasoning for reliability under Federal Rule of Evidence 702. *McClain*, 401 F.3d at 1237, 1245–46 ("The *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" (cleaned up)).

To organize this reliability assessment, "courts often address 'exposure,' 'general causation,' and 'specific causation.'" *See* Restatement § 28 cmt. c(1). Proving specific causation—that "exposure to an agent caused a particular plaintiff's disease"—requires reliable proof of exposure and general causation. *See id.* cmt. c(4).

A.   **When diseases have background risks that cannot be excluded, proving specific causation requires enabling reliable risk comparisons.**

"Sometimes proof of specific causation is easy and collapses into proof of general causation, as when there are no alternative causal agents for a disease, and the disease is said to be a 'signature' of the substance." *Id.*; *see also* REFERENCE MANUAL at 635 ("[F]or example, the relatively rare lung cancer known as mesothelioma is almost always caused by asbestos."). More frequently, diseases have causes that are undeniably unrelated to the substance at issue. These are called "background risks," and they "include all those causes of a disease, whether known or unknown, excluding

the . . . chemical in question." *McClain*, 401 F.3d at 1243.

When diseases have background risks, experts can sometimes use the "differential etiology" methodology to prove that a substance was the specific cause of a plaintiff's disease. *See, e.g.*, Restatement § 28 cmt. c(4). The methodology is ideal when all of the potential causes of a plaintiff's disease are known and all but one can be eliminated entirely. In these scenarios, courts describe differential etiology as a scientific "process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1195 (11th Cir. 2010).

Typically though, some alternative potential causes of a plaintiff's disease cannot be eliminated. This is particularly common when a disease has unknown, or "idiopathic," causes. In these scenarios, the most a differential etiology can accomplish is to "refine" the probability that a substance caused the disease, and even that can occur only if the disease also has known causes that can be eliminated:

> The underlying premise is that each of these known causes is independently responsible for some proportion of the disease in a given population. Eliminating one or more of these as a possible cause for a specific plaintiff's disease increases the probability that the agent in question was responsible for that plaintiff's disease.

Restatement § 28 cmt. c(4). Put differently, when idiopathic or other alternative potential causes of a plaintiff's disease cannot be eliminated, differential etiology is more a process of comparison than a process of elimination; the point is to enable a risk-to-risk comparison between a reduced background risk (the portion remaining after elimination of at least one known cause) and the risk posed by the plaintiff's

exposure to the substance in question.  *See id.*

**B.     Dose- and disease-specific risk estimates must be established through reliable epidemiology or toxicology before a differential etiology can be performed**.

The amount of risk posed by the plaintiff's exposure to the substance must thus be established **before** beginning a differential etiology.  "This is because a fundamental assumption underlying differential etiology is that the final suspected cause must actually be capable of causing the injury."  *Hendrix*, 609 F.3d at 1195 (cleaned up).  Courts must therefore "ensure that, for each possible cause the expert 'rules in' at the first stage of the analysis, the expert's opinion on **general causation** is derived from scientifically valid methodology."  *Id.* (cleaned up) (emphasis added).

In the Eleventh Circuit, there are two ways a plaintiff can build on general-causation evidence to establish the amount of risk (if any) posed by the plaintiff's exposure: epidemiologically and toxicologically.[3]  Both methods focus on the plaintiff's dose of the substance for the same scientific reason: "The intensity and duration of exposure (the 'dose') affects the magnitude of the risks posed and the likelihood of causation."  Restatement § 28 c(2); *see also* REFERENCE MANUAL at 507 ("Ultimately the dose incurred by populations or individuals is the measure needed by health experts to quantify the risk of toxicity.").

---

[3]     Courts sometimes cite *Chapman* for the proposition that there are three "indispensable" general-causation methodologies: (1) knowledge of dose-response, (2) epidemiological evidence, and (3) knowledge of the background risk of disease.  *See Chapman*, 766 F.3d at 1308.  "Dose issues," however, "are at the interface between toxicology and epidemiology" and measure increased risk over background.  *See* REFERENCE MANUAL at 658.  The three methodologies are thus closely related underscore the importance of epidemiologically or toxicologically sound dose-response assessments.

Epidemiologically, courts sometimes allow inferences about the risk posed by an individual's exposure to be drawn from group studies. For context, epidemiological studies "seek to identify toxic substances at the aggregate population level—by finding a higher incidence of a disease in a group exposed to the substance (an 'association')." Restatement § 28 cmt c(3). "The strength of an association between exposure and disease can be stated in various ways, including as a relative risk, an odds ratio, or an attributable risk." REFERENCE MANUAL at 566. "Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent." *Id.*

Although epidemiologists "do not examine specific causation in their research," some courts have "reasoned from the preponderance-of-the-evidence standard" that risk estimates from epidemiological studies can be used to evaluate specific causation in "similarly situated" individuals. Restatement § 28 cmt. c(4). The rationale is that,

> when a group study finds that exposure to the agent causes an incidence in the exposed group that is more than twice the incidence in the unexposed group (i.e., a relative risk greater than two), the probability that exposure to an agent caused a similarly situated individual's disease is greater than 50 percent.

*Id.*; *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) ("The threshold for concluding that an agent more likely than not caused a disease is 2.0. A relative risk of 1.0 means that the agent has no causative effect on incidence. A relative risk of 2.0 thus implies a 50% likelihood that the agent caused the disease. Risks greater than 2.0 permit an inference that the plaintiff's disease was more likely

than not caused by the agent.").[4]

"The propriety of this 'doubling' reasoning depends on group studies identifying a genuine causal relationship and a reasonably reliable measure of the increased risk." Restatement § 28 cmt. c(4). Further, the "similarly situated" requirement demands scientific evidence of comparable doses. *See id.* ("Thus, the extent to which the group-study outcome reflects the increased risk to the plaintiff depends on the plaintiff's similarity to those included in the group study," including most significantly "whether . . . the plaintiff was exposed to a comparable dose."); *see also* REFERENCE MANUAL at 612–16 (discussing the requirements for and limitations of drawing inferences regarding probability of causation from epidemiological data).

Under this epidemiological approach to specific causation, experts can sometimes use differential etiology to meet the risk-doubling standard even when the risk estimates in relevant studies do not exceed 2.0. *See* REFERENCE MANUAL at 618 ("Differential etiologies are most critical when the agent at issue is relatively weak and

---

[4]   As an example, imagine an epidemiological study of 10,000 people. Further imagine that within this study population the background risk of developing Disease A is 10% such that epidemiologists would expect 1,000 members of an identical control population to develop Disease A regardless of any chemical exposure. If the entire study population were exposed to a particular dose of a particular substance, and if 2,100 people then developed Disease A, epidemiologists would say that the relative risk associated with that dose was 2.1 (with the 0.0–1.0 portion attributable to background risk and the 1.0–2.1 portion representing risk attributable to the exposure).

If the observed association were truly causal, and if all 2,100 people who developed Disease A were to bring lawsuits claiming that the exposure (rather than background risk) caused their disease, then 1,100 would be correct and 1,000 would be incorrect. From this framework, courts that have adopted the group-to-individual risk reasoning would reason that each individual plaintiff's claim has roughly a 52.4% probability (1,100/2,100) of being correct; all 2,100 plaintiffs would therefore have met their burden of production under the preponderance-of-the-evidence standard. The same reasoning would extend to other plaintiffs in other cases who could prove that they experienced the same dose as the study population and were otherwise "similarly situated."

is not responsible for a large proportion of the disease in question.").

> For example, genetics might be known to be responsible for 50% of the incidence of a disease independent of exposure to the agent.  If genetics can be ruled out in an individual's case, then a relative risk greater than 1.5 might be sufficient to support an inference that the agent was more likely than not responsible for the plaintiff's disease.

*Id.* at 616–17.[5]  Importantly though, eliminating a known alternative cause of a disease advances the risk-comparison analysis only if the expert can also reliably estimate the portion of the background risk for which the eliminated cause was responsible.  "Even known causes for certain diseases may explain only a fraction of the incidence of such diseases, with the remainder due to unknown causes."  Restatement § 28 cmt. c(1).  Without knowing what that fraction is, eliminating a known cause does not enable a comparison to a reduced background risk.  And the smaller the fraction, the smaller the effect of the elimination, making differential etiology less helpful.  *See id.* cmt. c(4)

---

[5]   To add more clarity to the Reference Manual's example, imagine the same epidemiological study of 10,000 people from footnote 4, except this time imagine that the relative risk associated with the exposure was 1.6 instead of 2.1 (meaning that 1,600 people developed Disease A instead of 2,100 people).  If all 1,600 people then brought lawsuits claiming that the exposure caused their development of Disease A, only 600 would be correct; 1,000 would presumably have developed the disease due to background risks.  Under the group-to-individual risk reasoning, each individual's specific-causation claim would have only a 37.5% probability (600/1,600) of being correct, and thus none of them would be able to meet the burden of production under the preponderance standard—unless they could eliminate some background risks as potential alternative causes.

This is where differential etiology could come into play.  To use the Reference Manual's example, if genetics alone were responsible for 50% of the background incidence of Disease A, then plaintiffs who could exclude genetics as a potential cause would no longer be comparing the incidence of Disease A attributable to the exposure (600 of the 1,600 cases) with the incidence attributable to *all* other background risks (1,000 of the 1,600 cases); the comparison would instead be only to *non-genetic* background risks (500 of the 1,000 background-risk cases).  As a result, plaintiffs who could eliminate genetics as a background risk (via genetic testing, for example) could meet their burden of production under the preponderance standard by establishing that 600 of the 1,100 similarly situated population members (the 1,100 being all 1,600 cases less the 500 attributable to genetics) developed Disease A due to the exposure.  Applying the group-to-individual risk reasoning now, each such plaintiff's specific-causation claim would have a roughly 54.5% probability (600/1,100) of being correct.

("When the causes of a disease are largely unknown, however, differential etiology is of little assistance."); *see also* REFERENCE MANUAL at 618 ("Although differential etiologies are a sound methodology in principle, this approach is only valid if general causation exists and a substantial proportion of competing causes are known.").

Occasionally, toxicological studies can be used in much the same way as epidemiological studies to make dose-specific estimates of disease risk. This ordinarily involves comparing "the incidence of disease in groups of . . . animals (toxicological evidence) with different levels of exposure." Restatement § 28 cmt. c.[6] Dose-response estimates from animal studies, however, suffer from "uncertainties regarding extrapolation from animal and in vitro data to humans." *See id.*; *see also* REFERENCE MANUAL at 639 ("[T]he extent to which animal and cell experiments accurately predict human responses to chemical exposures is subject to debate."). This is why the Eleventh Circuit characterizes the use of "animal studies" as "secondary" methodologies that are "insufficient proof of general causation." *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).[7]

When toxicology can validly establish a dose-response relationship, proving specific causation is similar to doing so epidemiologically: "the primary issue will be whether there has been exposure to a **sufficient dose** to be a **likely** cause of [the

---

[6]   Toxicology is not exclusively confined to animal studies, but ethics preclude toxicological testing on humans outside of exceptional contexts, such as in support of "clinical epidemiology and in the testing of pharmaceutical agents." *See* REFERENCE MANUAL at 658.

[7]   No expert here has attempted to extrapolate human dose-response relationships from animals.

plaintiff's disease]." REFERENCE MANUAL at 638 (emphasis added).  Likelihood of causation is assessed through dose-specific comparisons to incidences of the disease in studies, then refined, if possible, through differential etiology. *See id.* at 665, 672.

### C.   Eleventh Circuit precedent requires differential etiology opinions to be reliably applied and have reliable dose-response predicates.

To summarize, in toxic-tort cases involving diseases with idiopathic or other non-chemical causes that cannot be eliminated, a plaintiff must offer scientifically reliable evidence from which a reasonable jury could infer that the defendant exposed the plaintiff to a substance that "increased [the plaintiff's] risk of harm to a greater extent than the risk posed by all other potential causes." *See* Restatement § 28 cmt. b. Meeting this burden of production requires at least three types of scientific evidence.

First, the plaintiff must reliably establish exposure to the substance of concern, including a scientific estimate of the plaintiff's dose.  "Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Pinares v. Raytheon Techs. Corp.*, No. 19-14831, 2023 WL 2661521, at *3 (11th Cir. Mar. 28, 2023) (quoting *McClain*, 401 F.3d at 1242).

Second, the plaintiff must "lay a 'reliable groundwork for determining the dose response relationship.'" *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1248 (11th Cir. 2018) (citation omitted).  While this groundwork does not require "precise numbers" in the sense that "[s]ome ambiguity about individual responses is expected," *see McClain*, 401 F.3d at 1241 n.6, it must enable a reliable estimate of *how much*—if at all—an exposure at the plaintiff's dose would increase the risk of developing the

plaintiff's disease.  *See, e.g.*, *Pinares*, 2023 WL 2661521, at *5 (affirming exclusion of dose-response opinions from an expert who "provided no reliable baseline against which the district court could evaluate his conclusions as to [plaintiff's] estimated exposure").  This requires pairing reliable evidence of the plaintiff's dose with reliable epidemiological or toxicological estimates of the disease-specific risk that dose poses.

Third, the plaintiff must enable risk-to-risk comparisons between the disease-specific risk posed by the plaintiff's exposure and the risks posed by all other potential causes of the disease, "whether known or unknown."  *See, e.g.*, *McClain*, 401 F.3d at 1243 ("[T]he likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes." (citation omitted)); *Chapman*, 766 F.3d at 1308 (affirming exclusion of causation experts who could not establish the idiopathic incidence of the plaintiff's disease).  Refining these risk comparisons through differential etiology requires establishing the "relative contribution" or "relative risk" of the plaintiff's risk factors, *see Guinn*, 602 F.3d at 1256–57, and the exclusion of known risk factors must be based on "scientific methods and procedures," *Chapman*, 766 F.3d at 1310.  The expert's "subjective beliefs or unsupported speculation" will not suffice.  *Id.*

All of this evidence must ultimately support a chain of reliable, non-speculative inferences that form "reasonable basis for the conclusion that it is more likely than not" that the alleged exposure caused the plaintiff's disease.  *See Guinn*, 602 F.3d at 1256 (citation omitted).  "A mere possibility of such causation is not enough . . . ."  *Id.*

II.   **Dr. Panigrahy's differential etiology analyses lack reliable exposure and dose-response predicates and reduce to unscientific speculation.**

A.   **There are idiopathic causes of the Bellwether Group I Cancers that no expert could exclude.**

Dr. Panigrahy intends to opine that exposure to PCE, TCE, styrene, hexavalent chromium, and arsenic from Lockheed Martin more likely than not caused six Bellwether Group I Plaintiffs' cancers: (1) David Berry's testicular cancer, (2) Kirsten Sheen's breast cancer, (3) Wendy Stone's breast cancer, (4) Naoyuki Komatsu's acute lymphoblastic leukemia, (5) Brian Kemp's hairy cell leukemia, and (6) Morgan Innes's Hodgkin's lymphoma (these cancer types are collectively "Group I Cancers").[8] Dr. Panigrahy agrees, however, that all Group I Cancers have idiopathic causes that cannot be excluded as possible causes of these Plaintiffs' cancers.[9]

B.   **Dr. Panigrahy failed at the general-causation stage to establish the predicate dose-response relationships required to form a reliable specific-causation opinion.**

As explained in Section I(A), Dr. Panigrahy's inability to exclude background risks of Plaintiffs' diseases means that he could only have offered a valid specific causation opinion by establishing risk-to-risk comparisons between these Plaintiffs' alleged exposures and the idiopathic or other potential causes of Group I Cancers. This requires a reliable groundwork for determining dose-response relationships, which Dr. Panigrahy failed to establish at the general-causation stage.

To recap, Dr. Panigrahy failed to establish any dose at which any relevant

---

[8]   (Doc. 275-2 at 2.)

[9]   (*See* Doc. 280–1 at 142:9–14, 143:1–5.)

substance poses even an appreciable risk of causing the Group I Cancers.[10]  He testified that every substance he considered is genotoxic and thus likely exhibits a linear no-threshold ("LNT") dose-response relationship with every Group I Cancer.[11]  He also testified that modeling an LNT relationship involves using known risks at observed doses to extrapolate unknown risks at unobserved doses, all the way down to single-molecule doses posing "infinitesimally small" risks.[12]  But Dr. Panigrahy could not identify any known Group I Cancer risks at any dose of a relevant substance, and he made no attempt to model the alleged LNT relationships.[13]

As previously briefed, the vast majority of Dr. Panigrahy's general-causation expert report was plagiarized from IARC "*Monographs*,"[14] without disclosing that IARC had **not** concluded from those analyses that the substances at issue cause the Group I Cancers.   Notably, Dr. Panigrahy conceded at his specific-causation deposition that IARC believes there is **insufficient** human evidence that PCE, TCE, styrene, hexavalent chromium, or arsenic cause any relevant cancer under any exposure conditions.[15]  Thus, even the organization from which Dr. Panigrahy most heavily plagiarized has not concluded that these alleged dose-response relationships

---

[10]   (Doc. 136-3 at 121:7–20.)

[11]   (Doc. 136-3 at 100:1–8.)

[12]   (Doc. 136-3 at 98:23–99:7, 100:10–21, 113:12–18.)

[13]   (*See* Doc. 136-3 at 102:1–11, 122:11–19.)

[14]   (*See* Doc. 139 at 13–22.)

[15]   (Doc. 280–1 at 130:21–131:1 ("**Q.**  IARC has not concluded for TCE, PCE, styrene, hexavalent chromium, or arsenic, that there is sufficient evidence of carcinogenicity in humans under any exposure conditions, right?  [**A.**]  Correct.  Correct." (discussing Doc. 275-10)).)  Throughout this Motion, deposition objections have been omitted and replaced with "[**A.**]" for brevity.

**exist**, let alone determined any doses posing appreciable risks.

>    **C.    Dr. Sahu's air model produced concentrations of PCE, TCE, styrene, hexavalent chromium, and arsenic that are extraordinarily low.**

Plaintiffs' fate-and-transport expert, Dr. Sahu, now claims to have modeled Lockheed Martin's contribution to PCE, TCE, styrene, hexavalent chromium, and arsenic concentrations in the air outside of the Golf Channel building where Plaintiffs worked.  Dr. Sahu summarizes the results of his model in Table 20 of his expert report, which lists his modeled annual average concentration of these substances for the years 1995–2020.  Table 20 omits the unit of measurement, but it is undisputed that the results are expressed in micrograms per cubic meter ($\mu g/m^3$).  Dr. Sahu also opines in Table 21 on "expected Florida background" concentrations of these substances.[16]

Dr. Sahu's model is unreliable for the reasons expressed in Lockheed Martin's contemporaneously filed motion to exclude his opinions.  Regardless, Dr. Sahu's modeled concentrations are *extraordinarily* low.

Consider two points of comparison.  First, EPA establishes substance-specific "inhalation unit risk factors" ("IURs") used for intentionally overprotective estimates of how many cancers of **any type** might result from a lifetime exposure to a substance at a particular concentration.  As explained by Lockheed Martin's expert toxicologist, Dr. James, these Plaintiffs' substance-specific all-cancer risks range from about "5.66E-06" (i.e., 5.66 in a million, or about **one in 176,000**) to "4.57E-11" (i.e.,

---

[16]    (Doc. 276-8 at 79 (Table 20), 80 (Table 21); *see also* Doc. 276-9 (standalone Table 20).)

4.57 in 100 billion, or about **one in 21.8 billion**) per standard IUR analyses.[17]

Second, Dr. Panigrahy has never staked out concentrations of any substance in any epidemiological or toxicological study that he is willing to say caused a demonstrable increase in the incidence of any Group I Cancer. This makes sense, as Lockheed Martin is unaware of any study in which the authors themselves reached such a conclusion or provided information that could support it. All the same, Dr. Panigrahy cites dozens of occupational epidemiological studies in his initial specific-causation report, evidently for more qualitative causal propositions. Those few studies that both address inhalation of the substances of concern and make statements from which inhaled concentrations can be inferred, even if only imprecisely, suggest that concentrations were between about **1,100 and 95 million times higher** than the highest concentrations reported in Dr. Sahu's Table 20:

| Substance | Study | Approx. x Higher than Dr. Sahu's Max Concn. | Citations |
|---|---|---|---|
| Arsenic | Axelson (1978) | **78,799** | Doc. 275-11 (Study) Doc. 275-12 (Summary) |
| "Chromates" | Marano (2000) | **1,136** | Doc. 275-15 (Study) Doc. 275-16 (Summary) |
| PCE | Marano (2000) | **64,600** | Doc. 275-15 (Study) Doc. 275-16 (Summary) |
| PCE | Callahan (2019) | **1,634,615–8,307,692** | Doc. 275-17 (Study) Doc. 275-19 (Summary) |
| TCE | Raaschou-Nielsen (2003) | **22,590,361–95,783,133** | Doc. 275-20 (Study) Doc. 275-21 (Summary) |
| Styrene | Bertke (2018) | **42,600,000–71,868,706** | Doc. 275-22 (Study) Doc. 275-23 (Summary) |
| Styrene | Christensen (2018) | **2,588,235–9,411,765** | Doc. 275-24 (Study) Doc. 275-29 (Summary) |

---

[17] (Doc. 280-2 at 42–45 (explanation), 52–57 (calculations), 57–58 (summary).)

| Substance | Study | Approx. x Higher than Dr. Sahu's Max Concn. | Citations |
|---|---|---|---|
| Styrene | Loomis (2019) | 62,248,471 | Doc. 275-30 (Study) Doc. 275-32 (Summary) |
| Styrene | Collins (2013) | 28,065,882 | Doc. 275-33 (Study) Doc. 275-34 (Summary) |
| Styrene | Graff (2005) | 4,009–50,117,647 | Doc. 275-35 (Study) Doc. 275-36 (Summary) |

Thus, even if these studies could establish causal relationships (and they cannot), they would be at concentrations orders of magnitude higher than the highest modeled here.

Holding Dr. Panigrahy to the Eleventh Circuit's dose-response requirements is therefore not hyper-technical. There is no reason to believe that any scientist could establish dose-response relationships at Dr. Sahu's concentrations, and it is no surprise that no expert has identified a toxicological or epidemiological study showing any association with Plaintiffs' cancers anywhere near these concentrations.

> **D.   Dr. Panigrahy performed no dose-response assessments based on Dr. Sahu's model, established no relevant cancer risks over background, and thus offers no reliable proof of specific-causation.**

Although it would have been untimely, Dr. Panigrahy still made no attempt to lay a reliable dose-response groundwork in his specific-causation opinions. He maintains his LNT hypotheses for every alleged dose-response relationship, claiming that cancer risks persist (albeit in "infinitesimally small" amounts) down to single-molecule doses.[18] Yet he has not, even now, attempted to use any methodology to graph or otherwise extrapolate any alleged LNT relationship,[19] nor has he identified

---

[18]   (*See* Doc. 280–1 at 44:12–46:3, 50:2–50:9.)

[19]   (Doc. 280–1 at 48:25–49:16.)

any dose-response levels from which such an extrapolation could be performed.[20]

Further, Dr. Panigrahy has never tried to establish any degree of risk posed by Dr. Sahu's modeled concentrations.  Although Dr. Panigrahy relied exclusively on Dr. Sahu to establish the concentrations of the substances to which Plaintiffs were allegedly exposed,[21] he could not discern and had never even "tried to figure out the units of measurement" in Table 20.[22]  Expectedly given this admission, Dr. Panigrahy also made no effort to compare Dr. Sahu's modeled concentrations to any dose expressed in his general causation report[23] or any concentration expressed in **any** epidemiological or toxicological study.[24]

During his deposition, Dr. Panigrahy repeatedly argued that any comparison to epidemiological or toxicological studies would have been inappropriate.  His rationale was essentially that the subjects of any study would have been exposed to different concentrations (both background and excess) than those that Plaintiffs purportedly

---

[20]  (Doc. 280–1 at 114:13–24 ("**Q.** . . . There's also no place in your report where you write down any dose of hexavalent chromium, PCE, TCE, or styrene that's been observed in any kind of study to cause testicular cancer, breast cancer, or any blood cancer in humans, right?  [**A.**]  Correct. . . ."), 113:14–114:11 (same for arsenic).)

[21]  (Doc. 280–1 at 39:14–1, 31:1–6.)

[22]  (Doc. 280–1 at 70:11–70:24 ("**Q.** Have you ever—have you ever tried to figure out the units of measurement?  **A.** Not for this—this particular modeling, no.").)

[23]  (Doc. 280–1 at 252:23–253:6 ("**Q.** Can you show me anywhere in either of your specific causation reports where you offer an analysis on whether or to what extent the exposure levels modeled by Dr. Sahu exceed any dose expressed in your general causation report?  **A.**  No. . . .").)

[24]  (Doc. 280–1 at 96:16–96:24 ("**Q.**  Did you compare any of those TCE, PCE, or styrene concentrations to concentrations studied in any epidemiological or toxicological study cited in any of your expert reports?  **A.**  I did not for the reasons as before, because the valid comparison for these concentrations would be the background in these people not exposed to these chemicals that Dr. Sahu compared to."); *see also id.* at 71:20–72:3, 92:6–93:4 (arsenic), 70:25–71:10 (hexavalent chromium).)

experienced, so it would be impossible to compare truly "like" exposures.[25]  He

therefore maintained that the only data to which Dr. Sahu's Table 20 concentrations

could be appropriately compared are the Table 21 "background" concentrations.  In

other words, on the basis that any epidemiological or toxicological comparison would

be imperfect, Dr. Panigrahy elected to make no such comparison at all.

The problem with this logic is that it would make establishing the **response**

portion of dose-response relationships impossible.  As explained in Section I, general

causation evidence in toxic-tort cases "consists of scientific studies **comparing the**

**incidence of disease in groups** of individuals (epidemiologic evidence) or animals

(toxicologic evidence) **with different levels of exposure**."  Restatement § 28 cmt. c(3)

(emphasis added).  This incidence-comparison is key because it enables not just proof

that a dose is able to cause harm, but also a basis for inferring **how much** that dose

increases the risk of developing a specific disease.  *See, e.g., Pinares*, 2023 WL 2661521,

at *5 (requiring a "reliable baseline against which the district court could evaluate [the

expert's] conclusions as to [the plaintiff's] estimated exposure").

Dr. Panigrahy's exclusively concentration-to-concentration comparison ignores

incidence of disease.  His reports contain no comparison of Group I Cancer incidences

around Dr. Sahu's Golf Channel receptor with those in any of his "background"

locations (which are elsewhere throughout Florida).  And although it should go

without saying, this case is not an epidemiological study; even if there were differences

---

[25]  (*See, e.g.*, Doc. 280–1 at 72:4–25.)

in the Group I cancer incidences, it would require epidemiological analyses that have not been performed here to assess whether those differences suggest causation.

That is why, contrary to Dr. Panigrahy's contentions, dose-specific comparisons to epidemiological or toxicological studies are not just appropriate in toxic-tort cases like this; they are **mandatory**. These are the tools used to establish that particular doses pose particular degrees of risk, which, in turn, enables comparison to background risks. *See, e.g.*, *Chapman*, 766 F.3d at 1303. Because Dr. Panigrahy eschewed these comparative methodologies, he was **completely unable to estimate the degree of risk**, if any, posed by Dr. Sahu's modeled concentrations.[26]

If imprecision in comparisons were really Dr. Panigrahy's concern, he could have at least **attempted** like-kind comparisons. But he testified that he made no effort to compare Dr. Sahu's Table 21 "background" concentrations to background concentrations in any study, and no effort to compare Dr. Sahu's Table 20 "increased exposure" concentrations with increases in any study.[27] Most tellingly, Dr. Panigrahy

---

[26]   (Doc. 280–1 at 172:1–17 ("**Q.** . . . My question is, **is there anywhere in your expert reports where you believe you have quantified excess cancer risk over background** attributable to the concentrations modeled by Dr. Sahu?  If the answer is "no," you didn't quantify it, please tell me.  If the answer is "yes," I want you to point me to the page and line. [**A.**] Yeah.  **I think the answer is no**. . . ."); 87:15–88:13 ("**Q.** So for the plaintiffs in this case, expressed as a ratio or a percentage, **can you tell me how much you believe their risk of developing their cancers increased** as a result of inhalation of the substances modeled in Table 20 of Dr. Sahu's expert report?  [**A.**] I would just—and as I said before, **I can't give a number**. . . ."), 97:23–99:17 (same for any **mixture** of any of the substances modeled by Dr. Sahu in the concentrations modeled by Dr. Sahu), 104:3–105:9 (same).)

[27]   (Doc. 280–1 at 73:1–17 ("**Q.** Well, have you made any effort to compare Dr. Sahu's modeled background concentrations of any substance in this case with background concentrations of any substance reported in any epidemiological study?  **A.** No. . . ."), 73:18–74:4 ("**Q.** Did you make any effort to compare the level of increased exposure in Dr. Sahu's model with the level of increased exposure in any epidemiological study?  **A.** No.").)

never attempted total-dose comparisons.   Exposure concentrations are typically expressed in studies using absolute (non-relative) units of measurement, such as parts per billion, parts per million, or (like Dr. Sahu used) micrograms per cubic meter. Dr. Panigrahy did not even try to compare Dr. Sahu's modeling results with any concentrations expressed in absolute units of measurement, and he testified that even a comparison between the **scale** of the increased exposures in epidemiological studies and those in Dr. Sahu's Table 20 would have made no difference in his analyses.[28]

The reason is clear: Dose—the "single most important factor" to reliable causation assessments in toxic-tort cases—played no meaningful role in Dr. Panigrahy's opinions.  *See McClain*, 401 F.3d at 1242.  Causation experts "need[] to perform or rely upon a methodologically sound dose-response assessment specifically relevant to [each plaintiff]."  *Id.* at 1245 n.2.  Dr. Panigrahy did not:

> **Q.**  Is there anywhere in your expert report for any particular plaintiff where you attempted to take the concentrations expressed in [Dr. Sahu's report] and the durations of their work and ultimately perform a dose–response assessment to evaluate how much increased risk would accompany inhalation of those concentrations for those durations? [**A.**] . . . **I did not do that** because it wouldn't be appropriate to do.[29]

Dr. Panigrahy's opinions and supporting methodologies (or lack thereof) are thus irreconcilably at odds with the Eleventh Circuit's requirements for reliable specific-

---

[28]   (*See* Doc. 280–1 at 76:10–78:4 ("[**Q.**] Did you make any effort to compare exposure concentrations modeled in Table 20 with exposure concentrations in any study of any kind expressed in parts per million, parts per billion, micrograms per cubic meter, or milligrams per cubic meter? [**A.**] No. . . ."), 74:19–76:8 ("**Q.**  Does the scale of the increased exposure level in an epidemiological study matter for purposes of your analysis as compared to the scale of the increased exposure levels, according to Dr. Sahu, for this case?  [**A.**]  No. . . .").)

[29]   (Doc. 280–1 at 124:10–20.)

causation opinions and must be excluded under Federal Rule of Evidence 702.

### E. Dr. Panigrahy failed to enable the background risk comparisons that are essential to a reliable differential etiology.

Because Dr. Panigrahy could neither exclude the possibility that Plaintiffs' cancers resulted from idiopathic causes (which is all but certainly what occurred) nor estimate the Group I Cancer risks, if any, posed by the exposures Plaintiffs purportedly experienced, no further consideration of his "differential etiology" is necessary.  As explained in Section I(B), the likelihood that a substance caused a disease cannot be refined through differential etiology if it was never established in the first instance.  To be clear though, Dr. Panigrahy's differential etiology would have been independently unreliable for four related reasons.

First, Dr. Panigrahy was unable to "quantify the relative contribution of [the plaintiffs'] risk factors." *See Guinn*, 602 F.3d at 1256.  He had no sense of how often any of the Group I Cancers develop idiopathically.[30]  As explained in Section I(B), eliminating a known alternative cause of a disease advances a differential etiology only if the expert can also reliably estimate the portion of the background risk for which the eliminated cause was responsible; this cannot be done if idiopathic causes are responsible for an unknown portion of a disease's background risk.

Second, Dr. Panigrahy could not quantify the risk attributable to idiopathic

---

[30]   (Doc. 280–1 at 151:24–152:25 ("**Q**. . . . So, "yes" or "no," is there anywhere in either of your specific causation reports where you provide a scientific estimate of how often you believe any cancer you considered developed as a result of idiopathic causes as compared to any known causes? . . . [**A.**]  No, I don't—**I don't think I have the percent of idiopathic cancer, because as I said, that wasn't relevant to my analysis**. . . .").)

causes because he did not reliably account for them **at all**.  Dr. Panigrahy repeatedly testified that he restricted his version of a differential etiology to comparing Plaintiffs' alleged exposures with "the **known** risk factors of these cancers."[31]  When asked about idiopathic causes, Dr. Panigrahy tried to sidestep the issue by saying that they are "not really relevant" to the case:

> **Q.**  Is there anywhere in either your specific causation initial report or your specific causation rebuttal report where you scientifically estimate how often you believe any of the cancer types in your expert report develop as a result of **idiopathic causes**?  **A.  That's not really relevant** to my -- my -- **the question here is** do these chemicals or mixture exposure to these five chemicals above background, more likely than not, cause these specific cancer -- cancers **compared to the known risk factors**, **rather than compared to other unknown causes**.  So that's where **I focus on the other known risk factors** for these cancers.[32]

Similarly, Dr. Panigrahy attempted to define "idiopathic" causes in a way that would have automatically eliminated them in the presence of known risk factors (even though risk factors are not necessarily even known causes).[33]  But he also conceded that all these cancers develop in the absence of known risk factors.[34]  Once it is established that there are unknown (i.e., idiopathic) causes for a disease, it does not follow that these causes must be absent in the presence of known risk factors.  *See Guinn*, 602 F.3d at 1255 ("The fact that exposure to a substance may be a risk factor for a disease does not

---

[31]   (Doc. 280–1 at 144:1–16 (emphasis added); *see also id.* at 134:11–20 (same), 144:18–145:8 (same).)

[32]   (Doc. 280–1 at 150:22–151:10 (emphasis added).)

[33]   (Doc. 280–1 at 137:25–138:9 ("Well, idiopathic, by definition, is you do a differential as we were talking about, etiology, and you look at the known risk factors.  And **if there's not a known risk factor, we don't know the cause, then that's called idiopathic**." (emphasis added)).)

[34]   (Doc. 280-1 at 138:12–18 ("[**Q.**] But there are people who develop all of the cancers that you addressed in your expert report with no known risk factors for those cancers, right? **A.** Correct. . . .").)

make it an actual cause simply because the disease developed." (cleaned up)).  In effect, Dr. Panigrahy's "differential etiology" does not exclude idiopathic causes of the Group I cancers; it ignores them.  *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342 (11th Cir. 2010) ("The failure to take into account the potential for idiopathically occurring [disease] . . . placed the reliability of [the expert's] conclusions in further doubt.").

Third, Dr. Panigrahy fails to meaningfully consider exposures from sources other than Lockheed Martin.  *See* REFERENCE MANUAL at 672 ("In addition, ascribing causality to a specific source of a chemical requires that a history be taken concerning other sources of the same chemical.").  People are routinely exposed to Dr. Sahu's modeled substances—which is why his "background concentrations," even while grossly understated, are not zero.  As pointed out by Lockheed Martin's expert toxicologist, if Dr. Panigrahy's "single-molecule" LNT dose-response hypothesis were true, all of these routine exposures would be potential causes of Plaintiffs' cancers.[35] *See, e.g., Adams v. Cooper Indus., Inc.*, No. CIVA 03-476 JBC, 2007 WL 2219212, at *7 (E.D. Ky. July 30, 2007) ("[I]f 'any' exposure is sufficient to cause the plaintiffs' illnesses, then differential etiology would not work to rule out other sources of exposure to the same substance.").  Dr. Panigrahy responded that the body has DNA-repair mechanisms that make exposures below "background" biologically irrelevant, then he conveniently defined "background" as everything other than Dr. Sahu's

---

[35]  (*See* Doc. 280-2 at 62–74 (Dr. James addressing Dr. Panigrahy's flawed genotoxicity analyses).)

modeled concentrations attributable to Lockheed Martin.[36]   But this ties back to Dr. Panigrahy's dose-response failures, and he offers no scientific evidence that the body's DNA-repair mechanisms are overwhelmed at any particular concentration.

Finally, Dr. Panigrahy's failure to establish dose-response estimates, his ignoring of idiopathic causation, and his selective disregard of DNA-repair mechanisms all speak to the overly temporal nature of his opinions.  His rebuttal report encapsulates his opinions: "[W]hat is apparent is that Lockheed Martin caused these plaintiffs to suffer from significantly elevated risks of numerous cancers—above the risks they otherwise would have—and that these plaintiffs then proceeded to suffer from the cancers that Lockheed Martin's emissions put them at a greater risk of."[37] With no valid dose-response and risk assessments, this reasoning is too "rooted in a temporal relationship" to be reliable.  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1343 (11th Cir. 2010) ("This is a classic 'post hoc ergo propter hoc' fallacy . . . because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." (cleaned up)).  "Such specific causation testimony has been found to be inherently unreliable in [The Eleventh] Circuit."  *Id.* at 1342.

## CONCLUSION

For the reasons expressed above, Lockheed Martin respectfully requests that this Court exclude Dr. Panigrahy's proffered specific-causation opinions as unreliable.

---

[36]   (*See* Doc. 275-7 at 18 (Panigrahy rebuttal report on DNA repair mechanisms); Doc. 280-1 at 175:19–176:4 ("**Q.** . . . Are you characterizing every exposure to those substances, other than those exposures modeled by Dr. Sahu, as background levels of these substances?  **A.**  Yes. . . .").)

[37]   (Doc. 275-7 at 13–14.)

Dated: June 20, 2023

Francis A. Citera*
citeraf@gtlaw.com
Gretchen N. Miller*
millerg@gtlaw.com
**GREENBERG TRAURIG, LLP**
77 West Wacker Dr., Ste. 3100
Chicago, Illinois 60601
Telephone: (312) 456-6583
Facsimile: (312) 899-0320

Irina Khasin*
irina.khasin@gtlaw.com
**GREENBERG TRAURIG, LLP**
Terminus 200
3333 Piedmont Rd. NE, Ste. 2500
Atlanta, GA 30305
Telephone: (678) 553-2455

*Specially admitted*

Respectfully submitted,

/s/ David B. Weinstein
David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Christopher Torres (FBN 0716731)
torresch@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
Raymond Jackson (FBN 1028350)
jacksonra@gtlaw.com
Brian Porter (FBN 0120282)
porterb@gtlaw.com
Christopher R. White (FBN 1022219)
whitech@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd., Ste. 1900
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

*Attorneys for Defendant Lockheed Martin Corporation*

## LOCAL RULE 3.01(g) CERTIFICATION

I certify that on June 20, 2023, counsel for Lockheed Martin Corporation conferred with counsel for Plaintiffs, who oppose the relief requested in this Motion.

/s/ David B. Weinstein
Counsel for Lockheed Martin Corporation

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

<u>/s/ David B. Weinstein</u>
Counsel for Lockheed Martin Corporation