## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

VERVICIA HENDERSON *et al.*,

      Plaintiffs,

v.                                         Case No. 6:21-cv-1363-RBD-DCI

LOCKHEED MARTIN
CORPORATION; and UNIVERSAL
CITY PROPERTY MANAGEMENT
COMPANY III, LLC,

      Defendants.

_____

### ORDER

Before the Court are the parties' summary judgment and *Daubert* motions

on the issue of general causation. (Docs. 139–42, 144, 146, 148, 151, 152.)

### BACKGROUND

In this toxic tort case, more than sixty Plaintiffs allege that Defendant

Lockheed Martin Corporation's weapons manufacturing facility in Orlando gave

off toxic chemicals that contaminated the surrounding air, soil, and groundwater,

which caused Plaintiffs to suffer various forms of cancer, birth defects,

neurological and immunological issues, and other injuries. (Doc. 89.) In support of

their resulting strict liability, negligence, nuisance, and other claims, Plaintiffs

have marshalled various doctors to opine on general causation—that is, whether

each chemical at issue is capable of causing the types of injuries Plaintiffs suffered. (*See* Doc. 142, pp. 3–10.) Plaintiffs and Lockheed[1] have now filed cross-motions for summary judgment on this issue of general causation. (Docs. 142, 152; *see* Docs. 164, 165, 177, 178.) Both sides have also moved to exclude each others' general causation experts. (Docs. 139–41, 144, 146, 148, 151; *see* Docs. 157, 160, 163, 167, 169, 171, 173.) After a hearing (Doc. 209), these matters are ripe.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Then the court must decide whether there is "sufficient disagreement to require submission to a jury." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (cleaned up).

Expert testimony may only be admitted if: (1) the expert is qualified; (2) the methodology is reliable; and (3) the testimony is helpful. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see Daubert v. Merrell Dow Pharms.*,

---

[1] Plaintiffs allege that the second Defendant, Universal City Property Management Company III, bought some land from Lockheed and contributed to some of the contamination. (Doc. 89, ¶ 17; *see* Doc. 286-3.) Universal did not move for summary judgment.

2

*Inc.*, 509 U.S. 579 (1993). The proponent of the expert must establish the opinion is admissible, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010), but need not prove it is correct, *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002).

## ANALYSIS

As a general overview of the voluminous and overlapping briefing: Plaintiffs argue that they are entitled to summary judgment on general causation because the chemicals at issue fall under *McClain* category one (discussed in detail below), thus bypassing the general causation inquiry with no need for consideration of particular dosages. (Doc. 142, pp. 11–16; Doc. 165, pp. 6–13; Doc. 177, pp. 1–6.) Lockheed disputes this characterization, arguing that *McClain* categorization does require analysis of both substances and dosages; because Plaintiffs' general causation experts do not consider dosage issues, Lockheed urges, they cannot reliably establish general causation. (Doc. 164, pp. 3–16; *see* Doc. 152, pp. 11–21; Doc. 178, pp. 1–7.) Even if dose-response consideration is not required at this stage, however, Lockheed urges that Plaintiffs cannot otherwise establish general causation; Plaintiffs dispute this on the strength of their experts (and correspondingly attack Lockheed's experts' contrary conclusions), but Lockheed argues that Plaintiffs' experts should be excluded, and even if they were reliable, they still fail to establish general causation. (Doc. 142, pp. 16–23; Doc. 152,

pp. 11–25; Doc. 164, pp. 16–19; Doc. 165, pp. 14–16.)

## I.    *McClain* Categorization

The Court begins with the threshold categorization question and thus a review of one of the seminal cases on causation in toxic tort cases: *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005). In all toxic tort cases, plaintiffs must prove both general and specific causation. *Id.* at 1237. *McClain* teaches that general causation is concerned with the substance—that is, can the substance cause the type of harm the plaintiff alleges? By contrast, specific causation is concerned with the individual—that is, was this particular plaintiff exposed to the substance, were they exposed to enough of it to cause the alleged harm, and did the substance actually cause this plaintiff's harm? *Id.* at 1239.

On the topic of general causation, *McClain* breaks the cases into two categories. *Id.* In category one, the medical community generally recognizes the substance as toxic and causing the type of harm alleged. *Id. McClain* points to asbestos causing asbestosis as an example of a category one signature substance/illness relationship. *Id.* For category one, courts need not undertake an "extensive" general causation analysis and should focus on specific causation. *Id.*

In category two, by contrast, the medical community does not generally recognize the substance as causing the type of harm alleged. *Id.* For instance, in *McClain*, the substance at issue was a combination of ephedrine and caffeine. *Id.*

4

Because the medical community did not generally recognize ephedrine or caffeine alone or in combination to cause the type of harm the *McClain* plaintiffs alleged (heart attacks and strokes), the court was required to undertake a typical full *Daubert* inquiry on both general and specific causation. *Id.* at 1236, 1239.

So as a threshold matter, the Court must determine whether this case falls into *McClain* category one, in which case general causation is met and the Court can skip to the specific causation part of the inquiry, or category two, in which case the Court must conduct a full *Daubert* general causation analysis. Plaintiffs argue that the substances in question fall under *McClain* category one. (Doc. 142, pp. 13–16.)

Here we must pause to determine which substances are in question. Plaintiffs identified thirty-four substances in their Fourth Amended Complaint. (Doc. 89, ¶¶ 127–60.) But Plaintiffs' experts offered opinions on only nine substances: toluene, xylenes, arsenic, hexavalent chromium, 1,1,1-trichloroethane, PCE (tetrachloroethylene/perchloroethylene), TCE (trichloroethylene), styrene, and formaldehyde. (Docs. 135-1, 136-1, 138-1, 150-1.) Plaintiffs' counsel confirmed at the hearing that these nine were the only substances at issue. (Doc. 251, p. 7:12–22.) Of these, only the first seven were identified in the operative Complaint; styrene and formaldehyde were not. (*See* Doc. 89.) But the Complaint does have a placeholder for additional unnamed contaminants. (*Id.* ¶ 161.) And though

5

Lockheed points out that styrene and formaldehyde were not named, it does not offer any substantive argument as to why the Court should not consider them. (*See* Doc. 152, p. 10.) Nor is there any suggestion of unfair surprise, as Lockheed's experts offered rebuttal opinions on these two substances. (Docs. 156-1, 159-1.) So the Court will consider all nine substances identified by Plaintiffs.[2]

In response to Plaintiffs' argument that these nine substances fall into *McClain* category one, Lockheed points out that *McClain* focuses on substance/illness relationships, not just substances alone. (Doc. 164, pp. 6–8.)

---

[2] Plaintiffs did not provide expert testimony on the remaining twenty-seven substances from the operative Complaint. (*See* Doc. 152, p. 25.) They assert that their experts should be permitted to offer opinions on mixtures of solvents without individually opining on each of them. (Doc. 165, p. 20.) But this argument is inconsistent with Plaintiffs' counsel's subsequent representation that only the nine enumerated substances were at issue. (*See* Doc. 251, p. 7:12–22.) In any event, as a general notion, the Court accepts the idea that mixing substances may increase the risk of certain illnesses over and above the risk of exposure to the individual substances due to dose additivity or synergy. (*See* Doc. 165, p. 20 n.32; *e.g.* Doc. 136-1, p. 58.) But for the Court to properly examine causation in connection with its *Daubert* responsibilities, the experts at the very least would have to identify and opine on the substances involved in the mixtures under consideration, as simply pointing to "mixtures" or "solvents" as the cause of any illness with no further information could not possibly satisfy *Daubert*; nor do Plaintiffs point to any binding or persuasive case law from within this Circuit in support of this argument. Indeed, Plaintiffs' sole cited case on this issue, *Allen v. Martin Surfacing*, 263 F.R.D. 47, 54–60 & n.10 (D. Mass. 2009), though from outside the Circuit and not particularly persuasive, supports the Court's conclusion. There, the court did accept opinions that solvent mixtures containing the substance at issue, toluene, along with other chemicals, caused the illness in question and thus sufficiently demonstrated general causation. But those opinions identified each chemical in the solvent mixture and were supported by the experts' underlying opinions on the risks of toluene. So while the Court does not exclude any expert opinions concerning mixtures involving the nine enumerated substances at issue solely because they look at mixtures rather than individual substances, for the twenty-seven substances for which the experts do *not* explicitly offer any underlying opinions supporting the harm caused by the individual substance, the Court considers claims based on those twenty-seven substances abandoned due to lack of scientific support. (*See* Doc. 135-1, p. 3; Doc. 136-1, pp. 10–12, 59; Doc. 138-1, pp. 4–23; Doc. 150-1, p. 6.)

Plaintiffs counter that these substances are genotoxic and carcinogenic (in other words, they potentially damage human cells and cause cancer) as a general matter, so they need not be linked to particular illnesses to fall into category one. (Doc. 142, pp. 5–9, 14; *see* Doc. 136-1, p. 10.) The Court agrees with Lockheed on this point. *McClain* category one encompasses substances with an essentially linked signature illness—like asbestos with asbestosis. *See McClain*, 401 F.3d at 1239. The entire point of category one is that the causal relationship between a substance and an illness is so strongly established that no one would question it, obviating the need for a full *Daubert* general causation analysis. *See id.* ("The court need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent *causes the type of harm* a plaintiff alleges." (emphasis added)). So even if a substance is harmful to humans as a general matter, the Court must look beyond that to whether the science establishes an undeniable causal link between the substance and the *types of illnesses* alleged.[3]

---

[3] Plaintiffs briefly assert that *McClain* is not clear on whether the substance must be generally accepted to cause *cancer* as a general matter or whether it must be generally accepted to cause a specific *type of cancer* to satisfy category one. (Doc. 177, p. 6); *see McClain*, 401 F.3d at 1239 (citing as a category one example "cigarette smoke, which causes cancer"). But *McClain* elsewhere clarifies that "cigarette smoking causes *lung* cancer," suggesting that the particular type of cancer must be linked to the substance. *McClain*, 401 F.3d at 1239 n.5 (emphasis added). And Plaintiffs cite no case law in this Circuit for the proposition that carcinogenicity generally is enough to meet the category one burden or even to show general causation more broadly. For instance, if the medical community agreed that cigarette smoke was a carcinogen, but the type of harm alleged in a particular case was bone cancer and there was no scientific support showing that cigarette smoke caused bone cancer, general causation plainly would not be satisfied. (*See, e.g.*, Doc. 136-3, p. 55:1–25 (Plaintiffs' expert testifying that not all carcinogenic substances are capable of causing

*See id.*; *cf. Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (noting that whether a substance has "genotoxic capabilities . . . is the beginning, not the end of the scientific inquiry and proves nothing about causation without other scientific evidence").

Here, the types of illnesses Plaintiffs allege are: (1) multiple sclerosis ("MS"); (2) Parkinson's disease; (3) congenital malformations; (4) cardiac malformations; (5) orofacial clefts; (6) autism; (7) chromosomal disorders; (8) kidney cancer; (9) liver and bile duct cancer; (10) non-Hodgkin's lymphoma; (11) Hodgkin's lymphoma; (12) leukemia; (13) anal cancer; (14) skin cancer; (15) breast cancer; (16) testicular cancer; (17) pancreatic cancer; and (18) thyroid cancer.[4] (Doc. 211-2.)

---

all tumor types).) Moreover, many other types of illnesses besides cancer are at issue here, so falling back *en masse* on general conclusions of carcinogenicity is insufficient anyway. (*See* Doc. 211-2); *cf. Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1248 n.3 (11th Cir. 2018) (noting that carcinogenicity is not relevant if plaintiff does not have cancer). As *McClain* explicitly focuses on substances causing a particular "type of harm," the Court concludes that to fall under category one, Plaintiffs must show the medical community generally accepts that the substance in question causes the particular types of cancer alleged, in keeping with the Court's overall gatekeeping function under *Daubert*. *See McClain*, 401 F.3d at 1239.

[4] Of the sixty-two Plaintiffs named in the operative Complaint, two have been dismissed and twenty-two bring only consortium claims, leaving thirty-eight Plaintiffs with illnesses under discussion. But three of those thirty-eight are not listed on Plaintiffs' summary chart linking each Plaintiff to an illness with supporting authority: (1) Jeff Kozak, suffering from blood clots, kidney stones, and degenerative neurological conditions; (2) Laura Juda, suffering from brain lesions, hearing loss, and degenerative neurological conditions; and (3) Kristen Sheen, suffering from breast cancer. While there is evidence for Sheen's breast cancer provided (as other Plaintiffs also suffer from it), there is no evidence provided in support of Kozak's and Laura Juda's specific conditions. With no evidence in support of general causation on their claims, Kozak's and Laura Juda's claims are due to be dismissed, as is Mark Juda's consortium claim for his wife. Further, there are several illnesses pled in the Complaint for some individuals who suffer from multiple conditions, which were limited to just the enumerated illnesses in the chart (Outing, San Martin, Stone, Tosti, Saperstein, Anderson, and Siegrist); for them, claims based on any

For the nine substances at issue to fall under *McClain* category one, the Court must determine whether each one is widely accepted to cause one or more of these eighteen illnesses.

Plaintiffs make a few of these easy calls: they offer no support for the assertion that any of the substances are generally accepted to cause congenital malformations, cardiac malformations, orofacial clefts, autism, chromosomal disorders, or breast, testicular, pancreatic, or thyroid cancer. (Doc. 211-2.) Further, for category one purposes, Plaintiffs do not point to any support for illnesses linked to toluene, xylenes, 1,1,1-trichloroethane, or formaldehyde. (*Id.*) So these substances and illnesses necessarily fall into *McClain* category two, which will require a full *Daubert* inquiry.

Let us turn then to the substance/illness pairs for which Plaintiffs offer some support for *McClain* category one treatment. Specifically, Plaintiffs allege that: (1) PCE, TCE, and styrene are generally accepted to cause MS and Parkinson's; and (2) PCE, TCE, styrene, arsenic, and hexavalent chromium are generally accepted to cause kidney, anal, skin, and liver and bile duct cancer, non-Hodgkin's and Hodgkin's lymphoma, and leukemia. (Doc. 211-2.) In support of these

---

illnesses pled but not supported by evidence will be deemed abandoned. So the universe is limited to thirty-six Plaintiffs representing only the eighteen illnesses listed above. (*See* Docs. 89, 211-2.)

assertions, Plaintiffs point to various findings by regulatory agencies. (*Id.*; *see* Doc. 142, p. 14.)

But the Eleventh Circuit has repeatedly found that regulatory findings and standards alone are insufficient to reliably establish general causation, as regulatory bodies are focused on protecting public health and thus err on the side of caution in determining what is safe. *See McClain*, 401 F.3d at 1248–50 (noting that the FDA uses a risk-benefit approach rather than an expert-causation approach, in addition to relying on anecdotal adverse incident reports, which can undermine reliability); *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1246–47 (11th Cir. 2018) (in examining EPA standards, noting that public health standards are typically protective rather than predictive). Public health rules are not altogether excluded from consideration, but courts must exercise caution in examining their methodology. *See McClain*, 401 F.3d at 1249; *cf. Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1313 (S.D. Fla. 2016) (noting that opinions of research agencies like ATSDR and IARC are properly considered in a weight-of-the-evidence approach alongside other types of reliable scientific evidence). While such cases typically examine regulatory findings in the context of *McClain* category two, their logic applies all the more to determining whether substance/illness pairs fall into category one—because, again, the only time a substance falls into category one is when there is such a widespread medical

10

consensus that it causes a signature disease that a full *Daubert* inquiry on general causation would be superfluous. As regulatory standards are not enough standing alone to establish general causation on a full *Daubert* inquiry, they certainly are not enough to show that these substance/illness pairings fall into category one.

Given that regulatory standards are the *only* evidence to which Plaintiffs point in support of their argument that these particular substance/illness pairings fall into *McClain* category one (Doc. 211-2), this evidence is insufficient, and these pairings will have to be examined in a full *Daubert* inquiry under *McClain* category two. The Court will take a deeper look at the individual studies cited in the context of the category two analysis.[5]

As *McClain* category one is not satisfied in any respect here,[6] this case falls

---

[5] The Court must note that even a superficial look at these authorities at this stage reveals a host of problems on their face. To pick two illustrative examples: First, as to Plaintiffs' assertion that PCE, TCE, and styrene are generally accepted to cause MS, the National Institute of Environmental Health Sciences ("NIEHS") paper cited (Doc. 211-2, p. 1) states that it is "likely, but requir[es] confirmation" that "solvents" "contribute" to MS—not even close to a statement of general acceptance of causation; nor does that paper even *mention* PCE or styrene, only TCE. (Doc. 236-14, p. 13.) Second, as to Plaintiffs' assertion that PCE, TCE, and styrene are generally accepted to cause Parkinson's, the Agency for Toxic Substances and Disease Registry ("ATSDR") paper cited (Doc. 211-2, p. 1) states that the study is "limited for the purpose of determining causal relationships"—and it only mentions TCE, not PCE or styrene. (Doc. 138-8, p. 5.) These generic references that lump together substances not even mentioned in the scientific literature simply are not going to cut it. So the Court will exercise great caution and examine these authorities in close detail in the context of the full *Daubert* general causation inquiry. *See McClain*, 401 F.3d at 1249.

[6] Plaintiffs argue that *McClain* held that arsenic is a category one substance in every instance. (Doc. 142, p. 14 n.42.) True, *McClain* pointed to arsenic causing death as an example of what might fall under category one. *McClain*, 401 F.3d at 1239 n.5. But none of the Plaintiffs here are claiming that they drank enough arsenic that it killed them. Rather, their argument is that arsenic, in conjunction with other chemicals, caused various forms of cancer. (Doc. 211-2, pp. 3–

into category two and the Court must conduct a full general causation inquiry.

## II.     Methods of Proving General Causation

To satisfy general causation in a *McClain* category two case, plaintiffs must establish at least one primary methodology that the Eleventh Circuit has recognized as reliable, including epidemiological studies, a dose-response relationship, and the background risk of the disease in the general population. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014); *cf. In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018).

"Epidemiology is the branch of science that studies the incidence, distribution, and cause of disease in human populations and examines the pattern of disease in human populations." *In re Deepwater Horizon Belo Cases*, No. 3:19CV963, 2020 WL 6689212, at *9 (N.D. Fla. Nov. 4, 2020), *aff'd*, No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022) (cleaned up). Types of epidemiological studies include: (1) observational cohorts, which compare the incidence of disease between exposed and unexposed groups; (2) case control studies, which compare the frequency of exposure between groups with the disease and those without; and (3) cross-sectional studies, which collect data from a certain group to see if

---

6.) Again, Plaintiffs must prove a connection between the substance and the *type of illness* alleged, so their reference to this portion of *McClain* is inapposite.

each individual has the disease or not at a particular point in time. *See id.* at *9 & n.30. Experts relying on epidemiological studies to show general causation must identify: (1) first, an association between a particular substance and a particular disease; and (2) second, whether that association shows a cause-effect relationship.[7] *See id.* at *10. This second step typically involves considering the "Bradford Hill" factors: "(1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge." *Id.* No one factor is dispositive, and scientists may reasonably interpret the factors in different ways. *See Abilify*, 299 F. Supp. 3d at 1307. Epidemiological studies are the best evidence of general causation, but the lack of them is not fatal. *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002); *see also Chapman*, 766 F.3d at 1307.

Another reliable primary methodology is the dose-response relationship, in which "a change in amount, intensity, or duration of exposure to a [substance] is associated with a change—either an increase or decrease—in risk of adverse effects

---

[7] Going beyond showing an association to showing causation is crucial, which is why a close examination of the conclusions drawn from epidemiological studies is so important—and why Plaintiffs pointing to the fact that Lockheed's experts have also identified *associations* between the substances and illnesses at issue is not sufficient on its own to demonstrate general causation. (*See* Doc. 142, p. 15 n.49.)

from that exposure." *Abilify*, 299 F. Supp. 3d at 1307.[8] "[A] dose-response assessment estimates scientifically the dose or level of exposure at which the substance at issue causes harm." *Williams*, 889 F.3d at 1246 (cleaned up). In addition to being a primary methodology, the existence of a dose-response relationship is part of the Bradford Hill analysis experts should consider in evaluating epidemiological studies for a cause-effect relationship. *See Abilify*, 299 F. Supp. 3d at 1307.

Finally, reliable primary methodologies should take into account background risk. *Id.* at 1308. This means that experts opining on general causation should take into account "the risk that members of the general public would have of developing the disease without exposure to the drug." *Id.* Again, all of these primary methodologies tie back to courts' ultimate *Daubert* responsibility: ensuring that the expert's methodology reliably identifies *causation* rather than mere correlation, association, or coincidence. *See id.*; *Chapman*, 766 F.3d at 1307–08.

Aside from these primary methodologies, secondary methodologies may

---

[8] The Court is cognizant that studying diseases in humans caused by potentially beneficial medicines or drugs is very different than those caused by toxic chemicals, heavy metals, or solvents not meant to be ingested by humans. So it is natural that many of the seminal cases in this area which emphasize the importance of epidemiological studies and the dose-response relationship are drug cases, not toxin cases—like *McClain*, *Chapman*, and *Abilify*. Given the ethical implications of exposing humans to toxins for research purposes, the Court is mindful that the kinds of studies and evidence available in drug cases are not always going to be available in this type of case, and the Court keeps that limitation in mind when reviewing Plaintiffs' expert testimony. That said, this scientific reality does not lessen Plaintiffs' burden to produce reliable evidence on causation.

also be used to support a general causation opinion, including: biologically plausible explanations for the substance's mechanism of action, anecdotal case studies or reports such as adverse event reports and de-challenge/re-challenge tests, hypotheses, animal studies, and extrapolations from analogous drugs. *See Chapman*, 766 F.3d at 1308; *McClain*, 401 F.3d at 1245–47, 1250, 1253–55; *Abilify*, 299 F. Supp. 3d at 1306. Experts may use these secondary methodologies as part of their overall analysis to support a primary methodology, but the failure to use at least one primary methodology is fatal. *See Chapman*, 766 F.3d at 1308; *see also Abilify*, 299 F. Supp. 3d at 1306. Experts may also combine various methodologies in weighing the entire body of scientific evidence to form an overall general causation opinion, which is known as the "weight of the evidence" approach. *See Abilify*, 299 F. Supp. 3d at 1311–12; *cf. Waite*, 194 F. Supp. 3d at 1313–16. But even under this approach, experts may not combine multiple unreliable methodologies to add up to a reliable one; each step in the weighing process must be reliable. *See Abilify*, 299 F. Supp. 3d at 1311–12.

Aside from the *McClain* categorization dispute, this topic—methodologies needed to prove general causation—brings us to the second major dispute between the parties. Lockheed spills most of its ink arguing that dose-response evidence is *required* to prove general causation. (Doc. 152, pp. 12–21 ("[D]emonstrating the levels of exposure that are hazardous to human beings

generally requires evidence tailored to case-relevant exposure conditions." (cleaned up)); Doc. 164, pp. 6–12 ("[C]rucially, [the general causation analysis] is dose-driven." (citing Reference Manual on Scientific Evidence)).) But this argument is incompatible with the Eleventh Circuit's teachings in *McClain*, which Lockheed misreads.

Lockheed claims that "all of the dose-response discussions in *McClain* occurred in the context of general-causation analyses." (Doc. 164, p. 9 (citing *McClain*, 401 F.3d at 1240–43).) This is not true. The cited portion of *McClain* reviews the opinions of Dr. O'Donnell, who only "primarily" offered general causation testimony. *See McClain*, 401 F.3d at 1237. "Primarily" is the key word there, as a close read of *McClain* shows that it contains an intertwined discussion of both inquiries. *Id.* at 1239–52. Indeed, Lockheed's specifically cited portion of the opinion looks at an article by Dr. Eaton that points to four scientific criteria for proving causation in the broad sense: (1) the substance in question must have been demonstrated to cause the type of illness in question, which "focuses on the issue of general causation"; (2) "the individual must have been *exposed to a sufficient amount* of the substance in question to elicit the health effect in question . . . requir[ing] not simply proof of exposure to the substance, but *proof of enough exposure to cause* the plaintiff's specific illness," which "focuses on the issue of individual causation"; (3) the chronological relationship between exposure and

16

effect must be biologically plausible, which "also focuses on individual causation"; and (4) the background risk, which focuses on general causation. *Id.* at 1242–44 (emphasis added). That second factor holds the answer to this dispute: this language not only contradicts Lockheed's assertion that *all* of *McClain*'s dose-response discussion is in the context of general causation, but in fact, it makes clear that Lockheed's "case-relevant exposure conditions" are part of the specific causation inquiry.[9] *See id.* at 1242; *see also id.* at 1239 ("[W]as plaintiff exposed to

---

[9] *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105 (8th Cir. 1996), does not compel a different conclusion. (*See* Doc. 152, pp. 13, 16.) Contrary to what Lockheed says, the Eleventh Circuit in *McClain* did not "adopt" the Eighth Circuit's articulation of what is required at the general causation stage in *Wright*. Rather, in *McClain*'s intertwined discussion of general and specific causation examined above, the Eleventh Circuit quoted a *Tenth* Circuit case (which itself then quoted *Wright*) for the unremarkable proposition that to recover in a toxic tort case, a plaintiff must show both the levels of exposure that are hazardous to humans and the plaintiff's level of exposure. *See McClain*, 401 F.3d at 1241 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (quoting *Wright*, 91 F.3d at 1106)). From this (already secondhand) reference, Lockheed cites another Eighth Circuit case that relied on *Wright* for the statement that a toxic tort plaintiff must show that "the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the *same level of exposure* as the plaintiff." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928 (8th Cir. 2001) (emphasis added); (*see* Doc. 152, pp. 13–14.) But this tortured citation chain does not advance Lockheed's cause. Neither *Wright* nor *Bonner* drew the distinction between general and specific causation urged by Lockheed, such that a *general* causation expert *must* speak to case-relevant exposure conditions to demonstrate a reliable methodology; rather, those cases simply examined whether the plaintiff proved causation as a broader matter at trial in the context of post-trial motions. *See Wright*, 91 F.3d at 1108 ("The jury could therefore only have speculated about whether the amount of [the substance] to which each plaintiff was exposed was sufficient to cause their injuries . . . ."); *Bonner*, 259 F.3d at 928 ("To prove causation in a toxic tort case, . . . the plaintiff must put forth sufficient evidence for a jury to conclude that the product was capable of causing her injuries, and that it did."). It is this contrived distinction that has caused so much agita on what is required at which stage. *See infra* note 13. But what is important here is not what the Eighth Circuit thinks but what the Eleventh does. And in the nearly two decades since *McClain*, not a single other Eleventh Circuit case has cited *Wright* (aside from the cite through *Mitchell*), nor has the Eleventh Circuit ever referenced *Bonner* at all. The Eleventh Circuit can speak for itself on what is a general causation question and what is a specific causation one—and it did in *McClain*. *McClain*, 401 F.3d at 1239 ("[W]as plaintiff

enough of the toxin to cause the alleged injury . . . ? [This analysis] deals with questions of individual causation to plaintiff."); *Williams*, 889 F.3d at 1245 n.2 ("[T]o establish specific causation, [the expert] would still have to reliably calculate whether [the plaintiff] was exposed to enough of the toxin to cause the alleged injury . . . ."); *cf. Williams v. Int'l Paper Co.*, No. CV 108-45, 2009 WL 10678630, at *1 (S.D. Ga. July 19, 2009) ("As *McClain* expressly notes, the dose-response relationship is an aspect of specific, not general, causation.").[10]

This conclusion is not to say that dose-response evidence is not required in toxic tort cases. It is. This case will not proceed to a jury unless each Plaintiff can show that they were exposed to enough of each alleged substance to cause their illness, and Plaintiffs will need at least *some* dose-response evidence to meet that requirement. *See McClain*, 401 F.3d at 1241 n.6 ("One should not conclude from this analysis that to pass *Daubert* muster an expert must give precise numbers about a dose-response relationship. Some ambiguity about individual responses is expected. However, the link between an expert's opinions and the dose-

---

exposed to enough of the toxin to cause the alleged injury . . . ? [This analysis] deals with questions of individual causation to plaintiff.").

[10] Lockheed's argument that *International Paper* was wrongly decided is unavailing. (Doc. 164, pp. 8–9.) That case is not particularly helpful here in the general causation inquiry because it involved *McClain* category one. *Int'l Paper*, 2009 WL 10678630, at *1. But it correctly points out what Lockheed gets wrong: *McClain* is explicit that whether a plaintiff is exposed to enough of a substance to cause a particular injury is a specific causation question, not a general causation one. *See id.* (citing *McClain*, 401 F.3d at 1242).

response relationship is a key element of reliability in toxic tort cases.”); *Williams*, 889 F.3d at 1248 (“[W]e have never required an expert to give precise numbers about a dose-response relationship, and we do not do so here. But we do require an expert to lay a reliable groundwork for determining the dose-response relationship.” (cleaned up)). But that inquiry—whether this Plaintiff was exposed to enough of this substance to cause this illness—is a specific causation question. *See McClain*, 401 F.3d at 1239. While dose-response evidence can go towards showing general causation, it is not the *only* way, nor is it even the best way. *See Chapman*, 766 F.3d at 1307; *cf. Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 595 & n.10 (11th Cir. 2019). And because dose-response is not the only way, the Court cannot throw out Plaintiffs’ whole case at the general causation stage, as Lockheed insists, simply because Plaintiffs’ general causation experts were not yet asked to focus on the doses to which Plaintiffs were exposed.[11] (Doc. 142, p. 19; Doc. 152, pp. 7–10, 15.) That said, at the specific causation stage, if Plaintiffs can produce sufficient dose-response evidence to show that they were exposed to enough of

---

[11] The Court will address the parties’ disputes on the linear no-threshold dose-response model in the context of the full *Daubert* analysis. (*See* Doc. 142, pp. 20–22; Doc. 164, p. 18); *cf. Pinares v. Raytheon Techs. Corp.*, No. 19-14831, 2023 WL 2661521, at *4–5 (11th Cir. Mar. 28, 2023) (upholding exclusion of expert who relied on a hypothesis that no safe threshold existed for the subject chemicals because he cited no authority in support of his position and gave no explanation for why model that ignored dosage was appropriate under the circumstances, as it failed to provide a “reliable baseline” against which the district court could determine whether the expert’s conclusion that the dosage caused the plaintiff’s cancer was scientifically sound).

the substances at issue to cause their illnesses, such evidence can also broadly be useful to showing general causation. *See Chapman*, 766 F.3d at 1306; *cf. Williams*, 889 F.3d at 1245 n.2 ("Setting general causation aside, to establish specific causation, [the expert] would still have to reliably calculate whether [the plaintiff] was exposed to enough of the toxin to cause the alleged injury, which he could have done only after reliably calculating *how much* exposure would have adversely affected her. In other words, under either [*McClain*] category, he still needed to perform or rely upon a methodologically sound dose-response assessment specifically relevant to [the plaintiff]." (cleaned up)). And because dose-response is one of the Bradford Hill factors, Plaintiffs' experts' consideration of the dose-response evidence will aid the Court in conducting a fulsome analysis of whether their reliance on epidemiological studies to draw cause-effect conclusions is scientifically sound.[12] (Doc. 177, p. 6 n.12); *see Abilify*, 299 F. Supp. 3d at 1307.

---

[12] Lockheed places great emphasis on *Deepwater Horizon*, 2020 WL 6689212, at *1, for the argument that a general causation expert must consider case-relevant dosages. (*See* Doc. 152, pp. 14–16; Doc. 164, pp. 10–11.) But that argument does not square with *McClain*, as discussed at length above. What *Deepwater Horizon* adds to the conversation is an issue the parties only touch on superficially (Doc. 152, p. 22): the helpfulness prong of *Daubert*, or whether the expert's opinion "fits" the facts of the case. *See Deepwater Horizon*, 2020 WL 6689212, at *15. The Eleventh Circuit did not address this issue in *McClain*, *Williams*, or *Chapman*, as they all focused on the reliability prong. But *Deepwater Horizon* is something of an outlier on that issue; as the district court opinion recognizes, that case involved unusual circumstances, where there was a great deal of publicly available data on the exposure levels because the case involved a massive, singular international oil spill incident. *See Deepwater Horizon*, 2020 WL 6689212, at *2–5, *15 ("While precise exposure data *may not be available in every case*, here there is an abundance of publicly available air and water quality data . . . ." (emphasis added)). In that case, it was eminently reasonable for the court to find that the expert's choice not to consider that relevant

But because the general and specific causation inquiries were bifurcated here (at Lockheed's urging), the parties talking past each other on dose-response places the Court in a dilemma: the Court is left with an incomplete record from which to determine general causation. So the Court concludes that it must take the instant motions under advisement at this time. The Court will conduct the full general and specific causation inquiries together with the full scientific record before it, as it should have from the beginning.[13] Reviewing the expert testimony

---

exposure data and instead to cherry-pick data concerning exposures far from where those plaintiffs lived caused the opinion not to "fit" or be helpful under those circumstances. But those unusual circumstances are not present here, so *Deepwater Horizon* is of limited usefulness on the fit issue. It is also important to note that the *Deepwater Horizon* expert's geographically irrelevant exposure data was part of much broader and deeper problems with her report from a reliability standpoint—she overrelied on EPA benchmarks, only conducted a conclusory Bradford Hill analysis, did not independently assess the limitations and biases of the epidemiological studies on which she relied (including failing to acknowledge the limited usefulness of cross-sectional studies not designed to assess causation), and did not draw distinctions between acute symptoms and chronic conditions (which was critical given the nature of the injuries in that case), among other flaws. *See id.* at *11–16. This Court cannot draw the conclusion from that case, then, that a failure to consider case-relevant exposure conditions must result in a *per se* exclusion of a general causation expert, as Lockheed urges. Nor is Lockheed's insistence that the Eleventh Circuit blessed its position by affirming *Deepwater Horizon* persuasive. (Doc. 152, p. 16.) That brief unreported per curiam affirmance held that even if there *was* some error in the district court's distinction between general and specific causation, there was no abuse of discretion because the expert's opinion was unhelpful. *See In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243, at *3 (11th Cir. Jan. 11, 2022). This is hardly a full-throated approval of the rigid position on reliable methodologies that Lockheed encourages. In fact, the circumspect language of that opinion further suggests the correctness of this Court's conclusion, based on *McClain* and other long-held Eleventh Circuit precedent, that consideration of case-relevant exposure conditions is not necessarily required of a reliable general causation methodology in all cases. Rather, the lesson of *Deepwater Horizon* relevant to the instant case is that the Court must closely examine the entirety of each expert's reasoning to determine whether their conclusions are predicated on a reliable methodology—which is exactly why the Court will wait to make this determination on the basis of a full scientific record.

[13] Plaintiffs argue that Lockheed is using a gotcha tactic by pursuing bifurcation and then using it against them in an attempt to require premature consideration of dosage when their

on what dosages Plaintiffs were actually exposed to and whether such dosages are capable of causing, and did cause, the harms Plaintiffs allege—together with the expert evidence already before the Court—will complete the rest of the puzzle and allow the Court to fulfill its *Daubert* gatekeeping responsibilities in examining both general and specific causation.[14]

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the parties' general causation motions (Docs. 139–42, 144, 146, 148, 151, 152) are **TAKEN UNDER ADVISEMENT**. The Clerk is **DIRECTED** to administratively terminate these motions. The Court will rule on them together with the specific causation motions.

In light of the Court's decision to consider general and specific causation simultaneously, Plaintiffs' motion to exclude certain opinions of Lockheed's experts on specific causation that they believe to contain belated general causation

---

experts were not prepared to address that question until the specific causation stage. (Doc. 165, pp. 17–19.) The Court does not agree with any aspersions cast on Lockheed's litigation strategy, but it must agree that bifurcating the inquiries was ill-advised in this case, as examining general causation artificially divorced from the entirety of the scientific record has proved significantly more difficult—and made the record far more voluminous and complicated—than necessary. This difficulty is probably why the vast majority of cases, including *McClain* itself, consider general and specific causation together. *See, e.g.*, *McClain*, 401 F.3d at 1255.

[14] As the specific causation motions have ripened during the time the instant general causation motions have been under consideration, there is no prejudice or delay to the parties in this conclusion. Nevertheless, in an abundance of caution, the Court will permit the parties to file short supplements to their specific causation briefing to address any additional global causation issues they believe the Court should consider arising out of this Order. But these supplements are not an invitation for the parties to ask the Court to revisit any of the conclusions in this Order; any rehashing of the arguments ruled on herein will be ignored.

testimony is **DENIED**. (Doc. 258.) The Court will consider all general and specific causation testimony for what it is worth and is capable of distinguishing between the two, and Plaintiffs suffer no prejudice under these circumstances.

As to claims based on the twenty-seven substances other than PCE, TCE, toluene, xylenes, arsenic, hexavalent chromium, 1,1,1-trichloroethane, styrene, and formaldehyde, and the claims of Jeff Kozak, Laura Juda, and Mark Juda, the Court finds that Lockheed is entitled to summary judgment due to Plaintiffs' failure to provide any evidence in support of these claims. The Court will formally resolve them in the forthcoming Order.

By **Monday, October 2, 2023**, Plaintiffs and Lockheed may each file a supplemental brief of no more than seven pages addressing any issues they wish the Court to consider in connection with the Court's joint resolution of general and specific causation, with the caveat set forth above. *See supra* note 14.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 15, 2023.



ROY B. DALTON, JR.
United States District Judge

23