UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VERVICIA HENDERSON *et al.*,

    Plaintiffs,

v.                                          Case No. 6:21-cv-1363-RBD-DCI

LOCKHEED MARTIN
CORPORATION; and UNIVERSAL
CITY PROPERTY MANAGEMENT
COMPANY III, LLC,

    Defendants.
_____

## **ORDER**

Before the Court are the parties' summary judgment and *Daubert* motions.

## **BACKGROUND**

In this toxic tort case that is part of a suite of companion cases, more than sixty Plaintiffs allege that Defendant Lockheed Martin Corporation's weapons manufacturing facility in Orlando gave off toxic chemicals that contaminated the surrounding air, soil, and groundwater, which caused Plaintiffs to suffer various injuries. (Doc. 89.)

In support of their resulting strict liability, negligence, nuisance, and other claims, Plaintiffs have marshalled various doctors to opine on general causation—that is, whether each chemical at issue is capable of causing the types of injuries at

issue. Plaintiffs and Lockheed[1] have filed cross-motions for summary judgment on the issue of general causation. (Docs. 142, 152; *see* Docs. 164, 165, 177, 178.) And both sides have moved to exclude each other's general causation experts. (Docs. 139–41, 144, 146, 148, 151; *see* Docs. 157, 160, 163, 167, 169, 171, 173.) The Court also held a hearing on general causation. (Doc. 209.)

Plaintiffs later submitted medical opinions on specific causation—that is, whether the chemicals actually caused their specific injuries. Lockheed has moved for summary judgment on the issue of specific causation. (Doc. 318; *see* Docs. 339, 356.) And both sides have moved to exclude the others' specific causation experts. (Docs. 283, 287, 289, 292, 294, 296, 299, 301, 304, 305, 307, 309–12, 314, 316, 317; *see* Docs. 332, 334, 336, 338, 341–50.)

The Court then entered an interim causation Order in which it decided: (1) that this is a *McClain* category two case requiring a full *Daubert* analysis; and (2) to take general and specific causation up on the full scientific record.[2] (Doc. 370.) Supplemental briefing followed that Order. (Docs. 373, 374.)

The instant Order focuses on two of Plaintiffs' general causation experts, Drs. Kantor and Kendall, about whose identical reports the Court has written

---

[1] Plaintiffs allege that the second Defendant, Universal City Property Management Company III, bought some land from Lockheed and contributed to some of the contamination. (Doc. 89, ¶ 17; *see* Doc. 286-3.) Universal did not move for summary judgment.

[2] The Court incorporates that Order in full here.

2

thoroughly in the companion cases.³ (Docs. 140, 151; *see* Docs. 167, 169.) These matters are ripe.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Then the court must decide whether there is "sufficient disagreement to require submission to a jury." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (cleaned up).

Expert testimony may be admitted only if: (1) the expert is qualified; (2) the methodology is reliable; and (3) the testimony is helpful. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of the expert must establish the opinion is admissible, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010), but need not prove it is correct, *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002).

---

³ *See Davis v. Lockheed Martin Corp.*, No. 6:22-cv-81 (M.D. Fla. Dec. 11, 2023) (Doc. 230).

3

## ANALYSIS

With *McClain* categorization decided, the Court turns to analyzing whether there are any genuine issues of material fact precluding summary judgment on causation. Given the large number of causation experts at issue, the Court begins with two of Plaintiffs' general causation experts, Drs. Kantor and Kendall, whose reports were cross-filed in multiple companion cases and which the Court has already examined. (*See* Doc. 138-1, p. 1; Doc. 150-1, p. 1); *supra* note 3. And because Dr. Kendall's report relies in part on Dr. Kantor's, the Court starts with Dr. Kantor. (*See* Doc. 150-1, p. 5.)

So, first, Lockheed moves to exclude Dr. Daniel Kantor, a neurologist, for lack of reliable methodology.[4] (Doc. 140, pp. 15–25.) The Court agrees.

Dr. Kantor purports to use a weight of the evidence approach to conclude that five[5] substances—PCE, TCE, toluene, xylenes, and styrene—are capable of

---

[4] Lockheed also seeks to exclude Dr. Kantor's opinions for lack of helpfulness or "fit" due to his lack of consideration of case-relevant exposure conditions, relying on *In re Deepwater Horizon Belo Cases*, No. 3:19CV963, 2020 WL 6689212 (N.D. Fla. Nov. 4, 2020), and *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105 (8th Cir. 1996). (Doc. 140, pp. 3–15.) But the Court has already rejected Lockheed's interpretation of those cases in the interim causation Order. (Doc. 370, pp. 17–18 n.9; *id.* at 20–21 n.12.) So the Court's conclusion on Dr. Kantor is solely predicated on his unreliable methodology without regard to the fact that he did not consider dosage issues.

[5] Dr. Kantor mentioned potential increased risks of Parkinson's following exposure to a sixth substance, formaldehyde, but he also acknowledged that the sole study he cited for this point expressed "caution" about its results and that formaldehyde's impact was "less well understood" than the other five substances, so the Court does not consider formaldehyde to be put at issue by his report. (Doc. 138-1, pp. 26, 31.)

causing two[6] diseases—multiple sclerosis ("MS") and Parkinson's disease.[7] (Doc. 138-1, pp. 29–32; *see* Doc. 138-3, p. 36:5–14.) While a weight of the evidence approach can be reliable, as discussed in the interim causation Order, each step in the analytical process must be reliable for the testimony to be admissible. (Doc.

---

[6] Dr. Kantor also gives a very brief opinion on juvenile idiopathic arthritis ("JIA"), from which one Plaintiff, Austin Siegrist, suffers. (Doc. 138-1, pp. 31–32; Doc. 152-3, p. 7.) But JIA was not one of the diseases in Plaintiffs' summary chart pointing to particular general causation evidence, so it fails on that basis alone. (Doc. 211-2; *see* Doc. 370, pp. 8–9 & n.4 (limiting universe of diseases to those specifically supported)); Fed. R. Civ. P. 56(c) (requiring parties to cite particular parts of the record to raise genuine disputes precluding summary judgment and stating that the court "need consider only the cited materials"). The Court is not obligated to hunt through this extraordinarily voluminous record to save particular Plaintiffs from summary judgment when their counsel fails to point the Court in the direction of supporting evidence. *See* Fed. R. Civ. P. 56(c) advisory committee's note (noting that parties should "assist the court in locating materials buried in a voluminous record" and that the court "may decide a motion for summary judgment without undertaking an independent search of the record" for support not called to its attention by the parties); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[J]udges are not like pigs, hunting for truffles buried in briefs. . . . [They] are not required to ferret out delectable facts buried in a massive record." (cleaned up)); *Cuapiaco v. Lender Processing Servs., Inc.*, No. 3:10-cv-704, 2011 WL 13295464, at *5 (M.D. Fla. Nov. 8, 2011) (Howard, J.) (granting summary judgment against plaintiff who failed to designate specific facts showing that genuine issue remained for trial).

Further, even considering Dr. Kantor's opinion on JIA, it is mentioned in only one paragraph of his thirty-plus page analysis, and it suffers from the same methodological flaws as the whole of his report, as discussed below. (*See* Doc. 138-1, pp. 31–32.) Additionally, this opinion improperly focuses on inflammation as a general matter rather than JIA specifically. (Doc. 138-3, pp. 26:8–27:5); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (expert must opine that substance causes the "type of illness" in question). Indeed, he did not cite *any* epidemiological literature showing even an association between JIA and the substances at issue (let alone causation). (*See* Doc. 138-3, p. 98:18–24); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1338 (11th Cir. 2010) ("Showing an *association* is far removed from proving *causation*." (cleaned up)). Especially for an idiopathic condition—which by definition has a generally unknown cause—far more than just Dr. Kantor's say-so is required to show that the substances cause JIA. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). So Dr. Kantor's JIA opinion is due to be excluded in any event.

[7] Plaintiffs Donna De Milt, Kristi Hujik, Eric Rutledge, Emilio San Martin, Eric Saperstein, and Brian Slusarz suffer from MS. (Doc. 211-2, p. 1.) And Plaintiff Michael McGarry suffers from Parkinson's. (*Id.* at 1.)

370, p. 15); *see In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1311–12 (N.D. Fla. 2018); *Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1313–16 (S.D. Fla. 2016). Here, Dr. Kantor describes his process as: (1) reviewing the opinions of public health agencies; (2) reviewing the epidemiological literature cited in those opinions and more broadly; and (3) looking at animal studies to determine a mechanism of action. (Doc. 138-1, p. 3.) Taking these pieces together, Dr. Kantor concluded that the five substances at issue "cause or contribute to" MS and Parkinson's. (*Id.* at 8, 15–16, 19, 21, 23, 24–27, 29–30.) The Court places the most importance on Dr. Kantor's review of the epidemiological literature, as public health agency opinions, animal studies, and biologically plausible explanations of a mechanism of action are all secondary considerations.[8] (Doc. 370, pp. 14–15); *see Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245–47, 1250, 1253–55 (11th Cir. 2005); *Abilify*, 299 F. Supp. 3d at 1306. Here, a review of the record makes clear that Dr. Kantor's approach as a whole is unsound.

Dr. Kantor's deposition (Doc. 138-3) makes plain that his report (Doc. 138-1) is missing virtually any hallmarks of reliability. For instance, Dr. Kantor testified

---

[8] Of the three primary methodologies—epidemiology, dose-response, and background risk—Dr. Kantor did neither a case-specific dose-response analysis (which the Court does not consider fatal, *see supra* note 4), nor a background risk analysis (Doc. 138-3, p. 99:18–25), so his review of the epidemiological literature is the only primary methodology on which he relies.

that he categorized the studies he pulled based on design, confounders, biases, and other limitations—a key part of an epidemiological review—but he does not actually conduct this categorization in his report, nor does he explain the criteria he used to pull these studies in the first place. (Doc. 138-3, pp. 31:13–17, 44:12–18, 76:13–16; *see* Doc. 138-1.) *See generally Abilify*, 299 F. Supp. 3d at 1315–27 (explaining the importance of study design, confounders, and bias in determining whether a study is reliable as part of an epidemiological review). He also testified that he then used the Bradford Hill factors to analyze these studies—again, a key part of determining whether an association identified in a study shows causation—yet Bradford Hill is not even mentioned in his report, nor were the factors themselves analyzed in the report.[9] (Doc. 138-3, pp. 32:5–19, 36:9–37:9, 71:18–23; *see* Doc. 138-1); *In re Deepwater Horizon Belo Cases*, No. 3:19CV963, 2020 WL 6689212, at *10–12 (N.D. Fla. Nov. 4, 2020), *aff'd*, No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022) (explaining the importance of the Bradford Hill factors in determining whether an association shows causation).[10] Standing on

---

[9] Dr. Kantor's rebuttal report, even though it gives a bit more explanation for some of the studies on which he relied and those he disregarded (Doc. 138-2, pp. 4–5, 8–12), does not fully resolve this problem. (*See* Doc. 138-3, pp. 37:10–38:2 ("In your rebuttal report, I believe you address the Bradford Hill criteria, but only for the Goldman 2012 paper; is that right?" "Correct."), 76:21–24 ("Is there anywhere in . . . your rebuttal report where you explain the relative weights, if any, you assign to the different studies?" "No.").)

[10] As the Court explained in the interim causation Order (Doc. 370, p. 13), experts relying on epidemiological studies to show general causation must identify: (1) first, an association between a particular substance and a particular disease; and (2) second, whether that association shows a cause-effect relationship. *Deepwater Horizon*, 2020 WL 6689212, at *10. This second step

their own, the report's failures to describe each step of Dr. Kantor's process cast serious doubt on the reliability of his weight of the evidence approach.[11] *See Abilify*, 299 F. Supp. 3d at 1311 ("[B]ecause the 'weight of the evidence' approach involves substantial judgment on the part of the expert, it is crucial that the expert describe each step in the process by which he gathered and assessed the relevant scientific evidence."); *Deepwater Horizon*, 2020 WL 6689212, at *10, *12 (excluding expert in part because of conclusory Bradford Hill analysis).

But the indicators of unreliability do not stop there. How did Dr. Kantor use these studies that he purportedly ensured were reliably designed and showed relevant associations (conclusions the Court cannot vet because they do not appear in the report)? Well, he extrapolated "trends" from them to reach his causation opinion—but, notably, he included statistically insignificant associations in those trends. (*See* Doc. 138-3, pp. 63:10–18, 70:13–22, 122:4–123:11, 125:6–15, 153:11–15, 180:7–183:9, 186:3–7); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir.

---

typically involves considering the Bradford Hill factors: "(1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge." *Id.*

[11] Perhaps the gaps in the report are unsurprising given that this is the first causation report Dr. Kantor has ever written, and he professed the belief that conducting a weight of the evidence review for litigation is not subject to the same strictures as preparing a peer-reviewed publication—specifically, he felt he need not explain which studies were excluded from the analysis and for what reasons. (Doc. 138-3, pp. 14:21–25, 40:23–41:21.) In fact, the opposite is true: peer review for publication in itself is not enough for *Daubert* admissibility, and experts must go further to show reliability. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999).

1999) ("[C]ourts warn against leaping from an accepted scientific premise to an unsupported one."). Yet, studies showing a statistically insignificant association are not relevant to a causation analysis because that means, essentially, that just as many people have the disease who were exposed to the substance as those who were not; in other words, the correlation is not really a significant association at all and may result from pure chance. *See Allison*, 184 F.3d at 1315 (holding that studies with statistically insignificant results are "not worth serious consideration for proving causation"). So not only did Dr. Kantor fail to demonstrably perform a Bradford Hill analysis to see if an identified association crossed the line into causation—he did not even reliably establish an association in the first place. (Doc. 138-3, p. 70:13–17 ("Do you agree that an association identified in the literature must be statistically significant in order to support a cause-and-effect relationship?" "No.")); *see Deepwater Horizon*, 2020 WL 6689212, at *10 (noting that "strength of the association" is part of the Bradford Hill analysis to show causation); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1338 (11th Cir. 2010) ("Showing an *association* is far removed from proving *causation*." (cleaned up)).

And those are just the flaws in the studies Dr. Kantor reviewed that *supported* his conclusions; the reliability problems become more glaring when we look to studies that *contradicted* his conclusions. He did not list any negative studies (those showing a lack of association between substance and disease) in his

9

report, so there is no telling what studies contradicted him or why he disregarded them. (Doc. 138-3, pp. 59:25–61:18.) Nor did he only ignore statistically insignificant negative studies; rather, troublingly, he also disregarded negative studies with statistically significant results because he believed he need not acknowledge those. (*See id.* at 63:19–65:3, 67:4–25.) So there are apparently studies out there with significant, relevant-to-causation results showing there is *no* association between the substances at issue and the diseases at issue, but Dr. Kantor omitted those from the Court's (and the jury's) view. *See Deepwater Horizon*, 2020 WL 6689212, at *10 (noting that consistency of the conclusion with other knowledge is part of the Bradford Hill analysis); *cf. In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 799–800 (3d Cir. 2017) (affirming exclusion of expert who should have "sufficiently discredited other studies that found no association or a negative association . . . or sufficiently explained why he did not accord weight to those studies" (cleaned up)). This methodology—pick the studies that agree with you (even if they are not statistically significant) and ignore the ones that disagree with you (even if they are statistically significant)—is essentially the definition of an unreliable "it's true because I said so" opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

The Court's analysis could end there: the process problems with what

10

Dr. Kantor included and omitted from his report require exclusion of his methodology as unreliable, period. But a dive into the substance of the science reveals critical weaknesses there, too. For instance, as to MS, not a single study Dr. Kantor cites concludes that MS is caused by an individual substance at issue; rather, he relies solely on studies testing mixtures of solvents. (Doc. 138-3, pp. 114:5–9, 114:25–115:5.) But while the five substances at issue are indeed solvents, there are many, many types of solvents. (*Id.* at 28:24–29:6.) And none of the studies he looked at had solvent mixtures with *only* the five substances at issue; they all had other chemicals mixed in.[12] (*Id.* at 115:3–5.) Yet Dr. Kantor could not exclude the possibility that the other chemicals in the mixtures caused MS, rather than the five substances in question. (*Id.* at 116:8–119:11.) And his Parkinson's opinions suffer many of the same flaws. (*See id.* at 190:9–13.) So ultimately, his conclusion that these particular substances at issue cause MS and Parkinson's is simply a wholly unproven hypothesis.[13] (*Id.* at 198:15–19 ("[I]f someone had figured out the exact cause of Parkinson disease . . . that person would have won a Nobel Prize.")); *see Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1199 (11th Cir. 2010) (affirming exclusion of doctor's opinion when "the literature overall

---

[12] Indeed, some studies he referenced did not even mention *any* of the substances in question. (Doc. 138-3, pp. 134:20–135:12, 146:8–147:23.)

[13] Further, in at least one instance, Dr. Kantor mistakenly cited a study that was not even about MS in support of his MS conclusion. (Doc. 138-3, pp. 131:12–132:5.) This type of error reinforces the overall impression of unreliability of his report.

11

[did] not provide the necessary support"). While science "is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so," the Court cannot permit the jury to rely on hypotheses alone. *Daubert*, 509 U.S. at 597. The science behind Dr. Kantor's conclusions is just not there. *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." (cleaned up)).

In sum, Dr. Kantor's failure to explain the steps in his weight of the evidence approach, reliance on statistically insignificant findings, unexplained omissions of studies contradicting his conclusion, and failure to tie the particular substances at issue to the diseases in question, taken together, lead the Court to conclude that his general causation[14] methodology is too unreliable to put before a jury.[15] *See*

---

[14] Even looking to Dr. Kantor's specific causation report lends no further credence to his conclusions, as that report suffers from the same flaws: unreliable citations to studies that found statistically insignificant associations and those that tested solvents generally without regard to the particular substances in question. (Doc. 278-2, p. 3; *see* Doc. 138-3, pp. 122:4–124:6, 134:20–135:12, 138:16–139:20, 142:20–143:24, 146:8–147:22, 148:1–150:21, 178:18–182:11, 190:9–13.)

[15] With these fatal flaws in Dr. Kantor's review of the epidemiological literature causing his methodology as a whole to be unreliable, the Court need not focus overmuch on the other bases for his opinion, but there are problems with his secondary methodologies too. As to his reliance on public health agencies (Doc. 138-1, pp. 29–30), their conclusions are entitled to less weight given their role in recommending protective standards rather than determining causation as a predictive matter. (*See* Doc. 370, p. 10); *McClain*, 401 F.3d at 1249–50; *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1246–47 (11th Cir. 2018). And even when citing those agencies, he goes further than they are willing to go on causation, undermining his conclusions. (Doc. 138-3, pp. 108:1–6, 165:4–19 (ignoring ATSDR's finding that TCE did not increase risk of Parkinson's even though he concluded the opposite based on statistically insignificant data), 176:10–13 (acknowledging that NIEHS said it was "likely, but requiring confirmation" that solvents as a general matter contribute to MS and noting that NIEHS did not make any specific findings about

*generally McClain*, 401 F.3d at 1255. So Lockheed's motion to exclude Dr. Kantor (Doc. 140) is due to be granted.

With Dr. Kantor excluded, Dr. Kendall's report (Doc. 150-1), which primarily relies on other experts' opinions including Dr. Kantor's, merits little discussion. He opines in very brief and conclusory fashion—with only about five pages of analysis—that, after reviewing the other expert reports, he also concludes that these substances are capable of causing various diseases suffered by unnamed Plaintiffs. (*Id.* at 5.) The rest of his report goes on about the likelihood of various Plaintiffs suffering various diseases, again based on other expert work, without specific reference to individual people or any specific discussion of the effects of

---

the five substances at issue)); *see McClain*, 401 F.3d at 1247 ("The authors of the articles limit the application of their studies consistent with the principles of good science; [the expert in question] expands the application beyond good science."); *cf. Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) ("It is axiomatic that causation testimony is inadmissible if an expert relies upon studies or publications, the authors of which were themselves unwilling to conclude that causation had been proven."). As to Dr. Kantor's proffered biologically plausible mechanisms of action (namely, that solvents' lipophilic nature targets lipid-rich areas of the brain, reducing myelination and degenerating neurons, leading to MS and Parkinson's symptoms) (*see* Doc. 138-1, pp. 3, 10, 29), "biological plausibility, without more, cannot establish general causation" because it is simply a hypothesis waiting to be proven. *Abilify*, 299 F. Supp. 3d at 1308; *see In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) ("While [the doctor's] biological theory may be exactly right, at this point it is merely plausible, not proven, and biological possibility is not proof of causation."). Similarly, the animal studies he cites in support of that hypothesis—showing that solvent exposure in rodents causes neurodegeneration—are of little value without an explanation of or some evidentiary support for how they can be extrapolated to prove similar effects in humans. (*See, e.g.*, Doc. 138-1, pp. 6–7, 10, 20–21); *Abilify*, 299 F. Supp. 3d at 1310. So *in toto*, these secondary methodologies add little to Dr. Kantor's faulty weight of the evidence approach predicated on an unsound epidemiological review. *See Abilify*, 299 F. Supp. 3d at 1311 ("[A]n expert cannot merely aggregate various categories of otherwise unreliable evidence to form a reliable theory of general causation.").

the substances at issue. (*Id.* at 9–10.) With no explanation of his methodology and a mere wholesale adoption of other experts' opinions, Dr. Kendall's report is wholly unreliable. *See Joiner*, 522 U.S. at 146; *Deepwater Horizon*, 2020 WL 6689212, at \*12; *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1113 (11th Cir. 2005). So Lockheed's motion to exclude Dr. Kendall (Doc. 151) is also due to be granted.

With Dr. Kantor excluded, there is no reliable general causation testimony on MS, Parkinson's, or JIA, so summary judgment is due to be granted in favor of Lockheed on the entire claims of Plaintiffs Donna De Milt, Eric Rutledge, Emilio San Martin, Brian Slusarz, and Michael McGarry,[16] and on part of the claims of Kristi Hujik,[17] Eric Saperstein,[18] and Austin Siegrist.[19] *See Chapman*,

---

[16] Rutledge and Slusarz suffer only from MS, and McGarry suffers only from Parkinson's, so this Order resolves their claims in full (plus McGarry's wife Ann's consortium claim). (Doc. 152-3, pp. 5–6, 8.) De Milt and San Martin suffer from MS plus other diseases (*id.* at 2, 4, 7), but Plaintiffs pointed to no general causation evidence in support of these other diseases (Doc. 211-2), so they are abandoned (Doc. 370, pp. 8–9 n.4). As a result, their claims are resolved in full, as well.

[17] Hujik suffers from MS plus infertility. (Doc. 152-3, p. 4.) Another expert, Dr. Mattison, speaks to reproductive problems, so that part of Hujik's claim survives for now (*see* Doc. 135-1)—though Plaintiffs did *not* list reproductive issues on their general causation evidence summary chart (Doc. 211-2), so the Court will review the rest of Hujik's claim closely in a forthcoming Order, mindful of its warning that it will not do Plaintiffs' counsel's job for them. *See supra* note 6.

[18] Saperstein suffers from MS plus other diseases (Doc. 89, ¶ 222), but Plaintiffs pointed to no general causation evidence in support of these other diseases (Doc. 211-2), so they are abandoned (Doc. 370, pp. 8–9 n.4). So his exposure claims are resolved in full; but he also brings a consortium claim on behalf of his son Ari, which survives this Order.

[19] Siegrist suffers from JIA and autism. (Doc. 152-3, p. 7.) While the JIA claim fails for the reasons above, *see supra* note 6, as the Court has not yet taken up autism, that part of Siegrist's claim proceeds. (*See* Doc. 211-2, p. 2.)

766 F.3d at 1316; *Hendrix*, 609 F.3d at 1203. In forthcoming Orders, the Court will take up causation of the remaining diseases at issue. (*See* Doc. 370, p. 8.)

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1. Lockheed's motions to exclude Drs. Kantor and Kendall (Docs. 140, 151) are **GRANTED**.

2. Lockheed's motion for summary judgment on general causation (Doc. 152) is **GRANTED IN PART** as set forth above. The rest of this and all remaining summary judgment motions will be taken up in forthcoming Orders.

3. In its discretion given the number of parties involved, the Court will enter piecemeal judgments as to particular Plaintiffs once their claims are resolved in full. *See* Fed. R. Civ. P. 54(b). So the Clerk is **DIRECTED** to enter judgment in favor of both Defendants[20] and against Plaintiffs Donna De Milt, Eric Rutledge, Emilio San Martin, Brian Slusarz, Michael McGarry, and Ann McGarry, as well as

---

[20] Though Universal did not move for summary judgment, it is entitled to judgment on these claims because these particular Plaintiffs cannot prove general causation as a matter of law. *See Williams v. Mosaic Fertilizer, LLC*, No. 8:14-cv-1748, 2017 WL 5307920, at *3 (M.D. Fla. Jan. 12, 2017), *aff'd*, 889 F.3d 1239 (11th Cir. 2018) (noting that summary judgment is properly granted *sua sponte* where the parties fully briefed the merits of the claims and thus the plaintiff had sufficient notice under Rule 56(f)); *cf. Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 (11th Cir. 2003).

Jeff Kozak, Laura Juda, and Mark Juda.[21] The Clerk is further **DIRECTED** to terminate those Plaintiffs as parties to this action.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 23, 2023.

ROY B. DALTON, JR.
United States District Judge

---

[21] The Court found in the interim causation Order that Defendants were entitled to summary judgment on these latter three Plaintiffs given the failure to point to any particular general causation evidence in connection with their diseases—blood clots, kidney stones, and unspecified degenerative neurological conditions for Kozak, and brain lesions, hearing loss, and unspecified degenerative neurological conditions for Laura Juda (together with her husband Mark's consortium claim). (Doc. 370, pp. 8–9 n.4; *id.* at 23; *see also* Docs. 89, 211-2.) *See generally* Fed. R. Civ. P. 56(c). (If Plaintiffs intended Dr. Kantor's brief opinion on unspecified neurodegenerative disorders (Doc. 138-1, p. 31) to support Juda's or Kozak's claim—which Plaintiffs do not say (*see* Doc. 211-2)—this opinion is excluded for the same reasons as the rest of his unreliable report. *See also supra* note 6.)