UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VERVICIA HENDERSON *et al.*,

    Plaintiffs,

v.                                          Case No. 6:21-cv-1363-RBD-DCI

LOCKHEED MARTIN
CORPORATION; and UNIVERSAL
CITY PROPERTY MANAGEMENT
COMPANY III, LLC,

    Defendants.
_____

## ORDER

Before the Court are the parties' summary judgment and *Daubert* motions.

## BACKGROUND

In this toxic tort case that is part of a suite of companion cases, more than sixty Plaintiffs allege that Defendant Lockheed Martin Corporation's weapons manufacturing facility in Orlando gave off toxic chemicals that contaminated the surrounding air, soil, and groundwater, which caused Plaintiffs to suffer various injuries. (Doc. 89.)

In support of their resulting strict liability, negligence, nuisance, and other claims, Plaintiffs have marshalled various doctors to opine on general causation—that is, whether each chemical at issue is capable of causing the types of injuries at

issue. Plaintiffs and Lockheed[1] have filed cross-motions for summary judgment on the issue of general causation. (Docs. 142, 152; *see* Docs. 164, 165, 177, 178.) And both sides have moved to exclude each others' general causation experts. (Docs. 139–41, 144, 146, 148, 151; *see* Docs. 157, 160, 163, 167, 169, 171, 173.) The Court also held a hearing on general causation. (Doc. 209.)

Plaintiffs later submitted medical opinions on specific causation—that is, whether the chemicals actually caused their specific injuries. Lockheed has moved for summary judgment on the issue of specific causation. (Doc. 318; *see* Docs. 339, 356.) And both sides have moved to exclude each others' specific causation experts. (Docs. 283, 287, 289, 292, 294, 296, 299, 301, 304, 305, 307, 309–12, 314, 316, 317; *see* Docs. 332, 334, 336, 338, 341–50.)

The Court then entered an interim causation Order in which it decided: (1) that this is a *McClain* category two case requiring a full *Daubert* analysis; and (2) to take general and specific causation up on the full scientific record.[2] (Doc. 370.) Supplemental briefing followed that Order. (Docs. 373, 374.) These matters are ripe.

The instant Order focuses on one of Plaintiffs' general causation experts,

---

[1] Plaintiffs allege that the second Defendant, Universal City Property Management Company III, bought some land from Lockheed and contributed to some of the contamination. (Doc. 89, ¶ 17; *see* Doc. 286-3.) Universal did not move for summary judgment.
[2] The Court incorporates that Order in full here.

Dr. Donald Mattison, a reproductive medicine doctor. (Doc. 141; *see* Doc. 171.)

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Then the court must decide whether there is "sufficient disagreement to require submission to a jury." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (cleaned up).

Expert testimony may only be admitted if: (1) the expert is qualified; (2) the methodology is reliable; and (3) the testimony is helpful. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of the expert must establish the opinion is admissible, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010), but need not prove it is correct, *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002).

## ANALYSIS

With *McClain* categorization decided, the Court turns to analyzing whether there are any genuine issues of material fact precluding summary judgment on

3

causation. Given the number of causation experts at issue, the Court is taking them one at a time. Lockheed moves to exclude Dr. Mattison, arguing he lacks a reliable methodology.[3] (Doc. 141, pp. 16–25.)

Dr. Mattison conducted a weight of the evidence analysis to conclude that six[4] substances are capable of causing various birth defects and reproductive issues, affecting ten[5] Plaintiffs. (Doc. 135-1; *see* Doc. 135-3, pp. 79:18–82:21.) Specifically, Dr. Mattison reviewed epidemiological studies showing reproductive effects, birth outcomes, and central nervous system and immunological effects of the substances at issue; evaluated public agency findings; examined the biological

---

[3] Lockheed also seeks to exclude Dr. Mattison's opinions for lack of helpfulness or "fit" due to his lack of consideration of case-relevant exposure conditions and dose-response analysis, relying on *In re Deepwater Horizon Belo Cases*, No. 3:19CV963, 2020 WL 6689212 (N.D. Fla. Nov. 4, 2020), and *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105 (8th Cir. 1996). (Doc. 141, pp. 3–16.) But the Court has already rejected Lockheed's interpretation of those cases in the interim causation Order. (Doc. 370, pp. 17–18 n.9; *id.* at 20–21 n.12.) So the Court's conclusion on Dr. Mattison solely considers the reliability of his methodology without regard to the fact that he did not consider dosage issues.

[4] These six substances are: PCE, TCE, toluene, xylenes, formaldehyde, and styrene. (Doc. 135-1, pp. 3–15.)

[5] The Plaintiffs relying on Dr. Mattison for testimony regarding birth defects are: (1) Harrison Carp-Schursky, suffering from bilateral neurogenic clubfoot, midbrain glioma, and midline brain anomalies; (2) Michael D. Iacovino, suffering from hypoplastic heart syndrome and born with one kidney; (3) Benjamin Johnson, suffering from Klinefelter syndrome; (4) Ryo Komatsu, suffering from DiGeorge syndrome; (5) Ari Saperstein, suffering from ectodermal dysplasia and syndactyly of fingers and toes and born with a missing portion of his middle finger, an extra toe, and missing tear ducts; (6) Austin Siegrist, suffering from autism (and JIA, though the Court already resolved that portion of his claim (Doc. 383, p. 14 n.19)); (7) Jack Turk, suffering from cleft lip and palate; and (8) Theodore Turk, suffering from autism and language disorder. (Doc. 152-3.) Two Plaintiffs also rely on Dr. Mattison for testimony regarding their reproductive health: Kristi Hujik, suffering from infertility, and Ana Saperstein, suffering from abnormal pregnancy. (*Id.*)

mechanisms of action for how the substances caused the effects; and analyzed animal studies in depth, connecting the results of animal studies with the biological mechanisms of action to show how the results could be similar in humans.[6] (Doc. 135-1, pp. 3–15.)

Lockheed argues that Dr. Mattison's weight of the evidence review was unreliable and his conclusions lack epidemiological support. (Doc. 141, pp. 18–25.) The Court largely disagrees. Unlike some of the other doctors excluded in these cases, Dr. Mattison presented a more complete and measured picture of the science based on a variety of evidence, lending his methodology more demonstrable reliability. *See In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769, 2009 WL 3806435, at *4–10 (M.D. Fla. June 23, 2009) (Conway, J.) (finding weight of the evidence approach reliable based on expert's review of epidemiological studies, animal studies, and mechanistic data, among other things); *see also Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1313 (S.D. Fla. 2016) (Bloom, J.). He primarily relied on studies with statistically significant results (meaning with

---

[6] Of the three primary methodologies—epidemiology, dose-response, and background risk—Dr. Mattison did neither a case-specific dose-response analysis (which the Court does not consider fatal, *see supra* note 3), nor a background risk analysis, so his review of the epidemiological literature via his weight of the evidence analysis is the only primary methodology on which he relies. (*See* Doc. 135-1; Doc. 135-3, pp. 60:1–14, 79:18–81:9; Doc. 370, pp. 12–15.) While public health agency findings, animal studies, and biologically plausible mechanisms of action are all secondary to epidemiological review, they may still be considered as part of a weight of the evidence analysis. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1248–50 (11th Cir. 2005); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306–12 (N.D. Fla. 2018).

confidence intervals with a lower bound over 1.0), demonstrating strong associations between the substance and the illness. (*See* Doc. 135-1, pp. 3–5, 8, 14–16); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314–1315 & n.16 (11th Cir. 1999) (explaining that the higher the interval above 1.0, the more likely the increased risk in the exposed group). And even in a few instances when he noted studies with statistically insignificant results, he acknowledged the limits of those studies and placed them within the greater scientific context, rather than extrapolating from them to reach unsupported conclusions.[7] (*See* Doc. 135-1, pp. 5, 12; Doc. 135-3, p. 115:18–25); *cf. Vandestreek v. Lockheed Martin Corp.*, No. 6:21-cv-1570, 2023 WL 6396087, at *7 (M.D. Fla. Sept. 27, 2023). He was evenhanded in his examination of public agency results, placing them in context rather than overstating their findings. (*See* Doc. 135-1, pp. 5, 8); *cf. McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1249–50 (11th Cir. 2005) (urging cautious reliance on public health findings in examining expert opinions given their protective rather than predictive nature). He also examined animal studies in a detailed fashion, combining his analysis of the mechanisms of action of substances with observed outcomes in animals and extrapolating how the substances would have similar effects in humans. (Doc. 135-1, pp. 6–8, 10, 12–14); *see In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp.

---

[7] With the exception of a couple of select opinions, addressed below.

3d 1291, 1310 (N.D. Fla. 2018) (noting that animal studies may supplement other types of evidence, "provided the expert explains how the [animal study] data can be reliably extrapolated to predict a drug's effects in humans"). And where he looked at solvent mixtures, he largely linked the particular substance he was examining to the mix studied. (Doc. 135-1, pp. 11–12, 20. *See generally* Doc. 370, p. 6 n.2.) Dr. Mattison also tempered his citations to studies supporting his conclusions with acknowledging some that came out the other way—rather than solely presenting positive outcomes, as Lockheed urges. (*See* Doc. 135-1, pp. 3–4.) And though he excluded explicit citations to studies with negative odds ratios, he did explain why he did so. (Doc. 135-3, p. 118:3–10.)

Dr. Mattison's report is not perfect. Far from it. (*See, e.g.*, Doc. 135-3, pp. 98:20–23, 103:6–17, 113:15–135:13.) But his deposition and rebuttal report sufficiently clear up any questions about his methodology, including explaining the factors he considered in weighing the studies, such as design, power, confounders, repeatability, and strengths and limitations. (*See id.* at 81:14–20, 82:24–83:11, 105:17–106:6, 109:10–20 & *passim*; Doc. 135-2.) And while he did not engage in a traditional Bradford Hill analysis because he was doing a weight of the evidence analysis instead, he did examine many of the factors involved in evaluating epidemiological studies under that test, including looking at the strength of the association identified in the literature, dose-dependent increases in

7

negative health outcomes, replication of the findings in follow-up studies, biological plausibility, and consistency with other knowledge; he also demonstrated a firm understanding of the need to evaluate associations for whether they actually show a causal relationship. (Doc. 135-1, pp. 3–5, 7–8, 12, 14–16; Doc. 135-2; Doc. 135-3, pp. 105:17–106:6.) *See generally Abilify*, 299 F. Supp. 3d at 1307. His opinions have quite a bit of fertile ground for vigorous cross-examination, but it is not the Court's role to consider whether he is right—only whether he employs a reliable method. *See Allison*, 184 F.3d at 1312 ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."); *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." (cleaned up)). In considering the entire record, the Court concludes that Dr. Mattison's methodology is sufficiently reliable to put his testimony before the jury. *See, e.g.*, *Seroquel*, 2009 WL 3806435, at *4 (permitting expert testimony where report included only positive studies but deposition and hearing testimony made methodology clear). Shaky but admissible testimony is still admissible. *See*

*Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

That said, shaky but admissible crosses over into inadmissible territory when it comes to Dr. Mattison's opinions on autism. While Dr. Mattison's overall methodology is largely reliable, the science underlying these particular opinions is just not there. Though Dr. Mattison overwhelmingly cited statistically significant studies, the few times he relied on statistically insignificant findings primarily concerned autism. (Doc. 135-1, pp. 6, 9; Doc. 135-3, pp. 164:11–170:16.) And several of the authors advocated more caution in interpreting their results than Dr. Mattison used. (Doc. 135-3, pp. 167:3–173:3, 184:5–10); *see McClain*, 401 F.3d at 1247 ("The authors of the articles limit the application of their studies consistent with the principles of good science; [the expert in question] expands the application beyond good science."); *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) ("It is axiomatic that causation testimony is inadmissible if an expert relies upon studies or publications, the authors of which were themselves unwilling to conclude that causation had been proven."). Even Dr. Mattison himself acknowledged that the studies underlying his opinion on autism did not support his conclusion after an individual study-by-study review. (Doc. 135-3, p. 190:2–24 ("[D]o you agree, then, that the epidemiological evidence that you've cited does

9

not support your ultimate conclusion that there's a cause-and-effect relationship between exposures to these substances and autism spectrum disorder? Yes.").) Because the science in this area is in too early a stage to put before the jury, Dr. Mattison's opinions on autism will be excluded. *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." (cleaned up)).

Likewise, the support for Dr. Mattison's opinions on DiGeorge syndrome and ectodermal dysplasia is also too thin to demonstrate reliability. (*See* Doc. 141, pp. 23–24.) His opinion on these two chromosomal disorders was supported by only two epidemiological studies—but neither actually addressed these particular syndromes.[8] (Doc. 135-1, pp. 22–23; Doc. 135-3, pp. 200:25–201:12, 205:19–25, 206:10–20.) With no epidemiological support, Dr. Mattison's "because I said so" opinion on these illnesses is inadmissible. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

So Lockheed's motion to exclude Dr. Mattison (Doc. 141) is due to be

---

[8] While Lockheed also challenges Dr. Mattison's opinions on another chromosomal disorder, Klinefelter syndrome, one of his cited studies does address this syndrome specifically, so the Court will permit his opinion on that point as sufficiently supported. (Doc. 135-5.)

granted on autism, DiGeorge syndrome, and ectodermal dysplasia only.[9] With these opinions excluded, there is no reliable general causation testimony on these illnesses, so summary judgment is due to be granted in favor of Lockheed on the entire claims of Plaintiffs Austin Siegrist,[10] Theodore Turk,[11] and Ryo Komatsu,[12] and part of the claim of Ari Saperstein.[13] *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1316 (11th Cir. 2014); *Hendrix*, 609 F.3d at 1203. In a forthcoming Order, the Court will take up causation of the remaining diseases at issue: various types of cancer on which Dr. Panigrahy opines. (*See* Doc. 370, p. 8.)

---

[9] Lockheed also briefly attacks Dr. Mattison's opinions on congenital heart defects. (Doc. 141, pp. 23–25.) Lockheed pointed to one study that concluded that major risks for these illnesses were unknown (Doc. 135-3, p. 194:14–18), but Dr. Mattison relied on numerous studies in support of his opinion on this point (Doc. 135-1, p. 20), so it is sufficiently supported.

As to the remaining illnesses, Lockheed does not specifically challenge Dr. Mattison's opinions on limb and organ malformations or orofacial clefts (Doc. 135-1, pp. 21–22), so those proceed. And though Dr. Mattison did not explicitly enumerate opinions on infertility and abnormal pregnancies in the summary section of his report, he did discuss fertility and pregnancy challenges throughout (*see, e.g., id.* at 3, 7) and Lockheed does not specifically challenge those claims, so they proceed, as well.

[10] Austin Siegrist suffers from JIA, which the Court has already disposed of, and autism, so his claim is summaried out in its entirety, as are the consortium claims of William and Amanda Siegrist. (Doc. 152-3, pp. 7–8; Doc. 383, p. 14 n.19.) William Siegrist's own medical monitoring claim proceeds.

[11] Theodore Turk suffers from autism and language disorder. (Doc. 152-3, p. 8.) Dr. Mattison did not provide any separate analysis of Turk's language disorder to the extent he claims one, so that is abandoned, and the exclusion of Dr. Mattison's autism opinion summaries out Theodore Turk's claim in its entirety, along with the consortium claim of Christina Turk-Eichstaedt as it pertains to Theodore only (her consortium claim proceeds as to Jack Turk, who suffers from cleft palate, as well as her own medical monitoring claim). (*Id.; see* Doc. 135-1.)

[12] Ryo Komatsu suffers from DiGeorge syndrome only, so that claim is summaried out, along with the consortium claims of Naho Komatsu and Naoyuki Komatsu (whose own exposure claim will be addressed separately). (Doc. 152-3, p. 5.)

[13] Ari Saperstein suffers from ectodermal dysplasia along with other issues, so that portion of his claim only is summaried out. (Doc. 152-3, p. 7.)

11

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1. Lockheed's motion to exclude Dr. Mattison (Doc. 141) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

2. Lockheed's motion for summary judgment on general causation (Doc. 152) is **GRANTED IN PART AND DENIED IN PART** as set forth above. The rest of this and all remaining summary judgment motions will be taken up in forthcoming Orders.

3. In its discretion given the number of parties involved, the Court will enter piecemeal judgments as to particular Plaintiffs once their claims are resolved in full. *See* Fed. R. Civ. P. 54(b). So the Clerk is **DIRECTED** to enter judgment in favor of both Defendants[14] and against Plaintiffs Austin Siegrist, Amanda Siegrist, Theodore Turk, Ryo Komatsu, and Naho Komatsu. The Clerk is further **DIRECTED**

---

[14] Though Universal did not move for summary judgment, it is entitled to judgment on these claims because these particular Plaintiffs cannot prove general causation as a matter of law. *See Williams v. Mosaic Fertilizer, LLC*, No. 8:14-cv-1748, 2017 WL 5307920, at *3 (M.D. Fla. Jan. 12, 2017), *aff'd*, 889 F.3d 1239 (11th Cir. 2018) (noting that summary judgment is properly granted *sua sponte* where the parties fully briefed the merits of the claims and thus the plaintiff had sufficient notice under Rule 56(f)); *cf. Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 (11th Cir. 2003).

to terminate those Plaintiffs as parties to this action.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 11, 2024.

ROY B. DALTON, JR.
United States District Judge