## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

VERVICIA HENDERSON *et al.*,

      Plaintiffs,

v.                                                                  Case No. 6:21-cv-1363-RBD-DCI

LOCKHEED MARTIN
CORPORATION; and UNIVERSAL
CITY PROPERTY MANAGEMENT
COMPANY III, LLC,

      Defendants.

_____

## ORDER

Before the Court is Defendant Lockheed Martin Corporation's motion to exclude Dr. David Warburton and for summary judgment. (Doc. 485.) The motion is due to be granted as to Plaintiff Michael D. Iacovino and denied as to Harrison Carp-Schursky, Benjamin Johnson, and Jack Turk.

## BACKGROUND

This toxic tort action is part of a long-running suite of companion cases in which plaintiffs allege that Lockheed's weapons manufacturing facility in Orlando gave off chemicals that contaminated the surrounding air, soil, and groundwater, harming the people who lived and worked nearby—and in this case, the babies born to those people.

After resolving the claims of dozens of plaintiffs through a lengthy period of dispositive motion practice, four primary plaintiffs remain: Harrison Carp-Schursky, Michael D. Iacovino, Benjamin Johnson, and Jack Turk. All are children born with birth defects to parents who worked near the Lockheed facility; the parents bring attendant consortium claims. (Docs. 1, 414.)

These Plaintiffs' claims previously relied on Dr. Donald Mattison, a reproductive medicine doctor, to establish general causation. (Doc. 394.) The Court permitted Dr. Mattison's opinions in part—excluding his testimony about DiGeorge syndrome (among other things), but permitting his opinions about the injuries of the four Plaintiffs at issue. (*Id.*) The Court did not make a general causation finding on these claims at that time. (*See id.*)

Dr. Mattison later became ill, and the parties agreed to substitute Dr. Warburton, a neonatologist, in his place. (Docs. 401, 403.) Dr. Warburton adopted Dr. Mattison's report. (Doc. 222-8.) Dr. Warburton then issued general and specific causation reports of his own, on which all remaining Plaintiffs rely. (Docs. 473-2, 473-3; *see* Doc. 473-4.)

Lockheed now moves for summary judgment, arguing that Dr. Warburton should be excluded and Plaintiffs cannot establish general or specific causation. (Doc. 485.) Plaintiffs oppose. (Doc. 493; *see* Doc. 496.) After a two-day evidentiary hearing (Docs. 513, 514), the matter is ripe.

2

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Then the court must decide whether there is "sufficient disagreement to require submission to a jury." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (cleaned up).

Expert testimony may be admitted if: (1) the expert is qualified; (2) the methodology is reliable; and (3) the testimony is helpful. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of the expert must establish the opinion is admissible, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010), but need not prove it is correct, *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002).

# ANALYSIS

## I.      General Causation[1]

Lockheed argues that Warburton cannot establish general causation because

he did not determine dose-response relationships for the substances at issue—in

other words, he failed to establish a threshold dose above which the types of birth

defects at issue here would likely result after exposure. (Doc. 485, p. 47.) But as the

Court has concluded in an exhaustive opinion in one of the companion cases,[2] the

precise quantitative dose of a substance is not always necessary to prove causation,

and Warburton's opinions are admissible without making such a precise

calculation.

Warburton is a board-certified neonatologist who studied at St. Thomas's in

London, did fellowships at Harvard and Brown, and works at Children's Hospital

Los Angeles; he has been practicing medicine for over fifty years.[3] (Doc. 473-2, p. 1;

---

[1] To the extent these rulings pertain to specific causation and vice versa, the Court adopts them as such, given the earlier ruling that the Court would consider causation as a united inquiry on the full scientific record. (Doc. 370); *see McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242–44 (11th Cir. 2005) (looking at general and specific causation together in the context of Dr. O'Donnell's report); *cf. In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243, at *3 (11th Cir. Jan. 11, 2022) (rejecting contention that trial court "did not adequately consider distinction between general and specific causation").

[2] Rather than repeat that lengthy legal and scientific analysis, the Court adopts that order in full here. *See Perrotti v. Lockheed Martin Corp.*, No. 6:22-cv-1338 (M.D. Fla. Sep. 2, 2025) (Doc. 198).

[3] Dr. Warburton is, among many other things, an Officer of the Order of the British Empire. (*See* Doc. 473-2, p. 1.) His honorifics, like those of other experts throughout this case, have been dropped for brevity, not disrespect.

Doc. 481-1, p. 12:1–12.) His opinions are predicated on Dr. Ranajit Sahu's opinion, which the Court has already found admissible,[4] that Plaintiffs' parents had "substantial exposures" to the substances at issue (PCE, TCE, and styrene) from working near the Lockheed facility. (Doc. 473-2, p. 2.) In forming his opinions, Warburton reviewed epidemiological studies, evidence from animal and lab studies, and biologically plausible reasons for the exposures causing the injuries. (*Id.* at 3.) He concluded that the exposures were capable of causing the types of conditions Plaintiffs suffered. (*Id.* at 3, 11–12.)

Of the epidemiological studies Warburton considered, he relied overwhelmingly on studies with a confidence interval beginning at 1.0 or above, and many over 2.0, indicating a strong inference of causation. (*See id.* at 3–11); *Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1315–27 (N.D. Fla. 2018) (confidence interval with lower bound over 1.0 indicates statistically significant results); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 (11th Cir. 1999) (risks over 2.0 permit inference that disease was more likely than not caused by substance). He also scrutinized the setup of studies, noting when particular ones were stronger because they limited bias, accounting for when others were

---

[4] Sahu, a fate-and-transport expert, modeled concentrations of the substances to which people in the area surrounding the facility were exposed, and then concluded that those concentrations were many times higher than background. The Court found this methodology reliable. (Docs. 273-6, 451.)

less weighty because of warnings by the authors or confounders, considering sample sizes in analyzing particular findings, and so on. (Doc. 473-2, pp. 3–5.) He looked at the substances alone and mixed solvents, underscoring the similar mechanisms of action in reproductive systems of the class of organic solvents to which TCE, PCE, and styrene belong; he also considered the way animal studies on those substances translated to human anatomy. (*Id.* at 3, 7–10.) He specifically considered dose-response issues and explained that because of the lipophilic nature of the substances combined with the sensitivity of the biological tissues in the reproductive system, "it is not appropriate to assume a threshold for toxicity exists," citing supporting studies that have rejected the notion of the "safe-dose threshold." (*Id.* at 11.) But he also paid careful attention to studies that did establish a dose-response curve. (*Id.* at 4–6, 8–11.) And given that Plaintiffs' parents were the ones exposed, he considered the science on both maternal and paternal exposures. (*Id.* at 3, 11.)

At this point, the Undersigned has reviewed a great many expert reports on the science involved in the alleged exposures at issue in these cases. As the above recitation should demonstrate, Warburton's report is among the strongest. He did exactly what the law in this area requires: relied on statistically significant study results; deeply considered study design; placed appropriate weight on his consideration of secondary methodologies in support of his primary

6

methodology; paid attention to how the authors of the studies interpreted them; and looked for follow-up studies and meta-analyses that confirmed earlier findings to strengthen his conclusions. *See Allison*, 184 F.3d at 1315 (holding that studies with statistically insignificant results are "not worth serious consideration for proving causation"); *Abilify*, 299 F. Supp. 3d at 1310 (noting that animal studies are secondary methodologies that require explanation of how they can be extrapolated to prove similar effects in humans), 1315–27 (explaining importance of study design, confounders, and bias in determining whether study is reliable); *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) ("It is axiomatic that causation testimony is inadmissible if an expert relies upon studies or publications, the authors of which were themselves unwilling to conclude that causation had been proven."); *In re Deepwater Horizon Belo Cases*, No. 3:19CV963, 2020 WL 6689212, at *10 (N.D. Fla. Nov. 4, 2020), *aff'd*, No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022) (noting that consistency of conclusion with other knowledge is crucial part of analysis).

So Warburton sails over hurdles that felled many of Plaintiffs' other experts. (*See* Doc. 383, pp. 7–9 (excluding Kantor[5] for failing to explain study designs,

---

[5] Lockheed unwisely tries to draw a parallel between Warburton and Kantor, a first-time expert, noting that the Court briefly criticized Kantor's opinions on mixed solvents. (Doc. 485, pp. 7, 16–17, 39–40.) But that criticism was part of the Court's overall impression of the

relying on statistically insignificant study results, and cherry-picking data, among many other things); Doc. 394 (excluding Mattison in part because his autism opinions relied on statistically insignificant results, went beyond authors' limitations, and were not supported by careful epidemiological review)); *Vandestreek v. Lockheed Martin Corp.*, No. 6:21-cv-1570 (M.D. Fla. Sep. 27, 2023) (Doc. 223) (excluding Kendall for relying on statistically insignificant results). With the overall reliability of Warburton's methodology established, we turn back to Lockheed's focus on his perceived failure on the dose-response issue. (Doc. 485, pp. 47–51.)

It is this Court's view that Lockheed overreads Eleventh Circuit precedent to require specific quantitative doses to prove causation, when in fact the law only

---

overwhelming unreliability of Kantor's report, mentioned only after the Court's conclusion that it could have excluded Kantor for his process problems alone—a far cry from the reliability of Warburton's analysis. (Doc. 383, pp. 10–11 & n.12.) As the Court has explained elsewhere, it is aware that the real-world challenges involved in epidemiological study mean that scientists often cannot definitively determine doses (and, it follows, exact chemical mixtures) to which particular populations were exposed. *See Perrotti*, No. 6:22-cv-1338 (Doc. 198, pp. 17–20). So the Court would not and did not rule that opinions on studies about mixed solvents are *per se* inadmissible, as Lockheed repeatedly suggests. That's just not how epidemiology works, as many studies examine the effects of solvents without the ability to break them down into their component parts. Rather, Warburton's analysis—unlike Kantor's—referenced studies of solvents that did contain the substances at issue and studies specific to each substance, examined the mechanisms of the substances in depth to explain why they similar effects in the body, and overwhelmingly relied on studies with highly statistically significant results. (Doc. 473-2, pp. 4, 7–10.) In other words, Warburton's report placed his opinions about mixed solvents in the proper context, which are admissible as part of the report's overall reliability. So Lockheed's attempt to lump Warburton in with Kantor is unpersuasive, as is its attempt to overstate the Court's rulings on mixed solvents.

requires experts to opine on harmful "levels" of exposure.[6] *See Perrotti v. Lockheed Martin Corp.*, No. 6:22-cv-1338 (M.D. Fla. Sep. 2, 2025) (Doc. 198, pp. 31–38). The true state of the law, in brief, is this: For many real-world exposures, it is impossible to quantify precise dose exposures. *See Cleveland v. United States*, No. 1:03-cv-1963, 2006 WL 5334601, at *3–4 (N.D. Ga. Jan. 24, 2006); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 8354662, at *10 (S.D. Fla. Nov. 23, 2010). Determining dose-response thresholds is difficult—indeed, such thresholds may not be evident at all for carcinogens—so identifying a dose-response relationship is only one non-essential factor of many in expert analysis. *See In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769, 2009 WL 3806434, at *16 (M.D. Fla. June 18, 2009); David L. Eaton, *Scientific Judgement* [sic] *& Toxic Torts – A Primer in Toxicology for Judges & Lawyers*, 12 Brook. J.L. & Pol'y 5, 18 (2003); Fed. Jud. Ctr., Reference Manual on Sci. Evidence 642–43 & n.28 (3d ed. 2011) ("Ref. Man."). Of course, if an expert chooses to do a dose-response assessment, he must do so reliably, but dose-response is not the only reliable methodology, nor even the best one: epidemiology is. *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005);

---

[6] The Fifth Circuit and the Northern District of Illinois share this Court's view that Lockheed's position misreads Eleventh Circuit precedent. *See Ruffin v. BP Expl. & Prod., Inc.*, 137 F.4th 276, 282 (5th Cir. 2025); *In re Abbott Lab'ys*, No. 22 C 00071, 2025 WL 1283927, at *11 (N.D. Ill. May 2, 2025).

*Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307–08 (11th Cir. 2014);

*Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1242–47 (11th Cir. 2018); *Taylor v.*

*Mentor Worldwide LLC*, 940 F.3d 582, 595 (11th Cir. 2019); *Seroquel*, 2009 WL

3806434, at *16. While a plaintiff's expert should opine on the level of exposure

that could harm a human generally and the level that did harm the plaintiff

specifically, such levels need not be proven by precise dose numbers, and

qualitative proof can be sufficient. *See McClain*, 401 F.3d at 1241 n.6; *Williams*,

889 F.3d at 1248; *Deepwater Horizon*, 2020 WL 6689212, at *15; *Guinn v. AstraZeneca*

*Pharms. LP*, 602 F.3d 1245, 1248 n.1 (11th Cir. 2010); *In re Deepwater Horizon BELO*

*Cases* (*DH Belo*), 119 F.4th 937, 945 (11th Cir. 2024); *Westberry v. Gislaved Gummi AB*,

178 F.3d 257, 264 (4th Cir. 1999); *Ruffin v. BP Expl. & Prod., Inc.*, 137 F.4th 276, 283

(5th Cir. 2025); *In re Abbott Lab'ys*, No. 22 C 00071, 2025 WL 1283927, at *11 (N.D.

Ill. May 2, 2025).

Warburton has satisfied what the law requires. Relying on Sahu's

quantitative opinions that Plaintiffs' parents were exposed at levels well above

background[7] (Doc. 273-6), Warburton examined "a number of studies that

---

[7] Lockheed's argument is more about Sahu than Warburton, claiming that Sahu's modeled
concentrations are much lower than the EPA's reference concentrations, so Warburton's
impression that the concentrations were higher is wrong. (Doc. 485, pp. 49–50.) But this point is
fodder for cross-examination, not reason for exclusion, especially given Warburton's opinion that
even low-dose exposures can still cause significant effects and the fact that regulatory agency
recommendations are not the end-all be-all. (Doc. 473-2, p. 11; Doc. 481-1, pp. 47:25–48:3 ("The

detected statistically significant dose-response relationships, which provides
strong evidence that risks accompany increasing exposures above background."
(Doc. 473-2, p. 11.) Based on his epidemiological review of those studies, taken
together with other studies casting doubt on the assumption of any safe-dose
threshold and the mechanism of how the substances work in the body, he
concluded that Plaintiffs' parents' exposures can cause the type of birth defects
their babies suffered. (*Id.* at 12); *see* Eaton at 18; Ref. Man. at 642–43 & n.28. Between
Warburton and Sahu, Plaintiffs have raised a genuine issue of material fact on
general causation. *See McClain*, 401 F.3d at 1239 ("[W]hether the drug or chemical
*can* cause the harm plaintiff alleges . . . is called general causation."), 1241 n.6 ("One
should not conclude from this analysis that to pass *Daubert* muster an expert must
give precise numbers about a dose-response relationship.").

## II.  Specific Causation

### A.  Carp-Schursky

The remainder of Lockheed's arguments are Plaintiff-specific, so the Court

---

EPA numbers for safety may not be that accurate because . . . these compounds may have toxic
effects well below that . . . .")); *see Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333,
1345 (11th Cir. 2003) ("[The movant] does not argue that it is improper to conduct a [study the
way the expert did], but rather that the specific numbers that [the expert] used were wrong. Thus,
the alleged flaws in [the expert's] analysis are of a character that impugn the accuracy of his
results, not the general scientific validity of his methods. The identification of such flaws in
generally reliable scientific evidence is precisely the role of cross-examination."); *Williams*,
889 F.3d at 1246–47 (EPA standards typically protective rather than predictive).

takes each Plaintiff in turn. As to Harrison Carp-Schursky, Lockheed argues that
Warburton did not cite sufficient authority that his injuries could be caused by his
father's exposures, asserting that his mother was not exposed so Warburton's cited
maternal exposure studies are "undisputedly irrelevant." (Doc. 485, pp. 16–20.)

Carp-Schursky was born in 2019 with clubfoot and brain abnormalities.
(Doc. 473-3, p. 6.) His father worked near Lockheed for years prior to his
conception and suffered from chronic headaches that resolved when he stopped
working there. (*Id.* at 6–7.) His mother has a bicornuate uterus, which can cause
foot deformities, but Warburton ruled her condition out as a likely cause of Carp-
Schursky's clubfoot because "the etiology of Harrison's foot deformities is not
consistent with this mechanism." (*Id.* at 7.) Warburton concluded, relying on the
studies he cited in his general causation report, that Carp-Schursky's injuries were
likely the result of his father's exposures to the substances at issue. (*Id.*)

Lockheed's assertion that only maternal exposures are relevant ignores
what Warburton said. His report explains that the substances at issue cause
oxidative stress, which can damage sperm and result in malformations once an
egg is fertilized. (Doc. 473-2, pp. 7–8.) His deposition was consistent with this
explanation. (Doc. 481-1, p. 93:3–6 ("These inhalations in the father can interfere
with the developmental trajectory . . . in contribution of the sperm to the
developing embryo.").) And Warburton did not solely cite studies on maternal

exposures, as Lockheed's argument concedes. (*See* Doc. 485, p. 22 (noting that only

fifteen of twenty-one studies cited addressed maternal exposures).) As Plaintiffs

rightly point out, he cited numerous studies that Lockheed chose to ignore.

(Doc. 493, pp. 32–33.)

Rather than consider Warburton's opinions as a whole, Lockheed wants the

Court to apply escalating artificial limitations on the authority he cited—First,

throw out maternal studies. Next, throw out studies with occupational exposures.

Finally, throw out solvent studies.—to chip away until it seems he cited nothing

relevant. (*See* Doc. 485, pp. 20–41.) But that is not true, nor does that exercise

comport with the Court's role as a gatekeeper instead of a factfinder. *See

Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

(citing *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996) ("By attempting

to evaluate the credibility of opposing experts and the persuasiveness of

competing scientific studies, the district court conflated the questions of the

admissibility of expert testimony and the weight appropriately to be accorded

such testimony by a fact finder.")). Warburton cited studies on how the individual

substances and solvents[8] cause limb malformations; he cited studies on the effects

of maternal, paternal, and general parental exposures; he explained how a father's

---

[8] *See supra* note 5.

exposures can cause damage to the sperm that would result in limb abnormalities; and he ruled out other potential causes to conclude that Carp-Schursky's father's exposures did cause his injuries. (Doc. 473-2, pp. 3–5, 7–10; Doc. 473-3, p. 7; Doc. 481, pp. 90:7–91:1; *see* Doc. 548, pp. 208:21–209:1.) In other words, Warburton conducted a reliable differential etiology to come to a specific causation finding, supported by a reliable general causation opinion. *See Guinn*, 602 F.3d at 1253 (reliable differential diagnosis rules out other factors that could have been sole cause of injury). Whether Warburton's evidence is sufficient to show that Carp-Schursky's father's exposures more likely than not caused his injuries is a question for the jury, not the Court. *See Allison*, 184 F.3d at 1311 ("The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury . . . ."). So Carp-Schursky's claim proceeds.

### B.   Iacovino

Like with Carp-Schursky, Lockheed also primarily (though not solely) seeks to exclude Warburton's opinion on Michael D. Iacovino's cardiac and kidney malformations because of the perceived lack of authority concerning paternal exposures. (Doc. 485, p. 17.)

Iacovino was born in 2011 with hypoplastic left heart syndrome and unilateral renal agenesis (only one kidney). (*See* Doc. 473-3, p. 2; Doc. 481-1, p. 159:17–20.) His father worked near Lockheed from 1994 to 2020. (Doc. 473-3,

14

p. 2.) At the time of his birth, his parents had no family history of congenital abnormalities, although his mother later miscarried another son with them. (*Id.* at 3.) Both parents were over thirty-five at the time of conception. (*Id.*) Warburton acknowledged that advanced parental age is a risk factor for these conditions, but he opined that age alone was unlikely to be the sole cause, noting that environmental exposures drive up the risk of anomalies with increasing age. (*Id.*) So Warburton concluded that Iacovino's injuries were likely caused by his father's exposures to the substances causing problems in his sperm, which led to developmental disruptions in the heart and kidney during Iacovino's gestation. (*Id.* at 4.)

All told, Iacovino's story sounds similar to Carp-Schursky's. And if Lockheed's complaint about Warburton's reliance on both maternal and paternal exposure studies was the only issue, Iacovino's result would be the same.[9] But Warburton missed something crucial in Iacovino's medical history: his 22q11 deletion. (Doc. 543-2, p. 2.)

22q11 deletion is a chromosomal abnormality that is "strongly associated" with hypoplastic left heart syndrome and renal agenesis, as Warburton

---

[9] While Warburton acknowledged in his deposition, when testifying about Iacovino's injuries, that the mechanisms of action are different between maternal and paternal exposures (Doc. 481-1, pp. 224:17–225:18), he did not concede that only maternal exposure studies are relevant to causation. In any event, the Court excludes his opinion on Iacovino for other reasons.

acknowledged when questioned at his deposition. (Doc. 481-1, pp. 153:23–154:2, 161:3–7.) But despite that strong association with Iacovino's injuries, neither of Warburton's initial reports mention 22q11 deletion as a possible cause or tie the substances at issue to the deletion. (*See* Docs. 473-2, 473-3.) Indeed, Warburton conceded at his deposition that there is no way to differentiate a 22q11 deletion that happened randomly from one that occurred as a result of exposure to chemicals. (Doc. 481-1, p. 166:9–14.) And when asked whether he could exclude the possibility that Iacovino's parents were asymptomatic carriers of the chromosomal abnormality, he said it was "50/50."[10] (Doc. 548, pp. 171:20–172:5.)

The dearth of authority about 22q11 deletion in Warburton's report tracks because at the hearing on this motion, he could not remember whether Iacovino even had the abnormality, acknowledging when presented with his medical record that "I may have missed this bit." (Doc. 548, pp. 165:9–14, 167:5–7; *see also id.* at 165:1–4 (acknowledging that the 22q11 issue was presented to him at the deposition).) And Plaintiffs' opposition to summary judgment did not mention the 22q11 issue at all. (*See* Doc. 493.) While Plaintiffs' counsel questioned Warburton about 22q11 deletion at the hearing in an attempt to walk back the issue, Lockheed's counsel rightly pointed out that the opinions Warburton professed on

---

[10] This testimony contradicted his earlier opinion that "I think asymptomatic carriers of that particular mutation would be rather unlikely." (Doc. 481-1, p. 166:7–8.)

22q11 deletion during the hearing were outside the scope of his reports. (*See* Doc. 548, pp. 32:9–33:20.)

At the hearing, Warburton's obvious unfamiliarity with Iacovino's medical history showed a marked contrast, in this Court's view, to his wealth of experience and authority when testifying about other issues. (*See* Doc. 548, p. 167:5–7); *DH Belo*, 119 F.4th at 944 (trial court "uniquely entrusted" with evaluating expert testimony in context of particular case). It would be unfair to permit Warburton to testify at trial about 22q11 opinions he did not disclose in his reports, preventing Lockheed from testing them fully in discovery. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (expert report must contain "complete statement of all opinions the witness will express and the basis and reasons for them").

More importantly, with no authority for the hypothesis that the substances at issue can cause the 22q11 deletion abnormality,[11] no way to tell a random deletion from one caused by the substances, and no more than a coin flip's chance

---

[11] Warburton did cite one study in his rebuttal report about toxins being associated with de novo genetic mutations in sperm. (Doc. 473-4, p. 2.) But that study analyzed dioxins and benzene, not the substances at issue here. (Doc. 548, pp. 174:17–176:22.) Now, as explained above, the Court does not wholesale discount an expert's reliance on authority merely because it is analyzes different substances or solvents than the ones at issue. *See supra* note 5. But from a process standpoint, this post hoc citation to a single study that is about neither the substances at issue nor apparently the condition at issue reads more as damage control than part of a complex raft of authority from which the expert is drawing inferentially supported conclusions. So this citation lends Warburton's analysis about Iacovino's injuries a distinct impression of unreliability. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1199 (11th Cir. 2010) (affirming exclusion of doctor's opinion when "the literature [did] not provide the necessary support").

17

that Iacovino's parents were asymptomatic carriers, Warburton has failed to reliably "rule out" 22q11 deletions unrelated to the substances as a known common cause of Iacovino's congenital malformations. (*See* Doc. 473-2; Doc. 473-3; Doc. 481-1, p. 161:3–7; Doc. 548, pp. 171:20–172:5); *Guinn*, 602 F.3d at 1253 (reliable differential diagnosis eliminates potential causes until reaching one that cannot be ruled out or determining one most likely among those that cannot be ruled out); *Daubert*, 509 U.S. at 597 (while science "is advanced by broad and wide-ranging consideration of a multitude of hypotheses," court cannot permit jury to rely on hypotheses alone). This "because I said so" opinion does not reflect a reliable methodology. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert").

Plaintiffs' failure to shore up their expert evidence on this point is particularly notable given that the Court previously excluded opinions about 22q11 deletion—albeit under another name—nearly a year before the close of discovery. (Doc. 394, p. 10.) DiGeorge syndrome is another condition caused by 22q11 deletion. (Doc. 481-1, p. 158:9–11.) In early 2024, long before Warburton submitted the instant reports, the Court excluded his predecessor Mattison's opinions on DiGeorge syndrome as too thinly supported. (Doc. 394, p. 10.) That opinion was inadequate because it relied on just two epidemiological studies,

Keen 2020 and Brender 2008,[12] neither of which actually addressed
DiGeorge syndrome. (Doc. 135-1, pp. 22–23.) But despite this ruling, Warburton
merely repeated cites to Keen and Brender. (Doc. 473-2, p. 7.) Yet those studies
address no other phenotypes of 22q11 deletion either, making them no more
helpful to Warburton's opinion on Iacovino than they were to Mattison's opinion
on Ryo Komatsu. (*See* Docs. 135-5, 232-1.) In short, Plaintiffs had plenty of
opportunity to marshal more support for the notion that the substances caused
Iacovino's 22q11 deletion and heart and kidney issues, but they could not—which
is telling. *See Rider*, 295 F.3d at 1202 ("The courtroom is not the place for scientific
guesswork, even of the inspired sort. Law lags science; it does not lead it."
(cleaned up)).

Because Warburton's differential etiology for determining the cause of
Iacovino's injuries was unreliable, and it was layered on top of already thin
epidemiological evidence, his opinions on this point are excluded. So summary
judgment is due to Lockheed on Iacovino's claim.[13]

---

[12] The experts have referred to this study variously as Brender 2007 (Doc. 135-1, p. 23) and
Brender 2008 (Doc. 473-2, p. 7) at different points, but it is the same study, accepted in 2007 and
published in 2008. (*Compare* Doc. 135-5, *with* Doc. 484-2.)

[13] While Warburton's failure to rule out non-substance-related 22q11 deletion as a known
cause of Iacovino's injuries dooms his claim, Lockheed's argument that Warburton failed to
exclude unknown idiopathic causes for Carp-Schursky's clubfoot is not well-taken. (Doc. 485,
p. 53.) Warburton adequately explained why he found idiopathy an insufficient explanation in
Carp-Schursky's case and believed exposure in utero was the likely cause instead. (*See, e.g.*,

### C.    Johnson

Iacovino dovetails into the discussion on Benjamin Johnson, who has Klinefelter syndrome, another chromosomal anomaly. (Doc. 473-3, pp. 2, 4.) As with Iacovino, Warburton's opinion on Johnson is predicated largely on the same two studies: Brender and Keen. (Doc. 473-2, p. 7.) The Court permitted Mattison's opinion on Klinefelter syndrome, largely because the Brender study did specifically analyze Klinefelter, but the Court did not make a causation finding at that time. (Doc. 394, p. 10 n.8; *see* Doc. 135-5.) Lockheed points to perceived limitations in Keen and Brender and argues that even if the Court permits Warburton's opinion on this point as it did with Mattison, it is still not enough to raise a genuine issue of fact on causation. (Doc. 485, pp. 42–47.) This is a closer call than Iacovino, but the Court ultimately disagrees with Lockheed.

Johnson was born in 2020. (Doc. 473-3, p. 4.) He suffered from a benign heart murmur, which resolved, and Klinefelter syndrome, which is a chromosomal anomaly resulting in hormone problems. (*Id.* at 4–5.) Both of Johnson's parents

---

Doc. 481-1, p. 219:22–24.) Because Warburton provided a reasonable explanation for why he excluded unknown causes, the question of idiopathy goes to weight, not admissibility. *See Guinn*, 602 F.3d at 1253; *Trasylol*, 2010 WL 8354662, at *12. Lockheed's expert believes Carp-Schursky's clubfoot was caused by his fetal position, and Warburton does not; that is a classic clash of experts a jury should sort out. (Doc. 481-1, p. 220:6–12; *see In re Abilify (Aripiprazole) Prods. Liab. Litig.*, No. 3:16-md-2734, 2021 WL 4951944, at *3 (N.D. Fla. July 15, 2021) ("Defendants may reasonably disagree with [the plaintiff's expert's] medical conclusions, but disagreements of this sort present a proverbial battle of the experts that should be decided by a jury, not excluded.").

worked near Lockheed from 2011 to 2020. (*Id.* at 4.) Both were of advanced parental age at the time of conception, although they were healthy and had prior healthy children. (*Id.* at 4–5.) Warburton opined that age could be a contributing factor to Johnson's injuries, but he cited authority showing that advanced age is also a susceptibility factor that would make the parents more at risk of effects of the substances on their reproductive systems. (*Id.* at 5.) And he pointed out that Johnson's parents were exposed for eight years before conception, so age would not be a totally independent risk factor. (*Id.*) So, relying in part on his general causation report that cited the Keen and Brender studies in support of his conclusion that the substances can cause chromosomal disorders, Warburton concluded that Johnson's injuries were likely caused by his parents' exposures to the substances. (*Id.*; *see* Doc. 473-2, p. 7.)

Warburton's opinion on Johnson presents a different issue than Iacovino because while he cited no authority showing that the substances at issue caused 22q11 deletion, he does cite the Brender study that looked at Klinefelter specifically. (Doc. 484-2, p. 1.) Lockheed makes some valid critiques of Brender, but they are not enough to persuade the Court that Warburton's reliance on it renders his causation opinion inadmissible.

Lockheed primarily criticizes Brender by labeling it as an ecological study (Doc. 485, p. 44), which by its nature studies only populations and not individuals

and therefore can rarely demonstrate causation. *See* Ref. Man. at 561–62. Yet the study labels itself as a case–control study (Doc. 484-2, p. 1), a different study design that compares a group of individuals who have the disease against those without it to see which group has a higher proportion of exposure; this design is more useful for drawing causal inferences. *See* Ref. Man. at 559–60. Lockheed seems to label Brender an ecological study because it used proximity of residence to an industrial facility as a proxy for exposure in lieu of collecting individualized exposure assessments; this criticism is in keeping with Lockheed's theory that a precise dose is required to show causation. (*See* Doc. 485, p. 44.) But the Reference Manual provides that individual studies where all members of a group are treated as exposed and disease status is determined individually are *not* actually ecological studies. *See* Ref. Man. at 561 n.33. That seems to be the case with Brender, given that the number of individuals with each disease was broken out and everyone within a mile of the facility was treated as exposed. (*See* Doc. 484-2, p. 5.) Neither side clarified the study design in further briefing or at the hearing — though Warburton described it as the authors did, as a case–control study. (Doc. 473-2, p. 7.) In any event, the distinction is of little moment in the Court's view because Warburton adequately explained why he believed proximity was a reasonable proxy for exposure. (Doc. 481-1, pp. 187:20–190:3); *see Abilify*, 299 F. Supp. 3d at 1311 ("[I]t is crucial that the expert describe each step in the

22

process by which he gathered and assessed the relevant scientific evidence."). And
of course, the Court does not share Lockheed's view that precise dose assessments
are required to show causation. *See supra* at 8–10.

Lockheed's other criticisms of Brender are a mixed bag, too. While the
study's Klinefelter finding had a confidence interval beginning at 0.75, indicating
less than statistical significance, its overall conclusion about chromosomal
abnormalities had a significant confidence interval beginning at 1.2 — which is
what Warburton focused on in drawing his conclusions. (Doc. 481-1, p. 192:5–11;
Doc. 484-2, pp. 1, 5); *see Abilify*, 299 F. Supp. 3d at 1315–27. And it is true that the
study did not identify which chemicals were in the solvents; but while that
generality can be a problem if part of an overall unreliable opinion, it does not
make an opinion *per se* inadmissible, especially here where Warburton's report as
a whole takes pains to explain why studies of mixed solvents are relevant.
(Doc. 473-2, p. 3; Doc. 481-1, pp. 193:24–194:3; Doc. 484-2, p. 2); *see supra* note 5.
Finally, the authors of the study did conclude only that there was "some relation"
between proximity to the solvents and chromosomal anomalies, and Warburton
did go further to conclude not just association but causation — but he explained
why he did so. (Doc. 481-1, pp. 187:9–193:17; Doc. 484-2, p. 1); *cf. McClain*, 401 F.3d
at 1247 (criticizing expert who expanded application of study "beyond good
science," as opposed to study's authors). So the Brender study was not perfect, and

Warburton's reliance on it was not perfect. But perfection is not required. *See Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1298 (N.D. Fla. 2017) ("An expert's method need not be perfect, nor must he apply it perfectly." (cleaned up)).

Lockheed similarly criticized Warburton's reliance on the Keen study. (Doc. 485, p. 43.) True, Keen is about Down syndrome and not Klinefelter, a different type of chromosomal disorder. (Doc. 484-1.) And this Court excluded Mattison's Digeorge opinion in part because of his reliance on Keen, given that Digeorge is also not Down syndrome. (Doc. 394, p. 10.) But Warburton clarified that *his* reliance on Keen was intended to show how the similar mechanism of exposures caused disruptions to chromosomes. (Doc. 481-1, p. 185:1–186:10); *see Abilify*, 299 F. Supp. 3d at 1306 & n.17 (biologically plausible mechanisms of action are valid secondary methodology when paired with primary epidemiological evidence). And he noted that Down is a much more common syndrome than Klinefelter, suggesting it is likely more well-studied—giving a concrete explanation for the limitations of the science and why his reliance on Keen was appropriate in context. (*See* Doc. 481-1, p. 250:8–19); *Allison*, 184 F.3d at 1321 ("Striking the appropriate balance may sometimes be a difficult task . . . particularly daunting when the dispute, as in this case, concerns matters at the very cutting edge of scientific research, where fact meets theory." (cleaned up)).

Warburton also cited studies in his specific causation report showing that

"[i]ncreasing risks of anomalies with increasing parental age are thought to be driven largely by the cumulative impacts of environmental exposures." (Doc. 473-3, p. 5.) Not only are these studies additional epidemiological support for Warburton's opinion, but they place Brender's conclusion—which found a connection between solvent exposure and increased chromosomal anomalies with older mothers specifically—in important context. (*See* Doc. 484-2, p. 1.) Warburton's conclusion is not just that the exposure of Johnson's parents, both of whom worked near Lockheed for a decade before conception, caused his chromosomal anomaly, but also that they were both particularly susceptible to those effects because they were chronically exposed as they entered advanced parental age. (*See* Doc. 473-3, p. 5; Doc. 473-4, p. 2.) And that conclusion is bolstered by more science than just Brender and Keen.

In sum, on all of the points Lockheed criticizes, Warburton rejected Lockheed's assumptions, sufficiently explained what he drew from the studies and why, and connected his conclusions to his understanding of how these substances work in the body. (Doc. 481-1, pp. 182:17–209:2.) Warburton's opinions on Johnson are more thinly sourced than some of his others. But Lockheed's objections about the inadequacies of Brender go to weight, not admissibility. *See Quiet Tech.*, 326 F.3d at 1345. And it is the jury's job to evaluate the persuasiveness of the experts and the correctness of the science, not the Court's. *See Allison*,

184 F.3d at 1312; *Ambrosini*, 101 F.3d at 141. So the Court finds, consistent with its earlier ruling on Mattison, that Warburton's opinions on Klinefelter and Johnson are sufficiently reliable. Construing all the evidence in the light most favorable to Plaintiffs, Johnson has raised a genuine issue of material fact on both general and specific causation to proceed to trial.

### D.    Turk

Finally, as to Jack Turk, Lockheed argues that Plaintiffs cannot prove his mother was exposed to the substances at a critical point of her pregnancy to cause his cleft lip and palate, so they cannot raise a genuine issue of fact on specific causation. (Doc. 485, p. 9.)

Cristina Eichstaedt, Turk's mother, worked at the Golf Channel building near Lockheed from 2008 to 2015, when she moved to Miami. (Doc. 474-5, pp. 22:24–23:24.) Turk's father also worked at the Golf Channel from 2011 to 2014. (Doc. 473-3, p. 6.) Turk was conceived in July 2017 once the family had moved to Miami. (Doc. 482-5, p. 88:23–25.) Eichstaedt then started freelancing for the Golf Channel again when she was pregnant with Turk in 2017, driving up to Orlando to work periodically. (Doc. 474-5, p. 24:11–22.) Turk was born in April 2018 with a cleft lip and palate. (Doc. 481-3, p. 5.)

Reviewing this history, Warburton noted that both of Turk's parents were exposed to the substances for years at the Golf Channel prior to his conception.

(Doc. 473-3, p. 6.) He also noted that Eichstaedt was near the Lockheed facility during the critical window of time when Turk's lip and palate were developing during her first trimester. (*Id.*) He ruled out any family history of congenital anomalies and found that Turk's older brother's autism was not relevant. (*Id.*) He concluded that exposure to the substances was the likely cause of Turk's cleft lip and palate. (*Id.*)

Warburton expounded on the mechanism that causes clefting in his deposition, explaining that maternal inhalation of the substances during the first eight to twelve weeks of pregnancy would cause them to cross the placenta and interfere with the fetus's orofacial structural development. (Doc. 481-1, pp. 64:23–17.) But Warburton's opinion was not limited to maternal inhalations; he also testified that paternal inhalation could impact the DNA in sperm, which could then affect the fertilized embryo. (*Id.* at 66:14–22, 82:11–14.)

At the hearing on the motion, Warburton also testified that a mother would not need to be exposed every day during the palatial formation because the substances get stored in the lipid membranes and carried around. (Doc. 548, pp. 28:25–29:7.) He added that exposures to the mother's egg even before conception is relevant. (*See id.* at 29:16–25.)

In light of the importance of the first trimester exposure, Eichstaedt's deposition was not all that clear about the timeline of when she was driving up to

Orlando freelancing at the Golf Channel during her pregnancy with Turk. But she testified that "I definitely worked there when I was pregnant . . . ." (Doc. 474-5, p. 25:12–13.) She testified that she found out about her pregnancy with Turk about seven or eight weeks in. (*Id.* at 91:3–18.) And though she could not place it exactly, she repeated, "I know that I worked [there] while I was pregnant." (*Id.* at 92:1–2.)

Based on Eichstaedt's deposition testimony, Lockheed moved for summary judgment on Turk's claim, arguing that Plaintiffs cannot raise a genuine issue of material fact that Eichstaedt exposed Turk in utero during her first trimester to cause his clefting. (Doc. 485, p. 14.) In response, Plaintiffs submitted a declaration from Eichstaedt, signed in May 2025 four months after her deposition, with two pieces of evidence showing she was in Orlando working at the Golf Channel during her first trimester: a work history showing that she began freelancing in March 2017, and a family picture in Orlando from early August 2017. (Doc. 494-2.) Lockheed then moved to strike the declaration as both untimely and a sham. (Doc. 497; *see* Doc. 498.)

Because Eichstaedt was adamant in her deposition that she did visit the Golf Channel during her pregnancy with Turk, the Court cannot conclude that her declaration—which clarifies rather than contradicts that testimony—is a sham. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) ("[A] party cannot give clear answers to unambiguous questions in a deposition and thereafter raise

an issue of material fact in a contradictory affidavit that fails to explain the contradiction." (cleaned up)); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.").

But the declaration, which was served months after both the deposition and the close of discovery, is undoubtedly untimely. (Doc. 420.) It would be fundamentally unfair to Lockheed to permit Plaintiffs to submit substantive evidence in opposition to summary judgment so belatedly with no showing that Eichstaedt (and Plaintiffs' counsel) could not access and disclose this information earlier. (*See* Doc. 81, p. 3 ("[T]he Court will diligently enforce this CMSO . . . .")); Fed. R. Civ. P. 16(b)(4) (deadlines in scheduling orders may be modified only with good cause); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (good cause requires that party cannot meet deadline despite diligence); Fed. R. Civ. P. 26(e) (requiring timely supplementation of disclosures); Fed. R. Civ. P. 37(c)(1) (failure to provide information may result in exclusion unless substantially justified or harmless); *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014) (failure to supplement justifies striking affidavit submitted in opposition to summary judgment). So the declaration is due to be stricken on those grounds.

That said, even without the declaration, Warburton's opinions, together with Eichstaedt's deposition testimony, raise a genuine issue of fact on specific causation as to Turk. Construing her deposition testimony in the light most favorable to Plaintiffs, Eichstaedt learned of her pregnancy soon after Turk's conception and worked near Lockheed periodically during her pregnancy. (Doc. 474-5, pp. 25:12–13, 91:3–18, 92:1–2.) And Warburton opined that both parents' exposures before Turk's conception, in addition to Eichstaedt's exposures while Turk was in utero, caused or contributed to his injuries. (Doc. 473-2, p. 7; Doc. 473-3, p. 6; Doc. 481-1, pp. 64:23–17, 66:14–22, 82:11–14; Doc. 548, pp. 28:25–29:7, 29:16–25.) Is it enough to convince a jury? That's not for the Court to say. But it is enough to pass summary judgment. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). So Turk's claim proceeds.

### CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1.    Lockheed's motion for summary judgment and to exclude Warburton (Doc. 485) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

   a.    The motion is **GRANTED** as to the claims of Michael D.

Iacovino and his parents.

    b.    The motion is **DENIED** as to the claims of Harrison Carp-Schursky, Benjamin Johnson, Jack Turk, and their parents, which will proceed to a joint trial.

2.    Co-Defendant Universal City Property Management Company III, LLC's motion adopting Lockheed's arguments (Doc. 495) is **GRANTED IN PART AND DENIED IN PART** for the same reasons.

3.    Lockheed's earlier redacted version of its motion (Doc. 478) is **DENIED AS MOOT**.

4.    In its discretion given the number of parties involved, the Court has been entering piecemeal judgments as to particular Plaintiffs once their claims are resolved in full. *See* Fed. R. Civ. P. 54(b). So the Clerk is **DIRECTED** to enter judgment in favor of both Defendants and against Plaintiffs Michael D. Iacovino, Dawn Iacovino, and Michael L. Iacovino. The Clerk is further **DIRECTED** to terminate those Plaintiffs as parties to this action.

5.    Lockheed's motion to strike the declaration of Cristina Eichstaedt (Doc. 497) is **GRANTED**. Eichstaedt's declaration (Doc. 494-2) is **STRICKEN**. The Court did not consider it in connection with summary judgment.

6.    Plaintiffs' motion to exclude Lockheed's purportedly untimely general causation opinions (Doc. 471) is **DENIED**. The Court previously ruled that it would take general and specific causation up together on the full scientific record, which it has now done. (Doc. 370.)

7.    The Court **TAKES UNDER ADVISEMENT** Plaintiffs' motions to exclude Lockheed's competing experts (Docs. 465, 467, 469), which do not impact summary judgment. A ruling on those motions will issue in due course.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 12, 2025.



ROY B. DALTON, JR.
United States District Judge